Hearing Date: December 15, 2011 at 10:00 A.M. (prevailing Eastern Time)
Objection Deadline: December 8, 2011 by 4:00 P.M. (prevailing Eastern Time)

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Proposed Counsel for the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GENERAL MARITIME CORPORATION, et al., | : | Case No. 11-15285 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |

---------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION, IN FURTHERANCE OF THEIR OBLIGATIONS
UNDER THE DEBTORS-IN-POSSESSION CREDIT AGREEMENT, FOR ENTRY OF
(I) AN ORDER APPROVING (A) BIDDING PROCEDURES, (B) ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND (C) BREAK-UP FEE AND EXPENSE
REIMBURSEMENT IN CONNECTION WITH THE POTENTIAL AUCTION AND
SALE OF THE DEBTORS' ASSETS AND (II) AN ORDER (A) APPROVING THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS AND ENCUMBRANCES, AND (B) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
<u>CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH</u>**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     On November 23, 2011, General Maritime Corporation ("**General Maritime**")
and substantially all of its direct and indirect subsidiaries, as chapter 11 debtors and debtors-in-
possession (each a "**Debtor**" and collectively the "**Debtors**," and together with their non-Debtor
affiliates, the "**Company**") filed the Debtors' Motion, in Furtherance of Their Obligations Under
The Debtor-In-Possession Credit Agreement, for Entry of (I) an Order Approving (A) Bidding
Procedures, (B) Assumption and Assignment Procedures, and (C) Break-Up Fee and Expense
Reimbursement in Connection With The Potential Auction and Sale of the Debtors' Assets and
(II) an Order (A) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of
All Liens, Claims and Encumbrances, and (B) Authorizing the Assumption and Assignment of
Certain Executory Contracts and Unexpired Leases in Connection Therewith (the "**Motion**").

2.       A hearing (the "**Hearing**") to consider the Motion shall be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room 501 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, on **December 15, 2011 at 10:00 a.m. (prevailing Eastern time)**, or as soon thereafter as counsel may be heard.

3.       Any objections to the Motion must be in writing, filed with the Court (with a copy to Chambers) in accordance with General Order M-242, and served upon (i) proposed counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Kenneth Eckstein, Esq.,  Adam C. Rogoff, Esq. Douglas Mannal, Esq., and Stephen D. Zide, Esq.; (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Paul K. Schwartzberg, Esq.; (iii) the Debtors' material prepetition lenders and proposed postpetition lenders or any agent therefore, Nordea Bank Finland PLC, New York Branch, as Administrative Agent under the 2011 Facility and 2010 Facility, 437 Madison Avenue, 21st Floor, New York, New York 10022, Attn: Shipping and Offshore Oil Services; OCM Administrative Agent LLC, as Administrative Agent under the OCM Facility c/o Oaktree Capital Management L.P., 333 South Grand Ave., 28th Floor, Los Angeles, California 90071, Attn: Amy Rice, (iv) counsel for the Debtors' material prepetition lenders and proposed postpetition lenders: White & Case, 1155 Avenue of the Americas, New York, New York 10036-2787, Attn: Scott Greissman, Esq.; Kirkland & Ellis, 601 Lexington Avenue, New  York, New York 10022, Attn: Edward O. Sassower, Esq. and Brian Schartz, Esq.; (v) the indenture trustee for the Debtors' Senior Notes, The Bank of New York Mellon, 101 Barclay Street, 8 West, New York, New York 10286, Attn: Beata Harvin; (vi) counsel for the ad hoc committee of Senior Notes, Jones Day, 222 East 41st Street, New York, New York 10017-6702, Attn: Paul Leake, Esq. and Pedro A. Jimenez, Esq.; (vii) counsel for any statutory committee appointed in these Chapter 11 Cases; (viii) the U.S. Securities and Exchange Commission; (ix) the Internal Revenue Service; and (x) any party filing a notice of appearance and request for service of papers in each case so as to be received no later than, **December 8, 2011 at 4:00 p.m. (prevailing Eastern Time)** (the "**Objection Deadline**").

4.       **Your rights may be affected.  You should read these papers carefully and discuss them with your attorney if you have one in these bankruptcy cases. If you do not have an attorney in these bankruptcy cases, you may wish to consult one.**

5.       If no objections are timely filed and served with respect to the Motion or any claim set forth thereon, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard offered to any party.

6.       A copy of the Motion can be viewed and obtained on the Court's website at www.ecf.nysb.uscourts.gov or (without charge) on the Debtors' restructuring website at www.GMRRestructuring.com.

Dated: New York, New York
November 23, 2011

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/  Adam C. Rogoff
Kenneth H. Eckstein
Adam C. Rogoff
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Proposed Counsel for the Debtors*

**Hearing Date: December 15, 2011 at 10:00 A.M. (prevailing Eastern Time)**
**Objection Deadline: December 8, 2011 by 4:00 P.M. (prevailing Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re:                                                          :    Chapter 11
                                                                :
GENERAL MARITIME CORPORATION, et al.,    :    Case No. 11-15285 (MG)
                                                                :
                                            Debtors.           :    Jointly Administered

-----------------------------------------------------------------x

**DEBTORS' MOTION, IN FURTHERANCE OF THEIR OBLIGATIONS UNDER
THE DEBTOR-IN-POSSESSION CREDIT AGREEMENT, FOR ENTRY OF
(I) AN ORDER APPROVING (A) BIDDING PROCEDURES, (B) ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND (C) BREAK-UP FEE AND EXPENSE
REIMBURSEMENT IN CONNECTION WITH THE POTENTIAL AUCTION AND
SALE OF THE DEBTORS' ASSETS AND (II) AN ORDER (A) APPROVING THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF
ALL LIENS, CLAIMS AND ENCUMBRANCES, AND (B) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Proposed Counsel for the Debtors*

TABLE OF CONTENTS

**Page**

**Preliminary Statement**.................................................................................................2

**Jurisdiction** .................................................................................................................5

**Background** ................................................................................................................6

    The DIP Facility.........................................................................................................9

**Part I**

    A.     The Bidding Procedures..................................................................................11

    B.     The Assignment Procedures ..........................................................................16

**Part II**

    C.     The Sale Hearing............................................................................................17

    D.     Extraordinary Provisions of the Proposed Sale Order ..................................18

**Relief Requested**..........................................................................................................19

**Basis for Relief Requested**..........................................................................................19

**Part I Relief**

    A.     The Bidding Procedures Are in the Best Interests of the Debtors'
          Estates and Should Be Approved....................................................................20

    B.     The Break-Up Fee and Expense Reimbursement Should Be Approved .............22

    C.     The Notice of Stalking Horse, Auction, and Sale Should Be Approved ..............25

    D.     The Assignment Procedures Should Each be Approved ......................................26

**Part II Relief**

    E.     The Sale of the Assets Should Be Approved.......................................................27

    F.     The Assets Should Be Sold Free and Clear .......................................................28

    G.     Successor Liability..............................................................................................31

    H.     The Senior Lenders are Good Faith Purchasers..................................................32

    I.      In the Event of an Auction, the Assumption and Assignment of the
          Assumed Contracts and Leases Should be Approved..........................................34

    J.     Assignment of Assumed Contracts and Leases with Anti-Assignment Provisions
          is Appropriate.....................................................................................................35

EXHIBITS

Exhibit 1 --  Proposed Bidding Procedures Order
            Annex A -- Bidding Procedures
            Annex B -- Assignment Procedures
            Annex C -- Notice of Stalking Horse, Auction, and Sale

TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Allstate Ins. Co. v. Hughes*, 174 B.R. 884 (S.D.N.Y. 1994) ........................................33

*Bace v. Babbitt*, No. 07 Civ. 2420 (WHP), 2008 WL 800579 (S.D.N.Y. Mar. 25, 2008) ............33

*Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343 (E.D. Pa. 1988) ...............29

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983)........................................................................22

*Douglas v. Stamco*, 363 F. App'x 100 (2d Cir. 2010) ....................................................32

*FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002)..................................29

*Hargrave v. T'ship of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855 (Bankr. D.N.J. 1994) ........29

*In re Adelphia Bus. Solutions, Inc.*, No. 02-11389 (REG)
(Bankr. S.D.N.Y. Dec. 16, 2002)........................................................................24

*In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM),
97 Civ. 2241 (MBM), 1997 WL 283412 (S.D.N.Y. 1997)............................................34

*In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) ....................................................34

*In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) ..........................24

*In re Bradlees Stores, Inc.*, No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2001).....................24

*In re Cabrini Med. Ctr.*, Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009).................24

*In re Child World, Inc.*, 142 B.R. 87 (Bankr. S.D.N.Y. 1992) ......................................34

*In re Chrysler LLC*, 576 F.3d 108 (2d Cir. 2009)..........................................................27

*In re Dundee Equity Corp.*, No. 89-B-10233,
1992 Bankr. LEXIS 436 (Bankr. S.D.N.Y. Mar. 6, 1992) ............................................28

*In re Enron Corp.*, No. 1-16034 (AJG), 2004 WL 5361245
(Bankr. S.D.N.Y. Feb. 5, 2004) ........................................................................29

*In re First Republic Group Realty, LLC*,
2010 WL 3638032 (Bankr. S.D.N.Y. Aug. 18, 2010) (Glenn, J.) ................................21

*In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.)*,
Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009)........................................31

In re Gen. Motors Corp., 407 B.R. 463 (Bankr. S.D.N.Y. 2009) ...................................................27

In re GSC, Inc., 453 B.R. 132 (Bankr. S.D.N.Y. 2011)...................................................................21

In re Ionosphere Clubs, Inc., 100 B.R. 670 (Bankr. S.D.N.Y. 1989) ............................................34

In re Iridium Operating LLC, 478 F.3d 452 (2d Cir. 2007)......................................................19, 21

In re Levitz Home Furnishings, Inc., No. 05-45189 (BRL) (Bankr. S.D.N.Y. Dec. 14,
    2005) .........................................................................................................................................30

In re Loral Space & Commc'ns Ltd., No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 18,
    2003) .........................................................................................................................................24

In re Magellan Health Servs., Inc., No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003) ..........24

In re Metaldyne Corp., 409 B.R. 661 (Bankr. S.D.N.Y. 2009) (Glenn, J.) .............................23, 24

In re Old Carco LLC (f/k/a/ Chrysler LLC), 406 B.R. 180 (Bankr. S.D.N.Y. 2009)..............20, 34

In re Old Carco LLC (f/k/a/ Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y.
    Jun. 1, 2009).............................................................................................................................31

In re Oneida Lake Dev., Inc., 114 B.R. 352 (Bankr. N.D.N.Y. 1990) ..........................................30

In re Smart World Tech., LLC, 423 F.3d 166 (2d Cir. 2005).........................................................28

In re Stein & Day, Inc., 113 B.R. 157 (Bankr. S.D.N.Y. 1990) ....................................................33

In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003)......................................................31

Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.),
    111 F.3d 269 (2d Cir. 1997)....................................................................................................33

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380 (2d Cir. 1997)....................31, 33

Myers v. Martin (In re Martin), 91 F.3d 389 (3d Cir. 1996) .........................................................22

N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201 (2d Cir. 2006) .......................................................32

Official Comm. of Sub. Bondholders v. Integrated Resources, Inc. (In re Integrated
    Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992)...............................................21, 22, 23, 24

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095 (2d
    Cir. 1993) ..................................................................................................................................20

Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.), 430 B.R. 65 (S.D.N.Y.
    2010) .........................................................................................................................................20

Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303 (5th Cir. 1985)............................20

Sharon Steel Corp. v. National Fuel Gast Distrib. Corp. (In re Sharon Steel Corp.), 872
    F.2d 36 (3d Cir. 1989)............................................................................................................34

Shoppers World Community Ctrs., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores,
    Inc.), 2001 WL 1112308 (S.D.N.Y. Sept. 21, 2001) ...............................................................36

Southern Boulevard, Inc. v. Martin Paint Stores, 207 B.R. 57 (S.D.N.Y. 1997) .........................36

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Proposed Counsel for the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re:                                               :    Chapter 11
                                                     :
GENERAL MARITIME CORPORATION, et al.,                :    Case No. 11-15285 (MG)
                                                     :
                               Debtors.              :    Jointly Administered
---------------------------------------------------------------x

**DEBTORS' MOTION, IN FURTHERANCE OF THEIR OBLIGATIONS UNDER
THE DEBTOR-IN-POSSESSION CREDIT AGREEMENT, FOR ENTRY OF
(I) AN ORDER APPROVING (A) BIDDING PROCEDURES, (B) ASSUMPTION AND
ASSIGNMENT PROCEDURES, AND (C) BREAK-UP FEE AND EXPENSE
REIMBURSEMENT IN CONNECTION WITH THE POTENTIAL AUCTION AND
SALE OF THE DEBTORS' ASSETS AND (II) AN ORDER (A) APPROVING THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF
ALL LIENS, CLAIMS AND ENCUMBRANCES, AND (B) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

General Maritime Corporation ("**General Maritime**") and substantially all of its

direct and indirect subsidiaries, as chapter 11 debtors and debtors-in-possession (each a

"**Debtor**" and collectively the "**Debtors**," and together with their non-Debtor affiliates, the

"**Company**") in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), hereby file

this Motion (the "**Motion**"), in furtherance of their obligations under their debtor-in-possession

credit agreement (the "**DIP Credit Agreement**"), for entry of (i) an order, substantially in the

form attached hereto as **Exhibit 1** (the "**Bidding Procedures Order**"), approving, solely in the event of a "Trigger Event" (as defined herein) (a) bidding procedures in connection with the potential auction (the "**Auction**") and sale of substantially all of the Debtors' assets (the "**Assets**"), substantially in the form annexed to the Bidding Procedures Order as Annex A (the "**Bidding Procedures**"), (b) procedures for the assumption and assignment of certain executory contracts and unexpired leases related thereto (the "**Assumed Contracts and Leases**"), substantially in the form annexed to the Bidding Procedures Order as Annex B (the "**Assignment Procedures**," and together with the Bidding Procedures, the "**Sale Procedures**"), and (c) a break-up fee (the "**Break-Up Fee**") and expense reimbursement (the "**Expense Reimbursement**") in connection the Auction and Sale (as defined below) (the foregoing relief to be sought in "**Part I**" of the Motion); and (ii) an order to be submitted to the Bankruptcy Court for approval at a later date (the "**Sale Order**"), (a) approving the asset purchase agreement (the "**APA**") to be entered into between the Debtors and the purchaser of the Assets (the "**Purchaser**"), (b) authorizing a sale of the Assets free and clear of all liens, claims and encumbrances in accordance with the Bidding Procedures and pursuant to the APA (the "**Sale**"), and (c) authorizing the assumption and assignment of the Assumed Contracts and Leases (such relief to be sought in "**Part II**" of the Motion, as amended by a supplement to be filed at a later date). In support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    The Debtors are fortunate to have reached agreement on an equity commitment pursuant to which an affiliate of Oaktree Capital Management L.P. ("**OCM**") will provide $175 million in new cash as part of a plan of reorganization (the "**Plan**") that

has the requisite support of the Prepetition Senior Lenders (as defined below).[1]  The Debtors have also negotiated a $75 million DIP Facility that should provide adequate funding for these Chapter 11 Cases as well as the key terms of the Debtors' senior debt that include significant concessions from the Prepetition Senior Lenders.[2]  With these important benefits in hand, and the ability to conduct a marketing process in an effort to improve on the proposed equity commitment, thereby achieving an even better deal for stakeholders, the Debtors fully expect to present the Court with a confirmable plan of reorganization on the contemplated timetable.  The present Motion addresses only the scenario in which for some reason that result is not achieved.

