Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 11-15285-mg

5  - - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  GENERAL MARITIME CORPORATION,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              November 18, 2011

19              11:05 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    (cc:  doc no. 4) Motion for Order Extending the Time to File

3    Schedules and Statements of Financial Affairs Filed by Adam C.

4    Rogoff on Behalf of General Maritime Corporation.  Marked Up

5    Documents:  4

6

7    (cc:  doc no. 5) Application to Employ GCG, Inc., as Notice and

8    Claims Agent/Debtors Application for Entry of an Order

9    Authorizing and Approving the Employment and Retention of GCG,

10   Inc., as Notice and Claims Agent for Debtors and Debtors-in-

11   Possession Nunc Pro Tunc to the Petition Date Filed by Adam C.

12   Rogoff on Behalf of General Maritime Corporation.  Marked Up

13   Documents:  5

14

15   (cc:  doc no. 6)  Debtors Motion for Entry of an Order (I)

16   Waiving the Requirements to File the Lists of Creditors and

17   Equity Security Holders; (II) Authorizing the Debtors to File a

18   Consolidated List of the Debtors 50 Largest Unsecured

19   Creditors; and (III) Approving the Form and Manner of Notice of

20   Commencement of the Debtors Chapter 11 Cases Filed by Adam C.

21   Rogoff on Behalf of General Maritime Corporation.  Marked Up

22   Documents:  6

23

24

25

Page 3

1

2   (cc:  Doc no. 7) Debtors Motion for Entry of Order Granting

3   Administrative Expense Status to Undisputed Obligations to

4   Vendors Arising from Postpetition Delivery of Goods and

5   Services Ordered Prepetition and Authorizing Debtors to Pay

6   Such Obligations in the Ordinary Course of Business Filed by

7   Adam C. Rogoff on Behalf of General Maritime Corporation.

8   Marked Up Documents:  7

9

10  (cc:  Doc no. 8) Debtors Motion for Entry of an Administrative

11  Order Establishing Case Management Procedures Filed by Adam C.

12  Rogoff on Behalf of General Maritime Corporation.  Marked Up

13  Documents:  8

14

15  (CC:  doc no. 2)  Debtors Motion for Entry of an Order Pursuant

16  to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure

17  Directing Joint Administrator of Chapter 11 Cases Filed by Adam

18  C. Rogoff on Behalf of General Maritime Corporation.  Marked Up

19  Documents:  2

20

21

22

23

24

25

Page 4

1

2    (cc:  doc no 10) Debtors Motion for Interim and Final Orders

3    Authorizing the Debtors to (I) Pay Wages, Other Compensation,

4    and Reimbursable Expenses; (II) Honor and Continue Employee

5    Benefit Programs in the Ordinary Course; and (III) Direct Banks

6    and Financial Institutions to Honor and Process Checks and

7    Transfers Related to Such Obligations Filed by Adam C. Rogoff

8    on Behalf of General Maritime Corporation.  Marked Up

9    Documents:  10

10

11   (cc:  doc no. 14)  Debtors' Motion for Entry of Interim and

12   Final Orders (A) Authorizing the Debtors to (I) Use Cash

13   Collateral of the Prepetition Secured Parties; (II) Obtain

14   Secured Superpriority Post-Petition Financing; and (III)

15   Provide Adequate Protection to the Prepetition Secured Parties

16   and (B) Prescribing Form and Manner of Notice of and Scheduling

17   A Final Hearing Filed by Douglas Mannal on Behalf of General

18   Maritime Corporation.  Marked Up Documents:  14

19

20

21

22

23

24

25

Page 5

1

2    (cc: Doc no. 11) Debtors Motion for Interim and Final Orders

3    (I) Authorizing Use of Existing Case Management System; (II)

4    Waiving the Requirements of Section 345(b) of the Bankruptcy

5    Code; (III) Authorizing Use of Existing Business Forms; (IV)

6    Authorizing Intercompany Transactions; and (V) Honoring Certain

7    of the Debtors Obligations Related to the Cash Management

8    System Filed by Adam C. Rogoff on Behalf of General Maritime

9    Corporation.  Marked Up Documents:  11

10

11   (cc:  doc no. 12) Debtors Motion for Entry of an Order

12   Authorizing Debtors to (I) Continue their Insurance Programs

13   and (II) Pay All Obligations in Respect Thereof Filed by Adam

14   C. Rogoff on Behalf of General Maritime Corporation.  Marked Up

15   Documents:  12

16

17

18

19

20

21

22

23

24

25

1

2    (cc:  doc no. 13) Debtors Motion for Interim and Final Orders

3    (I) Authorizing Payments to Foreign and Critical Vendors; (II)

4    Authorizing the Payment of Section 503(b)(9) Administrative

5    Expenses; (III) Authorizing the Payments of Prepetition Amounts

6    Owed to Customers Under Charter Agreements; (IV) Authorizing

7    the Debtors to Continue to Perform Under Pooling Agreements;

8    and (V) Directing Financial Institutions to Honor all Related

9    Checks and Electronic Payments Filed by Adam C. Rogoff on

10   Behalf of General Maritime Corporation.  Marked Up Documents:

11   13

12

13   Limited Objection of Ad Hoc Group of General Maritime

14   Noteholders to Debtors Motion to Use Cash Collateral and Obtain

15   Secured Superpriority Post-Petition Financing Document #:  20

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Aliza Chodoff

Page 7

1

2   A P P E A R A N C E S :

3   KRAMER LEVIN NAFTALIS & FRANKEL LLP

4          Attorneys for Debtors

5          1177 Avenue of the Americas

6          New York, NY 10036

7

8   BY:   KENNETH H. ECKSTEIN, ESQ.

9          DOUGLAS MANNAL, ESQ.

10         ADAM C. ROGOFF, ESQ.

11

12

13  WHITE & CASE LLP

14         Attorneys for Nordea Bank

15         1155 Avenue of the Americas

16         New York, NY 10036

17

18  BY:   SCOTT GREISSMAN, ESQ.

19         TOM LAURIA, ESQ.

20

21

22

23

24

25

```
 1

 2    SHEARMAN & STERLING LLP

 3         Attorneys for Citibank, N.A.

 4         599 Lexington Avenue

 5         New York, NY 10022

 6

 7    BY:   EDMUND EMRICH, ESQ.

 8

 9

10    KIRKLAND & ELLIS LLP

11         Attorneys for Oaktree Capital Management

12         601 Lexington Avenue

13         New York, NY

14

15    BY:   EDWARD O. SASSOWER, ESQ.

16         BRIAN E. SCHARTZ, ESQ.

17

18

19    JONES DAY

20         Attorneys for Ad Hoc Noteholders Group

21         222 East 41st Street

22         New York, NY 10017

23

24    BY:   PEDRO A. JIMENEZ, ESQ.

25         PAUL D. LEAKE, ESQ.
```

1

2    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

3          Attorneys for Proposed Conflicts Counsel for Debtors

4          101 Park Avenue

5          New York, NY 10178

6

7    BY:   STEVEN J. REISMAN, ESQ.

8          MARYANN GALLAGHER, ESQ.

9

10

11   UNITED STATES DEPARTMENT OF JUSTICE

12          Attorneys for Office of the United States Trustee

13          33 Whitehall Street

14          21st Floor

15          New York, NY 10004

16

17   BY:   PAUL K. SCHWARTZBERG, ESQ.

18

19

20

21

22

23

24

25

GENERAL MARITIME CORPORATION

Page 10

1                     P R O C E E D I N G S

2              THE COURT:  Be seated.  All right.  We're here in

3     General Maritime Corporation, number 11-15285.  I have the list

4     of appearances in front of me.  Who's going to begin for the

5     debtors?

6              MR. ECKSTEIN:  Your Honor, good morning.  My name is

7     Kenneth Eckstein.  I'm a partner at Kramer Levin.  We are

8     proposed counsel for the debtors-in-possession.  First, I'd

9     like to thank Your Honor for making some time this morning for

10    the first-day hearings.  We do appreciate it.  If I may begin

11    with some introductions, Your Honor.  With me are my partners,

12    Adam Rogoff and Douglas Mannal.  They'll be sharing the podium

13    today.  And Your Honor, I will be speaking at the outset,

14    presenting the background of the case and hopefully educating

15    the Court and the parties about the details that led up to the

16    filing.  Mr. Rogoff will deal today with the various

17    operational motions that are before the Court, and Mr. Mannal

18    will present the debtor-in-possession financing.

19             THE COURT:  Okay.

20             MR. ECKSTEIN:  Your Honor, I'd like to also introduce

21    Mr. Jeffrey Pribor, who is the executive vice president and

22    chief financial officer of the debtor.

23             THE COURT:  Good morning.

24             MR. ECKSTEIN:  Mr. Pribor was the declarant in the

25    first-day affidavit that Your Honor has received.  Also with

1    him is Leo Von Dresius (ph.), vice president of the company,

2    and Chris Alwin (ph.), both are with Mr. Pribor from the

3    company.

4         In addition, Your Honor, Moelis & Company is the

5    proposed financial advisor for the company, and Mr. Thane

6    Carlston is here.  Mr. Carlston was the declarant in connection

7    with the debtor-in-possession financing, and he and his

8    colleagues are in the courtroom today as well.

9         And in addition, the firm of Curtis, Mallet is

10   proposed conflicts counsel for the debtor, and Maryann

11   Gallagher is in the courtroom.  I don't know whether Mr.

12   Reisman is here --

13        THE COURT:  Mr. Reisman's there.

14        MR. ECKSTEIN:  Mr. Reisman is here as well.

15        Your Honor, that, I believe, would take care of the

16   introductions.  There are other parties in court today, and I

17   know they've all made appearances, and I expect they'll

18   introduce themselves in due course to Your Honor.

19        Your Honor, if it -- if I may, I would propose to

20   begin with a brief presentation on the background of the case.

21   We have prepared several slides, and we're going to actually

22   attempt to put them up on the screen.

23        THE COURT:  Yeah, we had a little computer problems

24   this morning, but I have the additional monitor --

25        MR. ECKSTEIN:  Hopefully, we navigated those well.

GENERAL MARITIME CORPORATION

Page 12

1          THE COURT:  We did, thank you.

2          MR. ECKSTEIN:  And we've also, Your Honor, prepared a

3    corporate chart, which, if --

4          THE COURT:  And I was given copies of two charts.

5          MR. ECKSTEIN:  That's great, so you -- I'm going

6    assuming Your Honor has both of these slide presentation and

7    the charts.  We've given out copies --

8          THE COURT:  I don't know that I have the slide

9    presentation.  I have --

10          MR. ECKSTEIN:  Can I approach, Your Honor?

11          THE COURT:  -- two char -- yes, please.  Thank you.

12    If you have an extra, why don't you -- thank you.

13          MR. ECKSTEIN:  Your Honor, if I may, I'll walk through

14    this briefly, but I -- given the fact that the affidavit, I

15    know, was lengthy and there was a voluminous document, it may

16    be useful to put the company in context.  And if Your Honor

17    obviously has questions, we can respond to them.

18          The introductions, which are on page 2, I think we

19    have already made.  On page 3, Your Honor knows the company

20    filed for Chapter 11 relief yesterday, November 17th.  General

21    Maritime Corporation is the parent holding company, and there

22    are fifty-six direct and indirect subsidiaries for a total of

23    fifty-seven debtors.  The company is a leading provider of

24    international seaborne transportation services for crude oil

25    and refined petroleum products.  It is a prominent company in

Page 13

1    the maritime industry.

2          The company has a fleet of thirty-three vessels that

3    are located internationally.  It's worth noting that the

4    company is not subject to the Jones Act because they do not

5    transport between two or more U.S. ports.  The vessels are

6    chartered by third party customers through both time charters

7    and through spot market charters.  Time charters are a

8    long term -- essentially long term leases over a period of

9    usually months or longer.  Spot market charters are essentially

10   individual voyages.  And in real estate parlance, you can

11   compare it to a long term lease versus essentially like a hotel

12   or a short term stay.  The company has both time charters and

13   sport charters, and I'll come back and refer to the impact of

14   those.

15         This company is located -- its headquarters are

16   located in Manhattan.  So in fact, the venue is most

17   appropriate in the Southern District.  And the business is

18   operated from the headquarters in Manhattan.  It also has local

19   offices in Portugal, in Russia, and until recently it had a

20   local office in India.

21         The debtor has over 1,000 employees located throughout

22   the world, which would include office personnel, crew members

23   and parties who are responsible for managing the vessels.

24         The debtor manages seventeen of its vessels directly,

25   and it uses third party ship managers for sixteen of its

1    vessels.

2         The company's thirty-three vessels; thirty of them are

3    owned, three of them are what is called chartered in.  Those

4    were sold by the company and are leased back by the debtors,

5    and I'll go through when we deal with the corporate chart where

6    each of these vessels are located.

7         The company is registered or flagged in Bermuda,

8    Liberia and the Marshal Islands and operates in 270 ports in

9    over 70 countries.

10        The vessels that the company operates are really

11   broken down by the capacity and ability to navigate.  The --

12   they're broken down into several categories.  Eight of the

13   vessels are called Aframax tankers.  They are 75,000 to 115,000

14   tons, and they traverse around the bottom of Africa.  Two are

15   called Panamax tankers, and they are designed with the maximum

16   width necessary to traverse the Panama Canal.  Twelve are

17   called Suezmax tankers because they are designed to traverse

18   the Suez Canal fully loaded.  There are seven VLCCs, which

19   are -- stand for very large crude carriers, and four product

20   tankers, which are coded cargo tanks.

21        Let me turn Your Honor to the corporate chart.  We've

22   tried to color code this so it's easier to follow.  The company

23   has four different types of entities -- or five different types

24   of entities.  It has several holding companies that -- the

25   company at the top is General Maritime Corporation.  The

1    blue -- the four blue ones are considered holding companies.

2    You have General Maritime Corporation.  To the right of that

3    you have Arlington Tanker Limited, which is a holding company

4    for six companies that own vessels.

5         You have to the right of that General Maritime

6    subsidiary NSF Corporation, which is a holding company for the

7    entities that now lease the three vessels.  And to the left on

8    the chart, you have General Maritime subsidiary Two

9    Corporation, which is a holding company for seven entities that

10   own vessels that are primary collateral for one of the two

11   secured lending facilities.

12        In addition, we have operating companies.  The main

13   operating companies are General Maritime Sub-1, which is the

14   box directly to the left of the General Maritime holding

15   company at the top.  And we have General Maritime Management

16   LLC, which is the holding company in the middle, which is

17   essentially the holding company above the six companies that

18   are in yellow, which are the nondebtor entities.

19        We next have vessel owning companies.  The way the

20   company is structured each vessel is held by a separate

21   subsidiary, and Your Honor will see the vessels directly under

22   General Maritime Subsidiary Corporation; they're the green

23   shaded entities.  Each of those entities hold a different

24   vessel.  There are several grey entities.  Those are inactive

25   subsidiaries because those are entities which had previously

1    held vessels that have been sold.

2          And we finally have the nondebtor subsidiaries, which

3    are the entities that are listed in yellow.  And these were

4    entities located in Lisbon, Portugal and Russia and in several

5    other locations, but we chose not to file the entities,

6    although they are obligors.  But the judgment was made that it

7    would be more prudent not to put those entities into Chapter

8    11.

9          I don't know if Your Honor has any specific questions

10   about the corporate chart, but you can obviously look at this

11   as the case goes forward.

12         Let me turn now to the capital structure, and it

13   relates to the corporate structure so I can tie it back.  The

14   company has three secured facilities.  This is on page 10, Your

15   Honor.  The company has three secured facilities.  The first

16   one is known as -- we're going to refer to it in the case as

17   the 2011 facility.  The second is the 2010 facility.  There's

18   the OCM facility, which is the Oaktree facility.  And then

19   there is the unsecured debt, referred to as the senior notes.

20   And let me walk through each of these briefly.

21         Page 11 describes the terms of the 2011 credit

22   facility.  This is a facility; the borrower is GenMar Sub-1,

23   which is the operating company at the top, directly to the left

24   of General Maritime Corporation.  It's -- and originally --

25   it's a 550 million dollar secured revolving credit facility

GENERAL MARITIME CORPORATION

Page 17

1    currently dated May 6th, 2011.  That facility was originally

2    entered into in October of 2005 and has been amended on several

3    occasions.  But it was most recently amended in 2011, so that's

4    why it's now called the 2011 facility.

5           This facility, which was agented by Nordea Bank with

6    seventeen banks in the bank syndicate, is secured by a first

7    lien on GMR's interest in General Maritime Sub-1 and in

8    Arlington, which is the entity over to the right, and is

9    secured by all of their -- the twenty-three vessel owning

10   subsidiaries and the assets of each of those subsidiaries.  So

11   essentially, this is a facility that has a first lien on

12   subsidiaries and twenty-three vessels.  They also are

13   guaranteed by substantially all the debtors.  And as of

14   September 30th, approximately 536.8 million in loans and 4.6

15   million in letters of credit were outstanding on this facility.