2.     As set forth in the Debtors' motion seeking approval of the DIP Credit Agreement (the "**DIP Motion**"), the lenders under the DIP Credit Agreement (the "**DIP Lenders**"), mindful of the risks and costs associated with an extended chapter 11 case, conditioned their agreement to lend on the Debtors' commitment to achieve certain restructuring milestones (the "**Lenders' Milestones**"), and, moreover, negotiated for the right to protect the value of their collateral in the event that the Debtors fail to achieve the Lenders' Milestones.  Specifically, the DIP Credit Agreement requires the Debtors to obtain pre-approval of the procedures for the sale of their assets (i.e., the Sale Procedures) that will take effect in the event of – and <u>only</u> in the event of – notice by the administrative and collateral agent under the DIP Credit Agreement (the "**DIP Agent**") at the direction of the Directing Parties (as defined below) of the Debtors' noncompliance with any of the

---

[1] On November 22, 2011, the Debtors filed the Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into an Equity Commitment Agreement and to Pay Certain Fees in Connection Therewith (the "**ECA Motion**") [Docket No. 49].

[2] On November 18, 2011, the Court entered an order approving the DIP Credit Agreement on an interim basis (the "**Interim DIP Order**") [Docket No. 32].

Lenders' Milestones (a "**Trigger Event**").  The Debtors are filing this Motion to comply with their obligations under the DIP Credit Agreement.  The procedures sought to be approved here will be implemented only in the event that the Plan is derailed and the Debtors are otherwise unable to achieve the Lenders' Milestones.

3.     The Bidding Procedures provide that immediately upon a Trigger Event, the Debtors will enter into either: (a) an asset purchase agreement providing for the credit bid of up to the full amount of the claims of the Prepetition Senior Lenders and DIP Lenders (together, the "**Senior Lenders**") for the Assets (the "**Lender Stalking Horse Agreement**"), with a Break-Up Fee and Expense Reimbursement to be paid to the Senior Lenders in the event that the Debtors and the Senior Lenders enter into the Lender Stalking Horse Agreement but the Senior Lenders are not the Successful Bidder (as defined below); or (b) within 10 business days of the Trigger Event, an alternative stalking horse agreement with alternative bidder(s), so long as that alternative provides for (i) the payment in full in cash of the Prepetition Senior Facilities (as defined below) and the DIP Facility (as defined below) or (ii) other treatment satisfactory to the Senior Lenders (the "**Alternative Stalking Horse Agreement**").  In addition, the Bidding Procedures set forth, among other things: (w) deadlines and procedures for notices, objections, and bids; (x) procedures for the marketing of the Assets; (y) procedures for the submission and consideration of qualified bids; and (z) procedures governing an Auction and Sale Hearing.

4.     The Assignment Procedures set forth procedures related to the assumption and assignment of those executory assets and unexpired leases related to the Assets whose assignment is contemplated by the Sale, including procedures for providing notice of assignment to parties to such Assumed Contracts and Leases.

5.      The Debtors and the DIP Lenders agreed that entry of an order approving the Bidding Procedures and the Assignment Procedures (i.e., the relief sought in Part I of the Motion) is one precondition, among others, to entry of a final order approving the DIP Motion.  Thus, both to ensure compliance with the terms of the DIP Credit Agreement and because the Debtors believe the procedures contemplated thereby are fair and reasonable and in their best interests, the Debtors will seek entry of the Bidding Procedures Order at the initial, scheduled hearing for this Motion.

6.      Because the relief sought in the Sale Order – approval of the Sale, the APA, the assumption and assignment of the Assumed Contracts and Leases, and notices and proposed procedures in connection therewith (i.e., the relief sought in Part II of the Motion) – will only be necessary in the event of a Sale, a form of proposed order, with the appropriate attachments, will be submitted to the Court, if necessary, in advance of any Sale Hearing.

## JURISDICTION

7.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**").

- 5 -

<u>**BACKGROUND**</u>

10.     On November 17, 2011 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are jointly administered for procedural purposes only.

11.     The Debtors are operating their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

12.     The Debtors, directly or indirectly through their non-Debtor affiliates, operate as one of the world's leading providers of international seaborne transportation services for crude oil and refined petroleum products, owning one of the largest fleets of oil tankers engaged in worldwide trade.  They operate in over 230 ports of call located in over 70 countries, including in the Caribbean, South and Central America, the United States, West Africa, the Mediterranean, Europe, the Far East, China, and the North Sea.[3]  As of the Petition Date, the Debtors' fleet consisted of thirty wholly-owned vessels and three chartered-in vessels (together, the "**Vessels**"), with a total carrying capacity of approximately 5.3 million deadweight tons.  Each Vessel is owned or chartered by a separate Debtor entity. The Vessels are registered (also known as "flagged") in Bermuda, Liberia, or the Marshall Islands.

13.     The Company's global headquarters, located in Manhattan, New York, oversees all major corporate and operating decisions, including arranging for Vessel charters and monitoring fleet operations, Vessel positions, and coordinating global spot market voyage charter rates.  Certain non-Debtor affiliates also maintain local offices in Portugal and Russia,

---

[3] Although the Debtors' Vessels often call on ports located in the United States, they are not permitted to provide cargo transportation services between two ports in the United States.  As such, voyages for the Debtors' vessels do not involve both a loading and unloading of cargo in ports in the United States, as the Debtors are not qualified to do so under provisions of 46 U.S.C. §§ 12103 and 50501 (together, the "**Jones Act**").  The Jones Act, among other things, governs the transport of goods or passengers between ports in the United States.

which assist in the daily operations of the Vessels.[4]  As of the Petition Date, the Company has over 1,000 employees consisting of administrative, office, and seaborne personnel located throughout the world.

14.     General Maritime, a public company, is the direct or indirect parent company of all of the other Debtors. The Debtors can be generally classified into three categories: (a) direct or indirect holding companies; (b) Vessel owning or Vessel chartering companies; and (c) inactive companies.  In addition, the Debtors have six direct or indirect non-Debtor subsidiaries generally responsible for operating the Debtors' offices located outside of the United States including the technical management of certain of the Vessels, and the procurement of crews for certain of the Vessels.[5]

15.     As of September 30, 2011, the Company had recorded consolidated liabilities totaling approximately $1,412,647,000.  For the twelve months ending September 30, 2011, the Company's consolidated net voyage revenue was approximately $201.7 million.[6]

16.     The Debtors generate substantially all of their revenues by chartering their fleet of Vessels to third-party customers.   The Debtors' largest customers include major international oil companies, oil producers, and oil traders such as BP, Chevron Corporation, CITGO Petroleum Corp., ConocoPhillips, Exxon Mobil Corporation, Hess Corporation, Lukoil Oil Company, Stena AB, and Trafigura.  These charters occur principally through either (i) "time charters" for specified charter periods (which can range from months to years in charter duration), or (ii) specific purpose charters obtained through the global "spot market," whereby

---

[4] The Company's local office in India was closed as of October 31, 2011. The three employees in India are operating out of the office of one of the Company's ship managers.

[5] One Debtor entity is also responsible for the day-to-day operations of certain of the Vessels.

[6] "Net voyage revenues" are voyage revenues minus voyage expenses (generally consisting of port, canal, and fuel costs unique to a particular voyage, which under a time charter are paid by a charterer).

the Debtors' charter Vessels only for specific individual voyages. To alleviate the risks associated with highly sensitive rates in the oil tanker industry, the Debtors use time charters for part of the fleet to provide greater cash flow stability, and the spot market for the balance of their Vessels to obtain the benefit of improvements in market rates. Generally, vessels operating in the spot market generate increased profit margins during improvements in tanker rates, while vessels operating on time charters provide more predictable cash flows.

17.    The vast majority of the Debtors' liabilities – approximately $1.3 billion – relates to borrowed debt comprised of the following: (i) $550 million under a credit facility dated May 6, 2011 (the "**2011 Facility**"), with Nordea Bank Finland PLC, New York Branch ("**Nordea**," or the "**Prepetition Senior Agent**"), as Administrative Agent and Collateral Agent and certain other lenders party thereto (collectively, the "**2011 Secured Lenders**"); (ii) $328.2 million under a credit facility dated May 6, 2011 (the "**2010 Facility,**" and with the 2011 Facility, the "**Prepetition Senior Facilities**"), with Nordea as administrative agent and certain other lenders party thereto (collectively, the "**2010 Secured Lenders**," and with the 2011 Secured Lenders, the Prepetition Senior Lenders); (iii) $200 million under a credit facility dated May 6, 2011 (the "**OCM Facility**"), with OCM Administrative Agent, LLC,  as administrative agent; and (iv) $300 million of senior notes due 2017 (the "**Senior Notes**") under an indenture dated November 12, 2009, with Bank of New York Mellon ("**BNYM**") as indenture trustee.

18.    The Debtors operate in a highly competitive and challenging business environment. For the past three years, the oil tanker industry has experienced a decrease in global demand for its services. At the same time, the industry suffers from an oversupply of tankers competing for that dwindling demand. As a result, despite occasional improvements, charter rates for oil tankers dropped sharply from 2008 to 2011.

19.    The industry's prolonged drop in charter rates directly and adversely affected the Debtors' operating results.  Although the Debtors' average fleet size increased from 21.5 to 34.6 over the last three years, their full year adjusted EBITDA decreased from $127.8 million in 2008, to $100.8 million in 2010, to $51.1 million for the twelve months ended September 30, 2011.  As noted, the Debtors historically balance their fleet with time charters and spot market charters.  Several of the Debtors' time charters with higher charter rates than the prevailing spot market expired within the few months prior to the Petition Date.  This increased the Debtors' exposure to the depressed market for spot tanker rates, thereby resulting in negative cash flows.  Despite these revenue challenges which have affected the entire industry, the Debtors believe that they have strong operations with a high-quality fleet.

20.    A more detailed description of the Company's operations, capital structure, and the events leading up to the commencement of these Chapter 11 Cases is contained in the Declaration of Jeffrey D. Pribor Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions and Applications filed on the Petition Date.

## THE DIP FACILITY

21.    On the Petition Date, the Debtors entered into a fully underwritten $75 million debtor-in-possession financing facility (the "**DIP Facility**"), agented by Nordea and the DIP Lenders.[7]  The DIP Facility provides the Debtors with $75 million of "new money" to (i) address the Debtors' current liquidity needs, (ii) make immediate payments to critical and foreign vendors to minimize disruption to their international operations, and (iii) provide the Debtors with sufficient time to restructure their over-levered balance sheet and preserve the

---

[7] The "**DIP Lenders**" include Citigroup Global Markets Inc. (for and on behalf of itself, Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as may be appropriate, DnB NOR Bank ASA, HSH Nordbank AG, Nordea Bank Finland plc, New York Branch, Skandinaviska Enskilada Banken AB (Pub.) and The Royal Bank of Scotland.

value of their businesses as a going concern. The Debtors entered into the DIP Facility with the DIP Lenders pursuant to the terms and conditions of the DIP Credit Agreement. On November 18, 2011, the Court entered the Interim DIP Order [Docket No. 32].

22.    The DIP Credit Agreement provides for the following Lenders' Milestones in connection with the reorganization of the Debtors' business pursuant to a plan of reorganization satisfactory to the Directing Parties[8] (as defined more fully in the DIP Credit Agreement, an "**Acceptable Plan**"):

a.    the Debtors shall (x) obtain a binding written commitment and support agreement in form and substance acceptable to the Directing Parties from one or more third parties (each, an "**Investor**" and together, the "**Investors**") regarding the terms of such Investors' funding of the New Equity Amount[9] and such Investors' support for an Acceptable Plan and (y) file with the Bankruptcy Court an Acceptable Plan and a disclosure statement in respect thereof, in each case on or before the 75th day after the Petition Date; [10] and

b.    the Debtors shall obtain an order of the Bankruptcy Court, in form and substance satisfactory to the Directing Parties, approving a disclosure statement in respect of an Acceptable Plan and authorizing solicitation of such Acceptable Plan on or before the 135th day after the Petition Date; and

c.    the Debtors shall obtain an order of the Bankruptcy Court, in form and substance satisfactory to the Directing Parties, confirming an Acceptable Plan, and such Acceptable Plan

---

[8] "Directing Parties" is defined in the DIP Credit Agreement and includes a certain number of the members of either the Steering Committee (as defined in the DIP Credit Agreement) or the Required Lenders (as defined in the DIP Credit Agreement) under each or both of the Prepetition Senior Facilities, provided that in the event of a disagreement or inconsistency between the Steering Committee and such Required Lenders, the vote of the Required Lenders shall control.

[9] "New Equity Amount" is defined in the DIP Credit Agreement to mean new equity (or similar) capital that provides proceeds, in an amount satisfactory to the Directing Parties, to the reorganized Debtors as of the effective date of an Acceptable Plan, whether funded by the issuance of rights to purchase new common stock in the reorganized Debtors or otherwise, in any case on terms acceptable to the Directing Parties.

[10] Under the terms of the Restructuring Support Agreement, the Plan is an Acceptable Plan, thereby satisfying the first of the Lenders' Milestones.

shall be substantially consummated, on or before the 210th
day after the Petition Date.

23.    In the event the Debtors fail to timely achieve one or more of the Lenders'

Milestones upon receipt of notice of such noncompliance from the DIP Agent at the direction of

the Directing Parties (i.e., in the event of a Trigger Event), the Debtors must immediately

implement the Bidding Procedures (an "**Acceptable Sale Process**").

**P<small>ART</small> I**

**A.    The Bidding Procedures**

24.    The Bidding Procedures were designed by the Debtors and the DIP

Lenders to provide a fair, accessible, and transparent process through which the Debtors will

solicit, receive, and evaluate bids so that they may realize the highest or otherwise best value in

exchange for the sale of the Assets, to the benefit of all of their stakeholders. The following is a

summary of certain of the Bidding Procedures.[11]

*Marketing of the Assets*

25.    The Bidding Procedures provide that the Debtors and their advisors may

engage in the marketing of the Assets following the occurrence of a Trigger Event, including the

entry into confidentiality agreements with potential purchasers and maintaining an electronic

data room for the purposes of disseminating due diligence information. The Bidding Procedures

provide contact information and notice and confidentiality requirements for parties interested in

conducting due diligence.

---

[11] The following summary of the Bidding Procedures is provided for the convenience of the Court and parties in
interest. To the extent that there are any discrepancies between this summary of the Bidding Procedures and the
Bidding Procedures, the terms and language of the Bidding Procedures shall govern. Capitalized terms used but not
otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

*Stalking Horse Agreement*

26.    In their discretion, the Debtors may enter into either (i) an asset purchase agreement which provides for the credit bid of up to the full amount of the claims of the Prepetition Senior Lenders and DIP Lenders for the Assets (i.e., the Lender Stalking Horse Agreement) or (ii) within 10 business days of a Trigger Event, an alternative stalking horse agreement with alternative bidder(s) if such alternative stalking horse agreement provides for the payment in full in cash of the Prepetition Senior Facilities and the DIP Facility (or other treatment satisfactory to the Senior Lenders) (i.e., the Alternative Stalking Horse Agreement). The Debtors will file either the Lender Stalking Horse Agreement or the Alternative Stalking Horse Agreement (as applicable) with the Court 11 business days after the Trigger Event (the stalking horse agreement entered into by the Debtors, herein after referred to as the "**Stalking Horse Agreement**").