16          The second bank facility described on page 12 is the

17   2010 credit facility.  Also agented by Nordea, with six

18   syndicate banks, there's substantial overlap of the banks,

19   although it's not completely overlapping so there are, I

20   believe, two banks in the 2010 facility who are not in the 2011

21   facility.  This facility is the borrower -- is General Maritime

22   Subsidiary Two Corporation, which is the operating company on

23   the left of the chart.  There's -- it's a 328.2 million dollar

24   facility, which includes a 50 million dollar revolver, and then

25   there's a 278 million dollar term loan.  And this was also

GENERAL MARITIME CORPORATION

Page 18

1  amended on several occasions.  Most recently it was amended in

2  September of 2011, and it's now -- the -- some of the banks are

3  part of the DIP.

4       This is secured by a first lien on GenMar Sub-2's

5  subsidiaries and the seven vessels that are owned by the GenMar

6  Sub-2 subsidiaries.  So the seven vessels that are -- that

7  reside in the pink boxes on the left are the primary collateral

8  of this facility.  They also have a second lien on the vessels

9  that are securing the 2011 facility, so both bank groups have a

10 first lien and a second line in the various respective vessels.

11 And they are then reversed with second liens below the -- below

12 each of the facilities.  So for practical purposes, you have

13 essentially two bank groups with effectively first liens,

14 although it's first lien, second lien the way it's structured.

15      And as of September 30th, approximately 313.5 million

16 dollars was outstanding on this facility.  So --

17      THE COURT:  When they -- when it was amended in

18 September, did the collateral securing the loans change?

19      MR. ECKSTEIN:  No.  The only amendment was a waiver of

20 the minimum cash condition.

21      So as of the petition date, we have approximately 850,

22 thereabout, million dollars of essentially first and second

23 lien bank debt.

24      Directly below the two bank facilities in the capital

25 structure, as described on page 13, is the OCM facility.  This

1    was a facility that was entered into in May of 2011 and was a

2    loan of 200 million dollars by an Oaktree entity.  That

3    essentially was brought in to take out a part of the bank

4    facility.  And we had cash pay debt that had significant

5    amortization obligations, and the company replaced the first

6    lien bank debt, which had cash pay and amortization

7    obligations, with 200 million dollars of third lien debt.  So

8    the Oaktree facility has a third lien on all of the vessels

9    that are securing the 2010 and the 2011 facility, but the

10    Oaktree facility was pick and didn't have amortization

11    obligations.

12            THE COURT:  Was this actually an advance of 200

13    million by Oaktree?

14            MR. ECKSTEIN:  Yes.  Oaktree infused 200 million

15    dollars into the company, and the proceeds were applied to pay

16    down the bank debt.

17            THE COURT:  Okay.

18            MR. ECKSTEIN:  And the banks -- in connection with

19    that transaction, the banks agreed to loosen the amortization

20    that burdens on the company.  And it was designed to

21    essentially give the banks a pay-down in exchange for a

22    reduction of the company's amortization obligations, and the

23    company replaced cash pay debt with pick debt.  And it was

24    expected at the time that this was going to give the company a

25    runway to essentially navigate through what was considered a

GENERAL MARITIME CORPORATION

Page 20

1    significant downturn in the market, and we would have our bank

2    lenders who were satisfied with essentially a pay-down release

3    on amortization and also release on covenants so that the

4    company could essentially satisfy its obligations during what

5    was considered to be a trough in the market.

6           As I'll get to, in a moment, the market has worsened.

7    And as a result, that transaction did not provide the company

8    with the relief that it had hoped for.  But that was the

9    structure of the Oaktree transaction at the time.  And at the

10   time, Oaktree also received in connection with that transaction

11   warrants for 19.9 percent of the company stock, which was, at

12   the time, considered to be a significant transfer of a

13   potential stake in the equity.  Those warrants today have no

14   value, but that was part of the transaction that Oaktree

15   received in connection with that facility.

16          So they have a third lien on the assets guaranteed by

17   substantially all of the debtors.  And with the pick interest,

18   as of September 30th, approximately 211 million dollars was

19   outstanding on the Oaktree facility.  So we add the 850 million

20   of first and second lien debt, 211 million dollars of third

21   lien Oaktree debt.

22          Below the Oaktree debt in the capital structure on

23   page 14 of the presentation, Your Honor, are the twelve-percent

24   senior notes.  These are unsecured public notes.  They were

25   issued in November of 2009.  The twelve-percent coupon; Bank of

GENERAL MARITIME CORPORATION

Page 21

1    New York Mellon is the trustee.  There was a coupon payment

2    that was due this week, November 15th, that was not paid.  So

3    as of the petition date, there was 300 million plus the 18

4    million of interest that's outstanding under that facility.

5    And as I said, that is unsecured public debt.

6            THE COURT:  This company -- what's the company's view

7    on the value of the collateral securing the first and second

8    lien debt?

9            MR. ECKSTEIN:  The company has not yet articulated a

10    specific view on the value of the collateral, and the company

11    is continuing to carefully evaluate the value of the

12    collateral.  There are --

13            THE COURT:  I read carefully the Jones Day objection

14    this morning.  That's why I'm asking that.

15            MR. ECKSTEIN:  And I think everybody probably will be

16    cautious about not prejudging the value of the collateral.  I

17    think, as I'll get into now, Your Honor, the financial

18    condition of the industry and the company have dramatically

19    changed.  And as Your Honor will quickly appreciate, the EBITDA

20    for this company is a small fraction of what it had been just a

21    few years ago.  And to the extent that's indicative of value,

22    obviously it's dramatically below what it was.  There are

23    valuations in this industry.  There are very assessments made,

24    primarily by the shipping lenders, of what the vessels are

25    worth if they were to be sold.  And that's something that we

Page 22

1    can, I think, get to at the appropriate time.

2         But given the difficulties in the industry, I think

3    that's a question that is being assessed -- I don't want to say

4    on a daily basis -- but on an ongoing basis.  And I would

5    suggest that it would be appropriate to defer that question to

6    a bit later in the case.

7         Let me turn, if I can, to the financial condition of

8    the company and to the industry.  The first, I think, focus

9    really is the shipping industry itself.  And on page --

10        THE COURT:  I did -- I'll let you -- if you want --

11   I'd go through part quickly.  I read the first-day affidavit

12   very carefully.  It was very well done.  It was very --

13   provided a very good explanation of what's happened to the

14   industry as a whole.  If you want to go through it, I'm not --

15        MR. ECKSTEIN:  I don't --

16        THE COURT:  It's not --

17        MR. ECKSTEIN:  -- I don't need to, Your Honor.

18        THE COURT:  I did -- I've reviewed everything.

19        MR. ECKSTEIN:  What I would like to spend on a moment

20   on -- I just would actually shift to the transaction that was

21   entered into --

22        THE COURT:  Okay.

23        MR. ECKSTEIN:  -- prior to the commencement of the

24   case because I think that's an important context to make sure

25   we focus on.

GENERAL MARITIME CORPORATION

Page 23

```
 1          The company realized in September that it needed

 2    additional capital infusion and it needed to delever.  So the

 3    company has really done two things leading up to the filing.

 4    First of all, the company put in place debtor-in-possession

 5    financing with its existing first and second lien bank lenders.

 6    And as Your Honor will hear when Mr. Mannal will describe it,

 7    we have a seventy-five-million-dollar debtor-in-possession

 8    financing with a nine-month term with a right to extend for an

 9    additional three months if we satisfy certain conditions.  And

10    there are various milestones in the debtor-in-possession

11    financing; the most significant of which is that we bargained

12    for as runway to try to identify a plan sponsor that will

13    infuse capital into the company.  And we have agreed that the

14    company will accomplish that process and filed a plan within

15    seventy-five days of the petition date, which essentially take

16    us to the end of February.

17          In the event the company is not successful in

18    accomplishing that, what the DIP provides is that the company

19    will properly initiate a Section 363 sale of the assets.

20          THE COURT:  Is Oaktree effectively your stalking horse

21    on that?

22          MR. ECKSTEIN:  Oaktree is now our stalking horse, yes.

23    And I'll get to that in a moment.  But I just wanted to point

24    out that there is -- in the DIP, there is an undertaking to

25    proceed with a 363 sale if we are not able to essentially
```

GENERAL MARITIME CORPORATION

Page 24

1    implement either the Oaktree or an alternative transaction.

2              THE COURT:  And have the DIP lenders agreed that

3    Oaktree's commitment letter would satisfy the conditions of the

4    DIP loan as a potential sponsor for the --

5              MR. ECKSTEIN:  Yes, Your Honor.  They have agreed that

6    the Oaktree transaction does satisfy the -- essentially the

7    first milestone, which is identifying a satisfactory --

8              THE COURT:  But that --

9              MR. ECKSTEIN:  -- transaction.

10             THE COURT:  -- first seventy-five day -- well, I guess

11   you'd have to file the plan within the seventy-five days.

12             MR. ECKSTEIN:  That's correct, Your Honor.

13             THE COURT:  Okay.

14             MR. ECKSTEIN:  So as long as we sati -- as long as we

15   file the plan within seventy-five days, we will have satisfied

16   that condition to the DIP, and then we have to proceed to

17   confirmation.  So essentially, after putting the DIP in place,

18   we felt that it was most advantageous, given the difficulties

19   in this industry, to -- if we able to -- to put in place

20   essentially what Your Honor described as a stalking horse.  And

21   we have entered into a plan support agreement with Oaktree and

22   the lenders, and we have two-thirds of the lenders who have

23   signed the plan support agreement that is based upon a 175

24   million dollar equity commitment that we've received from

25   Oaktree, which would, coupled with converting their 200 million

GENERAL MARITIME CORPORATION

Page 25

1    dollars -- or 211 million dollars of third lien debt, would be

2    contributed as part of a plan in exchange for the equity in the

3    reorganized company.

4          We view that as a very significant accomplishment and

5    provided we will -- we feel the market place, with the

6    confidence that there is a transaction, that will allow this

7    company to emerge as a going concern from Chapter 11 in short

8    order.  What we did negotiate and we felt was critical to this

9    process was rather than simply agreeing to an extremely

10   expedited process that would have essentially put tremendous

11   pressure on the case at the front end, we bargained for in

12   exchange for this the right for the company to affirmatively

13   shop the transaction.

14         And the company has a period of time beginning today

15   to continue to shop, because the shopping really has been

16   ongoing.  We have the right to continue to shop, in fact,

17   through confirmation of a plan.  And we have bargained for

18   several milestones.  And I assume Your Honor has glanced, at

19   least, at the milestones in the back.  There is -- and we've

20   actually spoken with chambers about a potential hearing date, I

21   believe, of December 15th, which would be a hearing date that

22   we would propose deal with the final DIP as well as a hearing

23   on a motion that we intend to file at the beginning of next

24   week to approve the equity commitment agreement.

25         And in connection with that, we would expect to have

GENERAL MARITIME CORPORATION

Page 26

1    an equity commitment agreement on file that it will include a

2    break fee and a commitment agreement, and that will all be

3    presented to the Court at the time.  But the expectation is

4    that we will have a hearing on that in mid-December, and we

5    have agreed to file a plan by the first week of January.

6          So what's not done in the case, Your Honor, is at this

7    point in time there is no agreement with the junior part of the

8    capital structure.  The fact is that before we filed we did

9    work with the large holders of the bonds and --

10         THE COURT:  So when I went through the term sheet DIP

11   I had a big question mark next to what the unsecureds might get

12   because you couldn't see that.

13         MR. ECKSTEIN:  And it is still a question mark, but we

14   did work with the large holders of the bonds.  They've engaged

15   the Jones Day firm, and they engaged a financial advisor who

16   we've been working with pre-filing.  there is no agreement in

17   place, but we clearly recognize that over the next several

18   weeks it would be ideal if we can arrive at a consensual

19   agreement with Oaktree and with the holders of our bonds so

20   that by the time we file a plan at the beginning of January we

21   can file a consensual plan that has the support, at least, of

22   our bondholders.

23         At this point in time, I do not want to speculate that

24   there'll be any ability to provide recoveries for shareholders,

25   but we're not going to foreclose anything.

GENERAL MARITIME CORPORATION

Page 27

1          THE COURT:  What's your estimate on the unsecured --

2     putting aside the senior notehold -- notes, what your estimate

3     of the unsecured claims?

4          MR. ECKSTEIN:  Your Honor, we view this as primarily a

5     financial restructuring.  I think as Your Honor will hear, Mr.

6     Rogoff will describe the critical vendors' motion.  Our

7     contemplation is that the substantial majority of our unsecured

8     debt, ideally, will be dealt with through a critical vendor

9     program.  And while there may be some residual unsecured debt,

10    we view it as a very small number relative to the billion-three

11    or so of financial debt.  So this is essentially a financial

12    restructuring.  And we don't yet know the extent to which we'll

13    have any outstanding pre-petition trade debt, and we'll have to

14    deal with that in the plan.

15          It is not contemplated that this case is going to

16    involve substantial modifications of contracts.  We don't have

17    labor issues that are going to be dealt with, so it is

18    essentially a financial restructuring.

19          And Your Honor, with that -- and I'm not going to go

20    through all of the milestones in detail.  I know Your Honor has

21    seen the papers.  I'm happy to answer any further question.

22    but un -- if Your Honor doesn't have any further questions, I

23    would propose that we turn to the operational motions first,

24    and then --

25          THE COURT:  Sure.

1          MR. ECKSTEIN:  -- do the debtor-in-possession

2    financing.

3          THE COURT:  That's fine.

4          MR. ECKSTEIN:  Thank you very much, Your Honor.

5          THE COURT:  Thank you very much.

6          MR. ROGOFF:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. ROGOFF:  Adam Rogoff, Kramer Levin, on behalf of

9    the debtors.

10         We have divided the agenda, if I can turn to that for

11   the benefit of the Court, into three -- four parts following

12   Mr. Eckstein's presentation.  The first part is administrative

13   matters in which I would just run through briefly or as much

14   time as Your Honor would like on the various four

15   administrative motions filed in the case.

16         I would then turn to the, what we referred to as

17   matters concerning the debtors' business operation, the more

18   substantive matters.

19         I will then turn the podium over to my partner, who

20   would address the financing matters, and then we would conclude

21   with a case coordination matter.

22         What I would just note is in discussion with Your

23   Honor's chambers, although we had filed the case management

24   order or a proposed form of that, we appreciate that Your Honor

25   would like time to review that.  And we would set that request

1    over for a different day.  So while it's on the agenda, we

2    were -- are not planning on proceeding with that this morning.

3            THE COURT:  That's fine.  We'll provide you with a

4    number of examples of case management order that we've entered

5    in other cases before -- large cases before, okay?  So we'll

6    get to that in due course.

7            MR. ROGOFF:  Excellent.  Thank you, Your Honor.

8            So turning to the administrative matters; the first

9    one is the request for joint administration.

10           THE COURT:  Okay.  Let me --

11           MR. ROGOFF:  As to --

12           THE COURT:  I've reviewed it.  Let me ask:  does

13   anybody else wish to be heard with respect to the motion for

14   joint administration?

15           All right, the motion is granted.

16           MR. ROGOFF:  Thank you.

17           Next up is the motion to extend time to file

18   schedules.  We've asked for an extension that would take us out

19   for forty-four days in total.

20           THE COURT:  Anybody wish to be heard with respect to

21   the motion to extend the time to file schedules?

22           The motion is granted as well.

23           MR. ROGOFF:  Thank you.

24           The next up is the motion to retain Garden City Group

25   pursuant to Section 156(c).  I would just like to point out two

GENERAL MARITIME CORPORATION

Page 30

1    quick things for the Court.  First, we solicited competitive

2    bids and got a very favorable proposal from Garden City Group.

3    And in addition, we have conformed.  We worked with the U.S.

4    Trustee and the clerk's office, and the motion does conform to

5    the format and the protocol that has been adopted by the Court.

6    We are filing a separate motion for additional services that

7    Garden City would do under Section 327, but the motion this

8    morning is the one for the acting as an agent under 156(c).

9               THE COURT:  All right.  Does anybody wish to be heard

10   with respect to the motion to retain Garden City Group?

11              The motion is granted.

12              MR. ROGOFF:  Thank you.

13              Next up is the motion concerning the waiver of the

14   filing of a creditor matrix and certain related relief.

15              THE COURT:  Anybody wish to be heard with respect to

16   the motion to waive the requirements for a list of creditors?