*Break-Up Fee and Expense Reimbursement*

27.    In the event of an Auction, the Bidding Procedures provide that, in the event the Debtors enter into the Lender Stalking Horse Agreement with the Senior Lenders but the Senior Lenders are not the Successful Bidder, the Senior Lenders are entitled to (a) a "break-up fee" in an amount equal to 1% of the purchase price (including, without limitation, that amount of the Prepetition Senior Facilities and DIP Facility that is credit bid), as set forth in the Stalking Horse Agreement, payable from the proceeds of the Sale to the Successful Bidder[12] and (b) the reimbursement of their actual and reasonable expenses related to the negotiation of the Lender Stalking Horse Agreement.

---

[12] The Debtors reserve the right to request permission of the Court to pay a break-up fee with respect to the Alternative Stalking Horse Agreement.

*Credit Bid*

28.    The Bidding Procedures preserve in all circumstances the right of the Prepetition Senior Agent on behalf of the Prepetition Senior Lenders and the DIP Agent on behalf of the DIP Lenders to credit bid, whether as the stalking horse or otherwise, up to the full amount of their claims under the Prepetition Senior Facilities and the DIP Facility, respectively, on terms and conditions satisfactory to (i) the Directing Parties with respect to a Credit Bid by the Prepetition Senior Agent on behalf of the Prepetition Senior Lenders and (ii) each DIP Lender with respect to a Credit Bid by the DIP Agent on behalf of the DIP Lenders, provided, however, that any Credit Bid shall be subject to the Senior Third Party Liens (as defined in the Interim DIP Order) which liens shall either be paid or remain on the Assets.[13]

*Wind-Down Budget*

29.    The Stalking Horse Agreement and any bid in connection with the Auction must include the provision of funds for a reasonable wind-down budget (the "**Wind-Down Budget**") for costs reasonably necessary to wind down these Chapter 11 Cases, including, without limitation, all allowed administrative expenses in these Chapter 11 Cases, which shall be (x) agreed to by the Debtors and the purchaser of the Assets and (y) subject in all cases to further approval of the Bankruptcy Court.

*Notice of Stalking Horse, Auction, and Sale*

30.    Within 11 business days of a Trigger Event, or such other later date mutually agreed to by the Senior Lenders and the Debtors (the "**Stalking Horse, Auction, and Sale Notice Date**"), the Debtors will file and serve a notice setting forth all relevant information, including (a) the Debtors' entry into either the Lender Stalking Horse Agreement or the

---

[13] The lenders under the OCM Facility will retain their right to credit bid subject to further order of the Court.

Alternative Stalking Horse Agreement, (b) notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures, (c) the Bid Deadline, (d) the Initial Objection Deadline, (e) the time, date, and location that the Auction will be held in the event that the Debtors receive Qualified Bids, and (f) the time, date, and location of the Sale Hearing (the "**Notice of Stalking Horse, Auction, and Sale**," a copy of which is annexed to the Proposed Bidding Procedures Order as Annex C) by first class mail, postage prepaid, to (w) the Special and General Service Lists as those terms are defined in the Court's administrative order establishing case management procedures (the "**Case Management Order**"), (x) all counterparties to the Assumed Contracts and Leases, (y) all potential purchasers identified by the Debtors or their agent, and (z) any other party known to the Debtors to have or assert an interest in any of the Assets.

*Qualifications of Bids and Bidders*

31.     In order to participate in the bidding process and to have a bid considered by the Debtors, each potential bidder must deliver a written offer or group of offers satisfying certain criteria in accordance with the Bidding Procedures (a "**Potential Bidder**").  A "**Qualified Bidder**" is a Potential Bidder that delivers a binding bid that, in the Debtors' discretion satisfies certain criteria (a "**Qualified Bid**") including, but not limited to:

a.      Bid Deadline. The deadline for submitting bids, 12:00 p.m. (prevailing Eastern Time) on or before the date that is no later than 70 days following the Trigger Event;

b.      Bid Package. The materials and formats of materials that must accompany a bid, including, among other things, an executed copy of the applicable Stalking Horse Agreement as modified by the Potential Bidder in accordance with its bid (the "**Modified APA**");

c.      Minimum Bid.  The amount of the purchase price in any bid for all of the Assets must provide for net cash (or cash equivalent) that is at least $500,000 more than the purchase

price contained in the Stalking Horse Agreement plus the amount of the Break-Up Fee and, if applicable, the Expense Reimbursement;

d.    Financial Information. Each Potential Bidder must provide financial and other information to allow the Debtors to make a determination as to the bidder's financial wherewithal and its ability to consummate the purchase of the Assets;

e.    Deposit. A Potential Bidder for the Assets must deposit 10% of the initial purchase price set forth in the Modified APA with an escrow agent selected by the Debtors (the "**Deposit**"). The Potential Bidder shall forfeit the Deposit under certain specified conditions, and the Deposit shall otherwise be returned to the Potential Bidder in the manner and under the terms set forth in the Bidding Procedures.

In addition, a Qualified Bid must contain certain disclosures and/or acknowledgments in regards to regulatory approval, the executory contracts, and unexpired leases that are intended to be assumed, the identity of each Potential Bidder, due diligence, and consents.

32.    The Debtors will notify Potential Bidders whether their bids have been determined to be Qualified Bids, as soon as possible, and prior to the Auction. The Debtors may reject any bid that is on terms more burdensome or conditional than the Stalking Horse Agreement or is otherwise contrary to the best interests of the Debtors and their estates. In addition, the Debtors may request any additional information from any Potential Bidder to assist them in making their determination as to whether a bid is a Qualified Bid.

***Auction***

33.    The Bidding Procedures provide that in the event that the Debtors timely receive more than one Qualified Bid, the Debtors shall conduct the Auction with respect to the Assets. The Bidding Procedures contain details regarding the location of the Auction and requirements pertaining to participation, anti-collusion and bidding. In addition, the Bidding Procedures set forth the following procedures pertaining to the Auction, among others:

a.     <u>Conduct of Auction</u>.  In the discretion of the Debtors, after consultation with the Steering Committee (as defined in the DIP Credit Agreement) (unless such consultation presents a conflict-of-interest), the Auction may be conducted as an "**Open Auction**" or a "**Closed Auction**," as those terms are defined in the Bidding Procedures Order;

b.     <u>Higher or Better</u>. The Debtors reserve the right, in their discretion, to determine whether any bid is better, if not higher, than another bid submitted during the Auction;

c.     <u>Successful Bid</u>.  The Auction will continue until the Debtors determine, in their sole discretion after consultation with the Steering Committee (unless such consultation presents a conflict-of-interest) and subject to Court approval, which Qualified Bid is the highest or otherwise best offer(s) from among the Qualified Bids submitted at the Auction (such bid or bids, as applicable, the "**Successful Bid**"; the Qualified Bidder(s) submitting such Successful Bid(s), the "**Successful Bidder(s)**"); and

d.     <u>Backup Bid</u>. At the conclusion of the Auction, the Debtors will also announce the second highest or otherwise best bid(s) from among the Qualified Bids submitted at the Auction (the "**Backup Bid**").

## B.     **The Assignment Procedures**

34.     The Assumed Contracts and Leases consist of certain executory contracts (the "**Assumed Contracts**") and unexpired leases (the "**Assumed Leases**") designated to be assumed by the Debtors and assigned to the Successful Bidders.  The following is a summary of certain provisions of the Assignment Procedures:[14]

a.     <u>Initial Notice of Assumed Contracts and Leases</u>.  Within three business days after entry of the Stalking Horse Agreement, the Debtors will serve by first class mail an omnibus notice (the "**Initial Assignment Notice**") on each counterparty to the Assumed Contracts and Assumed Leases (a "**Counterparty**") (and such party's attorney, if

---

[14] The following summary of the Assignment Procedures is provided for the convenience of the Court and parties in interest.  To the extent that there are any discrepancies between this summary of the Assignment Procedures and the Assignment Procedures, the terms and language of the Assignment Procedures shall govern.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Assignment Procedures.

such attorney has filed a notice of appearance in the Debtors' chapter 11 proceedings) at the last known address available to the Debtors and the notice address of such counterparty provided in each such contract or lease, if applicable. The Initial Assignment Notice shall include an exhibit that identifies (i) the name and address of the Counterparty, (ii) the specific Assumed Contract or Assumed Lease being specified, (iii), for each Assumed Lease, the premises relating to the Assumed Lease, and (iv) the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**");

The Initial Assignment Notice shall also include (i) a description of the Purchasers and a statement as to the Purchasers' ability to perform the Debtors' obligations under the Assumed Contracts and/or Assumed Leases ("**Purchasers' Adequate Assurance**"), (ii) the date of the Initial Objection Deadline (as defined in the Bidding Procedures), (iii) the date of the Auction, and (iv) the date of the Sale Hearing; and

b.    Further Assignments.    During the period between the Auction and the Closing, the Purchasers may designate additional executory contracts or unexpired leases for assumption by the Debtors and assignment to the Purchasers (the "**Further Assignments**"). The Debtors shall serve by first class mail an omnibus notice (the "**Further Assignments Notice**") on each Counterparty to the Further Assignments. To the extent that any interested party wishes to object to any matter pertaining to the Further Assignments, then such interested party must file a written objection (a "**Further Assignment Objection**") with the Court no later than at 4:00 p.m. (prevailing Eastern Time) on the fifteenth day after service of the Further Assignments Notice. In the event a Further Assignment Objection is filed, such objections will be heard at a hearing to be scheduled by the Court.

## PART II

### C.    The Sale Hearing

35.    The deadline for filing objections to the Stalking Horse Agreement, the

Sale or the assumption and/or assignment of any of the Assumed Contracts shall be 4:00 p.m.

(prevailing Eastern Time) on the date that is no later than 10 business days after service of the Stalking Horse, Auction, and Sale Notice.

       36.     The Successful Bid and the Backup Bid will be subject to approval by entry of the Sale Order by the Bankruptcy Court after a hearing (the "**Sale Hearing**") that will take place at such time to be set by the Court on a date that is on or before 90 days following a Trigger Event, or such other date as may be agreed to by the Debtors and the DIP Lenders. The Debtors may adjourn the Sale Hearing from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court. The Purchaser's asset purchase agreement, as well as a proposed form of order approving the asset purchase agreement, and the assumption and assignment of the Assumed Contracts and Leases (i.e., the Sale Order) will be submitted to the Bankruptcy Court for approval in advance of the Sale Hearing, on notice to all parties in interest with an objection deadline to be determined at a later date.

**D.**      **Extraordinary Provisions of the Proposed Sale Order**

       37.     Pursuant to General Order M-383 of the United States Bankruptcy Court for the Southern District of New York, dated November 18, 2009, establishing this Court's Guidelines for the Conduct of Asset Sales, the Debtors are required to highlight any "extraordinary provisions" in a separate section of a motion seeking to sell the estate's assets. The extraordinary provisions of the Sale Order, which the Debtors will file in advance of the Sale Hearing, will be as follows:

      a.     <u>Use of Proceeds</u>. The proceeds from the Sale will be used, among other things, to fund the Wind Down Budget (including, without limitation, any transaction fee due to the Debtors' financial advisor, Moelis & Co.). Further, a Sale pursuant to a Competing Bid will be used to pay the Break-Up Fee and Expense Reimbursement;

- 18 -

b.      Relief from Bankruptcy Rule 6004(h). The proposed form of Sale Order will contain a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtors submit that such relief is appropriate under the circumstances; and

c.      Successor Liability. The proposed form of Sale Order contains findings and provisions limiting the Purchasers' successor liability. The Debtors believe that a finding that the sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law. In addition, the Debtors are providing notice of the sale as set forth herein and in the Bidding Procedures (including publication notice).

## RELIEF REQUESTED

38.      By this Motion, the Debtors seek entry of: (i) an order, substantially in the form of the Bidding Procedures Order, approving, solely in the event of a Trigger Event (a) the Bidding Procedures (b) the Assignment Procedures, and (c) the Break-Up Fee and Expense Reimbursement; and (ii) the Sale Order, to be submitted at a later date, (a) approving the APA, (b) the Sale and (c) authorizing the assumption and assignment of the Assumed Contracts and Leases, (iii) approving notices and procedures related thereto; and (iv) granting certain related relief.

## BASIS FOR RELIEF REQUESTED

39.      Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The debtor's sale or use of property of the estate outside the ordinary course of business should be approved by this Court if there is a sound business justification for the proposed transaction. See In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is

- 19 -

permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (quoting <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983)). <u>See also</u> <u>Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)</u>, 430 B.R. 65, 83 (S.D.N.Y. 2010) ("The overriding consideration for approval of a Section 363 sale is whether a 'good business reason' has been articulated.") (citation omitted).

40.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  The "business judgment" test is the standard applied by courts in determining whether an executory contract or unexpired lease should be assumed. <u>See</u>, <u>e.g.</u>, <u>In re Old Carco LLC (f/k/a/ Chrysler LLC)</u>, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009), <u>aff'd</u>, No. 10 Civ. 2493 (AKH), 2010 WL 3566908 (S.D.N.Y. Sept. 14, 2010), <u>aff'd, sub nom.</u>; <u>see also</u> <u>Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)</u>, 4 F.3d 1095, 1099 (2d Cir. 1993); <u>see also</u> <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").

## PART I RELIEF

## A.     The Bidding Procedures Are in the Best Interests of the Debtors' Estates and Should Be Approved

41.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1).  The debtor's sale or use of property of the estate outside the ordinary course of business should be approved by this Court if there is a sound business justification for the proposed transaction. See In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'") (quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).  See also In re First Republic Group Realty, LLC, 2010 WL 3638032 at *2   (Bankr. S.D.N.Y. Aug. 18, 2010) (Glenn, J.) (approving sale procedures and break-up fee upon finding that sale "constitutes the exercise of the Debtor's sound business judgment").  Once a debtor has articulated a valid business justification under section 363, a presumption arises that the debtor's decision was made on an informed basis, in good faith, and in the honest belief that the action was in the best interest of the Debtors.  See Official Comm. of Sub. Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

        42.    When selling assets pursuant to section 363 of the Bankruptcy Code, a debtor's duty is to adopt a sale process "with the goal of maximizing the value of the estate."  In re GSC, Inc., 453 B.R. 132 (Bankr. S.D.N.Y. 2011).  See also Integrated Resources, 147 B.R. at 659 ("'It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

43.    The Bidding Procedures have been designed precisely in furtherance of this goal.  They are intended to attract Qualified Bidders through the marketing efforts to be undertaken by Moelis & Company LLC ("**Moelis**"), to encourage competitive and fair bidding, and to allow the Debtors the flexibility to select the bid that provides maximum value to the Debtors' estates.  Finally, the Bidding Procedures set out a timeframe that will allow potential purchasers sufficient time to conduct due diligence, arrange financing, and construct and submit informed Bids, while providing for the expeditious sale of the Assets within a reasonable period of time.

B.    **The Break-Up Fee and Expense Reimbursement Should Be Approved**

44.    Courts will generally defer to a debtor's judgment and approve the payment of  commitment fees, expense reimbursements, and break-up fees  pursuant to section 363(b) of the Bankruptcy Code as long as there is a "legitimate business justification."  Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).  Accord Lionel Corp., 722 F.2d at 1071 (applying the "business judgment rule," which requires that a sound business purpose for the transaction exist).  Under this standard, once a debtor has articulated a valid justification for the fee, a presumption arises that the decision was made on an informed basis, in good faith, and in the belief that the action was in its best interests.  See In re Integrated Resources, 147 B.R. at 656-57.