17              The motion's granted as well.

18              MR. ROGOFF:  Thank you.

19              The last of the administrative motions is a request

20   just to deem that any goods or services that are provided post-

21   petition, whether they are pursuant to a pre-petition purchase

22   order or not, would be deemed administrative expense claims of

23   the estate.  We are only dealing with things which occur post-

24   petition.

25              THE COURT:  Do you have the estimate of the dollars

GENERAL MARITIME CORPORATION

Page 31

1    that are involved?

2            MR. ROGOFF:  I don't have an estimate of the dollars,

3    but there's about 500 purchase orders that are outstanding.

4            THE COURT:  Okay.  Anybody wish to be heard with

5    respect to this motion on goods that were ordered pre-petition

6    be delivered post-petition?

7            MR. ROGOFF:  Correct.

8            THE COURT:  All right, the motion is granted as well.

9            MR. ROGOFF:  Thank you.

10           Turning now to the first of the business related

11   substantive motions; the first one we have relates to employee

12   wages.  I thought it would be helpful just to start with a

13   headline number to put it into a little bit of context.  The

14   total amount that we expect would be covered under this motion

15   is approximately 1.2 million dollars, of which approximately a

16   million of it relates to amounts that are outstanding to our

17   seaborne crew; the people actually working on the vessels.

18   Based on certain rights that they may have under maritime law,

19   they would be entitled to assert maritime liens for their

20   unpaid wages.

21           One reason why the number is a bit higher is, is that

22   they are paid on a monthly basis.  So the amounts outstanding

23   to them relate to the first two weeks of November.  The balance

24   of what is outstanding is about 80,000 dollars for U.S.

25   employees and approximately 200,000 dollars for our foreign

Page 32

```
 1    office employees.  One thing which I wanted to call to Your

 2    Honor's attention is both with respect to the critical vendor

 3    motion and this motion, as Mr. Eckstein noted, we have several

 4    nondebtor entities --

 5            THE COURT:  That --

 6            MR. ROGOFF:  -- operat --

 7            THE COURT:  -- was my only question, really.

 8            MR. ROGOFF:  Right.  That operate our foreign

 9    businesses.  We have included the economic amounts that the

10    nondebtor entities would be paying in our motions.  In other

11    words, we have -- we are -- when we request authorization to

12    pay the wages, even though these wages are being paid by

13    nondebtors, they're being funded ultimately through debtor

14    accounts, as I'll discuss when I talk about the cash management

15    system.  And so, in the exercise of caution, we've included

16    this information.

17            THE COURT:  How many employees of nondebtors?

18            MR. ROGOFF:  There are approximately -- one second,

19    Your Honor.  We have forty-one employees who are located in

20    Portugal, three who are located in Russia, three who are

21    located in India, and then one of the nondebtor entities

22    actually employs crew members.  And that is about 200 crew

23    members.

24            THE COURT:  Do you have a dollar -- approximate dollar

25    value for the pre-petition wages on employees of the nondebtor
```

1    entities?

2            MR. ROGOFF:  I do, Your Honor.  Being very specific,

3    there is 214,000, approximately, owed in respect of our

4    Portugal office.  There is 5,500 dollars owed in respect of our

5    Russian employees.  And a similar amount, 5,500 dollars, owed

6    in connection with our employees in India.  We've closed the

7    office in India, but we still employees who are working out of

8    a ship manager's office.

9            THE COURT:  And what about the crews who are employed

10    by nondebtors?

11            MR. ROGOFF:  The crew that is employed by the

12    nondebtors is employed by General Maritime Crewing PTE Limited,

13    and that is a little in excess of 700,000 dollars.  Just to

14    round it out, Your Honor, the balance of the crew is actually

15    employed by one of the debtors' General Maritime management.

16    They are owed about 230,000 dollars.  And when we go through

17    the math, what's left is the 80,000 dollars of payroll for the

18    U.S. employees.

19            THE COURT:  MR. Schwartzberg, what's the position of

20    the U.S. Trustee?

21            MR. SCHWARTZBERG:  Your Honor, good morning.  Paul

22    Schwartzberg from the U.S. Trustee's office.

23            The U.S. Trustee, I guess, has -- on this particular

24    matter has two concerns.  One that hasn't been addressed yet is

25    that the expenses are not included in this, and we're concerned

GENERAL MARITIME CORPORATION

Page 34

1    about any expenses, including wages being paid to employees

2    that it will exceed the priority cap.  And of course, to the

3    extent any individuals receive payment of a wage that would

4    exceed the priority cap as well, at least on the interim order.

5          MR. ROGOFF:  To answer that specifically, on wages we

6    don't believe that anybody, whether a debtor or employed by a

7    nondebtor affiliate, would have a wage claim that exceeds

8    11,725 dollars.  I would note that while the priority is

9    normally a factor we think about in debtor cases, with respect

10   to the vast majority of our employees, over 1,000 employees are

11   seaborne crew members who have maritime rights.  And with

12   respect to the issue raised about the expenses, we have

13   discussed that with the U.S. Trustee's office.

14         First, we're not aware of anybody that has any

15   reimbursable business expenses that would exceed the priority

16   amount.  But the reimbursable business expenses are exactly

17   that, Your Honor.  This is travel, because of the debtors'

18   global operations, because our customers, our suppliers, our

19   ship managers are located outside of the U.S., there is travel

20   that's required.  This is direct reimbursement of these

21   expenses.  We have asked for permission to reimburse expenses

22   in the normal course as and when they come due.  We're not

23   looking to accelerate a reimbursement, but we didn't think it

24   was appropriate for an individual employee that has put a

25   charge on his or her credit card to have to basically float the

Page 35

1    cost of that by not being reimbursed in the normal course.

2          So --

3          THE COURT:  MR. Schwartzberg, I take it that the U.S.

4    Trustee is not objecting to the payment -- the debtors' payment

5    of wages to employees of the nondebtor entities if they don't

6    exceed the cap?

7          MR. SCHWARTZBERG:  Correct, Your Honor.

8          THE COURT:  Okay.  Are you satisfied with Mr. Rogoff's

9    representation that -- I guess it was hedged slightly, but he

10   doesn't believe that anybody exceeds the cap.

11         MR. SCHWARTZBERG:  The only reason I raised the issue

12   is -- and I've seen so many versions of his motion.  I think

13   this one has it.  It might not.  The motion always says

14   something -- and crouches it in -- there may be people who are

15   also asking for permission to exceed the cap.  So our concern

16   was the cap.  If Mr. Rogoff is telling me that --

17         THE COURT:  All right.  Here's what we're going to do:

18   I'm going to approve the motion on an interim basis, limiting

19   the payment to any employee to the amount of the cap.  You can

20   come back at the final hearing on the wage motion.  And if you

21   have any issues about any employees with amount in excess of

22   the cap, you can raise it then and we'll deal --

23         MR. SCHWARTZBERG:  Okay.

24         THE COURT:  -- with it.

25         MR. ROGOFF:  I appreciate that.  Just for

GENERAL MARITIME CORPORATION

Page 36

1    clarification as well, Your Honor, there are no employees whose

2    wages are exceeding the cap.  The only issues is whether the

3    sum of the wages and a business expense reimbursement that

4    they're out-of-pocket; would the sum of that, whether that

5    would exceed the cap.

6            THE COURT:  MR. Schwartzberg?

7            MR. SCHWARTZBERG:  That's correct.  That was one of

8    the concerns as well.  And as I understand Mr. Rogoff saying

9    that they'd pay on a monthly basis.  They won't know or these

10   wages aren't even due until December any -- or these expense

11   reimbursements and wages, in fact, probably aren't --

12           THE COURT:  I don't know.

13           MR. SCHWARTZBERG:  -- due until December --

14           THE COURT:  I'm --

15           MR. SCHWARTZBERG:  -- anyway.

16           THE COURT:  -- not sure about that.

17           MR. ROGOFF:  I -- we don't know when somebody's

18   reimbursement -- what we had agreed and clarified in the motion

19   is that with respect to the expense reimbursement itself, it

20   would just be processed in the normal course.

21           THE COURT:  All right.  Here's what we're -- I'm

22   approving the payment to all employees, including the employees

23   of the nondebtor foreign entities up to the amount of the cap.

24   If there are any employees where the amounts for wages and

25   expense reimbursement exceed the amount of the cap, discuss it

GENERAL MARITIME CORPORATION

Page 37

```
 1    with Mr. Schwartzberg.  If the U.S. Trustee agrees, then the
 2    Court approves the payment to them if they -- if the amount's
 3    in excess.  If the U.S. Trustee objects, we'll schedule a
 4    hearing on very short notice, including by telephone if
 5    necessary, and we'll deal with it.  Okay?  Otherwise, this
 6    issue can be -- if necessary, can be revisited at a final
 7    hearing on the wage motion.  But I don't think this is going to
 8    turn out to be a problem.  Okay?
 9            MR. ROGOFF:  Thank you, Your Honor.
10            THE COURT:  But if you need -- if it becomes an issue
11    as to any employees, call my chambers.  We'll arrange a
12    telephone conference, and we'll deal with it, okay?
13            MR. SCHWARTZBERG:  Thank you, Your Honor.
14            MR. ROGOFF:  Thank you, Your Honor.
15            Turning the Court's attention next would be the cash
16    management and bank accounts motion.  We had provided Your
17    Honor with a chart, which is a larger version of the same chart
18    which was attached to the motion.  I thought it would be
19    helpful just to show how the various bank accounts work.  On
20    the one hand, it's complicated because we have approximately
21    sixty accounts that are located throughout the world.  On the
22    other hand, it's also relatively simple because we have two
23    accounts, which are at the top of the chart in green, which
24    receive revenues from the freight -- would Your Honor like
25    another copy or --
```

1          THE COURT:  No, thank you.  I got a copy.

2          MR. ROGOFF:  Okay.  Thank you.  Which receive revenues

3     from freight, from chartering of our vessels.  The reason why

4     there are two particular accounts is one relates to the vessels

5     that are owned by the debtor, and one relates to the three

6     vessels that we refer to as chartered in --

7          THE COURT:  Yeah, I understand --

8          MR. ROGOFF:  -- or that we lease from a third party.

9     All the vessel related accounts are swept -- all of the

10    individual debtor vessel accounts for freight are swept into a

11    larger vessel account, and then expenses are actually funded on

12    an as needed basis depending upon who needs to write the

13    checks.

14          So for example, if there's a requirement of making

15    payroll to the Pilipino crew, then there is a funding -- a cash

16    call by the foreign entity for the amount of wages that are

17    required to be paid that month.  And the cash call would be

18    made a couple of days before the wages are due, and funds would

19    be deposited into that account.  So essentially, while we have

20    a significant number of accounts that are used in operations,

21    monies are not kept as a general proposition in the accounts

22    other than small balances that may be needed.  It's all funded

23    on as an needed basis to pay for wages, provisions, stores, dry

24    docking fees, the expenses of operation.

25          We have asked for authorization to continue the

GENERAL MARITIME CORPORATION

Page 39

1    process that we have in place.  We have specifically asked for

2    authorization to allow for the continued funding of the

3    nondebtor affiliates.  One of things that I would like to just

4    emphasize is that the nondebtor affiliates are nondebtors as a

5    matter of convenience to avoid disruption --

6             THE COURT:  I think I understand why they haven't been

7    filed.  I mean, if they're in foreign countries, you may have

8    problems you want to avoid.  I understand that.

9             MR. ROGOFF:  Thank you, Your Honor.  So what we have

10   asked for authorization to do is to fund those accounts.  The

11   nondebtor entities are basically capped up to the debtors'

12   businesses.  They don't have independent operations.  They

13   don't have independent revenues.  They're simply vehicles for

14   paying payroll and other operating expenses, and we've asked

15   for authorization to make the necessary transfers in the

16   ordinary course to pay those expenses.

17            THE COURT:  Tell me how you maintain your books and

18   records.  I assume that there's careful records maintained of

19   all -- where the payments are -- on whose behalf they're going

20   and anything coming back the other way.

21            MR. ROGOFF:  Yes.  The accounting and treasury

22   department keeps careful records of each of the transfers in

23   and out of the accounts or intercompany transfers that are

24   necessary.  So we can track what is transferred and what it

25   relates to.

1          THE COURT:  Mr. Schwartzberg, what's the U.S.

2    Trustee's position?

3          MR. SCHWARTZBERG:  Your Honor, the concern here is

4    primarily all the bank accounts are nondebtor -- I mean, I'm

5    sorry, are nonauthorized depositories in foreign countries.  In

6    fact, the account list is the Cayman Islands, and then you have

7    for the nondebtor accounts where estate money is going in

8    Russia, Singapore, Portugal.  So we have a concern.  As Your

9    Honor is aware, unauthorized depositories pledges securities to

10   the United -- to the Southern District so if there is a failure

11   of that institution, the estate monies are protected.

12          That is not so for any of these.

13          THE COURT:  Mr. Rogoff, what's the maximum balances

14   that are maintained in these foreign bank accounts, because

15   these are being used for -- I mean, when this has come up in

16   other cases, Mr. Schwartzberg, your office has -- particularly

17   cases that appear to be on a fast track, which this one may

18   well be, if the balances maintained in the foreign accounts are

19   modest in amount or there is some cap put on, the balance that

20   can be kept in the foreign account --

21          MR. SCHWARTZBERG:  Your Honor --

22          THE COURT:  -- your office in other cases has been

23   willing to extend the time for a debtor to bring itself into

24   compliance with the requirements, and therefore you're not

25   compromising your position that all deposits have to be in

GENERAL MARITIME CORPORATION

Page 41

1    approved depositories.

2            MR. SCHWARTZBERG:  The unfortunate situation in

3    addition to the current situation worldwide is that not one of

4    these accounts are in authorized depositories, so --

5            THE COURT:  I understand.  But that -- I mean, I can't

6    remember now which of the cases, but I know I've had cases

7    where your office has been willing with foreign accounts, where

8    they're not authorized depositories, agreed with the debtor on

9    a maximum amount that would be maintained in the account and

10   have agreed for a period of time, usually a period of months,

11   to extend their time to comply.  So another case I had that was

12   a pre-pack, it took about four months for the case to get

13   resolved.  The issue went away because they just capped the

14   amount that they would keep in accounts.  You're using these

15   accounts for making -- paying expenses and things of that

16   nature.

17           MR. ROGOFF:  Correct, Your Honor.

18           THE COURT:  Have you explored that, Mr. Schwartzberg?

19           MR. SCHWARTZBERG:  What --

20           THE COURT:  Try to agree on a cap that -- because you

21   can sweep money in and out, I take it, Mr. Rogoff?

22           MR. ROGOFF:  Correct, Your Honor.

23           THE COURT:  Okay.

24           MR. SCHWARTZBERG:  The concern I -- A; that has not

25   been explored, and B; the concern is I don't know where the --

GENERAL MARITIME CORPORATION

Page 42

1    somewhere there's a big account.  Somewhere.  And unless I'm

2    wrong, I don't know that isn't information they've provided,

3    but there's no place to put that.  A lot of times an account

4    may be opened up or they have an authorized depository and some

5    unauthorized depositories.  And they fund the unauthorized

6    depositories on an -- and as Your Honor says, as needed basis.

7    But the rest of the money is kept something -- somewhere where

8    it's authorized, and I don't see that ability in this current

9    structure.

10        MR. ROGOFF:  Your Honor, if I may make a suggestion.

11   I appreciate the ones that the Court has made.  We've -- and I

12   discussed this with the U.S. Trustee before the hearing.  This

13   motion has an interim and a final order component to it.  I'd

14   like to request that we are permitted to maintain our status

15   quo during the interim order, that we will have discussions

16   with the U.S. Trustee's office to see whether we can come up

17   with a reasonable guidelines for the operating accounts.  It

18   gets a little complex in the sense that while the operating

19   accounts -- I think the largest account that we have would be

20   Portugal, which may have a million, a million and a half

21   dollars in that account.

22        Our main account is still with Nordea Bank, which is

23   the agent under our secured credit facility.  So we would need

24   to coordinate with the DIP lenders, with the agent about

25   whether or not there is a acceptable institution that could be

GENERAL MARITIME CORPORATION

Page 43

1   utilized to sweep things into -- for our main depository

2   account.  I'd also note that -- and I'm sure Mr. Eckstein will

3   remember me -- that in addition to preserving business

4   operations, which is very important in this case, we are

5   expecting and hoping that this case is a relatively swift case.

6   And I think Your Honor was referring to the Metaldyne case that

7   may have been before you.

8              THE COURT:  Well, there've been a few where I've had,

9   where they've had substantial foreign operations.

10             MR. ROGOFF:  Right.

11             THE COURT:  And I think Jones Day was in the Metaldyne

12  case, but -- with substantial foreign operations.  That

13  actually took -- it was a 363 sale.  But there've been others

14  even where they've reorganized where they were fairly quick in

15  and out, and it was the issue -- this issue got sorted out by

16  putting some caps on.  And the case was over so quickly, it

17  didn't -- it never had to get final resolved.