45.    The Debtors agreed to the Expense Reimbursement and the Break-Up Fee at arm's-length and in good faith.  The Senior Lenders negotiated for these fees in exchange for agreeing to set a reasonable floor bid that will allow a competitive bid process—an outcome that provides value directly to stakeholders of the Debtors' estates.  Moreover, the Break-Up Fee and the Expense Reimbursements are only payable to the Senior Lenders after entry into the Lender Stalking Horse Agreement on term acceptable to the Debtors and only in the event that (a) the

Acceptable Sale Process is triggered, (b) the Debtors do not enter into the Alternative Stalking Horse Agreement, and (c) the Senior Lenders are not the Successful Bidder at the Auction.

(i)      <strong>Break-Up Fee</strong>

46.      Bankruptcy courts have approved incentives similar to the Break-Up Fee under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Debtors' decision to agree to the break-up fee is not tainted by bad faith or self-dealing, (ii) the break-up fee does not hamper bidding, and (iii) the amount of the break-up fee is reasonable.  See Integrated Resources, 147 B.R at 656-57.  Accord In re Metaldyne Corp., 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (Glenn, J.).  A break-up fee is given to an unsuccessful stalking horse bidder in exchange for its having put the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction.  Specifically, break-up fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders.  See  Integrated Resources, 147 B.R. at 661-62.

47.      First, the parties negotiated the Bidding Procedures, the DIP Credit Agreement, and the other elements of their agreement at arm's-length and in good faith. The Debtors believe that the consideration they received in exchange for agreeing to the terms of the Break-Up Fee was significant, and that the Senior Lenders' interest in demanding the Break-Up Fee was not unreasonable in light of their commitment to serve as a stalking horse if the Debtors' so choose.

48.      Second, the Break-Up Fee will not hamper any other party's ability to offer a higher or better bid.  Given the size of the Break-Up Fee relative to the total amount of consideration, and relative to the "overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest.  In

- 23 -

addition, at an amount equal to 1% of the purchase price (including, without limitation, that amount of the Prepetition Senior Facilities and DIP Facility that is credit bid), the Break-Up Fee represents an amount less than other break-up fees approved in the Southern District of New York in other large chapter 11 cases.  See, e.g., In re Cabrini Med. Ctr., Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% of $80 million sale); In re Metaldyne Corp., 409 B.R. at 670 (approving a break-up fee and expense reimbursement of less than 3% of total purchase price as falling "within the range of what courts in this jurisdiction have found to be acceptable break-up fees") (Glenn, J.); In re BearingPoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% of a $350 million sale); In re Loral Space & Commc'ns Ltd., No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 18, 2003) (approving a break-up fee of 2% of $1 billion sale); In re Magellan Health Servs., Inc., No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003) (approving discrete termination and commitment fees of 2% and 3%, respectively, in connection with a $30-$50 million equity commitment); In re Adelphia Bus. Solutions, Inc., No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving a termination fee of 2.5% of $10.7 million sale); In re Bradlees Stores, Inc., No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2001) (approving a termination fee of 2% of $150 million sale); In re Integrated Res., Inc., 147 B.R. at 662 (approving termination fee of 3.2% of the $190 million out-of-pocket costs for $565 million sale).

49.   In the Debtors' business judgment, the Break-Up Fee is fair and reasonable, and integral to an arrangement that will bring value to the Debtors' estates.  The Debtors will only be compelled to pay the Break-Up Fee in the event of a Trigger Event, and then only if they elect to proceed with the Lender Stalking Horse Agreement but subsequently accept a different Qualified Bid.  Any conceivable successful restructuring in these chapter 11

cases will be at least partially as a result of the roadmap that the Senior Lenders have negotiated, which entails their willingness to serve as a "stalking horse bidder" for the Assets of the Debtors so choose. If the Debtors do make the election to proceed with the Lender Stalking Horse Agreement and then select a higher or otherwise better offer from a different Qualified Bidder, the Break-Up Fee will prove an altogether reasonable price to pay for that outcome.

### (ii)   The Expense Reimbursement

50.     The Senior Lenders have already invested considerable resources into negotiating and working in coordination with the Debtors to arrange for the DIP Facility and a roadmap to restructuring. This undertaking alone provides sufficient justification for the Expense Reimbursement. The Expense Reimbursement is part of the consideration that the Debtors have agreed to provide as part of the Acceptable Sale Process, which itself was a negotiated component of the DIP Credit Agreement. The milestones set forth in the DIP Credit Facility provide an extraordinarily organized and clear path for the Debtors' reorganization. The cost of reimbursing the Senior Lenders in the event of a Trigger Event, in the event that the Debtors elect to enter into the Lender Stalking Horse Agreement, and in the event that the Senior Lenders do not then prevail at the Auction is modest in comparison to the overall value of their arrangement with the Senior Lenders.

### C.   The Notice of Stalking Horse, Auction, and Sale Should Be Approved

51.     Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale. The Bidding Procedures require that the Stalking Horse, Auction, and Sale Notice sets forth all relevant information, including (a) the Debtors' entry into either the Lender Stalking Horse Agreement or the

Alternative Stalking Horse Agreement; (b) notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; (c) the Bid Deadline; (d) the Initial Objection Deadline; (e) the time, date, and location at which the Auction will be held in the event the Debtors receive Qualified Bids; and (f) the time, date, and location of the Sale Hearing.

52.     The Notice of Stalking Horse, Auction, and Sale will comply fully with Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1, and General Order M-331, and will constitute good and adequate notice of the sale and the proceedings with respect thereto. Therefore, the Debtors respectfully request that the Court approve the Notice of Stalking Horse, Auction, and Sale and the notice procedures proposed above.

53.     Because the Debtors are providing notice of this Motion, the Bidding Procedures, and the Assignment Procedures to the Notice Parties and the Counterparties in advance of the Auction, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(2) and 6004 are satisfied.

**D.     The Assignment Procedures Should Each be Approved**

54.     The Debtors designed the Assignment Procedures in order to provide a fair and reasonable process through which each Counterparty will receive notice and may file objections with respect to assumption and assignment of the Assumed Contracts and Leases. The Initial Assignment Notice and the Further Assignments Notice will allow each Counterparty to understand the cure amount and the adequate assurance that such Counterparty will receive in respect of an Assumed Contract and Lease. The Debtors submit that the Assignment Procedures are fair and reasonable in all respects and satisfy the notice requirements of Bankruptcy Rule 6006(c) in that they are calculated to provide adequate notice and an opportunity to each Counterparty to object to the assumption and assignment, the Cure Amounts and/or with respect to adequate assurance.

## PART II RELIEF

**E.     The Sale of the Assets Should Be Approved**

55.     Section 363(b) of the Bankruptcy Code governs transactions outside the ordinary course of business involving property of a debtor's estate.  Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate..."  The Debtors' sale or use of property of the estates outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction. See In re Chrysler LLC, 576 F.3d 108, 117-18 (2d Cir. 2009) (citing In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing In re Lionel Corp., 722 F.2d at 1071)); see also In re Gen. Motors Corp., 407 B.R. 463, 494-5 (Bankr. S.D.N.Y. 2009) (noting that sales under § 363(b) are "commonly" approved subject to the business judgment rule).

56.     In addition, section 105(a) of the Bankruptcy Code grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  This provision is "the basis for a broad exercise of power [by the Court] in the administration of a bankruptcy case."  2 Collier on Bankruptcy ¶105.01 (Lawrence P. King, et al. eds., 15th ed. rev. rel. 2000).

57.     The Sale is triggered only in the event that the Debtors fail to satisfy the Lenders' Milestones, and provides the basis for an alternative resolution to these Chapter 11 Cases in the event that the Debtors' efforts to reorganize do not progress as anticipated. Importantly, it is not being proposed in a vacuum.  Rather, it was contemplated and is being

proposed in the context of the Debtors' negotiation of the DIP Facility, which provides the

Debtors' the liquidity critical to the conduct of these Chapter 11 Cases.

58.    Moreover, if the Sale does go forward, it will be premised on a sound

business justification.    Given the fair and reasonable nature of the Bidding Procedures, the

Debtors submit that the Sale, if conducted, will be consummated in a manner that will comply

with section 363 of the Bankruptcy Code as an exercise of the Debtors' sound business

judgment, and it will allow the Debtors to monetize the Assets for the benefit of the Debtors'

estates and creditors

## F.    **The Assets Should Be Sold Free and Clear**

59.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell

property under section 363(b) of the Bankruptcy Code free and clear of liens, claims, and

encumbrances if one of the following conditions is satisfied:

a.    applicable non-bankruptcy law permits sale of such
property free and clear of such interest;

b.    the entity holding the lien, claim or encumbrance consents
to the sale;

c.    the interest is a lien and the price at which such property is
to be sold is greater than the aggregate value of all liens on
the property;

d.    the interest is in bona fide dispute; or

e.    the entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  See In re Smart World Tech., LLC, 423 F.3d 166, 169 n.3 (2d Cir. 2005)

("Section 363 permits sales of assets free and clear of claims and interests....   It thus allows

purchasers… to acquire assets [from a debtor] without any accompanying liabilities."); In re

Dundee Equity Corp., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar.

6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.") (citation omitted).

60.     The Debtors request that the Court authorize the sale of the Assets free and clear of all interests, other than those identified in the in definitive documentation with respect to the Sale (the "**Permitted Liens**").  Thus, the sale of the Assets pursuant to the Bidding Procedures will satisfy section 363(f)(1) of the Bankruptcy Code because any entities holding interests in the Assets and related assets will have received notice of this Motion and the Notice of Stalking Horse, Auction and Sale.

61.     Section 363(f)(2) of the Bankruptcy Code is satisfied as to those parties that consent or do not object to the proposed sale.  Here, all parties-in-interest will be given sufficient opportunity to object to the relief requested in this Motion, and any such entity that does not object to the sale should be deemed to have consented.  See FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.... It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. T'ship of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); In re Enron Corp., No. 1-16034 (AJG), 2004 WL 5361245, at *2 (Bankr. S.D.N.Y. Feb. 5, 2004) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).  As such, to the extent

that no party holding an interest objects to the relief requested in this Motion, the sale of the Assets free and clear of all interests except the Permitted Liens satisfies section 363(f)(2) of the Bankruptcy Code.

62.     Section 363(f)(3) of the Bankruptcy Code is satisfied because the price at which the Debtors' property is to be sold is greater than the economic value of the liens on the Assets.  A sale can be made free and clear of any liens pursuant to section 363(f)(3) of the Bankruptcy Code so long as the purchase price exceeds "the aggregate value of all liens on such property."  While the interpretation of section 363(f)(3) has produced some division in the courts, this Court has adopted the better-reasoned view that the "aggregate value of all liens" means the actual economic value placed on the liens – not the face amount of the liens.  In re Levitz Home Furnishings, Inc., No. 05-45189 (BRL) (Bankr. S.D.N.Y. Dec. 14, 2005) (rejecting creditor's "face value" argument, finding requirements of section 363(f) satisfied and interest of secured creditors adequately protected by attachment of their liens to sales proceeds); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356-57 (Bankr. N.D.N.Y. 1990) (value and not amount of liens is what the court must look at in applying section 363(f)(3)).  Here, the value offered under the transaction documents is greater than the amount offered by any other party-in-interest and remains subject to higher and better offers after what has been a thorough marketing effort. Accordingly, section 363(f)(3) is satisfied.

63.     Lastly, section 363(f)(5) of the Bankruptcy Code is also satisfied.  Any entity holding an interest in the Assets could be compelled to accept a monetary satisfaction of its interest.  Furthermore, the Debtors propose that any interest in the Assets that is not included in the Permitted Liens shall attach to the net proceeds of the sale of those Assets and related assets subject to any claims and defenses the Debtors may possess with respect thereto, in the

priority they had before the sale.  As such, the sale of the Assets free and clear of all interests

other than Permitted Liens satisfies section 363(f)(5) of the Bankruptcy Code.

## G.    Successor Liability

64.    The Debtors also seek to sell the Assets and related assets free and clear of

any successor liability claims related to the Assets and related assets, other than monetary

liability arising out of liabilities to be assumed under the Purchaser's asset purchase agreement

(the "the Assumed Liabilities") and any preclosing liabilities being assumed pursuant to the Sale.

Notwithstanding the reference to a conveyance free and clear of "any interest" in section 363(f),

that section has been interpreted to allow the sale of a debtor's assets free and clear of successor

liability claims, as well.  See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.),

Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing sale of assets free and

clear of successor liability claims); In re Old Carco LLC (f/k/a/ Chrysler LLC), Case No. 09-

50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009) (same); see also In re Trans World Airlines, Inc.,

322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor

liability claims for employment discrimination and rights under travel voucher program).

65.    Here, the sale is dependent on the ability of the Debtors to transfer the

Assets free and clear from successor liability, other than monetary liability, if any, arising out of

the Assumed Liabilities and any preclosing liabilities being assumed.  In order to be able to

dispose of their assets, the Debtors must be able to transfer these assets free and clear from

potential successor liability claims, other than monetary liability, if any, arising out of the

Assumed Liabilities and any preclosing liabilities being assumed.  Indeed, the transfer of the

Assets free and clear of successor liability claims is a critical inducement for the Purchasers to

enter into the transaction.  See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380,

387 (2d Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the

purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property") (citations omitted).

66.    Furthermore, pursuant to New York law and traditional common law, a purchaser of another company's assets will be found to be liable for the seller's liabilities only where (i) the successor expressly or impliedly assumes the predecessor's tort liability, (ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere continuation of the seller, or (iv) the transaction is fraudulent. See N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006). A finding by the Court that the transfer of the Assets is free and clear of any successor liability claims is proper because, except for Purchasers' assumption of monetary liability, if any, arising out of the Assumed Liabilities and any preclosing liabilities being assumed, none of these circumstances apply to the transaction. See Douglas v. Stamco, 363 F. App'x 100, 102 (2d Cir. 2010) (holding that sale pursuant to § 363 extinguished successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

67.    Accordingly, the Assets should be transferred to the Successful Bidder free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on any successor liability, except for the Assumed Liabilities and any preclosing liabilities being assumed.

**H.    The Senior Lenders are Good Faith Purchasers**

68.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an
> authorization under [section 363(b)]… does not
> affect the validity of a sale… to an entity that
> purchased… such property in good faith, whether or
> not such entity knew of the pendency of the appeal,
> unless such authorization and such sale… were
> stayed pending appeal."

See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)…

provides that good faith transfers of property will not be affected by the reversal or modification

on appeal of an unstayed order, whether or not the transferee knew of the pendency of the

appeal") (internal citation omitted); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y.

1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of

a sale on appeal unless there is a stay pending appeal") (citation omitted).

      69.    Although the Bankruptcy Code does not define "good faith," the Second

Circuit, in In re Gucci, has held:

> Good faith of a purchaser is shown by the integrity
> of his conduct during the course of the sale
> proceedings; where there is a lack of such integrity,
> a good faith finding may not be made. A
> purchaser's good faith is lost by "fraud, collusion
> between the purchaser and other bidders or the
> trustee, or an attempt to take grossly unfair
> advantage of other bidders."

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)

(interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code));

see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25,

2008) (same; quoting Gucci).