18             MR. ROGOFF:  So --

19             THE COURT:  Mr. Schwartzberg, what about Mr. Rogoff's

20  suggestion about permitting the debtor to continue its existing

21  cash management system in depository banks until the final

22  hearing?  Use that time to discuss perhaps some solutions and

23  terms of maximum amounts that'll be kept on deposit in any

24  account, sweeping funds so you can be assured that the bulk of

25  the money was kept in approved depository institutions?

1            MR. SCHWARTZBERG:  Your -- excuse me, Your Honor, I

2      hate to say this.  I don't have the authority --

3            THE COURT:  Okay.

4            MR. SCHWARTZBERG:  -- to consent to that at this

5      point.

6            THE COURT:  All right.  I'm going to approve for

7      purposes of the interim order the continuation of the existing

8      cash management system with the depository banks that the

9      debtors and the nondebtor affiliates are using.  But I direct,

10     Mr. Rogoff, that you promptly explore with the U.S. Trustee

11     trying to agree on dollar caps for any of the specific foreign

12     accounts.  And I expect that when you come back for the final

13     hearing that you will have at least narrowed, even if you've --

14     you don't have full agreement from the U.S. Trustee, you will

15     have narrowed these issues.  It's a very valid concern,

16     particularly in light of the current banking crisis in foreign

17     countries.

18            But I will approve it on an interim basis, but only on

19     the interim basis.  And you're going to have to come up with --

20     it isn't going business as usual without any limits on the

21     depositories or a balance at the final hearing.

22            MR. ROGOFF:  Thank you, Your Honor.  We will work with

23     the U.S. Trustee's office.

24            MR. SCHWARTZBERG:  Thank you, Your Honor.

25            MR. ROGOFF:  Next motion concerns continuing to honor

GENERAL MARITIME CORPORATION

Page 45

1    obligations under the debtors' various insurance policies.  The

2    motion lists in detail the various types of policies we have.

3    The -- what -- relating to both protection of indemnity, all

4    our machinery or risks and related insurance policies.  These

5    are all critical to preserve, to directly protect the vessels,

6    which travel overseas --

7            THE COURT:  How much is due in the interim period?

8            MR. ROGOFF:  We're requesting between the amount that

9    we already passed due, which is approximately 3.9 million, and

10   then the amount that would come due between now and the final

11   order, which is about 1.1 million.  We are asking for

12   authorization to pay up to five million on an interim basis,

13   Your Honor.

14           THE COURT:  Anybody wish to be heard with respect to

15   the motion on an interim basis to pay insurance premiums?

16           MR. ROGOFF:  Thank you.

17           THE COURT:  All right.  Your motion is granted on an

18   interim basis.

19           MR. ROGOFF:  Thank you, Your Honor.

20           That takes me to the last of our operational motions.

21   As Mr. Eckstein notes, the goal of these cases is to keep them

22   as a financial restructuring and minimize the disruption on the

23   debtors' business operations, which is critical not only

24   because a substantial majority of the operations are overseas,

25   the debtors' operate in 270 ports in 70 countries, but that the

GENERAL MARITIME CORPORATION

Page 46

1  debtors are so reliant upon services that are provided by

2  vendors, both outside the United States and who the debtors

3  believe would be critical vendors.  And it's not always an easy

4  bifurcation to say either you're critical or you're foreign

5  because we have a number of our foreign vendors that are

6  critical.  We have a number of our critical vendors that are

7  both foreign and domestic because we do have ports that are

8  utilized in the United States.

9          There's a fairly extensive description on pages 8 and

10  9 of the motion that discusses the various types of vendors

11  that we operate with; agents, port expenses, bunkers, which is

12  a significant part of the amount that the debtors have

13  outstanding as an individual type of a claim.  Bunkers is the

14  fuel used to operate the ships.

15          THE COURT:  How much are you looking for on an interim

16  basis?

17          MR. ROGOFF:  Nine million with respect to the interim

18  vendors.  There is -- of that 9 million, about 2.5 million or

19  2.4 million, I should say, otherwise qualifies, we think, under

20  503(b)(9) treatment because they relate to goods provided

21  within the pre-petition priority period.  In addition, Your

22  Honor, to the nine million the motion covers customer claims.

23  The way the debtors' vessels operate in some of their charters

24  is they will give representations and warranties as to the

25  efficiency in operation of the vessels.  A charterer will pay a

GENERAL MARITIME CORPORATION

Page 47

1    certain charter rate; in addition, would the responsible for

2    paying certain of the expenses relating, so buying the bunker

3    fuel.

4            We will give representations as to the efficiency of

5    the vessel because it ties into how much the charterer has to

6    spend on the bunker fuel.  And if for some reason we don't meet

7    the performance representation, then the charterer then has a

8    claim for -- a performance claim for failure to -- for the ship

9    to have performed as represented.  We have some of those, which

10    the debtors have as outstanding claims.  That amount is

11    approximately 1.6 million.  So we've asked for authorization to

12    pay that to our customers.

13            And finally, Your Honor, although this is not a

14    current cash requirement, our motion describes these pooling

15    agreements that we have.  So the debtors both have spot

16    charters.  They have time charters, and we also have four

17    vessels which are currently participating in a pool with other

18    vessels.  We contribute the vessel.  We also make certain

19    working capital contributions, which actually are deducted from

20    the debtors' proportionate share of the revenues generated by

21    the pool.  We have approximately six million of outstanding

22    working capital reserve commitments that would need to be paid.

23    This is not a cash requirement in the sense that we're writing

24    checks.  This is going to be more of an offset entitlement that

25    the charter party to our pooling agreements has under our

1    agreements, but that's covered by the motion as well.

2         THE COURT:  Is there -- you have both interim and

3    final orders.  Is there a difference in the amount between the

4    two?  I mean, it's all going to get paid now.  Isn't that --

5         MR. ROGOFF:  No.  There's a difference in the amount.

6    The total amount of critical and foreign vendors that we are

7    asking for is twenty million.  So for example, nine million is

8    what we would be seeking on an interim basis.  The balance of

9    eleven million, for a total of twenty, approximately, is what

10   we would be seeking for critical and foreign vendors.

11        THE COURT:  Mr. Schwartzberg?

12        MR. SCHWARTZBERG:  Your Honor, there's only one

13   concern I had with this -- or the U.S. Trustee had with this.

14   And it deals with the critical and foreign vendors.  There's

15   discussion how if before they pay these creditors the debtor is

16   going to have them enter into agreements or try to have them

17   enter into agreements saying that they're going to continue to

18   perform and provide services, et cetera on the same terms and

19   conditions.

20        I don't -- or the U.S. Trustee does not have a problem

21   with that to the extent that they actually are required to

22   enter those contracts.  There's a concern that there are

23   creditors out there that will get paid on the pre-petition

24   claims, but yet do not or are not required to continue to

25   provide goods and services after their payment of the pre-

GENERAL MARITIME CORPORATION

1    petition claim.

2           THE COURT:  Mr. Rogoff?

3           MR. ROGOFF:  Your Honor, what we have agreed to do --

4    and again, sort of realizing that with respect to -- and it's

5    more on the motion.  I haven't spent time talking about it, but

6    the international aspects that with the foreign vendors the

7    arrested vessels and the rights that they may have, the fact

8    that they may not respect our bankruptcy laws; go figure, but

9    that might happen.  And so, we have the foreign vendor issue,

10   which is different critical vendors.  Some of our vendors

11   overlap.

12          But to the specific point that was raised:  what we've

13   agreed to do, which we believe is consistent with most of the

14   protocol followed in comparable international cases, is that we

15   would use reasonable efforts to ask someone to enter into a

16   trade agreement.  But if for some reason that party simply will

17   not agree to do a trade agreement, the debtor still has the

18   discretion to make the payment if it believes that payments is

19   necessary or appropriate to preserve business operations.

20          So I think where we have our difference with the

21   trustee is whether it should be an absolute condition that

22   somebody must sign a trade agreement, or if the debtor has the

23   discretion after having made reasonable efforts to get someone

24   to sign a trade agreement, they refuse to do so, but the debtor

25   still needs to obtain the benefit of a continued relationship

1    with that customer or that supplier or vendor.

2            THE COURT:  Point me to language in the interim order

3    that would cover this.

4            MR. ROGOFF:  Just one second, Your Honor.

5            THE COURT:  Yeah, I'm looking at -- on page 4.

6            MR. SCHWARTZBERG:  Your Honor, I think it's paragraph

7    3 of the interim order.

8            MR. ROGOFF:  It's a combination of paragraph 3 --

9            THE COURT:  And then I'm looking at 4(f).

10           MR. ROGOFF:  -- and paragraph 4.  Paragraph 4, for

11   example, says "The debtor shall then take a reasonable efforts

12   in their reasonable business judgment."

13           MR. SCHWARTZBERG:  Your Honor, the concern there is

14   I'm assuming that the foreign vendors or the critical vendors

15   in this country can read this order.  They're going to see

16   they're not required to, and you've already -- you've let the

17   cat out of the bag.  If you put an absolute requirement on with

18   the caveat that the debtor perhaps come back in an emergency

19   situation, so there isn't an order out there that says oh you

20   don't have to do that and the other side can point to that, so

21   it's an order that says they don't have to do that.  That might

22   strengthen the debtors in their negotiating or that --

23           MR. ROGOFF:  Your Honor, my only concern about that is

24   that we are trying to minimize the disruption on our

25   operations.  The world does not neatly divided between just

1    domestic vendors and foreign vendors.  We are conc -- so far,

2    the debtors' filings have been well received as a Chapter 11

3    filing could be.  But we've had support and supportive

4    statement from our customers and vendors.  We are very

5    concerned that if any message that is sent out there to either

6    vendors or our customers, our charter customers could be

7    concerned that if a vendor is not paid, even if it's a domestic

8    vendor, and a vessel is somehow held up by that domestic vendor

9    overseas and their cargo is at risk, it could impact the value

10   of the debtors' operations and business going forward.

11        We have dollar amounts that we've identified that have

12   been worked out with our secured lenders.  I think that the

13   debtor is given an undertaking that it will use its reasonable

14   efforts to try to get someone to enter into a trade agreement.

15   But I think if you have to draw a line, we would concerned

16   about that line being you cannot go forward without an

17   agreement because it could be potentially very disruptive to

18   otherwise what we hope will be smooth sailing, pun intended,

19   during the Chapter 11 cases.

20        (Pause)

21            MR. ROGOFF:  Your Honor, if I may --

22            THE COURT:  Go ahead.

23            MR. ROGOFF:  -- as noted, Mr. Pribor is in the

24   courtroom today, and I just consulted with him.  And is -- as

25   we, the debtors, appreciate, and I certainly believe our

GENERAL MARITIME CORPORATION

Page 52

1    secured creditors appreciate, this is a very significant motion

2    for the estate.  We are very concerned about anything which

3    would send a disruptive message to our vendors in terms of the

4    ability to continue working with them and, in turn, our

5    customers who, as I mentioned, to the extent that they think

6    vessels are at risk or our ability to provide services timely

7    are at risk that we could lose charterers.

8           We have a number of our vessels that have come off or

9    are going to be coming off time charters; exposing ourselves to

10   not just the financials of the spot market, but the need to

11   replace them with new charters.  And if there's any delay or

12   disruption because a vendor says I'm not going to provide

13   service to you on a go forward basis, and I'm not signing your

14   agreement, and that gets out in the community, we could have

15   our customers who elect to turn to other service providers for

16   the leasing and chartering of vessels.  So this is very much a

17   business operational concern to the estate.

18          THE COURT:  What I don't know how you set the nine-

19   million-dollar cap for the interim order.  What I've always

20   been concerned with critical vendor motions is that it creates

21   an expectation on all of your vendors that they think they're

22   important, and therefore they're just going to say you either

23   pay or we don't deliver.  Okay?  If it's an executory contract,

24   you get -- and at least in the U.S., where an order of a Court

25   will be respect, you can come back and always argue they have

1    to perform.  But you -- the Court runs the risk of having the

2    expectation created.  I don't know how the million-dollar-cap

3    was established.

4           MR. ROGOFF:  Well, if I --

5           THE COURT:  So -- let me finish -- or tell me how the

6    nine-million-dollar cap was established.

7           MR. ROGOFF:  If I may, Your Honor, thank you.  The

8    company went through literally vendor-by-vendor of the parties

9    that they believe to be either foreign or critical and

10   identified the ones that they believe that they will need some

11   payment.  It could be a payment-in-full.  It could be a payment

12   of a percentage of the pre-petition amount during the first

13   thirty days of the case.  We did this exercising caution, not

14   knowing when the final hearing would be set.  and basically,

15   we're told how can you -- what can you budget, literally

16   budget, for the DIP budget purposes as payments that you can

17   use to keep operations calm with the hope and expectation, by

18   the way, that ultimately when the final order is entered we

19   would be able to turn to those vendors who hadn't received

20   payment or payment-in-full as a part of the interim order and

21   indicate that they would be paid as a part of the final order.

22          The message that we are looking to send between the

23   final and interim order is to our vendors -- our foreign

24   vendors and our critical vendors that this is a financial

25   restructuring.  Operations will continue in the normal

1    course --

2            THE COURT:  Well, it has to get balanced against the

3    fact that the Bankruptcy Code doesn't permit you, generally, to

4    pay your pre-petition creditors, okay?  And these critical

5    vendor motions are always an exception.  And everybody always

6    thinks they're critical.  And as soon as they see that

7    somebody's going to get money, they say I ought to get money.

8    What I've done in some other cases is require that you provide

9    the U.S. Trustee with the list -- with the spreadsheet

10   showing -- obviously, you're not going to file it.  If you

11   would stay at the podium and let me finish my statement --

12           MR. ROGOFF:  I apologize, Your Honor.

13           THE COURT:  -- before you go back.

14           MR. ROGOFF:  I apologize, Your Honor.

15           THE COURT:  Thank you.  You would provide the U.S.

16   Trustee with the spreadsheet showing the names of those vendors

17   who you deem are critical and the amounts that you budgeted.

18   You provide it to the U.S. Trustee.  And when a committee is

19   formed, you provide it to the committee as well.  The document

20   has to be maintained as confidential.  And in the event that

21   you propose to pay anyone else, you're going to need to come

22   back to the Court to do that.  I don't write checks -- I don't

23   write blank checks for payment of critical vendors.  Foreign

24   vendors raise a different set of issues.

25           And in other cases, I think myself and I know my

1    colleagues have been much more willing to approve payment to

2    foreign vendors because in many countries they won't respect

3    orders of our court.  And here, you've got vessels.  You don't

4    want -- I understand.  You don't want any vessels arrested.

5    But Mr. Schwartzberg, have you done this in other cases?  I

6    know I've ordered it, and your office has -- had told me before

7    that you've done this in other cases.

8                MR. SCHWARTZBERG:  I personally haven't had

9    experience, Your Honor, with that particular method.  That

10   doesn't say that Your Honor hasn't done that before.

11   Obviously, Your Honor would know.  And whether other people

12   are -- other cases that my office has dealt with, that is --

13   but I don't have --

14               MR. ROGOFF:  Your Honor --

15               MR. SCHWARTZBERG:  -- any personal knowledge --

16               THE COURT:  Okay.

17               MR. SCHWARTZBERG:  -- of that.

18               THE COURT:  Thank you, Mr. Schwartzberg.  Mr. Rogoff?

19               MR. ROGOFF:  First of all, Your Honor, I apologize for

20   having turned my back on you.  I was checking with my

21   colleague.  I believe that we had provided the information to

22   the U.S. Trustee, but I didn't represent, and I'm not, because

23   I haven't verified that we had.  But we certainly can work

24   towards providing information to the U.S. Trustee's office, and

25   then once a committee is formed; a committee as to the vendors

GENERAL MARITIME CORPORATION

Page 56

1    that we would expect would be covered by this.  What we haven't

2    done, Your Honor, however, is we identify with specificity

3    internally that it's X vendor who's getting Y dollars.

4         We tried to create a pool for negotiating purposes so

5    that to the extent that we don't have to spend all of the money

6    at a given point in time, we're able to do that.  So I would

7    just ask that if we've provided information to the U.S.

8    Trustee, for example, it is for -- it's not only confidential,

9    but it's for informational purposes, at least sort of on a line

10   item basis because it may be that we're able negotiate a better

11   deal with vendor 3 as opposed to vendor 5, and therefore we

12   might want to utilize some of the allowance funds through the

13   interim order to be able to adjust accordingly.