      70.    The Second Circuit has indicated that a party would have to show fraud or

collusion between a buyer and the debtor-in-possession or trustee in order to demonstrate a lack

of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill

- 33 -

Assocs.), 111 F.3d 269, 276, (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

71.     Here, the Senior Lenders – who are not "insiders" of the Debtors under section 101(31) of the Bankruptcy Code – and the Debtors satisfied the requirements of section 363(m).  The Lender Stalking Horse Agreement is the result of extended arm's-length, good faith negotiations between the Debtors and the Senior Lenders, and their respective professionals represented each party.  In the event that they are the Successful Bidders, the Senior Lenders will be "good-faith" purchasers within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection.  Therefore, the Debtors request that the Court make a finding that the Senior Lenders are entitled to the protections of section 363(m) of the Bankruptcy Code.

72.     To the extent that the Senior Lenders are not the Successful Bidder(s) at the Auction, the Debtors will seek a finding from the Court at the Sale Hearing that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, as well as an identical finding with regard to the Backup Bidder.

I.     **In the Event of an Auction, the Assumption and Assignment of the Assumed Contracts and Leases Should be Approved**

73.     A court should approve the assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate.  See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989); see also Sharon Steel

Corp. v. National Fuel Gast Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).  Section 365(b) of the Bankruptcy Code requires a debtor seeking to assume an executory contract to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults.  If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.

74.    The Senior Lenders have sufficient capital and financing commitments to provide adequate assurance of future performance on all the Assumed Contracts and Leases and, pursuant to the Bidding Procedures, the Debtors will require any Qualified Bidder to demonstrate its ability to provide adequate assurance of future performance.  Moreover,  assuming and assigning the Assumed Contracts and Leases to the Successful Bidder pursuant to the Assignment Procedures is an appropriate exercise of the Debtors' business judgment.  In the event that the Debtors conduct a Sale, the Assumed Contracts and Leases will no longer have any value to the Debtors.  By assuming and assigning the Assumed Contracts and Leases to the Successful Bidder, the Debtors' estate will benefit from avoiding the rejection damages claims that would arise from rejecting the Assumed Contracts and Leases.

75.    Therefore, because assuming and assigning the Assumed Contracts and Leases to the Successful Bidder(s) avoids the costs of rejecting those executory contracts and unexpired leases and increases the value to be realized from the Sale of the Assets, assumption and assignment to the Successful Bidder(s) of the Assumed Contracts and Leases (as may be amended by the Supplemental Notice of Assumed Contracts and Leases) is clearly an exercise of the Debtors' sound business judgment which warrants approval by this Court.

**J.    Assignment of Assumed Contracts and Leases
with Anti-Assignment Provisions is Appropriate**

76.    Section 365(f)(1) provides that:

> [N]otwithstanding a provision in an executory contract or
> unexpired lease of the debtor, or in applicable law, that prohibits,
> restricts, or conditions the assignment of such contract or lease, the
> trustee may assign such contract or lease under paragraph (2) of
> this subsection.

11 U.S.C. § 365(f)(1).  The effect of this provision is that a contract may be assumed and

assigned – notwithstanding the presence of a contractual prohibition against assignment –

provided that "adequate assurance of future performance" by the assignee be provided.  See also

11 U.S.C. § 365(f)(2).  The flexibility that this provision accords a debtor is consistent with the

"primary aim of section 365," i.e., "to 'assist in the debtor's rehabilitation or liquidation,'" while

ensuring that the counterparty "receives the full benefit of its bargain."  Southern Boulevard, Inc.

v. Martin Paint Stores, 207 B.R. 57, 62 n. 2 (S.D.N.Y. 1997) (quotations omitted).  See also

Shoppers World Community Ctrs., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.),

2001 WL 1112308, at *7 (S.D.N.Y. Sept. 21, 2001) (section 365(f) "assumes, as a matter of law,

that the free assignment of unexpired leases will assist the debtor in its reorganization or

liquidation efforts.") (internal quotation omitted).

      77.     In the event of an Auction and Sale, the Debtors will likely seek to assume

and assign certain contracts and/or leases with anti-assignment provisions.  The Debtors submit

that this relief is appropriate in light of the plain language of section 365(f).  The Assumption

and Assignment Procedures, including the Initial Assignment and Further Assignment Notices,

are calculated to provide Counterparties with an opportunity to understand and, if necessary,

object to the adequate assurance being given in respect of the Successful Bidder to whom the

Assumed Contracts and Leases will be assigned.

### WAIVER OF 14-DAY STAY UNDER BANKRUPTCY RULE 6004(h)

      78.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise,

all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for 14 days after entry of such order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  The Debtors believe that such waiver is appropriate here with respect to the Sale Order because all parties that have expressed interest in the Assets will have (i) received notice of this Motion and any entry of the Bidding Procedures Order and (ii) had the opportunity to participate in the Auction at which the Debtors propose to sell the Assets.

## NOTICE

79.     No trustee, examiner, or creditors' committee has been appointed in these Chapter 11 Cases.  Notice of this Motion has been given to, (i) the Office of the United States Trustee for the Southern District of New York; (ii) the Debtors' material prepetition and postpetition secured lenders or any agents therefor; (iii) counsel to the Debtors' material prepetition and postpetition secured lenders; (iv) the indenture trustee for the Debtors' Senior Notes; (v) the ad hoc committee of Senior Notes; (vi) the holders of the 50 largest unsecured claims against the Debtors on a consolidated basis; (vii) the Internal Revenue Service; and (viii) the U.S. Securities and Exchange Commission.  In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

## NO PRIOR REQUEST

80.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the

Court enter an order granting the relief requested herein and such other and further relief as is

just and proper.

Dated: New York, New York
   November 23, 2011

             KRAMER LEVIN NAFTALIS & FRANKEL LLP


             /s/ Adam C. Rogoff
             Kenneth H. Eckstein
             Adam C. Rogoff
             Douglas H. Mannal
             Stephen D. Zide
             1177 Avenue of the Americas
             New York, New York 10036
             Telephone: (212) 715-9100
             Facsimile: (212) 715-8000
             *Proposed Counsel for the Debtors*

## EXHIBIT 1

### Proposed Bidding Procedures Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:                                                :    Chapter 11
                                                      :
GENERAL MARITIME CORPORATION, et al.,    :    Case No. 11-15285 (MG)
                                                      :
                                Debtors.              :    Jointly Administered

------------------------------------------------------------x

## ORDER APPROVING (A) BREAK-UP
## FEE, EXPENSE REIMBURSEMENT, AND BIDDING
## PROCEDURES IN CONNECTION WITH THE POTENTIAL SALE OF
## SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (B) APPROVING
## PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT
## OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the motion (the "**Motion**")[1] of General Maritime Corporation ("**General**

**Maritime**") and substantially all of its direct and indirect subsidiaries, as chapter 11 debtors and

debtors-in-possession (each a "**Debtor**" and collectively the "**Debtors**," and together with the

non-Debtor affiliates, the "**Company**") in the above-referenced chapter 11 cases (the "**Chapter**

**11 Cases**") for an order (a) approving bidding procedures in connection with the potential

auction (the "**Auction**") and sale of substantially all of the Debtors' assets (the "**Assets**"),

substantially in the form annexed hereto as Annex A (the "**Bidding Procedures**"), (b)

procedures for the assumption and assignment of certain executory contracts and unexpired

leases related thereto (the "**Assumed Contracts and Leases**"), substantially in the form annexed

hereto as Annex B (the "**Assignment Procedures**," and together with the Bidding Procedures,

the "**Sale Procedures**"), and (c) a break-up fee (the "**Break-Up Fee**") and expense

reimbursement (the "**Expense Reimbursement**") in connection with the Auction and Sale and

(c) the form and manner of notice thereof, all as more fully set forth in the Motion; and the Court

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

U.S.C. §§ 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the

District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.);

and the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper

before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

Motion being adequate and appropriate under the particular circumstances; and no other or

further notice needing to be provided; and the relief requested in the Motion being in the best

interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion

and having heard the statements in support of the relief requested therein at a hearing before the

Court (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth

in the Motion and at the Hearing establish just cause for the relief granted herein; and any

objections to the requested relief having been withdrawn or overruled on the merits; and upon all

of the proceedings had before the Court; and after due deliberation and sufficient cause

appearing therefor, it is hereby FOUND AND DETERMINED THAT:

A.     The Debtors have articulated good and sufficient reasons for approving the

Bidding Procedures.  The Bidding Procedures are reasonable and appropriate and represent the

best method for maximizing the value of the Assets in the event of an Auction.

B.     The Prepetition Senior Agent on behalf of the Prepetition Senior Lenders

and the DIP Agent on behalf of the DIP Lenders (collectively, the "**Senior Lenders**") have

expended, and/or will likely expend, considerable time, money and energy pursuing the purchase

of the Assets in the event of an Auction and have engaged in extended arm's-length and good

faith negotiations.  The Break-Up Fee, the Expense Reimbursement, the Bidding Procedures, and

the Sale contemplated thereunder in the event of an Auction are the culmination of these efforts.

Recognizing this expenditure of time, energy and resources, the Debtors have agreed to pay the

Break-Up Fee and the Expense Reimbursement to Senior Lenders upon execution of an asset purchase agreement which will provide for the credit bid of up to the full amount of the claims of the Prepetition Senior Lenders and DIP Lenders for the Assets (the "**Lender Stalking Horse Agreement**").  Each of the Break-Up Fee and the Expense Reimbursement is, in the event of an Auction, (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of Bankruptcy Code section 503(b); (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Lender Stalking Horse Agreement; (iii) reasonable and appropriate in light of the size and nature of the proposed Sale, comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Senior Lenders in entering into the Lender Stalking Horse Agreement; and (iv) necessary to induce Senior Lenders to pursue the purchase of the Assets and to be bound by the Lender Stalking Horse Agreement.

C.     The Debtors have demonstrated a sound business justification for authorizing the payment of the Break-Up Fee and the Expense Reimbursement to the Senior Lenders.  The Break-Up Fee and the Expense Reimbursement have been negotiated at arm's-length and are reasonable under the circumstances.

THEREFORE IT IS HEREBY ORDERED THAT:

1.     The Bidding Procedures are hereby authorized and approved in all respects.

2.     The Assignment Procedures are hereby authorized and approved in all respects.

3.     The Notice of Stalking Horse, Auction, and Sale annexed hereto as **Annex C** is approved.

4.      All objections to the relief requested in the Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

5.      The Debtors and their advisors are authorized to engage in the marketing of the Assets following the occurrence of a Trigger Event, including the entry into confidentiality agreements with potential purchasers and maintaining an electronic data room for the purposes of disseminating due diligence information.

6.      Following the occurrence of a Trigger Event,[2] the Debtors shall contact the Court to request that the Court schedule a hearing to approve the Sale of the Assets for a date that is no later than 90 days after such Trigger Event, or such other date as may be agreed to by the Debtors and the DIP Lenders.

7.      Within three days of a Trigger Event, the Debtors shall file notice of the Trigger Event with the Bankruptcy Court (the "**Trigger Event Notice**").

8.      Upon to the occurrence of a Trigger Event, the Debtors shall take any and all actions necessary or appropriate to implement the Bidding Procedures; provided, however, the Debtors and their advisors are authorized to engage in the marketing of the Assets before the occurrence of the Trigger Event, including the entry into confidentiality agreements with potential purchasers and maintaining an electronic data room for the purposes of disseminating due diligence information.

9.      The Debtors are hereby authorized in their discretion to enter into either (i) the Lender Stalking Horse Agreement or (ii) within 10 business days of the Trigger Event,  an alternative stalking horse agreement with alternative bidder(s), so long as that alternative

---

[2]  For the purposes of this Order, a "**Trigger Event**," occurs upon notice from the DIP Agent at the direction of the Directing Parties of noncompliance with any of the Lenders' Milestones.

provides for (i) the payment in full in cash of the Prepetition Senior Facilities and the DIP Facility or (ii) other treatment satisfactory to the Senior Lenders (the "**Alternative Stalking Horse Agreement**").[3]

10.     Within 11 business days of a Trigger Event, or such other later date mutually agreed to by the Senior Lenders and the Debtors, the Debtors shall file with the Bankruptcy Court either the Lender Stalking Horse Agreement or the Alternative Stalking Horse Agreement (as applicable) and serve the Notice of Stalking Horse, Auction, and Sale.  The Notice of Stalking Horse, Auction, and Sale shall set forth all relevant information, including (a) the Debtors' entry into a either the Lender Stalking Horse Agreement or the Alternative Stalking Horse Agreement (if applicable); (b) notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; (c) the Bid Deadline; (d) the Initial Objection Deadline; (e) the time, date, and location at which the Auction will be held in the event that the Debtors receive Qualified Bids; and (f) the time, date, and location of the Sale Hearing.  The Debtors shall serve the Notice of Stalking Horse, Auction on Sale on the parties identified in the Bidding Procedures Order, which notice shall be deemed sufficient.

11.     Upon execution by (i) the Prepetition Senior Agent on behalf of the Prepetition Senior Lenders and (ii) the Administrative Agent on behalf of the DIP Lenders of the Lender Stalking Horse Agreement in form and substance satisfactory to the Senior Lenders and the Debtors, the Senior Lenders shall be entitled to the Break-Up Fee and Expense Reimbursement as set forth below.

12.     The Break-Up Fee and Expense Reimbursement are approved in their entirety with respect to the Lender Stalking Horse Agreement.  The Debtors shall pay the Break-

---

[3] The Debtors have reserved the right to request permission of the Court to pay a break-up fee with respect to the Alternative Stalking Horse Agreement.

Up Fee and the Expense Reimbursement to the Senior Lenders pursuant to the terms and conditions set forth in the Bidding Procedures and the Lender Stalking Horse Agreement without need for further order of the Court; provided, however, that the Break-Up Fee shall only be payable if (i) a Trigger Event occurs, (ii) the Debtors do not enter into an Alternative Stalking Horse Agreement as provided for herein, and (iii) the Senior Lenders are not the purchaser of the Assets.

13.     The deadline for filing objections to the Sale, the Lender Stalking Horse Agreement, the Alternative Stalking Horse Agreement, or the assumption and/or assignment of any of the Assumed Contract and Leases shall be 4:00 p.m. (prevailing Eastern Time) on the date that is no later than 10 business days after the Debtors file the Notice of Stalking Horse, Auction, and Sale at 4:00 p.m. prevailing Eastern Time (the "**Initial Objection Deadline**"), which date shall be clearly indicated on the Notice of Stalking Horse, Auction, and Sale.  Any objections must: (a) be made in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any applicable orders of the Court; (c) state with particularity the legal and factual basis for the objection and if practicable, a proposed modification to the terms of the sale that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties (the "**Objection Notice Parties**") so as to be **actually received** on or before the Initial Objection Deadline: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Kenneth H. Eckstein, Esq., Adam C. Rogoff, Esq., and Douglas H. Mannal, Esq.; (b) counsel for the DIP Agent and the Prepetition Senior Agent, White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036-2787, Attn: Thomas Lauria, Esq., Scott Greissman, Esq., and Andrew Ambruoso, Esq.; (c) counsel to Oaktree, Kirkland & Ellis LLP, 601 Lexington Avenue, New

York, New York 10022, Attn: Samantha Good, Esq. and Candace Wilhelm, Esq.; (d) the Senior

Notes Indenture Trustee, The Bank of New York Mellon, 101 Barclay Street, 8 West, New York,

New York 10286, Attn: Beata Harvin; (e) counsel to the Ad Hoc Group of Senior Noteholders,

Jones Day, 222 East 41st Street, New York, New York 10017-6702, Attn: Paul Leake, Esq. and

Pedro A. Jimenez, Esq.; (f) the Office of the United States Trustee for the Southern District of

New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Paul K.