14        THE COURT:  All right.  I'm going to grant the motion

15   on an interim basis with the additional requirement that you

16   provide the U.S. Trustee and when a committee if formed, you

17   provide the committee with the schedule showing the identity of

18   the vendors with whom you intend to negotiate and what that

19   budget amount is.  And then, you will provide the U.S. Trustee

20   and the committee, when it's formed, with the details of the

21   arrangements that you in fact negotiated.  When you come back

22   on a final basis, I expect I'll hear -- I don't want --

23   obviously, I'm not going to disclose the names or what the -- I

24   guess the budgeted amount for the interim period is the nine

25   million dollars.  But I understand the sensitivity of the

1   information.  But when you come back on a final basis, either

2   the U.S. Trustee or the committee will be able to more

3   intelligently address whether this is appropriate.

4         So I am going to approve it on an interim basis, but

5   direct that you provide that information to the U.S. Trustee.

6         MR. ROGOFF:  Thank you, Your Honor.  And we look

7   forward to coming back on the final hearing and indicating to

8   the Court that there's been transparency with the U.S. Trustee

9   and the committee, once formed.

10        THE COURT:  Okay.

11        MR. ROGOFF:  That -- at this point, I'll turn the

12   podium over to my partner, who will address the Court on the

13   DIP motion, please.

14        THE COURT:  Thank you very much, Mr. Rogoff.

15        MR. MANNAL:  Good afternoon, Your Honor.  Doug Mannal

16   from Kramer Levin, on behalf of General Maritime.

17        Your Honor, as part of our first-day motion we

18   submitted the declaration of Mr. Thane Carlston in support of

19   the debtor-in-possession financing.  And in that declaration,

20   Mr. Carlston discusses the critical need for this debtor-in-

21   possession financing.  It also describes how the debtors and

22   Moelis, as the financial adviser of the debtor, sized the DIP

23   and conducted a marketing process.  In that declaration, Mr.

24   Carlston also talks about the economic terms of this proposed

25   debtor-in-possession financing, that they are market, and they

1    are most favorable to the debtor.

2          And I'd ask that that declaration be admitted into the

3    record, admitted into evidence, Your Honor.

4          THE COURT:  Any objections?

5          All right, the declaration of Thane Carlston in

6    support of debtors' motion for entry of interim and final

7    orders -- this is on the DIP and cash collateral.  It's dated

8    November 17, 2011.  It's admitted into evidence for purposes of

9    this hearing.

10   (Declaration of Thane Carlston was hereby received into

11   evidence as Debtors' Exhibit, as of this date.)

12         MR. MANNAL:  Thank you, Your Honor.

13         And what I'd like to do is run through some of the

14   material terms of the debtor-in-possession financing, also

15   talked about certain milestones, not on for this hearing but

16   will be part of any final hearing on a final order, and then

17   also talked about specifically what we're here for today and

18   address the objection that you referred to earlier today that

19   was filed by the Jones Day firm on behalf of certain

20   noteholders.

21         Your Honor, this is a fully committed seventy-five-

22   million-dollar debtor-in-possession financing.  It has a nine-

23   month term with a option for a three-month extension.  The

24   interest rate on the loan is L plus six and a half, with a

25   LIBOR floor of one and a half, which will increase to LIBOR

GENERAL MARITIME CORPORATION

Page 59

1    plus seven in the event there is an extension on the DIP.

2         The debtor-in-possession financing as contemplated is

3    a priming loan on the collateral that is securing the pre-

4    petition secured facilities as well as the Oaktree junior term

5    loan.  It is a junior lien on any collateral that is subject to

6    other security interests, and it is a first lien on

7    unencumbered collateral.  And currently contemplated on an

8    interim basis, Your Honor, it does not have a lien on avoidance

9    actions.  In fact, the final order also does not contemplate a

10   lien on avoidance actions, but only with respect to proceeds of

11   avoidance actions.

12        THE COURT:  Well, let me tell you right now that if --

13   I will not approve a lien on the proceeds of avoidance actions

14   unless I have very, very strong testimony that would indicate

15   there's no other alternative to this.  I'm very much -- very

16   reluctant ever to approve a lien on avoidance actions.  We'll

17   see when there's a committee.  I'm not deciding the matter now.

18   I'm just letting everybody know right now that someone is going

19   to have a really uphill battle.

20        MR. MANNAL:  Okay, Your Honor.  We appreciate that

21   guidance on that.

22        The loan also contemplates a superpriority

23   administrative expense claim.  The use of proceeds, Your Honor,

24   this debtor-in-possession financing is critical to the

25   operations of this company.

1          THE COURT:  Yeah, I'm looking at the term sheet --

2     material terms.  It's at pages 6 and 7 through -- I guess, it

3     goes on through -- well --

4          MR. MANNAL:  Of the budget -- excuse me, of the motion

5     rather.

6          THE COURT:  Of the motion.

7          MR. MANNAL:  Yeah.  That's right, Your Honor.  On page

8     7 of the chart, it identifies the use of proceeds.  The fees

9     associated with the loan, Your Honor, aggregate approximately

10    2.3 million dollars or 3 percent of the facility.  The facility

11    also contemplates the reimbursement of reasonable and

12    documented professional fees for the DIP lenders and Lazard,

13    Your Honor, as financial advisor to the lenders.

14          THE COURT:  Let me ask you this:  does Oaktree get any

15    expense reimbursement based on the approval of the DIP?

16          MR. MANNAL:  No, not in connection with this

17    financing.

18          THE COURT:  Okay.

19          MR. MANNAL:  There are customary affirmative and

20    negative covenants, Your Honor, in the DIP financing.

21          THE COURT:  How much gets advanced in the interim

22    period?

23          MR. MANNAL:  the interim period is thirty million

24    dollars, Your Honor, which is critical, again, for the survival

25    of the company.

1           THE COURT:  Why shouldn't the fees be prorated?

2           MR. MANNAL:  Why shouldn't the --

3           THE COURT:  Why shouldn't the fees to the lenders for

4     the DIP loans be prorated?

5           MR. MANNAL:  Your Honor, this is a heavily negotiated

6     agreement.  There are -- we had competitive marketing that went

7     out, and we went to a variety of different --

8           THE COURT:  When I say prorated for the --

9           MR. MANNAL:  I understand you --

10          THE COURT:  -- interim period --

11          MR. MANNAL:  -- mean.  And what we did is we tried --

12    we -- although that may not have been one of the specific

13    asked, fees and the economics of this transaction were heavily

14    negotiated with the lenders.  So I -- they obviously could have

15    been prorated, but they are not contemplated to be prorated on

16    this.

17          THE COURT:  Okay, go ahead.

18          MR. MANNAL:  There are financial covenants

19    contemplated in the facility.  There's a budget that compares

20    operating receipts against operating disbursements.

21          THE COURT:  Let met --

22          MR. MANNAL:  There --

23          THE COURT:  On the fees -- I'm looking at page 7 on

24    the fees.  Fifty percent of the applicable margin on the DIP

25    loans; explain that to me.

1          MR. MANNAL:  Your Honor, the fees identified on page 7

2     are all of the fees.  And as you understand and can imagine,

3     this is a competitive market.  And the fees, while identified

4     in the aggregate --

5          THE COURT:  I'm just -- I'm really asking for you to

6     explain to me the fifty-percent of the applicable margin.  What

7     is that?

8          MR. MANNAL:  That is an identified -- I understand it

9     as a commitment commission fee.  I understand it was negotiated

10    as a small fee in connection with some -- the unused portion of

11    the commitment.  And it makes up part of the 2.3 in the total

12    of fees.

13         THE COURT:  Do you know how much of the 2.3?

14         MR. MANNAL:  How much?  Well, I think it depends on

15    how much is drawn or not.

16         THE COURT:  Go ahead.

17         MR. MANNAL:  Like I said, Your Honor, there are

18    financial covenants that are identified in the motion, and

19    there are certain events of default.  On an interim basis, Your

20    Honor, as I said, we're looking for thirty million dollars of

21    interim availability necessary to really fund this company over

22    the next thirty days; critical to the company's survival, at

23    least initially on the outset of these cases, and then

24    throughout these cases.

25         We're seeking authorization of continued use of cash

GENERAL MARITIME CORPORATION

Page 63

1    collateral, and then there's an adequate protection package

2    that I referenced earlier to the senior secured lenders, which

3    is a superpriority claim, replacement liens, current payment of

4    the interest at the nondefault rate, Your Honor, and

5    reimbursement of reasonable fees and expenses of counsel, Your

6    Honor.  There's also the adequate protection to the junior

7    lender as contemplated, which would be limited to superpriority

8    claims and junior replacement liens, Your Honor.

9         There is also a carve-out contemplated, which is your

10   typical carve-out for U.S. Trustee fees, court fees.  It also

11   includes a -- consistent with the local rules the 100,000

12   dollars for a Chapter 7 trustee in the event a Chapter 7 wind-

13   down.  And there also is a -- an allowance for accrued and

14   unpaid expenses of estate professional, plus an additional five

15   million dollars in the carve-out.

16        Earlier, I talked about the defaults, Your Honor, and

17   milestones.  While not subject this hearing or this order,

18   these milestones will become part of a final order.  And

19   they're milestones that we negotiated with the banks to

20   facilitate a plan of reorganization, and those milestones are

21   75 days, we you indicated earlier, to file an acceptable plan;

22   135 days to file a disclosure statement in connection with that

23   plan, and then 210 days to obtain a confirmation order of the

24   consummation of that plan.  And we think that runway will give

25   the estate the ability -- to at least have the ability to

1    confirm a Chapter 11 plan, and that's the goal.

2            If we're not able to satisfy those milestones, Your

3    Honor, we'll be required to flip into what is deemed an

4    acceptable sales process.  And early next week we intend to

5    file sort of a prophylactic bid procedures that contemplate the

6    secured lenders -- the senior secured lenders to act as a

7    stalking horse and credit bid under a sale process.  And once

8    we receive this notice that we've defaulted on any of the plan

9    milestones, we will have ninety days within which to conduct a

10   363 sale.

11           Again, Your Honor, not our first choice of action.

12   And that, Your Honor, is really the crux of the financing.  As

13   you can imagine, Your Honor, there have been a lot of

14   discussions.  There is the footnote in the Jones Day objection

15   talking about conversations that we've had.  We've engaged with

16   the ad hoc committee for the noteholders even before we

17   commenced the proceedings about the debtor-in-possession

18   financing and about where we're going and trying to sort of

19   bring them up to speed and bring them along.  And so, it's

20   unfortunate that they felt the need, I think, to object to the

21   interim relief being sought.  I think they were very careful to

22   say that it was a limited objection; that they're not objecting

23   to the financing per se.

24           I think everyone understands the need for this

25   financing.

1              THE COURT:  Well, address the -- I mean, I -- even

2      before I saw the Jones Day limited objection, I was focused on

3      what benefits are being provided to Oaktree in this

4      agreement -- in -- when I say the agreement; in the DIP loan.

5      The Carlston declaration doesn't address adequate protection

6      for Oaktree.  It addresses the terms that were negotiated in

7      shopping for loans.  So I don't have any evidence with respect

8      to why the built in protections for Oaktree, which are the

9      subject of the limited objection by -- filed by Jones Day.

10             MR. MANNAL:  Your Honor, there is an intercreditor

11     agreement.  And in that --

12             THE COURT:  Do I have that?  I looked for it.  I

13     didn't see it.  I mean, I see references to the intercreditor,

14     but I didn't see the intercreditor agreement.

15             MR. MANNAL:  I can provide the Court with a copy of

16     the intercreditor agreement if you'd like.

17             THE COURT:  Well, go ahead, and I'll -- I did look --

18     I saw the references to it, and I wanted -- it wasn't here.  I

19     don't think, unless you're telling --

20             MR. MANNAL:  And I --

21             THE COURT:  -- me it's here.

22             MR. MANNAL:  I apologize.  And we can provide the

23     Court and make a supplemental pleading and provide the pre-

24     petition agreements as well the intercreditor agreement.  But

25     pursuant to that intercreditor agreement, Your Honor, there are

GENERAL MARITIME CORPORATION

Page 66

1    certain requirements to have a consent of parties.  And that

2    requires that certain adequate protection be provided in

3    connection with any debtor-in-possession financing, and that

4    adequate protection would be replacement liens and

5    superpriority administrative claims that are junior in right of

6    payment to the -- any -- anything that the senior lenders got.

7    And that's what this contemplates, Your Honor, is that adequate

8    protection in the form of those two items exclusively, not

9    currently pay interest, not professional fees.

10         And the benefit, I think, of this financing, not just

11   to Oaktree but to all stakeholders, is the runway that this

12   financing gives.  The debtors made the decision that the runway

13   that was provided by the senior lenders under this financing

14   was the right financing as opposed to other financings that had

15   different sort of agendas, different milestones.

16         THE COURT:  I better see the intercreditor agreement,

17   and show me where it obligated providing adequate protection

18   for the junior --

19         MR. MANNAL:  I --

20         THE COURT:  -- lien holders.

21         MR. MANNAL:  -- I want to make clear, Your Honor.

22   It's not a requirement that adequate protection be given.  It

23   was that in order to avoid an objection to the proposed

24   financing there were certain adequate protection that was

25   required to be provided.

1          THE COURT:  Do you have the intercreditor agreement --

2          MR. MANNAL:  I do.

3          THE COURT:  -- with you?

4          MR. MANNAL:  May I approach, Your Honor?

5          THE COURT:  Yeah, absolutely.

6          MR. MANNAL:  You'll forgive the highlights and

7    underlines, Your Honor.  The relevant section is 6.1 and 6.3.

8          THE COURT:  All right.  Let me read those, okay?

9        (Pause)

10          MR. MANNAL:  Your Honor, I'm reminded by my colleague

11    that of course any adequate protection provided in the form --

12    to the senior notes -- or excuse me, to the senior secured

13    lenders or to the junior secured lenders is clearly only to the

14    extent that any diminution in value on that collateral.

15          THE COURT:  So if it were later determined that there

16    is no collateral securing the third lien lenders, and they're

17    not entitled to receive anything as adequate protection.

18          MR. MANNAL:  I think if there's -- it's determined

19    that there hasn't been any diminution in value of the

20    collateral, Your Honor, yeah.

21          THE COURT:  So they have to have a protection position

22    in the collateral in order to -- in order for there to be a

23    diminution in the value of their collateral.  Do you agree with

24    that?  In other words, if the first and second lien lenders are

25    undersecured, the third lien lenders have no collateral.  It's

1    the same collateral pool --

2            MR. MANNAL:  It is the same collateral pool.

3            THE COURT:  The third position in the same collateral

4    pool that protects the first and second liens, correct?

5            MR. MANNAL:  That is correct, Your Honor, yes.

6            THE COURT:  And so, if the first and second lien

7    lenders are undersecured, there's nothing -- would you agree

8    there was noth -- there would be nothing to protect the third

9    lien lenders for diminution?

10            MR. MANNAL:  If the first and second liens were

11    undersecured, absolutely, there would be nothing there.  Your

12    Honor, if I may, I'd like to hand up --

13            THE COURT:  And just to be clear, there's nothing in

14    the order that would change that result?

15            MR. MANNAL:  That is correct, Your Honor.

16            THE COURT:  Okay.

17            MR. MANNAL:  If I may, I'd like to hand up a copy of

18    what is the result of discussions both with counsel for the

19    noteholders and while I don't think there has been a

20    resolution, at least there's been -- at least partial

21    resolution that has tried to address a lot of the comments to

22    date --

23            THE COURT:  Well --

24            MR. MANNAL:  -- and narrow the issues --

25            THE COURT:  No, before you do that, though, let me

1    hear the rest of your presentation.  Then I want to hear from

2    the objectors.  To the extent you've resolved issues, let's

3    focus on the things where you haven't agreed.

4            MR. MANNAL:  Okay.  Your Honor, the rest of the

5    presentation is relatively simple.  I think the issue that was

6    raised in the bondholders' objection is simply premature.  I

7    got this, as we all did, late last night.  So just generally

8    speaking, a lot of what they're suggesting I think is not

9    accurate.  To be clear, there is no limitation on the challenge

10   period that will be binding on a creditors committee with

11   respect to any of the stipulations or findings in connection

12   with the junior loans.  And to the extent it was inartfully

13   stated in the draft that was included with the motion, we've

14   attempted to address that and correct that.

15           The -- I think the real issue, if I can boil --

16           THE COURT:  You have language in a revised order --

17           MR. MANNAL:  I have language in a draft order, yes --

18           THE COURT:  Okay.  Go --

19           MR. MANNAL:  -- that --

20           THE COURT:  -- ahead.

21           THE COURT:  -- that clearly states that, Your Honor.

22           THE COURT:  Okay.

23           MR. MANNAL:  The issue, I think, if there is one --

24   which again, I think is premature because a creditors committee

25   has not yet been appointed.  I think it boils down to one of

1    fees.  And the DIP lenders are not loaning money into this

2    situation, which I don't know.  The company has not yet taken a

3    position as to what the value of this collateral is.