Schwartzberg, Esq.; (g) the U.S. Securities and Exchange Commission; (h) the Internal Revenue

Service; and (i) counsel to any statutory committees appointed in these Chapter 11 Cases; and (j)

counsel to the Alternative Stalking Horse, if any.  To the extent a proper objection is timely filed

by the Initial Objection Deadline, the Debtors shall request, and the Court shall set, a hearing on

such an objection as soon as reasonably practicable.

    14.    In the event that the Debtors have entered into an Alternative Stalking

Horse Agreement and an Auction occurs, the Senior Lenders shall be deemed to be Qualified

Bidders (as such term is defined in the Bidding Procedures) and shall be permitted to credit bid

the claims under their respective facilities consistent with the terms of the DIP Credit Agreement

and the order approving the DIP Credit Agreement.

    15.    The Lender Stalking Horse Agreement shall include the provision of funds

for a reasonable wind-down budget (the "**Wind-Down Budget**") for costs reasonably necessary

to wind down the Chapter 11 Cases, including, without limitation, all allowed administrative

expenses in the Chapter 11 Cases, which shall be (x) agreed to by the Debtors and the purchaser

of the Assets and (y) subject in all cases to further approval of the Bankruptcy Court., which

shall be (x) agreed to by the Debtors and the purchaser of the Assets and (y) subject in all cases

to further approval of the Bankruptcy Court.

16.     Nothing in this Order or the Motion shall impair, prohibit, limit, or in any way restrict the rights of any entity or person that is a party to those certain Intercreditor Agreements dated May 6, 2011.

17.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

18.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

19.     This Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale, the Break-Up Fee, the Transaction Documents, the Bidding Procedures, the Assignment Procedures, and any other matter that in any way relates to the foregoing.

20.     Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be effective immediately and enforceable upon the Order's entry.

Dated: New York, New York
          December __, 2011


_____
UNITED STATES BANKRUPTCY JUDGE

## ANNEX A
### BIDDING PROCEDURES

## BIDDING PROCEDURES FOR THE SALE
## OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

Upon the motion (the "**Motion**") of General Maritime Corporation ("**General Maritime**") and substantially all of its direct and indirect subsidiaries (together with General Maritime, the "**Debtors**"), the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (the "**Bidding Procedures Order**"):[1] (a) approving the bidding procedures and bidder protections (the "**Bidding Procedures**") with respect to the sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**"); and (b) approving certain procedures (the "**Assignment Procedures**") related to the assumption and assignment of those executory contracts and unexpired leases related to the Assets and whose assignment is contemplated by the Sale (the "**Assumed Contracts and Leases**").

On November 18, 2011, the Court entered an interim order (the "**Interim DIP Order**") authorizing, *inter alia*, the Debtors to enter into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**") among General Maritime as Parent, Debtors General Maritime Subsidiary Corporation and General Maritime Subsidiary II Corporation as Borrowers, Nordea Bank Finland plc, New York Branch as Administrative Agent and Collateral Agent (the "**DIP Agent**"), and various parties as Lenders thereunder (collectively, the "**DIP Lenders**", together with the Prepetition Senior Lenders as that term is defined in the Interim DIP Order, the "**Senior Lenders**").  As used herein, a "**Trigger Event**," means the nonoccurrence of any Lenders' Milestone which shall require the Debtors to immediately commence an Acceptable Sale Process, as defined in the DIP Credit Agreement.

1.    **Important Dates**

| | |
|---|---|
| Trigger Event Notice Date | No later than 3 days following a Trigger Event. |
| Stalking Horse, Auction and Sale Notice Date | No later than 11 business days following a Trigger Event. |
| Initial Objection Deadline | No later than 10 business days following the Stalking Horse, Auction and Sale Notice Date. |
| Bid Deadline | No later than 70 days following a Trigger Event. |
| Auction | No later than 75 days following a Trigger Event. |
| Supplemental Objection Deadline | No later than 3 days following the Auction. |
| Sale Hearing | No later than 90 days following a Trigger Event. |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

2.     **Marketing of the Assets**

The Debtors and their advisors may engage in the marketing of the Assets prior to the occurrence of a Trigger Event, including the entry into confidentiality agreements with potential purchasers and maintaining an electronic data room for the purposes of disseminating due diligence information.

The Debtors may afford any bona fide interested party the opportunity to conduct a reasonable due diligence review in the manner determined by the Debtors in their discretion. The Debtors shall, after consultation with the Steering Committee (as defined in the DIP Credit Agreement) (unless such consultation presents a conflict-of-interest), not be obligated to furnish any due diligence information after the Bid Deadline (defined below).

**Parties interested in conducting due diligence should contact Moelis & Co., 399 Park Avenue, 5th Floor, New York, New York 10022, (212) 883-3800, Attn: Thane Carlston (thane.carlston@moelis.com), and Zul Jamal (zul.jamal@moelis.com).**

Any entity that wishes to conduct due diligence with respect to the Assets must deliver to (i) counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 Attn: Kenneth H. Eckstein, Esq. (keckstein@kramerlevin.com); Adam C. Rogoff, Esq. (arogoff@kramerlevin.com) Douglas H. Mannal, Esq. (dmannal@kramerlevin.com); and (ii) Moelis & Co., 399 Park Avenue, 5th Floor, New York, New York 10022, (212) 883-3800, Attn: Thane Carlston (thane.carlston@moelis.com), and Zul Jamal (zul.jamal@moelis.com), the following: (a) an executed confidentiality agreement in form and substance satisfactory to the Debtors, and (b) at the Debtors' discretion, the Debtors may require a written statement of interest demonstrating to the Debtors' satisfaction a bona fide interest to purchase the Assets and the ability to make a Qualified Bid (as defined below), which includes, *inter alia*, a purchase price range, the proposed structure and financing, if any, of the transaction, any additional conditions to closing that such entity may wish to impose, and the nature and extent of additional due diligence such entity may wish to conduct.

Any party delivering such a confidentiality agreement and, if necessary, a statement of interest demonstrating the financial wherewithal to consummate an Alternative Stalking Horse Agreement (as defined in paragraph 4 below) may be deemed by the Debtors, after consultation with the Steering Committee (unless such consultation presents a conflict-of-interest), to be reasonably likely to be able to close a proposed transaction, if selected as the Successful Bidder (as defined below), within a time frame acceptable to the Debtors (such person or entity, a "**Potential Bidder**"). After compliance with the foregoing, the Debtors may allow Potential Bidders to conduct due diligence with respect to the Assets.

3.     **Mailing the Notice of Stalking Horse, Auction, and Sale**

On a date no later than 11 business days following a Trigger Event or such other later date as mutually agreed to by the Senior Lenders and the Debtors, the Debtors shall file and serve (i) notice of the Stalking Horse APA (as defined below) for the sale of the Assets entered into by the Debtors pursuant to the following paragraph and (ii) notice of the Auction and Sale

setting forth all relevant information, including notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the Initial Objection Deadline; the time, date, and location of that the Auction will be held in the event that the Debtors receive Qualified Bids; and the time, date, and location of the Sale Hearing (the "**Notice of Stalking Horse, Auction, and Sale**") by first class mail, postage prepaid, to (a) the Special and General Service Lists as those terms are defined in the Court's Administrative Order Establishing Case Management Procedures (the "**Case Management Order**"), (b) all counterparties to the Assumed Contracts and Leases, (c) all potential purchasers identified by the Debtors or their agent, and (d) any other party known to the Debtors to have or assert an interest in any of the Assets.

4.    **The APA**

The Debtors are authorized, in their discretion, to enter into either (i) an asset purchase agreement which provides for the credit bid of up to the full amount of the claims of the Prepetition Senior Lenders and DIP Lenders for the Assets (the "**Lender Stalking Horse Agreement**") or (ii) within 10 business days of the Trigger Event, an alternative stalking horse agreement with alternative bidder(s) if such alternative stalking horse agreement provides for the payment in full in cash of the Prepetition Senior Facilities and the DIP Facility (or other treatment satisfactory to the Senior Lenders) (the "**Alternative Stalking Horse Agreement**"). The stalking horse agreement entered into by the Debtors' shall hereinafter be referred to the "**Stalking Horse APA.**"

5.    **Free and Clear**

Except as otherwise provided in definitive documentation with respect to the Sale, all of the Debtors' rights, title and interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "**Claims and Interests**").

6.    **Break-Up Fee and Expense Reimbursement**

In the event that the Debtors and the Senior Lenders enter into the Lender Stalking Horse Agreement but the Senior Lenders are not the Successful Bidder, the Senior Lenders are entitled to (a) a "break-up fee" in an amount which is equal to 1% of the purchase price (including, without limitation, that amount of the Prepetition Senior Facilities and DIP Facility that is credit bid), as set forth in the Stalking Horse APA (the "**Break-Up Fee**") payable from the proceeds of the Sale to the Successful Bidder,[2] and (b) the reimbursement of their actual and reasonable expenses related to the negotiation of the Lender Stalking Horse Agreement. (the "**Expense Reimbursement**").

---

[2] The Debtors reserve the right to request permission of the Court to pay a break-up fee with respect to the Alternative Stalking Horse Agreement.

7.  **Credit Bid**

Notwithstanding anything else herein, the right of the Prepetition Senior Agent on behalf of the Prepetition Senior Lenders and the DIP Agent on behalf of the DIP Lenders to credit bid, whether as the stalking horse or otherwise, up to the full amount of their claims under the Prepetition Senior Facilities and the DIP Facility, respectively, on terms and conditions satisfactory to (i) the Directing Parties (as that terms is defined in the DIP Credit Agreement) with respect to a Credit Bid by the Prepetition Senior Agent on behalf of the Prepetition Senior Lenders and (ii) each DIP Lender with respect to a Credit Bid by the DIP Agent on behalf of the DIP Lenders, shall be fully preserved in all circumstances (the "**Credit Bid**"); provided however, that any Credit Bid shall be subject to the Senior Third Party Liens (as defined in the Interim DIP Order) which liens shall either be paid or remain on the Assets.

8.  **Qualification of Bids and Bidders**

In order to participate in the bidding process and to have a bid considered by the Debtors, each Potential Bidder must deliver a written offer or group of offers satisfying the below criteria.  A "**Qualified Bidder**" is a Potential Bidder that delivers a binding bid that in the Debtors' discretion satisfies the following criteria (a "**Qualified Bid**"):

a.  Bid Deadline.  Each bid package must be delivered in written and electronic form (where available) to: (i) counsel to the Debtors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Kenneth H. Eckstein, Esq. (keckstein@kramerlevin.com), Adam C. Rogoff, Esq. (arogoff@kramerlevin.com), and Douglas H. Mannal, Esq. (dmannal@kramerlevin.com); (ii) counsel to the DIP Agent and the Prepetition Senior Agent, White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036-2787, Attn: Thomas Lauria, Esq., Scott Greissman, Esq., and Andrew Ambruoso, Esq.; and (iii) counsel to the Official Committee of Unsecured Creditors (the "**Committee**"), [], so as to **actually be received no later than 12:00 p.m. (prevailing Eastern Time) on [  ], 2012, i.e., the such date that is no later than 70 days following the Trigger Event (the "Bid Deadline")**.  The actual date of the Bid Deadline will be specifically identified in the Notice of Stalking Horse, Auction, and Sale.

b.  Bid Package.  Each bid must include (collectively, the "**Bid Package**"): (i) a written and signed irrevocable and binding offer letter stating that (w) the bidder offers to consummate a sale transaction on terms and conditions no less favorable than those found in the applicable Stalking Horse APA and in an amount at least equal to the Minimum Bid (as defined below), (x) confirming that the bid will remain irrevocable and binding until five business days following the entry of the Sale Order, unless such bid is determined by the Debtors to be the Back-Up Bid, in which case

- 4 -

such bid shall remain irrevocable and binding pursuant to paragraph 11(g) hereof, (y) that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representations except as expressly set forth in the Modified APA (as defined below), and (z) the Bidder shall serve as the Backup Bidder (defined below) until the closing on the sale with the Successful Bidder (as defined below); (ii) an executed copy of the asset purchase agreement by the Potential Bidder in accordance with its bid ("**Modified APA**"); (iii) an electronic markup of the Stalking Horse APA showing the revisions in the Modified APA; and (iv) a CD-ROM containing a clean copy of the Modified APA (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtors) and the electronic markup of the Stalking Horse APA. The Debtors shall determine whether any Modified APA that modifies the Stalking Horse APA in any respect beyond the identity of the purchasers and the purchase price is a Qualified Bid.

c.     Minimum Bid.  The amount of the purchase price in any bid for all of the Assets must provide for net cash (or cash equivalent) that is at least $500,000 more than the purchase price contained in the Stalking Horse APA plus the amount of the Break-Up Fee and, if applicable, the Expense Reimbursement[3] (the "**Minimum Bid**").

d.     Financial Information. The Bid Package must contain such financial and other information that will allow the Debtors to make a determination as to the bidder's financial wherewithal after consultation with the Steering Committee (unless such consultation presents a conflict-of-interest) and its ability to consummate the transactions contemplated by the Modified APA, including evidence of adequate financing, any proposed conditions to closing and adequate assurance of such bidder's ability to perform under any of the Assumed Contracts and Leases and to pay all cure amounts required to assume and assign any such Assumed Contracts and Leases.

e.     Regulatory Approvals.  The Bid Package must describe all regulatory approvals the bidder will need and provide evidence of the bidder's ability to obtain all necessary regulatory approvals in a timely manner, if applicable.

---

[3] The Senior Lenders shall disclose the amount of the Expense Reimbursement prior to the Auction to the Debtors, provided, however, the Debtors are not required to keep such information confidential.

f.      Executory Contracts and Unexpired Leases.  The Modified APA
must identify with particularity each and every proposed Assumed
Contract and Lease.

g.      Additional Bid Protections.  The bid must not request or entitle the
Potential Bidder to any transaction or break-up fee, expense
reimbursement, or similar type of payment, or propose to modify
any of the Bidding Procedures.

h.      Identity of Bidders.  Each Potential Bidder must fully disclose the
identity of each entity that will be bidding or otherwise
participating in connection with such bid, including the names and
addresses of any members or individuals with an interest in the
entity, and the complete terms of any such participation, as well as
disclose the organization form and the business conducted by each
entity.  Any Potential Bidder shall be required to provide such
additional information as the Debtors may reasonably require
regarding a Potential Bidder's ability to satisfy the requirements of
the applicable regulatory authorities.

i.      Due Diligence.  The bid must not contain any due diligence or
financing contingencies of any kind, and must affirmatively
acknowledge that the bidder (i) had an opportunity to conduct due
diligence regarding the Assets prior to making its offer and does
not require further due diligence, (ii) has relied solely upon its own
independent review, investigation, and/or inspection of any
documents and/or the Assets in making its bid, and (iii) did not
rely upon any written or oral statements, representations, promises,
warranties, or guaranties whatsoever, whether express, implied, by
operation of law, or otherwise, regarding the Assets, or the
completeness of any information provided in connection therewith.

j.      Consents.  Each Potential Bidder must represent that it obtained all
necessary organizational approvals to make its competing bid and
to enter into and perform the Modified APA and include evidence
of authorization and approval from the Potential Bidder's board of
directors (or comparable governing body) with respect to the
submission, execution, delivery and closing of the Modified APA.

k.      Wind-Down Budget.  Each bid must include the provision of funds
for a reasonable wind-down budget (the "**Wind-Down Budget**")
for costs reasonably necessary to wind down the Chapter 11 Cases,
including, without limitation, all allowed administrative expense
claims in the Chapter 11 Cases, which shall be (x) agreed to by the
Debtors and the purchaser of the Assets and (y) subject in all cases
to approval of the Bankruptcy Court.