4              THE COURT:  When you say -- Oaktree isn't lending

5    money in the DIP --

6              MR. MANNAL:  Oaktree -- no.  When I say the pre-

7    petition senior lenders --

8              THE COURT:  Okay.

9              MR. MANNAL:  -- are lending money to this situation,

10   not to fund a blank check -- I think you were talking about

11   blank checks earlier --- to fund endless litigation.  They want

12   to fund the operations of this business.  They want to ensure

13   that this business has sufficient liquidity to remain as a

14   going concern.  Just like every DIP budget, the contemplation

15   was that there would be a limit on the amount of challenge or

16   funding for any challenge or funding for any investigation.

17             That's not to say that that investigation can't take

18   place.  It's just that --

19             THE COURT:  I'm very familiar with this provision.  If

20   your dispute is about the 75,000 dollar cap, we can talk -- is

21   that the focus of the dispute?

22             MR. MANNAL:  What I'm suggesting is that they don't

23   want that cap to apply to -- or excuse me, it's my

24   understanding that the ad hoc committee of bondholders does not

25   want that cap -- that is against really the committee does not

1    want that cap to apply to anyone other than the DIP lenders.

2    They want to be free to use the DIP proceeds, the cash

3    collateral that Oaktree have a junior lien on, and it could --

4    there could be a determination that that lien is worthless --

5    but use those proceeds to go after and litigate.

6           And I think the approach that the -- and the DIP

7    lenders will speak for themselves, if so given the opportunity.

8    But I don't think that there's a desire to write a blank check

9    for litigation.  And so, I think there is a approach that would

10   recommend the debtors sit down with the creditors committee,

11   once they're appointed, figure out a budget, go to the DIP

12   lender, say does this make sense, and then come to the Court

13   and have it approved pursuant to a final order.  And that's

14   unique.  I think that's done --

15          THE COURT:  I'm losing their -- I thought you had --

16   the order that I had before me set the 75,000 dollar cap.

17          MR. MANNAL:  It absolute --

18          THE COURT:  And --

19          MR. MANNAL:  -- does, Your Honor.

20          THE COURT:  -- and it wasn't going to apply just to

21   this interim period.  It was -- that was for the case.  You

22   wanted to set that --

23          MR. MANNAL:  This interim order applies for the

24   interim period.  To the extent the final order has a different

25   number in it, which is often does after a meeting with the

1    creditors committee, and I understand that certain parties may

2    be more willing or less willing to extent that.  It's a

3    discussion that commonly occurs between now and the final

4    order.  That's what's going to apply.  The final order is going

5    to govern.

6           This is an interim order for an interim period, and I

7    think 75,000 dollars for what will essentially be a two-week

8    period, because the committee is appointed.  I think --

9           THE COURT:  Is there an organization --

10          MR. MANNAL:  -- there's going to be --

11          THE COURT:  -- meeting?

12          MR. MANNAL:  -- a formation meeting on the 29th of

13   November.  We're coming back, hopefully, before Your Honor on a

14   final basis on the 15th.  It's really talking about 75,000

15   dollars.  Maybe that's the budget for the entire case, but I'd

16   be hard pressed to understand how investigating liens and

17   claims in a two-week period could exceed that number.

18          THE COURT:  I hope it doesn't.

19          MR. MANNAL:  Well, we have that right to object to

20   reasonableness, Your Honor.

21          So if I may, I can cede the podium to the ad hoc

22   group, or I can --

23          THE COURT:  Well, before you do that there are a

24   couple of -- these are more in the nit category.  But focusing

25   on your proposed order -- the interim order --

1          MR. MANNAL:  Yes, Your Honor.

2          THE COURT:  -- on page 17, paragraph J, you provide as

3     adequate protection -- no, actually, on page 27.

4          MR. MANNAL:  I'm sorry, Your Honor, you said 27?

5          THE COURT:  27.

6          MR. MANNAL:  Thank you.

7          THE COURT:  Subparagraph D.  It provided as part of

8     adequate protection the payment of the DIP lenders for White &

9     Case and Lazard's fees in connection with the administration

10    and monitoring of the senior loan documents entering DIP

11    facility.  I didn't have a problem with that.

12          But then on page 42, this is paragraph -- in 20(b), 20

13    is other rights and obligations.  In subparagraph B, for

14    expenses you had not only preparation, execution, delivery,

15    funding, administration of DIP loan documents, but it's

16    Ruminate III that cases or any successor cases.  What I read

17    this order as saying is that all of the DIP lenders' fees for

18    the entire case, whether it relates to administering the DIP

19    loan or anything else in the case, would be -- they'd be

20    entitled to recover that.  That's the little Ruminate III.

21          So back on page 27, you didn't include expenses for

22    the cases or any successor cases.  But then back on page 41, it

23    got stuck in there.  Let me make -- let me shorten the

24    discussion.  For purposes of the interim order, that Ruminate

25    III has to be stricken.  If you want to raise it at a final

1    hearing, we'll raise it at the final hearing.  But I am not

2    approving the payment for all purposes for any issues in this

3    case throughout the case for the DIP lenders.  It's just not

4    going to happen.  And they're going to have to convince me at

5    the time of the final hearing why, because these are --

6    essentially, these are your pre-petition secured lenders.

7             I don't know why -- if they're oversecured, and their

8    documents provide for it, they may well be able to recover

9    their fees for the case.  If they're undersecured, they don't.

10   And I'm not going to change it by an order I'm going to enter.

11            MR. MANNAL:  Thank you, Your Honor.  In conferring

12   with counsel, I think that's --

13            THE COURT:  Okay.

14            MR. MANNAL:  -- that's fine.

15            THE COURT:  On page 45, subparagraph H, this is

16   probably my pet peeve.  I see it as paragraph -- in every DIP

17   order.  In my view, the parties cannot limit the Court's power

18   with respect to the doctrine of the equities of the case.  The

19   debtor can agree that it will not assert the equities of the

20   case doctrine under 552(b), but you can't preclude me from

21   applying it.  And if a committee comes in later in the case and

22   it wants to raise it -- I've never applied it yet.  If -- this

23   is a hypothetical issue.  But I don't believe that the parties

24   can limit the power that the Court was given under 552(b).

25            So if you want to rewrite it, the substance of which

1  would be that the parties to the DIP loans -- well, I just

2  wrote a note to myself about it.  You can come up with the

3  language.  I mean, the basic thing is the debtor can agree that

4  it won't assert the equities of the case doctrine, but it can't

5  do more than that.

6          MR. MANNAL:  Okay, Your Honor.

7          THE COURT:  Okay.

8          MR. MANNAL:  I'll sit with my colleague --

9          THE COURT:  That's fine.

10         MR. MANNAL:  -- representing the DIP lenders and come

11  up with the --

12         THE COURT:  It's not --

13         MR. MANNAL:  -- language.

14         THE COURT:  I --

15         MR. MANNAL:  I fully understand.

16         THE COURT:  -- I raise this every time, and my

17  colleagues may never raise it.  I don't know.  It's never

18  become an issue later in the case.  But it just -- okay.

19         So why don't you ceded the podium then?

20         MR. MANNAL:  Thank you, Your Honor.

21         MR. LEAKE:  Good afternoon, Your Honor.  Paul Leake

22  from Jones Day, on behalf of the ad hoc committee of

23  noteholders.

24         Your Honor, I want to take it from the top and maybe

25  give you some context, and then absolutely go into some of the

1  specific questions, I think, that you have raised because they

2  are obviously also part of our objection in some respects.

3  First of all, as I -- as we said in our papers, the noteholders

4  support a smooth landing in a Chapter 11.  We understand the

5  need for a stay of relief.  And in that regard, as you have

6  seen, we only filed this objection.  And we styled a limited

7  objection to the interim proposed DIP order.

8      Before I walk through the specifics of that objection,

9  I'd just like to give literally two minutes of context so you

10  understand where it's coming from because it really is

11  presaging the possibility of what happens when the committee is

12  here.  So what I would say is you've heard the debtor describe,

13  both in the paper as they were filed today in court, the

14  process by which they get here.  An important part of that

15  description was a description of, in the papers especially, the

16  plan that has -- is coming together, is being proposed, subject

17  to a plan support agreement between the debtors, the senior

18  banks and Oaktree, which in our papers are -- the pap -- the

19  DIP papers are called the junior secured creditors and I'll

20  call the third lien lenders sometimes.

21      To be clear, the debtors -- they -- sorry, to be

22  clear, the noteholders are not part of that agreement.  The --

23  we don't agree with the plan that's proposed as part of this

24  plan support agreement at all.  And we have very serious

25  concerns about it.  What you've also heard from the debtors is

GENERAL MARITIME CORPORATION

Page 77

1    that they've described discussions to date with respect to

2    trying to get to a consensual plan.  And there have been

3    discussions for sure with some parties more than others, a lot

4    less with certain other parties.

5         And what the debtor has said, I think both in the

6    papers and today, is they want to continue that -- those

7    discussions and see if a fully consensual plan can be reached.

8    And that is a very worthy goal.  We are absolutely in support

9    of that as noteholders and would welcome those discussions.  So

10   if a fully consensual plan can be reached, great.  No doubt

11   about it.

12        The context of the objection really is a possibility

13   that we don't get there; we don't get to a fully consensual

14   plan.  And that's -- so if a deal is not reached, then the

15   noteholders -- but I think more importantly for your purposes

16   today in terms of what's being asked for in this interim order

17   is really the unsecured creditors committee on behalf of all

18   unsecured creditors are going -- have a lot of work to do.  And

19   they're going to do a lot of investigation.  And it's very

20   clear, at least from my vantage point today, that there's going

21   to be an investigation and possible challenge to the proposed

22   plan and assumptions made in that plan, including valuation or

23   otherwise.

24        And second, investigation and potential challenge to

25   the circumstances giving rise to the third lien in these cases

GENERAL MARITIME CORPORATION

Page 78

1    put together, pursuant to a transaction, just six months ago.

2         Other things also the unsecured creditors committee

3    will probably have to take a really hard look at.  It's in that

4    context that we've put this very limited objection together to

5    say that unsecured creditors committee is just around the

6    corner, and we want to make sure that the level playing field

7    stays as much as it can possibly in this circumstance and that

8    rights and obligations aren't given away to parties --

9         THE COURT:  Well --

10        MR. LEAKE:  -- that don't deserve them.

11        THE COURT:  -- you agree -- let me ask you.  Do you

12   agree that Oaktree has a third lien position in the cash

13   collateral?  It may not be worth anything, but they have a

14   third lien position.  You hope it is worth something because

15   you want -- you hope they're all oversecured and there's money

16   for the unsecureds.

17        MR. LEAKE:  Your Honor, part of the hesitation you

18   heard from Mr. Eckstein about answers to a couple of your

19   questions was basically in an attempt to make sure that we can

20   continue these discussions and whether it makes sense --

21        THE COURT:  Look, subject to your challenge, the

22   documents --

23        MR. LEAKE:  That's exactly what I was going to say.

24        THE COURT:  -- would give Oaktree a third lien

25   position --

Page 79

1          MR. LEAKE:  Absolutely.

2          THE COURT:  -- in the cash collateral.

3          MR. LEAKE:  Yeah, the documents are there.  They

4    purport to give a third lien, yes.

5          THE COURT:  And to the extent that the debtor is being

6    per -- will be permitted, might be permitted to use cash

7    collateral, wouldn't Oaktree be entitled to adequate protection

8    to the extent of the diminution of the value of their third

9    lien position?

10          MR. LEAKE:  They're entitled to adequate protection,

11    but they're also subject to their intercreditor agreement, so I

12    think that was a very important question on your part earlier.

13    Unfortunately, the intercreditor agreement is not part of the

14    public record, which is one of the reasons --

15          THE COURT:  Well, it's going to be.

16          MR. LEAKE:  It's going to be now.

17          THE COURT:  It is going to --

18          MR. LEAKE:  Absolutely.

19          THE COURT:  -- have to be filed.

20          MR. MANNAL:  And Your Honor, it is filed with the FCC.

21          THE COURT:  Well, it's going to be filed here because

22    I looked for it, didn't see it, thought maybe I was missing

23    something.

24          MR. MANNAL:  Apologies, Your Honor.

25          MR. LEAKE:  And so, they're entitled to adequate

GENERAL MARITIME CORPORATION

Page 80

1    protection but subject to the terms of the intercreditor

2    agreement.  I think we're not objecting to them getting

3    replacement liens and a superpriority administrative expense

4    claim.  Whether or not the intercreditor agreement grants them

5    those rights, we're not objecting to that.  What we are

6    objecting to is loading what we gave four examples of other

7    protections that you can either call adequate protection or say

8    well, that's not adequate protection; it's something else.  But

9    granting rights to Oaktree in this circumstance that are only

10   really justifiably to be granted to a DIP lender.  And that's

11   the difference we're talking about.

12          We're not objecting to adequate protection in the

13   guise of replacement liens and superpriority claims.  That's

14   not in our objection.  What is in our objection is they've

15   asked for a slew of other rights and objections.  And again,

16   we've identified four of them, and I'd be -- I'd like to go

17   through each one.

18          THE COURT:  Please do.

19          MR. LEAKE:  Just so it's clear of what we're talking

20   about.

21          THE COURT:  Okay.

22          MR. LEAKE:  And at the end of it I'll give you kind of

23   my argument about why they're not entitled to it, but it all

24   comes down to one thing.  A lot of these protections are --

25   have become standard to give to DIP lenders, and we're not

GENERAL MARITIME CORPORATION

Page 81

1    going to be objecting to those.  It's not standard.  It's

2    absolutely extraordinary.  It is not justified to hand them out

3    to any other secured lender that happens to be in your capital

4    structure for whatever reason.  I have my own thoughts about

5    why they were handed out here, but they are not entitled to

6    them if they aren't the DIP lenders.

7            So here are the four examples that we went through:

8    the first --

9            THE COURT:  I don't mean to -- I had trouble, because

10   I went through your objection, and I went through the proposed

11   order.  You referred to paragraph numbers and section letters.

12           MR. LEAKE:  Yes.

13           THE COURT:  And I was having trouble tracking the

14   language, so you're going to have to give me page numbers in

15   the order.

16           MR. LEAKE:  I'd be happy to do that, Your Honor.  Part

17   of the confusion, unfortunately, I think, as to when debtors'

18   counsel was talking about the status of the order, he's

19   actually referring to proposed changes late last night that

20   aren't obviously before you.  And our objection is written as

21   to the proposal in front of you.  And by the way, I want to be

22   very clear, we appreciated the effort last night of trying

23   to --

24           THE COURT:  Okay.  Let's just go --

25           MR. LEAKE:  -- to limit --

 1              THE COURT:  -- through this --

 2              MR. LEAKE:  -- them.

 3              THE COURT:  -- okay?

 4              MR. LEAKE:  Okay.  So the first one that we identify

 5    is, I call, paragraph -- we go to paragraph 8.

 6              THE COURT:  You've got to give me page numbers.  I

 7    was --

 8              MR. LEAKE:  Sure.

 9              THE COURT:  Because this docu -- this order has

10    letters --

11              MR. LEAKE:  Page 30.

12              THE COURT:  Page 30.

13              MR. LEAKE:  It does, yes.

14              THE COURT:  Okay.

15              MR. LEAKE:  And our first objection basically says

16    look at paragraph 8.  That's a provision that deals with

17    challenge periods.  It's not an unusual provision to have.

18    It's basically a time limit, after which parties are bound by

19    the stipulations given by the debtor --

20              THE COURT:  Okay, Mr. Mannal said it doesn't apply to

21    Oaktree.

22              MR. LEAKE:  It does today.  It does as it's filed with

23    you.  So one thing for sure, as part of our discussions, they

24    said well, we'll make eliminations from the stipulations so

25    they aren't carried through to this paragraph.  But they

1    certainly are right now.

2            THE COURT:  All right.

3            MR. LEAKE:  Do you need to hear it, or --

4            THE COURT:  Well --

5            MR. LEAKE:  -- do you -- just no, right, I assume?

6            THE COURT:  -- let's -- you haven't seen the language

7    yet, have you?

8            MR. LEAKE:  No, I -- we saw --

9            THE COURT:  Have you seen the revised language?

10           MR. LEAKE:  As to this issue --

11           THE COURT:  Are you satisfied with the language as to

12    this issue?

13           MR. LEAKE:  As to this issue, yes.

14           THE COURT:  Okay.  Then, let's go on to the next one.

15           MR. LEAKE:  Okay, good.  The second issue, Your Honor,

16    that we raised was with respect to paragraph 9.  This is a much

17    more important provision.