- 6 -

l.    Deposit. A Potential Bidder for the Assets must deposit 10% of the initial purchase price set forth in the Modified APA with an escrow agent selected by the Debtors (the "**Deposit Agent**") in the form of a certified check or wire transfer at least three business days before the Auction (the "**Deposit**").  The Potential Bidder shall forfeit the Deposit if (i) the Potential Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtors' selection of the Successful Bidder, or (ii) the bidder is the Successful Bidder and (x) withdraws the bid without the Debtors' consent before the consummation of the sale contemplated by the bid, or (y) breaches the Modified APA associated with such bid. The Deposit shall be returned to the Potential Bidder (i) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder or (ii) no later than five business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not determined to be the Successful Bidder or the Backup Bidder (defined below).  The Debtors will not be required to maintain any Deposit in an interest bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above.

The Debtors shall have the right, in their discretion to determine whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids, as soon as possible, and prior to the Auction.  The Debtors may reject any bid that is on terms more burdensome or conditional than the Stalking Horse APA or is otherwise contrary to the best interests of the Debtors and their estates.  In addition to the requirements above, the Debtors may request any additional information from any Potential Bidder to assist them in making their determination as to whether a bid is a Qualified Bid.  For the avoidance of doubt, the party or parties who have entered into the Stalking Horse APA with the Debtors is a Qualified Bidder.

9.    **As Is, Where Is**

The sale of any or all of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates except to the extent set forth in the applicable asset purchase agreement.

10.   **Only One Qualified Bid**

If no Qualified Bid other than the stalking horse bid is submitted, the Debtors may elect not to hold the Auction, and may proceed with the Sale Hearing to seek approval of the Stalking Horse APA.

11.    **Auction**

In the event that the Debtors timely receive more than one Qualified Bid, the Debtors shall conduct the Auction with respect to the Assets.  The Auction will take place at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 on such date that is no later than 75 days following the Trigger Event, starting at 9:00 a.m. (prevailing Eastern Time), or at such other place, date and time as may be designated by the Debtors.  The actual date of the Auction will be specifically identified in the Notice of Stalking Horse, Auction, and Sale.  The Auction shall be governed by the following procedures:

a.    Participation.  Only the Qualified Bidders shall be entitled to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction, or through a duly authorized representative.  Each Qualified Bidder must be accompanied by counsel in order to participate in the Auction.  At least one day prior to the commencement of the Auction, each Qualified Bidder must confirm it will participate in this Auction; provided, however, that in the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.

b.    Anti-Collusion.  At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged and will not engage in any collusion with any other Qualified Bidder with respect to the bidding or the Sale.

c.    Conduct of Auction.  In the discretion of the Debtors, after consultation with the Steering Committee (unless such consultation presents a conflict-of-interest), the Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid (an "**Open Auction**"); provided, however, that nothing contained herein shall prohibit the Debtors from meeting privately with any Qualified Bidder to negotiate the terms of its bid.  Notwithstanding the foregoing, in the discretion of the Debtors, the Auction may be conducted as a closed auction through the submission of closed bids with the results being announced at the conclusion of the Auction process (a "**Closed Auction**").

d.    Bidding.  Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders for all of the Assets may then submit successive bids in increments of $500,000 (the "**Bid Increment**"); provided, however, that the Debtors, after consultation with the Steering Committee (unless such consultation presents a conflict-of-interest), shall retain the right to modify the Bid Increment at

- 8 -

the Auction. Any bid submitted after the conclusion of the Auction shall not be considered for any purpose unless an order of the Bankruptcy Court is entered directing that such bid be considered, and neither the Debtors nor any other person shall have the obligation to seek any such order from the Bankruptcy Court.

e.    <u>Higher or Better</u>. The Debtors reserve the right, in their sole discretion after consultation with the Steering Committee (unless such consultation presents a conflict-of-interest), to determine whether any bid is better, if not higher, than another bid submitted during the Auction. The Debtors may consider a variety of factors in making this decision, including, without limitation, the ability of the applicable Qualified Bidder to obtain the necessary regulatory approvals, any proposed conditions to closing, and the timing of the closing of the proposed transaction.

f.    <u>Successful Bid</u>. The Auction shall continue until the Debtors determine, in their sole discretion after consultation with the Steering Committee (unless such consultation presents a conflict-of-interest) and subject to Court approval, which Qualified Bid is the highest or otherwise best offer(s) from among the Qualified Bids submitted at the Auction (such bid or bids, as applicable, the "**<u>Successful Bid</u>**"). The Qualified Bidder(s) submitting such Successful Bid(s) shall become the "**<u>Successful Bidder</u>**," and shall have such rights and responsibilities of the purchaser, as set forth in its asset purchase agreement, together with any changes made thereto by the Successful Bidder at the Auction. Within one business day after the conclusion of the Auction, but in any event prior to the commencement of the Sale Hearing (as defined below), the Successful Bidder shall (i) complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such deposit equals 10% of the Successful Bid.

g.    <u>Backup Bid</u>. At the conclusion of the Auction, the Debtors will also announce the second highest or otherwise best bid(s) from among the Qualified Bids submitted at the Auction (the "**<u>Backup Bid</u>**"). The Qualified Bidder(s) submitting such Backup Bid(s) shall become the "**<u>Backup Bidder</u>**," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable asset purchase agreement, together with any changes made thereto by the Backup Bidder at the Auction. ***The Backup Bid shall remain open and irrevocable until the closing date with the Successful Bidder.***  Within one business day after the conclusion of the Auction, but in any event prior to the commencement of the Sale

Hearing (as defined below), the Backup Bidder shall (i) complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Backup Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such deposit equals 10% of the Backup Bid.  In the event the Backup Bidder fails to comply with the requirements of this paragraph, it will be deemed to have forfeited its Deposit.  The Backup Bidder's Deposit will be returned by the Debtors within 5 days of the closing with the Successful Bidder.

12.    **Sale Hearing**

The Successful Bid and the Backup Bid will be subject to approval by entry of an order (the "**Sale Order**") by the Bankruptcy Court after a hearing (the "**Sale Hearing**") that will take place at such time to be set by the Court on a date that is on or before 90 days following a Trigger Event.  The Debtors may adjourn the Sale Hearing from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court.

The deadline for filing objections to the Sale, the Stalking Horse APA, or the assumption and/or assignment of any of the Assumed Contracts shall be 4:00 p.m. (prevailing Eastern Time) on the date that is no later than 10 business days after the Notice of Stalking Horse, Auction, and Sale (the "**Initial Objection Deadline**"), which date shall be clearly indicated on the Notice of Stalking Horse, Auction, and Sale filed with the Court on the Stalking Horse, Auction and Sale Notice Date.  Any objections must: (a) be made in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any applicable orders of the Court; (c) state with particularity the legal and factual basis for the objection and if practicable, a proposed modification to the terms of the Sale that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties (the "**Objection Notice Parties**") so as to be actually received on or before the Initial Objection Deadline: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Kenneth H. Eckstein, Esq., Adam C. Rogoff, Esq. and Douglas H. Mannal, Esq.; (b) counsel for the DIP Agent and the Prepetition Senior Agent, White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036-2787, Attn: Thomas Lauria, Esq., Scott Greissman, Esq., Andrew Ambruoso, Esq.; (c) counsel to Oaktree, Kirkland & Ellis LLP, 601 Lexington Avenue, New  York, New York 10022, Attn: Samantha Good, Esq. and Candace Wilhelm, Esq.; (d) the Senior Notes Indenture Trustee, The Bank of New York Mellon, 101 Barclay Street, 8 West, New York, New York 10286, Attn: Beata Harvin; (e) counsel to the Ad Hoc Group of Senior Noteholders, Jones Day, 222 East 41st Street, New York, New York 10017-6702, Attn: Paul Leake, Esq. and Pedro A. Jimenez, Esq.; (f) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Paul K. Schwartzberg, Esq.; (g) the U.S. Securities and Exchange Commission; (h) the Internal Revenue Service; and (i) counsel to any statutory committees appointed in these Chapter 11 Cases; and (j) counsel to the Alternative Stalking Horse, if any.

13.     **Supplemental Objections**

In the event the Debtors choose a Successful Bidder or Back-Up Bidder other than the Senior Lenders or the Alternative Stalking Horse Bidder at the Auction or the terms of the proposed Sale are modified at the time of the Auction, the objection deadline solely with respect to (i) the Debtors' choice of such alternative Successful Bidder or Back-Up Bidder, or the modifications to the terms of the Sale to the Successful Bidder and (ii) to the extent such party did not receive notice of such cure amounts prior to the Auction, cure amounts under the Assumed Leases and Contracts, shall (a) be made in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any applicable orders of the Court; (c) state with particularity the legal and factual basis for the objection and if practicable, a proposed modification to the terms of the Sale that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the Objection Notice Parties and counsel to the Successful Bidder, so as to be actually received by 4:00 p.m. (prevailing Eastern Time) on a date no later than three days after the conclusion of the Auction (the "**Supplemental Objection Deadline**").

14.     **Consummation of the Sale**

Following the Sale Hearing, if for any reason the Successful Bidder fails to consummate the purchase of the Assets, then, after consultation between the Debtors and the Steering Committee (unless such consultation presents a conflict-of-interest), the Backup Bidder will automatically be deemed to have submitted the highest or otherwise best bid.  Thereafter, the Debtors and the Backup Bidder are authorized to immediately effect the sale of the Assets to the Backup Bidder on the terms of the Backup Bid as soon as is commercially reasonable without further order of the Bankruptcy Court.  If such failure to consummate the purchase is the result of a breach by the Successful Bidder, its Deposit shall be forfeited to the Debtors and the Debtors specifically reserve the right to seek all available damages from the defaulting bidder.

15.     **Extension of Deadlines and Modification of Bid Procedures**

The Debtors reserve their rights to modify the Bidding Procedures in their sole discretion, after consultation with the Steer Committee (unless such consultation presents a conflict-of-interest), at or prior to the Auction, including, without limitation, extending the deadlines set forth in the procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice.

16.     **Jurisdiction**

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale of the Assets, the Bidding Procedures, the Sale Hearing, the Auction, the Successful Bid, the Backup Bid, and/or any other matter that in any way relates to the foregoing.

# **ANNEX B**

## ASSIGNMENT PROCEDURES

## ASSIGNMENT PROCEDURES IN CONNECTION WITH
## THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

Upon the motion (the "**Motion**") of General Maritime Corporation ("**General Maritime**") and substantially all of its direct and indirect subsidiaries (together with General Maritime, the "**Debtors**") the U.S. Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (the "**Bidding Procedures Order**"):[1] (a) approving the bidding procedures and bidder protections (the "**Bidding Procedures**") with respect to the sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**"); and (b) approving certain procedures (the "**Assignment Procedures**") related to the assumption and assignment of those executory contracts and unexpired leases related to the Assets and whose assignment is contemplated by the Sale (the "**Assumed Contracts and Leases**"), including procedures for providing notice of assignment to parties to such Assumed Contracts and Leases (each, a "**Counterparty**").

On November 18, 2011, the Court entered an interim order (the "**Interim DIP Order**") authorizing, *inter alia*, the Debtors to enter into that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**") among General Maritime as Parent, Debtors General Maritime Subsidiary Corporation and General Maritime Subsidiary II Corporation as Borrowers, Nordea Bank Finland plc, New York Branch as Administrative Agent and Collateral Agent (the "**DIP Agent**"), and various parties as Lenders thereunder (collectively, the "**DIP Lenders**", together with the Prepetition Senior Lenders as that term is defined in the Interim DIP Order, the "**Senior Lenders**").  As used herein, a "**Trigger Event**," means the nonoccurrence of any Lenders' Milestone which shall require the Debtors to immediately commence an Acceptable Sale Process, as defined in the DIP Credit Agreement.

### 1.    **Important Dates**

| | |
|---|---|
| Trigger Event Notice Date | No later than 3 days following a Trigger Event. |
| Stalking Horse, Auction and Sale Notice Date | No later than 11 business days following a Trigger Event. |
| Initial Objection Deadline | No later than 10 business days following the Stalking Horse, Auction and Sale Notice Date. |
| Bid Deadline | No later than 70 days following a Trigger Event. |
| Auction | No later than 75 days following a Trigger Event. |
| Supplemental Objection Deadline | No later than 3 days following the Auction. |
| Sale Hearing | No later than 90 days following a Trigger Event. |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

2.      **Transaction Documents**

The Debtors are authorized, in their discretion, to enter into either (i) the Lender Stalking Horse Agreement or (ii) within 10 business days of a Trigger Event, an alternative stalking horse agreement with alternative bidder(s) (the "**Alternative Stalking Horse**") if such alternative stalking horse agreement provides for the payment in full in cash of the Prepetition Senior Facilities and the DIP Facility (or other treatment satisfactory to the Senior Lenders) (the "**Alternative Stalking Horse Agreement**").  The stalking horse agreement entered into by the Debtors' shall hereinafter be referred to the "**Stalking Horse APA.**"

3.      **Assumed Contracts and Lease**

Pursuant to the Stalking Horse APA, the Assumed Contracts and Leases consist of (i) certain executory contracts (the "**Assumed Contracts**") and (ii) unexpired leases (the "**Assumed Leases**") designated to be assumed by the Debtors and assigned to the purchaser under the Stalking Horse APA (the "**Purchaser**").

4.      **Initial Notice of Assumed Contracts and Leases**

Within three business days after entry of the Stalking Horse Agreement, the Debtors will serve by first class mail an omnibus notice (the "**Initial Assignment Notice**") on each Counterparty to the Assumed Contracts and Assumed Leases (and such party's attorney, if such attorney has filed a notice of appearance in the Debtors' chapter 11 proceedings) at the last known address available to the Debtors and the notice address of such counterparty provided in each such contract or lease, if applicable.  The Initial Assignment Notice shall include an exhibit that identifies (i) the name and address of the Counterparty, (ii) the specific Assumed Contract or Assumed Lease being specified, (iii) for each Assumed Lease, the premises relating to the Assumed Lease, and (iv) the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").

The Initial Assignment Notice shall also include (i) a description of the Purchasers and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Assumed Contracts and/or Assumed Leases ("**Purchasers' Adequate Assurance**"), (ii) the date of the Initial Objection Deadline (defined below), (iii) the date of the Auction, and (iv) the date of the Sale Hearing.