18           THE COURT:  Okay.

19           MR. LEAKE:  Paragraph 9, sorry, starts on page 31.

20    The most relevant language is really 32 and 33.  Let me tell

21    you, conceptually, what it is, and then I can point towards it

22    where it follows through.  But the concept is that paragraph 9

23    generally deals with the prohibition against the use of estate

24    funds to challenge liens and claims of lenders.  Normally, it's

25    a prohibition against the use of estate funds to challenge the

1    liens and claims of your DIP lenders.  In this case, it's DIP

2    lenders/senior secured lenders because it's the pre-petition

3    lenders senior banks were doing the DIP lending.  We have no

4    problem with that.

5            They're entitled to it.  You see it in DIP orders all

6    the time.  What we do object to is that Oaktree, third lien

7    lender, used as a junior secured party --

8            THE COURT:  Well, they were able to take -- to this --

9    so the -- I mean, what I viewed it as the DIP lenders don't

10   want their money to be used by a creditors committee subject to

11   the 75,000 dollars applies.  You investigate all you want,

12   creditors committee, but there's a 75,000 dollar cap.  What's

13   wrong with that?

14           MR. LEAKE:  The DIP lenders are entitled to that, not

15   the third lien lenders.  I don't --

16           THE COURT:  Well, no, the DIP lenders don't want --

17   they want their money to be used to fund the operations of the

18   business, to keep the business going, hopefully to stabilize,

19   hopefully with the goal of restructuring a confirmed plan.

20   That's why they're advancing this money, okay?  They don't want

21   the money to be -- they agree -- okay.  We understand there's

22   going to be a committee.  There are going to be professionals.

23   They're entitled to that money.

24           We don't want the money used to investigate certain

25   things.  And I see it all the time, okay?  This is a little

GENERAL MARITIME CORPORATION

Page 85

1    different.  I understand.  Here, the DIP lenders are saying --

2    they're giving Oaktree the benefit of it, the way they've

3    written it.  But -- I mean, why can't the DIP lenders says

4    these are the permissible uses for the funds we're going to

5    advance?

6            MR. LEAKE:  Right.

7            THE COURT:  Those -- the uses that they've

8    identified -- the use of funds seem perfectly appropriate.  I

9    understand you're not happy about it because you'd like a

10   committee to be able to spend six times that amount to

11   investigate Oaktree.  You know?  That's what -- I mean, maybe

12   six, whatever the number is you want -- you don't want a cap on

13   it.  Okay?  It's a seventy-five-million-dollar DIP.  I don't

14   know where it would fit into the budget.  DIPs are approved to

15   be spent in accordance with the budget, and I'm assuming this

16   budget doesn't include anything more than 75,000 to be used by

17   a committee in an investigation.  What is wrong with that?

18           MR. LEAKE:  I have no problem having a discussion with

19   a DIP lender about let's talk about what an appropriate budget

20   is for -- to allow the unsecured creditors committee to do its

21   job.  I do first have a real issue with a third lien lender, in

22   this case who's not providing funds, getting the benefit

23   through this way --

24           THE COURT:  What the --

25           MR. LEAKE:  -- number one.

GENERAL MARITIME CORPORATION

Page 86

1      THE COURT:  -- DIP lender is saying is I don't care

2   whether it's a third, fourth, fifth, whatever the theory is.

3   Committee, don't spend the money on investigating.  We want

4   this money to be spent for the operations of the debtor, and

5   that's why we're trying -- we're trying to re -- we want the

6   debtor to rehabilitate and confirm a plan.  Our money should be

7   used for that purpose.  If the creditors or if the ad hoc

8   committee wants to spend its money to go ahead and investigate,

9   do all you want.  But don't take it out of the DIP lenders'

10  loans.  Isn't that their position?

11      MR. LEAKE:  I think that is -- I think you will hear

12  that from the DIP lenders, I think.  Thus far --

13      THE COURT:  So tell me why that's not a totally

14  reasonable position?

15      MR. LEAKE:  I don't think the DIP lenders should

16  dic -- should be able to dictate so much of what the case

17  funding and the --

18      THE COURT:  They do it all the --

19      MR. LEAKE:  -- role of these --

20      THE COURT:  -- time.

21      MR. LEAKE:  They do it all the time with respect to

22  investigations against themselves and prohibitions against

23  challenging themselves.  And the reason I would submit, Your

24  Honor, that that is appropriate and found in DIP orders is

25  because that's the benefit of the bargain with a DIP lender.  I

1    think it's different to say we will have complete stranglehold

2    on -- because I view it that way as --

3            THE COURT:  It's not a complete stranglehold.  It's we

4    want the money spent on rehabilitating the debtor, not on going

5    off doing investigations.  I have your point.  I'm -- I'll hear

6    what the DIP lenders have to say.  I understand your point.

7            MR. LEAKE:  Yes.  I understand.  And my -- just the

8    response back to it is simply it's one thing to say we can

9    limit ourselves within the types and numbers that are

10   applicable to a DIP lender who kind of deserves the right of

11   the limitations, both on time to bring the challenge and --

12           THE COURT:  Let's go on to the next point.

13           MR. LEAKE:  Okay.

14           The -- well, the third one is related that we

15   raised -- just to tie it in with -- and that is in Section I we

16   say the seventy-five-million-dollar -- that's where the

17   seventy-five million -- the seventy-five-thousand-dollar cap is

18   for expenses for investigating claims as put forth.  And in

19   that case, again, I say DIP lenders entitled to it, not --

20   DIP -- a nonDIP lender is not, and that as it relates to

21   Oaktree.

22           The fourth objection that we put in here, and it

23   goes -- it all ties to the same theme, Your Honor, is either

24   you are entitle -- but you would maybe parse this one

25   differently.  We say -- and this is more subtle.  The

1    definition of senior collateral here works in such a way that

2    whenever it's used --

3              THE COURT:  This is on page 5, rule B of your

4    objection.

5              MR. LEAKE:  That's correct.

6              THE COURT:  Okay.  Go ahead.

7              MR. LEAKE:  And that's correct, because we just

8    covered the page 1, 2, 3.

9              THE COURT:  Yeah, okay.

10             MR. LEAKE:  And in there, again, it's a little bit

11   more subtle.  We've identified two places; one in paragraph 9

12   and the other in paragraph 11.  Let me conceptually, again,

13   tell you what we're trying to do here to identify and come up

14   with a remedy to -- the defined term senior collateral is used

15   in a way throughout where protections are intended, in our

16   mind, to -- or appropriately to be given to the DIP lenders.

17   It's a term that's also used to define Oaktree's position or

18   its collateral.  So they have a third lien in the senior

19   collateral as opposed to having their own definition that

20   identifies their interest, whatever it may be in the

21   collateral.

22             So that -- the two examples that we -- we've pointed

23   out here -- go, for instance, to paragraph 11, which is a

24   506(c) waiver.  That's going to be subject to a final order,

25   but the concept is Oaktree, not as a DIP len -- since it's not

1    a DIP lender, it shouldn't get the advantage of a 506(c)

2    waiver.  And same thing in paragraph 9.  That's the provision

3    that says, again, that you can't use fun -- DIP funds to

4    challenge the liens of Oaktree, and they shouldn't get the

5    benefit of that for the same reason I said earlier.

6            So this is a more -- this is -- the way we've proposed

7    to fix it was to say let's come up with a -- just a defined

8    term; junior collateral, which would be defined as Oaktree's

9    interest in --

10           THE COURT:  Were you able --

11           MR. LEAKE:  -- the senior collateral.

12           THE COURT:  -- to work this issue out or not?

13           MR. LEAKE:  I --

14           MR. MANNAL:  No, Your Honor.

15           MR. LEAKE:  No.

16           MR. MANNAL:  Only be -- and I can explain why if --

17    now or later, if that's really --

18           THE COURT:  I only asked -- my only question was did

19    you work it out.

20           MR. LEAKE:  No.  We --

21           THE COURT:  Go ahead.

22           MR. LEAKE:  -- have not, Your Honor.  So that's the

23    fourth concern; all related to we don't think Oaktree's

24    entitled to these protections because they really should be

25    granted only to the DIP lender.

1          We had two remaining objections we put in the order.

2     We tried to keep this as limited as possible for the reason

3     that we said earlier.  And that would go to the less

4     fundamental in our own minds, but certainly should be raised.

5     So I would say this next one is -- even if you -- this goes

6     to -- sorry --

7               THE COURT:  The next is one is the --

8               MR. LEAKE:  -- section --

9               THE COURT:  -- 75,000 dollar cap?

10              MR. LEAKE:  Exactly.  As it applies -- if you assume

11     that you're going to take Oaktree out from it, we just still

12     think it's too low even if you apply it only to the senior

13     banks.  And the reason for that -- so I can save, Your Honor --

14     is that I know where that number came from.  That came from the

15     local rules that say, at a minimum, it has to be 75,000

16     dollars.  And I would just submit that I don't think it's --

17              THE COURT:  Take it up with the rules --

18              MR. LEAKE:  -- put in --

19              THE COURT:  -- committee.

20              MR. LEAKE:  What's that?

21              THE COURT:  Take it up with the rules committee.

22              MR. LEAKE:  Absolutely could do that.  But I submit

23     that it probably, as a minimum, wasn't intended to be put in

24     place for an evaluation of a complex 800 million and 2

25     different facilities with assets all over the world.  It's a

1    different animal from a 75,000 dollar for some much smaller

2    cases, and maybe the minimum is more appropriate for.

3            The last objection that we put in here, Your Honor,

4    and that would be on page 6(d):  parties-in-interest should not

5    be foreclosed by Section F and paragraph 8.

6            THE COURT:  Did you work that out?

7            MR. LEAKE:  No, we did not.

8            THE COURT:  Explain what you mean by this.  Go ahead,

9    Mr. Mannal.  Did you work it out?

10           MR. MANNAL:  I think we did.  Mr. Jimenez can tell me

11   if we didn't.  I -- it might be appropriate time for me to show

12   you the blackline.

13           THE COURT:  Can we just --

14           MR. JIMENEZ:  I can meet with him right now on that,

15   Your Honor.  But I'm happy to see the language that Mr.

16   Mannal's suggesting to at least work it out.

17           MR. LEAKE:  It's very simply -- just to be clear about

18   it on the record so there is no misunderstanding.  Right now,

19   the way it works is it basically says that whatever the

20   stipulations are that are binding immediately on the debtor are

21   not binding for the challenge period on the committee, and then

22   in paran -- and any other party-in-interest.  And all we said

23   was well, let's just be clear that that's not a Chapter 11

24   trustee.  It's not a Chapter 7 trustee, and it's not an

25   examiner.  And I don't believe that language was accepted.

 1          And if it was, I apologize.  But I don't believe it

 2    was, Your Honor.

 3          So that was are our remaining objection that we put

 4    forth, Your Honor.

 5          THE COURT:  Okay.  Does the DIP lender want to be

 6    heard?

 7          MR. GREISSMAN:  Good afternoon, Your Honor.  Scott

 8    Greissman for Nordea Bank Finland --

 9          THE COURT:  Thank you.

10          MR. GREISSMAN:  -- White & Case.  I'm here with my

11    partner, Tom Lauria.

12          Your Honor, I really don't have too much to add to

13    your thoughts and to thoughts of debtors' counsel.  I think you

14    both have it exactly right.  With respect to the very limited

15    rights that Oaktree is granted under the DIP order,

16    essentially, Your Honor, this company is in a cash crisis.  And

17    if the DIP loans aren't funded, they'll probably be forced to

18    liquidate immediately.

19          The DIP lenders put funds into the company or agreed

20    to commit to put funds into the company to essentially preserve

21    the collateral, allow the continued operations in the hope that

22    a restructuring can be achieved and value maximized.  It is not

23    in the interest, obviously, of the DIP lenders to fund an open

24    ended litigation fund in a fight between Oaktree and the bonds.

25    We just don't think that benefits the estate.  It doesn't

1    benefit the lenders.  And in that respect, it's actually --

2         THE COURT:  They're big boys.  They can fight all they

3    want.

4         MR. GREISSMAN:  Exactly.  We just don't want to pay

5    for it.  And it is -- it's an element of our adequate

6    protection, frankly.  And for that reason, we granted Oaktree

7    very limited rights.  There is a right to an investigation.

8    There's a cap, but we shouldn't be funding anymore than that,

9    Your Honor.  Thank you.

10        THE COURT:  Thank you.  Oaktree want to be heard?  Do

11   they have anybody here; Oaktree?

12        MR. SASSOWER:  No, Your Honor.  Edward Sassower from

13   Kirkland & Ellis, on behalf of --

14        THE COURT:  Are you going to appear?  Then, come on

15   up.  Just state your name again.

16        MR. SASSOWER:  Good morning, Your Honor.  Edward --

17        THE COURT:  We're in the afternoon, but that's --

18        MR. SASSOWER:  -- Sassower of Kirkland & Ellis, on

19   behalf of Oaktree.

20        Your Honor, I have nothing to add to the record at

21   this time.

22        THE COURT:  Okay.

23        Mr. Mannal, do you want to be heard?  Mr.

24   Schwartzberg, do you have anything on this that you want to --

25        MR. SCHWARTZBERG:  Nothing, Your Honor.

1          THE COURT:  Okay.

2          MR. MANNAL:  Your Honor, in light of the Court's

3    comments, it may make sense for the parties to figure out what

4    the DIP order should say.  I think I know where the Court

5    stands.  I don't know if it makes sen -- I'm trying to chop as

6    much wood as possible before bringing you any further

7    disagreement.  I don't know --

8          THE COURT:  Here's what I'd like to do, okay, and it's

9    a perfectly reasonable, appropriate suggestion.  We're going to

10   take a recess.  I have a matter at 2 o'clock.  It should be

11   relatively short, I think.  I think they have it resolved.  But

12   they're coming in at 2 o'clock.  Why don't you all come back at

13   2:30?  I'm sorry to keep you, but unless you think you can

14   resolve this in five or ten minute -- you think you can?

15         MR. MANNAL:  I really don't think it should take much

16   longer than --

17         THE COURT:  Okay.

18         MR. MANNAL:  I'd like to try, at least.

19         THE COURT:  I'll be back at 20 after 1.  Let's see if

20   you can -- if you don't have it resolved then, we're going to

21   take a recess.

22         MR. LEAKE:  Perhaps -- one moment, Your Honor, if I

23   may.

24         THE COURT:  I'm sorry?  I'm going to leave you to see

25   if you can work this out.  I don't have to sit here while you

1    do it, okay?  I'll come back at 20 after 1, unless you knock on

2    chambers' door and say you're ready before that.  Okay?

3             MR. LEAKE:  Your Honor, can I ask one question?  Is

4    it -- would it be -- I guess I'm asking is it helpful -- and

5    I'm wondering how we get this resolved --

6             THE COURT:  You'll either resolve it or you won't.

7             MR. LEAKE:  Right.

8             THE COURT:  If you resolve it, fine.  If you don't,

9    I'll rule.

10            MR. LEAKE:  Okay, okay.

11            THE COURT:  I think it's really that --

12            MR. LEAKE:  Thank you, Your Honor.

13            THE COURT:  -- simple, okay?  We're in recess.  So

14   not -- if you get it resolved quickly, just knock on the door.

15   I'm sorry to --

16            MR. LEAKE:  Thank you.

17        (Recess from 1:04 p.m. until 1:22 p.m.)

18            THE COURT:  All right.  Please be seated.  Mr. Mannal?

19            MR. MANNAL:  Good afternoon, Your Honor.  I appreciate

20   the Court's flexibility.  I'd like to approach with a

21   handwritten markup.

22            THE COURT:  Sure, come on up.  Tell me first:  have

23   you resolved the issues or not?

24            MR. MANNAL:  We have resolved the issues, yes, Your

25   Honor.

GENERAL MARITIME CORPORATION

Page 96

1          THE COURT:  Great.

2          MR. MANNAL:  And unfortunately, I'm used to writing

3     with one of these as opposed to typing.  And so, I'm going --

4     I'm hoping that I was able to -- in fact, Your Honor, I gave

5     you the wrong copy.

6          THE COURT:  I didn't look at it.  But you shouldn't

7     have said that about it.

8          MR. MANNAL:  Your Honor, I've attempted to flag the

9     changed pages or pages --

10         THE COURT:  Okay.

11         MR. MANNAL:  -- with comments on them, and I'll just

12    quickly run through.

13         THE COURT:  Sure.

14         MR. MANNAL:  The first is really just a clarifying

15    comments that says --

16         THE COURT:  Just give the page number, and so we have

17    a clear record.

18         MR. MANNAL:  Page 2 --

19         THE COURT:  Yes.

20         MR. MANNAL:  -- the bottom of page 2.  The

21    parenthetical says "Prior to the termination of a structuring

22    support agreement," it's the definition of a structuring

23    support agreement.  It's just a clarification that a

24    restructuring support agreement is as amended, supplemented or

25    otherwise modified.