The Initial Assignment Notice shall also be served upon (a) counsel to the Purchaser; (b) counsel for the counsel to DIP Agent and the Prepetition Senior Agent White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036-2787, Attn: Thomas Lauria, Esq., Scott Greissman, Esq., Andrew Ambruoso, Esq.; (c) counsel to Oaktree, Kirkland & Ellis LLP, 601 Lexington Avenue, New  York, New York 10022, Attn: Samantha Good, Esq. and Candace Wilhelm, Esq.; (d) the Senior Notes Indenture Trustee, The Bank of New York Mellon, 101 Barclay Street, 8 West, New York, New York 10286, Attn: Beata Harvin; (e) counsel to the Ad Hoc Group of Senior Noteholders, Jones Day, 222 East 41st Street, New York, New York 10017-6702, Attn: Paul Leake, Esq. and Pedro A. Jimenez, Esq.; (f) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor,

New York, New York 10004, Attn: Paul K. Schwartzberg, Esq.; (g) the U.S. Securities and Exchange Commission; (h) the Internal Revenue Service; and (h) counsel to the Official Committee of Unsecured Creditors (the "**Committee**") (collectively, the "**Notice Parties**").

5.    **Initial Objections**

To the extent that any interested party wishes to object to any matter pertaining to the sale of the Assets or the assumption and assignment of an Assumed Contract or Assumed Lease, including, without limitation, Purchaser's Adequate Assurance or the Cure Amount designated in the Initial Assignment Notice, then such interested party must file a written objection (the "**Initial Objection**") with the Court on a date no later than no later than 10 business days following the Stalking Horse, Auction and Sale Notice Date at 4:00 p.m. (prevailing Eastern Time) (the "**Initial Objection Deadline**"), and simultaneously serve such Initial Objection on the following parties (the "**Objection Parties**"): (a) counsel to the Debtors. Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Kenneth H. Eckstein, Esq., Adam C. Rogoff, Esq. and Douglas H. Mannal, Esq., and (b) the Notice Parties so that it is **actually received** by each of the foregoing parties by the Initial Objection Deadline.

To the extent that any party-in-interest does not timely serve an Initial Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Contract or Assumed Lease; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with item (i) through (iv) hereof.

6.    **Supplemental Notice of Assumed Contracts and Leases**

Within one business day of the conclusion of the Auction, the Debtors will serve by overnight mail and email or facsimile, where possible, and file with the Court an omnibus notice (the "**Auction Results Notice**") upon the Notice Parties and each of the Counterparties (and their attorneys, if an attorney has filed a notice of appearance in the Debtors' chapter 11 proceedings) at the last known address available to the Debtors and the notice address of such Counterparty provided in each such contract or lease, if applicable.  The Auction Results Notice shall, *inter alia*, identify the successful bidder (the "**Successful Bidder**") and the back-up bidder (the "**Back-Up Bidder**")[2] chosen at the Auction in accordance with the Bidding Procedures and such other information as hereinafter provided.

If and only if the bid submitted by the Successful Bidder (the "**Successful Bid**") or the bid submitted by the Back-Up Bidder (the "**Back-Up Bid**") includes (i) new executory contracts (each an "**Additional Assumed Contract**") or new unexpired leases (each an

---

[2]  After entry of the Sale Order all references herein to "Purchaser" shall refer to the Successful Bidder.  In the event that the Back-Up Bidder is substituted for the Successful Bidder pursuant to the Sale Order, all references to the "Purchaser" shall refer to the Back-Up Bidder.  Similarly, after entry of the Sale Order, all references herein to the APA shall refer to the bid submitted by the Successful Bidder.

"**Additional Assumed Lease**") to be assumed and assigned by the Debtors to either the Successful Bidder or the Back-Up Bidder (as the case may be), or (ii) a different Cure Amount than the one listed in the Initial Assignment Notice (such Cure Amount, an "**Amended Cure Amount**"), then the Auction Results Notice shall include an exhibit that (a) identifies the name and address of the Counterparty, (b) identifies the specific Additional Assumed Contract and/or Additional Assumed Lease being assumed and assigned, (c) identifies, for each Additional Assumed Lease, the premises relating to the Additional Assumed Lease, and (d) the cure amount asserted by the Debtors that is necessary to cure any default under the relevant Additional Assumed Contract or Additional Assumed Leases pursuant to section 365 of the Bankruptcy Code (the "**Additional Cure Amount**"). For each Amended Cure Amount, the Auction Results Notice shall include an exhibit that identifies (w) the name and address of the Counterparty, (x) the relevant Assumed Contract or Assumed Lease, (y) for each Assumed Lease, the premises relating to the relevant Assumed Lease, and (z) the Amended Cure Amount.

The Auction Results Notice shall include, to the extent the Successful Bidder or Back-Up Bidder is not the Purchaser or with respect to the Additional Assumed Contracts and the Additional Assumed Leases, a description of the Successful Bidder and the Back-Up Bidder and a statement as to the ability of the Successful Bidder or the Back-Up Bidder to perform the Debtors' obligations under the Assumed Contracts and Assumed Leases (and, to the extent applicable, the Additional Assumed Contracts and the Additional Assumed Leases) (the "**Successful Bidder's Adequate Assurance**" or the "**Back-Up Bidder's Adequate Assurance**").

7.     **Supplemental Objections**

To the extent that any interested party wishes to object to (i) the assumption of an Additional Assumed Contract or Additional Assumed Lease; (ii) if the Successful Bidder or Back-Up Bidder is not the Purchaser, to the Successful Bidder's or the Back-Up Bidder's Adequate Assurance designated in the Auction Results Notice; or (iii) to the selection of an alternative purchaser as a result of the Auction; or (iv) the Amended Cure Amount or Additional Cure Amount, such party shall file a written objection (the "**Supplemental Objection**") with the Court no a date that is no later than three days following the Auction at 4:00 p.m. (prevailing Eastern Time) (the "**Supplemental Objection Deadline**"), and serve such an objection on the Objection Parties so that it is **actually received** by the Supplemental Sale Objection Deadline.

To the extent that any interested party does not timely serve (x) a Supplemental Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Additional Assumed Contract or Additional Assumed Lease; (ii) agreed that the Successful Bidder and the Back-Up Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) agreed to the terms of the Sale Order; and (iv) waived any and all objections in connection with items (i) through (iii) hereof, or (y) a Supplemental Objection as set forth above, such party will be deemed, as applicable, to have (i) consented to the relevant Additional Cure Amount or Amended Cure Amount, if any; (ii) agreed to the terms of the Sale Order; and (iii) waived any and all objections in connection with items (i) through (ii) hereof.

## 8.    __Further Assignments__

During the period between the Auction and the Closing, the Purchaser may designate additional executory contracts or unexpired leases for assumption by the Debtors and assignment to the Purchaser (the "__Further Assignments__").  The Debtors shall serve by first class mail an omnibus notice (the "__Further Assignments Notice__") on each Counterparty to the Further Assignments.  To the extent that any interested party wishes to object to any matter pertaining to the Further Assignments, then such interested party must file a written objection (a "__Further Assignment Objection__") with the Court no later than at 4:00 p.m. (prevailing Eastern Time) on the fifteenth day after service of the Further Assignments Notice.  In the event a Further Assignment Objection is filed, such objections will be heard at a hearing to be scheduled by the Court.

## 9.    __Resolution and Adjudication of Objections__

Upon filing of an objection by a Counterparty, the Debtors and/or the Purchaser will contact the objecting Counterparty to attempt to consensually resolve any timely served objection.  If the Debtors and/or the Purchaser is unable to resolve an objection in response to the Initial Assignment Notice or the Auction Results Notice, (i) to the extent such objections relate to the adequate assurance of future performance by the Purchaser (each an "__Adequate Assurance Objection__"), such objections will be heard at the Sale Hearing (except in the case of an Adequate Assurance Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Court) or (ii) to the extent such objections relate to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, such objections will be heard at a hearing (the "__Cure Objection Hearing__") to be scheduled by the Court at the Sale Hearing (except in the case of an Adequate Assurance Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Court).

In the event an objection relates solely as to a Cure Amount, Additional Cure Amount, or Amended Cure Amount, (each a "__Cure Objection__"), then such objecting party will be deemed to consent to the assumption of the related executory contract or unexpired lease and its assignment to the Purchaser, notwithstanding such objection.  In the event the Debtors and/or the Purchaser are unable to resolve the Cure Objection prior to the Cure Objection Hearing, the Purchaser may elect not to request assumption and assignment of the related executory contract or unexpired lease as part of the Sale.

On or as promptly after the Closing as practical, the Cure Amounts, Amended Cure Amounts, or Additional Cure Amounts to which no objections have been filed, or to which the Purchaser and applicable Counterparties have agreed shall be paid by the Purchaser.

Payment of the undisputed cure amounts shall be deemed to discharge the obligation of the Debtors and the Purchaser to: (i) cure any defaults under the Assumed Contracts and Leases; and (ii) compensate, or provide adequate assurance that the Debtors will promptly compensate, any non-Debtor party to the Assumed Contracts and Leases for any actual pecuniary loss resulting from any default thereunder.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall have no liabilities for any claims arising or relating to or accruing post-Closing under any of the Assumed Contracts and Leases.

- 5 -

10.      **<u>Reservation of Rights</u>**

The Debtors' decision to assume and assign any of the Assumed Contracts and Leases is subject to Court approval and consummation of the Sale.  Accordingly, the Debtors shall be deemed to have assumed and assigned Assumed Contracts and Leases ultimately identified under the Transaction Documents as of and effective only upon the Closing (as defined in the Transaction Documents).  Absent a Closing that includes such Assumed Contracts and Leases, each of the Assumed Contracts and Leases shall be deemed neither assumed nor assigned/subleased and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

The Purchaser shall have no rights in and to a particular executory contract or unexpired lease until such time as the particular executory contract or unexpired lease is assumed and assigned in accordance with the procedures set forth herein.  In the event that the Purchaser is not a Successful Bidder at the Auction, the Debtors reserve the right to modify these Assignment Procedures.  Under no circumstances will the Debtors be deemed to have assumed an executory contract or unexpired lease without a corresponding assignment of such an executory contract or unexpired lease to the Purchaser pursuant to the terms of the Transaction Documents and an order of the Bankruptcy Court approving such assumption and assignment. The Debtors reserve the right to cancel the assumption of any executory contract or unexpired lease no later than ten business days after a final order determining a cure amount greater than that proposed by the Debtors.

## <u>ANNEX C</u>
### STALKING HORSE, AUCTION AND SALE NOTICE

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Proposed Counsel for the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| GENERAL MARITIME CORPORATION, et al., | ) |
| | ) Case No. 11-15285 (MG) |
| Debtors. | ) |
| | ) Joint Administered |
| | ) |
| | ) **Related to Docket No.** |

**NOTICE OF STALKING HORSE AGREEMENT, AUCTION**
**AND SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

**PLEASE TAKE NOTICE**:

On _____, 2011, the United States Bankruptcy Court for the Southern District of New York (the "**Court**") entered an order (the "**Order**")[1] approving, approving among other things, certain bidding procedures in connection with the potential auction (a "**Auction**") and sale (the "**Sale**") of substantially all of the debtors' assets free and clear of all liens, claims and encumbrances (the "**Assets**") in the event of a Trigger Event (the "**Bidding Procedures**").[2]

A Trigger Event occurred on _____.  Accordingly, the Debtors are now in the process of engaging in the Sale of their Assets subject to the procedures set forth in the Order and the Bidding Procedures.

---

[1] The Court entered the Order in connection with the Debtors' motion seeking entry of an (I) Order approving (A) bidding procedures, (B) Assumption and Assignment Procedures, and (C)Break-up Fee and Expense Reimbursement in Connection with the Potential Auction and Sale; and (II) an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (C) Scheduling an Auction and Sale Hearing (the "**Motion**").  .

[2] All capitalized terms not defined herein shall have the meaning ascribed to them in the Bidding Procedures.

On [   ], the Debtors and [    ] entered into a stalking horse asset purchase agreement (the "**Stalking Horse APA**") that provides for [   ].

Within three business days after the entry of this Notice (the "**Stalking Horse, Auction and Sale Notice Date**"), the Debtors will serve by first class mail an omnibus notice (the "**Initial Assignment Notice**") on each Counterparty to the Assumed Contracts and Assumed Leases (and such party's attorney, if such attorney has filed a notice of appearance in the Debtors' chapter 11 proceedings) at the last known address available to the Debtors and the notice address of such counterparty provided in each such contract or lease, if applicable.

Pursuant to the Bidding Procedures Order, any party wishing to participate in the bidding process and the Auction must do so in accordance with the Bidding Procedures, including the submission of a written offer or group of offers such that it is actually received no later than _____, 2011 at 4:00 p.m. prevailing Eastern Time by the parties identified in the Bidding Procedure Order.

If the Debtors receive competing bids within the requirements and time frame specified by the Bidding Procedures, such that the bids are deemed Qualified Bids by the Debtors in consultation with the Committee, the Debtors will conduct the Auction on _____, 2011 at 4:00 p.m. prevailing Eastern Time at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, or at any such other location as the Debtors may hereafter designate (with notice of such of alternate location given to all qualified bidders under the Bidding Procedures).

The Debtors will seek approval of the Sale before the Honorable Martin Glenn, United States Bankruptcy Judge, in Courtroom 501 at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, on _____, 2011 at __:__ prevailing Eastern time, to consider the entry of an order approving, among other things, the Sale (the "**Sale Hearing**"). The Sale Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on the list of parties entitled to notice.

If you would like to obtain a copy of the Motion, the Bidding Procedures, the Bidding Procedures Order or related documents, you should contact GCG, Inc., the voting and claims agent retained by the Debtors in these chapter 11 cases, by: (a) calling the Debtors' restructuring hotline at (888) 435-3302 (international (614) 553-1243); (b) visiting the Debtors' restructuring website at: http://www.gmrrestructuring.com; (c) e-mailing the Debtors at GMRRestructuring@gcginc.com and/or (d) writing to General Maritime Corporation, c/o GCG, P.O. Box 9844. You may also obtain copies of any pleadings filed in these chapter 11 cases, including the Bidding Procedures, for a fee via PACER at: http://ecf.nysb.uscourts.gov.

The deadline for filing objections to the Stalking Horse APA, the Sale or any other remaining relief requested in the Motion is _____, 2011 at 4:00 p.m. prevailing Eastern Time. Any objections must: (a) be made in writing; (b) conform to the Bankruptcy Rules, the Local Rules and any orders of the Court; (c) state with particularity the legal and factual basis for the objection and if practicable, a proposed modification to the terms of the Sale that would

resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before _____, 2011 at 4:00 p.m. prevailing Eastern Time: (a) Debtors' counsel, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Kenneth H. Eckstein, Esq., Adam C. Rogoff, Esq., and Douglas H. Mannal, Esq.; (b) counsel for the DIP Agent and the Prepetition Senior Agent, White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036-2787, Attn: Thomas Lauria, Esq., Scott Greissman, Esq., Andrew Ambruoso, Esq.; (c) counsel to Oaktree, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Samantha Good, Esq. and Candace Wilhelm, Esq.; (d) the Senior Notes Indenture Trustee, The Bank of New York Mellon, 101 Barclay Street, 8 West, New York, New York 10286, Attn: Beata Harvin; (e) counsel to the Ad Hoc Group of Senior Noteholders, Jones Day, 222 East 41st Street, New York, New York 10017-6702, Attn: Paul Leake, Esq. and Pedro A. Jimenez, Esq.; (f) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Paul K. Schwartzberg, Esq.; (g) the U.S. Securities and Exchange Commission; (h) the Internal Revenue Service; and (i) counsel to any statutory committees appointed in these Chapter 11 Cases; and (j) counsel to the Alternative Stalking Horse, if any.

Dated: New York, New York
_____, 2011

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/_____
Kenneth H. Eckstein
Adam C. Rogoff
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Proposed Counsel for the Debtors*

- 3 -