1          THE COURT:  Okay.

2          MR. MANNAL:  On page 3, about six lines down, instead

3    of "such relief as provided for in the intercreditor

4    agreements," it's "such relief to the extent set forth in the

5    intercreditor agreements."

6          THE COURT:  Okay.

7          MR. MANNAL:  Page 5, it's a typo.  A final order

8    previously in the paragraph is already defined as defined

9    below, but a deletion of the parenthetical defined below.

10          THE COURT:  Fine.

11          MR. MANNAL:  Page 12, Your Honor, is a deletion of any

12   stipulation with respect to the secured -- junior secured

13   obligations, Your Honor.

14          THE COURT:  Okay.

15          MR. MANNAL:  Page 17, Your Honor, there are a few

16   things.  the insertion and clarification that the 75,000 dollar

17   budget applies both to the senior secured lenders as well as

18   the junior secured lenders by the insertion of the following at

19   the end of paragraph I:  Insert "or the junior secured

20   obligations as defined below and define that as the committee

21   investigation budget."

22          And then insert the following language after that,

23   which says "To the extent the final order applies, the

24   committee investigation budget to the investigation of the

25   junior secured obligations, any fees and expenses incurred by

1    the committee in connection with the investigation of the

2    junior secured obligations from the date of" the -- "this

3    interim order to the date of the final order shall reduce the

4    amount of the committee investigation budget."

5            And Your Honor, to settle this issue I'd like to state

6    on the record that any creditors committee appointed in this

7    case clearly has the right to challenge the amount of 75,000

8    dollars.

9            Paragraph 25 is a typo.  It doesn't make sense.  It

10   should say five lines down "Expressly provided herein,

11   including" --

12           THE COURT:  Page 25.

13           MR. MANNAL:  I'm sorry, page 25, paragraph G, six

14   lines down, beginning "Expressly provided herein, including in

15   paragraph 9 with respect to the carve-out."

16           THE COURT:  Right.  You struck the word "and."

17           MR. MANNAL:  Bless you.

18           Page 29:  this is an issue with respect to the swaps.

19   The swaps are not automatically terminated -- had not been

20   terminate to date.  And this is an insertion to ensure that the

21   counterparty will have the right to terminate the swaps at any

22   time in accordance with their terms.  So insert on the top of

23   that page 29, the second line:  agreement or other hedging --

24   other hedging agreement to terminate such agreement at any time

25   in such counter -- insert "and such counterparty may at any

1    time terminate such agreement in accordance with the terms

2    thereof."

3              THE COURT:  Okay.

4              MR. MANNAL:  Page 31, paragraph 8 -- and Your Honor, I

5    may or may not have been able to insert this into the version

6    you're reviewing.  So --

7              THE COURT:  There is an insertion.

8              MR. MANNAL:  There is an insertion?  At the -- and on

9    that page, there's a clarification at the beginning that says

10   "Except" -- it will -- it should now read "Except" -- at the

11   beginning of this paragraph -- "reservation of certain third

12   party rights in bar of challenges and claims, except as set

13   forth below in the immediately following sentence.  All of the

14   findings in subparagraphs 1, 2, and 3" -- excuse me -- "1, 2

15   and 4 of paragraph E and all of agreements, terms, provisions

16   and stipulations set forth in paragraph F of this interim

17   order."  That's the correction.

18              There's also a handwritten comment that may not appear

19   in your version --

20              THE COURT:  It is.

21              MR. MANNAL:  -- but the parties have agreed to --

22              THE COURT:  It's here.

23              MR. MANNAL:  -- in that parenthetical that's six lines

24   down, the lines that begins "Committee," it should "Committee

25   (including without limitation any Chapter 7 trustee, Chapter 11

Page 100

```
 1    trustee" --
 2              THE COURT:  It says "or Chapter 11 trustee."
 3              MR. MANNAL:  -- "or Chapter 11 trustee or any other
 4    party-in-interest with standing to do so."
 5              THE COURT:  Okay.  Actually, in the handwritten copy
 6    you actually had carrots putting it in two -- that same
 7    language in two different places.
 8              MR. MANNAL:  I apologize, Your Honor.  The --
 9              THE COURT:  It's okay.
10              MR. MANNAL:  -- blank carrot was at the beginning of
11    the parenthetical.
12              THE COURT:  Okay.
13              MR. MANNAL:  So it should say "Committee" --
14              THE COURT:  The correct carrot is at the beginning.
15    That's --
16              MR. MANNAL:  Yes.
17              THE COURT:  -- fine.  All right.  Go ahead.
18              MR. MANNAL:  And then, Your Honor, the language in
19    paragraph 9 with respect to the use of this is subject, again,
20    to the committee's ability to raise this as part of the final
21    order.
22              THE COURT:  Okay.
23              MR. MANNAL:  I think that was --
24              THE COURT:  Okay.  Mr. --
25              MR. JIMENEZ:  Your Honor, I just -- I wanted to
```

1    make --

2            THE COURT:  -- Jimenez?

3            MR. JIMENEZ:  -- a clarification on the record.

4            THE COURT:  Just identify yourself for the record.

5            MR. JIMENEZ:  Sure.

6            THE COURT:  Go ahead.

7            MR. JIMENEZ:  Your Honor, Pedro Jimenez of Jones Day,

8    on behalf of the noteholder committee.  There's one additional

9    section -- I just wanted to make sure that in your copy it's

10   stricken out.  It's in section --

11           THE COURT:  Well, you're going -- all going to get a

12   clean version of this down to us.  But go ahead and put it on

13   the record.

14           MR. JIMENEZ:  Section F --

15           THE COURT:  You got to give me a page.

16           MR. JIMENEZ:  Sure, Your Honor.  I was getting there.

17   Section F, Ruminate -- what used to Ruminate II, page 12 in the

18   blackline.

19           THE COURT:  Hold on.

20           MR. JIMENEZ:  That whole section should be stricken.

21           THE COURT:  Yes, it is in this --

22           MR. JIMENEZ:  Okay.

23           THE COURT:  -- copy here.

24           MR. JIMENEZ:  Okay.

25           THE COURT:  Okay.  Let me ask with the changes that

1    have been placed on the record in the -- I was given a redline

2    with further handwritten interlineations.  With those changes,

3    which Mr. Mannal has read into the record, Mr. Leake or Mr.

4    Jimenez, is the -- do you withdraw your objection?

5             MR. LEAKE:  Yes, Your Honor.

6             THE COURT:  Okay.  All right.  Does anybody else wish

7    to be heard with respect to the interim order for use of cash

8    collateral and debtor-in-possession financing?

9             All right.

10            MR. MANNAL:  Your Honor, could I ask that you so order

11   the record?  I apologize if I'm --

12            THE COURT:  No, that's perfectly fine because I'll so

13   order the record, and then you can go ahead and act on it.  And

14   I don't know.  Are you going to get in a clean version today

15   or --

16            MR. MANNAL:  As soon as possible, Your Honor,

17   absolutely.

18            THE COURT:  That's fine.  Okay.  And we'll get it

19   entered today.  So the motion is granted with the changes that

20   have been placed on the record.

21            MR. MANNAL:  Thank you very much, Your Honor.

22            THE COURT:  Okay.

23            Mr. Eckstein, anything else we needed to take care of?

24            MR. ECKSTEIN:  Just very briefly, Your Honor.  Thank

25   you very much.  Just to complete the record, Your Honor, I had

GENERAL MARITIME CORPORATION

Page 103

1    earlier referred to the declaration submitted by Mr. Pribor;

2    the first-day declaration.  I think it's appropriate if I ask

3    the Court to admit that declaration into evidence at this point

4    in time.

5            THE COURT:  Absolutely.

6            MR. ECKSTEIN:  Mr. Pribor is in court, and I believe

7    he's --

8            THE COURT:  That's fine.

9            MR. ECKSTEIN:  -- prepared to testify that if he were

10   to testify live that his testimony would be consistent with his

11   declaration.

12           THE COURT:  Okay.  Any objections to admitting the

13   Pribor declaration, which is dated November 17, 2011?

14           Hearing no objection, it's admitted into evidence.

15   (Mr. Pribor's Declaration was hereby received into evidence as

16   Debtors' Exhibit, as of this date.)

17           MR. ECKSTEIN:  Thank you very much, Your Honor.

18           THE COURT:  Thank you.  All right.  So --

19           MR. ECKSTEIN:  The --

20           THE COURT:  -- December 15th?

21           MR. ECKSTEIN:  Well, Your Honor, we have actually

22   spoken with your chambers about two potential dates.

23           THE COURT:  Okay.

24           MR. ECKSTEIN:  One was December 15th in the morning,

25   which would be the final hearing on the DIP as well as the

GENERAL MARITIME CORPORATION

Page 104

1    hearing on the motion that we contemplate filing to approve the

2    equity commitment agreement.

3              THE COURT:  Okay.

4              MR. ECKSTEIN:  And I believe that chambers had

5    indicated that that was available, so --

6              THE COURT:  When you're asking -- it this a motion to

7    assume an executory contract?  Is that what --

8              MR. ECKSTEIN:  No, Your Honor.  The agreement has not

9    been entered into yet.  We are going to -- we have an equity

10   commitment, and -- but --

11             THE COURT:  It's just the final documentation of

12   what's --

13             MR. ECKSTEIN:  Final documentation will be filed with

14   the Court, we contemplate, I believe, seven days in advance of

15   the hearing.  But we are going to file a motion next week for

16   the approval of certain of the key terms that are contemplated

17   in the equity commitment agree -- in the equity commitment

18   letter that we already have in place.

19             Specifically, it's a break free, an expense

20   reimbursement relief and a commitment agreement.  And -- so we

21   felt that once we have the agreement in final form, it would be

22   appropriate --

23             THE COURT:  And when would you want that heard?

24             MR. ECKSTEIN:  We're contemplating December 15th, Your

25   Honor.

1          THE COURT:  Okay.  Are we going to have a committee by

2     then?

3          MR. ECKSTEIN:  Yes, the committee's November 29th.

4          MR. SCHWARTZBERG:  That's correct, Your Honor.  The

5     formation meeting's November 29th.

6          THE COURT:  December 15th is good.  That's fine.

7          MR. ECKSTEIN:  Would 10 o'clock be appropriate, Your

8     Honor?

9          THE COURT:  10 o'clock is --

10         MR. ECKSTEIN:  That's -- appreciate that.

11         THE COURT:  -- would be perfect.

12         MR. ECKSTEIN:  We also had just consulted with

13    chambers about using December 5th in the afternoon to the

14    extent there are other miscellaneous motions that can be dealt

15    with so that we don't clutter that calendar.

16         THE COURT:  Fine, 2 o'clock.

17         MR. ECKSTEIN:  That'd be great.

18         THE COURT:  Okay.

19         MR. ECKSTEIN:  Very well.  With that, Your Honor, I

20    believe we've completed what we wanted to accomplish today.

21    And we appreciate Your --

22         THE COURT:  All right.

23         MR. ECKSTEIN:  -- Honor's --

24         THE COURT:  What other -- tell me what other

25    motions -- you've talked about a few motions that we'll hear.

1   You've got other motions you need to file, obviously; your

2   retention applications and --

3         MR. ECKSTEIN:  Correct.  There'll be some --

4         THE COURT:  -- things of that nature.

5         MR. ECKSTEIN:  -- retention applications.  It'll be

6   filed probably today or Monday.

7         THE COURT:  Okay.

8         MR. ECKSTEIN:  And we'll probably have those for

9   December --

10        THE COURT:  You finished vetting --

11        MR. ECKSTEIN:  -- 15th.

12        THE COURT:  -- that with the U.S. Trustee or --

13        MR. ECKSTEIN:  Yes.  We've been reviewing those

14   extensively with the U.S. Trustee, and I imagine we'll have

15   those, hopefully that the U.S. Trustee will be satisfied.

16        THE COURT:  Okay.  With respect to the case management

17   order, one of my law clerks will give you two examples.  Now,

18   it doesn't necessarily mean you have to follow those precisely.

19   But they include provisions that I insisted be included as well

20   as some that were put by other -- by the original draftsman.

21   But those two cases are Almatis, A-L-M-A-T-I-S and Metaldyne.

22        MR. ECKSTEIN:  To the extent we can, we may try to

23   deal with that on the 5th of December.

24        THE COURT:  That's fine.  I just give you those

25   examples.  I mean, I put page -- I put a provision of page

GENERAL MARITIME CORPORATION

1   limits.  I put some other things, and scheduling of omnibus

2   hearings.

3            I typically require more than the fourteen-day notice

4   period that the rules require, so it would include dates for

5   filing a deadline -- if you have omnibus dates, and I generally

6   include some specific omnibus dates in the case management

7   order, and then supplement if need when they go down the road,

8   it would include a deadline for filing motions for each of

9   those hearing dates, when responses would be due, any reply.

10           So everybody knows if you want a hearing on such and

11   such a date, unless it's an emergency motion, you -- when you

12   have to file your papers, so I typically require that.  And

13   I've typically expanded the fourteen days.

14           MR. ECKSTEIN:  We're comfortable with that --

15           THE COURT:  Okay.

16           MR. ECKSTEIN:  -- procedure as well, Your Honor.

17           THE COURT:  So you'll see what -- if --

18           MR. ECKSTEIN:  Are those both on the dockets?

19           THE COURT:  Well, we'll give you copies --

20           MR. ECKSTEIN:  Okay.

21           THE COURT:  -- but I -- just so -- anybody can look

22   them up.  That's why I gave you the case name.  Yes, they are.

23   They're both ones and Almatis early in the case, and one is in

24   Metaldyne fairly early in the case.  Okay?

25           MR. ECKSTEIN:  Very well, Your Honor.  We'll --

GENERAL MARITIME CORPORATION

Page 108

1          THE COURT:  All right.  We're --

2          MR. ECKSTEIN:  -- we'll follow that.

3          THE COURT:  -- we're adjourned.  Thank you very much.

4          MR. ECKSTEIN:  Thank you.

5     (Whereupon these proceedings were concluded at 1:37 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 109

1

2                        I N D E X

3

4                      E X H I B I T S

5   DEBTORS              DESCRIPTION        PAGE

6                        Declaration of     58

7                        Thane Carlston

8                        Mr. Pribor's       103

9                        Declaration

10

11                            RULINGS

12                                          Page      Line

13  Motion for Joint Administration Granted      29        15

14

15  Motion for an Interim Order for the Use of   102       19

16  Cash Collateral and Debtor-In-Possession

17  Financing

18  Granted as Modified

19

20  Motion to Extend Time to File Schedules      29        22

21  Granted

22

23  Motion to Retain Garden City Group under     30        11

24  Section 156(c)

25  Granted

Page 110

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | Motion to Waive the Requirements for a List | 30 | 17 |
| 3 | Of Creditors | | |
| 4 | Granted | | |
| 5 | | | |
| 6 | Motion for Goods and Services that were | 31 | 8 |
| 7 | Ordered Pre-Petition to be Deliver | | |
| 8 | Post-Petition | | |
| 9 | Granted | | |
| 10 | | | |
| 11 | Debtors Motion for Interim and Final Orders | 36 | 22 |
| 12 | Authorizing the Debtors to (I) Pay Wages, | | |
| 13 | Other Compensation, and Reimbursable | | |
| 14 | Expenses | | |
| 15 | Granted | | |
| 16 | | | |
| 17 | Motion to Continue the Existing Cash | 44 | 6 |
| 18 | Management System with the Depository Banks | | |
| 19 | That the Debtors and Nondebtor Affiliates | | |
| 20 | Are Using | | |
| 21 | Granted on an Interim Basis | | |
| 22 | | | |
| 23 | Motion on an Interim basis to Pay Insurance | 45 | 17 |
| 24 | Premiums | | |
| 25 | Granted | | |

Page 111

1

2   Debtors Motion for Interim and Final Orders    57        4

3   (I) Authorizing Payments to Foreign and

4   Critical Vendors; (II) Authorizing the

5   Payment of Section 503(b)(9) Administrative

6   Expenses; (III) Authorizing the Payments of

7   Prepetition Amounts Owed to Customers Under

8   Charter Agreements; (IV) Authorizing the

9   Debtors to Continue to Perform Under Pooling

10  Agreements

11  Granted on an Interim Basis and

12  As Modified

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 112

1

2                        C E R T I F I C A T I O N

3

4    I, Aliza Chodoff, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    Aliza Chodoff    Digitally signed by Aliza Chodoff
                      DN: cn=Aliza Chodoff,
                      o=Veritext, c=US
8    _____Date: 2011.11.21 10:53:03 -05'00'_____

9    ALIZA CHODOFF

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  November 21, 2011

17

18

19

20

21

22

23

24

25