KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Adam C. Rogoff
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:                                              :   Chapter 11
                                                    :
GENERAL MARITIME CORPORATION, <u>et al.</u>,   :   Case No. 11-15285 (MG)
                                                    :
                         Debtors.                   :   Jointly Administered

-------------------------------------------------------------x

**NOTICE OF FILING EXHIBITS 3 THROUGH 17 TO THE PLAN**
**SUPPLEMENT TO THE SECOND AMENDED JOINT PLAN OF REORGANIZATION**
**<u>OF THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.  By Order dated February 29, 2012 (the "**Disclosure Statement Approval Order**"),[1] the United States Bankruptcy Court for the Southern District of New York (the "**Court**") approved the *First Amended Disclosure Statement for the First Amended Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code*, dated February 29, 2012 (including all exhibits thereto, the "**Disclosure Statement**") for the *First Amended Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code*, dated February 29, 2012, as containing adequate information within the meaning of section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et</u> <u>seq.</u> (the "**Bankruptcy Code**"). On March 26, 2012, the Debtors filed the *Second Amended Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code* (as it may be amended, modified or supplemented in accordance with its terms, the "**Plan**").

2.  The Debtors hereby file substantially complete versions of the following documents that comprise part of the Plan Supplement in connection with confirmation of the Plan:[2]

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Plan or the Disclosure Statement Approval Order, as applicable.

[2] Exhibits 1 and 2 to the Plan Supplement were filed on April 12, 2012 [Docket No. 708].

- **Exhibit 3**: New Senior 2010 Facility Credit Agreement;

- **Exhibit 4**: New Senior 2011 Facility Credit Agreement;

- **Exhibit 5**: New GMR Charter;

- **Exhibit 6**: New GMR By-Laws;

- **Exhibit 7**: New GMR Warrant Agreement;

- **Exhibit 8**: Identity of the officers and members of the New Board and each of the other Reorganized Debtors;

- **Exhibit 9**: Summary of any Restructuring Transactions to occur on or after the Effective Date in accordance with Article IV.J.2 of the Plan, if any;

- **Exhibit 10**: List of retained Causes of Action;

- **Exhibit 11**: A summary of the material terms of the Equity Incentive Program (to the extent agreed to in accordance with Article V.E of the Plan);

- **Exhibit 12**: New Management Agreements;

- **Exhibit 13**: Registration Rights Agreement;

- **Exhibit 14**: Shareholders Agreement;

- **Exhibit 15**: The Existing Benefits Agreements to be assumed under the Plan (to the extent consented to by the Oaktree Plan Sponsors in accordance with Article V.D of the Plan);

- **Exhibit 16A**: New Senior 2010 Facility Intercreditor Agreement;

- **Exhibit 16B**: New Senior 2011 Facility Intercreditor Agreement; and

- **Exhibit 17**: Elected treatment of Intercompany Claims and Subsidiary Equity Interests.

3.      In accordance with Article X.E of the Plan, the Bankruptcy Code and the Bankruptcy Rules, the Debtors, the Creditors' Committee, the Oaktree Plan Sponsors and the Requisite Supporting Creditors reserve the right to amend or modify the Plan Supplement.

4.      On May 3, 2012 at 11:00 a.m. (prevailing Eastern Time) or as soon thereafter as counsel may be heard, a hearing will be held before the Honorable Martin Glenn, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 to consider confirmation of the Plan, including all exhibits thereto

and as amended, modified or supplemented from time to time, and for such other and further relief as may be just and proper (the "**Confirmation Hearing**").

5.      The Confirmation Hearing may be adjourned from time to time by the Court without further notice.  Additionally, the Plan may be modified in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and other applicable law, without further notice, prior to or as a result of the Confirmation Hearing.

6.      Objections, if any, to confirmation of the Plan, including, for the avoidance of doubt, any supporting memoranda and the exhibits in the Plan Supplement, must be in writing, must be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, together with proof of service, and shall state the name and address of the objector, all grounds for the objection and the amount of the Claim(s) or other Equity Interest(s) held by the objector.  **Any such objection must be filed with the Court and served so that it is <u>actually received</u> by the Court, the following parties, and all other parties requesting or entitled to receive notice in these cases, on or before <u>April 23, 2012 at 4:00 p.m.</u> (prevailing Eastern Time):**

- *To the Debtors*:  General Maritime Corporation, 299 Park Avenue, New York, NY 10171, attention: Jeffrey D. Pribor, Tel.: (212) 763-5600, Fax: (212) 763-5603, with a copy to Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, attention: Kenneth Eckstein, Douglas Mannal and Adam Rogoff, Tel.: (212) 715-9100, Fax: (212) 715-8000.

- *To the Unsecured Creditors' Committee*: Jones Day, 222 East 41st Street, New York, NY 10017, attention: Pedro A. Jimenez, Tel.: (212) 326-3939, Fax: (212) 755-7306.

- *To the Prepetition Administrative Agent*: White & Case LLP, 1155 Avenue of the Americas, New York, NY 10036, attention: Thomas E. Lauria and Scott Greissman, Tel.: (212) 819-8200, Fax: (212) 354-8113.

- *To the New Senior Lenders*:  White & Case LLP, 1155 Avenue of the Americas, New York, NY 10036, attention: Thomas E Lauria and Scott Greissman, Tel.: (212) 819-8200, Fax: (212) 354-8113.

- *To the Oaktree Plan Sponsors*:  Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, attention: Edward O. Sassower and Brian E. Schartz, Tel.: (212) 446-4800, Fax: (212) 446-4900.

- *To the Office of the United States Trustee*: 33 Whitehall Street, 21st Floor, New York, New York 10004, attention: Paul K. Schwartzberg, Esq., Tel.: (212) 510-0500, Fax: (212) 668-2255.

7.     Any objection not filed and served as set forth above will be deemed waived and will not be considered by the Court.

8.     Copies of the Plan and Plan Supplement can be viewed and obtained for a fee on via PACER at www.pacer.gov or (without charge) on the Debtors' restructuring website at www.GMRRestructuring.com.

Dated: New York, New York
       April 16, 2012

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Stephen D. Zide
Kenneth H. Eckstein
Adam C. Rogoff
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel for the Debtors*

# EXHIBIT 3

**New Senior 2010 Facility Credit Agreement**

$273,802,583.31

## SECOND AMENDED AND RESTATED CREDIT AGREEMENT

among

**GENERAL MARITIME CORPORATION,**
as Parent,

**GENERAL MARITIME SUBSIDIARY CORPORATION,**

and

**ARLINGTON TANKERS LTD.**
as Guarantors,

**GENERAL MARITIME SUBSIDIARY II CORPORATION,**
as Borrower,

**VARIOUS LENDERS**

and

**NORDEA BANK FINLAND PLC, NEW YORK BRANCH,**

as Administrative Agent and Collateral Agent

Dated as of [_____], 2012

**NORDEA BANK FINLAND PLC, NEW YORK BRANCH,**

and

**DNB BANK ASA**

as Joint Lead Arrangers and Joint Book Runners

TABLE OF CONTENTS

Page

SECTION 1. Definitions and Accounting Terms ................................................................2
  1.01 Defined Terms ........................................................................................................2

SECTION 2. Amount and Terms of Credit Facility ..........................................................34
  2.01 The Loans................................................................................................................34
  2.02 [Intentionally Omitted] ..........................................................................................34
  2.03 [Intentionally Omitted] ..........................................................................................34
  2.04 [Intentionally Omitted] ..........................................................................................34
  2.05 Notes 34
  2.06 Pro Rata Borrowings...............................................................................................35
  2.07 Interest.....................................................................................................................35
  2.08 Interest Periods........................................................................................................36
  2.09 Increased Costs, Illegality, Market Disruption Event, etc. .....................................38
  2.10 Compensation .........................................................................................................40
  2.11 Change of Lending Office ......................................................................................40
  2.12 Replacement of Lenders .........................................................................................40

SECTION 3. Fees 41
  3.01 Fees  41

SECTION 4. Prepayments; Payments; Taxes.....................................................................41
  4.01 Voluntary Prepayments...........................................................................................41
  4.02 Mandatory Repayments ..........................................................................................42
  4.03 Method and Place of Payment ................................................................................45
  4.04 Net Payments; Taxes...............................................................................................45

SECTION 5. [Intentionally Omitted] .................................................................................46

SECTION 6. [Intentionally Omitted] .................................................................................46

SECTION 7. Representations, Warranties and Agreements ...............................................46
  7.01 Corporate/Limited Liability Company/Limited Partnership Status........................47
  7.02 Corporate Power and Authority...............................................................................47
  7.03 No Violation.............................................................................................................47
  7.04 Governmental Approvals.........................................................................................47
  7.05 Financial Statements; Financial Condition; Undisclosed Liabilities. .....................48
  7.06 Litigation.................................................................................................................49
  7.07 True and Complete Disclosure.................................................................................49
  7.08 Use of Proceeds; Margin Regulations......................................................................49
  7.09 Tax Returns and Payments.......................................................................................49
  7.10 Compliance with ERISA..........................................................................................50

7.11 The Security Documents ................................................................................................. 51
7.12 Capitalization ................................................................................................................. 51
7.13 Subsidiaries ................................................................................................................... 52
7.14 Compliance with Statutes, etc. ...................................................................................... 52
7.15 Investment Company Act .............................................................................................. 52
7.16 Money Laundering ......................................................................................................... 52
7.17 Pollution and Other Regulations ................................................................................... 53
7.18 Labor Relations ............................................................................................................. 54
7.19 Patents, Licenses, Franchises and Formulas ................................................................ 54
7.20 Indebtedness .................................................................................................................. 54
7.21 Insurance ........................................................................................................................ 54
7.22 Concerning the Collateral Vessels ................................................................................ 54
7.23 Citizenship ..................................................................................................................... 55
7.24 Collateral Vessel Classification; Flag .......................................................................... 55
7.25 No Immunity .................................................................................................................. 55
7.26 Fees and Enforcement ................................................................................................... 55
7.27 Form of Documentation ................................................................................................ 55
7.28 Solvency ......................................................................................................................... 56
7.29 Patriot Act ...................................................................................................................... 56
7.30 Certain Business Practices ............................................................................................. 56

SECTION 8. Affirmative Covenants ....................................................................................... 56
8.01 Information Covenants ................................................................................................... 56
8.02 Books, Records and Inspections .................................................................................... 60
8.03 Maintenance of Property; Insurance .............................................................................. 61
8.04 Corporate Franchises ..................................................................................................... 61
8.05 Compliance with Statutes, etc. ...................................................................................... 61
8.06 Compliance with Environmental Laws .......................................................................... 61
8.07 ERISA ............................................................................................................................ 62
8.08 End of Fiscal Years; Fiscal Quarters ............................................................................ 64
8.09 Performance of Obligations ........................................................................................... 64
8.10 Payment of Taxes ........................................................................................................... 64
8.11 Further Assurances ......................................................................................................... 64
8.12 Deposit of Earnings ........................................................................................................ 65
8.13 Ownership of Subsidiaries ............................................................................................. 65
8.14 Flag of Collateral Vessels; Citizenship; Collateral Vessel Classifications .................. 65
8.15 Use of Proceeds .............................................................................................................. 66

SECTION 9. Negative Covenants ............................................................................................. 66
9.01 Liens 66
9.02 Consolidation, Merger, Sale of Assets, etc. ................................................................. 69
9.03 Dividends ....................................................................................................................... 71
9.04 Indebtedness ................................................................................................................... 71
9.05 Advances, Investments and Loans ................................................................................. 72
9.06 Transactions with Affiliates ........................................................................................... 73
9.07 Capital Expenditures ...................................................................................................... 73

9.08 Minimum Cash Balance......................................................................................74
9.09 Collateral Maintenance......................................................................................74
9.10 Interest Expense Coverage Ratio.......................................................................75
9.11 Limitation on Modifications of Certificate of Incorporation, By-Laws and
     Certain Other Agreements; etc...................................................................76
9.12 Limitation on Certain Restrictions on Subsidiaries............................................76
9.13 Limitation on Issuance of Equity Interests.........................................................76
9.14 Business.............................................................................................................77
9.15 Jurisdiction of Employment; Chartering In Contracts.........................................77
9.16 Bank Accounts...................................................................................................77
9.17 Indebtedness of Non-Recourse Subsidiaries.....................................................78

SECTION 10. Events of Default......................................................................................78

10.01 Payments.........................................................................................................78
10.02 Representations, etc. .......................................................................................78
10.03 Covenants........................................................................................................78
10.04 Default Under Other Agreements.....................................................................78
10.05 Bankruptcy, etc. ..............................................................................................79
10.06 ERISA..............................................................................................................79
10.07 Security Documents.........................................................................................80
10.08 Guaranties.......................................................................................................80
10.09 Judgments.......................................................................................................81
10.10 Change of Control............................................................................................81
10.11 Default Under Non-Recourse Subsidiary Agreements......................................81

SECTION 11. Agency and Security Trustee Provisions....................................................81

11.01 Appointment....................................................................................................81
11.02 Nature of Duties...............................................................................................82
11.03 Lack of Reliance on the Agents.......................................................................82
11.04 Certain Rights of the Agents............................................................................83
11.05 Reliance...........................................................................................................83
11.06 Indemnification................................................................................................83
11.07 The Administrative Agent in its Individual Capacity..........................................83
11.08 Holders............................................................................................................84
11.09 Resignation by the Administrative Agent..........................................................84
11.10 The Joint Lead Arrangers.................................................................................85
11.11 Collateral Matters............................................................................................85
11.12 Delivery of Information.....................................................................................86

SECTION 12. Miscellaneous...........................................................................................86

12.01 Payment of Expenses, etc. ..............................................................................86
12.02 Right of Setoff..................................................................................................87
12.03 Notices.............................................................................................................87
12.04 Benefit of Agreement.......................................................................................88
12.05 No Waiver; Remedies Cumulative....................................................................91
12.06 Payments Pro Rata..........................................................................................91

12.07 Calculations; Computations.................................................................91
12.08 **GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
WAIVER OF JURY TRIAL**.....................................................92
12.09 Counterparts.............................................................................93
12.10 Restatement Effective Date.........................................................93
12.11 Headings Descriptive...............................................................96
12.12 Amendment or Waiver; etc.........................................................96
12.13 Survival................................................................................98
12.14 Domicile of Loans....................................................................98
12.15 Confidentiality........................................................................98
12.16 Register.................................................................................99
12.17 Judgment Currency.................................................................100
12.18 Language..............................................................................100
12.19 Waiver of Immunity................................................................100
12.20 USA PATRIOT Act Notice.......................................................101
12.21 Release of Secondary Collateral and Subsidiary Guarantors ...............101

SECTION 13. Holdings Guaranty. ...........................................................101

13.01 Guaranty..............................................................................101
13.02 Bankruptcy...........................................................................102
13.03 Nature of Liability..................................................................102
13.04 Independent Obligation............................................................102
13.05 Authorization........................................................................102
13.06 Reliance...............................................................................103
13.07 Subordination........................................................................104
13.08 Waiver.................................................................................104
13.09 Judgment Shortfall..................................................................105

| SCHEDULE I | - | Loans |
|---|---|---|
| SCHEDULE II | - | Lender Addresses |
| SCHEDULE III | - | Collateral Vessels |
| SCHEDULE IV | - | Existing Liens |
| SCHEDULE V | - | Existing Indebtedness |
| SCHEDULE VI | - | Required Insurance |
| SCHEDULE VII | - | ERISA |
| SCHEDULE VIII | - | Subsidiaries |
| SCHEDULE IX | - | Capitalization |
| SCHEDULE X | - | Approved Classification Societies |
| SCHEDULE XI | - | Existing Investments |
| SCHEDULE XII | - | Transactions with Affiliates |
| SCHEDULE XIII | - | Subsidiary Guarantors |
| SCHEDULE XIV | - | Litigation |
| SCHEDULE XV | - | Non-Recourse Subsidiaries |

| EXHIBIT A | - | Form of Notice of Interest Period Election |
|---|---|---|
| EXHIBIT B | - | Form of Amended and Restated Term Note |

EXHIBIT C-1   -   Form of Opinion of Kirkland & Ellis LLP, New York counsel to the Credit Parties

EXHIBIT C-2   -   Form of Opinion of Constantine P. Georgiopoulos, New York maritime counsel to the Credit Parties

EXHIBIT C-3   -   Form of Opinion of Dennis J. Reeder, Esq., Marshall Islands counsel to the Credit Parties

EXHIBIT C-4   -   Form of Opinion of George E. Henries, Esq., Liberian counsel to the Credit Parties

EXHIBIT C-5   -   Form of Opinion of Conyers, Dill & Pearman Limited, Bermuda counsel to the Credit Parties

EXHIBIT D   -   Form of Officer's Certificate

EXHIBIT E   -   Form of Subsidiaries Guaranty

EXHIBIT F-1   -   Form of Amended and Restated Pledge Agreement

EXHIBIT F-2   -   Form of Amended and Restated Parent Pledge Agreement

EXHIBIT F-3   -   Form of Amended and Restated Secondary Pledge Agreement

EXHIBIT G-1   -   Form of Assignment of Earnings

EXHIBIT G-2   -   Form of Secondary Assignment of Earnings

EXHIBIT H-1   -   Form of Assignment of Insurances

EXHIBIT H-2   -   Form of Secondary Assignment of Insurances

EXHIBIT I-1   -   Form of Marshall Islands Collateral Vessel Mortgage

EXHIBIT I-2   -   Form of Marshall Islands Secondary Collateral Vessel Mortgage

EXHIBIT I-3   -   Form of Liberian Secondary Collateral Vessel Mortgage

EXHIBIT I-4   -   Form of Bermuda Secondary Collateral Vessel Mortgage

EXHIBIT J   -   Form of Solvency Certificate

EXHIBIT K   -   Form of Assignment and Assumption Agreement

EXHIBIT L   -   Form of Amended and Restated Compliance Certificate

EXHIBIT M   -   Subordination Provisions

EXHIBIT N   -   Form of Parent Officer's Certificate

EXHIBIT O-1   -   Form of Primary Intercreditor Agreement

EXHIBIT O-2   -   Form of Secondary Intercreditor Agreement

EXHIBIT P   -   Form of Joinder Agreement

EXHIBIT Q   -   Form of Excess Liquidity Certificate

THIS SECOND AMENDED AND RESTATED CREDIT AGREEMENT, dated as of [____], 2012, among GENERAL MARITIME CORPORATION, a Marshall Islands corporation (the "Parent"), GENERAL MARITIME SUBSIDIARY CORPORATION, a Marshall Islands corporation ("GMSC"), in its capacity as a Guarantor, ARLINGTON TANKERS LTD., a Bermuda corporation, as a Guarantor ("Arlington"), GENERAL MARITIME SUBSIDIARY II CORPORATION, a Marshall Islands corporation (the "Borrower"), the Lenders party hereto from time to time, and NORDEA BANK FINLAND PLC, NEW YORK BRANCH ("Nordea"), as Administrative Agent (in such capacity, the "Administrative Agent") and as Collateral Agent under the Security Documents (in such capacity, the "Collateral Agent"). All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

## W I T N E S S E T H:

WHEREAS, the Borrower, the Parent, GMSC, Arlington, the lenders party thereto and Nordea, as administrative agent and collateral agent, are party to an Amended and Restated Credit Agreement, dated as of May 6, 2011 (as amended, modified and/or supplemented from time to time to, but not including, the Restatement Effective Date, the "Original Credit Agreement");

WHEREAS, the Borrower, GMSC and the Parent and certain of their subsidiaries commenced voluntary bankruptcy proceedings (the "Chapter 11 Proceedings") on November 17, 2011 under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on [_____], 2012, in connection with the Chapter 11 Proceedings, the Bankruptcy Court confirmed a plan of reorganization (as such plan may be modified from time to time, in accordance with its terms, the "Plan of Reorganization") under Chapter 11 of the Bankruptcy Code pursuant to a confirmation order dated [_____], 2012;

WHEREAS, pursuant to the Plan of Reorganization, on the Restatement Effective Date (x) each of the Lenders holding outstanding Term Loans will continue such Term Loans as Loans pursuant to the terms of this Agreement after giving effect to the paydown of $39,649,220 as part of the Plan of Reorganization, (y) each of the Lenders holding outstanding Revolving Loans immediately prior to the Restatement Effective Date will convert such Revolving Loans into Loans under this Agreement and (z) the unutilized Revolving Commitments (as defined in the Original Credit Agreement) of the Lenders, if any, under the Original Credit Agreement will be terminated;

WHEREAS, pursuant to the Plan of Reorganization, GMSC intends to amend and restate its existing $550,000,000 Second Amended and Restated Credit Agreement, dated as of May 6, 2011 (as amended, modified and/or supplemented from time to time to, but not including, the Restatement Effective Date, the "Original Other Credit Agreement"), among GMSC, as borrower, the Parent, Arlington and the Borrower, as guarantors, the lenders party thereto and Nordea, as administrative agent, with a term loan credit facility providing for the conversion of

the outstanding revolving commitments under the Original Other Credit Agreement into term loans to GMSC and the exchange of the termination value of and interest on the Specified Swap (as defined in the Other Credit Agreement) for a term loan (such $508,963,260.95[1] Third Amended and Restated Credit Agreement (as amended, modified and/or supplemented in accordance with the terms thereof and of the Intercreditor Agreements), among GMSC, as borrower, the Parent, the Borrower and Arlington, as guarantors, the lenders from time to time party thereto and Nordea, as administrative agent and collateral agent (in such capacities, the "Other Agent"), the "Other Credit Agreement");

WHEREAS, subject to certain conditions, including the confirmation of the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code and the effectiveness of the Plan of Reorganization, pursuant to the Plan of Reorganization, the Lenders under the Original Credit Agreement shall be deemed a party to this Agreement without further action of the Administrative Agent or of the Lenders, and this Agreement, as set forth herein, will replace the Original Credit Agreement, which will have no remaining force and effect;

WHEREAS, pursuant to the terms of the Plan of Reorganization and in consideration for the Lenders under the Original Credit Agreement consenting to the conversion of Indebtedness under the Other Credit Agreement (including the guarantees thereof) and the continuation of the second priority liens on the collateral securing such Indebtedness, (x) the Guarantors under and as defined in the Other Credit Agreement will guarantee the Obligations under this Agreement and (y) the Obligations of the Credit Parties under this Agreement will continue to be secured by a second priority Lien on the Secondary Collateral; and

WHEREAS, the parties wish to amend and restate the Original Credit Agreement in order to permit the transactions described above and to amend certain other provisions of the Original Credit Agreement.

NOW, THEREFORE, the parties hereto agree that, effective as of the Restatement Effective Date, the Original Credit Agreement shall be, and hereby is, amended and restated in its entirety as follows:

SECTION 1. Definitions and Accounting Terms.

1.01 Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acceptable Flag Jurisdiction" shall have the meaning provided in Section 8.14.

"Acceptable Replacement Vessel" shall mean, with respect to a Primary Collateral Vessel, any Vessel with an equal or greater Fair Market Value than such Primary Collateral Vessel (as determined in accordance with the appraisal reports most recently delivered

---

[1] Amount to include accrued and unpaid interest on Specified Swap (as defined in the Other Credit Agreement).

to the Administrative Agent (or obtained by the Administrative Agent) pursuant to Section 8.01(c) or delivered pursuant to a Vessel Exchange to the Administrative Agent by the Borrower); provided that (I) the Administrative Agent shall have the right to inspect such Vessel and (II) such Vessel must (i) constitute a double hull Vessel, (ii) be of at least 80,000 dwt, (iii) have been built after the Primary Collateral Vessel it replaces and, in any event, have been built no more than seven years prior to the date of the Vessel Exchange, (iv) have a class certificate reasonably acceptable to the Administrative Agent and (v) be registered and flagged in an Acceptable Flag Jurisdiction.

"Administrative Agent" shall have the meaning provided in the first paragraph of this Agreement, and shall include any successor thereto.

"Affiliate" shall mean, with respect to any Person, any other Person (including, for purposes of Section 9.06 only, all directors, officers and partners of such Person) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; provided, however, that for purposes of Section 9.06, an Affiliate of the Parent shall include any Person that directly or indirectly owns more than 5% of any class of the capital stock of the Parent and any officer or director of the Parent or any of its Subsidiaries. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding anything to the contrary contained above, for purposes of Section 9.06, neither the Administrative Agent, nor the Collateral Agent, nor the Joint Lead Arrangers nor any Lender (or any of their respective affiliates) shall be deemed to constitute an Affiliate of the Parent or its Subsidiaries in connection with the Credit Documents or its dealings or arrangements relating thereto.

"Affiliated Lender" shall have the meaning provided in Section 12.04(d).

"Agents" shall mean, collectively, the Administrative Agent, the Collateral Agent and each Joint Lead Arranger.

"Aggregate Primary Collateral Vessel Value" shall have the meaning provided in Section 9.09(a).

"Agreement" shall mean this Second Amended and Restated Credit Agreement, as modified, supplemented, amended or restated from time to time.

"Applicable Margin" shall mean a percentage per annum equal to 4.00%.

"Applicable Property" shall have the meaning provided in Section 9.01.

"Approved Appraiser" shall mean H. Clarksons & Company Limited, Fearnleys Ltd., R.S. Platou Shipbrokers a.s., Lorentzen & Stemoco, Simpson Spence & Young Ltd. or such other independent appraisal firm as may be acceptable to the Administrative Agent.

"Arlington" shall have the meaning provided in the first paragraph of this Agreement.

"Assignment and Assumption Agreement" shall mean the Assignment and Assumption Agreement substantially in the form of Exhibit K (appropriately completed).

"Assignment of Charters" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Assignment of Earnings" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Assignment of Insurances" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Bankruptcy Code" shall have the meaning provided in Section 10.05.

"Bankruptcy Court" shall have the meaning provided in the Recitals.

"Blocked Account" shall have the meaning provided in Section 9.09(b).

"Blocked Amount" shall have the meaning provided in Section 9.09(b).

"Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"Borrowing" shall mean the borrowing of Loans from all the Lenders (other than Defaulting Lenders) on a given date having the same Interest Period.

"Business Day" shall mean any day except Saturday, Sunday and any day which shall be in New York City, Hamburg or London a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close.

"Capital Expenditures" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person.

"Capitalized Lease Obligations" of any Person shall mean all rental obligations which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"Cash Equivalents" shall mean (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition, (ii) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, capital, (x) surplus and undivided profits aggregating in excess of $200,000,000 and (y) a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than one year from the date of acquisition by such Person, (iii) repurchase obligations with a term of not

-4-

more than 90 days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (ii) above, (iv) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than one year after the date of acquisition by such Person, and (v) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (iv) above.

"Cash Flow Projections" shall have the meaning provided in Section 8.01(l).

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same may be amended from time to time, 42 U.S.C. § 9601 et seq.

"Change of Control" shall mean (i) the Parent shall at any time and for any reason fail to own or control, directly or indirectly, 100% of the Equity Interests of the Borrower and each Subsidiary Guarantor which owns a Primary Collateral Vessel, except in the case of a non-U.S. Subsidiary Guarantor, any such other ownership as required by applicable law, (ii) the sale, lease or transfer of all or substantially all of the Parent's assets to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), (iii) the liquidation or dissolution of the Parent or the Borrower, (iv) (x) at any time prior to the consummation of a Qualifying IPO, the Permitted Holders shall at any time cease to own, directly or indirectly, beneficially or of record, shares representing more than 50% of the outstanding voting or economic Equity Interests of the Parent, and (y) at any time upon or after the consummation of a Qualifying IPO, (1) any Person or Persons constituting a "group" (as such term is used in Section 13(d) and 14(d) of the Exchange Act, but excluding any benefit plan of such Person or Persons and its or their Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than a Permitted Holder, becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of Stock representing more than 35% of the outstanding voting Equity Interests of the Parent and (2) the percentage of outstanding voting Equity Interests of the Parent so held by such Person or Persons is greater than the percentage of outstanding voting Equity Interests of the Parent beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders, (v) the replacement of a majority of the directors on the board of directors of the Parent over a two-year period from the directors who constituted the board of directors of the Parent at the beginning of such period, and such replacement shall not have been approved by a vote of at least a majority of the board of directors of the Parent then still in office who either were members of such board of directors at the beginning of such period or whose election as a member of such Board of Directors was previously so approved or (vi) a "change of control" or similar event shall occur as provided in any outstanding Indebtedness (excluding Indebtedness with an aggregate principal amount of less than $20,000,000) of Parent or any of its Subsidiaries (or the documentation governing the same). For the avoidance of doubt, the Plan of Reorganization shall not constitute a Change of Control.

"Chapter 11 Proceedings" shall have the meaning provided in the Recitals.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall mean all Primary Collateral and Secondary Collateral.

"Collateral Agent" shall mean the Administrative Agent acting as mortgagee, security trustee or collateral agent for the Secured Creditors pursuant to the Security Documents.

"Collateral and Guaranty Requirements" shall mean with respect to each Collateral Vessel or each Credit Party, as the case may be, the requirement that:

(i)    each Subsidiary defined as a Subsidiary Guarantor shall have duly authorized, executed and delivered to the Administrative Agent a reaffirmation of the Subsidiaries Guaranty, substantially in the form of Exhibit E (as modified, supplemented or amended from time to time, together with any Joinder Agreement, the "Subsidiaries Guaranty"), or a joinder thereto substantially in the form of Exhibit P (as modified, supplemented or amended from time to time, the "Joinder Agreement"), and the Subsidiaries Guaranty shall be in full force and effect;

(ii)    the Borrower and each Subsidiary Guarantor described in clause (x) of the definition thereof shall have (x) duly authorized, executed and delivered the Amended and Restated Pledge Agreement substantially in the form of Exhibit F-1 (as modified, supplemented or amended from time to time, the "Pledge Agreement") or a joinder thereto, and shall have (A) delivered to the Collateral Agent, as pledgee, all the Pledged Securities referred to therein, and (B) otherwise complied with all of the requirements set forth in the Pledge Agreement, and (y) duly authorized, executed and delivered any other related documentation necessary or advisable to perfect the Lien on the Pledge Agreement Collateral in the respective jurisdictions of formation of the respective Subsidiary Guarantor or the Borrower, as the case may be;

(iii)    the Parent shall have (x) duly authorized, executed and delivered the Amended and Restated Parent Pledge and Security Agreement in the form of Exhibit F-2 (as modified, supplemented or amended from time to time, the "Parent Pledge Agreement") and shall have (A) delivered to the Collateral Agent, as pledgee, all the Pledged Securities referred to therein, together with executed and undated transfer powers, including, without limitation and to the extent applicable, a charge over shares of any Bermuda registered Subsidiary Guarantor taken by way of a Bermuda-law governed charge over shares, and (B) otherwise complied with all of the requirements set forth in the Parent Pledge Agreement and (y) duly authorized, executed and delivered any other related documentation necessary or advisable to perfect the Lien on the Pledge Agreement Collateral in the Parent's jurisdiction of formation;

(iv)    the Parent, GMSC, Arlington and each Subsidiary Guarantor described in clause (y) of the definition thereof shall have (x) duly authorized, executed and delivered the Amended and Restated Secondary Pledge Agreement substantially in the form of Exhibit F-3 (as modified, supplemented or amended from time to time, the "Secondary Pledge Agreement") or a joinder thereto, and shall have (A) delivered to the Other Agent, as pledgee and bailee on behalf

-6-

of the Secured Creditors in accordance with the Secondary Intercreditor Agreement, all the Pledged Securities referred to therein, together with executed and undated transfer powers, including, without limitation and to the extent applicable, a charge over shares of any Bermuda registered Subsidiary Guarantor taken by way of a Bermuda-law governed charge over shares, and (B) otherwise complied with all of the requirements set forth in the Secondary Pledge Agreement, (y) duly authorized, executed and delivered to the Other Agent any other related documentation necessary or advisable to perfect the Lien on the Secondary Pledge Agreement Collateral in the respective jurisdictions of formation of the Parent, the respective Subsidiary Guarantor, Arlington or GMSC, as the case may be, and (z) received the consent of the Bermuda Monetary Authority for the grant of a charge over shares of any Bermuda registered Subsidiary Guarantor;

(v)    the Parent, GMSC, Arlington, the Borrower, each Subsidiary Guarantor that owns a Collateral Vessel, the Collateral Agent and Nordea, as depositary bank, shall have duly executed and delivered a control agreement substantially in the form attached to the Pledge Agreement and/or the Secondary Pledge Agreement, as the case may be, with respect to any Concentration Account owned by the Parent, GMSC, Arlington, the Borrower or such Subsidiary Guarantor (or, if a control agreement with respect to any such Concentration Account shall have been executed and delivered by the Parent, GMSC, Arlington, the Borrower or any such Subsidiary Guarantor prior to the Restatement Effective Date, a reaffirmation of such control agreement); provided that, prior to the Discharge of the First-Priority Obligations (as defined in the Secondary Intercreditor Agreement) in full, no Subsidiary Guarantor that owns a Secondary Collateral Vessel shall be required to execute and deliver a control agreement to the Collateral Agent with respect to a Concentration Account as defined in the Secondary Pledge Agreement;

(vi)    each Subsidiary Guarantor that owns a Primary Collateral Vessel shall (A) have duly authorized, executed and delivered reaffirmations of such Subsidiary Guarantor's (x) Assignment of Earnings substantially in the form of Exhibit G-1 (as modified, supplemented or amended from time to time, the "Assignment of Earnings") and (y) Assignment of Insurances substantially in the form of Exhibit H-1 (as modified, supplemented or amended from time to time, the "Assignment of Insurances"), together covering all of such Subsidiary Guarantor's present and future Earnings and Insurance Collateral on such Primary Collateral Vessels, and (B) use its commercially reasonably efforts to obtain an Assignment of Charters substantially in the form of Exhibit B to the Assignment of Earnings (as modified, supplemented or amended from time to time, the "Assignment of Charters") for any charter or similar contract that has as of the execution date of such charter or similar contract a remaining term of 12 months or greater (including any renewal or extension option) (or, if an Assignment of Charters with respect to any such Primary Collateral Vessel shall have been executed and delivered by any such Subsidiary Guarantor prior to the Restatement Effective Date, a reaffirmation of such Assignment of Charters), and shall use commercially reasonable efforts to provide appropriate notices and consents related thereto, together covering all of such Subsidiary Guarantor's present and future Earnings and Insurance Collateral on such Primary Collateral Vessels, in each case together with:

(a)    proper Financing Statements (Form UCC-1) or amendments thereto, as requested by the Administrative Agent, in form for filing under the UCC or in other appropriate filing offices of each jurisdiction as may be

-7-

necessary to perfect the security interests purported to be created by the Pledge Agreement, the Parent Pledge Agreement, the Assignment of Earnings, Assignment of Charters and the Assignment of Insurances; and

(b)        certified copies of Requests for Information or Copies (Form UCC-11), or equivalent reports, listing all effective financing statements that name any Credit Party as debtor and that are filed in Washington, D.C. and any other relevant jurisdiction, together with copies of such other financing statements (none of which shall cover the Collateral, other than as set forth in the Intercreditor Agreements, unless the Collateral Agent shall have received Form UCC-3 Termination Statements (or such other termination statements as shall be required by local law) fully executed for filing if required by applicable laws in respect thereof);

(vii)    each Subsidiary Guarantor that owns a Secondary Collateral Vessel shall (A) have duly authorized, executed and delivered reaffirmations of such Subsidiary Guarantor's (x) Assignment of Earnings substantially in the form of Exhibit G-2 (as modified, supplemented or amended from time to time, the "Secondary Assignment of Earnings") and (y) Assignment of Insurances substantially in the form of Exhibit H-2 (as modified, supplemented or amended from time to time, the "Secondary Assignment of Insurances"), together covering all of such Subsidiary Guarantor's present and future Secondary Earnings and Insurance Collateral on such Secondary Collateral Vessels, and (B) use its commercially reasonably efforts to obtain an Assignment of Charters substantially in the form of Exhibit B to the Secondary Assignment of Earnings (as modified, supplemented or amended from time to time, the "Secondary Assignment of Charters") for any charter or similar contract that has as of the execution date of such charter or similar contract a remaining term of twelve months or greater (including any renewal or extension option) (or, if an Assignment of Charters with respect to any such Secondary Collateral Vessel shall have been executed and delivered by any such Subsidiary Guarantor prior to the Restatement Effective Date, a reaffirmation of such Assignment of Charters), and shall use commercially reasonable efforts to provide appropriate notices and consents related thereto, together covering all of such Subsidiary Guarantor's present and future Secondary Earnings and Insurance Collateral on such Secondary Collateral Vessels, in each case together with:

(a)        proper Financing Statements (Form UCC-1) or amendments thereto, as requested by the Administrative Agent, in form for filing under the UCC or in other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the Secondary Pledge Agreement, the Secondary Assignment of Earnings, the Secondary Assignment of Charters and the Secondary Assignment of Insurances; and

(b)        certified copies of Requests for Information or Copies (Form UCC-11), or equivalent reports, listing all effective financing statements that name any Credit Party as debtor and that are filed in Washington, D.C. and any other relevant jurisdiction, together with copies of such other financing statements (none of which shall cover the Collateral, other than as set forth in the Intercreditor Agreements, unless the Collateral Agent shall have received Form

-8-

UCC-3 Termination Statements (or such other termination statements as shall be required by local law) fully executed for filing if required by applicable laws in respect thereof);

(viii)   each Subsidiary Guarantor that owns a Collateral Vessel shall have duly authorized, executed and delivered, and caused to be recorded in the appropriate Vessel registry (x) in the case of each Primary Collateral Vessel, a Collateral Vessel Mortgage (together with any amendments thereto as may be requested by the Collateral Agent on or prior to the Restatement Effective Date in form and substance satisfactory to the Collateral Agent and the Subsidiary Guarantor that owns such Primary Collateral Vessel) with respect to such Primary Collateral Vessel and such Collateral Vessel Mortgage shall be effective to create in favor of the Collateral Agent and/or the Lenders a legal, valid and enforceable first priority security interest, in and lien upon such Primary Collateral Vessel and (y) in the case of each Secondary Collateral Vessel, a Secondary Collateral Vessel Mortgage (together with any amendments thereto as may be requested by the Collateral Agent on or prior to the Restatement Effective Date in form and substance satisfactory to the Collateral Agent and the Subsidiary Guarantor that owns the relevant Secondary Collateral Vessel) with respect to such Secondary Collateral Vessel and such Secondary Collateral Vessel Mortgage shall be effective to create in favor of the Collateral Agent and/or the Lenders a legal, valid and enforceable second priority security interest, in and lien upon such Secondary Collateral Vessel, in each case subject only to Permitted Liens;

(ix)   all filings, deliveries of instruments and other actions necessary or desirable in the reasonable opinion of the Collateral Agent to perfect and preserve the security interests described in clauses (ii) through and including (viii) above shall have been duly effected and the Collateral Agent shall have received evidence thereof in form and substance reasonably satisfactory to the Collateral Agent;

(x)   the Administrative Agent shall have received each of the following:

(a)   certificates of ownership from appropriate authorities showing (or confirmation updating previously reviewed certificates and indicating) the registered ownership of such Collateral Vessel by the relevant Subsidiary Guarantor;

(b)   the results of maritime registry searches with respect to such Collateral Vessel, indicating no record liens other than Liens in favor of the Collateral Agent and/or the Lenders and Permitted Liens;

(c)   class certificates from a classification society listed on Schedule X or another classification society reasonably acceptable to the Administrative Agent, indicating that such Collateral Vessel meets the criteria specified in Section 7.24;

(d)   certified copies of all agreements related to the technical and commercial management of each Collateral Vessel;

(e)   certified copies of all ISM and ISPS Code documentation for each Collateral Vessel; and

-9-

(f)       a report, in form and scope reasonably satisfactory to the Administrative Agent, from a firm of independent marine insurance brokers reasonably acceptable to the Administrative Agent (it being understood that Leeds and Leeds, AON and Marsh are acceptable) with respect to the insurance maintained by the Credit Parties in respect of such Collateral Vessel, together with a certificate from such broker certifying that such insurances (i) are placed with such insurance companies and/or underwriters and/or clubs, in such amounts, against such risks, and in such form, as are customarily insured against by similarly situated insureds for the protection of the Administrative Agent, the Collateral Agent and/or the Lenders as mortgagee, (ii) otherwise conform with the insurance requirements of each respective Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable and (iii) comply with the Required Insurance;

(xi)     the Administrative Agent shall have received from (a) special New York counsel to each of the Credit Parties (which shall be Kirkland & Ellis LLP or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-1, (b) special New York maritime counsel to each of the Credit Parties (which shall be Constantine P. Georgiopoulos or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-2, (c) special Marshall Islands counsel to each of the Credit Parties (which shall be Dennis J. Reeder, Esq. or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-3, (d) special Liberian counsel to each of the Credit Parties (which shall be George E. Henries, Esq. or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-4, (e) special Bermuda counsel to each of the Credit Parties (which shall be Conyers, Dill & Pearman Limited or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-5 and (f) counsel to each of the Credit Parties in the jurisdiction of the flag of the Collateral Vessel, an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering such matters as shall be reasonably required by the Administrative Agent, in each case which shall (x) be in form and substance reasonably acceptable to the Administrative Agent and (y) cover the matters set forth in the relevant Exhibit, including the perfection of the security interests (other than those to be covered by opinions delivered pursuant to the other opinions above) granted pursuant to the Security Documents, and such other matters incidental to the transactions contemplated herein as the Administrative Agent may reasonably request; and

(xii)   (a) the Administrative Agent shall have received a certificate, dated the Restatement Effective Date and reasonably acceptable to the Administrative Agent, signed by the Chairman of the Board, the Chief Executive Officer, the President, any Vice President, the Treasurer or an authorized manager, member or general partner of each Credit Party (other than any Credit Party that delivered such a certificate pursuant to the Original Credit Agreement), and attested to by the Secretary or any Assistant Secretary (or, to the extent such Credit Party does not have a Secretary or Assistant Secretary, the analogous Person within such Credit Party) of such Credit Party, as the case may be, substantially in the form of Exhibit D, with appropriate insertions, together with copies of the Certificate of Incorporation and By-Laws (or equivalent organizational documents) of such Credit Party and the resolutions of such Credit Party referred to in such certificate authorizing the consummation of the Transaction; provided that such documents shall not be required to be delivered so long as such Credit Party certifies that there have been no changes made in the organizational documents delivered in connection with the Original Credit Agreement; and (b) the Administrative Agent shall have received copies of governmental approvals, good standing certificates and bring-down telegrams or facsimiles, if any, which the Administrative Agent may have reasonably requested in connection therewith, such documents and papers, where appropriate, to be certified by proper corporate or governmental authorities.

"Collateral Disposition" shall mean (i) the sale, lease, transfer or other disposition of Collateral by the Parent or any of its Subsidiaries to any Person other than the Parent or any Subsidiary of the Parent or (ii) any Event of Loss of any Collateral Vessel; provided, however, that (a) the charter of any Collateral Vessel shall not be considered a Collateral Disposition and (b) a Vessel Exchange in accordance with the provisions of this Agreement shall not constitute a Collateral Disposition for purposes of Section 4.02 of this Agreement.

"Collateral Vessel" shall mean each Primary Collateral Vessel and each Secondary Collateral Vessel.

"Collateral Vessel Mortgage" shall mean, with respect to the Primary Collateral Vessels, a first preferred mortgage in substantially the form of Exhibit I-1, or such other form as may be reasonably satisfactory to the Administrative Agent, as such first preferred mortgage may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Concentration Account" shall have the meaning provided in the Pledge Agreement and/or the Secondary Pledge Agreement, as applicable.

"Consolidated Cash Interest Expense" shall mean, for any period, (i) the total consolidated interest expense paid or payable in cash of the Parent and its Subsidiaries (including, without limitation, to the extent included under GAAP, all commission, discounts and other commitment fees and charges (e.g., fees with respect to letters of credit, Interest Rate Protection Agreements and Other Hedging Agreements) for such period (calculated without regard to any limitations on payment thereof), adjusted to exclude (to the extent same would otherwise be included in the calculation above in this clause (i)), the amortization of any deferred financing costs for such period and any interest expense actually "paid in kind" or accreted during such period, plus (ii) without duplication, that portion of Capitalized Lease Obligations of

-11-

the Parent and its Subsidiaries on a consolidated basis representing the interest factor for such period, minus (iii) cash interest income.

"Consolidated EBITDA" shall mean, for any period, Consolidated Net Income for such period adjusted by (A) adding thereto the following to the extent deducted in calculating such Consolidated Net Income: (i) consolidated interest expense and amortization of debt discount and commissions and other fees and charges associated with Indebtedness for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) any extraordinary losses, expenses or charges for such period, (v) any non-cash management retention or incentive program payments for such period, (vi) non-cash restricted stock compensation, (vii) any non-cash charges or losses, including, without limitation, non-cash compensation expenses for such period, less any extraordinary gains for such period, (viii) any losses from the sales of any Vessels for such period, (ix) all costs and expenses incurred (a) prior to or within 180 days following the Restatement Effective Date and, in no event, later than December 31, 2012, in connection with the Transaction (including, without limitation, any payments of interest, fees and expenses made pursuant to, or in connection with, the DIP Credit Agreement and the Plan of Reorganization (in each case, including, but not limited to, fees to advisors, professionals, attorneys, the Administrative Agent, Lenders and Oaktree Capital Management L.P. and its Affiliates)) and (b) in connection with any equity issuances permitted hereunder so long as, notwithstanding anything set forth herein to the contrary, the Net Cash Proceeds of such equity issuances are applied to the prepayment of the Loans and such prepayments are applied to reduce the Scheduled Repayment due on the Maturity Date, (x) non-recurring costs, charges and expenses for severance and restructuring (including, without limitation, fees and expenses incurred in connection with the winding up of all of the Parent and its Subsidiaries' activities and operations in Portugal and any one-time cash charges in connection with the closing of an office for such period), (xi) all non-recurring fees, costs and expenses related to any litigation or settlements, and (xii) the amount of cost savings and expenses projected by the Borrower to be realized (including synergies) as a result of, or as a result of actions taken, committed to be taken or planned to be taken within one year, pursuant to a binding written contract with a tangible and quantifiable cost savings (calculated on a pro forma basis as though such items had been realized on the first day of the period provided that all such adjustments pursuant to this clause (xii) shall not exceed (a) $10,000,000 in the aggregate in any four-quarter period and (b) $25,000,000 in the aggregate from the Restatement Effective Date to and including the Maturity Date, and (B) subtracting therefrom the following to the extent added in calculating such Consolidated Net Income: (i) any extraordinary gains for such period and (ii) any gains from the sales of any Vessels for such period. Unless otherwise agreed to by the Administrative Agent, for purposes of this definition of "Consolidated EBITDA," "non-recurring" means any expense, loss or gain as of any date that (i) did not occur in the ordinary course of the Parent or its Subsidiaries' business and (ii) is of a nature and type that has not occurred in the prior two years and is not reasonably expected to recur in the future.

"Consolidated Net Income" shall mean, for any period, the consolidated net after tax income of the Parent and its Subsidiaries determined in accordance with GAAP.

"Consolidated Net Indebtedness" shall mean, with respect to any Person, as at any relevant date, (x) the aggregate outstanding principal amount of the Loans under this Agreement

-12-

and the loans under the Other Credit Agreement, plus (y) the aggregate outstanding principal amount of any other Indebtedness of the Parent or any of its Subsidiaries permitted pursuant to Section 9.04(v) and 9.04(vi), less (z) an amount equal to the Unrestricted Cash and Cash Equivalents of the Parent and its Subsidiaries as at such date.

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and any products warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if the less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Credit Document Obligations" shall have the meaning provided in the definition of "Guaranteed Obligations".

"Credit Documents" shall mean this Agreement, each Note, each Security Document, the Subsidiaries Guaranty, each Intercreditor Agreement, each Joinder Agreement and, after the execution and delivery thereof, each additional guaranty or additional security document executed pursuant to Section 8.11.

"Credit Party" shall mean the Parent, the Borrower, GMSC, Arlington, each Subsidiary Guarantor, and any other Subsidiary of the Parent which at any time executes and delivers any Credit Document (other than solely an acknowledgment of a pledge of such Person's equity).

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender with respect to which a Lender Default is in effect.

"Deferred Amortization Amount" shall mean $74,053,070.

"DIP Credit Agreement" shall mean the Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of November 17, 2011 (as amended, modified and/or supplemented from time to time to, but not including the Restatement Effective Date), among the Borrower and GMSC as co-borrowers, the Parent, certain Subsidiaries of the Parent and the Borrowers party thereto as guarantors, the lenders party thereto and Nordea, as administrative agent and collateral agent.

"Dividend" shall mean, with respect to any Person, a dividend, distribution or return of any equity capital to its stockholders, partners or members, any other distribution, payment or delivery of property or cash to its stockholders, partners or members in their capacity as such (other than common stock, Qualified Preferred Stock and the right to purchase any of such stock of such Person), the redemption, retirement, purchase or acquisition, directly or indirectly, for a consideration of any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Restatement Effective Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests), or the setting aside of any funds for any of the foregoing purposes, or the granting of permission to any of its Subsidiaries to purchase or otherwise acquire for a consideration (other than common stock, Qualified Preferred Stock and the right to purchase any of such stock of such Person) any shares of any class of the capital stock or any other Equity Interests of such Person outstanding on or after the Restatement Effective Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests) except for share repurchases resulting from the unwinding of any share sale requiring the repayment of any advances in connection with such sale as a result of any default on payment on the part of the ultimate purchaser of such shares. Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes. For the avoidance of doubt, any non-cash anti-dilution adjustments under the warrants listed on Schedule XII shall not constitute a Dividend.

"Documents" shall mean the Credit Documents.

"Dollars" and the sign "$" shall each mean lawful money of the United States.

"Earnings and Insurance Collateral" shall mean all "Earnings Collateral" and "Insurance Collateral", as the case may be, as defined in the respective Assignment of Earnings and the respective Assignment of Insurances.

"Effective Yield" shall mean, as to any Loans, or other loans of any tranche, the effective yield on such loans as determined by the Administrative Agent, taking into account the applicable interest rate margins, any interest rate floors or similar devices and all fees, including recurring, upfront or similar fees or original issue discount (amortized over the shorter of (x) the life of such loans and (y) the four years following the date of incurrence thereof) payable generally to Lenders making such loans, but excluding any arrangement, structuring or other fees payable in connection therewith that are not generally shared with the relevant Lenders and customary consent fees paid generally to consenting Lenders. All such determinations made by the Administrative Agent shall, absent manifest error, be final, conclusive and binding on the

-14-

Borrower and the Lenders and the Administrative Agent shall have no liability to any Person with respect to such determination absent gross negligence or willful misconduct.

"Eligible Transferee" shall mean and include a commercial bank, insurance company, financial institution, fund or other Person which regularly purchases interests in loans or extensions of credit of the types made pursuant to this Agreement, any other Person which would constitute a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act as in effect on the Restatement Effective Date or other "accredited investor" (as defined in Regulation D of the Securities Act); provided that none of the Borrower, the Guarantors nor any of their respective Affiliates shall be an Eligible Transferee at any time, except as provided for in Section 12.04(d).

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"Environmental Law" shall mean any applicable federal, state, foreign, international or local statute, law, treaty, protocol, rule, regulation, ordinance, code, or rule of common law, now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, to the extent binding on the Parent or any of its Subsidiaries, relating to the environment or to Hazardous Materials, including, without limitation, CERCLA; OPA; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. (to the extent it regulates occupational exposure to Hazardous Materials); any applicable state, foreign, international or local counterparts or equivalents thereof, in each case as amended from time to time; and any applicable rules, regulations or requirements of a classification society in respect of any Collateral Vessel.

"Environmental Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migration into the environment.

"Equity Contribution Agreement" shall mean the Equity Purchase Agreement, dated as of December 15, 2011 (as amended, restated, supplemented or otherwise modified from time to time through, but not including, the Restatement Effective Date), by and among the Parent, Oaktree Principal Fund V, L.P., Oaktree Principal Fund V (Parallel), L.P., Oaktree FF Investment Fund, L.P. - Class A, and OCM Asia Principal Opportunities Fund, L.P., which Equity Contribution Agreement (i) shall contain a minimum liquidity requirement with respect to the Parent and its Subsidiaries that is reasonably satisfactory to the Administrative Agent and (ii)

-15-

shall not have been amended, restated, supplemented or otherwise modified in such a manner as is adverse to the interests of the Lenders.

"Equity Conversion" shall mean the conversion of all outstanding secured obligations under the Amended and Restated Credit Agreement, dated as of May 6, 2011, by and among the Borrower and GMSC as co-borrowers, the Parent and certain of their respective Subsidiaries, OCM Marine Investments CTB, Ltd., as initial lender, and OCM Administrative Agent, LLC, as administrative agent and collateral agent, into equity of the Parent pursuant to the Equity Contribution Agreement on the terms and in the amounts set forth in the Plan of Reorganization.

"Equity Interests" shall mean (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents of corporate stock and (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited).

"Equity Investment" shall mean that certain cash Investment in the Parent of not less than $175,000,000 from the issuance of Equity Interests by the Parent to (x) an existing or newly-formed entity capitalized by funds managed by Oaktree Capital Management L.P. or one or more of its affiliates and (y) any other third party identified by the Permitted Holders to the Administrative Agent, including, but not limited to, any noteholders that previously held any Senior Unsecured Notes prior to the Restatement Effective Date on the terms and conditions specified in the Equity Contribution Agreement, (i) $39,649,220 of which shall have been contributed by the Parent to the Borrower to partially repay then outstanding Loans under and as defined in the Original Credit Agreement and (ii) $35,350,780 of which shall have been contributed by the Parent to GMSC to partially repay then outstanding loans under the Original Other Credit Agreement, in each case on terms set forth in the Plan of Reorganization.

"Equity Proceeds Amount" shall mean, on any date, the amount of Net Cash Proceeds received by the Parent from the issuance of Equity Interests of the Parent after the Restatement Effective Date (excluding, for the avoidance of doubt, the Equity Investment) less the cash amount expended by the Parent and its Subsidiaries to (i) make Investments pursuant to Section 9.05(vi), (ii) make any Capital Expenditures (other than maintenance Capital Expenditures) and (iii) make any other cash expenditures not in the ordinary course of business (for the avoidance of doubt, funding operating losses, working capital and repayment of Indebtedness will be deemed to be capital expenditures in the ordinary course of business for this purpose), in each case without duplication and after the Restatement Effective Date.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Parent or a Subsidiary of the Parent would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"Eurodollar Rate" shall mean with respect to each Interest Period for a Loan, (a) the offered rate (rounded upward to the nearest 1/16 of one percent) for deposits of Dollars for a period equivalent to such period at or about 11:00 A.M. (London time) on the second Business Day before the first day of such period as is displayed on Reuters LIBOR 01 Page (or such other service as may be nominated by the British Bankers' Association as the information vendor for displaying the London Interbank Offered Rates of major banks in the London interbank Eurodollar market) (the "Screen Rate"); provided that if on such date no such rate is so displayed or, in the case of the initial Interest Period in respect of a Loan, if less than three Business Days' prior notice of such Loan shall have been delivered to the Administrative Agent, the Eurodollar Rate for such period shall be the arithmetic average (rounded upward to the nearest 1/16 of 1%) of the rate quoted to the Administrative Agent by the Reference Banks for deposits of Dollars in an amount approximately equal to the amount in relation to which the Eurodollar Rate is to be determined for a period equivalent to such applicable Interest Period by prime banks in the London interbank Eurodollar market at or about 11:00 A.M. (London time) on the second Business Day before the first day of such period, in each case divided (and rounded upward to the nearest 1/16 of 1%) by (b) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves required by applicable law) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency funding or liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D); provided, further, that if any such rate is below zero, the Eurodollar Rate for such period will be deemed to be zero.

"Event of Default" shall have the meaning provided in Section 10.

"Event of Loss" shall mean any of the following events: (x) the actual or constructive total loss of a Collateral Vessel or the agreed or compromised total loss of a Collateral Vessel; or (y) the capture, condemnation, confiscation, requisition, purchase, seizure or forfeiture of, or any taking of title to, a Collateral Vessel. An Event of Loss shall be deemed to have occurred: (i) in the event of an actual loss of a Collateral Vessel, at the time and on the date of such loss or if that is not known at noon Greenwich Mean Time on the date which such Collateral Vessel was last heard from; (ii) in the event of damage which results in a constructive or compromised or arranged total loss of a Collateral Vessel, at the time and on the date of the event giving rise to such damage; or (iii) in the case of an event referred to in clause (y) above, at the time and on the date on which such event is expressed to take effect by the Person making the same. Notwithstanding the foregoing, if such Collateral Vessel shall have been returned to the Borrower or any Subsidiary Guarantor following any event referred to in clause (y) above prior to the date upon which payment is required to be made under Section 4.02(b) hereof, no Event of Loss shall be deemed to have occurred by reason of such event.

"Excess Liquidity" shall mean, for each Payment Date, the amount by which (a) the daily average for the 30 consecutive day period ending on such Payment Date of the amount by which the Unrestricted Cash and Cash Equivalents of the Parent and its Subsidiaries (excluding the Equity Proceeds Amount and any amounts permitted to be retained by the Parent and its Subsidiaries pursuant to Section 4.02(b), if any) exceeds (b) the sum of (x) the aggregate amount of (i) any Scheduled Repayment and any interest payment to be made under this Agreement and/or (ii) any scheduled amortization payment and any interest payment to be made

-17-

under the Other Credit Agreement, in each case within three Business Days of such Payment Date and (y) for any Payment Date (i) from the Restatement Effective Date to and including December 31, 2012, $100,000,000, (ii) from January 1, 2013 to and including December 31, 2013, $75,000,000, and (iii) thereafter, $70,000,000.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" shall mean (i) any tax imposed on or measured by the net income, net profits or any franchise tax based on net income, net profits or net worth, of a Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Lender is located or any subdivision thereof or therein, (ii) any branch profits taxes imposed by any jurisdiction in which the recipient Lender is organized or the jurisdiction in which the principal office or applicable lending office of such Lender is located or any subdivision thereof or therein, (iii) in the case of any Lender, any withholding tax that is imposed by the Marshall Islands on amounts payable to such Lender at the time such Lender becomes a party to this Agreement or designates a new lending office (except to the extent that, pursuant to Section 4.04, amounts with respect to such taxes were payable to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office) or is attributable to such Lender's failure to comply with Section 4.04(b), and (iv) taxes imposed on any "withholdable payment" payable to a recipient Lender as a result of the failure of such recipient to satisfy the applicable requirements as set forth in FATCA).

"Existing Indebtedness" shall have the meaning provided in Section 7.20.

"Fair Market Value" of any Collateral Vessel at any time shall mean the average of the fair market value of such Collateral Vessel on the basis of an individual charter-free arm's-length transaction between a willing and able buyer and seller not under duress as set forth in the appraisals of at least two Approved Appraisers most recently delivered to, or obtained by, the Administrative Agent prior to such time pursuant to Section 8.01(d).

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Federal Funds Rate" shall mean, for any day, an interest rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published for such day (or, if such day is not a Business Day, for the immediately preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations at approximately 11:00 A.M. (New York time) on such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent in its sole discretion.

"Final DIP/Cash Collateral Order" shall mean that certain Final Order, which was entered by the Bankruptcy Court on December 15, 2011 in respect of the Chapter 11 Proceeding

-18-

pursuant to Section 361, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure authorizing the debtors named therein to (I) use cash collateral of the Prepetition Secured Parties (as defined therein), (II) obtain secured superpriority post-petition financing and (III) provide adequate protection to the Prepetition Secured Parties.

"Financial Covenants" shall mean the covenants set forth in Sections 9.08 through 9.10, inclusive.

"Flag Jurisdiction Transfer" shall mean the transfer of the registration and flag of a Collateral Vessel from one Acceptable Flag Jurisdiction to another Acceptable Flag Jurisdiction, provided that the following conditions are satisfied with respect to such transfer:

(i)      On each Flag Jurisdiction Transfer Date, the Credit Party which is consummating a Flag Jurisdiction Transfer on such date shall have duly authorized, executed and delivered, and caused to be recorded in the appropriate Collateral Vessel registry a Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable, substantially in the form of Exhibit I (with such modifications as are required by or appropriate for the applicable Acceptable Flag Jurisdiction of the Collateral Vessel), with respect to the Collateral Vessel being transferred (the "Transferred Vessel") and (x) in the case of the Primary Collateral Vessels, the Collateral Vessel Mortgage shall be effective to create in favor of the Collateral Agent and/or the Lenders a legal, valid and enforceable first priority security interest, in and lien upon such Transferred Vessel, and (y) in the case of the Secondary Collateral Vessels, the Secondary Collateral Vessel Mortgage shall be effective to create in favor of the Collateral Agent and/or the Lenders a legal, valid and enforceable second priority security interest in, and lien upon, such Transferred Vessel, in each case subject only to Permitted Liens. All filings, deliveries of instruments and other actions necessary or desirable in the reasonable opinion of the Collateral Agent to perfect and preserve such security interests shall have been duly effected and the Collateral Agent shall have received evidence thereof in form and substance reasonably satisfactory to the Collateral Agent.

(ii)      On each Flag Jurisdiction Transfer Date, the Administrative Agent shall have received from (A) Constantine P. Georgiopoulos, special New York maritime counsel to the Credit Parties (or other counsel to such Credit Parties reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated such Flag Jurisdiction Transfer Date, which shall (x) be in form and substance reasonably acceptable to the Administrative Agent and (y) cover the recordation of the security interests granted pursuant to the Collateral Vessel Mortgage(s) or the Secondary Collateral Vessel Mortgage(s), as applicable, to be delivered on such date and such other matters incident thereto as the Administrative Agent may reasonably request and (B) local counsel to the Credit Parties consummating the relevant Flag Jurisdiction Transfer reasonably satisfactory to the Administrative Agent practicing in those jurisdictions in which the Transferred Vessel is registered and/or the Credit Party owning such Transferred Vessel is organized, which opinions shall be addressed to the Administrative Agent and each of the Lenders and dated such Flag Jurisdiction Transfer Date, which shall (x) be in form and substance reasonably acceptable to the Administrative Agent and (y) cover the perfection of the security

-19-

interests granted pursuant to the Collateral Vessel Mortgage(s) or the Secondary Collateral Vessel Mortgage(s), as applicable, and such other matters incident thereto as the Administrative Agent may reasonably request.

(iii) On each Flag Jurisdiction Transfer Date:

(A) The Administrative Agent shall have received (x) certificates of ownership from appropriate authorities showing (or confirmation updating previously reviewed certificates and indicating) the registered ownership of the Transferred Vessel transferred on such date by the relevant Subsidiary Guarantor and (y) the results of maritime registry searches with respect to the Transferred Vessel transferred on such date, indicating no record liens other than Liens in favor of the Collateral Agent and/or the Lenders and Permitted Liens.

(B) The Administrative Agent shall have received a report, in form and scope reasonably satisfactory to the Administrative Agent, from a firm of independent marine insurance brokers reasonably acceptable to the Administrative Agent with respect to the insurance maintained by the Credit Party in respect of the Transferred Vessel transferred on such date, together with a certificate from such broker certifying that such insurances (i) are placed with such insurance companies and/or underwriters and/or clubs, in such amounts, against such risks, and in such form, as are customarily insured against by similarly situated insureds for the protection of the Administrative Agent and/or the Lenders as mortgagee and (ii) conform with the insurance requirements of the respective Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable.

(iv) On or prior to each Flag Jurisdiction Transfer Date, the Administrative Agent shall have received a certificate, dated the Flag Jurisdiction Transfer Date, signed by the Chairman of the Board, the Chief Executive Officer, the President, any Vice President, the Treasurer or an authorized manager, member or general partner of the Credit Party commencing such Flag Jurisdiction Transfer, certifying that (A) all necessary governmental (domestic and foreign) and third party approvals and/or consents in connection with the Flag Jurisdiction Transfer being consummated on such date and otherwise referred to herein shall have been obtained and remain in effect, (B) there exists no judgment, order, injunction or other restraint prohibiting or imposing materially adverse conditions upon such Flag Jurisdiction Transfer or the other transactions contemplated by this Agreement and (C) copies of resolutions approving the Flag Jurisdiction Transfer of such Credit Party and any other matters the Administrative Agent may reasonably request.

"Flag Jurisdiction Transfer Date" shall mean the date on which a Flag Jurisdiction Transfer occurs.

"Foreign Pension Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States of America by the Parent or any one or more of its Subsidiaries primarily for the benefit of

-20-

employees of the Parent or such Subsidiaries residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"GAAP" shall have the meaning provided in Section 12.07(a).

"GMSC" shall have the meaning provided in the first paragraph of this Agreement.

"Guaranteed Creditors" shall mean and include each of the Administrative Agent, the Collateral Agent, the Lenders and each party (other than any Credit Party) party to an Interest Rate Protection Agreement or Other Hedging Agreement to the extent such party constitutes a Secured Creditor under the Security Documents.

"Guaranteed Obligations" shall mean (i) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of (x) the principal of, premium, if any, and interest on the Notes issued by, and the Loans made to, the Borrower under this Agreement, and (y) all other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness owing by the Borrower to the Lender Creditors (in the capacities referred to in the definition of Lender Creditors) under this Agreement and each other Credit Document to which the Borrower is a party (including, without limitation, indemnities, fees and interest thereon (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in this Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with this Agreement and any such other Credit Document and the due performance and compliance by the Borrower with all of the terms, conditions and agreements contained in all such Credit Documents (all such principal, premium, interest, liabilities, indebtedness and obligations being herein collectively called the "Credit Document Obligations") and (ii) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of (x) the principal of, premium, if any, and interest on the Notes issued by (if any) the Borrower under this Agreement, and (y) all other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in the respective Interest Rate Protection Agreements or Other Hedging Agreements, whether or not such interest is an allowed claim in any such proceeding) owing by the Borrower under any Interest Rate Protection Agreement or Other Hedging Agreement entered into in respect of the Borrower's obligations with respect to the outstanding Loans from time to time, whether now in existence or hereafter arising, and the due performance and compliance by the Borrower with all of the terms, conditions and agreements contained in each such Interest Rate Protection Agreement and Other Hedging Agreement to which it is a party (all such obligations, liabilities and indebtedness described in this clause (ii) being herein collectively called the "Swap Obligations").

"Guarantors" shall mean the Parent, GMSC, Arlington and each Subsidiary Guarantor.

"Guaranty" shall mean, collectively, the Holdings Guaranty and the Subsidiaries Guaranty.

"Hazardous Materials" shall mean: (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority under Environmental Laws because of its dangerous or deleterious properties or characteristics.

"Holdings Guaranty" shall mean the guaranty of the Parent, Arlington and GMSC pursuant to Section 13.

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person for borrowed money or for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn under all letters of credit issued for the account of such Person and all unpaid drawings in respect of such letters of credit, (iii) all Indebtedness of the types described in clause (i), (ii), (iv), (v), (vi) or (vii) of this definition secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (to the extent of the value of the respective property), (iv) the aggregate amount required to be capitalized under leases under which such Person is the lessee, (v) all obligations of such person to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person, (vii) all obligations under any Interest Rate Protection Agreement or Other Hedging Agreement or under any similar type of agreement and (viii) the maximum amount available to be drawn under all Existing Letters of Credit (as defined in the Other Credit Agreement) issued for the account of such Person and all Unpaid Drawings (as defined in the Other Credit Agreement) in respect of such Existing Letters of Credit; provided that Indebtedness shall in any event not include trade payables and expenses accrued in the ordinary course of business.

"Intercreditor Agreements" shall mean the Primary Intercreditor Agreement and the Secondary Intercreditor Agreement.

"Interest Determination Date" shall mean, with respect to any Loan, the second Business Day prior to the commencement of any Interest Period relating to such Loan.

"Interest Expense Coverage Ratio" shall mean, for any period, the ratio of (a) Consolidated EBITDA for such period to (b) Consolidated Cash Interest Expense for such period.

"Interest Period" shall have the meaning provided in Section 2.08.

"Interest Rate Protection Agreement" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement, interest rate floor agreement or other similar agreement or arrangement.

"Investments" shall have the meaning provided in Section 9.05.

"Joinder Agreement" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements".

"Joint Lead Arrangers" shall mean Nordea and DNB Bank ASA in their capacity as joint lead arranger and joint bookrunners in respect of the credit facility provided for herein.

"Judgment Currency" shall have the meaning provided in Section 13.09(a).

"Judgment Currency Conversion Date" shall have the meaning provided in Section 13.09(a).

"Leaseholds" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lender" shall mean each financial institution listed on Schedule I, as well as any Person which becomes a "Lender" hereunder pursuant to 12.04(b).

"Lender Creditors" shall mean the Lenders, the Collateral Agent and the Administrative Agent.

"Lender Default" shall mean, as to any Lender, (i) the wrongful refusal (which has not been retracted) of such Lender or the failure of such Lender (which has not been cured) to make available its portion of any Borrowing, (ii) such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority, or (iii) such Lender having notified the Administrative Agent and/or any Credit Party (x) that it does not intend to comply with its obligations under Sections 2.01 in circumstances where such non-compliance would constitute a breach of such Lender's obligations under such Section or (y) of the events described in preceding clause (ii); provided that, for purposes of (and only for purposes of) Section 2.12 (and the term "Defaulting Lender" as used therein), the term "Lender Default" shall also include, as to any Lender, any Affiliate of such Lender that has "control" (within the meaning provided in the definition of "Affiliate") of such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the

-23-

UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"Loan" shall have the meaning provided in Section 2.01.

"Loan to Value Ratio" shall mean, at any date of determination, the ratio of Consolidated Net Indebtedness of the Parent and its Subsidiaries on such date to the aggregate Fair Market Value of all Collateral Vessels owned by the Credit Parties on such date.

"Margin Regulations" shall mean the provisions of Regulations T, U and X of the Board of Governors of the Federal Reserve System.

"Margin Stock" shall have the meaning provided in Regulation U.

"Market Disruption Event" shall mean with respect to any Loans:

(i)    if, at or about noon on the Interest Determination Date for the relevant Interest Period, the Screen Rate is not available and none or only one of the Reference Banks supplies a rate to the Administrative Agent to determine the Eurodollar Rate for the relevant Interest Period; or

(ii)    before close of business in New York on the Interest Determination Date for the relevant Interest Period, the Administrative Agent receives notice from a Lender or Lenders the sum of whose outstanding Loans in the aggregate exceed 50% of the Loans that (i) the cost to such Lenders of obtaining matching deposits in the London interbank Eurodollar market for the relevant Interest Period would be in excess of the Eurodollar Rate for such Interest Period or (ii) such Lenders are unable to obtain funding in the London interbank Eurodollar market.

"Material Adverse Effect" shall mean a material adverse effect on (i) the business, property, assets, liabilities, condition (financial or otherwise) of (x) the Collateral Vessels taken as a whole, (y) the Borrower, GMSC, Arlington and the Subsidiary Guarantors taken as a whole, or (z) the Parent and its Subsidiaries taken as a whole, (ii) the rights and remedies of the Lenders or the Administrative Agent or (iii) the ability of the Borrower or the Borrower and its Subsidiaries, taken as a whole, to perform its or their Obligations.

"Maturity Date" shall mean [_____], 2017.

"Minimum Borrowing Amount" shall mean $1,000,000.

"Moody's" shall mean Moody's Investors Service, Inc. and its successors.

"Multiemployer Plan" shall mean a Plan which is defined in Section 3(37) of ERISA.

"Net Cash Proceeds" shall mean, (x) with respect to any Collateral Disposition, the aggregate cash payments (including any cash received by way of deferred payment pursuant

to a note receivable issued in connection with such Collateral Disposition, other than the portion of such deferred payment constituting interest, but only as and when received) received by the Parent or the Borrower or any of their respective Subsidiaries from such Collateral Disposition net of (i) reasonable transaction costs (including, without limitation, reasonable attorney's fees) and sales commissions and (ii) the estimated marginal increase in income taxes and any stamp tax payable by the Parent, the Borrower or any of its Subsidiaries as a result of such Collateral Disposition and (y) with respect to the issuance of any Equity Interests, the aggregate cash proceeds received by the Parent from such equity issuance net of reasonable transaction costs related thereto (including, without limitation, reasonable attorney's fees).

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Non-Recourse Indebtedness" shall mean any Indebtedness of a Non-Recourse Subsidiary that is non-recourse to any Credit Party and for which no Credit Party provides any credit support; provided such Indebtedness may be full recourse to the Non-Recourse Subsidiary.

"Non-Recourse Subsidiary" shall mean (x) any Subsidiary listed on Schedule XV hereto and (y) any Subsidiary that is not a Credit Party and is identified by the Parent in writing to the Administrative Agent after the Restatement Effective Date to be a "Non-Recourse Subsidiary"; provided that (i) neither the Parent nor any Subsidiary of the Parent (other than a Non-Recourse Subsidiary) shall have any liability or recourse with respect to any Non-Recourse Indebtedness of such Non-Recourse Subsidiary, (ii) any such designation of a Subsidiary as a "Non-Recourse Subsidiary" shall be deemed to be a permanent "Investment" in such Subsidiary in an amount (proportionate to the Parent's Equity Interest (directly or through a Subsidiary thereof) in such Subsidiary) equal to the fair market value of the net assets of such Subsidiary at the time such Subsidiary is designated a Non-Recourse Subsidiary and (iii) for the avoidance of doubt, Investments in Non-Recourse Subsidiaries may only be made pursuant to Section 9.05(vi).

"Note" shall have the meaning provided in Section 2.05(a).

"Notice of Interest Period Election" shall have the meaning provided in Section 2.08(a).

"Notice Office" shall mean the office of the Administrative Agent located at 437 Madison Avenue, 21st Floor, New York, NY 10022, or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Obligation Currency" shall have the meaning provided in Section 13.09(a).

"Obligations" shall mean all amounts owing to the Administrative Agent, the Collateral Agent or any Lender pursuant to the terms of this Agreement or any other Credit Document.

"OPA" shall mean the Oil Pollution Act of 1990, as amended, 33 U.S.C. § 2701 et seq.

-25-

"Original Credit Agreement" shall have the meaning provided in the Recitals.

"Original Effective Date" shall mean July 16, 2010.

"Original Other Credit Agreement" shall have the meaning provided in the Recitals.

"Other Agent" shall have the meaning provided in the Recitals hereto.

"Other Credit Agreement" shall have the meaning provided in the Recitals hereto.

"Other Credit Documents" shall mean the "Credit Documents" under and as defined in the Other Credit Agreement.

"Other Hedging Agreement" shall mean any foreign exchange contracts, currency swap agreements, commodity agreements or other similar agreements or arrangements designed to protect against the fluctuations in currency or commodity values.

"Parent" shall have the meaning provided in the first paragraph of this Agreement.

"Parent Pledge Agreement" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Participant Register" shall have the meaning provided in Section 12.16.

"PATRIOT Act" shall have the meaning provided in Section 12.20.

"Payment Date" shall mean the last Business Day of each March, June, September and December.

"Payment Office" shall mean the office of the Administrative Agent located at 437 Madison Avenue, 21st Floor, New York, NY 10022, or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Encumbrance" shall mean easements, rights-of-way, restrictions, encroachments, exceptions to title and other similar charges or encumbrances on any Collateral Vessel or any other property of the Parent or any of its Subsidiaries arising in the ordinary course of business which do not materially detract from the value of such Collateral Vessel or the property subject thereto.

"Permitted Holders" shall mean funds or segregated accounts managed by Oaktree Capital Management, L.P. and any corporation or other entity directly or indirectly controlled or managed by Oaktree Capital Management, L.P. or its managed funds.

"Permitted Liens" shall have the meaning provided in Section 9.01.

-26-

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Plan" shall mean any pension plan as defined in Section 3(2) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Parent or a Subsidiary of the Parent or any ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Parent, or a Subsidiary of the Parent or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan.

"Plan of Reorganization" shall have the meaning provided in the Recitals.

"Pledge Agreement" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Pledge Agreement Collateral" shall mean all "Collateral" as defined in the Pledge Agreement and/or the Parent Pledge Agreement, as applicable.

"Pledged Securities" shall mean "Securities" as defined in the Pledge Agreement, the Parent Pledge Agreement and/or the Secondary Pledge Agreement, as the case may be, pledged (or required to be pledged) pursuant thereto.

"Primary Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Primary Security Document, including, without limitation, all Pledge Agreement Collateral, all Earnings and Insurance Collateral, all Primary Collateral Vessels and all cash and Cash Equivalents at any time delivered as collateral thereunder or hereunder.

"Primary Collateral Vessel" shall mean, at any time, each of the Vessels listed in rows 1 through and including 7 on Schedule III (and any Acceptable Replacement Vessel in respect thereof) which is subject to a Collateral Vessel Mortgage at such time and with respect to which the other Collateral and Guaranty Requirements are satisfied at such time.

"Primary Intercreditor Agreement" shall mean the Amended and Restated Intercreditor Agreement, dated as of [_____], by and among the Parent, Arlington, the Borrower, as borrower under this Agreement, GMSC, as borrower under the Other Credit Agreement, the Administrative Agent (for and on behalf of the Secured Creditors), each Subsidiary Guarantor, the Collateral Agent, and the Other Agent (for and on behalf of the Secured Creditors under and as defined in the Other Credit Agreement), which Primary Intercreditor Agreement (i) shall be substantially in the form of Exhibit O-1 (as amended, modified and/or otherwise supplemented from time to time) and (ii) shall set forth the priority of the security interests in the Primary Collateral.

"Primary Security Documents" shall mean the Pledge Agreement, the Parent Pledge Agreement, each Assignment of Charter, each Assignment of Earnings, each Assignment of Insurances, each Collateral Vessel Mortgage and, after the execution and delivery thereof, each additional first-lien security document executed pursuant to Section 7.11.

"Projections" shall mean the Parent's forecasted consolidated and consolidating: (a) balance sheets; (b) profit and loss statements; (c) cash flow statements and (d) capitalization statements, all prepared on a Subsidiary by Subsidiary basis and based upon good faith estimates and assumptions believed by the Parent to be reasonable at the time made, together with appropriate supporting details and a statement of underlying assumptions.

"Pro Rata Excess Liquidity Share" shall mean (i) for any Payment Date prior to the repayment in full of the outstanding loans under the Other Credit Agreement, 52.9% of the Excess Liquidity on such Payment Date (or, to the extent any of the Excess Liquidity is required to be used on such Payment Date to repay the outstanding loans under the Other Credit Agreement in accordance with the provisions thereof, but the amount of the outstanding loans under the Other Credit Agreement is less than the portion of the Excess Liquidity that is required to be paid thereunder or the outstanding loans under the Other Credit Agreement have been repaid in full, such percentage will be increased to include the portion of the Excess Liquidity not being used to repay the Other Credit Agreement on such Payment Date), and (ii) for any Payment Date thereafter, 100% of the Excess Liquidity on such Payment Date.

"Qualified Preferred Stock" shall mean any preferred stock so long as the terms of any such preferred stock (i) do not contain any mandatory put, redemption, repayment, sinking fund or other similar provision occurring prior to one year after the Maturity Date, (ii) do not require the cash payment of dividends and (iii) any other preferred stock that satisfies (i) of this definition of Qualified Preferred Stock and that is otherwise issuable or may be distributed pursuant to a shareholders' rights plan of the Parent; provided, however, any Dividend or similar feature of such Qualified Preferred Stock shall only be declared and paid in accordance with Section 9.03.

"Qualifying IPO" shall mean the issuance by the Parent or any direct or indirect parent of the Parent of its Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) after the Restatement Effective Date pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act (whether alone or in connection with a secondary public offering) and such issuance results in Net Cash Proceeds received by the Parent of at least $75,000,000.

"Real Property" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"Reference Banks" shall mean, at any time, (i) if there are less than two Lenders at such time, each Lender and (ii) if there are three or more Lenders at such time, each Joint Lead Arranger and one other Lender as shall be determined by the Administrative Agent.

"Refinanced Loans" shall have the meaning provided in Section 12.12(c).

"Register" shall have the meaning provided in Section 12.16.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

-28-

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Replaced Lender" shall have the meaning provided in Section 2.12(a).

"Replacement Lender" shall have the meaning provided in Section 2.12(a).

"Replacement Loan" shall have the meaning provided in Section 12.12(c).

"Reportable Event" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043.

"Required Insurance" shall have the meaning provided in Section 7.21.

"Required Lenders" shall mean, at any time, prior to the repayment in full of the Loans, Non-Defaulting Lenders the sum of whose outstanding Loans at such time represents an amount greater than 66-2/3% of the sum of all outstanding Loans of Non-Defaulting Lenders.

"Restatement Effective Date" shall have the meaning provided in Section 12.10.

"Returns" shall have the meaning provided in Section 7.09.

"Revolving Loans" shall mean the "Revolving Loans" as defined in the Original Credit Agreement.

"S&P" shall mean Standard & Poor's Financial Services LLC, and its successors.

"Scheduled Repayment" shall have the meaning provided in Section 4.02(a).

"Screen Rate" shall have the meaning provided in the definition of Eurodollar Rate.

"Secondary Assignment of Charters" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements".

"Secondary Assignment of Earnings" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements".

"Secondary Assignment of Insurances" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements".

"Secondary Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Secondary Security Document, including, without limitation, all Secondary Pledge Agreement Collateral, all Secondary Earnings and Insurance Collateral, all Secondary Collateral Vessels and all cash and Cash Equivalents at any time delivered as collateral thereunder or under the Other Credit Agreement.

"Secondary Collateral Vessel" shall mean, at any time, each of the Vessels listed in rows 8 through and including 30 on Schedule III, which is subject to a Secondary Collateral Vessel Mortgage at such time and with respect to which the other Collateral and Guaranty Requirements are satisfied at such time.

"Secondary Collateral Vessel Mortgage" shall mean, with respect to the Secondary Collateral Vessels, a second priority statutory mortgage and deed of covenant supplemental thereto or a second preferred mortgage in substantially the form of Exhibit I-2, Exhibit I-3 or Exhibit I-4, as applicable, or such other form as may be reasonably satisfactory to the Administrative Agent, as such second priority statutory mortgage and deed of covenant supplemental thereto or second preferred mortgage may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Secondary Earnings and Insurance Collateral" shall mean all "Earnings Collateral" and "Insurance Collateral", as the case may be, as defined in the respective Secondary Assignment of Earnings and the respective Secondary Assignment of Insurances.

"Secondary Intercreditor Agreement" shall mean the Amended and Restated Intercreditor Agreement, dated as of [_____], by and among the Parent, Arlington, the Borrower, as borrower under this Agreement, GMSC, as borrower under the Other Credit Agreement, the Administrative Agent (for and on behalf of the Secured Creditors), each Subsidiary Guarantor, the Collateral Agent, and the Other Agent (for and on behalf of the Secured Creditors under and as defined in the Other Credit Agreement), which Secondary Intercreditor Agreement (i) shall be substantially in the form of Exhibit O-2 (as amended, modified and/or otherwise supplemented from time to time) and (ii) shall set forth the priority of the security interests in the Secondary Collateral.

"Secondary Pledge Agreement" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Secondary Pledge Agreement Collateral" shall mean all "Collateral" as defined in the Secondary Pledge Agreement.

"Secondary Security Documents" shall mean the Secondary Pledge Agreement, each Secondary Assignment of Charter, each Secondary Assignment of Earnings, each Secondary Assignment of Insurances, each Secondary Collateral Vessel Mortgage and, after the execution and delivery thereof, each additional Secondary Security Document executed pursuant to Section 7.11.

-30-

"Secured Creditors" shall mean the "Secured Creditors" as defined in the Security Documents.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Documents" shall mean each Primary Security Document and each Secondary Security Document.

"Senior Unsecured Notes" shall mean the 12% senior unsecured notes of the Parent issued pursuant to that certain indenture, dated as of November 12, 2009, entered into by the Parent, certain of its Subsidiaries and The Bank of New York Mellon, as trustee.

"Subsidiaries Guaranty" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time; provided that, for all purposes under this Credit Agreement or any other Credit Document, Non-Recourse Subsidiaries shall not be considered Subsidiaries hereunder or thereunder other than as set forth herein or therein.

"Subsidiary Guarantor" shall mean, at any time, (x) each direct and indirect Subsidiary of the Parent (other than GMSC, Arlington and the Borrower) which owns a Primary Collateral Vessel or which owns, directly or indirectly, any of the Equity Interests of any such direct or indirect Subsidiary at such time, (y) each direct and indirect Subsidiary of the Parent (other than GMSC, Arlington and the Borrower) which owns a Secondary Collateral Vessel or which owns, directly or indirectly, any of the Equity Interests of any such direct or indirect Subsidiary at such time and (z) each other Subsidiary of the Parent (other than GMSC, Arlington and the Borrower) that guarantees the obligations under the Other Credit Agreement at any time. The Subsidiary Guarantors as of the Restatement Effective Date are listed on Schedule XIII.

"Swap Obligations" shall have the meaning provided in the definition of "Guaranteed Obligations".

"Tax Benefit" shall have the meaning provided in Section 4.04(c).

"Taxes" shall have the meaning provided in Section 4.04(a).

"Term Loans" shall mean the "Term Loans" as defined in the Original Credit Agreement.

"Test Period" shall mean each period of four consecutive fiscal quarters then last ended, in each case taken as one accounting period.

"Transaction" shall mean, collectively, (i) the entering into of this Agreement and the other Credit Documents, as applicable, on the Restatement Effective Date and the continuation and conversion of Loans hereunder, (ii) the entering into of the Other Credit Agreement and the other Other Credit Documents, as applicable, on the Restatement Effective Date and the conversion of loans thereunder, (iii) the Equity Conversion, (iv) the Equity Investment, including the partial repayment of Loans with the proceeds of the Equity Investment in a principal amount of no less than $39,649,220 on the Restatement Effective Date, and the partial repayment of Loans under and as defined in the Other Credit Agreement with the proceeds of the Equity Investment in a principal amount of no less than $35,350,780 on the Restatement Effective Date, (v) the confirmation and effectiveness of the Plan of Reorganization and (vi) the payment of all fees and expenses in connection with the foregoing.

"Transferred Vessel" shall have the meaning provided in the definition of "Flag Jurisdiction Transfer" in this Section 1.

"Trigger Date" shall mean the date on which (x) the aggregate principal payments of Loans under this Agreement after the Restatement Effective Date (other than any such prepayment pursuant to Section 4.02(b)) equals the Deferred Amortization Amount and (y) the aggregate principal payments of loans under the Other Credit Agreement after the Restatement Effective Date (other than any such prepayment pursuant to Section 5.02(c) of the Other Credit Agreement) equals the Deferred Amortization Amount (under and as defined in the Other Credit Agreement).

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"Unfunded Current Liability" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"United States" and "U.S." shall each mean the United States of America.

"Unrestricted Cash and Cash Equivalents" shall mean, when referring to cash or Cash Equivalents of the Parent or any of its Subsidiaries, that such cash or Cash Equivalents (i) does not appear (or would not be required to appear) as "restricted" on a consolidated balance sheet of the Parent or of any such Subsidiary, (ii) are not subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Creditors and the Other Agent for the benefit of the Secured Creditors under and as defined in the Other Credit Agreement, (iii) are otherwise generally available for use by the Parent or such Subsidiary or (iv) are not subject to Liens permitted under Section 9.01(xviii).

"Vessel" shall mean, collectively, all sea going vessels and tankers at any time owned by the Parent and its Subsidiaries, and, individually, any of such vessels.

"Vessel Exchange" shall mean the exchange of a Primary Collateral Vessel for a Vessel which Vessel shall constitute an Acceptable Replacement Vessel and provided that the following conditions are satisfied with respect to such exchange:

(i)      On the Vessel Exchange Date, if the Subsidiary owning the Acceptable Replacement Vessel is not a Credit Party, (A) such Subsidiary shall (1) grant to the Collateral Agent a first priority Lien (subject only to Permitted Liens) on all property of such Subsidiary by executing and delivering a counterpart of or joinder to the Pledge Agreement, taking all actions required pursuant to Section 25 of the Pledge Agreement to become a Pledgor thereunder, and taking any other action reasonably requested by the Administrative Agent and (2) execute and deliver a Joinder Agreement and (B) the Borrower shall pledge and deliver, or cause to be pledged and delivered, all of the Equity Interests of such Subsidiary owned by any Credit Party to the Collateral Agent;

(ii)      On the applicable Vessel Exchange Date, the Administrative Agent shall have received from (A) Constantine P. Georgiopoulos, special New York maritime counsel to the Credit Parties (or other counsel to the Credit Parties reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated such Vessel Exchange Date, which shall (x) be in form and substance reasonably acceptable to the Administrative Agent and (y) cover the recordation of the security interests granted pursuant to the Collateral Vessel Mortgage(s) to be delivered on such date and such other matters incident thereto as the Administrative Agent may reasonably request and (B) local counsel to the Credit Parties consummating the relevant Vessel Exchange reasonably satisfactory to the Administrative Agent practicing in those jurisdictions in which the Acceptable Replacement Vessel is registered and/or the Credit Party owning such Acceptable Replacement Vessel is organized, which opinions shall be addressed to the Administrative Agent and each of the Lenders and dated such Vessel Exchange Date, which shall (x) be in form and substance reasonably acceptable to the Administrative Agent and (y) cover the perfection of the security interests granted pursuant to the Collateral Vessel Mortgage(s) and such other matters incident thereto as the Administrative Agent may reasonably request;

(iii)      On or prior to the Vessel Exchange Date, the Credit Party which is consummating a Vessel Exchange on such date shall have satisfied the Collateral and Guaranty Requirements with respect to such Vessel;

(iv)      On or prior to the Vessel Exchange Date, Schedule III shall be updated with the name, registered owner (which shall be a Subsidiary Guarantor), official number, and jurisdiction of registration and flag (which shall be in an Acceptable Flag Jurisdiction) of the Acceptable Replacement Vessel;

(v)      On the Vessel Exchange Date and immediately after giving effect to a Vessel Exchange, no Default or Event of Default shall have occurred and be continuing and all representations and warranties made by the Parent and its Subsidiaries pursuant to Section 7 of this Agreement shall be true and correct both before and after any such Vessel Exchange; and

(vi)      All filings, deliveries of instruments and other actions necessary or desirable in the reasonable opinion of the Collateral Agent to perfect and preserve such security

interests shall have been duly effected and the Collateral Agent shall have received evidence thereof in form and substance reasonably satisfactory to the Collateral Agent.

"Vessel Exchange Date" shall mean each date on which a Vessel Exchange occurs.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock (other than director's qualifying shares) is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time.

SECTION 2.  Amount and Terms of Credit Facility.

2.01  The Loans.  On the Restatement Effective Date, the loans (a "Loan" and, collectively, the "Loans") of each Lender shall consist of (x) the term loan of each such Lender which is outstanding under the Original Credit Agreement immediately prior to the Restatement Effective Date and (y) the Revolving Loans of each such Lender which are outstanding under the Original Credit Agreement immediately prior to the Restatement Effective Date and shall be converted into Loans under this Agreement on the Restatement Effective Date, less each such Lender's pro rata percentage of $39,649,220, which is paid to such Lenders on the Restatement Effective Date as part of the Plan of Reorganization.  The amount of each Lender's outstanding Loans immediately after giving effect to the Transactions on the Restatement Effective Date is set forth on Schedule I.

2.02  [Intentionally Omitted].

2.03  [Intentionally Omitted].

2.04  [Intentionally Omitted].

2.05  Notes.  (a)  The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 12.16 and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B, with blanks appropriately completed in conformity herewith (each, a "Note" and, collectively, the "Notes").

-34-

(b)      Each Note shall (i) be executed by the Borrower, (ii) be payable to such Lender or its registered assigns and be dated the Restatement Effective Date, (iii) be in a stated principal amount equal to the outstanding Loans of such Lender and be payable in the outstanding principal amount of Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in Section 2.07 in respect of the Loans evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 4.01, and mandatory repayment as provided in Section 4.02, and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(c)      Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and will, prior to any transfer of any of its Notes, endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby. Failure to make any such notation or any error in any such notation or endorsement shall not affect the Borrower's obligations in respect of such Loans.

(d)      Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, Notes shall be delivered only to Lenders that at any time specifically request the delivery of such Notes. No failure of any Lender to request or obtain a Note evidencing its Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower that would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the Credit Documents. Any Lender that does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (c). At any time (including, without limitation, to replace any Note that has been destroyed or lost) when any Lender requests the delivery of a Note to evidence any of its Loans, the Borrower shall promptly execute and deliver to such Lender the requested Note in the appropriate amount or amounts to evidence such Loans provided that, in the case of a substitute or replacement Note, the Borrower shall have received from such requesting Lender (i) an affidavit of loss or destruction and (ii) a customary lost/destroyed Note indemnity, in each case in form and substance reasonably acceptable to the Borrower and such requesting Lender, and duly executed by such requesting Lender.

2.06 Pro Rata Borrowings. All Borrowings of Loans under this Agreement have been incurred from the Lenders pro rata.

2.07 Interest. (a) The Borrower agrees to pay interest in respect of the unpaid principal amount of each Loan from the date the proceeds thereof are made available to the Borrower until the maturity (whether by acceleration or otherwise) of such Loan at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the Applicable Margin and the Eurodollar Rate for such Interest Period.

(b)      If the Borrower fails to pay any amount payable by it under a Credit Document on its due date, interest shall accrue on the overdue amount (in the case of overdue interest to the extent permitted by law) from the due date up to the date of actual payment (both before and after judgment) at a rate which is, subject to paragraph (c) below, 2% plus the rate which would have been payable if the overdue amount had, during the period of non payment,

constituted a Loan for successive Interest Periods, each of a duration selected by the Administrative Agent. Any interest accruing under this Section 2.07(b) shall be immediately payable by the Borrower on demand by the Administrative Agent.

(c)     If any overdue amount consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to such Loan:

(i)     the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

(ii)     the rate of interest applying to the overdue amount during that first Interest Period shall be 2% plus the rate which would have applied if the overdue amount had not become due.

Default interest (if unpaid) arising on the overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

(d)     Accrued and unpaid interest shall be payable in respect of each Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three month intervals after the first day of such Interest Period, on any repayment or prepayment (on the amount repaid or prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(e)     Upon each Interest Determination Date, the Administrative Agent shall determine the Eurodollar Rate for each Interest Period applicable to the Loans made or to be made pursuant to the applicable Borrowing and shall promptly notify the Borrower and the respective Lenders thereof. Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.08 Interest Periods. (a) The Borrower shall give the Administrative Agent at its Notice Office written notice at least three Business Days' prior to (x) the Restatement Effective Date (in the case of the initial Interest Period applicable to any Loans) and (y) the expiration of an Interest Period applicable to such Loans (in the case of any subsequent Interest Period), which notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York time), electing the interest period (each an "Interest Period") applicable to such Loan. Each such written notice (each a "Notice of Interest Period Election"), except as otherwise expressly provided in Section 2.09, shall be irrevocable and shall be given by the Borrower in the form of Exhibit A, appropriately completed to specify (i) the aggregate principal amount of the Loans to be included in the Borrowing (if applicable), (ii) the commencement date of the applicable Interest Period (which shall be a Business Day) and (iii) at the option of the Borrower, whether the applicable Interest Period will be a one, three or six month period (or such other period as all the Lenders may agree); provided that:

(i)     there shall be no more than six different Interest Periods at any time, each of which shall be comprised of Loans in an amount of not less than the Minimum Borrowing Amount (or, if less, the aggregate principal amount of the Loans outstanding hereunder);

-36-

(ii)     the initial Interest Period for each Loan shall commence on the Restatement Effective Date of such Loan and each Interest Period occurring thereafter in respect of such Loan shall commence on the day on which the immediately preceding Interest Period applicable thereto expires;

(iii)    if any Interest Period relating to a Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(iv)    if any Interest Period would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the first succeeding Business Day; provided, however, that if any Interest Period for a Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the immediately preceding Business Day;

(v)     no Interest Period longer than one month may be selected at any time when an Event of Default (or, if the Administrative Agent or the Required Lenders have determined that such an election at such time would be disadvantageous to the Lenders, a Default) has occurred and is continuing; and

(vi)    no Interest Period in respect of any Borrowing of any Loans shall be selected which extends beyond the Maturity Date.

The Administrative Agent shall promptly give each Lender whose Loans are being converted on the Restatement Effective Date or continued at the end of any Interest Period, notice of the proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Interest Period Election.  If on the Restatement Effective Date or upon the expiration of any Interest Period applicable to Loans, the Borrower has failed to deliver a Notice of Interest Period Election in respect of such Loans as provided above, the Borrower shall be deemed to have elected a one month Interest Period to be applicable to such Loans effective as of the Restatement Effective Date or expiration date of such current Interest Period, as applicable.

(b)     Without in any way limiting the obligation of the Borrower to deliver a written Notice of Interest Period Election in accordance with Section 2.08(a), the Administrative Agent may act without liability upon the basis of telephonic notice of such Interest Period election, believed by the Administrative Agent in good faith to be from the President or the Treasurer of the Borrower (or any other officer of the Borrower designated in writing to the Administrative Agent by the President or Treasurer of the Borrower as being authorized to give such notices under this Agreement) prior to receipt of Notice of Interest Period Election.  In each such case, the Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of such telephonic notice of such Interest Period election of Loans, absent manifest error.

2.09 <u>Increased Costs, Illegality, Market Disruption Event, etc.</u>  (a) In the event that any Lender shall have determined in good faith (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto):

(i)    at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Loan because of, without duplication, any change since the Restatement Effective Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, for example, but not limited to:  (A) a change with respect to taxes (other than Excluded Taxes) imposed on any recipient Lender's loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, but without duplication of any amounts payable in respect of Taxes pursuant to Section 4.04, or (B) any change in official reserve requirements but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate; or

(ii)    at any time, that the making or continuance of any Loan has been made unlawful by any law or governmental rule, regulation or order;

then, and in any such event, such Lender shall promptly give notice (by telephone confirmed in writing) to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the Lenders).  Thereafter (x) in the case of clause (i) above, the Borrower agrees, subject to the provisions of Section 2.11 (to the extent applicable), to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased costs or reductions to such Lender or such other corporation and (y) in the case of clause (ii) above, the Borrower shall take one of the actions specified in Section 2.09(b) as promptly as possible and, in any event, within the time period required by law.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, provided that such Lender's determination of compensation owing under this Section 2.09(a) shall, absent manifest error be final and conclusive and binding on all the parties hereto.  Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.09(a), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for the calculation of such additional amounts; <u>provided</u> that the failure to give such notice shall not relieve the Borrower from its Obligations hereunder.

(b)    At any time that any Loan is affected by the circumstances described in Section 2.09(a)(i) or (ii), the Borrower may (and in the case of a Loan affected by the circumstances described in Section 2.09(a)(ii) shall) either (x) if the affected Loan is then being made initially, cancel the respective Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date or the next Business Day that such Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.09(a)(i) or (ii) or (y) if the affected Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, in the case of any Loan, repay all outstanding Borrowings (within

-38-

the time period required by the applicable law or governmental rule, governmental regulation or governmental order) which include such affected Loans in full in accordance with the applicable requirements of Section 4.02; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.09(b).

(c)    If any Lender in good faith determines that after the Restatement Effective Date the introduction of or effectiveness of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by any governmental authority, central bank or comparable agency will have the effect of increasing the amount of capital required or requested to be maintained by such Lender, or any corporation controlling such Lender, based on the existence of such Lender's Loans hereunder or its obligations hereunder, then the Borrower agrees (to the extent applicable), to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital. In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, provided that such Lender's determination of compensation owing under this Section 2.09(c) shall, absent manifest error be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.09(c), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts; provided that the failure to give such notice shall not relieve the Borrower from its Obligations hereunder.

(d)    If a Market Disruption Event occurs in relation to a Loan for any Interest Period, then the rate of interest on each Lender's share of such Loan for the relevant Interest Period shall be the rate per annum which is the sum of:

(i)    the Applicable Margin; and

(ii)    the rate determined by each Lender and notified to the Administrative Agent, which expresses the actual cost to each such Lender of funding its participation in that Loan for a period equivalent to such Interest Period from whatever source it may reasonably select.

(e)    If a Market Disruption Event occurs and the Administrative Agent or the Borrower so require, the Administrative Agent and the Borrower shall enter into negotiations (for a period of not more than thirty days) with a view to agreeing a substitute basis for determining the rate of interest. Any alternative basis agreed pursuant to the immediately preceding sentence shall, with the prior consent of all the Lenders and the Borrower, be binding on all parties. If no agreement is reached pursuant to this clause (e), the rate provided for in clause (d) above shall apply for the entire Interest Period.

(f)    Notwithstanding anything in this Agreement to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or

-39-

directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change after the Restatement Effective Date in a requirement of law or governmental rule, regulation or order, regardless of the date enacted, adopted, issued or implemented for all purposes under or in connection with this Agreement (including this Section 2.09).

2.10 Compensation. The Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting and the calculation of such compensation), for all reasonable losses, expenses and liabilities (including, without limitation, any such loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Loans but excluding any loss of anticipated profits) which such Lender may sustain in respect of Loans made to the Borrower: (i) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 2.09(a), Section 4.01 or Section 4.02 or as a result of an acceleration of the Loans pursuant to Section 10) of any of its Loans, or assignment of its Loans pursuant to Section 2.12, occurs on a date which is not the last day of an Interest Period with respect thereto; (ii) if any prepayment of any of its Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iii) as a consequence of any other Default or Event of Default arising as a result of the Borrower's failure to repay Loans or make payment on any Note held by such Lender when required by the terms of this Agreement.

2.11 Change of Lending Office. Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.09(a)(ii), Section 2.09(b) or Section 4.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable good faith efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this Section 2.11 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender provided in Section 2.09 or Section 4.04.

2.12 Replacement of Lenders. (a) (x) If any Lender becomes a Defaulting Lender or otherwise defaults in its obligations to make Loans, (y) upon the occurrence of any event giving rise to the operation of Section 2.09(a)(i) or (ii), Section 2.09(b) or Section 4.04 with respect to any Lender which results in such Lender charging to the Borrower material increased costs in excess of those being generally charged by the other Lenders, or (z) as provided in Section 12.12(b) in the case of certain refusals by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders, the Borrower shall have the right, if no Default or Event of Default will exist immediately after giving effect to the respective replacement, to replace such Lender (the "Replaced Lender") with one or more other Eligible Transferee or Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "Replacement Lender") reasonably acceptable to the Administrative Agent; provided that:

-40-

(i)      at the time of any replacement pursuant to this Section 2.12, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 12.04(b) (and with all fees payable pursuant to said Section 12.04(b) to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire all of the outstanding Loans of the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum (without duplication) of an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Replaced Lender; and

(ii)     all obligations of the Borrower due and owing to the Replaced Lender at such time (other than those specifically described in clause (i) above) in respect of which the assignment purchase price has been, or is concurrently being, paid shall be paid in full to such Replaced Lender concurrently with such replacement.

(b)      Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (i) and (ii) above and, if so requested by the Replacement Lender, delivery to (i) the Replacement Lender of the appropriate Note or Notes executed by the Borrower, the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.09, 2.10, 4.04, 12.01 and 12.06), which shall survive as to such Replaced Lender and (ii) if so requested by the Borrower, the Replaced Lender shall deliver all Notes in its possession to the Borrower.

## SECTION 3. Fees.

3.01 Fees.   The Borrower shall pay to the Administrative Agent, for the Administrative Agent's own account, such other fees as have been agreed to in writing by the Borrower and the Administrative Agent.

## SECTION 4. Prepayments; Payments; Taxes.

4.01 Voluntary Prepayments. The Borrower shall have the right to prepay, at any time, the Loans, in each case without premium or penalty except as provided by law and Section 2.10, in whole or in part at any time and from time to time on the following terms and conditions:

(i)      the Borrower shall give the Administrative Agent prior to 12:00 Noon (New York time) at its Notice Office at least three Business Days' prior written notice (including e-mail notice or telephonic notice promptly confirmed in writing) of its intent to prepay such Loans, the amount of such prepayment and the specific Borrowing or Borrowings pursuant to which made, which notice the Administrative Agent shall promptly transmit to each of the Lenders;

(ii)     each prepayment shall be in an aggregate principal amount of at least $1,000,000 or such lesser amount of a Borrowing which is outstanding, provided that no partial prepayment of Loans made pursuant to any Borrowing shall reduce the outstanding Loans made pursuant to such Borrowing to an amount less than $1,000,000;

-41-

(iii)   at the time of any prepayment of Loans pursuant to this Section 4.01 on any date other than the last day of the Interest Period applicable thereto, the Borrower shall pay the amounts required pursuant to Section 2.10;

(iv)    in the event of certain refusals by a Lender as provided in Section 12.12(b) to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders, the Borrower may, upon five Business Days' written notice to the Administrative Agent at its Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), prepay all Loans, together with accrued and unpaid interest and other amounts owing to such Lender (or owing to such Lender with respect to each Loan which gave rise to the need to obtain such Lender's individual consent) in accordance with said Section 12.12(b) so long as the consents required by Section 12.12(b) in connection with the prepayment pursuant to this clause (iv) have been obtained;

(v)    except as expressly provided in the preceding clause (iv), each prepayment in respect of any Loans made pursuant to a Borrowing shall be applied pro rata among the Loans comprising such Borrowing, provided that in connection with any prepayment of Loans pursuant to this Section 4.01, at the Borrower's election, such prepayment shall not be applied to any Loan of a Defaulting Lender until all other Loans of Non-Defaulting Lenders have been repaid in full; and

(vi)    each prepayment of principal of Loans pursuant to this Section 4.01 shall be applied to reduce the then remaining Scheduled Repayments in accordance with Section 4.02(f).

4.02 Mandatory Repayments. (a) In addition to any other mandatory repayments pursuant to this Section 4.02, on each Payment Date (including, for the avoidance of doubt, the Maturity Date) set forth below, the Borrower shall be required to repay Loans to the extent then outstanding in the amount set forth opposite each such Payment Date in the table below (each such repayment, as the same may be reduced in accordance with Sections 4.01, 4.02(b), 4.02(c) and/or 4.02(d), a "Scheduled Repayment"):

| Payment Date | Amount |
| --- | --- |
| June 30, 2014 | $7,405,307 |
| September 30, 2014 | $7,405,307 |
| December 31, 2014 | $7,405,307 |
| March 31, 2015 | $7,405,307 |
| June 30, 2015 | $7,405,307 |
| September 30, 2015 | $7,405,307 |
| December 31, 2015 | $7,405,307 |
| March 31, 2016 | $7,405,307 |
| June 30, 2016 | $7,405,307 |

-42-

| | |
|---|---|
| September 30, 2016 | $7,405,307 |
| December 31, 2016 | $7,405,307 |
| Maturity Date | $192,344,206 |

(b)     In addition to any other mandatory repayments pursuant to this Section 4.02, but without duplication, on (i) the date of any Collateral Disposition involving a Primary Collateral Vessel (other than a Collateral Disposition constituting an Event of Loss) and, after the repayment of the loans and the satisfaction in full of all obligations under the Other Credit Agreement, a Secondary Collateral Vessel and (ii) the earlier of (A) the date which is 180 days following any Collateral Disposition constituting an Event of Loss involving a Primary Collateral Vessel or, after the repayment of the loans and the satisfaction in full of all obligations under the Other Credit Agreement a Secondary Collateral Vessel and (B) the date of receipt by the Borrower, any of its Subsidiaries or the Administrative Agent of the insurance proceeds relating to such Event of Loss, the Borrower shall be required (subject to the first proviso below) to repay an aggregate principal amount of outstanding Loans in accordance with the requirements of Section 4.02(e) in an amount equal to (X) in the case of a Primary Collateral Vessel, the greater of (x) the Net Cash Proceeds of such Collateral Disposition (such amount under this clause (x) the "Net Cash Proceeds Value") and (y) the sum of the then outstanding aggregate principal amount of Loans multiplied by a fraction (I) the numerator of which is equal to the appraised value (as determined in accordance with the most recent appraisal report delivered to the Administrative Agent (or obtained by the Administrative Agent) pursuant to Section 8.01(d)) of the Primary Collateral Vessel or Primary Collateral Vessels which is/are the subject of such Collateral Disposition and (II) the denominator of which is equal to the Aggregate Primary Collateral Vessel Value (as determined in accordance with the most recent appraisal report delivered to the Administrative Agent (or obtained by the Administrative Agent) pursuant to Section 8.01(d)) prior to such Collateral Disposition (such amount under this clause (y) the "Appraisal Value") and (Y) after the repayment of the loans and the satisfaction in full of all obligations under the Other Credit Agreement, in the case of a Secondary Collateral Vessel, the Net Cash Proceeds Value of such Collateral Disposition; provided that (I) in the case of any Collateral Vessel which is older than 15 years at the time of such Collateral Disposition (including, for the avoidance of doubt, an Event of Loss) the Borrower shall only be required to repay an amount equal to the Net Cash Proceeds thereof; (II) after the Trigger Date, if the Net Cash Proceeds Value is greater than the Appraisal Value and the Parent and its Subsidiaries would have a Loan to Value Ratio of no greater than 0.60 to 1.00, on a pro forma basis after giving effect to the Collateral Disposition and any repayment with the proceeds thereof, then the Parent and its Subsidiaries may retain the proceeds of such Collateral Disposition in an amount equal to the difference between the Net Cash Proceeds Value and the Appraisal Value, which amount will not be subject to the mandatory repayment provisions of this Section 4.02(b); (III) without limiting anything otherwise provided for in this Agreement, the Borrower hereby acknowledges that it is obliged to comply with Section 9.09 at all times (including, without limitation, after giving effect to any repayment contemplated by the foregoing Section 4.02(a)); and (IV) so long as no Default or Event of Default exists, the Borrower, at its option, shall not be required to repay outstanding Loans upon a Collateral Disposition in respect of a Primary Collateral Vessel (other than a Collateral Disposition constituting an Event of Loss) so long as (I) to the extent required by Section 4.02(a), the Borrower repays any Loans and (II) no later than

-43-

365 days after the date of such Collateral Disposition, such Primary Collateral Vessel is replaced by an Acceptable Replacement Vessel pursuant to a Vessel Exchange, provided that, if such Vessel Exchange does not occur within 365 days of the date of such Collateral Disposition the Loans shall be repaid by an amount equal to the amount by which the Loans would have been required to be repaid as a result of the Collateral Disposition of such Primary Collateral Vessel.

(c)    In addition to any other mandatory repayments pursuant to this Section 4.02, upon the occurrence of a default under Section 9.09, the Borrower shall be required to repay Loans in accordance with the requirements of Section 9.09 in an amount required to cure such default; provided that it is understood and agreed that the requirement to repay Loans under this Section 4.02(c) shall not be deemed to be a waiver of any other right or remedy that any Lender may have as a result of an Event of Default under Section 9.09.

(d)    In addition to any other mandatory repayments pursuant to this Section 4.02, on the tenth day (or, if such day is not a Business Day, on the next succeeding Business Day) after each Payment Date, the Loans shall be repaid in an amount equal to (i) the Lenders' Pro Rata Excess Liquidity Share determined on such Payment Date. The mandatory repayment pursuant to this Section 4.02(d) shall be applied to reduce the Scheduled Repayments as follows: (i) first, 25% of such repayment to reduce the Scheduled Repayment following the applicable Payment Date, and, to the extent that such next Scheduled Repayment has been paid in full, to the next succeeding Scheduled Repayment until such Scheduled Repayment has been reduced to zero, after which the remaining portion (if any) of such 25% to reduce the then remaining Scheduled Repayments (excluding the Scheduled Repayment due on the Maturity Date) pro rata based upon such remaining Scheduled Repayments (excluding the Scheduled Repayment due on the Maturity Date) after giving effect to all prior reductions thereto, (ii) second, 25% of such repayment to reduce the then remaining Scheduled Repayments (excluding the Scheduled Repayment due on the Maturity Date) pro rata based upon such remaining Scheduled Repayments (excluding the Scheduled Repayment due on the Maturity Date) after giving effect to all prior reductions thereto, and (iii) third, 50% of such repayment to reduce the Scheduled Repayment due on the Maturity Date.

(e)    All repayments of the Loans pursuant to (i) Section 4.02(a) shall be applied to the repayment of the Loans then outstanding on a pro rata basis and (ii) Sections 4.01, 4.02(b), 4.02(c) and 4.02(d) shall be applied to the repayment of the Loans then outstanding on a pro rata basis.

(f)    The amount of all repayments of Loans pursuant to Sections 4.01, 4.02(b) and 4.02(c) shall be applied to reduce the then remaining Scheduled Repayments pro rata based upon the then remaining Scheduled Repayments after giving effect to all prior reductions thereto.

(g)    With respect to each repayment of Loans under Section 4.01 or required by this Section 4.02, the Borrower may designate the specific Borrowing or Borrowings pursuant to which such Loans were made, provided that (i) all Loans with Interest Periods ending on such date of required repayment shall be paid in full prior to the payment of any other Loans and (ii) each repayment of any Loans comprising a Borrowing shall be applied pro rata among such Loans. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the preceding provisions of this clause (g), make such

-44-

designation in its sole reasonable discretion with a view, but no obligation, to minimize breakage costs owing pursuant to Section 2.10.

(h)    Notwithstanding anything to the contrary contained elsewhere in this Agreement, all then outstanding Loans shall be repaid in full on the Maturity Date.

(i)    The Loans repaid pursuant to Section 4.01 and this Section 4.02 may not be reborrowed.

4.03    Method and Place of Payment.    Except as otherwise specifically provided herein, all payments under this Agreement or any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 12:00 Noon (New York time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office of the Administrative Agent or such other office in the State of New York as the Administrative Agent may hereafter designate in writing.    Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

4.04    Net Payments; Taxes.    (a)    All payments made by any Credit Party hereunder or under any Note will be made without setoff, counterclaim or other defense. Unless otherwise required by law, all such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding any Excluded Taxes) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes").    If any Taxes are so levied or imposed, each of the Borrower, the Parent, GMSC and Arlington agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note.    Each of the Borrower, the Parent, GMSC, Arlington and the Subsidiary Guarantors will furnish to the Administrative Agent within 45 days after the date of payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment.    Each of the Borrower, the Parent, GMSC, Arlington and the Subsidiary Guarantors agrees to jointly and severally indemnify and hold harmless each Lender, and reimburse such Lender upon its written request, for the amount of any Taxes so levied or imposed and paid by such Lender.

(b)    Each Lender agrees to use commercially reasonable efforts (consistent with legal and regulatory restrictions and subject to overall policy considerations of such Lender) to file any certificate or document or to furnish to the Borrower and the Administrative Agent any information as reasonably requested by the Borrower and the Administrative Agent that may be necessary to establish any available exemption from, or reduction in the amount of, any Taxes; provided, however, that nothing in this Section 4.04(b) shall require a Lender to disclose

-45-

any confidential information (including, without limitation, its tax returns or its calculations). If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall use commercially reasonable efforts to deliver to the Borrower and the Administrative Agent at the time or times prescribed by law such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

Each non-U.S. Lender hereby agrees, whenever a lapse in time or change in circumstances renders any of the forms, certificates or other evidence delivered pursuant to this Section 4.04(b) obsolete or inaccurate in any material respect, that such Lender shall use commercially reasonable efforts to promptly (1) update such form, certificate or other evidence delivered, or (2) notify the Administrative Agent and the Borrower of its inability to do so.

(c) If the Borrower pays any additional amount under this Section 4.04 to a Lender and such Lender determines in its sole discretion exercised in good faith that it has actually received or realized in connection therewith any refund or any reduction of, or credit against, its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "Tax Benefit"), such Lender shall pay to the Borrower an amount that such Lender shall, in its sole discretion exercised in good faith, determine is equal to the net benefit, after tax, which was obtained by such Lender in such year as a consequence of such Tax Benefit; provided, however, that (i) any Lender may determine, in its sole discretion exercised in good faith consistent with the policies of such Lender, whether to seek a Tax Benefit, (ii) any Taxes that are imposed on a Lender as a result of a disallowance or reduction (including through the expiration of any tax credit carryover or carryback of such Lender that otherwise would not have expired) of any Tax Benefit with respect to which such Lender has made a payment to the Borrower pursuant to this Section 4.04(c) shall be treated as a Tax for which the Borrower is obligated to indemnify such Lender pursuant to this Section 4.04 without any exclusions or defenses, (iii) nothing in this Section 4.04(c) shall require any Lender to disclose any confidential information to the Borrower (including, without limitation, its tax returns), and (iv) no Lender shall be required to pay any amounts pursuant to this Section 4.04(c) at any time during which a Default or Event of Default exists.

SECTION 5. [Intentionally Omitted].

SECTION 6. [Intentionally Omitted].

SECTION 7. Representations, Warranties and Agreements. In order to induce the Lenders to enter into this Agreement, to continue the Term Loans as Loans and convert the Revolving Loans into the Loans, each of the Parent, GMSC, Arlington and the Borrower makes the following representations, warranties and agreements, in each case on the Restatement Effective Date, all of which shall survive the execution and delivery of this

Agreement and the Notes, and the continuation of the Term Loans as Loans and the conversion of the Revolving Loans into the Loans (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date):

7.01 <u>Corporate/Limited Liability Company/Limited Partnership Status</u>. Each Credit Party (i) is a duly organized and validly existing corporation, limited liability company or limited partnership, as the case may be, in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications, except for failures to be so qualified which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

7.02 <u>Corporate Power and Authority</u>. Each Credit Party has the corporate or other applicable power and authority to execute, deliver and perform the terms and provisions of each of the Documents to which it is party and has taken all necessary corporate or other applicable action to authorize the execution, delivery and performance by it of each of such Documents. Each Credit Party has duly executed and delivered each of the Documents to which it is party, and each of such Documents constitutes the legal, valid and binding obligation of such Credit Party enforceable against such Credit Party in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

7.03 <u>No Violation</u>. Neither the execution, delivery or performance by any Credit Party of the Documents to which it is a party, nor compliance by it with the terms and provisions thereof, will (i) contravene any material provision of any applicable law, statute, rule or regulation or any applicable order, judgment, writ, injunction or decree of any court or governmental instrumentality, (ii) conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the material properties or assets of the Parent or any of its Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, to which the Parent or any of its Subsidiaries is a party or by which it or any of its material property or assets is bound or to which it may be subject or (iii) violate any provision of the Certificate of Incorporation or By-Laws (or equivalent organizational documents) of the Parent or any of its Subsidiaries.

7.04 <u>Governmental Approvals</u>. No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except as have been obtained or made or, in the case of any filings or recordings in respect of the Security Documents (other than the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages), will be made within 10 days of the date such Security Document is required to be executed pursuant hereto), or exemption by, any governmental or public body or authority, or any

-47-

subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance by any Credit Party of any Document to which it is a party or (ii) the legality, validity, binding effect or enforceability of any Document to which it is a party.

7.05 <u>Financial Statements; Financial Condition; Undisclosed Liabilities</u>. (a) (i) The audited consolidated balance sheets of the Parent as at December 31, 2011 and the related consolidated statements of operations and of cash flows for the fiscal year ended on such date and (ii) to the extent available, the consolidated balance sheets of the Parent as at the end of each quarterly accounting period in the 2012 fiscal year and the related consolidated statements of operations and cash flows, in each case for such quarterly accounting period, reported on by and accompanied by, in the case of the annual financial statements, an unqualified report from Deloitte & Touche LLP, present fairly the consolidated financial condition of the Parent as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein). Neither the Parent nor any of its Subsidiaries has any material guarantee obligations, contingent liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the financial statements referred to in the preceding sentence (it being understood that with respect to guarantee obligations, the underlying debt is so reflected).

(b) Except as fully disclosed in the financial statements and the notes related thereto delivered pursuant to Section 7.05(a), there were as of the Restatement Effective Date no liabilities or obligations with respect to the Parent or any of its Subsidiaries of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, would be materially adverse to the Parent and its Subsidiaries taken as a whole. As of the Restatement Effective Date, none of the Credit Parties knows of any basis for the assertion against it of any liability or obligation of any nature that is not fairly disclosed (including, without limitation, as to the amount thereof) in the financial statements and the notes related thereto delivered pursuant to Section 7.05(a) which, either individually or in the aggregate, could reasonably be expected to be materially adverse to the Parent and its Subsidiaries taken as a whole.

(c) The Projections delivered by the Parent to the Administrative Agent and the Lenders prior to the Restatement Effective Date have been prepared in good faith and are based on GAAP and reasonable assumptions, and there are no statements or conclusions in such Projections which are based upon or include information known to the Parent on the Restatement Effective Date to be misleading in any material respect or which fail to take into account material information known to the Parent on the Restatement Effective Date regarding the matters reported therein. On the Restatement Effective Date, the Parent believes that such Projections are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results included in such Projections.

7.06 <u>Litigation</u>. Except as set forth on Schedule XIV, there are no actions, suits, investigations (conducted by any governmental or other regulatory body of competent jurisdiction) or proceedings pending or, to the knowledge of the Parent, GMSC, Arlington or the Borrower, threatened against the Parent or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

7.07 <u>True and Complete Disclosure</u>. All factual information (taken individually or as a whole) furnished by or on behalf of the Parent, GMSC, Arlington or the Borrower in writing to the Administrative Agent or any Lender (including, without limitation, all information contained in the Documents and any financial statement referred to in Section 7.05(a)) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information (taken individually or as a whole) hereafter furnished by or on behalf of the Parent, GMSC, Arlington or the Borrower in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time as such information was provided.

7.08 <u>Use of Proceeds: Margin Regulations</u>. (a) All proceeds of the Loans (including the Loans which result from the conversion of Revolving Loans into Loans) were used for working capital, Capital Expenditures and general corporate purposes.

(b) No part of the proceeds of any Loan was used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock except to purchase or carry or extend credit for the purpose of purchasing or carrying such Margin Stock as may be permitted to be purchased or carried pursuant to the terms of Sections 9.05(vi) and (vii). Neither the continuation of the Term Loans as Loans, the conversion of the Revolving Loans into the Loans, the use of the proceeds thereof nor the occurrence of any other Borrowing will violate or be inconsistent with the Margin Regulations.

7.09 <u>Tax Returns and Payments</u>. The Parent and each of its Subsidiaries has timely filed all U.S. federal income tax returns, statements, forms and reports for taxes and all other material U.S. and non-U.S. tax returns, statements, forms and reports for taxes required to be filed by or with respect to the income, properties or operations of the Parent and/or any of its Subsidiaries (the "Returns"). The Returns accurately reflect in all material respects all liability for taxes of the Parent and its Subsidiaries as a whole for the periods covered thereby. The Parent and each of its Subsidiaries have at all times paid, or have provided adequate reserves (in accordance with GAAP) for the payment of, all taxes shown as due on the Returns and all other material U.S. federal, state and non-U.S. taxes that have become due and payable. There is no material action, suit, proceeding, investigation, audit, or claim now pending or, to the knowledge of the Parent or any of its Subsidiaries, threatened by any authority regarding any taxes relating to the Parent or any of its Subsidiaries. As of the Restatement Effective Date, neither the Parent nor any of its Subsidiaries has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of taxes of the Parent or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of the Parent or any of its Subsidiaries not to be subject to the normally applicable statute of limitations. Neither the Parent nor any of its

-49-

Subsidiaries (i) has engaged in any "listed transaction" within the meaning of Section 6011 of the Code or (ii) has any actual or potential liability for the taxes of any Person (other than the Parent or any of its present or former Subsidiaries) under the United States Treasury regulation Section 1.1502-6 (or any similar provision of state, local, foreign or provincial law).

7.10 <u>Compliance with ERISA</u>. (i) <u>Schedule VII</u> sets forth, as of the Restatement Effective Date, each Plan; with respect to each Plan, other than any Multiemployer Plan (and each related trust, insurance contract or fund), there has been no failure to be in substantial compliance with its terms and with all applicable laws, including without limitation ERISA and the Code, that could reasonably be expected to give rise to a Material Adverse Effect; each Plan, other than any Multiemployer Plan (and each related trust, if any), which is intended to be qualified under Section 401(a) of the Code has received a determination letter (or an opinion letter) from the United States Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code; no Reportable Event has occurred; to the best knowledge of the Parent or any of its Subsidiaries or ERISA Affiliates no Plan which is a Multiemployer Plan is insolvent or in reorganization; no Plan has an Unfunded Current Liability in an amount material to Borrower's operation; no Plan (other than a Multiemployer Plan) which is subject to Section 412 of the Code or Section 302 of ERISA has failed to satisfy minimum funding standards, or has applied for or received a waiver of the minimum funding standards or an extension of any amortization period, within the meaning of Section 412 or 430 of the Code or Section 302 or 303 of ERISA; with respect to each Plan (other than a Multiemployer Plan) its actuary has certified that such Plan is not an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; all contributions required to be made with respect to a Plan have been or will be timely made (except as disclosed on <u>Schedule VII</u>); neither the Parent nor any of its Subsidiaries nor any ERISA Affiliate has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 436(f), 4971 or 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan; no condition exists which presents a material risk to the Parent or any of its Subsidiaries or any ERISA Affiliate of incurring a liability to or on account of a Plan pursuant to the foregoing provisions of ERISA and the Code; no proceedings have been instituted by the PBGC to terminate or appoint a trustee to administer any Plan (in the case of a Multiemployer Plan, to the best knowledge of the Parent or any of its Subsidiaries or ERISA Affiliates) which is subject to Title IV of ERISA; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, or, to the best knowledge of the Parent or any of its Subsidiaries, expected or threatened which could reasonably be expected to have a Material Adverse Effect; using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the Parent and its Subsidiaries and ERISA Affiliates would have no liabilities to any Plans which are Multiemployer Plans in the event of a complete withdrawal therefrom in an amount which could reasonably be expected to have a Material Adverse Effect; neither the Borrower nor any of its Subsidiaries nor any ERISA Affiliate has received any notice that a Plan which is a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Parent, any of its Subsidiaries, or any ERISA Affiliate has at all times been operated in material compliance with the provisions of

Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code; no lien imposed under the Code or ERISA on the assets of the Parent or any of its Subsidiaries or any ERISA Affiliate exists nor has any event occurred which could reasonably be expected to give rise to any such lien on account of any Plan; and the Parent and its Subsidiaries do not maintain or contribute to any employee welfare plan (as defined in Section 3(1) of ERISA) which provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan the obligations with respect to which could reasonably be expected to have a Material Adverse Effect.

(ii)   Each Foreign Pension Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities. All contributions required to be made with respect to a Foreign Pension Plan have been or will be timely made. Neither the Parent nor any of its Subsidiaries has incurred any obligation in connection with the termination of or withdrawal from any Foreign Pension Plan that could reasonably be expected to have a Material Adverse Effect. Neither the Parent nor any of its Subsidiaries maintains or contributes to any Foreign Pension Plan the obligations with respect to which could in the aggregate reasonably be expected to have a Material Adverse Effect.

7.11 The Security Documents. After the execution and delivery thereof and upon the taking of the actions mentioned in the second immediately succeeding sentence, each of the Security Documents creates in favor of the Collateral Agent for the benefit of the Secured Creditors (x) in the case of the Collateral Vessel Mortgages, the Assignments of Earnings, the Assignments of Insurances, the Pledge Agreement and the Parent Pledge Agreement, a legal, valid and enforceable fully perfected first priority security interest in and Lien on all right, title and interest of the Credit Parties party thereto in the Primary Collateral described therein and (y) in the case of the Secondary Collateral Vessel Mortgages, the Secondary Assignments of Earnings, the Secondary Assignments of Insurances and the Secondary Pledge Agreement, a legal, valid and enforceable fully perfected second priority security interest in and Lien on all right, title and interest of the Credit Parties party thereto in the Secondary Collateral described therein, in the case of each of (x) and (y) above, subject to no other Liens except for Permitted Liens. No filings or recordings are required in order to perfect the security interests created under any Security Document except for filings or recordings which shall have been made on or prior to the Restatement Effective Date and such other filings made on or prior to the tenth day after the Restatement Effective Date, subject in each case to Section 7.03.

7.12 Capitalization. (a) On the Restatement Effective Date and after giving effect to the conditions precedent related thereto: (1) the authorized capital stock of the Borrower shall consist of 500 shares of common stock, $0.01 par value per share, 100 of which have been issued and 100% of which issued shares are outstanding and owned by the Parent; (2) all such outstanding shares shall have been duly and validly issued, fully paid and non-assessable and issued free of preemptive rights; and (3) the Borrower shall not have outstanding any securities convertible into or exchangeable for its capital stock or outstanding any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its capital stock or any stock appreciation or similar rights.

-51-

(b)    Except as set forth in Schedule IX, as of the Restatement Effective Date and after giving effect to the conditions precedent related thereto, there are (i) no other shares of capital stock or other Equity Interests or voting securities of the Parent, (ii) no securities of the Parent convertible into or exchangeable for capital stock or other Equity Interests or voting securities of the Parent, (iii) no options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other similar contracts or commitments that could require the Parent to issue, sell or otherwise cause to become outstanding any of its Equity Interests and (iv) no stock appreciation, phantom stock, profit participation or similar rights with respect to the Parent or any repurchase, redemption or other obligation to acquire for value any capital stock of the Parent.

(c)    As of the Restatement Effective Date, all outstanding shares of the Parent's capital stock are duly authorized, validly issued, fully paid and nonassessable and, except as set forth in Schedule IX, not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of the Business Corporations Act of the Republic of the Marshall Islands 1990, the articles of incorporation of the Parent, the bylaws of the Parent or any agreement to which the Parent is a party or otherwise bound.  None of the shares of the capital stock of the Parent have been issued in violation of any securities Laws.  There are no accrued and unpaid dividends with respect to any outstanding shares of capital stock of the Parent.

7.13 Subsidiaries.    On the Restatement Effective Date, the Parent has no Subsidiaries other than those Subsidiaries listed on Schedule VIII (which Schedule identifies the correct legal name, direct owner, percentage ownership and jurisdiction of organization of each such Subsidiary on the date hereof).  On the Restatement Effective Date, all outstanding capital stock, membership interests, partnership interests, units or other form of equity, of each class outstanding, of each of the Subsidiaries listed on Schedule VIII has been validly issued, is fully paid and non-assessable (to the extent applicable) and, except in the case of the Parent, is owned beneficially and of record by a Credit Party free and clear of all Liens other than the security interests created by the Credit Documents, the Other Credit Documents and Permitted Liens.

7.14 Compliance with Statutes, etc.  The Parent and each of its Subsidiaries is in compliance in all material respects with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such non-compliances that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.15 Investment Company Act.  Neither the Parent, nor any of its Subsidiaries, is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

7.16 Money Laundering.  (a)  To the extent applicable, each Credit Party is in compliance, in all material respects, with the (i) Trading and Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the PATRIOT Act. No part of the proceeds of the Loans will be used, directly or

indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(b)     None of the Credit Parties nor, to the best knowledge of the Parent, GMSC, Arlington and the Borrower after due inquiry, any Affiliate of any Credit Party, is, or will be after consummation of the Transaction and application of the proceeds of the Loans, by reason of being a "national" of a "designated foreign country" or a "specially designated national" within the meaning of the Regulations of the Office of Foreign Assets Control, United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), or for any other reason, in violation of, any United States Federal Statute or Presidential Executive Order concerning trade or other relations with any foreign country or any citizen or national thereof.

7.17 Pollution and Other Regulations. (a) Each of the Parent and its Subsidiaries is in compliance with all applicable Environmental Laws governing its business, except for such failures to comply as are not reasonably likely to have a Material Adverse Effect, and neither the Parent nor any of its Subsidiaries is liable for any penalties, fines or forfeitures for failure to comply with any of the foregoing except for such penalties, fines or forfeitures as are not reasonably likely to have a Material Adverse Effect. All licenses, permits, registrations or approvals required for the business of the Parent and each of its Subsidiaries, as conducted as of the Restatement Effective Date, under any Environmental Law have been secured and the Parent and each of its Subsidiaries is in substantial compliance therewith, except for such failures to secure or comply as are not reasonably likely to have a Material Adverse Effect. Neither the Parent nor any of its Subsidiaries is in any respect in noncompliance with, breach of or default under any applicable writ, order, judgment, injunction, or decree to which the Parent or such Subsidiary is a party or which would affect the ability of the Parent or such Subsidiary to operate any Vessel, Real Property or other facility and no event has occurred and is continuing which, with the passage of time or the giving of notice or both, would constitute noncompliance, breach of or default thereunder, except in each such case, such noncompliance, breaches or defaults as are not likely to, individually or in the aggregate, have a Material Adverse Effect. There are, as of the Restatement Effective Date, no Environmental Claims pending or, to the knowledge of the Parent or the Borrower, threatened, against the Parent or any of its Subsidiaries in respect of which an unfavorable decision, ruling or finding would be reasonably likely to have a Material Adverse Effect. There are no facts, circumstances, conditions or occurrences on any Vessel, Real Property or other facility owned or operated by the Parent or any of its Subsidiaries that are reasonably likely (i) to form the basis of an Environmental Claim against the Parent, any of its Subsidiaries or any Vessel, Real Property or other facility owned by the Parent or any of its Subsidiaries, or (ii) to cause such Vessel, Real Property or other facility to be subject to any restrictions on its ownership, occupancy, use or transferability under any Environmental Law, except in each such case for clauses (i) and (ii) above, such Environmental Claims or restrictions that individually or in the aggregate are not reasonably likely to have a Material Adverse Effect.

(b)     Hazardous Materials have not at any time prior to the date of this Agreement or any subsequent Borrowing, been (i) generated, used, treated or stored on, or transported to or from, any Vessel, Real Property or other facility at any time owned or operated by the Parent or any of its Subsidiaries or (ii) released on or from any such Vessel, Real Property

or other facility, except in each case for clauses (i) and (ii) above where such occurrence or event, either individually or in the aggregate, is reasonably likely to have a Material Adverse Effect.

This Section 7.17 contains the sole and exclusive representations and warranties of the Credit Parties with respect to environmental, health and safety matters, including any relating to or arising under Environmental Laws, Environmental Claims or Hazardous Materials.

7.18 <u>Labor Relations</u>. Neither the Parent nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect and there is (i) no unfair labor practice complaint pending against the Parent or any of its Subsidiaries or, to the Parent's knowledge, threatened against any of them before the National Labor Relations Board, and no material grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Parent or any of its Subsidiaries or, to the Parent's knowledge, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against the Parent or any of its Subsidiaries or, to the Parent's knowledge, threatened against the Parent or any of its Subsidiaries and (iii) no union representation proceeding pending with respect to the employees of the Parent or any of its Subsidiaries, except (with respect to the matters specified in clauses (i), (ii) and (iii) above) as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.19 <u>Patents, Licenses, Franchises and Formulas</u>. The Parent and each of its Subsidiaries owns, or has the right to use, and has the right to enforce and prevent any third party from using, all material patents, trademarks, permits, service marks, trade names, copyrights, licenses, franchises and formulas, and has obtained assignments of all leases and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others, except for such failures and conflicts which could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

7.20 <u>Indebtedness</u>. Schedule V sets forth a true and complete list of all Indebtedness of the Parent and its Subsidiaries as of the Restatement Effective Date (other than Indebtedness under the Other Credit Documents) and which is to remain outstanding after giving effect to the Restatement Effective Date (the "<u>Existing Indebtedness</u>"), in each case showing the aggregate principal amount thereof and the name of the borrower and any other entity which directly or indirectly guarantees such debt.

7.21 <u>Insurance</u>. Schedule VI sets forth a true and complete listing of all insurance maintained by each Credit Party as of the Restatement Effective Date, with the amounts insured (and any deductibles) set forth therein (the "<u>Required Insurance</u>").

7.22 <u>Concerning the Collateral Vessels</u>. The name, registered owner (which shall be a Subsidiary Guarantor), official number, and jurisdiction of registration and flag (which shall be in an Acceptable Flag Jurisdiction) of each Collateral Vessel is set forth on <u>Schedule III</u>. Each Collateral Vessel is and will be operated in compliance with all applicable law, rules and regulations, except such noncompliance as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.23 <u>Citizenship</u>. The Parent and each other Credit Party which owns or operates, or will own or operate, one or more Collateral Vessels is, or will be, qualified to own and operate such Collateral Vessels under the laws of the Republic of the Marshall Islands, the Republic of Liberia or Bermuda, as applicable, or such other jurisdiction in which any such Collateral Vessels are permitted, or will be permitted, to be flagged in accordance with the terms of the respective Collateral Vessel Mortgages and the respective Secondary Collateral Vessel Mortgages.

7.24 <u>Collateral Vessel Classification; Flag</u>. Each Collateral Vessel is (i) or will be, classified in the highest class available for Vessels of its age and type with a classification society listed on <u>Schedule X</u> hereto or another internationally recognized classification society acceptable to the Collateral Agent, free of any conditions or recommendations, other than as permitted, or will be permitted, under the Collateral Vessel Mortgage or the Secondary Collateral Vessel Mortgage, as applicable, and (ii) flagged in an Acceptable Flag Jurisdiction.

7.25 <u>No Immunity</u>. The Parent does not, nor does any other Credit Party or any of their respective properties, have any right of immunity on the grounds of sovereignty or otherwise from the jurisdiction of any court or from setoff or any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) under the laws of any jurisdiction. The execution and delivery of the Credit Documents by the Credit Parties and the performance by them of their respective obligations thereunder constitute commercial transactions.

7.26 <u>Fees and Enforcement</u>. No fees or taxes, including, without limitation, stamp, transaction, registration or similar taxes, are required to be paid to ensure the legality, validity, or enforceability of this Agreement or any of the other Credit Documents other than recording taxes which have been, or will be, paid by the Parent or any of its Subsidiaries as and to the extent due. Under the laws of the Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia (or any other Acceptable Flag Jurisdiction), as applicable, the choice of the laws of the State of New York as set forth in the Credit Documents which are stated to be governed by the laws of the State of New York is a valid choice of law, and the irrevocable submission by each Credit Party to jurisdiction and consent to service of process and, where necessary, appointment by such Credit Party of an agent for service of process, in each case as set forth in such Credit Documents, is legal, valid, binding and effective.

7.27 <u>Form of Documentation</u>. Each of the Credit Documents is, or when executed will be, in proper legal form under the laws of the Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia (or any other applicable Acceptable Flag Jurisdiction), as applicable, for the enforcement thereof under such laws, subject only to such matters which may affect enforceability arising under the law of the State of New York. To ensure the legality, validity, enforceability or admissibility in evidence of each such Credit Document in the Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia (or any other applicable Acceptable Flag Jurisdiction), as applicable, it is not necessary that any Credit Document or any other document be filed or recorded with any court or other authority in the Republic of the Marshall Islands, the United

Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia (or any other applicable Acceptable Flag Jurisdiction), as applicable, or notarized or executed under seal, or physically executed in any such jurisdiction, except as have been made, or will be made, in accordance with Section 12.10.

7.28 Solvency. After giving effect to (a) the Loans, (b) the consummation of the Transaction and (c) the payment and accrual of all transaction costs in connection with the foregoing, the Parent and its Subsidiaries taken as a whole and the Borrower and its Subsidiaries, taken as a whole, are solvent.

7.29 Patriot Act. No Credit Party (and, to the knowledge of each Credit Party, no joint venture or Subsidiary thereof) is in violation of any United States law relating to terrorism, sanctions or money laundering, including the United States Executive Order No. 13224 on Terrorist Financing and the Patriot Act.

7.30 Certain Business Practices. To the knowledge of the Parent, neither the Parent nor any of its Subsidiaries (nor any of their respective officers, directors or employees) (a) has made or agreed to make any contribution, payment, gift or entertainment to, or accepted or received any contributions, payments, gifts or entertainment from, any government official, employee, political party or agent or any candidate for any federal, state, local or foreign public office, where either the contribution, payment or gift or the purpose thereof was illegal under the laws of any federal, state, local or foreign jurisdiction; or (b) has engaged in or otherwise participated in, assisted or facilitated any transaction that is prohibited by any applicable embargo or related trade restriction imposed by the United States Office of Foreign Assets Control or any other agency of the United States government.

SECTION 8. Affirmative Covenants. Each of the Parent, the Borrower, GMSC and Arlington hereby covenants and agrees that on and after the Restatement Effective Date, and until the Loans and Notes, together with interest and all other obligations incurred hereunder and thereunder, are paid in full:

8.01 Information Covenants. The Parent will make available to the Administrative Agent, with sufficient copies for each of the Lenders:

(a) Quarterly Financial Statements. Within 45 days after the close of the first three quarterly accounting periods in each fiscal year of the Parent (provided that for the first fiscal quarter following the Restatement Effective Date, such delivery shall be within 60 days after the end of such fiscal quarter), (i) the consolidated balance sheets of the Parent and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of operations and cash flows, in each case for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, and in each case, setting forth comparative figures for the related periods in the prior fiscal year, all of which shall be certified by the senior financial officer of the Parent, subject to normal year-end audit adjustments and (ii) management's discussion and analysis of the important operational and financial developments during the fiscal quarter and year-to-date periods.

(b)   Annual Financial Statements. Within (a) 90 days after the close of each fiscal year of the Parent in which any of Parent's securities are listed on a nationally recognized securities exchange and (b) 120 days after the close of each fiscal year of Parent (provided, that for the first fiscal year following the Restatement Effective Date, such delivery shall be within 150 days after the end of such fiscal year) in which none of Parent's securities are listed on a nationally recognized securities exchange, (i) the consolidated balance sheets of the Parent and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of operations and retained earnings and of cash flows for such fiscal year setting forth comparative figures for the preceding fiscal year and certified by Deloitte & Touche LLP or such other independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent, together with a report of such accounting firm stating that in the course of its regular audit of the financial statements of the Parent and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge of any Default or Event of Default pursuant to the Financial Covenants, which has occurred and is continuing or, if in the opinion of such accounting firm such a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal year.

(c)   Monthly Financial Statements. Within 30 days after the end of each of the first two calendar months of each fiscal quarter of the Parent occurring prior to the Trigger Date, the unaudited trial balance sheets of the Parent and its Subsidiaries as at the end of such month, and setting forth comparative figures for the prior calendar month, all of which shall be certified by the senior financial officer of the Parent, subject to normal year-end audit adjustments and including normal recurring adjustments; provided, however, that in no event will the Parent be required to deliver such unaudited trial balance sheets if, at the end of any such month, the Parent and its Subsidiaries have a Loan to Value Ratio of no greater than 0.60 to 1.00.

(d)   Appraisal Reports. Together with delivery of the compliance certificates described in Section 8.01(f) required in connection with each fiscal quarter in each fiscal year of the Parent, and at any other time within 33 days of the written request of the Administrative Agent, appraisal reports dated no more than 30 days prior to the date of delivery of such compliance certificate or such request, as applicable, in form and substance reasonably satisfactory to the Administrative Agent and from two Approved Appraisers stating the then current Fair Market Value of each of the Collateral Vessels. All such appraisals shall be conducted by, and made at the expense of, the Borrower (it being understood that the Administrative Agent may and, at the request of the Required Lenders, shall, upon notice to the Borrower, obtain such appraisals and that the cost of all such appraisals will be for the account of the Borrower); provided that, unless an Event of Default shall then be continuing, in no event shall the Borrower be required to pay for more than four appraisal reports obtained pursuant to this Section 8.01(d) in any single fiscal year of the Borrower, with the cost of any such reports in excess thereof to be paid by the Lenders on a pro rata basis.

(e)   Projections, Budget, etc. (i) As soon as available but not less than 30 days prior to the commencement of each fiscal year of the Parent beginning with its fiscal year commencing on January 1, 2013, a preliminary budget of the Parent and its Subsidiaries in reasonable detail for each of the twelve months and four fiscal quarters of such fiscal year, and

-57-

(ii) as soon as available but not more than 45 days after the commencement of each fiscal year of the Parent beginning with its fiscal year commencing on January 1, 2013, (x) a budget of the Parent and its Subsidiaries in reasonable detail for each of the twelve months and four fiscal quarters of such fiscal year and (y) the Projections referred to in Section 7.05(c) in reasonable detail for the subsequent three fiscal years including the fiscal year in which such Projections are being delivered. It is recognized by each Lender and the Administrative Agent that such projections and determinations provided by the Parent, although reflecting the Parent's good faith projections and determinations, are not to be viewed as facts and that actual results covered by any such determination may differ from the projected results.

(f)    Officer's Compliance Certificates. (i) At the time of the delivery of the financial statements provided for in Sections 8.01(a) and (b), a certificate of the senior financial officer of the Parent in the form of Exhibit L to the effect that, to the best of such officer's knowledge, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof (in reasonable detail), which certificate shall, (x) set forth the calculations required to establish whether the Parent was in compliance with the Financial Covenants at the end of such fiscal quarter or year, as the case may be and (y) certify that there have been no changes to any of Schedule VIII and Annexes A through F of the Pledge Agreement, the Parent Pledge Agreement or the Secondary Pledge Agreement, as the case may be, or, if later, since the date of the most recent certificate delivered pursuant to this Section 8.01(f)(i), or if there have been any such changes, a list in reasonable detail of such changes (but, in each case with respect to this clause (y), only to the extent that such changes are required to be reported to the Collateral Agent pursuant to the terms of such Security Documents) and whether the Parent and the other Credit Parties have otherwise taken all actions required to be taken by them pursuant to such Security Documents in connection with any such changes.

(ii)    At the time of a Collateral Disposition in respect of any Primary Collateral Vessel, a certificate of a senior financial officer of the Parent which certificate shall (x) certify on behalf of the Parent the last appraisal reports received pursuant to Section 8.01(d) determining the Aggregate Primary Collateral Vessel Value after giving effect to such disposition and/or showing the individual Fair Market Value of all Collateral Vessels owned by the Subsidiary Guarantors which have not been sold, transferred, lost or otherwise disposed of at such time, and (y) set forth the calculations required to establish whether the Parent is in compliance with the provisions of Section 9.09 after giving effect to such disposition.

(g)    Notice of Default, Litigation or Event of Loss. Promptly, and in any event within three Business Days after the Parent obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or Event of Default which notice shall specify the nature thereof, the period of existence thereof and what action the Parent proposes to take with respect thereto, (ii) any litigation or governmental investigation or proceeding pending or threatened in writing against the Parent or any of its Subsidiaries which, if adversely determined, could reasonably be expected to have a Material Adverse Effect or any Document and (iii) any Event of Loss in respect of any Collateral Vessel.

(h)    Other Reports and Filings. Promptly, copies of all financial information, proxy materials and other information and reports, if any, which the Parent or any of its

-58-

Subsidiaries shall file with the Securities and Exchange Commission (or any successor thereto) or deliver to holders of its Indebtedness pursuant to the terms of the documentation governing such Indebtedness (or any trustee, agent or other representative therefor).

(i)     Material Breach; Other Debt Documents.   Promptly upon, and in any event within five Business Days after, without duplication of any other reporting requirements herein, receipt of any notices of default, financial reporting and collateral reporting under the Other Credit Documents, and copies of all effectuated additions, amendments, restatements, supplements or other modifications in respect of the Other Credit Documents.

(j)     Environmental Matters.   Promptly upon, and in any event within fifteen Business Days after, the Parent obtains knowledge thereof, written notice of any of the following environmental matters occurring after the Restatement Effective Date, except to the extent that such environmental matters could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect:

(i)     any Environmental Claim pending or threatened in writing against the Parent or any of its Subsidiaries or any Collateral Vessel or property owned or operated or occupied by the Parent or any of its Subsidiaries;

(ii)     any condition or occurrence on or arising from any Collateral Vessel or property owned or operated or occupied by the Parent or any of its Subsidiaries that (a) results in noncompliance by the Parent or such Subsidiary with any applicable Environmental Law or (b) could reasonably be expected to form the basis of an Environmental Claim against the Parent or any of its Subsidiaries or any such Collateral Vessel or property;

(iii)     any condition or occurrence on any Collateral Vessel or property owned or operated or occupied by the Parent or any of its Subsidiaries that could reasonably be expected to cause such Collateral Vessel or property to be subject to any restrictions on the ownership, occupancy, use or transferability by the Parent or such Subsidiary of such Collateral Vessel or property under any Environmental Law; and

(iv)     the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Collateral Vessel or property owned or operated or occupied by the Parent or any of its Subsidiaries as required by any Environmental Law or any governmental or other administrative agency; provided that in any event the Parent shall deliver to the Administrative Agent all material notices received by the Parent or any of its Subsidiaries from any government or governmental agency under, or pursuant to, CERCLA or OPA.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Parent's or such Subsidiary's response thereto.   In addition, the Parent will provide the Administrative Agent with copies of all material communications with any government or governmental agency and all material communications with any Person relating to any Environmental Claim of which notice is required to be given pursuant to this Section 8.01(j), and such detailed reports of any such

-59-

Environmental Claim as may reasonably be requested by the Administrative Agent or the Required Lenders.

(k)   Management Letters.   Promptly after Parent's or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(l)   Cash Flow Projections.   On the Restatement Effective Date and monthly thereafter until the Trigger Date, cash flow projections for the Parent and its Subsidiaries (the "Cash Flow Projections") for the 13-week period beginning on the Business Day on which such Cash Flow Projections are due, which Cash Flow Projections shall (i) be based on information available, and projections made, as of the last Business Day of the immediately preceding calendar month and (ii) include a variance report describing in reasonable detail the variance(s) in actual cash flow from projected cash flow for the month ended on such last Business Day; provided, however, that in no event will the Parent be required to deliver such Cash Flow Projections if, at the end of any such month, the Parent and its Subsidiaries have a Loan to Value Ratio of no greater than 0.60 to 1.00.

(m)   Excess Liquidity Calculations.   On or before the tenth day (or, if such day is not a Business Day, on the next succeeding Business Day) after each Payment Date, a certificate of the senior financial officer of the Parent substantially in the form of Exhibit Q, which certificate shall set forth the calculations required to determine the Excess Liquidity, if any, for such Payment Date.

(n)   Non-Recourse Subsidiaries.   Promptly upon, and in any event within five Business Days after delivery thereof, without duplication of any other reporting requirements herein, any periodic financial reports provided to the lenders under any documents evidencing Non-Recourse Indebtedness or any notices of default provided thereunder.

(o)   Other Information.   From time to time, such other information or documents (financial or otherwise) with respect to the Parent, its Subsidiaries or its Non-Recourse Subsidiaries as the Administrative Agent or the Required Lenders may reasonably request in writing.

8.02 Books, Records and Inspections.   The Parent will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries, in conformity in all material respects with GAAP and all requirements of law, shall be made of all dealings and transactions in relation to its business. The Parent will, and will cause each of its Subsidiaries to, permit officers and designated representatives of the Administrative Agent and the Lenders as a group to visit and inspect, during regular business hours and under guidance of officers of the Parent or any of its Subsidiaries, any of the properties of the Parent or its Subsidiaries, and to examine the books of account of the Parent or such Subsidiaries and discuss the affairs, finances and accounts of the Parent or such Subsidiaries with, and be advised as to the same by, its and their officers and, in the presence of the Parent, independent accountants, all upon reasonable advance notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or the Required Lenders may request; provided that, unless an Event of Default exists and is continuing at such time, the Administrative Agent

and the Lenders shall not be entitled to request more than two such visitations and/or examinations in any fiscal year of the Parent.

8.03 Maintenance of Property; Insurance. The Parent will, and will cause each of its Subsidiaries to, (i) keep all material property necessary in its business in good working order and condition (ordinary wear and tear and loss or damage by casualty or condemnation excepted), (ii) maintain insurance on the Collateral Vessels in at least such amounts and against at least such risks as are in accordance with (a) normal industry practice for similarly situated insureds and (b) the requirements set forth in Section 8.06, and (iii) furnish to the Administrative Agent, at the written request of the Administrative Agent or any Lender, a complete description of the material terms of insurance carried. In addition to the requirements of the immediately preceding sentence, the Parent will at all times cause the Required Insurance to (x) be maintained on the Collateral Vessels (with the same scope of coverage as that described in Schedule VI) at levels which are at least as great as the respective amount described on Schedule VI and (y) comply with the insurance requirements of the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages, as applicable.

8.04 Corporate Franchises. The Parent will, and will cause each of its Subsidiaries, to do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and its material rights, franchises, licenses and patents (if any) used in its business, except, in the case of any Subsidiary of the Parent that is not a Guarantor, which could not be reasonably expected to have a Material Adverse Effect; provided, however, that nothing in this Section 8.04 shall prevent (i) sales or other dispositions of assets, consolidations or mergers by or involving the Parent or any of its Subsidiaries which are permitted in accordance with Section 9.02, (ii) any Subsidiary Guarantor from changing the jurisdiction of its organization to the extent permitted by Section 9.11 or (iii) the abandonment by the Parent or any of its Subsidiaries of any rights, franchises, licenses and patents that could not be reasonably expected to have a Material Adverse Effect.

8.05 Compliance with Statutes, etc. The Parent will, and will cause each of its Subsidiaries and each of its Non-Recourse Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions (including all laws and regulations relating to money laundering) imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such non-compliances as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.06 Compliance with Environmental Laws. (a) The Parent will, and will cause each of its Subsidiaries and each of its Non-Recourse Subsidiaries to, comply in all material respects with all Environmental Laws applicable to the ownership or use of any Collateral Vessel or any other Vessel or property now or hereafter owned or operated by the Parent or any of its Subsidiaries or any of its Non-Recourse Subsidiaries, will within a reasonable time period pay or cause to be paid all costs and expenses incurred in connection with such compliance (except to the extent being contested in good faith), and will keep or cause to be kept all such Collateral Vessels or Vessels or property free and clear of any Liens imposed pursuant to such Environmental Laws, in each of the foregoing cases, except to the extent any failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse

-61-

Effect. None of the Parent, any of Subsidiaries of the Parent or any Non-Recourse Subsidiaries of the Parent will generate, use, treat, store, release or dispose of, or permit the generation, use, treatment, storage, release or disposal of, Hazardous Materials on any Collateral Vessel or Vessel or property now or hereafter owned or operated or occupied by the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any ports or property except in material compliance with all applicable Environmental Laws and as reasonably required by the trade in connection with the operation, use and maintenance of any such property or otherwise in connection with their businesses or except to the extent the same could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Parent will, and will cause each of its Subsidiaries and each of its Non-Recourse Subsidiaries to, maintain insurance on the Collateral Vessels and any other Vessel in at least such amounts as are in accordance with normal industry practice for similarly situated insureds, against losses from oil spills and other environmental pollution.

(b)     At the written request of the Administrative Agent or the Required Lenders, which request shall specify in reasonable detail the basis therefor, the Parent or the Borrower will provide, at the Parent or the Borrower's sole cost and expense, an environmental assessment of any Primary Collateral Vessel by such Primary Collateral Vessel's classification society (to the extent such classification society is listed on Schedule X) or another internationally recognized classification society reasonably acceptable to the Administrative Agent. If said classification society, in its assessment, indicates that such Primary Collateral Vessel is not in compliance with the Environmental Laws, said society shall set forth potential costs of the remediation of such non-compliance; provided that such request for an assessment may be made only if (i) there has occurred and is continuing an Event of Default, (ii) the Administrative Agent or the Required Lenders reasonably and in good faith believe that the Parent, any of its Subsidiaries or any such Primary Collateral Vessel is not in compliance with Environmental Law and such non-compliance could reasonably be expected to have a Material Adverse Effect, or (iii) the Administrative Agent or the Required Lenders reasonably and in good faith believe that circumstances exist that reasonably could be expected to form the basis of a material Environmental Claim against the Parent or any of its Subsidiaries or any such Primary Collateral Vessel. If the Parent or the Borrower fails to provide the same within 90 days after such request was made, the Administrative Agent may order the same and the Parent or the Borrower shall grant and hereby grants to the Administrative Agent and the Lenders and their agents reasonable access to such Primary Collateral Vessel and specifically grants the Administrative Agent and the Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment, all at the Parent or the Borrower's expense.

8.07 ERISA. As soon as reasonably possible and, in any event, within ten (10) days after the Parent or any of its Subsidiaries or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following, the Parent will deliver to the Administrative Agent, with sufficient copies for each of the Lenders, a certificate of the senior financial officer of the Parent setting forth the full details as to such occurrence and the action, if any, that the Parent, such Subsidiary or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given to or filed with or by the Parent, the Subsidiary, the ERISA Affiliate, the PBGC, a Plan participant or the Plan administrator with respect thereto: that a Reportable Event has occurred (except to the extent that the Parent has previously delivered to the Administrative Agent a certificate and notices (if any) concerning such event pursuant to the

-62-

next clause hereof); that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; that a failure to satisfy minimum funding requirements, within the meaning of Section 412 of the Code or Section 302 of ERISA, has occurred or an application may be or has been made for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 or 430 of the Code or Section 302 or 303 of ERISA with respect to a Plan; that the actuary of a Plan (other than a Multiemployer Plan) has or will certify that the Plan is an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; that a Plan which is a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; that any contribution required to be made with respect to a Plan or Foreign Pension Plan has not been timely made and such failure could result in a material liability for the Parent or any of its Subsidiaries; that a Plan has been or may be reasonably expected to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA with a material amount of unfunded benefit liabilities; that a Plan (in the case of a Multiemployer Plan, to the best knowledge of the Parent or any of its Subsidiaries or ERISA Affiliates) has a material Unfunded Current Liability; that proceedings may be reasonably expected to be or have been instituted by the PBGC to terminate or appoint a trustee to administer a Plan which is subject to Title IV of ERISA; that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a material delinquent contribution to a Plan; that the Parent, any of its Subsidiaries or any ERISA Affiliate will or may reasonably expect to incur any material liability (including any indirect, contingent, or secondary liability) to or on account of the termination of or withdrawal from a Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or with respect to a Plan under Section 436(f), 4971, 4975 or 4980 of the Code or Section 409 or 502(i) or 502(l) of ERISA or with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code; or that the Parent, or any of its Subsidiaries may incur any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan or any Foreign Pension Plan.   Upon request, the Parent will deliver to the Administrative Agent with sufficient copies to the Lenders (i) a complete copy of the annual report (on Internal Revenue Service Form 5500-series) of each Plan (including, to the extent required, the related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information) required to be filed with the Internal Revenue Service and (ii) copies of any records, documents or other information that must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA.   In addition to any certificates or notices delivered to the Lenders pursuant to the first sentence hereof, copies of annual reports and any records, documents or other information required to be furnished to the PBGC, and any notices received by the Parent, any of its Subsidiaries or any ERISA Affiliate with respect to any Plan or Foreign Pension Plan with respect to any circumstances or event that could reasonably be expected to result in a material liability shall be delivered to the Lenders no later than ten (10) days after the date such annual report has been filed with the Internal Revenue Service or such records, documents and/or information has been furnished to the PBGC or such notice has been received by the Parent, such Subsidiary or such ERISA Affiliate, as applicable.

8.08 <u>End of Fiscal Years; Fiscal Quarters</u>. The Parent shall cause (i) each of its, and each of its Subsidiaries', fiscal years to end on December 31 of each year and (ii) each of its and its Subsidiaries' fiscal quarters to end on March 31, June 30, September 30 and December 31 of each year.

8.09 <u>Performance of Obligations</u>. The Parent will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement and other debt instrument (including, without limitation, the Documents) by which it is bound, except to the extent waived by the parties thereto and except such non-performances as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.10 <u>Payment of Taxes</u>. The Parent will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all material taxes, assessments and governmental charges or levies that become due and payable which are imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims for sums that have become due and payable which, if unpaid, might become a Lien not otherwise permitted under Section 9.01(i), <u>provided</u> that neither the Parent nor any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

8.11 <u>Further Assurances</u>.   (a)   The Parent will, and will cause each of its Subsidiaries to, cause each Collateral and Guaranty Requirement to be satisfied at all times.

(b)   The Parent, on behalf of itself and each other Credit Party, agrees that at any time and from time to time, at the expense of the Parent or such other Credit Party, it will promptly execute and deliver all further instruments and documents, and take all further action that may be reasonably necessary, or that the Administrative Agent may reasonably require, to perfect and protect any Lien granted or purported to be granted hereby or by the other Credit Documents, or to enable the Collateral Agent to exercise and enforce its rights and remedies with respect to any Collateral. Without limiting the generality of the foregoing, the Parent will, and will cause each Credit Party to, execute (to the extent applicable) and file, or cause to be filed, such financing or continuation statements under the UCC (or any non-U.S. equivalent thereto), or amendments thereto, such amendments or supplements to the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages (including any amendments required to maintain Liens granted by such Collateral Vessel Mortgages and such Secondary Collateral Vessel Mortgages pursuant to the effectiveness of this Agreement), and such other instruments or notices, as may be reasonably necessary, or that the Administrative Agent may reasonably require, to protect and preserve the Liens granted or purported to be granted hereby and by the other Credit Documents.

(c)   Each Credit Party hereby authorizes the Collateral Agent to file one or more financing or continuation statements under the UCC (or any non-U.S. equivalent thereto), and amendments thereto, relative to all or any part of the Collateral, where permitted by law. The Collateral Agent will promptly send each Credit Party a copy of any financing or

continuation statements which it may file and the filing or recordation information with respect thereto.

(d)   If at any time any Subsidiary of the Parent owns a Collateral Vessel or owns, directly or indirectly, an interest in any Subsidiary which owns a Collateral Vessel and such Subsidiary has not otherwise satisfied the Collateral and Guaranty Requirements, the Parent will cause such Subsidiary (and any Subsidiary which directly or indirectly owns the Equity Interests of such Subsidiary to the extent not a Credit Party) to satisfy the Collateral and Guaranty Requirements with respect to each relevant Collateral Vessel as such Subsidiary would have been required to satisfy pursuant to Section 12.10 of this Agreement had such Subsidiary been a Credit Party on or prior to the Restatement Effective Date.

8.12 Deposit of Earnings.  Each Credit Party shall cause the earnings derived from each of the respective Collateral Vessels, to the extent constituting Earnings and Insurance Collateral or Secondary Earnings and Insurance Collateral, to be deposited by the respective account debtor in respect of such earnings into one or more of the Concentration Accounts maintained for such Credit Party from time to time.  Without limiting any Credit Party's obligations in respect of this Section 8.12, each Credit Party agrees that, in the event it receives any earnings constituting Earnings and Insurance Collateral or Secondary Earnings and Insurance Collateral, or any such earnings are deposited other than in one of the Concentration Accounts, it shall promptly deposit all such proceeds into one of the Concentration Accounts maintained for such Credit Party from time to time.

8.13 Ownership of Subsidiaries.  (a) Other than "director qualifying shares", the Parent shall at all times directly or indirectly own 100% of the Equity Interests of GMSC, Arlington, the Borrower and each of the Subsidiary Guarantors.

(b)   The Parent shall cause each Subsidiary Guarantor to at all times be directly owned by one or more Credit Parties.

(c)   The Parent will cause each Collateral Vessel to be owned at all times by a single Subsidiary Guarantor that owns no other Collateral Vessels.

8.14 Flag of Collateral Vessels; Citizenship; Collateral Vessel Classifications. (a) The Parent shall, and shall cause each Credit Party that owns a Collateral Vessel to, cause each Collateral Vessel to be registered under the laws and flag of (t) the Bahamas, (u) the Republic of Malta, (v) the Republic of Liberia, (w) the Republic of the Marshall Islands, (x) Bermuda, (y) the United Kingdom or (z) such other jurisdiction as is acceptable to the Required Lenders (each jurisdiction in clauses (t) through and including (z), an "Acceptable Flag Jurisdiction").  Notwithstanding the foregoing, any Credit Party may transfer a Collateral Vessel to another Acceptable Flag Jurisdiction pursuant to a Flag Jurisdiction Transfer.

(b)   The Parent will, and will cause each Subsidiary Guarantor which owns or operates a Collateral Vessel to, be qualified to own and operate such Collateral Vessel under the laws of the Bahamas, the Republic of Malta, the Republic of Liberia, the Republic of the Marshall Islands, Bermuda, the United Kingdom, or such other jurisdiction in which such

-65-

Collateral Vessel is permitted to be flagged in accordance with the terms of the related Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable.

(c)    The Parent will, and will cause each Subsidiary Guarantor which owns or operates a Collateral Vessel to, cause each Collateral Vessel to be classified in the highest class available for Vessels of its age and type with a classification society listed on Schedule X or another internationally recognized classification society acceptable to the Administrative Agent, free of any material conditions or recommendations.

8.15  Use of Proceeds.  The Borrower will use the proceeds of the Loans only as provided in Section 7.08.

SECTION 9.  Negative Covenants.  Each of the Parent, the Borrower, GMSC and Arlington hereby covenants and agrees that on and after the Restatement Effective Date, and until the Loans and Notes, together with interest and all other Obligations incurred hereunder and thereunder, are paid in full:

9.01  Liens.  The Parent will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to (I) prior to the Trigger Date and at any time that the Parent and its Subsidiaries have a Loan to Value Ratio of greater than 0.60 to 1.00, any property or assets (real or personal, tangible or intangible) of the Parent or any of its Subsidiaries and (II) on and after the Trigger Date and at any time that the Parent and its Subsidiaries have a Loan to Value Ratio of no greater than 0.60 to 1.00, any Collateral (the property and assets described in clause (I) or (II), as applicable, the "Applicable Property"), whether now owned or hereafter acquired, or sell any such Applicable Property subject to an understanding or agreement, contingent or otherwise, to repurchase such Applicable Property (including sales of accounts receivable with recourse to the Parent or any of its Subsidiaries), or assign any right to receive income or permit the filing of any financing statement under the UCC or any other similar notice of Lien under any similar recording or notice statute; provided that the provisions of this Section 9.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "Permitted Liens"):

(i)    inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(ii)    Liens in respect of the Applicable Property imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of the Applicable Property do not materially impair the use thereof in the operation of the business of the Parent or such Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the Applicable Property subject to any such Lien;

(iii)     Liens in existence on the Restatement Effective Date which are listed, and the property subject thereto described, on Schedule IV, without giving effect to any renewals or extensions of such Liens, provided that the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding on the Restatement Effective Date, less any repayments of principal thereof;

(iv)     Permitted Encumbrances;

(v)     Liens created pursuant to the Security Documents;

(vi)     Liens arising out of judgments, awards, decrees or attachments with respect to which the Parent or any of its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review, provided that the aggregate amount of all such judgments, awards, decrees or attachments shall not constitute an Event of Default under Section 10.09;

(vii)     Liens (other than any Lien imposed by ERISA) incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, Liens to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations in each case incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money) and Liens arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; provided that the aggregate value of all cash and property at any time encumbered pursuant to this clause (vii) shall not exceed $5,000,000;

(viii)     Liens in respect of seamen's wages which are not past due and other maritime Liens for amounts not past due arising in the ordinary course of business and not yet required to be removed or discharged under the terms of the respective Collateral Vessel Mortgages;

(ix)     Liens on the Applicable Property securing the obligations under the Other Credit Agreement (and any interest rate protection agreement or other hedging agreement entered into in connection therewith), provided that such Liens are subject to the provisions of the Intercreditor Agreements;

(x)     Liens placed upon equipment or machinery acquired after the Restatement Effective Date and used in the ordinary course of business of the Borrower or any of its Subsidiaries and placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within 90 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 9.04 and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any asset of the Parent or any other asset of the Borrower or such Subsidiary;

-67-

(xi)     easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Parent or any of its Subsidiaries;

(xii)    Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(xiii)   statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(xiv)    Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(xv)     Liens (x) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods; and

(xvi)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Parent or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements.

(xvii)   to the extent required by the Other Credit Agreement or permitted by Section 9.04(v), Liens in respect of the cash collateralization of the Existing Letters of Credit (as defined in the Other Credit Agreement);

(xviii)  Liens securing obligations in respect of Indebtedness permitted pursuant to Section 9.04(v) (including any Liens on cash required to cash collateralize letters of credit permitted pursuant to Section 9.04(v) in an aggregate amount not to exceed $5,000,000 at any time); provided that at no time will any Indebtedness incurred by the Parent or any of its Subsidiaries from Oaktree Capital Management L.P. or any of its Affiliates be permitted to be secured pursuant to this clause (xviii); and

(xix)    Liens permitted at the time they were created.

In connection with the granting of Liens described above in this Section 9.01 by the Parent or any of its Subsidiaries, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including, without limitation, by executing appropriate lien subordination agreements in favor of the holder or holders of such Liens, in respect of the item or items of equipment or other assets subject to such Liens).

9.02 <u>Consolidation, Merger, Sale of Assets, etc.</u> The Parent will not, and will not permit any of its Subsidiaries to wind up, liquidate or dissolve its affairs or enter into any transaction of merger, consolidation or amalgamation, or convey, sell, lease or otherwise dispose of (or agree to do any of the foregoing at any future time) all or substantially all of its assets (other than Margin Stock) or any of the Collateral, or enter into any sale-leaseback transactions involving any of the Collateral (or agree to do so at any future time), except that:

(i)      the Parent and each of its Subsidiaries may sell, lease or otherwise dispose of any Primary Collateral Vessels, <u>provided</u> that (I)(x)(A) such sale is made at Fair Market Value (as determined in accordance with the appraisal report most recently delivered to the Administrative Agent (or obtained by the Administrative Agent) pursuant to Section 8.01(d) or delivered at the time of such sale to the Administrative Agent by the Parent), (B) 100% of the consideration in respect of such sale shall consist of cash or Cash Equivalents (unless the Primary Collateral Vessel is being sold to the Parent or a Subsidiary of the Parent, in which case the sale shall consist of cash only) received by the Borrower, or to the respective Subsidiary Guarantor which owned such Primary Collateral Vessel, on the date of consummation of such sale and (C) the Net Cash Proceeds of such sale, lease or other disposition shall be applied as required by Section 4.02 to repay the Loans or (y) so long as no Default or Event of Default has occurred and is continuing (or would arise after giving effect thereto) and so long as all representations and warranties made by the Parent and its Subsidiaries pursuant to Section 7 of this Agreement are true and correct both before and after any such exchange, such Primary Collateral Vessel is exchanged for an Acceptable Replacement Vessel pursuant to a Vessel Exchange; <u>provided</u>, <u>further</u>, that in the case of both clauses (x) and (y) above, the Parent shall have delivered to the Administrative Agent an officer's certificate, certified by the senior financial officer of the Parent, demonstrating <u>pro forma</u> compliance (giving effect to such Collateral Disposition and, in the case of calculations involving the appraised value of Collateral Vessels, using valuations consistent with the appraisal report most recently delivered to the Administrative Agent (or obtained by the Administrative Agent) pursuant to Section 8.01(d)) with each of the Financial Covenants for the most recently ended Test Period for which financial statements under Section 8.01(a) or (b) are due; <u>provided</u> that, with respect to any Test Period ending on December 31, the Parent shall deliver unaudited financial statements as at the end of such Test Period at the time of such sale but only if such sale occurs more than 45 days (and less than 90 days) after the end of such Test Period (or at the time of such sale, as applicable) setting forth the calculations required to make such determination in reasonable detail, and (II) at least five Business Days (or such other period as shall be agreed by the Borrower and the Administrative Agent) prior written notice of the proposed sale, lease or other disposition of a Primary Collateral Vessel shall have been given to the Collateral Agent, which notice shall set forth the expected closing date of such sale, lease or other disposition and the date of the corresponding repayment of Loans;

(ii)     subject to compliance with Section 4.02(b) the Parent and its Subsidiaries may sell, lease or otherwise dispose of any Secondary Collateral to the extent such sale, lease or disposition is permitted pursuant to the terms of the Other Credit Agreement and the Intercreditor Agreements; <u>provided</u> that the consent of the Required Lenders shall be required if the Required Lenders (under and as defined in the Other Credit Agreement)

-69-

were required to consent and have consented to the Net Cash Proceeds of such sale, lease or disposition not being applied to repay loans under the Other Credit Agreement;

(iii)     the Parent and its Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, overdue accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale);

(iv)     (A) the Borrower, GMSC, Arlington and any Subsidiary Guarantor may transfer assets or lease to or acquire or lease assets from the Borrower, GMSC, Arlington or any other Subsidiary Guarantor, or any Subsidiary Guarantor may be merged into the Borrower, GMSC, Arlington or any other Subsidiary Guarantor; provided that the Borrower, GMSC, Arlington or such Subsidiary Guarantor, as the case may be, will be a successor in interest to all rights, titles and interest of such merged Subsidiary Guarantor and, in each case so long as all actions necessary or desirable to preserve, protect and maintain the security interest and Lien of the Collateral Agent in any Collateral held by any Person involved in any such transaction are taken to the satisfaction of the Collateral Agent and (B) any Subsidiary of the Parent (other than the Borrower, GMSC, Arlington and any Subsidiary Guarantor) may transfer assets or lease to or acquire or lease assets from any other Subsidiary of the Parent, or any other Subsidiary of the Parent (other than the Borrower, GMSC, Arlington and any Subsidiary Guarantor) may be merged into any other Subsidiary of the Parent, in each case so long as all actions necessary or desirable to preserve, protect and maintain the security interest and Lien of the Collateral Agent in any Collateral held by any Person involved in any such transaction are taken to the satisfaction of the Collateral Agent; and

(v)     following a Collateral Disposition permitted by this Agreement, the Subsidiary Guarantor which owned the Collateral Vessel that is the subject of such Collateral Disposition may dissolve, provided that (x) the Net Cash Proceeds from such Collateral Disposition shall be applied (i) in the case of a Primary Collateral Vessel, as required by Section 4.02 to repay the Loans and (ii) in the case of a Secondary Collateral Vessel, as required by the Other Credit Agreement to repay loans thereunder and hereunder to the extent required pursuant to Section 4.02, (y) all of the proceeds of such dissolution shall be paid only to a Credit Party and (z) no Default or Event of Default is continuing unremedied at the time of such dissolution.

To the extent the Required Lenders (or to the extent required pursuant to Section 12.12(a), all Lenders) waive the provisions of this Section 9.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 9.02, such Collateral (unless sold to the Parent or a Subsidiary of the Parent) shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing. Notwithstanding anything to the contrary contained above, the foregoing covenant shall not be violated as a result of sales of Margin Stock for cash at fair market value (as determined in good faith by the Parent at the time of the respective sale).

9.03 <u>Dividends</u>.  The Parent will not, and will not permit any of its Subsidiaries to, authorize, declare or pay any Dividends with respect to the Parent or any of its Subsidiaries, except that:

(i) (A) any Wholly-Owned Subsidiary of the Parent may pay Dividends to the Parent or any Wholly-Owned Subsidiary of the Parent, (B) any Subsidiary Guarantor may pay Dividends to the Borrower or any other Subsidiary Guarantor and (C) if the respective Subsidiary is not a Wholly-Owned Subsidiary of the Parent, such Subsidiary may pay Dividends to its shareholders generally so long as the Parent and/or its respective Subsidiaries which own Equity Interests in the Subsidiary paying such Dividends receive at least their proportionate share thereof (based upon their relative holdings of the Equity Interests in the Subsidiary paying such cash Dividends and taking into account the relative preferences, if any, of the various classes of Equity Interests of such Subsidiary); and

(ii)   so long as no Event of Default (both before and after giving effect to the payment thereof) has occurred and is continuing, the Parent may repurchase its outstanding Equity Interests (or options to purchase such equity) theretofore held by its or any of its Subsidiaries' employees, officers or directors following the death, disability, retirement or termination of employment of employees, officers or directors of the Parent or any of its Subsidiaries, <u>provided</u> that the aggregate amount expended to so repurchase equity of the Parent shall not exceed $2,000,000 in any fiscal year of the Parent.

9.04 <u>Indebtedness</u>.   The Parent will not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness other than:

(i)   Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(ii)   Indebtedness of the Credit Parties incurred pursuant to the Other Credit Agreement in an aggregate principal amount not to exceed $508,963,260.95[2] at any time outstanding less any repayments thereof made after the Restatement Effective Date;

(iii)   Interest Rate Protection Agreements and Other Hedging Agreements in respect of currencies entered into in the ordinary course of business and consistent with past practices; <u>provided</u> that (x) in the case of Interest Rate Protection Agreements, the term thereof does not extend beyond the Maturity Date and (y) in the case of Other Hedging Agreements in respect of currencies, the term thereof does not exceed six months;

(iv)   Intercompany indebtedness permitted pursuant to Sections 9.05(iii) and 9.05(viii); and

---

[2] Amount to include accrued and unpaid interest on the Specified Swap (as defined in the Original Other Credit Agreement

(v)      Indebtedness evidenced by the Existing Letters of Credit (as defined in the Other Credit Agreement), as such Existing Letters of Credit may be replaced from time to time;

(vi)      so long as no Event of Default then exists or would result therefrom, additional Indebtedness incurred by the Parent, the Borrower or any other Credit Party that does not own a Collateral Vessel at the time such Indebtedness is incurred in an aggregate principal amount not to exceed $10,000,000 (or, in the case of Indebtedness in respect of letters of credit, $5,000,000) at any one time outstanding.

9.05   Advances, Investments and Loans.  The Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any Margin Stock (or other Equity Interests), or make any capital contribution to any other Person (each of the foregoing an "Investment" and, collectively, "Investments"), except that:

(i)      the Parent and its Subsidiaries may acquire and hold accounts receivable owing to any of them and Cash Equivalents;

(ii)      so long as no Event of Default exists or would result therefrom, the Parent and its Subsidiaries may make loans and advances in the ordinary course of business to its employees, officers and directors other than officers and directors of Persons which own Equity Interests, directly or indirectly, of the Parent and constitute Affiliates of the Parent or persons employed by any such Affiliates (not including, for the avoidance of doubt, the operational managers of any Credit Party) so long as the aggregate principal amount thereof at any time outstanding which are made on or after the Original Effective Date (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $2,000,000;

(iii)      the Credit Parties may make intercompany loans and advances among one another, and Subsidiaries of the Parent (other than the Credit Parties) may make intercompany loans and advances to the Parent or any other Subsidiary of the Parent (other than any Non-Recourse Subsidiary), provided that any such loans or advances to a Credit Party pursuant to this clause shall be unsecured and subordinated to the Obligations of the respective Credit Party pursuant to written subordination provisions in the form of Exhibit M;

(iv)      the Parent and its Subsidiaries may sell or transfer assets to the extent permitted by Section 9.02;

(v)      the Parent may make Investments in GMSC, Arlington and the Borrower, and GMSC, Arlington and the Borrower may make equity Investments in the Subsidiary Guarantors;

(vi)      each of Parent, GMSC, Arlington and the Borrower may make Investments in its respective Subsidiaries that are not Subsidiary Guarantors to the extent funded (and only to the extent funded) with the Equity Proceeds Amount; provided that for all Investments made pursuant to this clause (vi), no Event of Default has occurred

-72-

and is continuing (or would arise after giving effect thereto) at the time any such Investment is made unless such Investment is funded with the Net Cash Proceeds of an Equity Investment made no earlier than six months prior to the date on which such Investment is made.

(vii)    Investments existing on the Restatement Effective Date and described on Schedule XI, without giving effect to any additions thereto or replacement thereof; and

(viii)    the Parent may make loans, advances and Investments in other Subsidiaries of the Parent (other than (i) the Credit Parties and (ii) Non-Recourse Subsidiaries);

(ix)    the Parent and its Subsidiaries may make Investments in amounts required to fund charter costs and actual expenses relating to operating Vessels leased or chartered as of the date hereof by General Maritime NSF Corporation, GMR Concord LLC, GMR Contest LLC and GMR Concept LLC, provided that such Investments may only be made in good faith and only to the extent necessary to fund such costs and expenses after taking into account the cash and Cash Equivalents held by such Subsidiary.

9.06 Transactions with Affiliates. The Parent will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of such Person, other than on terms and conditions no less favorable to such Person as would be obtained by such Person at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that:

(i)    Dividends may be paid to the extent provided in Section 9.03;

(ii)    loans and Investments may be made and other transactions may be entered into between the Parent and its Subsidiaries to the extent permitted by Sections 9.04 and 9.05;

(iii)    as long as the Parent has an independent compensation committee, directors' fees as determined by such independent compensation committee and, at any time the Parent does not have an independent compensation committee, the Parent may pay reasonable directors' fees;

(iv)    the Parent and its Subsidiaries may enter into employment agreements or arrangements with their respective officers and employees in the ordinary course of business;

(v)    the Parent and its Subsidiaries may pay management fees to Wholly-Owned Subsidiaries of the Parent in the ordinary course of business; and

(vi)    the transactions in existence on the Restatement Effective Date which are listed on Schedule XII shall be permitted.

9.07 Capital Expenditures. The Parent will not, and will not permit any of its Subsidiaries to, make any Capital Expenditures at any time prior to the Trigger Date and at any

time that the Parent and its Subsidiaries have a Loan to Value Ratio of greater than 0.60 to 1.00, other than (i) maintenance Capital Expenditures incurred in the ordinary course of business or consistent with past practice, (ii) acquisitions of new Vessels and (iii) other Capital Expenditures not in the ordinary course of business, in the case of clauses (ii) and (iii) only to the extent funded (and only to the extent funded) with the Equity Proceeds Amount.  At any time after the Trigger Date provided that the Parent and its Subsidiaries have a Loan to Value Ratio of less than or equal to 0.60 to 1.00 at such time, the Parent and its Subsidiaries may make any Capital Expenditures at such time.

9.08 <u>Minimum Cash Balance</u>.  The Parent will not permit the Unrestricted Cash and Cash Equivalents held by the Parent and its Subsidiaries (other than amounts on deposit in the Blocked Account) to be less than (x) $10,000,000 at any time from October 1, 2012 to and including June 30, 2013, (y) $15,000,000 at any time from July 1, 2013 to and including June 30, 2014 and (z) $20,000,000 at any time thereafter.

9.09 <u>Collateral Maintenance</u>.  (a)  The Parent will not permit the aggregate Fair Market Value of all Primary Collateral Vessels owned by the Credit Parties which have not been sold, transferred, lost or otherwise disposed of at any time (such value, the "<u>Aggregate Primary Collateral Vessel Value</u>"), as determined by the most recent appraisal delivered by the Borrower to the Administrative Agent or obtained by the Administrative Agent in accordance with Section 8.01(d) at any time to equal less than (I) from the Restatement Effective Date to and including December 31, 2012, 110% of the aggregate principal amount of outstanding Loans at such time, (II) from January 1, 2013 to and including December 31, 2013, 115% of the amount equal to the aggregate principal amount of outstanding Loans at such time <u>minus</u> the Blocked Amount, if any, (III) from January 1, 2014 to and including September 30, 2014, 120% of the amount equal to the aggregate principal amount of outstanding Loans at such time <u>minus</u> the Blocked Amount, if any, and (IV) thereafter, 120% of the aggregate principal amount of outstanding Loans at such time; <u>provided</u> that, so long as any default in respect of this Section 9.09 is not caused by any voluntary Collateral Disposition, such default shall not constitute an Event of Default (but shall constitute a Default) so long as within 45 days of the occurrence of such default, the Borrower shall either (i) post additional collateral satisfactory to the Required Lenders, pursuant to security documentation reasonably satisfactory in form and substance to the Collateral Agent, sufficient to cure such default (and shall at all times during such period and prior to satisfactory completion thereof, be diligently carrying out such actions) or (ii) make such repayment of Loans in an amount sufficient to cure such default (it being understood that any action taken in respect of this proviso shall only be effective to cure such default pursuant to this Section 9.09 to the extent that no Default or Event of Default exists hereunder immediately after giving effect thereto).

(b)      In order to comply with clauses (II) and (III) of Section 9.09(a) above, the Parent may, at any time, deposit an amount equal to the amount of Unrestricted Cash and Cash Equivalents held by the Parent and its Subsidiaries at such time such that, after giving effect to such deposit, the Parent would be in compliance with the provisions of Section 9.08 at such time (the "<u>Blocked Amount</u>") into a non-interest bearing blocked account with Nordea, as depository bank (the "<u>Blocked Account</u>"), with respect to which the Parent shall have duly executed and delivered a control agreement granting a first priority security interest to the Collateral Agent (reasonably satisfactory in all respects to the Collateral Agent), <u>provided</u> that (I) at such time, the Parent shall have furnished to the Administrative Agent a certificate of the senior financial officer

-74-

of the Parent setting forth the calculations required to establish the amount of the Unrestricted Cash and Cash Equivalents that are required by the Parent in order to establish compliance with the provisions of this Section 9.09 at the time of the deposit of the Blocked Amount into the Blocked Account and (II) notwithstanding anything set forth in Section 9.09 to the contrary, the Parent will not be permitted to deduct the Blocked Amount to establish compliance with the provisions of this Section 9.09 for more than 365 days in the aggregate during the term of this Agreement. The Blocked Amount may be released from such Blocked Account at such time as the Parent shall have furnished to the Administrative Agent a certificate of the senior financial officer of the Parent setting forth the calculations required to establish compliance with the provisions of this Section 9.09 without the deduction of any such Unrestricted Cash and Cash Equivalents so long as no Default or Event of Default exists at such time or would result under Section 9.08 or otherwise from the withdrawal of the Blocked Amount from the Blocked Account. The Collateral Agent may apply the Blocked Amount in accordance with the terms of the Credit Documents at any time if an Event of Default exists at such time or would result from the withdrawal of the Blocked Amount from the Blocked Account.

9.10 <u>Interest Expense Coverage Ratio</u>. The Parent will not permit the Interest Expense Coverage Ratio for any Test Period ending on the last day of a fiscal quarter of the Parent set forth below to be less than the ratio set forth opposite such fiscal quarter below:

| Fiscal Quarter Ending | Ratio |
| --- | --- |
| December 31, 2012 | 0.70:1.00 |
| March 31, 2013 | 0.71:1.00 |
| June 30, 2013 | 0.72:1.00 |
| September 30, 2013 | 0.69:1.00 |
| December 31, 2013 | 0.61:1.00 |
| March 31, 2014 | 0.95:1.00 |
| June 30, 2014 | 1.58:1.00 |
| September 30, 2014 | 2.20:1.00 |
| December 31, 2014 | 2.85:1.00 |
| March 31, 2015 | 3.16:1.00 |
| June 30, 2015 | 3.19:1.00 |
| September 30, 2015 | 3.19:1.00 |
| December 31, 2015 | 3.20:1.00 |

9.11 <u>Limitation on Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.</u>  The Parent will not, and will not permit any Subsidiary Guarantor to, amend, modify or change its Certificate of Incorporation, Certificate of Formation (including, without limitation, by the filing or modification of any certificate of designation), By-Laws, limited liability company agreement, partnership agreement (or equivalent organizational documents) or any agreement entered into by it with respect to its Equity Interests (including any Shareholders' Agreement), or enter into any new agreement with respect to its capital stock or membership interests (or equivalent interests), other than any amendments, modifications or changes or any such new agreements which are not in any way materially adverse to the interests of the Lenders.  Notwithstanding the foregoing, upon not less than 30 days prior written notice to the Administrative Agent and so long as no Default or Event of Default exists and is continuing, any Subsidiary Guarantor may change its jurisdiction of organization to another jurisdiction reasonably satisfactory to the Administrative Agent, <u>provided</u> that any Subsidiary Guarantor that has entered into the Security Documents or the Secondary Security Documents hereunder shall promptly take all actions reasonably deemed necessary by the Collateral Agent to preserve, protect and maintain, without interruption, the security interest and Lien of the Collateral Agent in any Collateral owned by such Subsidiary Guarantor to the satisfaction of the Collateral Agent, and such Subsidiary Guarantor shall have provided to the Administrative Agent and the Lenders such opinions of counsel as may be reasonably requested by the Administrative Agent to assure itself that the conditions of this proviso have been satisfied.

9.12 <u>Limitation on Certain Restrictions on Subsidiaries.</u>  The Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Parent or any Subsidiary of the Parent, or pay any Indebtedness owed to the Parent or a Subsidiary of the Parent, (b) make loans or advances to the Parent or any of the Parent's Subsidiaries or (c) transfer any of its properties or assets to the Parent or any of the Parent's Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, (iii) the Other Credit Agreement as in effect on the Restatement Effective Date, or any refinancing thereof or amendments thereto, and the other Other Credit Documents, (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Parent or a Subsidiary of the Parent, (v) customary provisions restricting assignment of any agreement entered into by the Parent or a Subsidiary of the Parent in the ordinary course of business, (vi) any holder of a Permitted Lien may restrict the transfer of the asset or assets subject thereto, (vii) restrictions which are not more restrictive than those contained in this Agreement contained in any documents governing any Indebtedness incurred after the Original Effective Date in accordance with the provisions of this Agreement, and (viii) Non-Recourse Indebtedness.

9.13 <u>Limitation on Issuance of Equity Interests.</u>  (a) The Parent will not issue, and will not permit any Subsidiary to issue, any preferred stock (or equivalent equity interests) other than Qualified Preferred Stock.

(b)    The Parent will not permit GMSC, Arlington, the Borrower or any Subsidiary Guarantor described in clause (x) or (y) of the definition thereof to issue any capital stock (including by way of sales of treasury stock) or any options or warrants to purchase, or

securities convertible into, capital stock, except (i) for transfers and replacements of then outstanding shares of capital stock, (ii) for stock splits, stock dividends and additional issuances which do not decrease the percentage ownership of the Parent or any of its Subsidiaries in any class of the capital stock of such Subsidiary, (iii) to qualify directors to the extent required by applicable law and (iv) to such Person's shareholders or in connection with any Investment permitted under this Agreement. All capital stock of the Borrower, Arlington, GMSC or any Subsidiary Guarantor described in clause (x) or (y) of the definition thereof issued in accordance with this Section 9.13(b) shall be delivered to the Collateral Agent pursuant to the Pledge Agreement, the Parent Pledge Agreement or the Secondary Pledge Agreement, as applicable, subject to the Intercreditor Agreements.

9.14 Business. The Parent, its Subsidiaries and its Non-Recourse Subsidiaries will not engage in any business other than the businesses in which any of them is engaged in as of the Restatement Effective Date (or, in the case of any Subsidiary or any Non-Recourse Subsidiary that is formed or incorporated after the Restatement Effective Date, any business in which the Parent, any other Subsidiary or any other Non-Recourse Subsidiary is engaged as of the Restatement Effective Date) and activities directly related thereto, and similar or related maritime businesses. It being understood that no Subsidiary Guarantor which owns a Collateral Vessel will engage directly or indirectly in any business other than the business of owning and operating Collateral Vessels and businesses ancillary or complementary thereto, except that, to the extent that any Subsidiary that owns a Secondary Collateral Vessel is permitted under the Other Credit Agreement to engage in any business other than the business of owning and operating Collateral Vessels and businesses ancillary or complementary thereto, such change in the business of such Subsidiary Guarantor shall be permitted to do so hereunder automatically.

9.15 Jurisdiction of Employment; Chartering In Contracts. (a) The Parent will not, and will not permit the Subsidiary Guarantors or any third party charterer of a Collateral Vessel to, employ or cause to be employed any Collateral Vessel in any country or jurisdiction in which (i) the Borrower, the Subsidiary Guarantors or such third party charterer of a Collateral Vessel is prohibited by law from doing business, (ii) the Lien created by the applicable Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable, will be rendered unenforceable or (iii) the Collateral Agent's foreclosure or enforcement rights will be materially impaired or hindered.

(b) Prior to the Trigger Date and at any time that the Parent and its Subsidiaries have a Loan to Value Ratio of greater than 0.60 to 1.00, the Parent will not, and will not permit any Subsidiary to, enter into any contract to charter in or cause to be chartered in any Vessel for a period of 12 months or greater (including any renewal or extension option) as of the execution date of such contract unless the Administrative Agent consents in its sole discretion to such contract.

9.16 Bank Accounts. The Parent will not permit the Borrower, Arlington, GMSC or any Subsidiary Guarantor to maintain any deposit, savings, investment or other similar accounts other than (i) the Concentration Accounts, (ii) the Blocked Account (if applicable), (iii) an account maintained at Deutsche Bank as of the Restatement Effective Date in the name of General Maritime Subsidiary Corporation, (iv) an account maintained at DNB Bank ASA as of the Restatement Effective Date in the name of General Maritime Subsidiary Corporation, (v)

zero balance accounts in the name of the Credit Parties, and (vi) any payroll account or accounts opened and maintained by a Credit Party at any time if the aggregate amount of cash deposited by the Credit Parties in such payroll account(s) does not exceed, together with the amount deposited in the account referenced in clauses (iii) through and including (v), $5,000,000 at such time.

9.17 Indebtedness of Non-Recourse Subsidiaries. Non-Recourse Subsidiaries will not contract, create, incur, assume or suffer to exist any Indebtedness other than Indebtedness incurred to finance the acquisition of new Vessels or to finance any of the activities such Non-Recourse Subsidiaries are permitted to engage in pursuant to Section 9.14, provided that (I) if any such Vessel is being so acquired prior the Trigger Date, then (i) the aggregate principal amount of such Indebtedness shall not exceed 60% of the lesser of (x) the fair market value of such Vessel on the basis of an individual charter-free arm's-length transaction between a willing and able buyer and seller not under duress as set forth in at least one appraisal and (y) the acquisition price of such Vessel, (ii) no amortization of such Indebtedness shall be permitted prior to June 30, 2014 and (iii) the Weighted Average Life to Maturity of such Indebtedness shall be at least one year longer than the Weighted Average Life to Maturity of the Loans at the time such Indebtedness is incurred, and (II) if any such Vessel is being so acquired on or after the Trigger Date, then the aggregate principal amount of such Indebtedness shall not exceed 70% of the lesser of (x) the fair market value of such Vessel on the basis of an individual charter-free arm's-length transaction between a willing and able buyer and seller not under duress as set forth in at least one appraisal and (y) the acquisition price of such Vessel.

SECTION 10. Events of Default. Upon the occurrence of any of the following specified events (each an "Event of Default"):

10.01 Payments. The Borrower shall (i) default in the payment when due of any principal of any Loan or any Note or (ii) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Loan or Note, or any other amounts owing hereunder or thereunder; or

10.02 Representations, etc. Any representation, warranty or statement made by any Credit Party herein or in any other Credit Document or in any certificate delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

10.03 Covenants. Any Credit Party shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 8.01(f)(i), 8.08, 8.11(a), 8.13 or Section 9 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement and, in the case of this clause (ii), such default shall continue unremedied for a period of 30 days after written notice to the Borrower by the Administrative Agent or any of the Lenders; or

10.04 Default Under Other Agreements. (i) The Parent or any of its Subsidiaries shall default in any payment of any Indebtedness (other than the Obligations) beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) the Parent or any of its Subsidiaries shall default in the observance or performance

-78-

of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Indebtedness to become due prior to its stated maturity or (iii) any Indebtedness (other than the Obligations) of the Parent or any of its Subsidiaries shall be declared to be due and payable, or required to be prepaid, redeemed, defeased or repurchased other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that it shall not be a Default or Event of Default under this Section 10.04 unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) through (iii), inclusive, exceeds $10,000,000; or

10.05 Bankruptcy, etc. The Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or an involuntary case is commenced against the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries and the petition is not controverted within 20 days after service of summons, or is not dismissed within 60 days, after commencement of the case; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries or the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries or there is commenced against the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries any such proceeding which remains undismissed for a period of 60 days, or the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries suffers any appointment of any custodian or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of 60 days; or the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries makes a general assignment for the benefit of creditors; or any corporate action is taken by the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries for the purpose of effecting any of the foregoing, provided that, in the case of any Non-Recourse Subsidiary, it shall not be a Default or Event of Default under this Section 10.05 unless the aggregate principal amount of all Indebtedness incurred by such Non-Recourse Subsidiary pursuant to Section 9.17 exceeds $15,000,000; or

10.06 ERISA. (a) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 or 430 of the Code or Section 302 or 303 of ERISA, a Reportable Event shall have occurred, a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event

described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following 30 days, any Plan which is subject to Title IV of ERISA shall have had or is reasonably likely to have a trustee appointed to administer such Plan, any Plan which is subject to Title IV of ERISA is, shall have been or is reasonably likely to be terminated or to be the subject of termination proceedings under ERISA, any Plan shall have an Unfunded Current Liability, its actuary has certified that a determination has been made that a Plan (other than a Multiemployer Plan) is an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA, a Plan which is a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA, a contribution required to be made with respect to a Plan or a Foreign Pension Plan is not timely made, the Parent or any of its Subsidiaries or any ERISA Affiliate has incurred or events have happened, or reasonably expected to happen, that will cause it to incur any liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 436(f), 4971 or 4975 of the Code or on account of a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code, or the Parent, or any of its Subsidiaries, has incurred or is reasonably likely to incur liabilities pursuant to one or more employee welfare benefit plans (as defined in Section 3(1) of ERISA) that provide benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or Plans or Foreign Pension Plans; (b) there shall result from any such event or events the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and (c) such lien, security interest or liability, individually, and/or in the aggregate, in the reasonable opinion of the Required Lenders, has had, or could reasonably be expected to have, a Material Adverse Effect; or

10.07 <u>Security Documents</u>. At any time after the execution and delivery thereof, any of the Security Documents shall cease to be in full force and effect, or shall cease in any material respect to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral), in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except in connection with Permitted Liens), and subject to no other Liens (except Permitted Liens), or any Credit Party shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to any of the Security Documents and such default shall continue beyond any grace period (if any) specifically applicable thereto pursuant to the terms of such Security Document, or any "event of default" (as defined in any Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage) shall occur in respect of any Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage; or

10.08 <u>Guaranties</u>. After the execution and delivery thereof, any Guaranty, or any provision thereof, shall cease to be in full force or effect as to any Guarantor (unless such Guarantor is no longer a Subsidiary of the Parent by virtue of a liquidation, sale, merger or consolidation permitted by Section 9.02) or any Guarantor (or Person acting by or on behalf of such Guarantor) shall deny or disaffirm such Guarantor's obligations under the Guaranty to which it is a party or any Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Guaranty to which it is a party beyond any grace period (if any) provided therefor; or

10.09 <u>Judgments</u>.  One or more judgments or decrees shall be entered against the Parent or any of its Subsidiaries involving in the aggregate for the Parent and its Subsidiaries a liability (not paid or fully covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 60 consecutive days, and the aggregate amount of all such judgments, to the extent not covered by insurance, exceeds $10,000,000; or

10.10 <u>Change of Control</u>.  At any time after the Restatement Effective Date, a Change of Control shall occur; or

10.11 <u>Default Under Non-Recourse Subsidiary Agreements</u>.  (i)  Any Non-Recourse Subsidiary shall default in any payment at maturity of any Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) any Non-Recourse Subsidiary shall default in the observance or performance of any agreement or condition relating to any Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause any such Indebtedness to become due prior to its stated maturity or (iii) any Indebtedness of any Non-Recourse Subsidiary shall be declared to be due and payable, or required to be prepaid, redeemed, defeased or repurchased other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, <u>provided</u> that it shall not be a Default or Event of Default under this Section 10.11 unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) through (iii), inclusive, exceeds $15,000,000;

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party (<u>provided</u> that, if an Event of Default specified in Section 10.05 shall occur, the result which would occur upon the giving of written notice by the Administrative Agent to the Borrower as specified in clauses (i) and (ii) below shall occur automatically without the giving of any such notice): (i) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; and (ii) enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents.

SECTION 11.  <u>Agency and Security Trustee Provisions</u>.

11.01 <u>Appointment</u>.  (a) The Lenders hereby designate Nordea as Administrative Agent (for purposes of this Section 11, the term "<u>Administrative Agent</u>" shall include Nordea (and/or any of its affiliates) in its capacity as Collateral Agent pursuant to the Security Documents and in its capacity as security trustee pursuant to the Collateral Vessel Mortgages or Secondary Collateral Vessel Mortgages) to act as specified herein and in the other Credit Documents.  Each Lender hereby irrevocably authorizes, and each holder of any Note by the

acceptance of such Note shall be deemed irrevocably to authorize, the Agents to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Agents by the terms hereof and thereof and such other powers as are reasonably incidental thereto. Furthermore, each Lender hereby irrevocably authorizes the Administrative Agent and the Collateral Agent to enter into the Intercreditor Agreements on their behalf, and agrees to be bound by the provisions set forth therein. The Agents may perform any of its duties hereunder by or through its respective officers, directors, agents, employees or affiliates and, may assign from time to time any or all of its rights, duties and obligations hereunder and under the Security Documents to any of its banking affiliates.

(b)    The Lenders hereby irrevocably appoint Nordea as security trustee solely or the purpose of holding legal title to the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages on each of the flag Vessels of an Acceptable Flag Jurisdiction on behalf of the applicable Lenders, from time to time, with regard to the (i) security, powers, rights, titles, benefits and interests (both present and future) constituted by and conferred on the Lenders or any of them or for the benefit thereof under or pursuant to the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages (including, without limitation, the benefit of all covenants, undertakings, representations, warranties and obligations given, made or undertaken by any Lender in the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages), (ii) all money, property and other assets paid or transferred to or vested in any Lender or any agent of any Lender or received or recovered by any Lender or any agent of any Lender pursuant to, or in connection with the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages, whether from the Borrower or any Subsidiary Guarantor or any other person and (iii) all money, investments, property and other assets at any time representing or deriving from any of the foregoing, including all interest, income and other sums at any time received or receivable by any Lender or any agent of any Lender in respect of the same (or any part thereof). Nordea hereby accepts such appointment as security trustee.

11.02 <u>Nature of Duties</u>.    The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement and the Security Documents. None of the Agents nor any of their respective officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by such Person's gross negligence or willful misconduct (any such liability limited to the applicable Agent to whom such Person relates). The duties of each of the Agents shall be mechanical and administrative in nature; none of the Agents shall have by reason of this Agreement or any other Credit Document any fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agents any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

11.03 <u>Lack of Reliance on the Agents</u>.    Independently and without reliance upon the Agents, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Parent and its Subsidiaries in connection with the making and the continuance

-82-

of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Parent and its Subsidiaries and, except as expressly provided in this Agreement, none of the Agents shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. None of the Agents shall be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of the Parent and its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of the Parent and its Subsidiaries or the existence or possible existence of any Default or Event of Default.

11.04 <u>Certain Rights of the Agents</u>. If any of the Agents shall request instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Agents shall be entitled to refrain from such act or taking such action unless and until the Agents shall have received instructions from the Required Lenders; and the Agents shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Lender or the holder of any Note shall have any right of action whatsoever against the Agents as a result of any of the Agents acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

11.05 <u>Reliance</u>. Each of the Agents shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the applicable Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

11.06 <u>Indemnification</u>. To the extent any of the Agents is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the applicable Agents, in proportion to their respective "percentages" as used in determining the Required Lenders (without regard to the existence of any Defaulting Lenders), for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by such Agents in performing their respective duties hereunder or under any other Credit Document, in any way relating to or arising out of this Agreement or any other Credit Document; <u>provided</u> that no Lender shall be liable in respect to an Agent for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct.

11.07 <u>The Administrative Agent in its Individual Capacity</u>. With respect to its obligation to make Loans under this Agreement, each of the Agents shall have the rights and

powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lenders," "Secured Creditors", "Required Lenders", "holders of Notes" or any similar terms shall, unless the context clearly otherwise indicates, include each of the Agents in their respective individual capacity. Each of the Agents may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Credit Party or any Affiliate of any Credit Party as if it were not performing the duties specified herein, and may accept fees and other consideration from the Borrower or any other Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

11.08 Holders. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

11.09 Resignation by the Administrative Agent. (a) The Administrative Agent may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents at any time by giving 15 Business Days' prior written notice to the Borrower and the Lenders. Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b) Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company that is, unless an Event of Default has occurred and is continuing at such time, reasonably acceptable to the Borrower.

(c) If a successor Administrative Agent shall not have been so appointed within such 15 Business Day period, the Administrative Agent, with the consent of the Borrower (which shall not be unreasonably withheld or delayed and shall not be required if an Event of Default has occurred and is continuing at such time), shall then appoint a commercial bank or trust company with capital and surplus of not less than $500,000,000 as successor Administrative Agent (which successor Administrative Agent shall be a Lender hereunder if any such Lender agrees to serve as Administrative Agent at such time) who shall serve as Administrative Agent hereunder until such time, if any, as the Lenders appoint a successor Administrative Agent as provided above.

(d) If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 25th Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

11.10 <u>The Joint Lead Arrangers</u>.  Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, each of the Joint Lead Arrangers are named as such for recognition purposes only, and in their respective capacities as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Credit Documents or the transactions contemplated hereby and thereby; it being understood and agreed that the Joint Lead Arrangers shall be entitled to all indemnification and reimbursement rights in favor of any of the Agents as provided for under Sections 11.06 and 12.01.  Without limitation of the foregoing, none of the Joint Lead Arrangers shall, solely by reason of this Agreement or any other Credit Documents, have any fiduciary relationship in respect of any Lender or any other Person.

11.11 <u>Collateral Matters</u>.  (a)  Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured Creditors.  Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b)  The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon payment and satisfaction of all of the Obligations (other than inchoate indemnification obligations) at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than the Borrower and its Subsidiaries) upon the sale or other disposition thereof in compliance with Section 9.02, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 12.12), (iv) as otherwise may be expressly provided in the relevant Security Documents or (v) as otherwise provided in Section 12.21 hereof.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 11.11.

(c)  The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 11.11 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the

-85-

Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

11.12 <u>Delivery of Information</u>. The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

SECTION 12. <u>Miscellaneous</u>.

12.01 <u>Payment of Expenses, etc.</u> The Borrower agrees that it shall: (i) whether or not the transactions herein contemplated are consummated, pay all reasonable out-of-pocket costs and expenses of each of the Agents (including, without limitation, the reasonable fees and disbursements of White & Case LLP, Watson, Farley & Williams, other counsel to the Administrative Agent and the Joint Lead Arrangers and local counsel) in connection with the preparation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, of the Agents in connection with their respective syndication efforts with respect to this Agreement and of the Agents and each of the Lenders in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein (including, without limitation, the reasonable fees and disbursements of counsel (including in-house counsel) for each of the Agents and for each of the Lenders); (ii) pay and hold each of the Lenders harmless from and against any and all present and future stamp, documentary, transfer, sales and use, value added, excise and other similar taxes with respect to the foregoing matters and save each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to such Lender) to pay such taxes; and (iii) indemnify the Agents, the Collateral Agent and each Lender, and each of their respective officers, directors, trustees, employees, representatives and agents from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not any of the Agents, the Collateral Agent or any Lender is a party thereto) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the consummation of any transactions contemplated herein, or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, or (b) the actual or alleged presence of Hazardous Materials on any Collateral Vessel or in the air, surface water or groundwater or on the surface or subsurface of any property at any time owned or operated by the Borrower or any of its Subsidiaries, the generation, storage, transportation,

handling, disposal or Environmental Release of Hazardous Materials at any location, whether or not owned or operated by the Borrower or any of its Subsidiaries, the non-compliance of any Collateral Vessel or property with foreign, federal, state and local laws, regulations, and ordinances (including applicable permits thereunder) applicable to any Collateral Vessel or property, or any Environmental Claim asserted against the Borrower, any of its Subsidiaries or any Collateral Vessel or property at any time owned or operated by the Borrower or any of its Subsidiaries, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding (but excluding any losses, liabilities, claims, damages, penalties, actions, judgments, suits, costs, disbursements or expenses to the extent incurred by reason of the gross negligence or willful misconduct of the Person to be indemnified). To the extent that the undertaking to indemnify, pay or hold harmless each of the Agents or any Lender set forth in the preceding sentence may be unenforceable because it violates any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

12.02 <u>Right of Setoff</u>. In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by such Lender (including, without limitation, by branches and agencies of such Lender wherever located) to or for the credit or the account of any Credit Party but in any event excluding assets held in trust for any such Person against and on account of the Obligations and liabilities of such Credit Party, to such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 12.06(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

12.03 <u>Notices</u>. Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telexed, telecopier or e-mail communication) and mailed, telexed, telecopied or delivered: if to any Credit Party, at the address specified under its signature below; if to any Lender, at its address specified opposite its name on <u>Schedule II</u>; and if to the Administrative Agent, at its Notice Office; or, as to any other Credit Party, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent. All such notices and communications shall, (i) when mailed, be effective three Business Days after being deposited in the mails, prepaid and properly addressed for delivery, (ii) when sent by overnight courier, be effective one Business Day after delivery to the overnight courier prepaid and properly addressed for delivery on such next Business Day, or (iii) when sent by telex, telecopier or e-mail, be effective when sent by telex, telecopier or e-mail except that notices and communications to the Administrative Agent shall not be effective until received by the Administrative Agent.

12.04 <u>Benefit of Agreement</u>. (a) This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; <u>provided</u>, <u>however</u>, that (i) no Credit Party may assign or transfer any of its rights, obligations or interest hereunder or under any other Credit Document without the prior written consent of the Lenders, (ii) although any Lender may transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Loans hereunder except as provided in Section 12.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and (iii) no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (x) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest thereon (except (m) in connection with a waiver of applicability of any post-default increase in interest rates and (n) that any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (x)) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default shall not constitute a change in the terms of such participation, and that an increase in any Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (y) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement or (z) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) securing the Loans hereunder in which such participant is participating. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b)     Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its outstanding Loans to its (i) (A) parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company or (B) to one or more other Lenders or any Affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company (<u>provided</u> that any fund that invests in bank loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an Affiliate of such other Lender for the purposes of this sub-clause (x)(i)(B)), <u>provided</u> that no such assignment may be made to any such Person that is, or would at such time constitute, a Defaulting Lender, or (ii) in the case of any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor of such Lender or by an Affiliate of such investment advisor or (iii) to one or more Lenders or (y) assign with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed and shall not be required if any Event of Default is then in existence, <u>provided</u> that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof) all, or if less than all, a portion equal to at least $20,000,000 in the aggregate for

-88-

the assigning Lender or assigning Lenders, of such Lender's outstanding principal amount of Loans hereunder to one or more Eligible Transferees (treating any fund that invests in bank loans and any other fund that invests in bank loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, provided that (i) at such time Schedule I shall be deemed modified to reflect the outstanding Loans of such new Lender and of the existing Lenders, (ii) new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised outstanding Loans, (iii) the consent of the Administrative Agent shall be required in connection with any assignment pursuant to preceding clause (y) (which consent shall not be unreasonably withheld or delayed), and (iv) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500. To the extent of any assignment pursuant to this Section 12.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Loans (it being understood that the indemnification provisions under this Agreement (including, without limitation, Sections 2.09, 2.10, 4.04, 12.01 and 12.06) shall survive as to such assigning Lender). To the extent that an assignment of all or any portion of a Lender's Loans and related outstanding Obligations pursuant to Section 2.12 or this Section 12.04(b) would, at the time of such assignment, result in increased costs under Section 2.09, 2.10 or 4.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank or any central bank having jurisdiction over such Lender in support of borrowings made by such Lender from such Federal Reserve Bank or central bank and, with the consent of the Administrative Agent, any Lender which is a fund may pledge all or any portion of its Notes or Loans to a trustee for the benefit of investors and in support of its obligation to such investors; provided, however, no such pledge shall release a Lender from any of its obligations hereunder or substitute any such pledge for such Lender as a party hereto.

(d)     Oaktree Capital Management, L.P. and any Affiliate thereof (each an "Affiliated Lender") may purchase Loans hereunder, whether by assignment or participation, subject to the following requirements:

(i)     no Loans may be assigned, or participations sold, to an Affiliated Lender if, after giving effect to such assignment, the Affiliated Lenders in the aggregate would own (as a Lender or through a participation) in excess of 30% of all Loans then outstanding under this Agreement;

(ii)     notwithstanding anything to the contrary in the definition of "Required Lenders", or in Section 12.12, for purposes of determining whether the Required Lenders or all of the Lenders hereunder have or any affected Lender hereunder has (i) consented

-89-

(or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Credit Document or any departure therefrom by the Credit Parties, (ii) otherwise acted on any matter related to any Credit Document or (iii) directed or required the Administrative Agent, the Collateral Agent or any Lender under the Credit Documents to undertake any action (or refrain from taking any action) with respect to or under any such Credit Document, the Loans held by any Affiliated Lender shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders, all of the Lenders have or any affected Lender has taken any action or voted on any matter (other than any vote that has a disproportionate effect on the Loans held by an Affiliated Lender relative to the Loans held by Lenders that are Affiliated Lenders);

(iii)   the Affiliated Lenders shall be prohibited from being appointed as, or succeeding to the rights and duties of, the Administrative Agent or the Collateral Agent under this Agreement and the other Credit Documents until such time (if any) as when all Obligations (other than those held by any Affiliated Lender and other than contingent obligations not then due and owing) have been paid in full in cash;

(iv)   by acquiring a Loan, each Affiliated Lender, in its capacity as a Lender, shall be deemed to have (I) waived its right to receive information prepared by the Administrative Agent or any other Lender (or any advisor, agent or counsel thereof) under or in connection with the Credit Documents (to the extent not provided to the Credit Parties), attend any meeting or conference call (or any portion thereof) with the Administrative Agent or any Lender(to the extent that the Credit Parties are excluded from attending), (II) agreed that it is prohibited from making or bringing any claim, in its capacity as a Lender hereunder against the Administrative Agent or any Lender with respect to the duties and obligations of such Persons under the Credit Documents, except any claims that the Administrative Agent or such Lender is treating such Affiliated Lender, in its capacity as a Lender, in a disproportionate manner relative to the other Lenders, and (III) agreed, without limiting its rights as a Lender described in clause (ii) above, that it will have no right whatsoever to require the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to this Agreement or any other Credit Document other than each Lender's and Administrative Agent's duties and obligations hereunder; and

(v)   the applicable Affiliated Lender identifies itself as an Affiliated Lender prior to the assignment of Loans to it pursuant to the respective Assignment and Assumption Agreement;

Additionally, the Credit Parties and each Affiliated Lender hereby agree that if a case under Title 11 of the United States Code is commenced against any Credit Party, such Credit Party shall seek (and each Affiliated Lender shall consent) to provide that the vote of any Affiliated Lender (in its capacity as a Lender) with respect to any plan of reorganization of such Credit Party shall not be counted except that such Affiliated Lender's vote (in its capacity as a Lender) may be counted to the extent any such plan of reorganization proposes to treat the Obligations held by such Affiliated Lender in a manner that is less favorable in any material

-90-

respect to such Affiliated Lender than the proposed treatment of similar Obligations held by Lenders that are not Affiliates of the Credit Parties.

12.05 <u>No Waiver; Remedies Cumulative</u>. No failure or delay on the part of the Administrative Agent or any Lender or any holder of any Note in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent or any Lender or the holder of any Note shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent or any Lender or the holder of any Note would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent or any Lender or the holder of any Note to any other or further action in any circumstances without notice or demand.

12.06 <u>Payments Pro Rata</u>. (a) Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, it shall distribute such payment to the Lenders (other than any Lender that has consented in writing to waive its <u>pro rata</u> share of any such payment) <u>pro rata</u> based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)     Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; <u>provided</u> that if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)     Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 12.06(a) and (b) shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

12.07 <u>Calculations; Computations</u>. (a) The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with generally accepted accounting principles in the United States consistently applied throughout the periods involved

(except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lenders).  In addition, all determinations of compliance with this Agreement or any other Credit Document shall utilize accounting principles and policies in conformity with those used to prepare the historical financial statements delivered to the Lenders for the first fiscal year of the Borrower ended December 31, 2010 (with the foregoing generally accepted accounting principles, subject to the preceding proviso, herein called "GAAP").  Unless otherwise noted, all references in this Agreement to GAAP shall mean generally accepted accounting principles as in effect in the United States.

(b)     All computations of interest for Loans and fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable.

12.08 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.  (a)  THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE COLLATERAL VESSEL MORTGAGES AND THE SECONDARY COLLATERAL VESSEL MORTGAGES, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY, IN THE CASE OF ANY SECURED CREDITOR, AND SHALL, IN THE CASE OF ANY CREDIT PARTY, BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY IN THE CITY OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARENT, THE BORROWER, GMSC AND ARLINGTON HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  EACH OF THE PARENT, THE BORROWER, GMSC AND ARLINGTON FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED MAIL, POSTAGE PREPAID, TO THE PARENT, THE BORROWER, GMSC AND/OR ARLINGTON, AS THE CASE MAY BE, AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT UNDER THIS AGREEMENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY CREDIT PARTY IN ANY OTHER JURISDICTION.  IF AT ANY TIME DURING WHICH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT REMAINS IN EFFECT, THE BORROWER DOES NOT MAINTAIN A REGULARLY FUNCTIONING OFFICE IN NEW YORK CITY, IT WILL DULY APPOINT, AND AT ALL TIMES MAINTAIN, AN AGENT IN NEW YORK CITY FOR THE SERVICE OF PROCESS OR SUMMONS, AND WILL PROVIDE TO THE ADMINISTRATIVE AGENT AND THE LENDERS

WRITTEN NOTICE OF THE IDENTITY AND ADDRESS OF SUCH AGENT FOR SERVICE OF PROCESS OR SUMMONS; PROVIDED THAT ANY FAILURE ON THE PART OF THE BORROWER TO COMPLY WITH THE FOREGOING PROVISIONS OF THIS SENTENCE SHALL NOT IN ANY WAY PREJUDICE OR LIMIT THE SERVICE OF PROCESS OR SUMMONS IN ANY OTHER MANNER DESCRIBED ABOVE IN THIS SECTION 12.08 OR OTHERWISE PERMITTED BY LAW.

(b)    THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

12.09 Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

12.10 Restatement Effective Date. This Agreement shall become effective on the date (the "Restatement Effective Date") on which the following conditions shall have been satisfied on or prior to such date (which date shall be substantially concurrent with the "Effective Date," as defined in the Plan of Reorganization):

(i)    the Parent, GMSC, Arlington, the Borrower, the Administrative Agent and the Lenders constituting the Required Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and the Subsidiary Guarantors described in clause (x) of the definition thereof shall have signed an acknowledgment hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or facsimile notice (actually received) at such office that the same has been signed and mailed to it;

(ii)    the Borrower shall have paid to the Administrative Agent and the Lenders all costs, fees and expenses (including, without limitation, the reasonable and documented legal fees and expenses of White & Case LLP and maritime counsel and other counsel to the Administrative Agent reasonably acceptable to the Borrower) and other compensation

contemplated in connection with this Agreement and the Final DIP/Cash Collateral Order payable to the Administrative Agent and the Lenders in respect of the transactions contemplated by this Agreement to the extent then due and invoiced at least two Business Days prior to the Restatement Effective Date;

(iii)   the Borrower shall have paid to the Lenders any interest that has accrued but has not been paid on the Revolving Loans or the Term Loans pursuant to the Final DIP/Cash Collateral Order;

(iv)   the Plan of Reorganization shall have been confirmed by the Bankruptcy Court and the conditions to effectiveness of the Plan of Reorganization shall have been satisfied or waived in accordance with the terms thereof;

(v)   the Administrative Agent shall have received a copy of the duly authorized and executed Other Credit Agreement, which Other Credit Agreement shall be in form and substance reasonably satisfactory to the Administrative Agent and shall be in full force and effect in accordance with its terms;

(vi)   (a) the Equity Investment shall have been received by the Parent and certain of its Subsidiaries, (b) the Equity Conversion shall have occurred and (c) the Loans under this Agreement shall have been partially repaid in the amount of $39,649,220 with the proceeds of the Equity Investment;

(vii)   all Indebtedness of the Borrower, GMSC, the Parent and its other Subsidiaries under the DIP Credit Agreement, shall have been repaid in full with proceeds of the Equity Investment, together with all fees and other amounts owing thereon, all commitments thereunder shall have been terminated, and all security documentation relating thereto shall have been terminated and released or reassigned, and the Administrative Agent shall have received all such releases and reassignments as may have been requested by the Administrative Agent, which releases and reassignments shall be in form and substance reasonably satisfactory to the Administrative Agent;

(viii)   the Collateral and Guaranty Requirements with respect to each Collateral Vessel shall have been satisfied (including any amendments to the Security Documents set forth in the definition of Collateral and Guaranty Requirements as are necessary or desirable in the sole discretion of the Administrative Agent);

(ix)   the Administrative Agent shall have received a copy of the duly authorized and executed Primary Intercreditor Agreement, which Primary Intercreditor Agreement shall be in form and substance reasonably satisfactory to the Administrative Agent and shall be in full force and effect in accordance with its terms;

(x)   the Administrative Agent shall have received a copy of the duly authorized and executed Secondary Intercreditor Agreement, which Secondary Intercreditor Agreement shall be in form and substance reasonably satisfactory to the Administrative Agent and shall be in full force and effect in accordance with its terms;

(xi)     (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein or in any other Credit Document shall be true and correct in all material respects both before and after giving effect to the Transaction (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date);

(xii)    all Loans converted or continued pursuant to this Agreement shall be in full compliance with all applicable requirements (including without limitation the collateral valuation requirements) of law, including, without limitation, the Margin Regulations and the collateral valuation requirements thereunder, and each Lender in good faith shall be able to complete the relevant forms establishing compliance with the Margin Regulations;

(xiii)   after giving effect to the Transaction, there shall be no conflict with, or default under, any material agreement or contractual or other restrictions which is binding for the Borrower or any of its Subsidiaries;

(xiv)    the Borrower shall cause to be delivered to the Administrative Agent a solvency certificate from the senior financial officer of the Parent, in the form of Exhibit J, which shall be addressed to the Administrative Agent and each of the Lenders and dated the Restatement Effective Date, setting forth the conclusion that, after giving effect to the incurrence of all the financings contemplated hereby, the Parent and its Subsidiaries, taken as a whole, and the Borrower, Arlington and their Subsidiaries, taken as a whole, are not insolvent and will not be rendered insolvent by the incurrence of such indebtedness, and will not be left with unreasonably small capital with which to engage in their respective businesses and will not have incurred debts beyond their ability to pay such debts as they mature;

(xv)     the Administrative Agent shall have received copies of (i) the financial statements referred to in Sections 7.05(a), which financial statements shall be in form and substance reasonably satisfactory to the Administrative Agent and (ii) Cash Flow Projections for the 13-week period beginning on the Restatement Effective Date in form and substance reasonably satisfactory to the Lenders;

(xvi)    on the Restatement Effective Date, nothing shall have occurred since February 28, 2012 (and neither the Administrative Agent nor the Required Lenders shall have become aware of any facts or conditions not previously known to the Administrative Agent or the Required Lenders) which the Administrative Agent or the Required Lenders shall determine is reasonably likely to have a Material Adverse Effect (other than events publicly disclosed prior to the commencement of the Chapter 11 Proceedings, the commencement and continuation of the Chapter 11 Proceeding and the consequences that would reasonably be expected to result therefrom);

(xvi)    other than the Chapter 11 Proceedings, there shall be no actions, suits or proceedings pending or threatened (i) against the Credit Parties that challenges, enjoins or prevents this Agreement or any other Credit Document or (ii) which the Administrative Agent shall determine has had, or could reasonably be expected to have, a Material Adverse Effect (other than events publicly disclosed prior to the commencement of the Chapter 11 Proceedings,

the commencement and continuation of the Chapter 11 Proceeding and the consequences that would reasonably be expected to result therefrom);

(xvii)   the Credit Parties shall have provided, or procured the supply of, the "know your customer" information required pursuant to the PATRIOT Act, in each case as reasonably requested by any Lender or the Administrative Agent at least three Business Days prior to the Restatement Effective Date in connection with its internal compliance regulations thereunder or other information reasonably requested by the Lender or the Administrative Agent to satisfy related checks under all applicable laws and regulations pursuant to the transactions contemplated hereby;

(xviii)   all necessary governmental (domestic and foreign) and third party approvals and/or consents in connection with the Loans, the other transactions contemplated hereby and the granting of Liens under the Credit Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of this Agreement or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein; and

(xix)   there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon this Agreement or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein.

The Administrative Agent will give the Borrower and each Lender prompt written notice of the occurrence of the Restatement Effective Date.

12.11 <u>Headings Descriptive</u>.   The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

12.12 <u>Amendment or Waiver; etc.</u>   (a)   Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party thereto and the Required Lenders, <u>provided</u> that no such change, waiver, discharge or termination shall, without the consent of each Lender (other than a Defaulting Lender) (with Obligations being directly affected in the case of following clause (i)) and, in the case of the following clause (vi), to the extent that any such Lender would be required to make a Loan in excess of its <u>pro rata</u> portion provided for in this Agreement or would receive a payment or prepayment of Loans that (in any case) is less than its <u>pro rata</u> portion provided for in this Agreement, in each case, as a result of any such amendment, modification or waiver referred to in the following clause (vi)), (i) extend the final scheduled maturity of any Loan or Note, extend the timing for or reduce the principal amount of any Scheduled Repayment, or reduce the rate or extend the time of payment of fees or interest on any Loan or Note (except (x) in connection with the waiver of applicability of any post-default increase in interest rates and (y) any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (i)), or reduce the principal

amount thereof (except to the extent repaid in cash), (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under the Security Documents, (iii) amend, modify or waive any provision of this Section 12.12, (iv) reduce the percentage specified in the definition of Required Lenders or otherwise amend or modify the definition of Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Loans are included on the Restatement Effective Date), (v) consent to the assignment or transfer by the Borrower or any Subsidiary Guarantor of any of its respective rights and obligations under this Agreement, (vi) amend, modify or waive Section 2.06 or amend, modify or waive any other provision in this Agreement to the extent providing for payments or prepayments of Loans to be applied pro rata among the Lenders entitled to such payments or prepayments of Loans (it being understood that the provision of additional extensions of credit pursuant to this Agreement, or the waiver of any mandatory prepayment of Loans by the Required Lenders shall not constitute an amendment, modification or waiver for purposes of this clause (vi)), or (vii) release any Subsidiary Guarantor from the Subsidiaries Guaranty to the extent same owns a Collateral Vessel (other than as provided in the Subsidiaries Guaranty); provided, further, that no such change, waiver, discharge or termination shall (t) without the consent of each Agent, amend, modify or waive any provision of Section 11 as same applies to such Agent or any other provision as same relates to the rights or obligations of such Agent, (u) without the consent of the Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, or (v) without the consent of at least a majority of the holders of outstanding Swap Obligations at all times after the time on which all Credit Document Obligations have been paid in full, amend, modify or waive any provision set forth in Section 13.

(b)    If, in connection with any proposed change, waiver, discharge or termination to any of the provisions of this Agreement as contemplated by clauses (i) through (vii), inclusive, of the first proviso to Section 12.12(a), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described in either clauses (A) or (B) below, to either (A) replace each such non-consenting Lender or Lenders (or, at the option of the Borrower if the respective Lender's consent is required with respect to less than all Loans, to replace only the respective Loans of the respective non-consenting Lender which gave rise to the need to obtain such Lender's individual consent) with one or more Replacement Lenders pursuant to Section 2.12 so long as at the time of such replacement, each such Replacement Lender consents to the proposed  change, waiver, discharge or termination or (B) repay outstanding Loans of such Lender which gave rise to the need to obtain such Lender's consent, in accordance with Sections 4.01(iv), provided that, unless the Loans being repaid pursuant to preceding clause (B) are immediately replaced in full at such time through the addition of new Lenders or the increase of outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to preceding clause (B) the Required Lenders (determined before giving effect to the proposed action) shall specifically consent thereto, provided, further, that in any event the Borrower shall not have the right to replace a Lender, repay its Loans solely as a result of the exercise of such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to Section 12.12(a).

-97-

(c)     In addition, notwithstanding anything set forth herein to the contrary, this Agreement may be amended or amended and restated with the written consent of the Credit Parties, the Administrative Agent and the Lenders providing the relevant Replacement Loans or to permit the refinancing of all outstanding Loans (the "Refinanced Loans"), with a replacement Loan tranche denominated in Dollars (the "Replacement Loans"), respectively, hereunder; provided that (i) the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of, plus an amount equal to accrued interest, fees and expenses with respect to, such Refinanced Loans, (ii) the Effective Yield with respect to such Replacement Loans shall not be higher than the Effective Yield with respect to such Refinanced Loans, (iii) the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Refinanced Loans, at the time of such refinancing (except to the extent of nominal amortization for periods where amortization has been eliminated as a result of prepayment of the applicable Loans), (iv) such Replacement Loans shall not receive in excess of such Replacement Loans' pro rata share of any such payment (such pro rata share to be calculated at any time on the basis of the principal amount of such Replacement Loans over the total aggregate principal amount of Loans and Replacement Loans at such time), (v) the credit parties to such Replacement Loans secured by the Collateral will become party to the Intercreditor Agreements in accordance with the terms thereof, and (vi) all other terms applicable to such Replacement Loans shall be substantially identical to, or less favorable to the Lenders providing such Replacement Loans than, those applicable to such Refinanced Loans (including, without limitation, the guarantors, obligors and security applicable thereto), except to the extent necessary to provide for covenants and other terms applicable to any period after the latest final maturity of the Loans in effect immediately prior to such refinancing.

12.13 Survival. All indemnities set forth herein including, without limitation, in Sections 2.09, 2.10, 4.04, 12.01 and 12.06 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Loans.

12.14 Domicile of Loans. Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender. Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 12.14 would, at the time of such transfer, result in increased costs under Section 2.09, 2.10 or 4.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

12.15 Confidentiality. (a) Subject to the provisions of clauses (b) and (c) of this Section 12.15, each Lender agrees that it will use its best efforts not to disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel or to another Lender if the Lender or such Lender's holding or parent company or board of trustees in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 12.15 to the same extent as such Lender) any information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender may disclose any such information (a) as has become generally available to the public other than by virtue of a breach of this Section 12.15(a) by the respective Lender, (b) as

-98-

may be required in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (c) as may be required in respect to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Lender, (e) to the Administrative Agent or the Collateral Agent, (f) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or any interest therein by such Lender, (g) any credit insurance provider related to the Borrower and its Obligations and (h) any direct, indirect, actual or prospective counterparty (and its advisors) to any swap, derivative or securitization transaction related to the Obligations, provided that such prospective transferee expressly agrees to be bound by the confidentiality provisions contained in this Section 12.15.

(b)    The Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates any information related to the Borrower or any of its Subsidiaries (including, without limitation, any nonpublic customer information regarding the creditworthiness of the Borrower or its Subsidiaries), provided such Persons shall be subject to the provisions of this Section 12.15 to the same extent as such Lender.

12.16 Register.    The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent, solely for purposes of this Section 12.16, to maintain a register (the "Register") on which it will record the Loans made by each of the Lenders and each repayment and prepayment in respect of the principal amount (and stated interest) of the Loans of each Lender. Failure to make any such recordation, or any error in such recordation shall not affect the Borrower's obligations in respect of such Loans. The registration of assignment or transfer of all or part of any Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 12.04(b). Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender. The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 12.16, except to the extent caused by the Administrative Agent's own gross negligence or willful misconduct.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal and interest amounts of each participant's interest in the Loans and the obligations thereunder (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury

Regulations. The entries in the Participant Register shall be conclusive absent manifest error. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

12.17 Judgment Currency. If for the purposes of obtaining judgment in any court it is necessary to convert a sum due from the Borrower hereunder or under any of the Notes in the currency expressed to be payable herein or under the Notes (the "specified currency") into another currency, the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the specified currency with such other currency at the Administrative Agent's New York office on the Business Day preceding that on which final judgment is given. The obligations of the Borrower in respect of any sum due to any Lender or the Administrative Agent hereunder or under any Note shall, notwithstanding any judgment in a currency other than the specified currency, be discharged only to the extent that on the Business Day following receipt by such Lender or the Administrative Agent (as the case may be) of any sum adjudged to be so due in such other currency such Lender or the Administrative Agent (as the case may be) may in accordance with normal banking procedures purchase the specified currency with such other currency; if the amount of the specified currency so purchased is less than the sum originally due to such Lender or the Administrative Agent, as the case may be, in the specified currency, the Borrower agrees, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any such judgment, to indemnify such Lender or the Administrative Agent, as the case may be, against such loss, and if the amount of the specified currency so purchased exceeds the sum originally due to any Lender or the Administrative Agent, as the case may be, in the specified currency, such Lender or the Administrative Agent, as the case may be, agrees to remit such excess to the Borrower.

12.18 Language. All correspondence, including, without limitation, all notices, reports and/or certificates, delivered by any Credit Party to the Administrative Agent, the Collateral Agent or any Lender shall, unless otherwise agreed by the respective recipients thereof, be submitted in the English language or, to the extent the original of such document is not in the English language, such document shall be delivered with a certified English translation thereof.

12.19 Waiver of Immunity. The Borrower, in respect of itself, each other Credit Party, its and their process agents, and its and their properties and revenues, hereby irrevocably agrees that, to the extent that the Borrower, any other Credit Party or any of its or their properties has or may hereafter acquire any right of immunity from any legal proceedings, whether in the Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia or any other Acceptable Flag Jurisdiction or elsewhere, to enforce or collect upon the Obligations of the Borrower or any other Credit Party related to or arising from the transactions contemplated by any of the Credit Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, the Borrower, for itself and on behalf of the other Credit Parties, hereby expressly waives, to the fullest extent permissible under applicable law, any such immunity, and agrees not to assert any such right or claim in any such proceeding, whether in the

Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia or elsewhere.

12.20 <u>USA PATRIOT Act Notice</u>. Each Lender hereby notifies each Credit Party that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.: 107-56 (signed into law October 26, 2001)) (the "<u>PATRIOT Act</u>"), it is required to obtain, verify, and record information that identifies each Credit Party, which information includes the name of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the PATRIOT Act, and each Credit Party agrees to provide such information from time to time to any Lender.

12.21 <u>Release of Secondary Collateral and Subsidiary Guarantors</u>. At any time that (i) the Other Agent agrees to release a Secondary Collateral Vessel (and the various guarantees and security documents related thereto) in accordance with the terms of the Other Credit Documents in accordance with the terms of the Secondary Intercreditor Agreement, other than in contemplation of the repayment of the Indebtedness thereunder in full, and (ii) no Default or Event of Default exists or would result from the release of such Secondary Collateral Vessel (including, without limitation, under Section 9.09), the Collateral Agent shall, at the request of the Borrower, (x) release and discharge the Security Documents related to such Secondary Collateral Vessel, (y) release the Credit Party which owns such Secondary Collateral Vessel from the Subsidiaries Guaranty and (z) release the Secondary Pledge Agreement Collateral of the Subsidiary Guarantor which owned such Secondary Collateral Vessel, <u>provided</u> that, in each case, the relevant Credit Party shall pay all documented out of pocket costs and expenses reasonably incurred by the Collateral Agent in connection with provision of such release and discharge.

## SECTION 13. <u>Holdings Guaranty</u>.

13.01 <u>Guaranty</u>. In order to induce the Administrative Agent, the Collateral Agent and the Lenders to enter into this Agreement and to extend credit hereunder, and induce the other Guaranteed Creditors to enter into Interest Rate Protection Agreements and Other Hedging Agreements and in recognition of the direct benefits to be received by the Parent, Arlington and GMSC from the continuation and conversion of the Loans and the entering into of such Interest Rate Protection Agreements and Other Hedging Agreements, each of the Parent, Arlington and GMSC hereby agrees with the Guaranteed Creditors as follows: Each of the Parent, Arlington and GMSC hereby unconditionally and irrevocably guarantees as primary obligor and not merely as surety, the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Guaranteed Obligations of the Borrower to the Guaranteed Creditors. If any or all of the Guaranteed Obligations of the Borrower to the Guaranteed Creditors becomes due and payable hereunder, each of the Parent, Arlington and GMSC, unconditionally and irrevocably, promises to pay such indebtedness to the Administrative Agent and/or the other Guaranteed Creditors, or order, on demand, together with any and all reasonable documented out-of-pocket expenses which may be incurred by the Administrative Agent and the other Guaranteed Creditors in collecting any of the Guaranteed Obligations. If a claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment,

decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrower), then and in such event, each of the Parent, Arlington and GMSC agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the Parent, Arlington or GMSC, as the case may be, notwithstanding any revocation of this Holdings Guaranty or other instrument evidencing any liability of the Borrower, and the Parent, Arlington or GMSC, as the case may be, shall both be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

13.02 <u>Bankruptcy</u>. Additionally, each of the Parent, Arlington and GMSC unconditionally and irrevocably guarantees the payment of any and all of the Guaranteed Obligations to the Guaranteed Creditors whether or not due or payable by the Borrower upon the occurrence of any of the events specified in Section 10.05, and irrevocably, unconditionally and jointly and severally promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand, in lawful money of the United States.

13.03 <u>Nature of Liability</u>. The liability of each of the Parent, Arlington and GMSC hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by the Parent, Arlington, GMSC, any other guarantor or by any other party, and the liability of each of the Parent, Arlington and GMSC hereunder shall not be affected or impaired by (a) any direction as to application of payment by the Borrower or by any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, or (e) any payment made to any Guaranteed Creditor on the Guaranteed Obligations which any such Guaranteed Creditor repays to the Borrower or any other Credit Party pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and the Borrower waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (f) any action or inaction by the Guaranteed Creditors as contemplated in Section 13.05, or (g) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor.

13.04 <u>Independent Obligation</u>. The obligations of each of the Parent, Arlington and GMSC hereunder are several and are independent of the obligations of any other guarantor, any other party or the Borrower, and a separate action or actions may be brought and prosecuted against the Parent, Arlington or GMSC whether or not action is brought against any other guarantor, any other party or the Borrower and whether or not any other guarantor, any other party or the Borrower be joined in any such action or actions. Each of the Parent, Arlington and GMSC waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to each of the Parent, Arlington and GMSC.

13.05 <u>Authorization</u>. Each of the Parent, Arlington and GMSC authorizes the Guaranteed Creditors without notice or demand (except as shall be required by applicable statute

or this Agreement and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)   in accordance with the terms and provisions of this Agreement and the other Credit Documents, change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Holdings Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)   take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)   exercise or refrain from exercising any rights against the Borrower, any other Credit Party or others or otherwise act or refrain from acting;

(d)   release or substitute any one or more endorsers, guarantors, the Borrower, other Credit Parties or other obligors;

(e)   settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to its creditors other than the Guaranteed Creditors;

(f)   apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Guaranteed Creditors regardless of what liability or liabilities of the Borrower remain unpaid;

(g)   consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document, any Interest Rate Protection Agreement or any Other Hedging Agreement or any of the instruments or agreements referred to herein or therein, or, pursuant to the terms of the Credit Documents, otherwise amend, modify or supplement this Agreement, any other Credit Document, any Interest Rate Protection Agreement or any Other Hedging Agreement or any of such other instruments or agreements; and/or

(h)   take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of the Parent, Arlington or GMSC from its liabilities under this Holdings Guaranty.

13.06 Reliance. It is not necessary for any Guaranteed Creditor to inquire into the capacity or powers of each of the Parent, Arlington or GMSC or any of their respective

-103-

Subsidiaries or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

13.07 <u>Subordination</u>. Any indebtedness of the Borrower now or hereafter owing to each of the Parent, Arlington and GMSC, as the case may be, is hereby subordinated to the Guaranteed Obligations of the Borrower owing to the Guaranteed Creditors; and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of the Borrower to each of the Parent, Arlington and GMSC shall be collected, enforced and received by the Parent, Arlington or GMSC, as the case may be, for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the Guaranteed Obligations to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of the Parent, Arlington or GMSC under the other provisions of this Holdings Guaranty. Prior to the transfer by the Parent, Arlington or GMSC of any note or negotiable instrument evidencing any such indebtedness of the Borrower to the Parent, Arlington or GMSC, as the case may be, the Parent, Arlington or GMSC, as the case may be, shall mark such note or negotiable instrument with a legend that the same is subject to this subordination. Without limiting the generality of the foregoing, each of the Parent, Arlington and GMSC hereby agrees with the Guaranteed Creditors that they will not exercise any right of subrogation which they may at any time otherwise have as a result of this Holdings Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash. If and to the extent required in order for the Guaranteed Obligations of each of the Parent, Arlington and GMSC to be enforceable under applicable federal, state and other laws relating to the insolvency of debtors, the maximum liability of the Parent, Arlington and GMSC, as the case may be, hereunder shall be limited to the greatest amount which can lawfully be guaranteed by the Parent, Arlington and GMSC, as the case may be, under such laws, after giving effect to any rights of contribution, reimbursement and subrogation arising under this Section 13.07.

13.08 <u>Waiver</u>. (a) Each of the Parent, Arlington and GMSC waives any right (except as shall be required by applicable law and cannot be waived) to require any Guaranteed Creditor to (i) proceed against the Borrower, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Borrower, any other guarantor or any other party or (iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever. Each of the Parent, Arlington and GMSC hereby irrevocably waives any defenses it may now or hereafter have in any way relating to any and all of the following: (a) based on or arising out of any defense of the Borrower, any other guarantor or any other party, other than payment in full in cash of the Guaranteed Obligations, based on or arising out of the disability of the Borrower, any other guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower other than payment in full in cash of the Guaranteed Obligations; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Credit Document; (c) any taking, exchange, release or nonperfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from the Holdings Guaranty or any other guaranty, for all or any of the Guaranteed Obligations; (d) any law or regulation of any foreign jurisdiction or any other event affecting any term of a Guaranteed Obligation; and (e) any

other circumstance (including, without limitation, any statute of limitations or any existence of or reliance on any representation by the Administrative Agent or any other Secured Party) that might otherwise constitute a defense available to, or a discharge of, such Guarantor, any other Credit Party or any other guarantor or surety other than payment in full in cash of the Guaranteed Obligations. The Guaranteed Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Guaranteed Creditors may have against the Borrower, or any other party, or any security, without affecting or impairing in any way the liability of either the Parent, Arlington or GMSC hereunder except to the extent the Guaranteed Obligations have been paid in cash. Each of the Parent, Arlington and GMSC waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Parent, Arlington or GMSC against the Borrower or any other party or any security.

(b)     Each of the Parent, Arlington and GMSC waives all presentments, demands for performance, protests and notices, including, without limitation, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Holdings Guaranty, and notices of the existence, creation or incurring of new or additional Guaranteed Obligations. Each of the Parent, Arlington and GMSC assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which each of the Parent, Arlington and GMSC assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any of the other Guaranteed Creditors shall have any duty to advise either the Parent, Arlington or GMSC of information known to them regarding such circumstances or risks.

13.09 Judgment Shortfall. (a) The obligations of the Parent, Arlington and GMSC under the Holdings Guaranty to make payments in the respective currency or currencies in which the respective Guaranteed Obligations are required to be paid (such currency being herein called the "Obligation Currency") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by the Administrative Agent, the Collateral Agent or the respective other Secured Creditor of the full amount of the Obligation Currency expressed to be payable to the Administrative Agent, the Collateral Agent or such other Secured Creditor under this Holdings Guaranty or the other Credit Documents or any Interest Rate Protection Agreements or any Other Hedging Agreements, as applicable. If for the purpose of obtaining or enforcing judgment against the Parent, Arlington or GMSC in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "Judgment Currency") an amount due in the Obligation Currency, the conversion shall be made, at the rate of exchange (quoted by the Administrative Agent, determined, in each case, as of the date immediately preceding the day on which the judgment is given (such Business Day being hereinafter referred to as the "Judgment Currency Conversion Date").

(b) If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due, the Parent, Arlington and GMSC jointly and severally covenant and agree to pay, or cause to be paid, such additional amounts, if any (but in any event not a lesser amount), as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial award at the rate or exchange prevailing on the Judgment Currency Conversion Date.

\*　　\*　　\*

-106-

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

GENERAL MARITIME CORPORATION,
as Parent


By:_____

Name:
Title:  Executive Vice President & Chief Financial
         Officer
Address: 299 Park Avenue, New York, NY 10171
Telephone:  (212) 763-5600
Facsimile:   (212) 763-5608


GENERAL MARITIME SUBSIDIARY II
CORPORATION,
as Borrower


By:_____

Name:
Title:  President
Address: 299 Park Avenue, New York, NY 10171
Telephone:  (212) 763-5600
Facsimile:   (212) 763-5608


GENERAL MARITIME SUBSIDIARY CORPORATION,
as a Guarantor


By:_____

Name:
Title:  President
Address: 299 Park Avenue, New York, NY 10171
Telephone:  (212) 763-5600
Facsimile:   (212) 763-5608

ARLINGTON TANKERS LTD.,
as a Guarantor


By:_____

    Name:
    Title:  President
    Address: 299 Park Avenue, New York, NY 10171
    Telephone:  (212) 763-5600
    Facsimile:   (212) 763-5608


With a copy to:

    Kramer Levin Naftalis & Frankel LLP
    1177 Avenue of the Americas
    New York, NY  10022
    Attention:  Kenneth Chin, Esq.
    Telephone:  (212) 715-9100
    Facsimile:  (212) 715-8000


    and

    Kirkland & Ellis LLP
    555 California Street
    San Francisco, CA 94104
    Attention: Samantha Good
    Telephone: (415) 439-1914
    Facsimile: (415) 439-1500

NORDEA BANK FINLAND PLC, NEW YORK
BRANCH, Individually, as Administrative Agent and
as Joint Lead Arranger

By:_____

   Name:
   Title:

By:_____

   Name:
   Title:

General Maritime Subsidiary Corporation Second Amended and Restated Credit Agreement

DNB BANK ASA,
Individually and as Joint Lead Arranger

By:_____
      Name:
      Title:

By:_____
      Name:
      Title:

SIGNATURE PAGE TO THE SECOND AMENDED AND RESTATED CREDIT AGREEMENT, DATED AS OF THE DATE FIRST REFERENCED ABOVE, AMONG GENERAL MARITIME CORPORATION, GENERAL MARITIME SUBSIDIARY II CORPORATION, GENERAL MARITIME SUBSIDIARY CORPORATION, ARLINGTON TANKERS LTD., THE LENDERS PARTY THERETO, AND NORDEA BANK FINLAND PLC, NEW YORK BRANCH, AS ADMINISTRATIVE AGENT

NAME OF INSTITUTION:


By _____
    Name:
    Title:

By executing and delivering a copy hereof, each Subsidiary Guarantor listed below hereby acknowledges and agrees that all Guaranteed Obligations of each such Subsidiary Guarantor shall be fully guaranteed pursuant to the Subsidiaries Guaranty and shall be fully secured pursuant to the Security Documents, in each case in accordance with the respective terms and provisions thereof. Each of the undersigned, each being a Subsidiary Guarantor under, and as defined in, the Original Credit Agreement referenced in the foregoing Credit Agreement, hereby consents to the entering into of the Credit Agreement by the Borrower and agrees to the provisions thereof.

Acknowledged and Agreed by the following Subsidiary Guarantors:

GMR POSEIDON LLC,
GMR ULYSSES LLC,
GMR HERCULES LLC,
GMR ATLAS LLC,
GMR ZEUS LLC,
GMR MANIATE LLC,
GMR SPARTIATE LLC,


By: _____
    Name:
    Title: Manager

VISION LTD.
VICTORY LTD.
COMPANION LTD.
COMPATRIOT LTD.
CONSUL LTD.

By: _____
    Name:    John C. Georgiopoulos
    Title:     Director

GMR AGAMEMNON LLC
GMR AJAX LLC
GMR ALEXANDRA LLC
GMR ARGUS LLC
GMR DAPHNE LLC
GMR DEFIANCE LLC
GMR ELEKTRA LLC
GMR GEORGE T LLC
GMR HARRIET G LLC
GMR HOPE LLC
GMR HORN LLC
GMR KARA G LLC
GMR MINOTAUR LLC
GMR ORION LLC
GMR PHOENIX LLC
GMR ST. NIKOLAS LLC
GMR SPYRIDON LLC
GMR STRENGTH LLC
GMR ATLAS LLC
GMR HERCULES LLC
GMR MANIATE LLC
GMR SPARTIATE LLC
GMR POSEIDON LLC
GMR ULYSSES LLC
GMR ZEUS LLC

By: _____
    Name:    John C. Georgiopoulos
    Title:    Manager

SCHEDULE I

Redacted.

SCHEDULE II

## LENDER ADDRESSES

| INSTITUTIONS | ADDRESSES |
|---|---|
| **NORDEA BANK FINLAND PLC, NEW YORK BRANCH** | 437 Madison Avenue, 21st Floor<br>New York, NY 10022<br>Attn: Shipping Offshore and Oil Services<br>Telephone: 212-318-9636<br>Facsimile: 212-421-4420<br>E-mail: john.boesen@nordea.com |
| **DNB BANK ASA** | 200 Park Avenue, 31st Floor<br>New York, NY 10166<br>Attn: Sanjiv Nayar/Hugues Calmet<br>Telephone: 212-681-3862/3876<br>Facsimile: 212-681-3900<br>E-mail: sanjiv.nayar@dnb.no<br>hugues.calmet@dnb.no |
| **SKANDINAVISKA ENSKILDA BANKEN AB (PUBL)** | Kungsträdgårdsgatan 8<br>S-106 40 Stockholm, Sweden<br>Attn: Arne Juell-Skielse<br>Telephone: (46) 87 63 8638<br>E-mail: arne.juell-skielse@seb.se |
| **NIBC BANK N.V.** | Carnegieplein 4<br>2517 KJ The Hague<br>Netherlands<br>Attn: Jan-Willem Schellingerhout<br>Telephone: (31) 70 342 54 06<br>Facsimile: (31) 70 342 55 77<br>E-mail: jan-willem.schellingerhout@nibc.com |
| **ITF INTERNATIONAL TRANSPORT FINANCE SUISSE AG** | Wasserwerkstrasse 12<br>8006 Zurich<br>Switzerland<br>Attn: Mirko Ruelker<br>Telephone: (41) 44 3656 123<br>Facsimile: (41) 44 3656 299<br>E-mail: Mirko.Ruelker@itf-suisse.com |
| **CITIBANK, N.A.** | 388 Greenwich Street, 23rd Floor<br>New York, NY 10013<br>Attn: Peter Baumann<br>Telephone: 212-559-5200<br>E-mail: peter.t.baumann@citi.com |

SCHEDULE III

## COLLATERAL VESSELS

| # | Collateral Vessels | Type | Size (dwt) | Built | Registry | Official Number |
|---|---|---|---|---|---|---|
| | **Primary Collateral Vessels** | | | | | |
| 1 | Genmar Poseidon | VLCC | 305,795 | 2002 | Republic of the Marshall Islands | 2187 |
| 2 | Genmar Ulysses | VLCC | 318,695 | 2003 | Republic of the Marshall Islands | 2092 |
| 3 | Genmar Hercules | VLCC | 306,543 | 2007 | Republic of the Marshall Islands | 2001 |
| 4 | Genmar Atlas | VLCC | 306,005 | 2007 | Republic of the Marshall Islands | 2004 |
| 5 | Genmar Zeus | VLCC | 318,325 | 2010 | Republic of the Marshall Islands | 2295 |
| 6 | Genmar Maniate | Suezmax | 165,000 | 2010 | Republic of the Marshall Islands | 2247 |
| 7 | Genmar Spartiate | Suezmax | 165,000 | 2011 | Republic of the Marshall Islands | 2262 |
| | **Secondary Collateral Vessels** | | | | | |
| 8 | Genmar Agamemnon | Aframax | 96,214 | 1995 | Republic of Liberia | 10257 |
| 9 | Genmar Ajax | Aframax | 96,183 | 1996 | Republic of Liberia | 10259 |
| 10 | Genmar Alexandra | Aframax | 102,262 | 1992 | Republic of the Marshall Islands | 1441 |
| 11 | Genmar Daphne | Aframax | 106,560 | 2002 | Republic of the Marshall Islands | 2501 |
| 12 | Genmar Defiance | Aframax | 105,538 | 2002 | Republic of Liberia | 11678 |
| 13 | Genmar Elektra | Aframax | 106,548 | 2002 | Republic of the Marshall Islands | 2945 |
| 14 | Genmar Strength | Aframax | 105,674 | 2003 | Republic of Liberia | 11846 |
| 15 | Genmar Minotaur | Aframax | 96,226 | 1995 | Republic of Liberia | 10948 |
| 16 | Genmar Consul | Handymax | 47,400 | 2004 | Islands of Bermuda | 733745 |
| 17 | Genmar Companion | Panamax | 72,750 | 2004 | Islands of Bermuda | 733743 |
| 18 | Genmar Compatriot | Panamax | 72,750 | 2004 | Islands of Bermuda | 733750 |
| 19 | Genmar Argus | Suezmax | 164,097 | 2000 | Republic of the Marshall Islands | 1826 |

SCHEDULE III

Page 2

| # | Collateral Vessels | Type | Size (dwt) | Built | Registry | Official Number |
|---|---|---|---|---|---|---|
| 20 | Genmar George T | Suezmax | 149,847 | 2007 | Republic of the Marshall Islands | 2935 |
| 21 | Genmar Harriet G | Suezmax | 150,205 | 2006 | Republic of Liberia | 12884 |
| 22 | Genmar Hope | Suezmax | 153,919 | 1999 | Republic of the Marshall Islands | 1343 |
| 23 | Genmar Horn | Suezmax | 159,475 | 1999 | Republic of the Marshall Islands | 1225 |
| 24 | Genmar Kara G | Suezmax | 150,296 | 2007 | Republic of Liberia | 13098 |
| 25 | Genmar Orion | Suezmax | 159,992 | 2002 | Republic of the Marshall Islands | 1641 |
| 26 | Genmar Phoenix | Suezmax | 149,999 | 1999 | Republic of the Marshall Islands | 1882 |
| 27 | Genmar Spyridon | Suezmax | 153,972 | 2000 | Republic of the Marshall Islands | 1404 |
| 28 | Genmar St. Nikolas | Suezmax | 149,876 | 2008 | Republic of the Marshall Islands | 3046 |
| 29 | Genmar Victory | VLCC | 314,000 | 2001 | Islands of Bermuda | 733717 |
| 30 | Genmar Vision | VLCC | 314,000 | 2001 | Islands of Bermuda | 733716 |

SCHEDULE IV

## EXISTING LIENS

None.

## EXISTING INDEBTEDNESS

None.

## REQUIRED INSURANCE

Insurance to be maintained on each Collateral Vessel:

(a)   The Parent shall, and shall cause its Subsidiaries to, at the Parent's expense, keep each Collateral Vessel insured with insurers and protection and indemnity clubs or associations of internationally recognized responsibility, and placed in such markets, on such terms and conditions, and through brokers, in each case reasonably acceptable to the Collateral Agent (it being understood that Leeds and Leeds, AON and Marsh are acceptable) and under forms of policies approved by the Collateral Agent against the risks indicated below and such other risks as the Collateral Agent may specify from time to time:

(i)      Marine and war risk, including terrorism, confiscation, piracy, London Blocking and Trapping Addendum and Lost Vessel Clause, hull and machinery insurance, hull interest insurance and freight interest insurance, together in an amount in U.S. dollars at all times equal to, except as otherwise approved or required in writing by the Collateral Agent, the greater of (x) the then Fair Market Value of the Collateral Vessel and (y) an amount which, when aggregated with such insured value of the other Collateral Vessels (if the other Collateral Vessels are then subject to a Collateral Vessel Mortgage or a Secondary Collateral Vessel Mortgage in favor of the Collateral Agent under the Credit Agreement, and have not suffered an Event of Loss) is equal to 120% of the aggregate principal amount of outstanding Loans at such time. The insured values for hull and machinery required under this clause (i) for each Collateral Vessel shall at all times be in an amount equal to the greater of (x) eighty per cent (80%) of the Fair Market Value of the Collateral Vessel and (y) an amount which, when aggregated with such hull and machinery insured value of the other Collateral Vessels (if the other Collateral Vessels are then subject to a Collateral Vessel Mortgage or a Secondary Collateral Vessel Mortgage in favor of the Collateral Agent and have not suffered an Event of Loss), is equal to the aggregate principal amount of outstanding Loans at such time, and the remaining machinery and war risk insurance required by this clause (i) may be taken out as hull and freight interest insurance.

(ii)     Marine and war risk protection and indemnity insurance or equivalent insurance (including coverage against liability for crew, fines and penalties arising out of the operation of the Collateral Vessel, insurance against liability arising out of pollution, spillage or leakage, and workmen's compensation or longshoremen's and harbor workers' insurance as shall be required by applicable law) in such amounts approved by the Collateral Agent; provided, however, that insurance against liability under law or international convention arising out of pollution, spillage or leakage shall be in an amount not less than the greater of:

(y)      the maximum amount available, as that amount may from time to time change, from the International Group of Protection and Indemnity Associations (the "International Group") or alternatively such sources of pollution, spillage or leakage coverage as are commercially available in any

absence of such coverage by the International Group as shall be carried by prudent shipowners for similar vessels engaged in similar trades plus amounts available from customary excess insurers of such risks as excess amounts shall be carried by prudent shipowners for similar vessels engaged in similar trades; and

(z)    the amounts required by the laws or regulations of the United States of America or any applicable jurisdiction in which the Collateral Vessel may be trading from time to time.

(iii)    While the Collateral Vessel is idle or laid up, at the option of the Parent and in lieu of the above-mentioned marine and war risk hull insurance, port risk insurance insuring the Collateral Vessel against the usual risks encountered by like vessels under similar circumstances.

(b)    The Collateral Agent shall, at the Parent's expense, keep each Collateral Vessel insured with mortgagee's interest insurance (including extended mortgagee's interest-additional perils-pollution) on such conditions as the Collateral Agent may reasonably require and mortgagee's interest insurance for pollution risks as from time to time agreed, in each case satisfactory to the Collateral Agent and in an amount in U.S. dollars which, when aggregated with such insured value of the other Collateral Vessels (if the other Collateral Vessels are then subject to a Collateral Vessel Mortgage or a Secondary Collateral Vessel Mortgage in favor of the Collateral Agent under the Credit Agreement, and have not suffered an Event of Loss), is not less than 120% of the aggregate principal amount of outstanding Loans at such time; all such Collateral Agent's interest insurance cover shall in the Collateral Agent's discretion be obtained directly by the Collateral Agent and the Parent shall on demand pay all costs of such cover; premium costs shall be reimbursed by the Parent to the Collateral Agent.

(c)    The marine and commercial war-risk insurance required in this Schedule VI for each Collateral Vessel shall have deductibles no higher than the following:  (i) Hull and Machinery - U.S. $500,000 (or such other amount as may be agreed to by the Required Lenders) for all hull and machinery claims and each accident or occurrence and (ii) Protection and Indemnity – U.S. $100,000 for collision liabilities, U.S. $50,000 for cargo claims, U.S. $35,000 for crew claims, U.S. $20,000 passenger claims and U.S. $20,000 all other claims, in each case each accident or occurrence.

All insurance maintained hereunder shall be primary insurance without right of contribution against any other insurance maintained by the Collateral Agent. Each policy of marine and war risk hull and machinery insurance with respect to each Collateral Vessel shall provide that the Collateral Agent shall be a named insured in its capacity as Mortgagee and as a loss payee. Each entry in a marine and war risk protection indemnity club with respect to each Collateral Vessel shall note the interest of the Collateral Agent. The Administrative Agent, the Collateral Agent and each of their respective successors and assigns shall not be responsible for any premiums, club calls, assessments or any other obligations or for the representations and warranties made therein by the Parent, any of the Parent's Subsidiaries or any other person.

(d)     The Collateral Agent shall from time to time, and in any event at least annually, obtain a detailed report signed by a firm of marine insurance brokers acceptable to the Collateral Agent with respect to P & I entry, the hull and machinery and war risk insurance carried and maintained on each Collateral Vessel, together with their opinion as to the adequacy thereof and its compliance with the provisions of this Schedule VI. At the Parent's expense the Parent will cause its insurance broker (which, for the avoidance of doubt shall be a different insurance broker from the firm of marine insurance brokers referred to in the immediately preceding sentence) and the P & I club or association providing P & I insurance referred to in part (a)(ii) of this Schedule VI, to agree to advise the Collateral Agent by telecopier or electronic mail confirmed by letter of any expiration, termination, alteration or cancellation of any policy, any default in the payment of any premium and of any other act or omission on the part of the Parent or any of its Subsidiaries of which the Parent has knowledge and which might invalidate or render unenforceable, in whole or in part, any insurance on any Collateral Vessel, and to provide an opportunity of paying any such unpaid premium or call, such right being exercisable by the Collateral Agent on a Collateral Vessel on an individual basis and not on a fleet basis. In addition, the Parent shall promptly provide the Collateral Agent with any information which the Collateral Agent reasonably requests for the purpose of obtaining or preparing any report from the Collateral Agent's independent marine insurance consultant as to the adequacy of the insurances effected or proposed to be effected in accordance with this Schedule VI as of the date hereof or in connection with any renewal thereof, and the Parent shall upon demand indemnify the Collateral Agent in respect of all reasonable fees and other expenses incurred by or for the account of the Collateral Agent in connection with any such report, provided that the Collateral Agent shall be entitled to such indemnity only for one such report during a period of twelve months.

The underwriters or brokers shall furnish the Collateral Agent with a letter or letters of undertaking to the effect that:

(i)     they will hold the instruments of insurance, and the benefit of the insurances thereunder, to the order of the Collateral Agent in accordance with the terms of the loss payable clause referred to in the relevant Assignment of Insurances or Secondary Assignment of Insurances for each Collateral Vessel, as applicable;

(ii)     they will have endorsed on each and every policy as and when the same is issued the loss payable clause and the notice of assignment referred to in the relevant Assignment of Insurances or Secondary Assignment of Insurances for each Collateral Vessel, as applicable; and

(iii)     they will not set off against any sum recoverable in respect of a claim against any Collateral Vessel under the said underwriters or brokers or any other Person in respect of any other vessel nor cancel the said insurances by reason of non-payment of such premiums or other amounts.

All policies of insurance required hereby shall provide for not less than 14 days prior written notice to be received by the Collateral Agent of the termination or cancellation of the insurance evidenced thereby. All policies of insurance maintained pursuant to this Schedule VI

for risks covered by insurance other than that provided by a P & I Club shall contain provisions waiving underwriters' rights of subrogation thereunder against any assured named in such policy and any assignee of said assured. The Parent shall, and shall cause its Subsidiaries to, assign to the Collateral Agent its full rights under any policies of insurance in respect of each Collateral Vessel. The Parent agrees that it shall, and shall cause each of its Subsidiaries to, deliver, unless the insurances by their terms provide that they cannot cease (by reason of nonrenewal or otherwise) without the Collateral Agent being informed and having the right to continue the insurance by paying any premiums not paid by the Parent, receipts showing payment of premiums for Required Insurance and also of demands from the Collateral Vessel's P & I underwriters to the Collateral Agent at least two (2) days before the risk in question commences.

(e)      Unless the Collateral Agent shall otherwise agree, all amounts of whatsoever nature payable under any insurance must be payable to the Collateral Agent for distribution first to itself and thereafter to the Parent or others as their interests may appear, provided that, notwithstanding anything to the contrary herein, until otherwise required by the Collateral Agent by notice to the underwriters upon the occurrence and continuance of a Default or an Event of Default hereunder, (i) amounts payable under any insurance on each Collateral Vessel with respect to protection and indemnity risks may be paid directly to (x) the Parent to reimburse it for any loss, damage or expense incurred by it and covered by such insurance or (y) the Person to whom any liability covered by such insurance has been incurred provided that the underwriter shall have first received evidence that the liability insured against has been discharged, and (ii) amounts payable under any insurance with respect to each Collateral Vessel involving any damage to each Collateral Vessel not constituting an Event of Loss, may be paid by underwriters directly for the repair, salvage or other charges involved or, if the Parent shall have first fully repaired the damage or paid all of the salvage or other charges, may be paid to the Parent as reimbursement therefor; provided, however, that if such amounts (including any deductible) are in excess of U.S. $2,000,000, the underwriters shall not make such payment without first obtaining the written consent thereto of the Collateral Agent.

(f)      All amounts paid to the Collateral Agent in respect of any insurance on the Collateral Vessels shall be disposed of as follows (after deduction of the expenses of the Collateral Agent in collecting such amounts):

(i)      any amount which might have been paid at the time, in accordance with the provisions of paragraph (d) above, directly to the Parent or others shall be paid by the Collateral Agent to, or as directed by, the Parent;

(ii)      all amounts paid to the Collateral Agent in respect of an Event of Loss of the Collateral Vessel shall be applied by the Collateral Agent to the payment of the Indebtedness hereby secured pursuant to Section 4.02(b) of the Credit Agreement and subject to the Intercreditor Agreements;

(iii)      all other amounts paid to the Collateral Agent in respect of any insurance on the Collateral Vessel may, in the Collateral Agent's sole discretion, be held and applied to the prepayment of the Obligations or to making of needed repairs or other work on the Collateral Vessel, or to the payment of other claims incurred by the Parent or

any of its Subsidiaries relating to the Collateral Vessel, or may be paid to the Parent or whosoever may be entitled thereto.

(g)     In the event that any claim or lien is asserted against any Collateral Vessel for loss, damage or expense which is covered by insurance required hereunder and it is necessary for the Parent to obtain a bond or supply other security to prevent arrest of such Collateral Vessel or to release the Collateral Vessels from arrest on account of such claim or lien, the Collateral Agent, on request of the Parent, may, in the sole discretion of the Collateral Agent, assign to any Person, firm or corporation executing a surety or guarantee bond or other agreement to save or release the Collateral Vessel from such arrest, all right, title and interest of the Collateral Agent in and to said insurance covering said loss, damage or expense, as collateral security to indemnify against liability under said bond or other agreement.

(h)     The Parent shall deliver to the Collateral Agent certified copies and, whenever so requested by the Collateral Agent, the originals of all certificates of entry, cover notes, binders, evidences of insurance and policies and all endorsements and riders amendatory thereof in respect of insurance maintained pursuant to Section 8.03 of the Credit Agreement and this Schedule VI for the purpose of inspection or safekeeping, or, alternatively, satisfactory letters of undertaking from the broker holding the same. The Collateral Agent shall be under no duty or obligation to verify the adequacy or existence of any such insurance or any such policies, endorsement or riders.

(i)     The Parent will not, and will not permit any of its Subsidiaries to, execute or permit or willingly allow to be done any act by which any insurance may be suspended, impaired or cancelled, and that it will not permit or allow the Collateral Vessels to undertake any voyage or run any risk or transport any cargo which may not be permitted by the policies in force, without having previously notified the Collateral Agent in writing and insured the Collateral Vessels by additional coverage to extend to such voyages, risks, passengers or cargoes.

(j)     In case any underwriter proposes to pay less on any claim than the amount thereof, the Parent shall forthwith inform the Collateral Agent, and if a Default, an Event of Default or an Event of Loss has occurred and is continuing, the Collateral Agent shall have the exclusive right to negotiate and agree to any compromise.

(k)     The Parent will, and will cause each of its Subsidiaries to, comply with and satisfy all of the provisions of any applicable law, convention, regulation, proclamation or order concerning financial responsibility for liabilities imposed on the Parent, its Subsidiaries or the Collateral Vessels with respect to pollution by any state or nation or political subdivision thereof and will maintain all certificates or other evidence of financial responsibility as may be required by any such law, convention, regulation, proclamation or order with respect to the trade in which the Collateral Vessels are from time to time engaged and the cargo carried by it.

## ERISA

General Maritime Corporation 401(k) Profit Sharing Plan and Trust

SCHEDULE VIII

**SUBSIDIARIES**

| Name of Subsidiary | Direct Owner(s) | Percent (%) Ownership | Jurisdiction of Organization |
|---|---|---|---|
| General Maritime Subsidiary Corporation | General Maritime Corporation | 100% | Republic of the Marshall Islands |
| General Maritime Management LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| General Maritime Management (UK) LLC | General Maritime Management LLC | 100% | Republic of the Marshall Islands |
| General Maritime Management (Hellas) LLC | General Maritime Management LLC | 100% | Republic of Liberia |
| General Maritime Management (Portugal) LLC | General Maritime Management LLC | 100% | Republic of the Marshall Islands |
| General Maritime Management (Portugal) LDA | General Maritime Management (Portugal) LLC | 100% | Republic of Portugal |
| General Maritime Crewing Pte. Ltd. | General Maritime Management (Portugal) LLC | 100% | Singapore |
| General Maritime Crewing Private Limited (India Division Office) | General Maritime Crewing Pte. Ltd. | 100% | India |
| General Maritime Crewing Limited | General Maritime Crewing Pte. Ltd. | 100% | Russia |
| GMR Chartering LLC | General Maritime Subsidiary Corporation | 100% | New York |
| GMR Administration Corp. | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Agamemnon LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Ajax LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Alexandra LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Argus LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Constantine LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Daphne LLC | General Maritime Subsidiary | 100% | Republic of the |

Schedule VIII
Page 2

| Name of Subsidiary | Direct Owner(s) | Percent (%) Ownership | Jurisdiction of Organization |
|---|---|---|---|
| | Corporation | | Marshall Islands |
| GMR Defiance LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Elektra LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR George T LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR GP LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Gulf LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Harriet G LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Hope LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Horn LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Kara G LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Limited LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Minotaur LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Orion LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Phoenix LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Princess LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Progress LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Revenge LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |

| Name of Subsidiary | Direct Owner(s) | Percent (%) Ownership | Jurisdiction of Organization |
|---|---|---|---|
| GMR St. Nikolas LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Spyridon LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Star LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Strength LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Trader LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Trust LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| Arlington Tankers Ltd. | General Maritime Corporation | 100% | Bermuda |
| Companion Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Compatriot Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Consul Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Victory Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Vision Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Arlington Tankers, LLC | Arlington Tankers Ltd. | 100% | Delaware |
| General Maritime Subsidiary II Corporation | General Maritime Corporation | 100% | Republic of the Marshall Islands |
| GMR Poseidon LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Ulysses LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Hercules LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Atlas LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Zeus LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Maniate LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |

| Name of Subsidiary | Direct Owner(s) | Percent (%) Ownership | Jurisdiction of Organization |
|---|---|---|---|
| GMR Spartiate LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| General Maritime Investments LLC | General Maritime Corporation | 100% | Republic of the Marshall Islands |
| General Product Carriers Corporation | General Maritime Investments LLC | 100% | Republic of the Marshall Islands |
| General Maritime Subsidiary NSF Corporation | General Maritime Corporation | 100% | Republic of the Marshall Islands |
| Concept Ltd. | General Maritime Subsidiary NSF Corporation | 100% | Bermuda |
| Concord Ltd. | General Maritime Subsidiary NSF Corporation | 100% | Bermuda |
| Contest Ltd. | General Maritime Subsidiary NSF Corporation | 100% | Bermuda |
| GMR Concord LLC | General Maritime Subsidiary NSF Corporation | 100% | Republic of the Marshall Islands |
| GMR Contest LLC | General Maritime Subsidiary NSF Corporation | 100% | Republic of the Marshall Islands |
| GMR Concord LLC | General Maritime Subsidiary NSF Corporation | 100% | Republic of the Marshall Islands |

# **CAPITALIZATION**[3]

All defined terms used in this Schedule IX and not defined in the Agreement shall have the meaning assigned thereto in the Plan of Reorganization.

| | | |
|---|---|---|
| New Equity Investment Shares | Oaktree Plan Sponsors | 4,750,272 |
| Commitment Fee GMR Common Stock | Oaktree Plan Sponsors | 300,017 |
| OCM Conversion Shares | OCM | 4,750,271 |
| Unsecured Creditor Equity Distribution | Unsecured Creditor Distribution Escrow Account | 200,011 |
| New GMR Warrants | Unsecured Creditor Distribution Escrow Account | 309,296 |

10% of the shares of New GMR Common Stock, or such other amount as agreed to between the Debtors and the Oaktree Plan Sponsors, on a fully-diluted basis, will be available for award on or after the Restatement Effective Date to eligible employees, directors or officers of the Parent.

Note: Subject to True-Up for Rejection Claim Damage Claims pursuant to Article IX.D of the Plan of Reorganization.

---

[3] To be amended if the Plan of Reorganization is further amended.

## APPROVED CLASSIFICATION SOCIETIES

American Bureau of Shipping
Nippon Kaiji Kyokai
Germanischer Lloyd
Lloyd's Register of Shipping
Bureau Veritas
Det Norske Veritas

SCHEDULE XI

## EXISTING INVESTMENTS

None.

SCHEDULE XII

## TRANSACTIONS WITH AFFILIATES

None.

SCHEDULE XIII

**SUBSIDIARY GUARANTORS**

| Name of Subsidiary | Direct Owner(s) |
| --- | --- |
| GMR Agamemnon LLC | General Maritime Subsidiary Corporation |
| GMR Ajax LLC | General Maritime Subsidiary Corporation |
| GMR Alexandra LLC | General Maritime Subsidiary Corporation |
| GMR Argus LLC | General Maritime Subsidiary Corporation |
| GMR Daphne LLC | General Maritime Subsidiary Corporation |
| GMR Defiance LLC | General Maritime Subsidiary Corporation |
| GMR Elektra LLC | General Maritime Subsidiary Corporation |
| GMR George T LLC | General Maritime Subsidiary Corporation |
| GMR Harriet G LLC | General Maritime Subsidiary Corporation |
| GMR Hope LLC | General Maritime Subsidiary Corporation |
| GMR Horn LLC | General Maritime Subsidiary Corporation |
| GMR Kara G LLC | General Maritime Subsidiary Corporation |
| GMR Minotaur LLC | General Maritime Subsidiary Corporation |
| GMR Orion LLC | General Maritime Subsidiary Corporation |
| GMR Phoenix LLC | General Maritime Subsidiary Corporation |
| GMR St. Nikolas LLC | General Maritime Subsidiary Corporation |
| GMR Spyridon LLC | General Maritime Subsidiary Corporation |
| GMR Strength LLC | General Maritime Subsidiary Corporation |
| Companion Ltd. | Arlington Tankers Ltd. |
| Compatriot Ltd. | Arlington Tankers Ltd. |
| Consul Ltd. | Arlington Tankers Ltd. |
| Victory Ltd. | Arlington Tankers Ltd. |
| Vision Ltd. | Arlington Tankers Ltd. |

| Name of Subsidiary | Direct Owner(s) |
|---|---|
| GMR Poseidon LLC | General Maritime Subsidiary II Corporation |
| GMR Ulysses LLC | General Maritime Subsidiary II Corporation |
| GMR Hercules LLC | General Maritime Subsidiary II Corporation |
| GMR Atlas LLC | General Maritime Subsidiary II Corporation |
| GMR Zeus LLC | General Maritime Subsidiary II Corporation |
| GMR Maniate LLC | General Maritime Subsidiary II Corporation |
| GMR Spartiate LLC | General Maritime Subsidiary II Corporation |

SCHEDULE XIV

## LITIGATION

- On or about August 29, 2007, an oil sheen was discovered by shipboard personnel of the *Genmar Progress* in Guayanilla Bay, Puerto Rico in the vicinity of the vessel. The vessel crew took prompt action pursuant to the vessel response plan. The Parent's subsidiary which operates the vessel promptly reported this incident to the U.S. Coast Guard and subsequently accepted responsibility under the U.S. Oil Pollution Act of 1990 for any damage or loss resulting from the accidental discharge of bunker fuel determined to have been discharged from the vessel. The Parent understands the federal and Puerto Rico authorities are conducting civil investigations into an oil pollution incident which occurred during this time period on the southwest coast of Puerto Rico including Guayanilla Bay. The extent to which oil discharged from the *Genmar Progress* is responsible for this incident is currently the subject of investigation. The U.S. Coast Guard has designated the *Genmar Progress* as a potential source of discharged oil. Under the U.S. Oil Pollution Act of 1990, the source of the discharge is liable, regardless of fault, for damages and oil spill remediation as a result of the discharge. On January 13, 2009, the Parent received a demand from the U.S. National Pollution Fund for approximately $5.8 million for the U.S. Coast Guard's response costs and certain costs of the Departamento de Recursos Naturales y Ambientales of Puerto Rico in connection with the alleged damage to the environment caused by the spill. In April 2010, the U.S. National Pollution Fund made an additional natural resource damage assessment claim against the Parent of approximately $0.5 million. In October 2010, the Parent entered into a settlement agreement with the U.S. National Pollution Fund in which the Parent agreed to pay approximately $6.3 million in full satisfaction of the oil spill response costs of the U.S. Coast Guard and natural damage assessment costs of the U.S. National Pollution Fund through the date of the settlement agreement. Pursuant to the settlement agreement, the U.S. National Pollution Fund will waive its claims to any additional civil penalties under the U.S. Clean Water Act as well as for accrued interest. The settlement has been paid in full by the vessel's protection and indemnity underwriters. Notwithstanding the settlement agreement, the Parent may be subject to any further potential claims by the U.S. National Pollution Fund or the U.S. Coast Guard arising from the ongoing natural resource damage assessment.

- On November 25, 2008, a jury in the Southern District of Texas found General Maritime Management (Portugal) L.D.A., a subsidiary of GMR ("GMM Portugal"), and two vessel officers of the *Genmar Defiance* guilty of violating the Act to Prevent Pollution from Ships and 18 USC 1001. The conviction resulted from charges based on alleged incidents occurring on board the *Genmar Defiance* arising from potential failures by shipboard staff to properly record discharges of bilge waste during the period of November 24, 2007 through November 26, 2007. Pursuant to the sentence imposed by the Court on March 13, 2009, GMM Portugal paid a $1 million fine in April 2009 and is subject to a probationary period of five years. During this period, a court-appointed monitor will monitor and audit GMM Portugal's compliance with its environmental compliance plan, and GMM Portugal is required to designate a responsible corporate officer to submit monthly reports to, and respond to inquiries from, the court's probation department. The court stated that, should GMM Portugal engage in future conduct in violation of its probation, it may, under appropriate circumstances, ban certain of the Parent's vessels from calling on U.S. ports. Any violations of probation may also result in additional penalties, costs or sanctions being imposed on the Parent.

SCHEDULE XV

## NON-RECOURSE SUBSIDIARIES

None.

SCHEDULE XV

## NON-RECOURSE SUBSIDIARIES

## EXHIBIT 4

**New Senior 2011 Facility Credit Agreement**

$508,963,260.95[1]

# THIRD AMENDED AND RESTATED CREDIT AGREEMENT

among

**GENERAL MARITIME CORPORATION,**
as Parent,

**GENERAL MARITIME SUBSIDIARY II CORPORATION,**

and

**ARLINGTON TANKERS LTD.**
as Guarantors,

**GENERAL MARITIME SUBSIDIARY CORPORATION,**
as Borrower,

**VARIOUS LENDERS**

and

**NORDEA BANK FINLAND PLC, NEW YORK BRANCH,**
as Administrative Agent and Collateral Agent

and

**NORDEA BANK FINLAND PLC, NEW YORK BRANCH**

and

**DNB BANK ASA**
as Joint Book Runners

Dated as of [_____], 2012

---

[1] Amount to include accrued and unpaid interest on the Specified Swap.

TABLE OF CONTENTS

Page

SECTION 1. Definitions and Accounting Terms ...................................................................2

    1.01 Defined Terms ...........................................................................................2

SECTION 2. Amount and Terms of Credit Facility ..............................................................34

    2.01 The Loans ...............................................................................................34
    2.02 [Intentionally Omitted] ............................................................................35
    2.03 [Intentionally Omitted] ............................................................................35
    2.04 [Intentionally Omitted] ............................................................................35
    2.05 Notes 35
    2.06 Pro Rata Borrowings ...............................................................................36
    2.07 Interest ...................................................................................................36
    2.08 Interest Periods .......................................................................................36
    2.09 Increased Costs, Illegality, Market Disruption Event, etc. ...........................38
    2.10 Compensation ........................................................................................40
    2.11 Change of Lending Office ........................................................................40
    2.12 Replacement of Lenders ..........................................................................41
    2.13 Defaulting Lenders .................................................................................41

SECTION 3. Existing Letters of Credit ...............................................................................42

    3.01 Existing Letters of Credit .........................................................................42
    3.02 Existing Letter of Credit Participations .....................................................42
    3.03 Agreement to Repay Existing Letter of Credit Drawings .............................45
    3.04 Increased Costs ......................................................................................46

SECTION 4. Fees 46

    4.01 Fees  46

SECTION 5. Prepayments; Payments; Taxes .......................................................................47

    5.01 Voluntary Prepayments ............................................................................47
    5.02 Mandatory Repayments ...........................................................................48
    5.03 Method and Place of Payment ..................................................................51
    5.04 Net Payments; Taxes ...............................................................................51

SECTION 6. [Intentionally Omitted] ...................................................................................52

SECTION 7. Representations, Warranties and Agreements ....................................................52

    7.01 Corporate/Limited Liability Company/Limited Partnership Status ................52
    7.02 Corporate Power and Authority ................................................................53
    7.03 No Violation ...........................................................................................53
    7.04 Governmental Approvals .........................................................................53
    7.05 Financial Statements; Financial Condition; Undisclosed Liabilities. .............53

7.06 Litigation.................................................................................................54
7.07 True and Complete Disclosure.............................................................54
7.08 Use of Proceeds; Margin Regulations...................................................55
7.09 Tax Returns and Payments....................................................................55
7.10 Compliance with ERISA........................................................................56
7.11 The Security Documents.......................................................................57
7.12 Capitalization .......................................................................................57
7.13 Subsidiaries...........................................................................................58
7.14 Compliance with Statutes, etc..............................................................58
7.15 Investment Company Act .....................................................................58
7.16 Money Laundering................................................................................58
7.17 Pollution and Other Regulations..........................................................59
7.18 Labor Relations.....................................................................................60
7.19 Patents, Licenses, Franchises and Formulas .......................................60
7.20 Indebtedness..........................................................................................60
7.21 Insurance...............................................................................................60
7.22 Concerning the Collateral Vessels .......................................................60
7.23 Citizenship ...........................................................................................61
7.24 Collateral Vessel Classification; Flag...................................................61
7.25 No Immunity.........................................................................................61
7.26 Fees and Enforcement...........................................................................61
7.27 Form of Documentation .......................................................................61
7.28 Solvency................................................................................................62
7.29 Patriot Act ............................................................................................62
7.30 Certain Business Practices ...................................................................62

SECTION 8. Affirmative Covenants.............................................................62
8.01 Information Covenants..........................................................................62
8.02 Books, Records and Inspections ..........................................................66
8.03 Maintenance of Property; Insurance ....................................................67
8.04 Corporate Franchises ...........................................................................67
8.05 Compliance with Statutes, etc..............................................................67
8.06 Compliance with Environmental Laws.................................................67
8.07 ERISA ...................................................................................................68
8.08 End of Fiscal Years; Fiscal Quarters ...................................................70
8.09 Performance of Obligations .................................................................70
8.10 Payment of Taxes..................................................................................70
8.11 Further Assurances................................................................................70
8.12 Deposit of Earnings...............................................................................71
8.13 Ownership of Subsidiaries ....................................................................71
8.14 Flag of Collateral Vessels; Citizenship; Collateral Vessel Classifications...............71
8.15 Use of Proceeds.....................................................................................72

SECTION 9. Negative Covenants .................................................................72
9.01 Liens 72
9.02 Consolidation, Merger, Sale of Assets, etc. .........................................74

9.03 Dividends ................................................................................................76
9.04 Indebtedness.............................................................................................77
9.05 Advances, Investments and Loans ...........................................................77
9.06 Transactions with Affiliates .....................................................................79
9.07 Capital Expenditures.................................................................................79
9.08 Minimum Cash Balance............................................................................79
9.09 Collateral Maintenance ............................................................................80
9.10 Interest Expense Coverage Ratio .............................................................81
9.11 Limitation on Modifications of Certificate of Incorporation, By-Laws and
        Certain Other Agreements; etc..............................................................81
9.12 Limitation on Certain Restrictions on Subsidiaries ..................................82
9.13 Limitation on Issuance of Equity Interests ...............................................82
9.14 Business ...................................................................................................83
9.15 Jurisdiction of Employment; Chartering In Contracts...............................83
9.16 Bank Accounts .........................................................................................83
9.17 Indebtedness of Non-Recourse Subsidiaries.............................................83

SECTION 10. Events of Default ............................................................................84

10.01 Payments.................................................................................................84
10.02 Representations, etc. ...............................................................................84
10.03 Covenants................................................................................................84
10.04 Default Under Other Agreements .............................................................84
10.05 Bankruptcy, etc. ......................................................................................85
10.06 ERISA.....................................................................................................85
10.07 Security Documents .................................................................................86
10.08 Guaranties ...............................................................................................86
10.09 Judgments ...............................................................................................86
10.10 Change of Control....................................................................................86
10.11 Default Under Non-Recourse Subsidiary Agreements ..............................87

SECTION 11. Agency and Security Trustee Provisions .........................................87

11.01 Appointment ...........................................................................................87
11.02 Nature of Duties......................................................................................88
11.03 Lack of Reliance on the Agents ..............................................................88
11.04 Certain Rights of the Agents...................................................................89
11.05 Reliance...................................................................................................89
11.06 Indemnification.......................................................................................89
11.07 The Administrative Agent in its Individual Capacity ...............................89
11.08 Holders....................................................................................................90
11.09 Resignation by the Administrative Agent.................................................90
11.10 Collateral Matters....................................................................................90
11.11 Delivery of Information ...........................................................................91

SECTION 12. Miscellaneous..................................................................................92

12.01 Payment of Expenses; etc. ......................................................................92
12.02 Right of Setoff.........................................................................................93

12.03 Notices ................................................................................................................. 93
12.04 Benefit of Agreement .......................................................................................... 93
12.05 No Waiver; Remedies Cumulative ..................................................................... 96
12.06 Payments Pro Rata ............................................................................................. 97
12.07 Calculations; Computations ............................................................................... 97
12.08 **GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;**
      **WAIVER OF JURY TRIAL** ............................................................................ 98
12.09 Counterparts ........................................................................................................ 99
12.10 Restatement Effective Date ................................................................................. 99
12.11 Headings Descriptive ........................................................................................ 102
12.12 Amendment or Waiver; etc. .............................................................................. 102
12.13 Survival ............................................................................................................. 104
12.14 Domicile of Loans ............................................................................................. 104
12.15 Confidentiality .................................................................................................. 104
12.16 Register .............................................................................................................. 105
12.17 Judgment Currency ........................................................................................... 106
12.18 Language ............................................................................................................ 106
12.19 Waiver of Immunity .......................................................................................... 106
12.20 USA PATRIOT Act Notice ............................................................................... 107
12.21 Release of Secondary Collateral and Subsidiary Guarantors ........................... 107

SECTION 13. Holdings Guaranty. ................................................................................. 107

13.01 Guaranty ............................................................................................................ 107
13.02 Bankruptcy ........................................................................................................ 108
13.03 Nature of Liability ............................................................................................. 108
13.04 Independent Obligation ..................................................................................... 109
13.05 Authorization .................................................................................................... 109
13.06 Reliance ............................................................................................................. 110
13.07 Subordination .................................................................................................... 110
13.08 Waiver ............................................................................................................... 110
13.09 Judgment Shortfall ............................................................................................ 111

SCHEDULE I        -    Loans
SCHEDULE II       -    Lender Addresses
SCHEDULE III      -    Collateral Vessels
SCHEDULE IV       -    Existing Liens
SCHEDULE V        -    Existing Indebtedness
SCHEDULE VI       -    Required Insurance
SCHEDULE VII      -    ERISA
SCHEDULE VIII     -    Subsidiaries
SCHEDULE IX       -    Capitalization
SCHEDULE X        -    Approved Classification Societies
SCHEDULE XI       -    Existing Investments
SCHEDULE XII      -    Existing Letters of Credit
SCHEDULE XIII     -    Transactions with Affiliates
SCHEDULE XIV      -    Subsidiary Guarantors
SCHEDULE XV       -    Litigation

SCHEDULE XVI        -        Non-Recourse Subsidiaries

EXHIBIT A           -        Form of Notice of Interest Period Election
EXHIBIT B           -        Form of Term Note
EXHIBIT C-1         -        Form of Opinion of Kirkland & Ellis LLP, New York counsel to the
                             Credit Parties
EXHIBIT C-2         -        Form of Opinion of Constantine P. Georgiopoulos, New York
                             maritime counsel to the Credit Parties
EXHIBIT C-3         -        Form of Opinion of Dennis J. Reeder, Esq., Marshall Islands counsel
                             to the Credit Parties
EXHIBIT C-4         -        Form of Opinion of George E. Henries, Esq., Liberian counsel to the
                             Credit Parties
EXHIBIT C-5         -        Form of Opinion of Conyers, Dill & Pearman Ltd., Bermuda counsel
                             to the Credit Parties
EXHIBIT D           -        Form of Officer's Certificate
EXHIBIT E           -        Form of Amended and Restated Subsidiaries Guaranty
EXHIBIT F-1         -        Form of Second Amended and Restated Pledge Agreement
EXHIBIT F-2         -        Form of Amended and Restated Secondary Pledge Agreement
EXHIBIT G-1         -        Form of Assignment of Earnings
EXHIBIT G-2         -        Form of Secondary Assignment of Earnings
EXHIBIT H-1         -        Form of Assignment of Insurances
EXHIBIT H-2         -        Form of Secondary Assignment of Insurances
EXHIBIT I-1         -        Form of Marshall Islands Collateral Vessel Mortgage
EXHIBIT I-2         -        Form of Marshall Islands Secondary Collateral Vessel Mortgage
EXHIBIT I-3         -        Form of Liberian Collateral Vessel Mortgage
EXHIBIT I-4         -        Form of Bermuda Collateral Vessel Mortgage
EXHIBIT J           -        Form of Excess Liquidity Certificate
EXHIBIT K           -        Form of Solvency Certificate
EXHIBIT L           -        Form of Assignment and Assumption Agreement
EXHIBIT M           -        Form of Amended and Restated Compliance Certificate
EXHIBIT N           -        Subordination Provisions
EXHIBIT O           -        Form of Parent Officer's Certificate
EXHIBIT P-1         -        Form of Primary Intercreditor Agreement
EXHIBIT P-2         -        Form of Secondary Intercreditor Agreement
EXHIBIT Q           -        Form of Joinder Agreement

THIS THIRD AMENDED AND RESTATED CREDIT AGREEMENT, dated as of [        ], 2012, among GENERAL MARITIME CORPORATION, a Marshall Islands corporation (the "Parent"), GENERAL MARITIME SUBSIDIARY CORPORATION, a Marshall Islands corporation (the "Borrower"), GENERAL MARITIME SUBSIDIARY II CORPORATION, a Marshall Islands corporation ("GMSCII"), in its capacity as a Guarantor, ARLINGTON TANKERS LTD., a Bermuda corporation, as a Guarantor ("Arlington"), the Lenders party hereto from time to time, and NORDEA BANK FINLAND PLC, NEW YORK BRANCH ("Nordea"), as Administrative Agent (in such capacity, the "Administrative Agent") and as Collateral Agent under the Security Documents (in such capacity, the "Collateral Agent"). All capitalized terms used herein and defined in Section 1 are used herein as therein defined.

## W I T N E S S E T H:

WHEREAS, the Borrower, the Parent, GMSCII, Arlington, the lenders party thereto and Nordea, as administrative agent and collateral agent, are party to a Second Amended and Restated Credit Agreement, dated as of May 6, 2011 (as amended, modified and/or supplemented from time to time to, but not including, the Restatement Effective Date, the "Original Credit Agreement");

WHEREAS, the Borrower, GMSCII and the Parent and certain of their subsidiaries commenced voluntary bankruptcy proceedings (the "Chapter 11 Proceedings") on November 17, 2011 under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on [        ], 2012, in connection with the Chapter 11 Proceedings, the Bankruptcy Court confirmed a plan of reorganization (as such plan may be modified from time to time, in accordance with its terms, the "Plan of Reorganization") under Chapter 11 of the Bankruptcy Code pursuant to a confirmation order dated [            ], 2012;

WHEREAS, pursuant to the Plan of Reorganization, on the Restatement Effective Date (x) each of the Lenders holding outstanding Revolving Loans immediately prior to the Restatement Effective Date will convert such Revolving Loans into Tranche A Loans under this Agreement after giving effect to the paydown of $35,350,780 as part of the Plan of Reorganization, (y) the unutilized Revolving Commitments (as defined in the Original Credit Agreement) of the Lenders, if any, under the Original Credit Agreement will be terminated and (z) the termination value of and interest in accordance with the Final DIP/Cash Collateral Order on the Indebtedness under the Specified Swap shall be exchanged on a dollar for dollar basis for a Tranche B Loan under this Agreement;

WHEREAS, pursuant to the Plan of Reorganization, GMSCII intends to amend and restate its existing $372,000,000 Amended and Restated Credit Agreement, dated as of May 6, 2011 (as amended, modified and/or supplemented from time to time to, but not including, the Restatement Effective Date, the "Original Other Credit Agreement"), among GMSCII, as borrower, the Parent, Arlington and the Borrower, as guarantors, the lenders party thereto and Nordea, as administrative agent, with a term loan credit facility providing for the continuation of

the outstanding term loans and conversion of revolving commitments under the Original Other Credit Agreement into term loans to GMSCII (such $273,802,583.31 Second Amended and Restated Credit Agreement (as amended, modified and/or supplemented in accordance with the terms thereof and of the Intercreditor Agreements), among GMSCII, as borrower, the Parent, the Borrower and Arlington, as guarantors, the lenders from time to time party thereto and Nordea, as administrative agent and collateral agent (in such capacities, the "Other Agent"), the "Other Credit Agreement");

WHEREAS, subject to certain conditions, including the confirmation of the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code and the effectiveness of the Plan of Reorganization, pursuant to the Plan of Reorganization, the Lenders under the Original Credit Agreement shall be deemed a party to this Agreement without further action of the Administrative Agent or of the Lenders, and this Agreement, as set forth herein, will replace the Original Credit Agreement, which will have no remaining force and effect;

WHEREAS, pursuant to the terms of the Plan of Reorganization and in consideration for the Lenders under the Original Credit Agreement consenting to the conversion and continuation of Indebtedness under the Other Credit Agreement (including the guarantees thereof) and the continuation of the second priority liens on the collateral securing such Indebtedness, (x) the Guarantors under and as defined in the Other Credit Agreement will guarantee the Obligations under this Agreement and (y) the Obligations of the Credit Parties under this Agreement will continue to be secured by a second priority Lien on the Secondary Collateral; and

WHEREAS, the parties wish to amend and restate the Original Credit Agreement in order to permit the transactions described above and to amend certain other provisions of the Original Credit Agreement.

NOW, THEREFORE, the parties hereto agree that, effective as of the Restatement Effective Date, the Original Credit Agreement shall be, and hereby is, amended and restated in its entirety as follows:

SECTION 1. Definitions and Accounting Terms.

1.01 Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acceptable Flag Jurisdiction" shall have the meaning provided in Section 8.14.

"Administrative Agent" shall have the meaning provided in the first paragraph of this Agreement, and shall include any successor thereto.

"Affiliate" shall mean, with respect to any Person, any other Person (including, for purposes of Section 9.06 only, all directors, officers and partners of such Person) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; provided, however, that for purposes of Section 9.06, an Affiliate of the Parent shall include any Person that directly or indirectly owns more than 5% of any class of the capital stock

-2-

of the Parent and any officer or director of the Parent or any of its Subsidiaries. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding anything to the contrary contained above, for purposes of Section 9.06, none of the Administrative Agent, the Collateral Agent or any Lender (or any of their respective affiliates) shall be deemed to constitute an Affiliate of the Parent or its Subsidiaries in connection with the Credit Documents or its dealings or arrangements relating thereto.

"Affiliated Lender" shall have the meaning provided in Section 12.04(d).

"Agents" shall mean, collectively, the Administrative Agent, the Collateral Agent, each Joint Book Runner and each Issuing Lender.

"Aggregate Primary Collateral Vessel Value" shall have the meaning provided in Section 9.09(a).

"Agreement" shall mean this Third Amended and Restated Credit Agreement, as modified, supplemented, amended or restated from time to time.

"Applicable Margin" shall mean a percentage per annum equal to 4.00%.

"Applicable Property" shall have the meaning provided in Section 9.01.

"Approved Appraiser" shall mean H. Clarksons & Company Limited, Fearnleys Ltd., R.S. Platou Shipbrokers a.s., Lorentzen & Stemoco, Simpson Spence & Young Ltd. or such other independent appraisal firm as may be acceptable to the Administrative Agent.

"Arlington" shall have the meaning provided in the first paragraph of this Agreement.

"Assignment and Assumption Agreement" shall mean the Assignment and Assumption Agreement substantially in the form of Exhibit L (appropriately completed).

"Assignment of Charters" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Assignment of Earnings" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Assignment of Insurances" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Bankruptcy Code" shall have the meaning provided in Section 10.05.

"Bankruptcy Court" shall have the meaning provided in the Recitals.

"Base Rate" shall mean, for any day, a rate per annum equal to the highest of (i) the Prime Rate in effect on such day, (ii) the sum of the Federal Funds Rate for such day plus ½ of 1% per annum and (iii) the Eurodollar Rate for a Eurodollar Loan denominated in Dollars with a one-month interest period commencing on such day plus 1.00%. For purposes of this definition, the Eurodollar Rate shall be determined using the Eurodollar Rate as otherwise determined by the Administrative Agent in accordance with the definition of Eurodollar Rate, except that (x) if a given day is a Business Day, such determination shall be made on such day (rather than two Business Days prior to the commencement of an Interest Period) or (y) if a given day is not a Business Day, the Eurodollar Rate for such day shall be the rate determined by the Administrative Agent pursuant to preceding clause (x) for the most recent Business Day preceding such day. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or such Eurodollar Rate shall be effective as of the opening of business on the day of such change in the Prime Rate, the Federal Funds Rate or such Eurodollar Rate, respectively.

"Blocked Account" shall have the meaning provided in Section 9.09(b).

"Blocked Amount" shall have the meaning provided in Section 9.09(b).

"Borrower" shall have the meaning provided in the first paragraph of this Agreement.

"Borrowing" shall mean the borrowing of Tranche A Loans from all the Lenders (other than Defaulting Lenders) on a given date having the same Interest Period.

"Business Day" shall mean any day except Saturday, Sunday and any day which shall be in New York City, Hamburg or London a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close.

"Capital Expenditures" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person.

"Capitalized Lease Obligations" of any Person shall mean all rental obligations which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"Cash Equivalents" shall mean (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition, (ii) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, capital, (x) surplus and undivided profits aggregating in excess of $200,000,000 and (y) a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than one year from the date of acquisition by such Person, (iii) repurchase obligations with a term of not more than 90 days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (ii) above, (iv) commercial paper

-4-

issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than one year after the date of acquisition by such Person, and (v) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (iv) above.

"Cash Flow Projections" shall have the meaning provided in Section 8.01(l).

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same may be amended from time to time, 42 U.S.C. § 9601 et seq.

"Change of Control" shall mean (i) the Parent shall at any time and for any reason fail to own or control, directly or indirectly, 100% of the Equity Interests of the Borrower and each Subsidiary Guarantor which owns a Primary Collateral Vessel, except in the case of a non-U.S. Subsidiary Guarantor, any such other ownership as required by applicable law, (ii) the sale, lease or transfer of all or substantially all of the Parent's assets to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), (iii) the liquidation or dissolution of the Parent or the Borrower, (iv) (x) at any time prior to the consummation of a Qualifying IPO, the Permitted Holders shall at any time cease to own, directly or indirectly, beneficially or of record, shares representing more than 50% of the outstanding voting or economic Equity Interests of the Parent and (y) at any time upon or after the consummation of a Qualifying IPO, (1) any Person or Persons constituting a "group" (as such term is used in Section 13(d) and 14(d) of the Exchange Act, but excluding any benefit plan of such Person or Persons and its or their Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than a Permitted Holder, becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of Stock representing more than 35% of the outstanding voting Equity Interests of the Parent and (2) the percentage of outstanding voting Equity Interests of the Parent so held by such Person or Persons is greater than the percentage of outstanding voting Equity Interests of the Parent beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders, (v) the replacement of a majority of the directors on the board of directors of the Parent over a two-year period from the directors who constituted the board of directors of the Parent at the beginning of such period, and such replacement shall not have been approved by a vote of at least a majority of the board of directors of the Parent then still in office who either were members of such board of directors at the beginning of such period or whose election as a member of such Board of Directors was previously so approved or (vi) a "change of control" or similar event shall occur as provided in any outstanding Indebtedness (excluding Indebtedness with an aggregate principal amount of less than $20,000,000) of Parent or any of its Subsidiaries (or the documentation governing the same). For the avoidance of doubt, the Plan of Reorganization shall not constitute a Change of Control.

"Chapter 11 Proceedings" shall have the meaning provided in the Recitals.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the

Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" shall mean all Primary Collateral and Secondary Collateral.

"Collateral Agent" shall mean the Administrative Agent acting as mortgagee, security trustee or collateral agent for the Secured Creditors pursuant to the Security Documents.

"Collateral and Guaranty Requirements" shall mean with respect to each Collateral Vessel or each Credit Party, as the case may be, the requirement that:

(i)    each Subsidiary defined as a Subsidiary Guarantor shall have duly authorized, executed and delivered to the Administrative Agent a reaffirmation of the Subsidiaries Guaranty, substantially in the form of Exhibit E (as modified, supplemented or amended from time to time, together with any Joinder Agreement, the "Subsidiaries Guaranty"), or a joinder thereto substantially in the form of Exhibit Q (as modified, supplemented or amended from time to time, the "Joinder Agreement"), and the Subsidiaries Guaranty shall be in full force and effect;

(ii)    the Parent, the Borrower, Arlington and each Subsidiary Guarantor described in clause (x) of the definition thereof shall have (x) duly authorized, executed and delivered the Second Amended and Restated Pledge Agreement substantially in the form of Exhibit F-1 (as modified, supplemented or amended from time to time, the "Pledge Agreement") or a joinder thereto, and shall have (A) delivered to the Collateral Agent, as pledgee, all the Pledged Securities referred to therein, together with executed and undated transfer powers, including, without limitation and to the extent applicable, a charge over shares of any Bermuda registered Subsidiary Guarantor taken by way of a Bermuda-law governed charge over shares, and (B) otherwise complied with all of the requirements set forth in the Pledge Agreement, and (y) duly authorized, executed and delivered any other related documentation necessary or advisable to perfect the Lien on the Pledge Agreement Collateral in the respective jurisdictions of formation of the respective Subsidiary Guarantor, Arlington the Parent or the Borrower, as the case may be;

(iii)    the Parent, GMSCII and each Subsidiary Guarantor described in clause (y) of the definition thereof shall have (x) duly authorized, executed and delivered the Amended and Restated Secondary Pledge Agreement substantially in the form of Exhibit F-2 (as modified, supplemented or amended from time to time, the "Secondary Pledge Agreement") or a joinder thereto, and shall have (A) delivered to the Other Agent, as pledgee and bailee on behalf of the Secured Creditors in accordance with the Secondary Intercreditor Agreement, all the Pledged Securities referred to therein, together with executed and undated transfer powers, including, without limitation and to the extent applicable, a charge over shares of any Bermuda registered Subsidiary Guarantor taken by way of a Bermuda-law governed charge over shares, and (B) otherwise complied with all of the requirements set forth in the Secondary Pledge Agreement and (y) duly authorized, executed and delivered to the Other Agent any other related documentation necessary or advisable to perfect the Lien on the Secondary Pledge Agreement Collateral in the respective jurisdictions of formation of the Parent, the respective Subsidiary Guarantor or GMSCII, as the case may be;

(iv)    the Parent, GMSCII, Arlington, the Borrower, each Subsidiary Guarantor that owns a Collateral Vessel, the Collateral Agent and Nordea, as depositary bank, shall have duly executed and delivered a control agreement substantially in the form attached to the Pledge Agreement and/or the Secondary Pledge Agreement, as the case may be, with respect to any Concentration Account owned by the Parent, GMSCII, Arlington, the Borrower or such Subsidiary Guarantor (or, if a control agreement with respect to any such Concentration Account shall have been executed and delivered by the Parent, GMSCII, Arlington, the Borrower or any such Subsidiary Guarantor prior to the Restatement Effective Date, a reaffirmation of such control agreement); provided that, prior to the Discharge of the First-Priority Obligations (as defined in the Secondary Intercreditor Agreement) in full, no Subsidiary Guarantor that owns a Secondary Collateral Vessel shall be required to execute and deliver a control agreement to the Collateral Agent with respect to a Concentration Account as defined in the Secondary Pledge Agreement;

(v)    each Subsidiary Guarantor that owns a Primary Collateral Vessel shall (A) have duly authorized, executed and delivered reaffirmations of such Subsidiary Guarantor's (x) Assignment of Earnings substantially in the form of Exhibit G-1 (as modified, supplemented or amended from time to time, the "Assignment of Earnings") and (y) Assignment of Insurances substantially in the form of Exhibit H-1 (as modified, supplemented or amended from time to time, the "Assignment of Insurances"), together covering all of such Subsidiary Guarantor's present and future Earnings and Insurance Collateral on such Primary Collateral Vessels, and (B) use its commercially reasonably efforts to obtain an Assignment of Charters substantially in the form of Exhibit B to the Assignment of Earnings (as modified, supplemented or amended from time to time, the "Assignment of Charters") for any charter or similar contract that has as of the execution date of such charter or similar contract a remaining term of 12 months or greater (including any renewal or extension option) (or, if an Assignment of Charters with respect to any such Primary Collateral Vessel shall have been executed and delivered by any such Subsidiary Guarantor prior to the Restatement Effective Date, a reaffirmation of such Assignment of Charters), and shall use commercially reasonable efforts to provide appropriate notices and consents related thereto, together covering all of such Subsidiary Guarantor's present and future Earnings and Insurance Collateral on such Primary Collateral Vessels, in each case together with:

(a)    proper Financing Statements (Form UCC-1) or amendments thereto, as requested by the Administrative Agent, in form for filing under the UCC or in other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the Pledge Agreement, the Assignment of Earnings, Assignment of Charters and the Assignment of Insurances; and

(b)    certified copies of Requests for Information or Copies (Form UCC-11), or equivalent reports, listing all effective financing statements that name any Credit Party as debtor and that are filed in Washington, D.C. and any other relevant jurisdiction, together with copies of such other financing statements (none of which shall cover the Collateral, other than as set forth in the Intercreditor Agreements, unless the Collateral Agent shall have received Form UCC-3 Termination Statements (or such other termination statements as shall be

required by local law) fully executed for filing if required by applicable laws in respect thereof);

(vi) each Subsidiary Guarantor that owns a Secondary Collateral Vessel shall (A) have duly authorized, executed and delivered reaffirmations of such Subsidiary Guarantor's (x) Assignment of Earnings substantially in the form of Exhibit G-2 (as modified, supplemented or amended from time to time, the "Secondary Assignment of Earnings") and (y) Assignment of Insurances substantially in the form of Exhibit H-2 (as modified, supplemented or amended from time to time, the "Secondary Assignment of Insurances"), together covering all of such Subsidiary Guarantor's present and future Secondary Earnings and Insurance Collateral on such Secondary Collateral Vessels, and (B) use its commercially reasonably efforts to obtain an Assignment of Charters substantially in the form of Exhibit B to the Secondary Assignment of Earnings (as modified, supplemented or amended from time to time, the "Secondary Assignment of Charters") for any charter or similar contract that has as of the execution date of such charter or similar contract a remaining term of twelve months or greater (including any renewal or extension option) (or, if an Assignment of Charters with respect to any such Secondary Collateral Vessel shall have been executed and delivered by any such Subsidiary Guarantor prior to the Restatement Effective Date, a reaffirmation of such Assignment of Charters), and shall use commercially reasonable efforts to provide appropriate notices and consents related thereto, together covering all of such Subsidiary Guarantor's present and future Secondary Earnings and Insurance Collateral on such Secondary Collateral Vessels, in each case together with:

(a) proper Financing Statements (Form UCC-1) or amendments thereto, as requested by the Administrative Agent, in form for filing under the UCC or in other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the Secondary Pledge Agreement, the Secondary Assignment of Earnings, the Secondary Assignment of Charters and the Secondary Assignment of Insurances; and

(b) certified copies of Requests for Information or Copies (Form UCC-11), or equivalent reports, listing all effective financing statements that name any Credit Party as debtor and that are filed in Washington, D.C. and any other relevant jurisdiction, together with copies of such other financing statements (none of which shall cover the Collateral, other than as set forth in the Intercreditor Agreements, unless the Collateral Agent shall have received Form UCC-3 Termination Statements (or such other termination statements as shall be required by local law) fully executed for filing if required by applicable laws in respect thereof);

(vii) each Subsidiary Guarantor that owns a Collateral Vessel shall have duly authorized, executed and delivered, and caused to be recorded in the appropriate Vessel registry (x) in the case of each Primary Collateral Vessel, a Collateral Vessel Mortgage (together with any amendments thereto as may be requested by the Collateral Agent on or prior to the Restatement Effective Date in form and substance satisfactory to the Collateral Agent and the Subsidiary Guarantor that owns such Primary Collateral Vessel) with respect to such Primary Collateral Vessel and such Collateral Vessel Mortgage shall be effective to create in favor of the

-8-

Collateral Agent and/or the Lenders a legal, valid and enforceable first priority security interest, in and lien upon such Primary Collateral Vessel and (y) in the case of each Secondary Collateral Vessel, a Secondary Collateral Vessel Mortgage (together with any amendments thereto as may be requested by the Collateral Agent on or prior to the Restatement Effective Date in form and substance satisfactory to the Collateral Agent and the Subsidiary Guarantor that owns the relevant Secondary Collateral Vessel) with respect to such Secondary Collateral Vessel and such Secondary Collateral Vessel Mortgage shall be effective to create in favor of the Collateral Agent and/or the Lenders a legal, valid and enforceable second priority security interest, in and lien upon such Secondary Collateral Vessel, in each case subject only to Permitted Liens;

(viii) all filings, deliveries of instruments and other actions necessary or desirable in the reasonable opinion of the Collateral Agent to perfect and preserve the security interests described in clauses (ii) through and including (vii) above shall have been duly effected and the Collateral Agent shall have received evidence thereof in form and substance reasonably satisfactory to the Collateral Agent;

(ix) the Administrative Agent shall have received each of the following:

(a) certificates of ownership from appropriate authorities showing (or confirmation updating previously reviewed certificates and indicating) the registered ownership of such Collateral Vessel by the relevant Subsidiary Guarantor;

(b) the results of maritime registry searches with respect to such Collateral Vessel, indicating no record liens other than Liens in favor of the Collateral Agent and/or the Lenders and Permitted Liens;

(c) class certificates from a classification society listed on Schedule X or another classification society reasonably acceptable to the Administrative Agent, indicating that such Collateral Vessel meets the criteria specified in Section 7.24;

(d) certified copies of all agreements related to the technical and commercial management of each Collateral Vessel;

(e) certified copies of all ISM and ISPS Code documentation for each Collateral Vessel; and

(f) a report, in form and scope reasonably satisfactory to the Administrative Agent, from a firm of independent marine insurance brokers reasonably acceptable to the Administrative Agent (it being understood that Leeds and Leeds, AON and Marsh are acceptable) with respect to the insurance maintained by the Credit Parties in respect of such Collateral Vessel, together with a certificate from such broker certifying that such insurances (i) are placed with such insurance companies and/or underwriters and/or clubs, in such amounts, against such risks, and in such form, as are customarily insured against by similarly situated insureds for the protection of the Administrative Agent, the Collateral Agent and/or the Lenders as mortgagee, (ii) otherwise conform with the

-9-

insurance requirements of each respective Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable and (iii) comply with the Required Insurance;

(x)　　the Administrative Agent shall have received from (a) special New York counsel to each of the Credit Parties (which shall be Kirkland & Ellis LLP or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-1, (b) special New York maritime counsel to each of the Credit Parties (which shall be Constantine P. Georgiopoulos or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-2, (c) special Marshall Islands counsel to each of the Credit Parties (which shall be Dennis J. Reeder, Esq. or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-3, (d) special Liberian counsel to each of the Credit Parties (which shall be George E. Henries, Esq. or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-4, (e) special Bermuda counsel to each of the Credit Parties (which shall be Conyers, Dill & Pearman Limited or other counsel to each of the Credit Parties qualified in such jurisdiction and reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering the matters set forth in Exhibit C-5 and (f) counsel to each of the Credit Parties in the jurisdiction of the flag of the Collateral Vessel, an opinion addressed to the Administrative Agent and each of the Lenders and dated as of the Restatement Effective Date covering such matters as shall be reasonably required by the Administrative Agent, in each case which shall (x) be in form and substance reasonably acceptable to the Administrative Agent and (y) cover the matters set forth in the relevant Exhibit, including the perfection of the security interests (other than those to be covered by opinions delivered pursuant to the other opinions above) granted pursuant to the Security Documents, and such other matters incidental to the transactions contemplated herein as the Administrative Agent may reasonably request; and

(xi)　　(a) the Administrative Agent shall have received a certificate, dated the Restatement Effective Date and reasonably acceptable to the Administrative Agent, signed by the Chairman of the Board, Chief Executive Officer, the President, any Vice President, the Treasurer or an authorized manager, member or general partner of each Credit Party (other than any Credit Party that delivered such a certificate pursuant to the Original Credit Agreement), and attested to by the Secretary or any Assistant Secretary (or, to the extent such Credit Party does not have a Secretary or Assistant Secretary, the analogous Person within such Credit Party) of such Credit Party, as the case may be, substantially in the form of Exhibit D, with appropriate insertions, together with copies of the Certificate of Incorporation and By-Laws (or equivalent organizational documents) of such Credit Party and the resolutions of such Credit Party referred to in such certificate authorizing the consummation of the Transaction; provided that such

-10-

documents shall not be required to be delivered so long as such Credit Party certifies that there have been no changes made in the organizational documents delivered in connection with the Original Credit Agreement; and (b) the Administrative Agent shall have received copies of governmental approvals, good standing certificates and bring-down telegrams or facsimiles, if any, which the Administrative Agent may have reasonably requested in connection therewith, such documents and papers, where appropriate, to be certified by proper corporate or governmental authorities.

"Collateral Disposition" shall mean (i) the sale, lease, transfer or other disposition of Collateral by the Parent or any of its Subsidiaries to any Person other than the Parent or any Subsidiary of the Parent or (ii) any Event of Loss of any Collateral Vessel; provided, however, that the charter of any Collateral Vessel shall not be considered a Collateral Disposition.

"Collateral Vessel" shall mean each Primary Collateral Vessel and each Secondary Collateral Vessel.

"Collateral Vessel Mortgage" shall mean, with respect to the Primary Collateral Vessels, a first priority statutory mortgage and deed of covenants supplemental thereto or a first preferred mortgage in substantially the form of Exhibit I-1, Exhibit I-3 or Exhibit I-4, as applicable, or such other form as may be reasonably satisfactory to the Administrative Agent, as such first priority statutory mortgage and deed of covenants supplemental thereto or a first preferred mortgage may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Concentration Account" shall have · the meaning provided in the Pledge Agreement and/or the Secondary Pledge Agreement, as applicable.

"Consolidated Cash Interest Expense" shall mean, for any period, (i) the total consolidated interest expense paid or payable in cash of the Parent and its Subsidiaries (including, without limitation, to the extent included under GAAP, all commission, discounts and other commitment fees and charges (e.g., fees with respect to letters of credit, Interest Rate Protection Agreements and Other Hedging Agreements) for such period (calculated without regard to any limitations on payment thereof), adjusted to exclude (to the extent same would otherwise be included in the calculation above in this clause (i)), the amortization of any deferred financing costs for such period and any interest expense actually "paid in kind" or accreted during such period, plus (ii) without duplication, that portion of Capitalized Lease Obligations of the Parent and its Subsidiaries on a consolidated basis representing the interest factor for such period, minus (iii) cash interest income.

"Consolidated EBITDA" shall mean, for any period, Consolidated Net Income for such period adjusted by (A) adding thereto the following to the extent deducted in calculating such Consolidated Net Income: (i) consolidated interest expense and amortization of debt discount and commissions and other fees and charges associated with Indebtedness for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) any extraordinary losses, expenses or charges for such period, (v) any non-cash management retention or incentive program payments for such period, (vi) non-cash restricted stock compensation, (vii) any non-cash charges or. losses,

-11-

including, without limitation, non-cash compensation expenses for such period, less any extraordinary gains for such period, (viii) any losses from the sales of any Vessels for such period, (ix) all costs and expenses incurred (a) prior to or within 180 days following the Restatement Effective Date and, in no event, later than December 31, 2012, in connection with the Transaction (including, without limitation, any payments of interest, fees and expenses made pursuant to, or in connection with, the DIP Credit Agreement and the Plan of Reorganization (in each case, including, but not limited to, fees to advisors, professionals, attorneys, the Administrative Agent, Lenders and Oaktree Capital Management L.P. and its Affiliates)) and (b) in connection with any equity issuances permitted hereunder so long as, notwithstanding anything set forth herein to the contrary, the Net Cash Proceeds of such equity issuances are applied to the prepayment of the Loans and such prepayments are applied to reduce the Scheduled Repayment due on the Maturity Date, (x) non-recurring costs, charges and expenses for severance and restructuring (including, without limitation, fees and expenses incurred in connection with the winding up of all of the Parent and its Subsidiaries' activities and operations in Portugal and any one-time cash charges in connection with the closing of an office for such period), (xi) all non-recurring fees, costs and expenses related to any litigation or settlements, and (xii) the amount of cost savings and expenses projected by the Borrower to be realized (including synergies) as a result of, or as a result of actions taken, committed to be taken or planned to be taken within one year, pursuant to a binding written contract with a tangible and quantifiable cost savings (calculated on a pro forma basis as though such items had been realized on the first day of the period provided that all such adjustments pursuant to this clause (xii) shall not exceed (a) $10,000,000 in the aggregate in any four-quarter period and (b) $25,000,000 in the aggregate from the Restatement Effective Date to and including the Maturity Date, and (B) subtracting therefrom the following to the extent added in calculating such Consolidated Net Income: (i) any extraordinary gains for such period and (ii) any gains from the sales of any Vessels for such period. Unless otherwise agreed to by the Administrative Agent, for purposes of this definition of "Consolidated EBITDA," "non-recurring" means any expense, loss or gain as of any date that (i) did not occur in the ordinary course of the Parent or its Subsidiaries' business and (ii) is of a nature and type that has not occurred in the prior two years and is not reasonably expected to recur in the future.

"Consolidated Net Income" shall mean, for any period, the consolidated net after tax income of the Parent and its Subsidiaries determined in accordance with GAAP.

"Consolidated Net Indebtedness" shall mean, with respect to any Person, as at any relevant date, (x) the aggregate outstanding principal amount of the Loans under this Agreement and the loans under the Other Credit Agreement, plus (y) the aggregate outstanding principal amount of any other Indebtedness of the Parent or any of its Subsidiaries permitted pursuant to Sections 9.04(v) and 9.04(vi), less (z) an amount equal to the Unrestricted Cash and Cash Equivalents of the Parent and its Subsidiaries as at such date.

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to

maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and any products warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if the less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Credit Document Obligations" shall have the meaning provided in the definition of "Guaranteed Obligations".

"Credit Documents" shall mean this Agreement, each Note, each Security Document, the Subsidiaries Guaranty, each Intercreditor Agreement, each Joinder Agreement and, after the execution and delivery thereof, each additional guaranty or additional security document executed pursuant to Section 8.11.

"Credit Party" shall mean the Parent, the Borrower, GMSCII, Arlington, each Subsidiary Guarantor, and any other Subsidiary of the Parent which at any time executes and delivers any Credit Document (other than solely an acknowledgment of a pledge of such Person's equity).

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender with respect to which a Lender Default is in effect.

"Deferred Amortization Amount" shall mean $66,024,848.

"DIP Credit Agreement" shall mean the Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of November 17, 2011 (as amended, modified and/or supplemented from time to time to, but not including the Restatement Effective Date), among the Borrower and GMSCII, as co-borrowers, the Parent, certain Subsidiaries of the Parent and the Borrowers party thereto as guarantors, the lenders party thereto and Nordea, as administrative agent and collateral agent.

"Dividend" shall mean, with respect to any Person, a dividend, distribution or return of any equity capital to its stockholders, partners or members, any other distribution, payment or delivery of property or cash to its stockholders, partners or members in their capacity as such (other than common stock, Qualified Preferred Stock and the right to purchase any of such stock of such Person), the redemption, retirement, purchase or acquisition, directly or

-13-

indirectly, for a consideration of any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Restatement Effective Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests), or the setting aside of any funds for any of the foregoing purposes, or the granting of permission to any of its Subsidiaries to purchase or otherwise acquire for a consideration (other than common stock, Qualified Preferred Stock and the right to purchase any of such stock of such Person) any shares of any class of the capital stock or any other Equity Interests of such Person outstanding on or after the Restatement Effective Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests) except for share repurchases resulting from the unwinding of any share sale requiring the repayment of any advances in connection with such sale as a result of any default on payment on the part of the ultimate purchaser of such shares. Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes. For the avoidance of doubt, any non-cash anti-dilution adjustments under the warrants listed on Schedule XIII shall not constitute a Dividend.

"Documents" shall mean the Credit Documents.

"Dollars" and the sign "$" shall each mean lawful money of the United States.

"Drawing" has the meaning provided in Section 3.03(b).

"Earnings and Insurance Collateral" shall mean all "Earnings Collateral" and "Insurance Collateral", as the case may be, as defined in the respective Assignment of Earnings and the respective Assignment of Insurances.

"Effective Yield" shall mean, as to any Loans, or other loans of any tranche, the effective yield on such loans as determined by the Administrative Agent, taking into account the applicable interest rate margins, any interest rate floors or similar devices and all fees, including recurring, upfront or similar fees or original issue discount (amortized over the shorter of (x) the life of such loans and (y) the four years following the date of incurrence thereof) payable generally to Lenders making such loans, but excluding any arrangement, structuring or other fees payable in connection therewith that are not generally shared with the relevant Lenders and customary consent fees paid generally to consenting Lenders. All such determinations made by the Administrative Agent shall, absent manifest error, be final, conclusive and binding on the Borrower and the Lenders and the Administrative Agent shall have no liability to any Person with respect to such determination absent gross negligence or willful misconduct.

"Eligible Transferee" shall mean and include a commercial bank, insurance company, financial institution, fund or other Person which regularly purchases interests in loans or extensions of credit of the types made pursuant to this Agreement, any other Person which would constitute a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act as in effect on the Restatement Effective Date or other "accredited investor" (as defined in Regulation D of the Securities Act); provided that none of the Borrower, the Guarantors nor any of their respective Affiliates shall be an Eligible Transferee at any time, except as provided for in Section 12.04(d).

-14-

"Environmental Claims" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations or proceedings relating in any way to any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence of Hazardous Materials.

"Environmental Law" shall mean any applicable federal, state, foreign, international or local statute, law, treaty, protocol, rule, regulation, ordinance, code, or rule of common law, now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, to the extent binding on the Parent or any of its Subsidiaries, relating to the environment or to Hazardous Materials, including, without limitation, CERCLA; OPA; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. (to the extent it regulates occupational exposure to Hazardous Materials); any applicable state, foreign, international or local counterparts or equivalents thereof, in each case as amended from time to time; and any applicable rules, regulations or requirements of a classification society in respect of any Collateral Vessel.

"Environmental Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migration into the environment.

"Equity Contribution Agreement" shall mean the Equity Purchase Agreement, dated as of December 15, 2011 (as amended, restated, supplemented or otherwise modified from time to time through, but not including, the Restatement Effective Date), by and among the Parent, Oaktree Principal Fund V, L.P., Oaktree Principal Fund V (Parallel), L.P., Oaktree FF Investment Fund, L.P. - Class A, and OCM Asia Principal Opportunities Fund, L.P., which Equity Contribution Agreement (i) shall contain a minimum liquidity requirement with respect to the Parent and its Subsidiaries that is reasonably satisfactory to the Administrative Agent and (ii) shall not have been amended, restated, supplemented or otherwise modified in such a manner as is adverse to the interests of the Lenders.

"Equity Conversion" shall mean the conversion of all outstanding secured obligations under the Amended and Restated Credit Agreement, dated as of May 6, 2011, by and among the Borrower and GMSCII, as co-borrowers, the Parent and certain of their respective Subsidiaries, OCM Marine Investments CTB, Ltd., as initial lender, and OCM Administrative Agent, LLC, as administrative agent and collateral agent, into equity of the Parent pursuant to the Equity Contribution Agreement on the terms and in the amounts set forth in the Plan of Reorganization.

"Equity Interests" shall mean (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents of corporate stock and (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited).

"Equity Investment" shall mean that certain cash Investment in the Parent of not less than $175,000,000 from the issuance of Equity Interests by the Parent to (x) an existing or newly-formed entity capitalized by funds managed by Oaktree Capital Management L.P. or one or more of its affiliates and (y) any other third party identified by the Permitted Holders to the Administrative Agent, including, but not limited to, any noteholders that previously held any Senior Unsecured Notes prior to the Restatement Effective Date on the terms and conditions specified in the Equity Contribution Agreement, (i) $35,350,780 of which shall have been contributed by the Parent to the Borrower to partially repay then outstanding Loans under and as defined in the Original Credit Agreement and (ii) $39,649,220 of which shall have been contributed by the Parent to GMSCII to partially repay then outstanding loans under the Original Other Credit Agreement, in each case on terms set forth in the Plan of Reorganization.

"Equity Proceeds Amount" shall mean, on any date, the amount of Net Cash Proceeds received by the Parent from the issuance of Equity Interests of the Parent after the Restatement Effective Date (excluding, for the avoidance of doubt, the Equity Investment) less the cash amount expended by the Parent and its Subsidiaries to (i) make Investments pursuant to Section 9.05(vi), (ii) make any Capital Expenditures (other than maintenance Capital Expenditures) and (iii) make any other cash expenditures not in the ordinary course of business (for the avoidance of doubt, funding operating losses, working capital and repayment of Indebtedness will be deemed to be capital expenditures in the ordinary course of business for this purpose), in each case without duplication and after the Restatement Effective Date.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the date of this Agreement and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Parent or a Subsidiary of the Parent would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"Eurodollar Rate" shall mean with respect to each Interest Period for a Loan, (a) the offered rate (rounded upward to the nearest 1/16 of one percent) for deposits of Dollars for a period equivalent to such period at or about 11:00 A.M. (London time) on the second Business Day before the first day of such period as is displayed on Reuters LIBOR 01 Page (or such other service as may be nominated by the British Bankers' Association as the information vendor for displaying the London Interbank Offered Rates of major banks in the London interbank Eurodollar market) (the "Screen Rate"); provided that if on such date no such rate is so displayed or, in the case of the initial Interest Period in respect of a Loan, if less than three Business Days' prior notice of such Loan shall have been delivered to the Administrative Agent, the Eurodollar Rate for such period shall be the arithmetic average (rounded upward to the

-16-

nearest 1/16 of 1%) of the rate quoted to the Administrative Agent by the Reference Banks for deposits of Dollars in an amount approximately equal to the amount in relation to which the Eurodollar Rate is to be determined for a period equivalent to such applicable Interest Period by prime banks in the London interbank Eurodollar market at or about 11:00 A.M. (London time) on the second Business Day before the first day of such period, in each case divided (and rounded upward to the nearest 1/16 of 1%) by (b) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves required by applicable law) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency funding or liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D); provided, further, that if any such rate is below zero, the Eurodollar Rate for such period will be deemed to be zero.

"Event of Default" shall have the meaning provided in Section 10.

"Event of Loss" shall mean any of the following events: (x) the actual or constructive total loss of a Collateral Vessel or the agreed or compromised total loss of a Collateral Vessel; or (y) the capture, condemnation, confiscation, requisition, purchase, seizure or forfeiture of, or any taking of title to, a Collateral Vessel. An Event of Loss shall be deemed to have occurred: (i) in the event of an actual loss of a Collateral Vessel, at the time and on the date of such loss or if that is not known at noon Greenwich Mean Time on the date which such Collateral Vessel was last heard from; (ii) in the event of damage which results in a constructive or compromised or arranged total loss of a Collateral Vessel, at the time and on the date of the event giving rise to such damage; or (iii) in the case of an event referred to in clause (y) above, at the time and on the date on which such event is expressed to take effect by the Person making the same. Notwithstanding the foregoing, if such Collateral Vessel shall have been returned to the Borrower or any Subsidiary Guarantor following any event referred to in clause (y) above prior to the date upon which payment is required to be made under Section 5.02(c) hereof, no Event of Loss shall be deemed to have occurred by reason of such event.

"Excess Liquidity" shall mean, for each Payment Date, the amount by which (a) the daily average for the 30 consecutive day period ending on such Payment Date of the amount by which the Unrestricted Cash and Cash Equivalents of the Parent and its Subsidiaries (excluding the Equity Proceeds Amount and any amounts permitted to be retained by the Parent and its Subsidiaries pursuant to Section 5.02(c), if any) exceeds (b) the sum of (x) the aggregate amount of (i) any Scheduled Repayment and any interest payment to be made under this Agreement and/or (ii) any scheduled amortization payment and any interest payment to be made under the Other Credit Agreement, in each case within three Business Days of such Payment Date and (y) for any Payment Date (i) from the Restatement Effective Date to and including December 31, 2012, $100,000,000, (ii) from January 1, 2013 to and including December 31, 2013, $75,000,000, and (iii) thereafter, $70,000,000.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" shall mean (i) any tax imposed on or measured by the net income, net profits or any franchise tax based on net income, net profits or net worth, of a Lender pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the

-17-

principal office or applicable lending office of such Lender is located or any subdivision thereof or therein, (ii) any branch profits taxes imposed by any jurisdiction in which the recipient Lender is organized or the jurisdiction in which the principal office or applicable lending office of such Lender is located or any subdivision thereof or therein, (iii) in the case of any Lender, any withholding tax that is imposed by the Marshall Islands on amounts payable to such Lender at the time such Lender becomes a party to this Agreement or designates a new lending office (except to the extent that, pursuant to Section 5.04, amounts with respect to such taxes were payable to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office) or is attributable to such Lender's failure to comply with Section 5.04(b), and (iv) taxes imposed on any "withholdable payment" payable to a recipient Lender as a result of the failure of such recipient to satisfy the applicable requirements as set forth in FATCA).

"Existing Indebtedness" shall have the meaning provided in Section 7.20.

"Existing Letter of Credit" shall have the meaning provided in Section 3.01.

"Existing Letter of Credit Back-Stop Arrangements" shall have the meaning provided in Section 2.13(a)(i).

"Existing Letter of Credit Exposure" shall mean, at any time, the aggregate amount of all Existing Letter of Credit Outstandings at such time in respect of Existing Letters of Credit. The Existing Letter of Credit Exposure of any Lender at any time shall be its Percentage of the aggregate Existing Letter of Credit Exposure at such time.

"Existing Letter of Credit Fee" shall have the meaning provided in Section 4.01(b).

"Existing Letter of Credit Outstandings" shall mean, at any time, the sum of (i) the aggregate Stated Amount of all outstanding Existing Letters of Credit and (ii) the amount of all Unpaid Drawings.

"Facing Fee" shall have the meaning provided in Section 4.01(c).

"Fair Market Value" of any Collateral Vessel at any time shall mean the average of the fair market value of such Collateral Vessel on the basis of an individual charter-free arm's-length transaction between a willing and able buyer and seller not under duress as set forth in the appraisals of at least two Approved Appraisers most recently delivered to, or obtained by, the Administrative Agent prior to such time pursuant to Section 8.01(d).

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Federal Funds Rate" shall mean, for any day, an interest rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published for such

-18-

day (or, if such day is not a Business Day, for the immediately preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations at approximately 11:00 A.M. (New York time) on such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent in its sole discretion.

"Final DIP/Cash Collateral Order" shall mean that certain Final Order, which was entered by the Bankruptcy Court on December 15, 2011 in respect of the Chapter 11 Proceeding pursuant to Section 361, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure authorizing the debtors named therein to (I) use cash collateral of the Prepetition Secured Parties (as defined therein), (II) obtain secured superpriority post-petition financing and (III) provide adequate protection to the Prepetition Secured Parties.

"Financial Covenants" shall mean the covenants set forth in Sections 9.08 through 9.10, inclusive.

"Flag Jurisdiction Transfer" shall mean the transfer of the registration and flag of a Collateral Vessel from one Acceptable Flag Jurisdiction to another Acceptable Flag Jurisdiction, provided that the following conditions are satisfied with respect to such transfer:

(i)     On each Flag Jurisdiction Transfer Date, the Credit Party which is consummating a Flag Jurisdiction Transfer on such date shall have duly authorized, executed and delivered, and caused to be recorded in the appropriate Collateral Vessel registry a Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable, substantially in the form of Exhibit I (with such modifications as are required by or appropriate for the applicable Acceptable Flag Jurisdiction of the Collateral Vessel), with respect to the Collateral Vessel being transferred (the "Transferred Vessel") and (x) in the case of the Primary Collateral Vessels, the Collateral Vessel Mortgage shall be effective to create in favor of the Collateral Agent and/or the Lenders a legal, valid and enforceable first priority security interest, in and lien upon such Transferred Vessel, and (y) in the case of the Secondary Collateral Vessels, the Secondary Collateral Vessel Mortgage shall be effective to create in favor of the Collateral Agent and/or the Lenders a legal, valid and enforceable second priority security interest in, and lien upon, such Transferred Vessel, in each case subject only to Permitted Liens. All filings, deliveries of instruments and other actions necessary or desirable in the reasonable opinion of the Collateral Agent to perfect and preserve such security interests shall have been duly effected and the Collateral Agent shall have received evidence thereof in form and substance reasonably satisfactory to the Collateral Agent.

(ii)     On each Flag Jurisdiction Transfer Date, the Administrative Agent shall have received from (A) Constantine P. Georgiopoulos, special New York maritime counsel to the Credit Parties (or other counsel to such Credit Parties reasonably satisfactory to the Administrative Agent), an opinion addressed to the Administrative Agent and each of the Lenders and dated such Flag Jurisdiction Transfer Date, which shall (x) be in form and substance reasonably acceptable to the Administrative Agent and (y) cover the recordation of the security interests granted pursuant to the Collateral Vessel Mortgage(s) or the Secondary Collateral Vessel Mortgage(s), as applicable, to be

delivered on such date and such other matters incident thereto as the Administrative Agent may reasonably request and (B) local counsel to the Credit Parties consummating the relevant Flag Jurisdiction Transfer reasonably satisfactory to the Administrative Agent practicing in those jurisdictions in which the Transferred Vessel is registered and/or the Credit Party owning such Transferred Vessel is organized, which opinions shall be addressed to the Administrative Agent and each of the Lenders and dated such Flag Jurisdiction Transfer Date, which shall (x) be in form and substance reasonably acceptable to the Administrative Agent and (y) cover the perfection of the security interests granted pursuant to the Collateral Vessel Mortgage(s) or the Secondary Collateral Vessel Mortgage(s), as applicable, and such other matters incident thereto as the Administrative Agent may reasonably request.

(iii)    On each Flag Jurisdiction Transfer Date:

(A)    The Administrative Agent shall have received (x) certificates of ownership from appropriate authorities showing (or confirmation updating previously reviewed certificates and indicating) the registered ownership of the Transferred Vessel transferred on such date by the relevant Subsidiary Guarantor and (y) the results of maritime registry searches with respect to the Transferred Vessel transferred on such date, indicating no record liens other than Liens in favor of the Collateral Agent and/or the Lenders and Permitted Liens.

(B)    The Administrative Agent shall have received a report, in form and scope reasonably satisfactory to the Administrative Agent, from a firm of independent marine insurance brokers reasonably acceptable to the Administrative Agent with respect to the insurance maintained by the Credit Party in respect of the Transferred Vessel transferred on such date, together with a certificate from such broker certifying that such insurances (i) are placed with such insurance companies and/or underwriters and/or clubs, in such amounts, against such risks, and in such form, as are customarily insured against by similarly situated insureds for the protection of the Administrative Agent and/or the Lenders as mortgagee and (ii) conform with the insurance requirements of the respective Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable.

(iv)    On or prior to each Flag Jurisdiction Transfer Date, the Administrative Agent shall have received a certificate, dated the Flag Jurisdiction Transfer Date, signed by the Chairman of the Board, Chief Executive Officer, the President, any Vice President, the Treasurer or an authorized manager, member or general partner of the Credit Party commencing such Flag Jurisdiction Transfer, certifying that (A) all necessary governmental (domestic and foreign) and third party approvals and/or consents in connection with the Flag Jurisdiction Transfer being consummated on such date and otherwise referred to herein shall have been obtained and remain in effect, (B) there exists no judgment, order, injunction or other restraint prohibiting or imposing materially adverse conditions upon such Flag Jurisdiction Transfer or the other transactions contemplated by this Agreement and (C) copies of resolutions approving the Flag

Jurisdiction Transfer of such Credit Party and any other matters the Administrative Agent may reasonably request.

"Flag Jurisdiction Transfer Date" shall mean the date on which a Flag Jurisdiction Transfer occurs.

"Foreign Pension Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States of America by the Parent or any one or more of its Subsidiaries primarily for the benefit of employees of the Parent or such Subsidiaries residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"GAAP" shall have the meaning provided in Section 12.07(a).

"GMSCII" shall have the meaning provided in the first paragraph of this Agreement.

"Guaranteed Creditors" shall mean and include each of the Administrative Agent, the Collateral Agent, the Issuing Lenders, the Lenders and each party (other than any Credit Party) party to an Interest Rate Protection Agreement or Other Hedging Agreement to the extent such party constitutes a Secured Creditor under the Security Documents.

"Guaranteed Obligations" shall mean (i) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of (x) the principal of, premium, if any, and interest on the Notes issued by, and the Tranche A Loans made to, the Borrower under this Agreement, and (y) all other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness owing by the Borrower to the Lender Creditors (in the capacities referred to in the definition of Lender Creditors) under this Agreement and each other Credit Document to which the Borrower is a party (including, without limitation, indemnities, fees and interest thereon (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in this Agreement, whether or not such interest is an allowed claim in any such proceeding)), whether now existing or hereafter incurred under, arising out of or in connection with this Agreement and any such other Credit Document and the due performance and compliance by the Borrower with all of the terms, conditions and agreements contained in all such Credit Documents (all such principal, premium, interest, liabilities, indebtedness and obligations being herein collectively called the "Credit Document Obligations") and (ii) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of (x) the principal of, premium, if any, and interest on the Notes issued by (if any), and the Tranche B Loans made to, the Borrower under this Agreement, and (y) all other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in the respective Interest Rate Protection Agreements or Other Hedging Agreements, whether or not such interest is an allowed claim in any such

-21-

proceeding) owing by the Borrower under any Interest Rate Protection Agreement or Other Hedging Agreement entered into in respect of the Borrower's obligations with respect to the outstanding Tranche A Loans from time to time, whether now in existence or hereafter arising, and the due performance and compliance by the Borrower with all of the terms, conditions and agreements contained in each such Interest Rate Protection Agreement and Other Hedging Agreement to which it is a party (all such obligations, liabilities and indebtedness described in this clause (ii) being herein collectively called the "Swap Obligations").

"Guarantors" shall mean the Parent, GMSCII, Arlington and each Subsidiary Guarantor.

"Guaranty" shall mean, collectively, the Holdings Guaranty and the Subsidiaries Guaranty.

"Hazardous Materials" shall mean: (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority under Environmental Laws because of its dangerous or deleterious properties or characteristics.

"Holdings Guaranty" shall mean the guaranty of the Parent, Arlington and GMSCII pursuant to Section 13.

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such Person for borrowed money or for the deferred purchase price of property or services, (ii) the maximum amount available to be drawn under all letters of credit issued for the account of such Person and all unpaid drawings in respect of such letters of credit, (iii) all Indebtedness of the types described in clause (i), (ii), (iv), (v), (vi), (vii) or (viii) of this definition secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person (to the extent of the value of the respective property), (iv) the aggregate amount required to be capitalized under leases under which such Person is the lessee, (v) all obligations of such person to pay a specified purchase price for goods or services, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person, (vii) all obligations under any Interest Rate Protection Agreement or Other Hedging Agreement or under any similar type of agreement and (viii) the maximum amount available to be drawn under all Existing Letters of Credit issued for the account of such Person and all Unpaid Drawings in respect of such Existing Letters of Credit; provided that Indebtedness shall in any event not include trade payables and expenses accrued in the ordinary course of business.

"Individual Exposure" of any Lender shall mean, at any time, the sum of (a) the aggregate principal amount of all Loans made by such Lender and then outstanding and (b) such

-22-

Lender's Percentage in the aggregate amount of all Existing Letter of Credit Outstandings at such time.

"Intercreditor Agreements" shall mean the Primary Intercreditor Agreement and the Secondary Intercreditor Agreement.

"Interest Determination Date" shall mean, with respect to any Loan, the second Business Day prior to the commencement of any Interest Period relating to such Loan.

"Interest Expense Coverage Ratio" shall mean, for any period, the ratio of (a) Consolidated EBITDA for such period to (b) Consolidated Cash Interest Expense for such period.

"Interest Period" shall have the meaning provided in Section 2.08.

"Interest Rate Protection Agreement" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement, interest rate floor agreement or other similar agreement or arrangement.

"Investments" shall have the meaning provided in Section 9.05.

"Issuing Lender" shall have the meaning provided in Section 3.01.

"Joinder Agreement" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements".

"Joint Book Runners" shall mean Nordea and DNB Bank ASA.

"Judgment Currency" shall have the meaning provided in Section 13.09(a).

"Judgment Currency Conversion Date" shall have the meaning provided in Section 13.09(a).

"Leaseholds" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lender" shall mean each financial institution listed on Schedule I, as well as any Person which becomes a "Lender" hereunder pursuant to 12.04(b).

"Lender Creditors" shall mean the Lenders, the Collateral Agent and the Administrative Agent.

"Lender Default" shall mean, as to any Lender, (i) the wrongful refusal (which has not been retracted) of such Lender or the failure of such Lender (which has not been cured) to make available its portion of any Borrowing or to fund its portion of any unreimbursed payment with respect to an Existing Letter of Credit, (ii) such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover

-23-

by a regulatory authority, or (iii) such Lender having notified the Administrative Agent, any Issuing Lender and/or any Credit Party (x) that it does not intend to comply with its obligations under Sections 2.01 or Section 3, as the case may be, in circumstances where such non-compliance would constitute a breach of such Lender's obligations under the respective Section or (y) of the events described in preceding clause (ii); provided that, for purposes of (and only for purposes of) Sections 2.12 (with respect to clause (i) below) and 2.13 and any documentation entered into pursuant to the Existing Letter of Credit Back-Stop Arrangements (and the term "Defaulting Lender" as used therein), the term "Lender Default" shall also include, as to any Lender, (i) any Affiliate of such Lender that has "control" (within the meaning provided in the definition of "Affiliate") of such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority, (ii) any previously cured "Lender Default" of such Lender under this Agreement, unless such Lender Default has ceased to exist for a period of at least 90 consecutive days, (iii) any default by such Lender with respect to its funding obligations under any other credit facility to which it is a party and which any Issuing Lender or the Administrative Agent reasonably believes in good faith has occurred and is continuing, and (iv) the failure of such Lender to make available its portion of any Borrowing or to fund its portion of any unreimbursed payment with respect to an Existing Letter of Credit pursuant to Section 3.02(c) within one (1) Business Day of the date (x) the Administrative Agent (in its capacity as a Lender) or (y) Lenders constituting the Required Lenders with Loans has or have, as applicable, funded its or their portion thereof.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"Loan" shall mean each Tranche A Loan and each Tranche B Loan.

"Loan to Value Ratio" shall mean, at any date of determination, the ratio of Consolidated Net Indebtedness of the Parent and its Subsidiaries on such date to the aggregate Fair Market Value of all Collateral Vessels owned by the Credit Parties on such date.

"Margin Regulations" shall mean the provisions of Regulations T, U and X of the Board of Governors of the Federal Reserve System.

"Margin Stock" shall have the meaning provided in Regulation U.

"Market Disruption Event" shall mean with respect to any Loans:

(i)     if, at or about noon on the Interest Determination Date for the relevant Interest Period, the Screen Rate is not available and none or only one of the Reference Banks supplies a rate to the Administrative Agent to determine the Eurodollar Rate for the relevant Interest Period; or

(ii)     before close of business in New York on the Interest Determination Date for the relevant Interest Period, the Administrative Agent receives notice

-24-

from a Lender or Lenders the sum of whose outstanding Loans in the aggregate exceed 50% of the Loans that (i) the cost to such Lenders of obtaining matching deposits in the London interbank Eurodollar market for the relevant Interest Period would be in excess of the Eurodollar Rate for such Interest Period or (ii) such Lenders are unable to obtain funding in the London interbank Eurodollar market.

"Material Adverse Effect" shall mean a material adverse effect on (i) the business, property, assets, liabilities, condition (financial or otherwise) of (x) the Collateral Vessels taken as a whole, (y) the Borrower, GMSCII, Arlington and the Subsidiary Guarantors taken as a whole, or (z) the Parent and its Subsidiaries taken as a whole, (ii) the rights and remedies of the Lenders or the Administrative Agent or (iii) the ability of the Borrower or the Borrower and its Subsidiaries, taken as a whole, to perform its or their Obligations.

"Maturity Date" shall mean [_____], 2017.

"Minimum Borrowing Amount" shall mean $1,000,000.

"Moody's" shall mean Moody's Investors Service, Inc. and its successors.

"Multiemployer Plan" shall mean a Plan which is defined in Section 3(37) of ERISA.

"Net Cash Proceeds" shall mean, (x) with respect to any Collateral Disposition, the aggregate cash payments (including any cash received by way of deferred payment pursuant to a note receivable issued in connection with such Collateral Disposition, other than the portion of such deferred payment constituting interest, but only as and when received) received by the Parent or the Borrower or any of their respective Subsidiaries from such Collateral Disposition net of (i) reasonable transaction costs (including, without limitation, reasonable attorney's fees) and sales commissions and (ii) the estimated marginal increase in income taxes and any stamp tax payable by the Parent, the Borrower or any of its Subsidiaries as a result of such Collateral Disposition and (y) with respect to the issuance of any Equity Interests, the aggregate cash proceeds received by the Parent from such equity issuance net of reasonable transaction costs related thereto (including, without limitation, reasonable attorney's fees).

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Non-Recourse Indebtedness" shall mean any Indebtedness of a Non-Recourse Subsidiary that is non-recourse to any Credit Party and for which no Credit Party provides any credit support; provided such Indebtedness may be full recourse to the Non-Recourse Subsidiary.

"Non-Recourse Subsidiary" shall mean (x) any Subsidiary listed on Schedule XVI hereto and (y) any Subsidiary that is not a Credit Party and is identified by the Parent in writing to the Administrative Agent after the Restatement Effective Date to be a "Non-Recourse Subsidiary"; provided that (i) neither the Parent nor any Subsidiary of the Parent (other than a Non-Recourse Subsidiary) shall have any liability or recourse with respect to any Non-Recourse Indebtedness of such Non-Recourse Subsidiary, (ii) any such designation of a Subsidiary as a

"Non-Recourse Subsidiary" shall be deemed to be a permanent "Investment" in such Subsidiary in an amount (proportionate to the Parent's Equity Interest (directly or through a Subsidiary thereof) in such Subsidiary) equal to the fair market value of the net assets of such Subsidiary at the time such Subsidiary is designated a Non-Recourse Subsidiary and (iii) for the avoidance of doubt, Investments in Non-Recourse Subsidiaries may only be made pursuant to Section 9.05(vi).

"Note" shall have the meaning provided in Section 2.05(a).

"Notice of Interest Period Election" shall have the meaning provided in Section 2.08(a).

"Notice Office" shall mean the office of the Administrative Agent located at 437 Madison Avenue, 21st Floor, New York, NY 10022, or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"Obligation Currency" shall have the meaning provided in Section 13.09(a).

"Obligations" shall mean all amounts owing to the Administrative Agent, the Collateral Agent, any Lender, and each Issuing Lender pursuant to the terms of this Agreement or any other Credit Document.

"OPA" shall mean the Oil Pollution Act of 1990, as amended, 33 U.S.C. § 2701 et seq.

"Original Credit Agreement" shall have the meaning provided in the Recitals.

"Original Effective Date" shall mean October 20, 2008.

"Original Other Credit Agreement" shall have the meaning provided in the Recitals.

"Other Agent" shall have the meaning provided in the Recitals hereto.

"Other Credit Agreement" shall have the meaning provided in the Recitals hereto.

"Other Credit Documents" shall mean the "Credit Documents" under and as defined in the Other Credit Agreement.

"Other Hedging Agreement" shall mean any foreign exchange contracts, currency swap agreements, commodity agreements or other similar agreements or arrangements designed to protect against the fluctuations in currency or commodity values.

"Parent" shall have the meaning provided in the first paragraph of this Agreement.

"Participant" shall have the meaning provided in Section 3.02(a).

"Participant Register" shall have the meaning provided in Section 12.16.

-26-

"PATRIOT Act" shall have the meaning provided in Section 12.20.

"Payment Date" shall mean the last Business Day of each March, June, September and December.

"Payment Office" shall mean the office of the Administrative Agent located at 437 Madison Avenue, 21st Floor, New York, NY 10022, or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Percentage" of any Lender at any time shall mean a fraction (expressed as a percentage) the numerator of which is the outstanding Tranche A Loans of such Lender at such time and the denominator of which is the aggregate amount of outstanding Tranche A Loans of all Lenders at such time.

"Permitted Encumbrance" shall mean easements, rights-of-way, restrictions, encroachments, exceptions to title and other similar charges or encumbrances on any Collateral Vessel or any other property of the Parent or any of its Subsidiaries arising in the ordinary course of business which do not materially detract from the value of such Collateral Vessel or the property subject thereto.

"Permitted Holders" shall mean funds or segregated accounts managed by Oaktree Capital Management, L.P. and any corporation or other entity directly or indirectly controlled or managed by Oaktree Capital Management, L.P. or its managed funds.

"Permitted Liens" shall have the meaning provided in Section 9.01.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Plan" shall mean any pension plan as defined in Section 3(2) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Parent or a Subsidiary of the Parent or any ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Parent, or a Subsidiary of the Parent or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan.

"Plan of Reorganization" shall have the meaning provided in the Recitals.

"Pledge Agreement" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Pledge Agreement Collateral" shall mean all "Collateral" as defined in the Pledge Agreement.

-27-

"Pledged Securities" shall mean "Securities" as defined in the Pledge Agreement and/or the Secondary Pledge Agreement, as the case may be, pledged (or required to be pledged) pursuant thereto.

"Primary Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Primary Security Document, including, without limitation, all Pledge Agreement Collateral, all Earnings and Insurance Collateral, all Primary Collateral Vessels and all cash and Cash Equivalents at any time delivered as collateral thereunder or hereunder.

"Primary Collateral Vessel" shall mean, at any time, each of the Vessels listed in rows 8 through and including 30 on Schedule III, which is subject to a Collateral Vessel Mortgage at such time and with respect to which the other Collateral and Guaranty Requirements are satisfied at such time.

"Primary Intercreditor Agreement" shall mean the Amended and Restated Intercreditor Agreement, dated as of [_____], by and among the Parent, Arlington, the Borrower, as borrower under this Agreement, GMSCII, as borrower under the Other Credit Agreement, the Administrative Agent (for and on behalf of the Secured Creditors), each Subsidiary Guarantor, the Collateral Agent, and the Other Agent (for and on behalf of the Secured Creditors under and as defined in the Other Credit Agreement), which Primary Intercreditor Agreement (i) shall be substantially in the form of Exhibit P-1 (as amended, modified and/or otherwise supplemented from time to time) and (ii) shall set forth the priority of the security interests in the Primary Collateral.

"Primary Security Documents" shall mean the Pledge Agreement each Assignment of Charter, each Assignment of Earnings, each Assignment of Insurances, each Collateral Vessel Mortgage and, after the execution and delivery thereof, each additional first-lien security document executed pursuant to Section 7.11; provided that cash collateral or other agreements entered into pursuant to the Existing Letter of Credit Back-Stop Arrangements shall constitute "Security Documents" solely for purposes of (x) Sections 9.01(v) and 11 and (y) the term "Credit Documents" as used in Sections 9.04(i) and 11.

"Prime Rate" shall mean the rate which the Administrative Agent announces from time to time as its prime lending rate, the Prime Rate to change when and as such prime lending rate changes. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"Projections" shall mean the Parent's forecasted consolidated and consolidating: (a) balance sheets; (b) profit and loss statements; (c) cash flow statements and (d) capitalization statements, all prepared on a Subsidiary by Subsidiary basis and based upon good faith estimates and assumptions believed by the Parent to be reasonable at the time made, together with appropriate supporting details and a statement of underlying assumptions.

"Pro Rata Excess Liquidity Share" shall mean (i) for any Payment Date prior to the repayment in full of the outstanding loans under the Other Credit Agreement, 47.1% of the

Excess Liquidity on such Payment Date (or, to the extent any of the Excess Liquidity is required to be used on such Payment Date to repay the outstanding loans under the Other Credit Agreement in accordance with the provisions thereof, but the amount of the outstanding loans under the Other Credit Agreement is less than the portion of the Excess Liquidity that is required to be paid thereunder or the outstanding loans under the Other Credit Agreement have been repaid in full, such percentage will be increased to include the portion of the Excess Liquidity not being used to repay the Other Credit Agreement on such Payment Date), and (ii) for any Payment Date thereafter, 100% of the Excess Liquidity on such Payment Date.

"Qualified Preferred Stock" shall mean any preferred stock so long as the terms of any such preferred stock (i) do not contain any mandatory put, redemption, repayment, sinking fund or other similar provision occurring prior to one year after the Maturity Date, (ii) do not require the cash payment of dividends and (iii) any other preferred stock that satisfies (i) of this definition of Qualified Preferred Stock and that is otherwise issuable or may be distributed pursuant to a shareholders' rights plan of the Parent; provided, however, any Dividend or similar feature of such Qualified Preferred Stock shall only be declared and paid in accordance with Section 9.03.

"Qualifying IPO" shall mean the issuance by the Parent or any direct or indirect parent of the Parent of its Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) after the Restatement Effective Date pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission in accordance with the Securities Act (whether alone or in connection with a secondary public offering) and such issuance results in Net Cash Proceeds received by the Parent of at least $75,000,000.

"Real Property" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"Reference Banks" shall mean, at any time, (i) if there are less than two Lenders at such time, each Lender and (ii) if there are three or more Lenders at such time, the Administrative Agent and two other Lenders as shall be determined by the Administrative Agent.

"Refinanced Loans" shall have the meaning provided in Section 12.12(c).

"Register" shall have the meaning provided in Section 12.16.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Replaced Lender" shall have the meaning provided in Section 2.12(a).

"Replacement Lender" shall have the meaning provided in Section 2.12(a).

"Replacement Loan" shall have the meaning provided in Section 12.12(c).

"Reportable Event" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043.

"Required Insurance" shall have the meaning provided in Section 7.21.

"Required Lenders" shall mean, at any time, (x) prior to the repayment in full of the Tranche A Loans, Non-Defaulting Lenders the sum of whose outstanding Tranche A Loans at such time represents an amount greater than 66-2/3% of the sum of (i) all outstanding Tranche A Loans of Non-Defaulting Lenders and (ii) the Existing Letter of Credit Outstandings of Non-Defaulting Lenders, in each case at such time and (y) thereafter, Non-Defaulting Lenders the sum of whose outstanding Tranche B Loans at such time represents an amount greater than 66-2/3% of the sum of all outstanding Tranche B Loans of Non-Defaulting Lenders.

"Restatement Effective Date" shall have the meaning provided in Section 12.10.

"Returns" shall have the meaning provided in Section 7.09.

"Revolving Loans" shall mean the "Revolving Loans" as defined in the Original Credit Agreement.

"S&P" shall mean Standard & Poor's Financial Services LLC, and its successors.

"Scheduled Repayment" shall have the meaning provided in Section 5.02(b).

"Screen Rate" shall have the meaning provided in the definition of Eurodollar Rate.

"Secondary Assignment of Charters" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements".

"Secondary Assignment of Earnings" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements".

"Secondary Assignment of Insurances" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements".

"Secondary Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Secondary Security Document, including, without limitation, all Secondary Pledge Agreement Collateral, all Secondary Earnings and Insurance Collateral, all Secondary Collateral Vessels and all cash and Cash Equivalents at any time delivered as collateral thereunder or under the Other Credit Agreement.

"Secondary Collateral Vessel" shall mean, at any time, each of the Vessels listed in rows 1 through and including 7 on Schedule III, which is subject to a Secondary Collateral Vessel Mortgage at such time and with respect to which the other Collateral and Guaranty Requirements are satisfied at such time.

"Secondary Collateral Vessel Mortgage" shall mean, with respect to the Secondary Collateral Vessels, a second preferred mortgage in substantially the form of Exhibit I-2 or such other form as may be reasonably satisfactory to the Administrative Agent, as such second preferred mortgage may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"Secondary Earnings and Insurance Collateral" shall mean all "Earnings Collateral" and "Insurance Collateral", as the case may be, as defined in the respective Secondary Assignment of Earnings and the respective Secondary Assignment of Insurances.

"Secondary Intercreditor Agreement" shall mean the Amended and Restated Intercreditor Agreement, dated as of [_____], by and among the Parent, Arlington, the Borrower, as borrower under this Agreement, GMSCII, as borrower under the Other Credit Agreement, the Administrative Agent (for and on behalf of the Secured Creditors), each Subsidiary Guarantor, the Collateral Agent, and the Other Agent (for and on behalf of the Secured Creditors under and as defined in the Other Credit Agreement), which Secondary Intercreditor Agreement (i) shall be substantially in the form of Exhibit P-2 (as amended, modified and/or otherwise supplemented from time to time) and (ii) shall set forth the priority of the security interests in the Secondary Collateral.

"Secondary Pledge Agreement" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Secondary Pledge Agreement Collateral" shall mean all "Collateral" as defined in the Secondary Pledge Agreement.

"Secondary Security Documents" shall mean the Secondary Pledge Agreement, each Secondary Assignment of Charter, each Secondary Assignment of Earnings, each Secondary Assignment of Insurances, each Secondary Collateral Vessel Mortgage and, after the execution and delivery thereof, each additional Secondary Security Document executed pursuant to Section 7.11.

"Secured Creditors" shall mean the "Secured Creditors" as defined in the Security Documents.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Documents" shall mean each Primary Security Document and each Secondary Security Document.

"Senior Unsecured Notes" shall mean the 12% senior unsecured notes of the Parent issued pursuant to that certain indenture, dated as of November 12, 2009, entered into by the Parent, certain of its Subsidiaries and The Bank of New York Mellon, as trustee.

"Specified Swap" shall mean the swap identified as a "Specified Swap" on Schedule V.

"Stated Amount" of each Existing Letter of Credit shall, at any time, mean the maximum amount available to be drawn thereunder (in each case determined without regard to whether any conditions to drawing could then be met).

"Subsidiaries Guaranty" shall have the meaning provided in the definition of "Collateral and Guaranty Requirements."

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time; provided that, for all purposes under this Credit Agreement or any other Credit Document, Non-Recourse Subsidiaries shall not be considered Subsidiaries hereunder or thereunder other than as set forth herein or therein.

"Subsidiary Guarantor" shall mean, at any time, (x) each direct and indirect Subsidiary of the Parent (other than GMSCII, Arlington and the Borrower) which owns a Primary Collateral Vessel or which owns, directly or indirectly, any of the Equity Interests of any such direct or indirect Subsidiary at such time, (y) each direct and indirect Subsidiary of the Parent (other than GMSCII, Arlington and the Borrower) which owns a Secondary Collateral Vessel or which owns, directly or indirectly, any of the Equity Interests of any such direct or indirect Subsidiary at such time and (z) each other Subsidiary of the Parent (other than GMSCII, Arlington and the Borrower) that guarantees the obligations under the Other Credit Agreement at any time. The Subsidiary Guarantors as of the Restatement Effective Date are listed on Schedule XIV.

"Swap Obligations" shall have the meaning provided in the definition of "Guaranteed Obligations".

"Tax Benefit" shall have the meaning provided in Section 5.04(c).

"Taxes" shall have the meaning provided in Section 5.04(a).

"Test Period" shall mean each period of four consecutive fiscal quarters then last ended, in each case taken as one accounting period.

-32-

"Tranche" shall mean the respective facility and commitments utilized in making Loans hereunder, with there being two separate Tranches, i.e., Tranche A Loans and Tranche B Loans.

"Tranche A Loan" shall have the meaning provided in Section 2.01.

"Tranche B Loan" shall mean an amount equal to the termination value arising from the termination of the Specified Swap held by Citibank, N.A. prior to the Restatement Effective Date plus any interest on the Specified Swap that has accrued since the termination date thereof and is unpaid on the Restatement Effective Date pursuant to the Final DIP/Cash Collateral Order.

"Transaction" shall mean, collectively, (i) the entering into of this Agreement and the other Credit Documents, as applicable, on the Restatement Effective Date and the conversion of Loans hereunder, (ii) the entering into of the Other Credit Agreement and the other Other Credit Documents, as applicable, on the Restatement Effective Date and the continuation and conversion of loans thereunder, (iii) the Equity Conversion, (iv) the Equity Investment, including the partial repayment of Tranche A Loans with the proceeds of the Equity Investment in a principal amount of no less than $35,350,780 on the Restatement Effective Date, and the partial repayment of Tranche A Loans under and as defined in the Other Credit Agreement with the proceeds of the Equity Investment in a principal amount of no less than $39,649,220 on the Restatement Effective Date, (v) the confirmation and effectiveness of the Plan of Reorganization and (vi) the payment of all fees and expenses in connection with the foregoing.

"Transferred Vessel" shall have the meaning provided in the definition of "Flag Jurisdiction Transfer" in this Section 1.

"Trigger Date" shall mean the date on which (x) the aggregate principal payments of Loans under this Agreement after the Restatement Effective Date (other than any such prepayment pursuant to Section 5.02(c)) equals the Deferred Amortization Amount and (y) the aggregate principal payments of loans under the Other Credit Agreement after the Restatement Effective Date (other than any such prepayment pursuant to Section 4.02(b) of the Other Credit Agreement) equals the Deferred Amortization Amount (under and as defined in the Other Credit Agreement).

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"Unfunded Current Liability" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"United States" and "U.S." shall each mean the United States of America.

"Unpaid Drawing" shall have the meaning provided in Section 3.03(a).

"Unrestricted Cash and Cash Equivalents" shall mean, when referring to cash or Cash Equivalents of the Parent or any of its Subsidiaries, that such cash or Cash Equivalents (i) does not appear (or would not be required to appear) as "restricted" on a consolidated balance sheet of the Parent or of any such Subsidiary, (ii) are not subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Creditors and the Other Agent for the benefit of the Secured Creditors under and as defined in the Other Credit Agreement, (iii) are otherwise generally available for use by the Parent or such Subsidiary or (iv) are not subject to Liens permitted under Section 9.01(xvii) or 9.01(xviii).

"Vessel" shall mean, collectively, all sea going vessels and tankers at any time owned by the Parent and its Subsidiaries, and, individually, any of such vessels.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock (other than director's qualifying shares) is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time.

SECTION 2. Amount and Terms of Credit Facility.

2.01 The Loans. (a) On the Restatement Effective Date, the loans (a "Tranche A Loan" and, collectively, the "Tranche A Loans") of each Lender shall consist of the Revolving Loans of each such Lender which are outstanding under the Original Credit Agreement immediately prior to the Restatement Effective Date and shall be converted into Tranche A Loans under this Agreement on the Restatement Effective Date, less each such Lender's pro rata percentage of $35,350,780, which is paid to such Lenders on the Restatement Effective Date as part of the Plan of Reorganization. The amount of each Lender's outstanding Tranche A Loans immediately after giving effect to the Transactions on the Restatement Effective Date is set forth on Schedule I.

(b) On the Restatement Effective Date, the amount due in respect of the termination of the Specified Swap, plus any interest that has accrued but has not been paid on the Specified Swap since the termination of the Specified Swap pursuant to the Final DIP/Cash Collateral Order, shall be exchanged for the Tranche B Loan under this Agreement and shall be held by Citibank, N.A. The amount of Citibank, N.A.'s outstanding Tranche B Loan immediately after giving effect to the Transactions on the Restatement Effective Date is set forth on Schedule I.

2.02 [Intentionally Omitted].

2.03 [Intentionally Omitted].

2.04 [Intentionally Omitted].

2.05 Notes. (a) The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 12.16 and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B, with blanks appropriately completed in conformity herewith (each, a "Note" and, collectively, the "Notes").

(b)    Each Note shall (i) be executed by the Borrower, (ii) be payable to such Lender or its registered assigns and be dated the Restatement Effective Date, (iii) be in a stated principal amount equal to the outstanding Tranche A Loans or Tranche B Loans of such Lender and be payable in the outstanding principal amount of Loans evidenced thereby, (iv) mature on the Maturity Date, (v) bear interest as provided in Section 2.07 in respect of the Loans evidenced thereby, (vi) be subject to voluntary prepayment as provided in Section 5.01, and mandatory repayment as provided in Section 5.02, and (vii) be entitled to the benefits of this Agreement and the other Credit Documents.

(c)    Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and will, prior to any transfer of any of its Notes, endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby. Failure to make any such notation or any error in any such notation or endorsement shall not affect the Borrower's obligations in respect of such Loans.

(d)    Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, Notes shall be delivered only to Lenders that at any time specifically request the delivery of such Notes. No failure of any Lender to request or obtain a Note evidencing its Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower that would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the Credit Documents. Any Lender that does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (c). At any time (including, without limitation, to replace any Note that has been destroyed or lost) when any Lender requests the delivery of a Note to evidence any of its Loans, the Borrower shall promptly execute and deliver to such Lender the requested Note in the appropriate amount or amounts to evidence such Loans provided that, in the case of a substitute or replacement Note, the Borrower shall have received from such requesting Lender (i) an affidavit of loss or destruction and (ii) a customary lost/destroyed Note indemnity, in each case in form and substance reasonably acceptable to the Borrower and such requesting Lender, and duly executed by such requesting Lender.

2.06 <u>Pro Rata Borrowings</u>.   All Borrowings of Tranche A Loans under this Agreement have been incurred from the Lenders <u>pro rata</u>.

2.07 <u>Interest</u>.   (a) The Borrower agrees to pay interest in respect of the unpaid principal amount of each Loan from the date the proceeds thereof are made available to the Borrower until the maturity (whether by acceleration or otherwise) of such Loan at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the Applicable Margin and the Eurodollar Rate for such Interest Period.

(b)   If the Borrower fails to pay any amount payable by it under a Credit Document on its due date, interest shall accrue on the overdue amount (in the case of overdue interest to the extent permitted by law) from the due date up to the date of actual payment (both before and after judgment) at a rate which is, subject to paragraph (c) below, 2% <u>plus</u> the rate which would have been payable if the overdue amount had, during the period of non payment, constituted a Loan for successive Interest Periods, each of a duration selected by the Administrative Agent.   Any interest accruing under this Section 2.07(b) shall be immediately payable by the Borrower on demand by the Administrative Agent.

(c)   If any overdue amount consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to such Loan:

(i)   the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

(ii)   the rate of interest applying to the overdue amount during that first Interest Period shall be 2% <u>plus</u> the rate which would have applied if the overdue amount had not become due.

Default interest (if unpaid) arising on the overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

(d)   Accrued and unpaid interest shall be payable in respect of each Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three month intervals after the first day of such Interest Period, on any repayment or prepayment (on the amount repaid or prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(e)   Upon each Interest Determination Date, the Administrative Agent shall determine the Eurodollar Rate for each Interest Period applicable to the Loans made or to be made pursuant to the applicable Borrowing and shall promptly notify the Borrower and the respective Lenders thereof.   Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.08 <u>Interest Periods</u>.   (a) The Borrower shall give the Administrative Agent at its Notice Office written notice at least three Business Days' prior to (x) the Restatement Effective Date (in the case of the initial Interest Period applicable to any Loans) and (y) the expiration of an Interest Period applicable to such Loans (in the case of any subsequent Interest

-36-

Period), which notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York time), electing the interest period (each an "Interest Period") applicable to such Loan. Each such written notice (each a "Notice of Interest Period Election"), except as otherwise expressly provided in Section 2.09, shall be irrevocable and shall be given by the Borrower in the form of Exhibit A, appropriately completed to specify (i) the aggregate principal amount of the Loans to be included in the Borrowing (if applicable), (ii) the commencement date of the applicable Interest Period (which shall be a Business Day) and (iii) at the option of the Borrower, whether the applicable Interest Period will be a one, three or six month period (or such other period as all the Lenders may agree); provided that:

(i)      there shall be no more than six different Interest Periods at any time, each of which shall be comprised of Loans in an amount of not less than the Minimum Borrowing Amount (or, if less, the aggregate principal amount of the Loans outstanding hereunder);

(ii)      the initial Interest Period for each Loan shall commence on the Restatement Effective Date of such Loan and each Interest Period occurring thereafter in respect of such Loan shall commence on the day on which the immediately preceding Interest Period applicable thereto expires;

(iii)      if any Interest Period relating to a Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(iv)      if any Interest Period would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the first succeeding Business Day; provided, however, that if any Interest Period for a Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the immediately preceding Business Day;

(v)      no Interest Period longer than one month may be selected at any time when an Event of Default (or, if the Administrative Agent or the Required Lenders have determined that such an election at such time would be disadvantageous to the Lenders, a Default) has occurred and is continuing; and

(vi)      no Interest Period in respect of any Borrowing of any Loans shall be selected which extends beyond the Maturity Date.

The Administrative Agent shall promptly give each Lender whose Loans are being converted on the Restatement Effective Date or continued at the end of any Interest Period, notice of the proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Interest Period Election. If on the Restatement Effective Date or upon the expiration of any Interest Period applicable to Loans, the Borrower has failed to deliver a Notice of Interest Period Election in respect of such Loans as provided above, the Borrower shall be deemed to have elected a one

-37-

month Interest Period to be applicable to such Loans effective as of the Restatement Effective Date or expiration date of such current Interest Period, as applicable.

(b)    Without in any way limiting the obligation of the Borrower to deliver a written Notice of Interest Period Election in accordance with Section 2.08(a), the Administrative Agent may act without liability upon the basis of telephonic notice of such Interest Period election, believed by the Administrative Agent in good faith to be from the President or the Treasurer of the Borrower (or any other officer of the Borrower designated in writing to the Administrative Agent by the President or Treasurer of the Borrower as being authorized to give such notices under this Agreement) prior to receipt of Notice of Interest Period Election. In each such case, the Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of such telephonic notice of such Interest Period election of Loans, absent manifest error.

2.09 <u>Increased Costs, Illegality, Market Disruption Event, etc.</u> (a) In the event that any Lender shall have determined in good faith (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto):

(i)    at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Loan because of, without duplication, any change since the Restatement Effective Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, for example, but not limited to: (A) a change with respect to taxes (other than Excluded Taxes) imposed on any recipient Lender's loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, but without duplication of any amounts payable in respect of Taxes pursuant to Section 5.04, or (B) any change in official reserve requirements but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate; or

(ii)    at any time, that the making or continuance of any Loan has been made unlawful by any law or governmental rule, regulation or order;

then, and in any such event, such Lender shall promptly give notice (by telephone confirmed in writing) to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the Lenders). Thereafter (x) in the case of clause (i) above, the Borrower agrees, subject to the provisions of Section 2.11 (to the extent applicable), to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased costs or reductions to such Lender or such other corporation and (y) in the case of clause (ii) above, the Borrower shall take one of the actions specified in Section 2.09(b) as promptly as possible and, in any event, within the time period required by law. In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, provided that such Lender's determination of compensation owing under this Section 2.09(a) shall, absent

-38-

manifest error be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.09(a), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for the calculation of such additional amounts; provided that the failure to give such notice shall not relieve the Borrower from its Obligations hereunder.

(b)    At any time that any Loan is affected by the circumstances described in Section 2.09(a)(i) or (ii), the Borrower may (and in the case of a Loan affected by the circumstances described in Section 2.09(a)(ii) shall) either (x) if the affected Loan is then being made initially, cancel the respective Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date or the next Business Day that such Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.09(a)(i) or (ii) or (y) if the affected Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, in the case of any Loan, repay all outstanding Borrowings (within the time period required by the applicable law or governmental rule, governmental regulation or governmental order) which include such affected Loans in full in accordance with the applicable requirements of Section 5.02; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.09(b).

(c)    If any Lender in good faith determines that after the Restatement Effective Date the introduction of or effectiveness of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by any governmental authority, central bank or comparable agency will have the effect of increasing the amount of capital required or requested to be maintained by such Lender, or any corporation controlling such Lender, based on the existence of such Lender's Loans hereunder or its obligations hereunder, then the Borrower agrees (to the extent applicable), to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital. In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, provided that such Lender's determination of compensation owing under this Section 2.09(c) shall, absent manifest error be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.09(c), will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts; provided that the failure to give such notice shall not relieve the Borrower from its Obligations hereunder.

(d)    If a Market Disruption Event occurs in relation to a Tranche A Loan for any Interest Period, then the rate of interest on each Lender's share of such Tranche A Loan for the relevant Interest Period shall be the rate per annum which is the sum of:

(i)    the Applicable Margin; and

(ii)    the rate determined by each Lender and notified to the Administrative Agent, which expresses the actual cost to each such Lender of funding its participation in

-39-

that Tranche A Loan for a period equivalent to such Interest Period from whatever source it may reasonably select.

(e)    If a Market Disruption Event occurs and the Administrative Agent or the Borrower so require, the Administrative Agent and the Borrower shall enter into negotiations (for a period of not more than thirty days) with a view to agreeing a substitute basis for determining the rate of interest.  Any alternative basis agreed pursuant to the immediately preceding sentence shall, with the prior consent of all the Lenders and the Borrower, be binding on all parties.  If no agreement is reached pursuant to this clause (e), the rate provided for in clause (d) above shall apply for the entire Interest Period.

(f)    Notwithstanding anything in this Agreement to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change after the Restatement Effective Date in a requirement of law or governmental rule, regulation or order, regardless of the date enacted, adopted, issued or implemented for all purposes under or in connection with this Agreement (including this Section 2.09).

2.10 Compensation.  The Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting and the calculation of such compensation), for all reasonable losses, expenses and liabilities (including, without limitation, any such loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Loans but excluding any loss of anticipated profits) which such Lender may sustain in respect of Loans made to the Borrower:  (i) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 2.09(a), Section 5.01 or Section 5.02 or as a result of an acceleration of the Loans pursuant to Section 10) of any of its Loans, or assignment of its Loans pursuant to Section 2.12, occurs on a date which is not the last day of an Interest Period with respect thereto; (ii) if any prepayment of any of its Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iii) as a consequence of any other Default or Event of Default arising as a result of the Borrower's failure to repay Loans or make payment on any Note held by such Lender when required by the terms of this Agreement.

2.11 Change of Lending Office.  Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.09(a)(ii), Section 2.09(b) or Section 5.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable good faith efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans or Existing Letters of Credit affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section.  Nothing in this Section 2.11 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender provided in Section 2.09 or Section 5.04.

-40-

2.12 <u>Replacement of Lenders</u>.  (a) (x)  If any Lender becomes a Defaulting Lender or otherwise defaults in its obligations to make Loans, (y) upon the occurrence of any event giving rise to the operation of Section 2.09(a)(i) or (ii), Section 2.09(b) or Section 5.04 with respect to any Lender which results in such Lender charging to the Borrower material increased costs in excess of those being generally charged by the other Lenders, or (z) as provided in Section 12.12(b) in the case of certain refusals by a Lender to consent to certain proposed changes, waivers, discharges or terminations with respect to this Agreement which have been approved by the Required Lenders, the Borrower shall have the right, if no Default or Event of Default will exist immediately after giving effect to the respective replacement, to replace such Lender (the "<u>Replaced Lender</u>") with one or more other Eligible Transferee or Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "<u>Replacement Lender</u>") reasonably acceptable to the Administrative Agent; <u>provided</u> that:

(i)     at the time of any replacement pursuant to this Section 2.12, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 12.04(b) (and with all fees payable pursuant to said Section 12.04(b) to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire all of the outstanding Loans of the Replaced Lender and such Replaced Lender's Individual Exposure and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum (without duplication) of an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Replaced Lender; and

(ii)     all obligations of the Borrower due and owing to the Replaced Lender at such time (other than those specifically described in clause (i) above) in respect of which the assignment purchase price has been, or is concurrently being, paid shall be paid in full to such Replaced Lender concurrently with such replacement.

(b)     Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (i) and (ii) above and, if so requested by the Replacement Lender, delivery to (i) the Replacement Lender of the appropriate Note or Notes executed by the Borrower, the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.09, 2.10, 3.04, 5.04, 12.01 and 12.06), which shall survive as to such Replaced Lender and (ii) if so requested by the Borrower, the Replaced Lender shall deliver all Notes in its possession to the Borrower.

2.13 <u>Defaulting Lenders</u>.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)     if any Existing Letter of Credit Exposure exists at the time a Lender becomes a Defaulting Lender then:

-41-

(i)    the Borrower shall, within one Business Day following notice by the Administrative Agent, cash collateralize in a manner reasonably satisfactory to the applicable Issuing Lender such Defaulting Lender's Existing Letter of Credit Exposure in an aggregate amount equal to 100% of such Defaulting Lender's Existing Letter of Credit Exposure for so long as such Existing Letter of Credit Exposure is outstanding (the "Existing Letter of Credit Back-Stop Arrangements");

(ii)    the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.01(a) with respect to such Defaulting Lender's Existing Letter of Credit Exposure; and

(iii)    if any Defaulting Lender's Existing Letter of Credit Exposure is not cash collateralized pursuant to this Section 2.13(a), then, without prejudice to any rights or remedies of any Issuing Lender or any Lender hereunder, all Existing Letter of Credit Fees payable under Section 4.01(a) with respect to such Defaulting Lender's Existing Letter of Credit Exposure shall be payable to each Issuing Lender until such Existing Letter of Credit Exposure is cash collateralized and/or reallocated; and

(b)    notwithstanding anything to the contrary contained in Section 2.01 or Section 3, so long as any Lender is a Defaulting Lender, no Issuing Lender shall be required to amend or renew any Existing Letter of Credit.

In the event that the Administrative Agent, the Borrower and each Issuing Lender each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then so long as no Event of Default then exists, all funds held as cash collateral pursuant to the Existing Letter of Credit Back-Stop Arrangements shall thereafter be promptly returned to the Borrower. If the Loans and all other Obligations have been paid in full and no Existing Letters of Credit are outstanding, then all funds held as cash collateral pursuant to the Existing Letter of Credit Back-Stop Arrangements shall thereafter be returned to the Borrower as promptly as practicable.

SECTION 3.  Existing Letters of Credit

3.01 Existing Letters of Credit.  Schedule XII contains a description of the standby letters of credit that were issued pursuant to the Original Credit Agreement for the account of the Borrower prior to the Restatement Effective Date and which remain outstanding on the Restatement Effective Date (and setting forth, with respect to each such letter of credit, (i) the name of the issuing lender (the "Issuing Lender"), (ii) the letter of credit number, (iii) the name of the account party, (iv) the stated amount (which shall be in Dollars), (v) the name of the beneficiary and (vi) the expiry date). Each such letter of credit (each, as amended from time to time in accordance with the terms thereof and hereof, an "Existing Letter of Credit") shall constitute a letter of credit issued by the relevant Issuing Lender hereunder for all purposes of this Agreement and shall be deemed issued on the Restatement Effective Date. At no time after the Restatement Effective Date will any Existing Letter of Credit be extended or renewed.

3.02 Existing Letter of Credit Participations.  (a)  On the Restatement Effective Date, the Issuing Lender shall be deemed to have sold and transferred to each Lender with

outstanding Tranche A Loans, other than such Issuing Lender (each such Lender, in its capacity under this Section 3.02, a "Participant"), and each such Participant shall be deemed irrevocably and unconditionally to have purchased and received from such Issuing Lender, without recourse or warranty, an undivided interest and participation, to the extent of such Participant's Percentage, in such Existing Letter of Credit, each drawing made thereunder and the obligations of the Borrower under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto. Upon any change in the outstanding Tranche A Loans or Percentages of the Lenders pursuant to Sections 2.12 or 12.04, it is hereby agreed that, with respect to all outstanding Existing Letters of Credit and Unpaid Drawings, there shall be an automatic adjustment to the participations pursuant to this Section 3.02 to reflect the new Percentages of the assignor and assignee Lender or of all Lenders with outstanding Tranche A Loans, as the case may be.

(b)     In determining whether to pay under any Existing Letter of Credit, such Issuing Lender shall have no obligation relative to the other Lenders other than to confirm that any documents required to be delivered under such Existing Letter of Credit appear to have been delivered and that they appear to substantially comply on their face with the requirements of such Existing Letter of Credit. Subject to the provisions of the immediately preceding sentence, any action taken or omitted to be taken by any Issuing Lender under or in connection with any Existing Letter of Credit if taken or omitted in the absence of gross negligence or willful misconduct, as determined by a court of competent jurisdiction, shall not create for such Issuing Lender any resulting liability to any Credit Party or any Lender.

(c)     In the event that any Issuing Lender makes any payment under any Existing Letter of Credit issued by it and the Borrower shall not have reimbursed such amount in full to such Issuing Lender pursuant to Section 3.03(a), such Issuing Lender shall promptly notify the Administrative Agent, which shall promptly notify each Participant, of such failure, and each Participant shall promptly and unconditionally pay to the Administrative Agent for the account of such Issuing Lender the amount of such Participant's Percentage (as relates to the respective Existing Letter of Credit) of such unreimbursed payment in Dollars and in same day funds. If the Administrative Agent so notifies, prior to 11:00 A.M. (New York time) on any Business Day, any Participant required to fund a payment under an Existing Letter of Credit, such Participant shall make available to the Administrative Agent at the Payment Office for the account of such Issuing Lender in Dollars such Participant's Percentage (as relates to the respective Existing Letter of Credit) of the amount of such payment on such Business Day in same day funds. If and to the extent such Participant shall not have so made its Percentage of the amount of such payment available to the Administrative Agent for the account of such Issuing Lender, such Participant agrees to pay to the Administrative Agent for the account of such Issuing Lender, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent for the account of such Issuing Lender at the overnight Federal Funds Rate. The failure of any Participant to make available to the Administrative Agent for the account of such Issuing Lender its Percentage of any payment under any Existing Letter of Credit issued by it shall not relieve any other Participant of its obligation hereunder to make available to the Administrative Agent for the account of such Issuing Lender its Percentage of any such Existing Letter of Credit on the date required, as specified above, but no Participant shall be responsible for the failure of any other

-43-

Participant to make available to the Administrative Agent for the account of such Issuing Lender such other Participant's Percentage of any such payment.

(d) Whenever any Issuing Lender receives a payment of a reimbursement obligation as to which the Administrative Agent has received (for the account of any such Issuing Lender) any payments from the Participants pursuant to clause (c) above, such Issuing Lender shall forward such payment to the Administrative Agent, which in turn shall distribute to each Participant which has paid its Percentage thereof, in same day funds, an amount equal to such Participant's share (based upon the proportionate aggregate amount originally funded by such Participant to the aggregate amount funded by all Participants) of the principal amount of such reimbursement obligation and interest thereon accruing after the purchase of the respective participations.

(e) Each Issuing Lender shall, promptly after the amendment to an Existing Letter of Credit give the Administrative Agent and the Borrower written notice of such amendment and such notice shall be accompanied by a copy of such amendment. Upon receipt of such notice, the Administrative Agent shall promptly notify each Participant, in writing, of such amendment and in the event a Participant shall so request, the Administrative Agent shall furnish such Participant with a copy of such amendment.

(f) Upon request, the Administrative Agent shall, within 10 days after the last Business Day of each calendar month, deliver to each Participant a report setting forth for such preceding calendar month the aggregate daily Stated Amount available to be drawn under all outstanding Existing Letters of Credit during such calendar month.

(g) The obligations of the Participants to make payments to the Administrative Agent for the account of the respective Issuing Lender with respect to Existing Letters of Credit issued by it shall be irrevocable and not subject to any qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including, without limitation, any of the following circumstances:

(i) any lack of validity or enforceability of this Agreement or any of the other Credit Documents;

(ii) the existence of any claim, setoff, defense or other right which the Borrower or any of its Subsidiaries may have at any time against a beneficiary named in an Existing Letter of Credit, any transferee of any Existing Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Lender, any Issuing Lender, any Participant, or any other Person, whether in connection with this Agreement, any Existing Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between the Borrower or any of its Subsidiaries and the beneficiary named in any such Existing Letter of Credit);

-44-

(iii)    any draft, certificate or any other document presented under any Existing Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)    the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents; or

(v)    the occurrence of any Default or Event of Default.

3.03 <u>Agreement to Repay Existing Letter of Credit Drawings</u>.  (a)  The Borrower hereby agrees to reimburse each Issuing Lender, by making payment to the Administrative Agent in immediately available funds at the Payment Office, for any payment or disbursement made by such Issuing Lender under any Existing Letter of Credit issued by it (each such amount, so paid until reimbursed, an "<u>Unpaid Drawing</u>"), not later than four Business Days following receipt by the Borrower of notice of such payment or disbursement (<u>provided</u> that no such notice shall be required to be given if an Event of Default under Section 10.05 shall have occurred and be continuing, in which case the Unpaid Drawing shall be due and payable immediately without presentment, demand, protest or notice of any kind (all of which are hereby waived by the Borrower)), with interest on the amount so paid or disbursed by such Issuing Lender, to the extent not reimbursed prior to 12:00 Noon (New York time) on the date of such payment or disbursement, from and including the date paid or disbursed to but excluding the date such Issuing Lender was reimbursed by the Borrower therefor at a rate per annum equal to the Base Rate, as in effect from time to time, <u>plus</u> 2%; <u>provided, however,</u> to the extent such amounts are not reimbursed prior to 12:00 Noon (New York time) on the fourth Business Day following the receipt by the Borrower of notice of such payment or disbursement or following the occurrence of an Event of Default under Section 10.05, interest shall thereafter accrue on the amounts so paid or disbursed by such Issuing Lender (and until reimbursed by the Borrower) at a rate per annum equal to the Base Rate, in effect from time to time, <u>plus</u> 2%, with such interest to be payable on demand.  Each Issuing Lender shall give the Borrower prompt written notice of each Drawing under any Existing Letter of Credit issued by it, <u>provided</u> that the failure to give any such notice shall in no way affect, impair or diminish the Borrower's obligations hereunder.

(b)    The obligations of the Borrower under this Section 3.03 to reimburse the respective Issuing Lender with respect to drawings on Existing Letters of Credit (each, a "<u>Drawing</u>") (including, in each case, interest thereon) shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which the Borrower may have or have had against any Lender (including in its capacity as Issuing Lender or Participant or as Participant), or any non-application or misapplication by the beneficiary of the proceeds of such Drawing, the respective Issuing Lender's only obligation to the Borrower being to confirm that any documents required to be delivered under such Existing Letter of Credit appear to have been delivered and that they appear to comply on their face with the requirements of such Existing Letter of Credit.  Subject to the provisions of the immediately preceding sentence, any action taken or omitted to be taken by any Issuing Lender under or in connection with any Existing Letter of Credit if taken or omitted in the absence of gross negligence or willful misconduct as determined by a court of competent jurisdiction, shall not create for such Issuing Lender any resulting liability to the Borrower or any other Credit Party.

-45-

3.04 <u>Increased Costs</u>. If at any time after the Restatement Effective Date, any Issuing Lender or any Participant determines that the introduction of or any change in any applicable law, rule, regulation, order, guideline or request or in the interpretation or administration thereof by any governmental authority charged with the interpretation or administration thereof, or compliance by any Issuing Lender or any Participant with any request or directive by any such authority (excluding any changes in law related to Excluded Taxes) (whether or not having the force of law), shall either (a) impose, modify or make applicable any reserve, deposit, capital adequacy or similar requirement against Existing Letters of Credit issued by any Issuing Lender or participated in by any Participant, or (b) impose on any Issuing Lender or any Participant any other conditions relating, directly or indirectly, to this Agreement or any Existing Letter of Credit; and the result of any of the foregoing is to increase the cost to any Issuing Lender or any Participant of issuing, maintaining or participating in any Existing Letter of Credit, or reduce the amount of any sum received or receivable by any Issuing Lender or any Participant hereunder or reduce the rate of return on its capital with respect to Existing Letters of Credit, then, upon demand to the Borrower by such Issuing Lender or any Participant (a copy of which demand shall be sent by such Issuing Lender or such Participant to the Administrative Agent), the Borrower agrees to pay to such Issuing Lender or such Participant such additional amount or amounts as will compensate such Lender for such increased cost or reduction in the amount receivable or reduction on the rate of return on its capital. Any Issuing Lender or any Participant, upon determining that any additional amounts will be payable pursuant to this Section 3.04, will give prompt written notice thereof to the Borrower, which notice shall include a certificate submitted to such Borrower by such Issuing Lender or such Participant (a copy of which certificate shall be sent by such Issuing Lender or such Participant to the Administrative Agent), setting forth in reasonable detail the basis for and the calculation of such additional amount or amounts necessary to compensate such Issuing Lender or such Participant, although the failure to give any such notice shall not release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 3.04. The certificate required to be delivered pursuant to this Section 3.04 shall, if delivered in good faith and absent manifest error, be final and conclusive and binding on the Borrower.

SECTION 4. <u>Fees</u>.

4.01 <u>Fees</u>. (a) The Borrower shall pay to the Administrative Agent, for the Administrative Agent's own account, such other fees as have been agreed to in writing by the Borrower and the Administrative Agent.

(b)　The Borrower agrees to pay to the Administrative Agent for distribution to each Lender (based on each such Lender's respective Percentage), a fee in respect of each Existing Letter of Credit (the "<u>Existing Letter of Credit Fee</u>") for the period from and including the date of issuance of such Existing Letter of Credit to and including the date of termination or expiration of such Existing Letter of Credit, computed at a rate per annum equal to the Applicable Margin then in effect from time to time on the daily Stated Amount of each such Existing Letter of Credit. Accrued Existing Letter of Credit Fees shall be due and payable quarterly in arrears on each Payment Date and on the Maturity Date (or such earlier date upon which the Loans and all other Obligations have been paid in full).

-46-

(c)   The Borrower agrees to pay directly to each Issuing Lender, for its own account, a facing fee in respect of each Existing Letter of Credit issued by it (the "Facing Fee") for the period from and including the date of issuance of such Existing Letter of Credit to and including the date of termination or expiration of such Existing Letter of Credit, computed at a rate per annum equal to 1/8 of 1% on the daily Stated Amount of such Existing Letter of Credit, provided that in any event the minimum amount of Facing Fees payable in any twelve-month period for each Existing Letter of Credit shall be not less than $500; it being agreed that, on the day of issuance of any Existing Letter of Credit and on each anniversary thereof prior to the termination or expiration of such Existing Letter of Credit, if $500 will exceed the amount of Facing Fees that will accrue with respect to such Existing Letter of Credit for the immediately succeeding twelve-month period, the full $500 shall be payable on the date of issuance of such Existing Letter of Credit and on each such anniversary thereof. Except as otherwise provided in the proviso to the immediately preceding sentence, accrued Facing Fees shall be due and payable quarterly in arrears on each Payment Date and upon the first day on or after the repayment of the Loans in full upon which no Existing Letters of Credit remain outstanding.

(d)   The Borrower agrees to pay, upon each payment (including any partial payment) under, or amendment to, any Existing Letter of Credit issued hereunder, such amount as shall at the time of such event be the administrative charge which the respective Issuing Lender is generally charging in connection with such occurrence with respect to letters of credit.

SECTION 5.  Prepayments; Payments; Taxes.

5.01  Voluntary Prepayments.  The Borrower shall have the right to prepay, at any time, the Loans, in each case without premium or penalty except as provided by law and Section 2.10, in whole or in part at any time and from time to time on the following terms and conditions:

(i)   the Borrower shall give the Administrative Agent prior to 12:00 Noon (New York time) at its Notice Office at least three Business Days' prior written notice (including e-mail notice or telephonic notice promptly confirmed in writing) of its intent to prepay such Loans, the amount of such prepayment and the specific Borrowing or Borrowings pursuant to which made, which notice the Administrative Agent shall promptly transmit to each of the Lenders;

(ii)   each prepayment shall be in an aggregate principal amount of at least $1,000,000 or such lesser amount of a Borrowing which is outstanding, provided that no partial prepayment of Loans made pursuant to any Borrowing shall reduce the outstanding Loans made pursuant to such Borrowing to an amount less than $1,000,000;

(iii)   at the time of any prepayment of Loans pursuant to this Section 5.01 on any date other than the last day of the Interest Period applicable thereto, the Borrower shall pay the amounts required pursuant to Section 2.10;

(iv)   in the event of certain refusals by a Lender as provided in Section 12.12(b) to consent to certain proposed changes, waivers, discharges or terminations with respect

to this Agreement which have been approved by the Required Lenders, the Borrower may, upon five Business Days' written notice to the Administrative Agent at its Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), prepay all Loans, together with accrued and unpaid interest and other amounts owing to such Lender (or owing to such Lender with respect to each Loan which gave rise to the need to obtain such Lender's individual consent) in accordance with said Section 12.12(b) so long as (A) such Lender's Individual Exposure (if any) is terminated concurrently with such prepayment and (B) the consents required by Section 12.12(b) in connection with the prepayment pursuant to this clause (iv) have been obtained;

(v)      except as expressly provided in the preceding clause (iv), each prepayment in respect of any Loans made pursuant to a Borrowing shall be applied pro rata among the Loans comprising such Borrowing, provided that in connection with any prepayment of Loans pursuant to this Section 5.01, at the Borrower's election, such prepayment shall not be applied to any Loan of a Defaulting Lender until all other Loans of Non-Defaulting Lenders have been repaid in full; and

(vi)     each prepayment of principal of Loans pursuant to this Section 5.01 shall be applied to reduce the then remaining Scheduled Repayments in accordance with Section 5.02(g).

5.02 Mandatory Repayments. (a) [Intentionally Omitted].

(b)      In addition to any other mandatory repayments pursuant to this Section 5.02, on each Payment Date (including, for the avoidance of doubt, the Maturity Date) set forth below, the Borrower shall be required to repay Tranche A Loans to the extent then outstanding in the amount set forth opposite each such Payment Date in the table below (each such repayment, as the same may be reduced in accordance with Sections 5.01, 5.02(c), 5.02(d) and/or 5.02(e), a "Scheduled Repayment"):

| Payment Date | Amount |
| --- | --- |
| June 30, 2014 | $16,506,212 |
| September 30, 2014 | $16,506,212 |
| December 31, 2014 | $16,506,212 |
| March 31, 2015 | $16,506,212 |
| June 30, 2015 | $16,506,212 |
| September 30, 2015 | $16,506,212 |
| December 31, 2015 | $16,506,212 |
| March 31, 2016 | $16,506,212 |
| June 30, 2016 | $16,506,212 |
| September 30, 2016 | $16,506,212 |
| December 31, 2016 | $16,506,212 |

-48-

Maturity Date                                    $324,555,428.95

(c)     In addition to any other mandatory repayments pursuant to this Section 5.02, but without duplication, on (i) the date of any Collateral Disposition involving a Primary Collateral Vessel (other than a Collateral Disposition constituting an Event of Loss) and, after the repayment of the loans and the satisfaction in full of all obligations under the Other Credit Agreement, a Secondary Collateral Vessel and (ii) the earlier of (A) the date which is 180 days following any Collateral Disposition constituting an Event of Loss involving a Primary Collateral Vessel or, after the repayment of the loans and the satisfaction in full of all obligations under the Other Credit Agreement, a Secondary Collateral Vessel and (B) the date of receipt by the Borrower, any of its Subsidiaries or the Administrative Agent of the insurance proceeds relating to such Event of Loss, the Borrower shall be required (subject to the first proviso below) to repay an aggregate principal amount of outstanding Loans in accordance with the requirements of Section 5.02(f) in an amount equal to (X) in the case of a Primary Collateral Vessel, the greater of (x) the Net Cash Proceeds of such Collateral Disposition (such amount under this clause (x) the "Net Cash Proceeds Value") and (y) the sum of the then outstanding aggregate principal amount of Loans and the Existing Letter of Credit Exposure multiplied by a fraction (I) the numerator of which is equal to the appraised value (as determined in accordance with the most recent appraisal report delivered to the Administrative Agent (or obtained by the Administrative Agent) pursuant to Section 8.01(d)) of the Primary Collateral Vessel or Primary Collateral Vessels which is/are the subject of such Collateral Disposition and (II) the denominator of which is equal to the Aggregate Primary Collateral Vessel Value (as determined in accordance with the most recent appraisal report delivered to the Administrative Agent (or obtained by the Administrative Agent) pursuant to Section 8.01(d)) prior to such Collateral Disposition (such amount under this clause (y) the "Appraisal Value") and (Y) after the repayment of the loans and the satisfaction in full of all obligations under the Other Credit Agreement, in the case of a Secondary Collateral Vessel, the Net Cash Proceeds Value of such Collateral Disposition; provided that (I) in the case of any Collateral Vessel which is older than 15 years at the time of such Collateral Disposition (including, for the avoidance of doubt, an Event of Loss) the Borrower shall only be required to repay an amount equal to the Net Cash Proceeds thereof; (II) after the Trigger Date, if the Net Cash Proceeds Value is greater than the Appraisal Value and the Parent and its Subsidiaries would have a Loan to Value Ratio of no greater than 0.60 to 1.00, on a pro forma basis after giving effect to the Collateral Disposition and any repayment with the proceeds thereof, then the Parent and its Subsidiaries may retain the proceeds of such Collateral Disposition in an amount equal to the difference between the Net Cash Proceeds Value and the Appraisal Value, which amount will not be subject to the mandatory repayment provisions of this Section 5.02(c); and (III) without limiting anything otherwise provided for in this Agreement, the Borrower hereby acknowledges that it is obliged to comply with Section 9.09 at all times (including, without limitation, after giving effect to any repayment contemplated by the foregoing Section 5.02(b)).

(d)     In addition to any other mandatory repayments pursuant to this Section 5.02, upon the occurrence of a default under Section 9.09, the Borrower shall be required to repay Loans in accordance with the requirements of Section 9.09 in an amount required to cure such default; provided that it is understood and agreed that the requirement to repay Loans

-49-

under this Section 5.02(d) shall not be deemed to be a waiver of any other right or remedy that any Lender may have as a result of an Event of Default under Section 9.09.

(e)     In addition to any other mandatory repayments pursuant to this Section 5.02, on the tenth day (or, if such day is not a Business Day, on the next succeeding Business Day) after each Payment Date, the Loans shall be repaid in an amount equal to (i) the Lenders' Pro Rata Excess Liquidity Share determined on such Payment Date. The mandatory repayment pursuant to this Section 5.02(e) shall be applied to reduce the Scheduled Repayments as follows: (i) first, 25% of such repayment to reduce the Scheduled Repayment following the applicable Payment Date, and, to the extent that such next Scheduled Repayment has been paid in full, to the next succeeding Scheduled Repayment until such Scheduled Repayment has been reduced to zero, after which the remaining portion (if any) of such 25% to reduce the then remaining Scheduled Repayments (excluding the Scheduled Repayment due on the Maturity Date) pro rata based upon such remaining Scheduled Repayments (excluding the Scheduled Repayment due on the Maturity Date) after giving effect to all prior reductions thereto, (ii) second, 25% of such repayment to reduce the then remaining Scheduled Repayments (excluding the Scheduled Repayment due on the Maturity Date) pro rata based upon such remaining Scheduled Repayments (excluding the Scheduled Repayment due on the Maturity Date) after giving effect to all prior reductions thereto, and (iii) third, 50% of such repayment to reduce the Scheduled Repayment due on the Maturity Date.

(f)     All repayments of the Loans pursuant to (i) Section 5.02(b) shall be applied to the repayment of the Tranche A Loans then outstanding on a pro rata basis and (ii) Sections 5.01, 5.02(c), 5.02(d) and 5.02(e) shall be applied to the repayment of the outstanding Loans on a pro rata basis and shall be further applied to the Loans within each Tranche on a pro rata basis.

(g)     The amount of all repayments of Tranche A Loans pursuant to Sections 5.01, 5.02(c) and 5.02(d) shall be applied to reduce the then remaining Scheduled Repayments pro rata based upon the then remaining Scheduled Repayments after giving effect to all prior reductions thereto.

(h)     With respect to each repayment of Loans under Section 5.01 or required by this Section 5.02, the Borrower may designate the specific Borrowing or Borrowings pursuant to which such Loans were made, provided that (i) all Loans with Interest Periods ending on such date of required repayment shall be paid in full prior to the payment of any other Loans and (ii) each repayment of any Loans comprising a Borrowing shall be applied pro rata among such Loans. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the preceding provisions of this clause (h), make such designation in its sole reasonable discretion with a view, but no obligation, to minimize breakage costs owing pursuant to Section 2.10.

(i)     Notwithstanding anything to the contrary contained elsewhere in this Agreement, all then outstanding Loans of each Tranche shall be repaid in full on the Maturity Date.

-50-

(j)     The Loans repaid pursuant to Section 5.01 and this Section 5.02 may not be reborrowed.

5.03  Method and Place of Payment.  Except as otherwise specifically provided herein, all payments under this Agreement or any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 12:00 Noon (New York time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office of the Administrative Agent or such other office in the State of New York as the Administrative Agent may hereafter designate in writing.  Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

5.04  Net Payments; Taxes.  (a)  All payments made by any Credit Party hereunder or under any Note will be made without setoff, counterclaim or other defense.  Unless otherwise required by law, all such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding any Excluded Taxes) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes").  If any Taxes are so levied or imposed, each of the Borrower, the Parent, GMSCII and Arlington agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any Note, after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein or in such Note.  Each of the Borrower, the Parent, GMSCII, Arlington and the Subsidiary Guarantors will furnish to the Administrative Agent within 45 days after the date of payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment.  Each of the Borrower, the Parent, GMSCII, Arlington and the Subsidiary Guarantors agrees to jointly and severally indemnify and hold harmless each Lender, and reimburse such Lender upon its written request, for the amount of any Taxes so levied or imposed and paid by such Lender.

(b)     Each Lender agrees to use commerically reasonable efforts (consistent with legal and regulatory restrictions and subject to overall policy considerations of such Lender) to file any certificate or document or to furnish to the Borrower and the Administrative Agent any information as reasonably requested by the Borrower and the Administrative Agent that may be necessary to establish any available exemption from, or reduction in the amount of, any Taxes; provided, however, that nothing in this Section 5.04(b) shall require a Lender to disclose any confidential information (including, without limitation, its tax returns or its calculations).  If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall use commercially reasonable efforts to deliver to the Borrower and the Administrative Agent at the time or times prescribed by law such

-51-

documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

Each non-U.S. Lender hereby agrees, whenever a lapse in time or change in circumstances renders any of the forms, certificates or other evidence delivered pursuant to this Section 5.04(b) obsolete or inaccurate in any material respect, that such Lender shall use commercially reasonable efforts to promptly (1) update such form, certificate or other evidence delivered, or (2) notify the Administrative Agent and the Borrower of its inability to do so.

(c)     If the Borrower pays any additional amount under this Section 5.04 to a Lender and such Lender determines in its sole discretion exercised in good faith that it has actually received or realized in connection therewith any refund or any reduction of, or credit against, its Tax liabilities in or with respect to the taxable year in which the additional amount is paid (a "Tax Benefit"), such Lender shall pay to the Borrower an amount that such Lender shall, in its sole discretion exercised in good faith, determine is equal to the net benefit, after tax, which was obtained by such Lender in such year as a consequence of such Tax Benefit; provided, however, that (i) any Lender may determine, in its sole discretion exercised in good faith consistent with the policies of such Lender, whether to seek a Tax Benefit, (ii) any Taxes that are imposed on a Lender as a result of a disallowance or reduction (including through the expiration of any tax credit carryover or carryback of such Lender that otherwise would not have expired) of any Tax Benefit with respect to which such Lender has made a payment to the Borrower pursuant to this Section 5.04(c) shall be treated as a Tax for which the Borrower is obligated to indemnify such Lender pursuant to this Section 5.04 without any exclusions or defenses, (iii) nothing in this Section 5.04(c) shall require any Lender to disclose any confidential information to the Borrower (including, without limitation, its tax returns), and (iv) no Lender shall be required to pay any amounts pursuant to this Section 5.04(c) at any time during which a Default or Event of Default exists.

SECTION 6. [Intentionally Omitted].

SECTION 7. Representations, Warranties and Agreements. In order to induce the Lenders to enter into this Agreement, to convert the Revolving Loans into the Tranche A Loans and to exchange the termination value of the Specified Swap for the Tranche B Loan, each of the Parent, GMSCII, Arlington and the Borrower makes the following representations, warranties and agreements, in each case on the Restatement Effective Date, all of which shall survive the execution and delivery of this Agreement and the Notes, the conversion of the Revolving Loans into the Tranche A Loans and the exchange of the termination value of the Specified Swap for the Tranche B Loan (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date):

7.01 Corporate/Limited Liability Company/Limited Partnership Status. Each Credit Party (i) is a duly organized and validly existing corporation, limited liability company or

limited partnership, as the case may be, in good standing under the laws of the jurisdiction of its incorporation or formation, (ii) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications, except for failures to be so qualified which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

7.02  Corporate Power and Authority.  Each Credit Party has the corporate or other applicable power and authority to execute, deliver and perform the terms and provisions of each of the Documents to which it is party and has taken all necessary corporate or other applicable action to authorize the execution, delivery and performance by it of each of such Documents. Each Credit Party has duly executed and delivered each of the Documents to which it is party, and each of such Documents constitutes the legal, valid and binding obligation of such Credit Party enforceable against such Credit Party in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

7.03  No Violation.  Neither the execution, delivery or performance by any Credit Party of the Documents to which it is a party, nor compliance by it with the terms and provisions thereof, will (i) contravene any material provision of any applicable law, statute, rule or regulation or any applicable order, judgment, writ, injunction or decree of any court or governmental instrumentality, (ii) conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the material properties or assets of the Parent or any of its Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, to which the Parent or any of its Subsidiaries is a party or by which it or any of its material property or assets is bound or to which it may be subject or (iii) violate any provision of the Certificate of Incorporation or By-Laws (or equivalent organizational documents) of the Parent or any of its Subsidiaries.

7.04  Governmental Approvals.  No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except as have been obtained or made or, in the case of any filings or recordings in respect of the Security Documents (other than the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages), will be made within 10 days of the date such Security Document is required to be executed pursuant hereto), or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to authorize, or is required in connection with, (i) the execution, delivery and performance by any Credit Party of any Document to which it is a party or (ii) the legality, validity, binding effect or enforceability of any Document to which it is a party.

7.05  Financial Statements; Financial Condition; Undisclosed Liabilities.  (a)  (i) The audited consolidated balance sheets of the Parent as at December 31, 2011 and the related consolidated statements of operations and of cash flows for the fiscal year ended on such date

and (ii) to the extent available, the consolidated balance sheets of the Parent as at the end of each quarterly accounting period in the 2012 fiscal year and the related consolidated statements of operations and cash flows, in each case for such quarterly accounting period, reported on by and accompanied by, in the case of the annual financial statements, an unqualified report from Deloitte & Touche LLP, present fairly the consolidated financial condition of the Parent as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein). Neither the Parent nor any of its Subsidiaries has any material guarantee obligations, contingent liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the financial statements referred to in the preceding sentence (it being understood that with respect to guarantee obligations, the underlying debt is so reflected).

(b) Except as fully disclosed in the financial statements and the notes related thereto delivered pursuant to Section 7.05(a), there were as of the Restatement Effective Date no liabilities or obligations with respect to the Parent or any of its Subsidiaries of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, would be materially adverse to the Parent and its Subsidiaries taken as a whole. As of the Restatement Effective Date, none of the Credit Parties knows of any basis for the assertion against it of any liability or obligation of any nature that is not fairly disclosed (including, without limitation, as to the amount thereof) in the financial statements and the notes related thereto delivered pursuant to Section 7.05(a) which, either individually or in the aggregate, could reasonably be expected to be materially adverse to the Parent and its Subsidiaries taken as a whole.

(c) The Projections delivered by the Parent to the Administrative Agent and the Lenders prior to the Restatement Effective Date have been prepared in good faith and are based on GAAP and reasonable assumptions, and there are no statements or conclusions in such Projections which are based upon or include information known to the Parent on the Restatement Effective Date to be misleading in any material respect or which fail to take into account material information known to the Parent on the Restatement Effective Date regarding the matters reported therein. On the Restatement Effective Date, the Parent believes that such Projections are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results included in such Projections.

7.06 Litigation. Except as set forth on Schedule XV, there are no actions, suits, investigations (conducted by any governmental or other regulatory body of competent jurisdiction) or proceedings pending or, to the knowledge of the Parent, GMSCII, Arlington or the Borrower, threatened against the Parent or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

7.07 True and Complete Disclosure. All factual information (taken individually or as a whole) furnished by or on behalf of the Parent, GMSCII, Arlington or the Borrower in

-54-

writing to the Administrative Agent or any Lender (including, without limitation, all information contained in the Documents and any financial statement referred to in Section 7.05(a)) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information (taken individually or as a whole) hereafter furnished by or on behalf of the Parent, GMSCII, Arlington or the Borrower in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time as such information was provided.

7.08 <u>Use of Proceeds; Margin Regulations</u>.   (a) All proceeds of the Loans (including the Loans which result from the conversion of Revolving Loans into Tranche A Loans and the exchange of Indebtedness of the Specified Swap for the Tranche B Loan) were used only for the following (i) to continue the Existing Letters of Credit and/or (ii) for working capital, Capital Expenditures and general corporate purposes.

(b)   No part of the proceeds of any Loan was used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock except to purchase or carry or extend credit for the purpose of purchasing or carrying such Margin Stock as may be permitted to be purchased or carried pursuant to the terms of Sections 9.05(vi) and (vii).  None of the conversion of the Revolving Loans into the Tranche A Loans, the exchange of Indebtedness of the Specified Swap for the Tranche B Loan, the use of the proceeds thereof or the occurrence of any other Borrowing will violate or be inconsistent with the Margin Regulations.

7.09 <u>Tax Returns and Payments</u>.  The Parent and each of its Subsidiaries has timely filed all U.S. federal income tax returns, statements, forms and reports for taxes and all other material U.S. and non-U.S. tax returns, statements, forms and reports for taxes required to be filed by or with respect to the income, properties or operations of the Parent and/or any of its Subsidiaries (the "Returns").  The Returns accurately reflect in all material respects all liability for taxes of the Parent and its Subsidiaries as a whole for the periods covered thereby.  The Parent and each of its Subsidiaries have at all times paid, or have provided adequate reserves (in accordance with GAAP) for the payment of, all taxes shown as due on the Returns and all other material U.S. federal, state and non-U.S. taxes that have become due and payable.  There is no material action, suit, proceeding, investigation, audit, or claim now pending or, to the knowledge of the Parent or any of its Subsidiaries, threatened by any authority regarding any taxes relating to the Parent or any of its Subsidiaries.  As of the Restatement Effective Date, neither the Parent nor any of its Subsidiaries has entered into an agreement or waiver or been requested to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of taxes of the Parent or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of the Parent or any of its Subsidiaries not to be subject to the normally applicable statute of limitations.  Neither the Parent nor any of its Subsidiaries (i) has engaged in any "listed transaction" within the meaning of Section 6011 of the Code or (ii) has any actual or potential liability for the taxes of any Person (other than the Parent or any of its present or former Subsidiaries) under the United States Treasury regulation Section 1.1502-6 (or any similar provision of state, local, foreign or provincial law).

7.10 <u>Compliance with ERISA</u>. (i) <u>Schedule VII</u> sets forth, as of the Restatement Effective Date, each Plan; with respect to each Plan, other than any Multiemployer Plan (and each related trust, insurance contract or fund), there has been no failure to be in substantial compliance with its terms and with all applicable laws, including without limitation ERISA and the Code, that could reasonably be expected to give rise to a Material Adverse Effect; each Plan, other than any Multiemployer Plan (and each related trust, if any), which is intended to be qualified under Section 401(a) of the Code has received a determination letter (or an opinion letter) from the United States Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code; no Reportable Event has occurred; to the best knowledge of the Parent or any of its Subsidiaries or ERISA Affiliates no Plan which is a Multiemployer Plan is insolvent or in reorganization; no Plan has an Unfunded Current Liability in an amount material to Borrower's operation; no Plan (other than a Multiemployer Plan) which is subject to Section 412 of the Code or Section 302 of ERISA has failed to satisfy minimum funding standards, or has applied for or received a waiver of the minimum funding standards or an extension of any amortization period, within the meaning of Section 412 or 430 of the Code or Section 302 or 303 of ERISA; with respect to each Plan (other than a Multiemployer Plan) its actuary has certified that such Plan is not an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; all contributions required to be made with respect to a Plan have been or will be timely made (except as disclosed on <u>Schedule VII</u>); neither the Parent nor any of its Subsidiaries nor any ERISA Affiliate has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 436(f), 4971 or 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan; no condition exists which presents a material risk to the Parent or any of its Subsidiaries or any ERISA Affiliate of incurring a liability to or on account of a Plan pursuant to the foregoing provisions of ERISA and the Code; no proceedings have been instituted by the PBGC to terminate or appoint a trustee to administer any Plan (in the case of a Multiemployer Plan, to the best knowledge of the Parent or any of its Subsidiaries or ERISA Affiliates) which is subject to Title IV of ERISA; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending, or, to the best knowledge of the Parent or any of its Subsidiaries, expected or threatened which could reasonably be expected to have a Material Adverse Effect; using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the Parent and its Subsidiaries and ERISA Affiliates would have no liabilities to any Plans which are Multiemployer Plans in the event of a complete withdrawal therefrom in an amount which could reasonably be expected to have a Material Adverse Effect; neither the Borrower nor any of its Subsidiaries nor any ERISA Affiliate has received any notice that a Plan which is a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; each group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) which covers or has covered employees or former employees of the Parent, any of its Subsidiaries, or any ERISA Affiliate has at all times been operated in material compliance with the provisions of Part 6 of subtitle B of Title I of ERISA and Section 4980B of the Code; no lien imposed under the Code or ERISA on the assets of the Parent or any of its Subsidiaries or any ERISA Affiliate exists nor has any event occurred which could reasonably be expected to give rise to any such lien on account of any Plan; and the Parent and its Subsidiaries do not maintain or contribute to

any employee welfare plan (as defined in Section 3(1) of ERISA) which provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan the obligations with respect to which could reasonably be expected to have a Material Adverse Effect.

(ii) Each Foreign Pension Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities. All contributions required to be made with respect to a Foreign Pension Plan have been or will be timely made. Neither the Parent nor any of its Subsidiaries has incurred any obligation in connection with the termination of or withdrawal from any Foreign Pension Plan that could reasonably be expected to have a Material Adverse Effect. Neither the Parent nor any of its Subsidiaries maintains or contributes to any Foreign Pension Plan the obligations with respect to which could in the aggregate reasonably be expected to have a Material Adverse Effect.

7.11 The Security Documents. After the execution and delivery thereof and upon the taking of the actions mentioned in the second immediately succeeding sentence, each of the Security Documents creates in favor of the Collateral Agent for the benefit of the Secured Creditors (x) in the case of the Collateral Vessel Mortgages, the Assignments of Earnings, the Assignments of Insurances and the Pledge Agreement, a legal, valid and enforceable fully perfected first priority security interest in and Lien on all right, title and interest of the Credit Parties party thereto in the Primary Collateral described therein and (y) in the case of the Secondary Collateral Vessel Mortgages, the Secondary Assignments of Earnings, the Secondary Assignments of Insurances and the Secondary Pledge Agreement, a legal, valid and enforceable fully perfected second priority security interest in and Lien on all right, title and interest of the Credit Parties party thereto in the Secondary Collateral described therein, in the case of each of (x) and (y) above, subject to no other Liens except for Permitted Liens. No filings or recordings are required in order to perfect the security interests created under any Security Document except for filings or recordings which shall have been made on or prior to the Restatement Effective Date and such other filings made on or prior to the tenth day after the Restatement Effective Date, subject in each case to Section 7.03.

7.12 Capitalization. (a) On the Restatement Effective Date and after giving effect to the conditions precedent related thereto: (1) the authorized capital stock of the Borrower shall consist of 1,000 shares of common stock, $0.01 par value per share, 100 of which have been issued and 100% of which issued shares are outstanding and owned by the Parent; (2) all such outstanding shares shall have been duly and validly issued, fully paid and non-assessable and issued free of preemptive rights; and (3) the Borrower shall not have outstanding any securities convertible into or exchangeable for its capital stock or outstanding any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its capital stock or any stock appreciation or similar rights.

(b) Except as set forth in Schedule IX, as of the Restatement Effective Date and after giving effect to the conditions precedent related thereto, there are (i) no other shares of capital stock or other Equity Interests or voting securities of the Parent, (ii) no securities of the

Parent convertible into or exchangeable for capital stock or other Equity Interests or voting securities of the Parent, (iii) no options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other similar contracts or commitments that could require the Parent to issue, sell or otherwise cause to become outstanding any of its Equity Interests and (iv) no stock appreciation, phantom stock, profit participation or similar rights with respect to the Parent or any repurchase, redemption or other obligation to acquire for value any capital stock of the Parent.

(c)     As of the Restatement Effective Date, all outstanding shares of the Parent's capital stock are duly authorized, validly issued, fully paid and nonassessable and, except as set forth in Schedule IX, not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of the Business Corporations Act of the Republic of the Marshall Islands 1990, the articles of incorporation of the Parent, the bylaws of the Parent or any agreement to which the Parent is a party or otherwise bound. None of the shares of the capital stock of the Parent have been issued in violation of any securities Laws. There are no accrued and unpaid dividends with respect to any outstanding shares of capital stock of the Parent.

7.13 Subsidiaries.   On the Restatement Effective Date, the Parent has no Subsidiaries other than those Subsidiaries listed on Schedule VIII (which Schedule identifies the correct legal name, direct owner, percentage ownership and jurisdiction of organization of each such Subsidiary on the date hereof). On the Restatement Effective Date, all outstanding capital stock, membership interests, partnership interests, units or other form of equity, of each class outstanding, of each of the Subsidiaries listed on Schedule VIII has been validly issued, is fully paid and non-assessable (to the extent applicable) and, except in the case of the Parent, is owned beneficially and of record by a Credit Party free and clear of all Liens other than the security interests created by the Credit Documents, the Other Credit Documents and Permitted Liens.

7.14 Compliance with Statutes, etc.  The Parent and each of its Subsidiaries is in compliance in all material respects with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such non-compliances that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.15 Investment Company Act.  Neither the Parent, nor any of its Subsidiaries, is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

7.16 Money Laundering.  (a)  To the extent applicable, each Credit Party is in compliance, in all material respects, with the (i) Trading and Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the PATRIOT Act. No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in

order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(b)    None of the Credit Parties nor, to the best knowledge of the Parent, GMSCII, Arlington and the Borrower after due inquiry, any Affiliate of any Credit Party, is, or will be after consummation of the Transaction and application of the proceeds of the Loans, by reason of being a "national" of a "designated foreign country" or a "specially designated national" within the meaning of the Regulations of the Office of Foreign Assets Control, United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), or for any other reason, in violation of, any United States Federal Statute or Presidential Executive Order concerning trade or other relations with any foreign country or any citizen or national thereof.

7.17 <u>Pollution and Other Regulations</u>. (a) Each of the Parent and its Subsidiaries is in compliance with all applicable Environmental Laws governing its business, except for such failures to comply as are not reasonably likely to have a Material Adverse Effect, and neither the Parent nor any of its Subsidiaries is liable for any penalties, fines or forfeitures for failure to comply with any of the foregoing except for such penalties, fines or forfeitures as are not reasonably likely to have a Material Adverse Effect. All licenses, permits, registrations or approvals required for the business of the Parent and each of its Subsidiaries, as conducted as of the Restatement Effective Date, under any Environmental Law have been secured and the Parent and each of its Subsidiaries is in substantial compliance therewith, except for such failures to secure or comply as are not reasonably likely to have a Material Adverse Effect. Neither the Parent nor any of its Subsidiaries is in any respect in noncompliance with, breach of or default under any applicable writ, order, judgment, injunction, or decree to which the Parent or such Subsidiary is a party or which would affect the ability of the Parent or such Subsidiary to operate any Vessel, Real Property or other facility and no event has occurred and is continuing which, with the passage of time or the giving of notice or both, would constitute noncompliance, breach of or default thereunder, except in each such case, such noncompliance, breaches or defaults as are not likely to, individually or in the aggregate, have a Material Adverse Effect. There are, as of the Restatement Effective Date, no Environmental Claims pending or, to the knowledge of the Parent or the Borrower, threatened, against the Parent or any of its Subsidiaries in respect of which an unfavorable decision, ruling or finding would be reasonably likely to have a Material Adverse Effect. There are no facts, circumstances, conditions or occurrences on any Vessel, Real Property or other facility owned or operated by the Parent or any of its Subsidiaries that are reasonably likely (i) to form the basis of an Environmental Claim against the Parent, any of its Subsidiaries or any Vessel, Real Property or other facility owned by the Parent or any of its Subsidiaries, or (ii) to cause such Vessel, Real Property or other facility to be subject to any restrictions on its ownership, occupancy, use or transferability under any Environmental Law, except in each such case for clauses (i) and (ii) above, such Environmental Claims or restrictions that individually or in the aggregate are not reasonably likely to have a Material Adverse Effect.

(b)    Hazardous Materials have not at any time prior to the date of this Agreement or any subsequent Borrowing, been (i) generated, used, treated or stored on, or transported to or from, any Vessel, Real Property or other facility at any time owned or operated by the Parent or any of its Subsidiaries or (ii) released on or from any such Vessel, Real Property or other facility, except in each case for clauses (i) and (ii) above where such occurrence or

event, either individually or in the aggregate, is reasonably likely to have a Material Adverse Effect.

This Section 7.17 contains the sole and exclusive representations and warranties of the Credit Parties with respect to environmental, health and safety matters, including any relating to or arising under Environmental Laws, Environmental Claims or Hazardous Materials.

7.18 Labor Relations. Neither the Parent nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect and there is (i) no unfair labor practice complaint pending against the Parent or any of its Subsidiaries or, to the Parent's knowledge, threatened against any of them before the National Labor Relations Board, and no material grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Parent or any of its Subsidiaries or, to the Parent's knowledge, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against the Parent or any of its Subsidiaries or, to the Parent's knowledge, threatened against the Parent or any of its Subsidiaries and (iii) no union representation proceeding pending with respect to the employees of the Parent or any of its Subsidiaries, except (with respect to the matters specified in clauses (i), (ii) and (iii) above) as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.19 Patents, Licenses, Franchises and Formulas. The Parent and each of its Subsidiaries owns, or has the right to use, and has the right to enforce and prevent any third party from using, all material patents, trademarks, permits, service marks, trade names, copyrights, licenses, franchises and formulas, and has obtained assignments of all leases and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others, except for such failures and conflicts which could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

7.20 Indebtedness.    Schedule V sets forth a true and complete list of all Indebtedness of the Parent and its Subsidiaries as of the Restatement Effective Date (other than Indebtedness under the Other Credit Documents) and which is to remain outstanding after giving effect to the Restatement Effective Date (the "Existing Indebtedness"), in each case showing the aggregate principal amount thereof and the name of the borrower and any other entity which directly or indirectly guarantees such debt.

7.21 Insurance.    Schedule VI sets forth a true and complete listing of all insurance maintained by each Credit Party as of the Restatement Effective Date, with the amounts insured (and any deductibles) set forth therein (the "Required Insurance").

7.22 Concerning the Collateral Vessels. The name, registered owner (which shall be a Subsidiary Guarantor), official number, and jurisdiction of registration and flag (which shall be in an Acceptable Flag Jurisdiction) of each Collateral Vessel is set forth on Schedule III. Each Collateral Vessel is and will be operated in compliance with all applicable law, rules and regulations, except such noncompliance as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

7.23 <u>Citizenship</u>. The Parent and each other Credit Party which owns or operates, or will own or operate, one or more Collateral Vessels is, or will be, qualified to own and operate such Collateral Vessels under the laws of the Republic of the Marshall Islands, the Republic of Liberia or Bermuda, as applicable, or such other jurisdiction in which any such Collateral Vessels are permitted, or will be permitted, to be flagged in accordance with the terms of the respective Collateral Vessel Mortgages and the respective Secondary Collateral Vessel Mortgages.

7.24 <u>Collateral Vessel Classification; Flag</u>. Each Collateral Vessel is (i) or will be, classified in the highest class available for Vessels of its age and type with a classification society listed on <u>Schedule X</u> hereto or another internationally recognized classification society acceptable to the Collateral Agent, free of any conditions or recommendations, other than as permitted, or will be permitted, under the Collateral Vessel Mortgage or the Secondary Collateral Vessel Mortgage, as applicable, and (ii) flagged in an Acceptable Flag Jurisdiction.

7.25 <u>No Immunity</u>. The Parent does not, nor does any other Credit Party or any of their respective properties, have any right of immunity on the grounds of sovereignty or otherwise from the jurisdiction of any court or from setoff or any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) under the laws of any jurisdiction. The execution and delivery of the Credit Documents by the Credit Parties and the performance by them of their respective obligations thereunder constitute commercial transactions.

7.26 <u>Fees and Enforcement</u>. No fees or taxes, including, without limitation, stamp, transaction, registration or similar taxes, are required to be paid to ensure the legality, validity, or enforceability of this Agreement or any of the other Credit Documents other than recording taxes which have been, or will be, paid by the Parent or any of its Subsidiaries as and to the extent due. Under the laws of the Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia (or any other Acceptable Flag Jurisdiction), as applicable, the choice of the laws of the State of New York as set forth in the Credit Documents which are stated to be governed by the laws of the State of New York is a valid choice of law, and the irrevocable submission by each Credit Party to jurisdiction and consent to service of process and, where necessary, appointment by such Credit Party of an agent for service of process, in each case as set forth in such Credit Documents, is legal, valid, binding and effective.

7.27 <u>Form of Documentation</u>. Each of the Credit Documents is, or when executed will be, in proper legal form under the laws of the Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia (or any other applicable Acceptable Flag Jurisdiction), as applicable, for the enforcement thereof under such laws, subject only to such matters which may affect enforceability arising under the law of the State of New York. To ensure the legality, validity, enforceability or admissibility in evidence of each such Credit Document in the Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia (or any other applicable Acceptable Flag Jurisdiction), as applicable, it is not necessary that any Credit Document or any other document be filed or recorded with any court or other authority in the Republic of the Marshall Islands, the United

Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia (or any other applicable Acceptable Flag Jurisdiction), as applicable, or notarized or executed under seal, or physically executed in any such jurisdiction, except as have been made, or will be made, in accordance with Section 12.10.

7.28 <u>Solvency</u>.  After giving effect to (a) the Loans, (b) the consummation of the Transaction and (c) the payment and accrual of all transaction costs in connection with the foregoing, the Parent and its Subsidiaries taken as a whole and the Borrower and its Subsidiaries, taken as a whole, are solvent.

7.29 <u>Patriot Act</u>.  No Credit Party (and, to the knowledge of each Credit Party, no joint venture or Subsidiary thereof) is in violation of any United States law relating to terrorism, sanctions or money laundering, including the United States Executive Order No. 13224 on Terrorist Financing and the Patriot Act.

7.30 <u>Certain Business Practices</u>.  To the knowledge of the Parent, neither the Parent nor any of its Subsidiaries (nor any of their respective officers, directors or employees) (a) has made or agreed to make any contribution, payment, gift or entertainment to, or accepted or received any contributions, payments, gifts or entertainment from, any government official, employee, political party or agent or any candidate for any federal, state, local or foreign public office, where either the contribution, payment or gift or the purpose thereof was illegal under the laws of any federal, state, local or foreign jurisdiction; or (b) has engaged in or otherwise participated in, assisted or facilitated any transaction that is prohibited by any applicable embargo or related trade restriction imposed by the United States Office of Foreign Assets Control or any other agency of the United States government.

SECTION 8.  <u>Affirmative Covenants</u>.  Each of the Parent, the Borrower, GMSCII and Arlington hereby covenants and agrees that on and after the Restatement Effective Date, and until all Existing Letters of Credit have terminated and the Loans, Notes and Unpaid Drawings, together with interest and all other Obligations incurred hereunder and thereunder, are paid in full:

8.01 <u>Information Covenants</u>.  The Parent will make available to the Administrative Agent, with sufficient copies for each of the Lenders:

(a)     <u>Quarterly Financial Statements</u>.  Within 45 days after the close of the first three quarterly accounting periods in each fiscal year of the Parent (<u>provided</u> that for the first fiscal quarter following the Restatement Effective Date, such delivery shall be within 60 days after the end of such fiscal quarter), (i) the consolidated balance sheets of the Parent and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of operations and cash flows, in each case for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period, and in each case, setting forth comparative figures for the related periods in the prior fiscal year, all of which shall be certified by the senior financial officer of the Parent, subject to normal year-end audit adjustments and (ii) management's discussion and analysis of the important operational and financial developments during the fiscal quarter and year-to-date periods.

(b)    Annual Financial Statements.  Within (a) 90 days after the close of each fiscal year of the Parent in which any of Parent's securities are listed on a nationally recognized securities exchange and (b) 120 days after the close of each fiscal year of Parent (provided, that for the first fiscal year following the Restatement Effective Date, such delivery shall be within 150 days after the end of such fiscal year) in which none of Parent's securities are listed on a nationally recognized securities exchange, (i) the consolidated balance sheets of the Parent and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of operations and retained earnings and of cash flows for such fiscal year setting forth comparative figures for the preceding fiscal year and certified by Deloitte & Touche LLP or such other independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent, together with a report of such accounting firm stating that in the course of its regular audit of the financial statements of the Parent and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge of any Default or Event of Default pursuant to the Financial Covenants, which has occurred and is continuing or, if in the opinion of such accounting firm such a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal year.

(c)    Monthly Financial Statements.  Within 30 days after the end of each of the first two calendar months of each fiscal quarter of the Parent occurring prior to the Trigger Date, the unaudited trial balance sheets of the Parent and its Subsidiaries as at the end of such month, and setting forth comparative figures for the prior calendar month, all of which shall be certified by the senior financial officer of the Parent, subject to normal year-end audit adjustments and including normal recurring adjustments; provided, however, that in no event will the Parent be required to deliver such unaudited trial balance sheets if, at the end of any such month, the Parent and its Subsidiaries have a Loan to Value Ratio of no greater than 0.60 to 1.00.

(d)    Appraisal Reports.  Together with delivery of the compliance certificates described in Section 8.01(f) required in connection with each fiscal quarter in each fiscal year of the Parent, and at any other time within 33 days of the written request of the Administrative Agent, appraisal reports dated no more than 30 days prior to the date of delivery of such compliance certificate or such request, as applicable, in form and substance reasonably satisfactory to the Administrative Agent and from two Approved Appraisers stating the then current Fair Market Value of each of the Collateral Vessels.  All such appraisals shall be conducted by, and made at the expense of, the Borrower (it being understood that the Administrative Agent may and, at the request of the Required Lenders, shall, upon notice to the Borrower, obtain such appraisals and that the cost of all such appraisals will be for the account of the Borrower); provided that, unless an Event of Default shall then be continuing, in no event shall the Borrower be required to pay for more than four appraisal reports obtained pursuant to this Section 8.01(d) in any single fiscal year of the Borrower, with the cost of any such reports in excess thereof to be paid by the Lenders on a pro rata basis.

(e)    Projections, Budget, etc.  (i) As soon as available but not less than 30 days prior to the commencement of each fiscal year of the Parent beginning with its fiscal year commencing on January 1, 2013, a preliminary budget of the Parent and its Subsidiaries in reasonable detail for each of the twelve months and four fiscal quarters of such fiscal year, and

-63-

(ii) as soon as available but not more than 45 days after the commencement of each fiscal year of the Parent beginning with its fiscal year commencing on January 1, 2013, (x) a budget of the Parent and its Subsidiaries in reasonable detail for each of the twelve months and four fiscal quarters of such fiscal year and (y) the Projections referred to in Section 7.05(c) in reasonable detail for the subsequent three fiscal years including the fiscal year in which such Projections are being delivered.  It is recognized by each Lender and the Administrative Agent that such projections and determinations provided by the Parent, although reflecting the Parent's good faith projections and determinations, are not to be viewed as facts and that actual results covered by any such determination may differ from the projected results.

(f)    Officer's Compliance Certificates.  (i)  At the time of the delivery of the financial statements provided for in Sections 8.01(a) and (b), a certificate of the senior financial officer of the Parent in the form of Exhibit M to the effect that, to the best of such officer's knowledge, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof (in reasonable detail), which certificate shall, (x) set forth the calculations required to establish whether the Parent was in compliance with the Financial Covenants at the end of such fiscal quarter or year, as the case may be and (y) certify that there have been no changes to any of Schedule VIII and Annexes A through F of the Pledge Agreement or the Secondary Pledge Agreement, as the case may be, or, if later, since the date of the most recent certificate delivered pursuant to this Section 8.01(f)(i), or if there have been any such changes, a list in reasonable detail of such changes (but, in each case with respect to this clause (y), only to the extent that such changes are required to be reported to the Collateral Agent pursuant to the terms of such Security Documents) and whether the Parent and the other Credit Parties have otherwise taken all actions required to be taken by them pursuant to such Security Documents in connection with any such changes.

(ii)    At the time of a Collateral Disposition in respect of any Primary Collateral Vessel, a certificate of a senior financial officer of the Parent which certificate shall (x) certify on behalf of the Parent the last appraisal reports received pursuant to Section 8.01(d) determining the Aggregate Primary Collateral Vessel Value after giving effect to such disposition and/or showing the individual Fair Market Value of all Collateral Vessels owned by the Subsidiary Guarantors which have not been sold, transferred, lost or otherwise disposed of at such time, and (y) set forth the calculations required to establish whether the Parent is in compliance with the provisions of Section 9.09 after giving effect to such disposition.

(g)    Notice of Default, Litigation or Event of Loss.  Promptly, and in any event within three Business Days after the Parent obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or Event of Default which notice shall specify the nature thereof, the period of existence thereof and what action the Parent proposes to take with respect thereto, (ii) any litigation or governmental investigation or proceeding pending or threatened in writing against the Parent or any of its Subsidiaries which, if adversely determined, could reasonably be expected to have a Material Adverse Effect or any Document and (iii) any Event of Loss in respect of any Collateral Vessel.

(h)    Other Reports and Filings.  Promptly, copies of all financial information, proxy materials and other information and reports, if any, which the Parent or any of its

-64-

Subsidiaries shall file with the Securities and Exchange Commission (or any successor thereto) or deliver to holders of its Indebtedness pursuant to the terms of the documentation governing such Indebtedness (or any trustee, agent or other representative therefor).

(i)     Material Breach; Other Debt Documents.  Promptly upon, and in any event within five Business Days after, without duplication of any other reporting requirements herein, receipt of any notices of default, financial reporting and collateral reporting under the Other Credit Documents, and copies of all effectuated additions, amendments, restatements, supplements or other modifications in respect of the Other Credit Documents.

(j)     Environmental Matters.  Promptly upon, and in any event within fifteen Business Days after, the Parent obtains knowledge thereof, written notice of any of the following environmental matters occurring after the Restatement Effective Date, except to the extent that such environmental matters could not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect:

(i)     any Environmental Claim pending or threatened in writing against the Parent or any of its Subsidiaries or any Collateral Vessel or property owned or operated or occupied by the Parent or any of its Subsidiaries;

(ii)     any condition or occurrence on or arising from any Collateral Vessel or property owned or operated or occupied by the Parent or any of its Subsidiaries that (a) results in noncompliance by the Parent or such Subsidiary with any applicable Environmental Law or (b) could reasonably be expected to form the basis of an Environmental Claim against the Parent or any of its Subsidiaries or any such Collateral Vessel or property;

(iii)     any condition or occurrence on any Collateral Vessel or property owned or operated or occupied by the Parent or any of its Subsidiaries that could reasonably be expected to cause such Collateral Vessel or property to be subject to any restrictions on the ownership, occupancy, use or transferability by the Parent or such Subsidiary of such Collateral Vessel or property under any Environmental Law; and

(iv)     the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Collateral Vessel or property owned or operated or occupied by the Parent or any of its Subsidiaries as required by any Environmental Law or any governmental or other administrative agency; provided that in any event the Parent shall deliver to the Administrative Agent all material notices received by the Parent or any of its Subsidiaries from any government or governmental agency under, or pursuant to, CERCLA or OPA.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Parent's or such Subsidiary's response thereto.  In addition, the Parent will provide the Administrative Agent with copies of all material communications with any government or governmental agency and all material communications with any Person relating to any Environmental Claim of which notice is required to be given pursuant to this Section 8.01(j), and such detailed reports of any such

Environmental Claim as may reasonably be requested by the Administrative Agent or the Required Lenders.

(k)   Management Letters.  Promptly after Parent's or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(l)   Cash Flow Projections.  On the Restatement Effective Date and monthly thereafter until the Trigger Date, cash flow projections for the Parent and its Subsidiaries (the "Cash Flow Projections") for the 13-week period beginning on the Business Day on which such Cash Flow Projections are due, which Cash Flow Projections shall (i) be based on information available, and projections made, as of the last Business Day of the immediately preceding calendar month and (ii) include a variance report describing in reasonable detail the variance(s) in actual cash flow from projected cash flow for the month ended on such last Business Day; provided, however, that in no event will the Parent be required to deliver such Cash Flow Projections if, at the end of any such month, the Parent and its Subsidiaries have a Loan to Value Ratio of no greater than 0.60 to 1.00.

(m)   Excess Liquidity Calculations.  On or before the tenth day (or, if such day is not a Business Day, on the next succeeding Business Day) after each Payment Date, a certificate of the senior financial officer of the Parent substantially in the form of Exhibit J, which certificate shall set forth the calculations required to determine the Excess Liquidity, if any, for such Payment Date.

(n)   Non-Recourse Subsidiaries.  Promptly upon, and in any event within five Business Days after delivery thereof, without duplication of any other reporting requirements herein, any periodic financial reports provided to the lenders under any documents evidencing Non-Recourse Indebtedness or any notices of default provided thereunder.

(o)   Other Information.  From time to time, such other information or documents (financial or otherwise) with respect to the Parent, its Subsidiaries or its Non-Recourse Subsidiaries as the Administrative Agent or the Required Lenders may reasonably request in writing.

8.02 Books, Records and Inspections.  The Parent will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries, in conformity in all material respects with GAAP and all requirements of law, shall be made of all dealings and transactions in relation to its business.  The Parent will, and will cause each of its Subsidiaries to, permit officers and designated representatives of the Administrative Agent and the Lenders as a group to visit and inspect, during regular business hours and under guidance of officers of the Parent or any of its Subsidiaries, any of the properties of the Parent or its Subsidiaries, and to examine the books of account of the Parent or such Subsidiaries and discuss the affairs, finances and accounts of the Parent or such Subsidiaries with, and be advised as to the same by, its and their officers and, in the presence of the Parent, independent accountants, all upon reasonable advance notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or the Required Lenders may request; provided that, unless an Event of Default exists and is continuing at such time, the Administrative Agent

and the Lenders shall not be entitled to request more than two such visitations and/or examinations in any fiscal year of the Parent.

8.03 <u>Maintenance of Property; Insurance</u>. The Parent will, and will cause each of its Subsidiaries to, (i) keep all material property necessary in its business in good working order and condition (ordinary wear and tear and loss or damage by casualty or condemnation excepted), (ii) maintain insurance on the Collateral Vessels in at least such amounts and against at least such risks as are in accordance with (a) normal industry practice for similarly situated insureds and (b) the requirements set forth in Section 8.06, and (iii) furnish to the Administrative Agent, at the written request of the Administrative Agent or any Lender, a complete description of the material terms of insurance carried. In addition to the requirements of the immediately preceding sentence, the Parent will at all times cause the Required Insurance to (x) be maintained on the Collateral Vessels (with the same scope of coverage as that described in <u>Schedule VI</u>) at levels which are at least as great as the respective amount described on <u>Schedule VI</u> and (y) comply with the insurance requirements of the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages, as applicable.

8.04 <u>Corporate Franchises</u>. The Parent will, and will cause each of its Subsidiaries, to do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and its material rights, franchises, licenses and patents (if any) used in its business, except, in the case of any Subsidiary of the Parent that is not a Guarantor, which could not be reasonably expected to have a Material Adverse Effect; <u>provided, however</u>, that nothing in this Section 8.04 shall prevent (i) sales or other dispositions of assets, consolidations or mergers by or involving the Parent or any of its Subsidiaries which are permitted in accordance with Section 9.02, (ii) any Subsidiary Guarantor from changing the jurisdiction of its organization to the extent permitted by Section 9.11 or (iii) the abandonment by the Parent or any of its Subsidiaries of any rights, franchises, licenses and patents that could not be reasonably expected to have a Material Adverse Effect.

8.05 <u>Compliance with Statutes, etc.</u> The Parent will, and will cause each of its Subsidiaries and each of its Non-Recourse Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions (including all laws and regulations relating to money laundering) imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such non-compliances as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.06 <u>Compliance with Environmental Laws</u>. (a) The Parent will, and will cause each of its Subsidiaries and each of its Non-Recourse Subsidiaries to, comply in all material respects with all Environmental Laws applicable to the ownership or use of any Collateral Vessel or any other Vessel or property now or hereafter owned or operated by the Parent or any of its Subsidiaries or any of its Non-Recourse Subsidiaries, will within a reasonable time period pay or cause to be paid all costs and expenses incurred in connection with such compliance (except to the extent being contested in good faith), and will keep or cause to be kept all such Collateral Vessels or Vessels or property free and clear of any Liens imposed pursuant to such Environmental Laws, in each of the foregoing cases, except to the extent any failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse

Effect. None of the Parent, any of Subsidiaries of the Parent or any Non-Recourse Subsidiaries of the Parent will generate, use, treat, store, release or dispose of, or permit the generation, use, treatment, storage, release or disposal of, Hazardous Materials on any Collateral Vessel or Vessel or property now or hereafter owned or operated or occupied by the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any ports or property except in material compliance with all applicable Environmental Laws and as reasonably required by the trade in connection with the operation, use and maintenance of any such property or otherwise in connection with their businesses or except to the extent the same could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Parent will, and will cause each of its Subsidiaries and each of its Non-Recourse Subsidiaries to, maintain insurance on the Collateral Vessels and any other Vessel in at least such amounts as are in accordance with normal industry practice for similarly situated insureds, against losses from oil spills and other environmental pollution.

(b)    At the written request of the Administrative Agent or the Required Lenders, which request shall specify in reasonable detail the basis therefor, the Parent or the Borrower will provide, at the Parent or the Borrower's sole cost and expense, an environmental assessment of any Primary Collateral Vessel by such Primary Collateral Vessel's classification society (to the extent such classification society is listed on Schedule X) or another internationally recognized classification society reasonably acceptable to the Administrative Agent. If said classification society, in its assessment, indicates that such Primary Collateral Vessel is not in compliance with the Environmental Laws, said society shall set forth potential costs of the remediation of such non-compliance; provided that such request for an assessment may be made only if (i) there has occurred and is continuing an Event of Default, (ii) the Administrative Agent or the Required Lenders reasonably and in good faith believe that the Parent, any of its Subsidiaries or any such Primary Collateral Vessel is not in compliance with Environmental Law and such non-compliance could reasonably be expected to have a Material Adverse Effect, or (iii) the Administrative Agent or the Required Lenders reasonably and in good faith believe that circumstances exist that reasonably could be expected to form the basis of a material Environmental Claim against the Parent or any of its Subsidiaries or any such Primary Collateral Vessel. If the Parent or the Borrower fails to provide the same within 90 days after such request was made, the Administrative Agent may order the same and the Parent or the Borrower shall grant and hereby grants to the Administrative Agent and the Lenders and their agents reasonable access to such Primary Collateral Vessel and specifically grants the Administrative Agent and the Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment, all at the Parent or the Borrower's expense.

8.07 ERISA. As soon as reasonably possible and, in any event, within ten (10) days after the Parent or any of its Subsidiaries or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following, the Parent will deliver to the Administrative Agent, with sufficient copies for each of the Lenders, a certificate of the senior financial officer of the Parent setting forth the full details as to such occurrence and the action, if any, that the Parent, such Subsidiary or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given to or filed with or by the Parent, the Subsidiary, the ERISA Affiliate, the PBGC, a Plan participant or the Plan administrator with respect thereto: that a Reportable Event has occurred (except to the extent that the Parent has previously delivered to the Administrative Agent a certificate and notices (if any) concerning such event pursuant to the

-68-

next clause hereof); that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; that a failure to satisfy minimum funding requirements, within the meaning of Section 412 of the Code or Section 302 of ERISA, has occurred or an application may be or has been made for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 or 430 of the Code or Section 302 or 303 of ERISA with respect to a Plan; that the actuary of a Plan (other than a Multiemployer Plan) has or will certify that the Plan is an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; that a Plan which is a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; that any contribution required to be made with respect to a Plan or Foreign Pension Plan has not been timely made and such failure could result in a material liability for the Parent or any of its Subsidiaries; that a Plan has been or may be reasonably expected to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA with a material amount of unfunded benefit liabilities; that a Plan (in the case of a Multiemployer Plan, to the best knowledge of the Parent or any of its Subsidiaries or ERISA Affiliates) has a material Unfunded Current Liability; that proceedings may be reasonably expected to be or have been instituted by the PBGC to terminate or appoint a trustee to administer a Plan which is subject to Title IV of ERISA; that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a material delinquent contribution to a Plan; that the Parent, any of its Subsidiaries or any ERISA Affiliate will or may reasonably expect to incur any material liability (including any indirect, contingent, or secondary liability) to or on account of the termination of or withdrawal from a Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or with respect to a Plan under Section 436(f), 4971, 4975 or 4980 of the Code or Section 409 or 502(i) or 502(l) of ERISA or with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code; or that the Parent, or any of its Subsidiaries may incur any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or any Plan or any Foreign Pension Plan.    Upon request, the Parent will deliver to the Administrative Agent with sufficient copies to the Lenders (i) a complete copy of the annual report (on Internal Revenue Service Form 5500-series) of each Plan (including, to the extent required, the related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information) required to be filed with the Internal Revenue Service and (ii) copies of any records, documents or other information that must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA.    In addition to any certificates or notices delivered to the Lenders pursuant to the first sentence hereof, copies of annual reports and any records, documents or other information required to be furnished to the PBGC, and any notices received by the Parent, any of its Subsidiaries or any ERISA Affiliate with respect to any Plan or Foreign Pension Plan with respect to any circumstances or event that could reasonably be expected to result in a material liability shall be delivered to the Lenders no later than ten (10) days after the date such annual report has been filed with the Internal Revenue Service or such records, documents and/or information has been furnished to the PBGC or such notice has been received by the Parent, such Subsidiary or such ERISA Affiliate, as applicable.

8.08 <u>End of Fiscal Years; Fiscal Quarters</u>. The Parent shall cause (i) each of its, and each of its Subsidiaries', fiscal years to end on December 31 of each year and (ii) each of its and its Subsidiaries' fiscal quarters to end on March 31, June 30, September 30 and December 31 of each year.

8.09 <u>Performance of Obligations</u>. The Parent will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement and other debt instrument (including, without limitation, the Documents) by which it is bound, except to the extent waived by the parties thereto and except such non-performances as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.10 <u>Payment of Taxes</u>. The Parent will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all material taxes, assessments and governmental charges or levies that become due and payable which are imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims for sums that have become due and payable which, if unpaid, might become a Lien not otherwise permitted under Section 9.01(i), <u>provided</u> that neither the Parent nor any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

8.11 <u>Further Assurances</u>. (a) The Parent will, and will cause each of its Subsidiaries to, cause each Collateral and Guaranty Requirement to be satisfied at all times.

(b) The Parent, on behalf of itself and each other Credit Party, agrees that at any time and from time to time, at the expense of the Parent or such other Credit Party, it will promptly execute and deliver all further instruments and documents, and take all further action that may be reasonably necessary, or that the Administrative Agent may reasonably require, to perfect and protect any Lien granted or purported to be granted hereby or by the other Credit Documents, or to enable the Collateral Agent to exercise and enforce its rights and remedies with respect to any Collateral. Without limiting the generality of the foregoing, the Parent will, and will cause each Credit Party to, execute (to the extent applicable) and file, or cause to be filed, such financing or continuation statements under the UCC (or any non-U.S. equivalent thereto), or amendments thereto, such amendments or supplements to the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages (including any amendments required to maintain Liens granted by such Collateral Vessel Mortgages and such Secondary Collateral Vessel Mortgages pursuant to the effectiveness of this Agreement), and such other instruments or notices, as may be reasonably necessary, or that the Administrative Agent may reasonably require, to protect and preserve the Liens granted or purported to be granted hereby and by the other Credit Documents.

(c) Each Credit Party hereby authorizes the Collateral Agent to file one or more financing or continuation statements under the UCC (or any non-U.S. equivalent thereto), and amendments thereto, relative to all or any part of the Collateral, where permitted by law. The Collateral Agent will promptly send each Credit Party a copy of any financing or

continuation statements which it may file and the filing or recordation information with respect thereto.

(d)      If at any time any Subsidiary of the Parent owns a Collateral Vessel or owns, directly or indirectly, an interest in any Subsidiary which owns a Collateral Vessel and such Subsidiary has not otherwise satisfied the Collateral and Guaranty Requirements, the Parent will cause such Subsidiary (and any Subsidiary which directly or indirectly owns the Equity Interests of such Subsidiary to the extent not a Credit Party) to satisfy the Collateral and Guaranty Requirements with respect to each relevant Collateral Vessel as such Subsidiary would have been required to satisfy pursuant to Section 12.10 of this Agreement had such Subsidiary been a Credit Party on or prior to the Restatement Effective Date.

8.12 Deposit of Earnings.  Each Credit Party shall cause the earnings derived from each of the respective Collateral Vessels, to the extent constituting Earnings and Insurance Collateral or Secondary Earnings and Insurance Collateral, to be deposited by the respective account debtor in respect of such earnings into one or more of the Concentration Accounts maintained for such Credit Party from time to time.   Without limiting any Credit Party's obligations in respect of this Section 8.12, each Credit Party agrees that, in the event it receives any earnings constituting Earnings and Insurance Collateral or Secondary Earnings and Insurance Collateral, or any such earnings are deposited other than in one of the Concentration Accounts, it shall promptly deposit all such proceeds into one of the Concentration Accounts maintained for such Credit Party from time to time.

8.13 Ownership of Subsidiaries.  (a) Other than "director qualifying shares", the Parent shall at all times directly or indirectly own 100% of the Equity Interests of GMSCII, Arlington, the Borrower and each of the Subsidiary Guarantors.

(b)      The Parent shall cause each Subsidiary Guarantor to at all times be directly owned by one or more Credit Parties.

(c)      The Parent will cause each Collateral Vessel to be owned at all times by a single Subsidiary Guarantor that owns no other Collateral Vessels.

8.14 Flag of Collateral Vessels; Citizenship; Collateral Vessel Classifications. (a)  The Parent shall, and shall cause each Credit Party that owns a Collateral Vessel to, cause each Collateral Vessel to be registered under the laws and flag of (t) the Bahamas, (u) the Republic of Malta, (v) the Republic of Liberia, (w) the Republic of the Marshall Islands, (x) Bermuda, (y) the United Kingdom or (z) such other jurisdiction as is acceptable to the Required Lenders (each jurisdiction in clauses (t) through and including (z), an "Acceptable Flag Jurisdiction").  Notwithstanding the foregoing, any Credit Party may transfer a Collateral Vessel to another Acceptable Flag Jurisdiction pursuant to a Flag Jurisdiction Transfer.

(b)      The Parent will, and will cause each Subsidiary Guarantor which owns or operates a Collateral Vessel to, be qualified to own and operate such Collateral Vessel under the laws of the Bahamas, the Republic of Malta, the Republic of Liberia, the Republic of the Marshall Islands, Bermuda, the United Kingdom, or such other jurisdiction in which such

Collateral Vessel is permitted to be flagged in accordance with the terms of the related Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable.

(c)     The Parent will, and will cause each Subsidiary Guarantor which owns or operates a Collateral Vessel to, cause each Collateral Vessel to be classified in the highest class available for Vessels of its age and type with a classification society listed on Schedule X or another internationally recognized classification society acceptable to the Administrative Agent, free of any material conditions or recommendations.

8.15   Use of Proceeds. The Borrower will use the proceeds of the Loans only as provided in Section 7.08.

SECTION 9. Negative Covenants. Each of the Parent, the Borrower, GMSCII and Arlington hereby covenants and agrees that on and after the Restatement Effective Date, and until all Existing Letters of Credit have terminated and the Loans, Notes and Unpaid Drawings, together with interest and all other Obligations incurred hereunder and thereunder, are paid in full:

9.01   Liens. The Parent will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to (I) prior to the Trigger Date and at any time that the Parent and its Subsidiaries have a Loan to Value Ratio of greater than 0.60 to 1.00, any property or assets (real or personal, tangible or intangible) of the Parent or any of its Subsidiaries and (II) on and after the Trigger Date and at any time that the Parent and its Subsidiaries have a Loan to Value Ratio of no greater than 0.60 to 1.00, any Collateral (the property and assets described in clause (I) or (II), as applicable, the "Applicable Property"), whether now owned or hereafter acquired, or sell any such Applicable Property subject to an understanding or agreement, contingent or otherwise, to repurchase such Applicable Property (including sales of accounts receivable with recourse to the Parent or any of its Subsidiaries), or assign any right to receive income or permit the filing of any financing statement under the UCC or any other similar notice of Lien under any similar recording or notice statute; provided that the provisions of this Section 9.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "Permitted Liens"):

(i)     inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(ii)     Liens in respect of the Applicable Property imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's and mechanics' liens and other similar Liens arising in the ordinary course of business, and (x) which do not in the aggregate materially detract from the value of the Applicable Property do not materially impair the use thereof in the operation of the business of the Parent or such Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the Applicable Property subject to any such Lien;

(iii)   Liens in existence on the Restatement Effective Date which are listed, and the property subject thereto described, on Schedule IV, without giving effect to any renewals or extensions of such Liens, provided that the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding on the Restatement Effective Date, less any repayments of principal thereof;

(iv)   Permitted Encumbrances;

(v)   Liens created pursuant to the Security Documents;

(vi)   Liens arising out of judgments, awards, decrees or attachments with respect to which the Parent or any of its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review, provided that the aggregate amount of all such judgments, awards, decrees or attachments shall not constitute an Event of Default under Section 10.09;

(vii)   Liens (other than any Lien imposed by ERISA) incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, Liens to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations in each case incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money) and Liens arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; provided that the aggregate value of all cash and property at any time encumbered pursuant to this clause (vii) shall not exceed $5,000,000;

(viii)   Liens in respect of seamen's wages which are not past due and other maritime Liens for amounts not past due arising in the ordinary course of business and not yet required to be removed or discharged under the terms of the respective Collateral Vessel Mortgages;

(ix)   Liens on the Applicable Property securing the obligations under the Other Credit Agreement (and any interest rate protection agreement or other hedging agreement entered into in connection therewith), provided that such Liens are subject to the provisions of the Intercreditor Agreements;

(x)   Liens placed upon equipment or machinery acquired after the Restatement Effective Date and used in the ordinary course of business of the Borrower or any of its Subsidiaries and placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within 90 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 9.04 and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any asset of the Parent or any other asset of the Borrower or such Subsidiary;

(xi)   easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Parent or any of its Subsidiaries;

(xii)   Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the ordinary course of business;

(xiii)   statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(xiv)   Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(xv)   Liens (x) incurred in the ordinary course of business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(xvi)   bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Parent or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(xvii)   to the extent required by Section 2.13(a)(i) or permitted by Section 9.04(v), Liens in respect of the cash collateralization of the Existing Letters of Credit;

(xviii)   Liens securing obligations in respect of Indebtedness permitted pursuant to Section 9.04(vi) (including any Liens on cash required to cash collateralize letters of credit permitted pursuant to Section 9.04(vi) in an aggregate amount not to exceed $5,000,000 at any time); provided that at no time will any Indebtedness incurred by the Parent or any of its Subsidiaries from Oaktree Capital Management L.P. or any of its Affiliates be permitted to be secured pursuant to this clause (xviii); and

(xix)   Liens permitted at the time they were created.

In connection with the granting of Liens described above in this Section 9.01 by the Parent or any of its Subsidiaries, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including, without limitation, by executing appropriate lien subordination agreements in favor of the holder or holders of such Liens, in respect of the item or items of equipment or other assets subject to such Liens).

9.02 Consolidation, Merger, Sale of Assets, etc. The Parent will not, and will not permit any of its Subsidiaries to wind up, liquidate or dissolve its affairs or enter into any

-74-

transaction of merger, consolidation or amalgamation, or convey, sell, lease or otherwise dispose of (or agree to do any of the foregoing at any future time) all or substantially all of its assets (other than Margin Stock) or any of the Collateral, or enter into any sale-leaseback transactions involving any of the Collateral (or agree to do so at any future time), except that:

(i)    the Parent and each of its Subsidiaries may sell, lease or otherwise dispose of any Primary Collateral Vessels, provided that (I)(A) such sale is made at Fair Market Value (as determined in accordance with the appraisal report most recently delivered to the Administrative Agent (or obtained by the Administrative Agent) pursuant to Section 8.01(d) or delivered at the time of such sale to the Administrative Agent by the Parent), (B) 100% of the consideration in respect of such sale shall consist of cash or Cash Equivalents (unless the Primary Collateral Vessel is being sold to the Parent or a Subsidiary of the Parent, in which case the sale shall consist of cash only) received by the Borrower, or to the respective Subsidiary Guarantor which owned such Primary Collateral Vessel, on the date of consummation of such sale and (C) the Net Cash Proceeds of such sale, lease or other disposition shall be applied as required by Section 5.02 to repay the Loans and/or cash collateralize the Existing Letters of Credit; provided, further, that the Parent shall have delivered to the Administrative Agent an officer's certificate, certified by the senior financial officer of the Parent, demonstrating pro forma compliance (giving effect to such Collateral Disposition and, in the case of calculations involving the appraised value of Collateral Vessels, using valuations consistent with the appraisal report most recently delivered to the Administrative Agent (or obtained by the Administrative Agent) pursuant to Section 8.01(d)) with each of the Financial Covenants for the most recently ended Test Period for which financial statements under Section 8.01(a) or (b) are due; provided that, with respect to any Test Period ending on December 31, the Parent shall deliver unaudited financial statements as at the end of such Test Period at the time of such sale but only if such sale occurs more than 45 days (and less than 90 days) after the end of such Test Period (or at the time of such sale, as applicable) setting forth the calculations required to make such determination in reasonable detail, and (II) at least five Business Days (or such other period as shall be agreed by the Borrower and the Administrative Agent) prior written notice of the proposed sale, lease or other disposition of a Primary Collateral Vessel shall have been given to the Collateral Agent, which notice shall set forth the expected closing date of such sale, lease or other disposition and the date of the corresponding repayment of Loans;

(ii)   subject to compliance with Section 5.02(c), the Parent and its Subsidiaries may sell, lease or otherwise dispose of any Secondary Collateral to the extent such sale, lease or disposition is permitted pursuant to the terms of the Other Credit Agreement and the Intercreditor Agreements; provided that the consent of the Required Lenders shall be required if the Required Lenders (under and as defined in the Other Credit Agreement) were required to consent and have consented to the Net Cash Proceeds of such sale, lease or disposition not being applied to repay loans under the Other Credit Agreement;

(iii)  the Parent and its Subsidiaries may sell or discount, in each case without recourse and in the ordinary course of business, overdue accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale);

(iv)    (A) the Borrower, GMSCII, Arlington and any Subsidiary Guarantor may transfer assets or lease to or acquire or lease assets from the Borrower, GMSCII, Arlington or any other Subsidiary Guarantor, or any Subsidiary Guarantor may be merged into the Borrower, GMSCII, Arlington or any other Subsidiary Guarantor; provided that the Borrower, GMSCII, Arlington or such Subsidiary Guarantor, as the case may be, will be a successor in interest to all rights, titles and interest of such merged Subsidiary Guarantor and, in each case so long as all actions necessary or desirable to preserve, protect and maintain the security interest and Lien of the Collateral Agent in any Collateral held by any Person involved in any such transaction are taken to the satisfaction of the Collateral Agent and (B) any Subsidiary of the Parent (other than the Borrower, GMSCII, Arlington and any Subsidiary Guarantor) may transfer assets or lease to or acquire or lease assets from any other Subsidiary of the Parent, or any other Subsidiary of the Parent (other than the Borrower, GMSCII, Arlington and any Subsidiary Guarantor) may be merged into any other Subsidiary of the Parent, in each case so long as all actions necessary or desirable to preserve, protect and maintain the security interest and Lien of the Collateral Agent in any Collateral held by any Person involved in any such transaction are taken to the satisfaction of the Collateral Agent; and

(v)    following a Collateral Disposition permitted by this Agreement, the Subsidiary Guarantor which owned the Collateral Vessel that is the subject of such Collateral Disposition may dissolve, provided that (x) the Net Cash Proceeds from such Collateral Disposition shall be applied (i) in the case of a Primary Collateral Vessel, as required by Section 5.02 to repay the Loans and (ii) in the case of a Secondary Collateral Vessel, as required by the Other Credit Agreement to repay loans thereunder and hereunder to the extent required pursuant to Section 5.02, (y) all of the proceeds of such dissolution shall be paid only to a Credit Party and (z) no Default or Event of Default is continuing unremedied at the time of such dissolution.

To the extent the Required Lenders (or to the extent required pursuant to Section 12.12(a), all Lenders) waive the provisions of this Section 9.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 9.02, such Collateral (unless sold to the Parent or a Subsidiary of the Parent) shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.  Notwithstanding anything to the contrary contained above, the foregoing covenant shall not be violated as a result of sales of Margin Stock for cash at fair market value (as determined in good faith by the Parent at the time of the respective sale).

9.03 Dividends.  The Parent will not, and will not permit any of its Subsidiaries to, authorize, declare or pay any Dividends with respect to the Parent or any of its Subsidiaries, except that:

(i)    (A) any Wholly-Owned Subsidiary of the Parent may pay Dividends to the Parent or any Wholly-Owned Subsidiary of the Parent, (B) any Subsidiary Guarantor may pay Dividends to the Borrower or any other Subsidiary Guarantor and (C) if the respective Subsidiary is not a Wholly-Owned Subsidiary of the Parent, such Subsidiary may pay Dividends to its shareholders generally so long as the Parent and/or its

respective Subsidiaries which own Equity Interests in the Subsidiary paying such Dividends receive at least their proportionate share thereof (based upon their relative holdings of the Equity Interests in the Subsidiary paying such cash Dividends and taking into account the relative preferences, if any, of the various classes of Equity Interests of such Subsidiary); and

(ii)    so long as no Event of Default (both before and after giving effect to the payment thereof) has occurred and is continuing, the Parent may repurchase its outstanding Equity Interests (or options to purchase such equity) theretofore held by its or any of its Subsidiaries' employees, officers or directors following the death, disability, retirement or termination of employment of employees, officers or directors of the Parent or any of its Subsidiaries, provided that the aggregate amount expended to so repurchase equity of the Parent shall not exceed $2,000,000 in any fiscal year of the Parent.

9.04 Indebtedness.    The Parent will not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness other than:

(i)    Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(ii)    Indebtedness of the Credit Parties incurred pursuant to the Other Credit Agreement in an aggregate principal amount not to exceed $273,802,583.31 at any time outstanding less any repayments thereof made after the Restatement Effective Date;

(iii)    Interest Rate Protection Agreements and Other Hedging Agreements in respect of currencies entered into in the ordinary course of business and consistent with past practices; provided that (x) in the case of Interest Rate Protection Agreements, the term thereof does not extend beyond the Maturity Date and (y) in the case of Other Hedging Agreements in respect of currencies, the term thereof does not exceed six months.

(iv)    Intercompany indebtedness permitted pursuant to Sections 9.05(iii) and 9.05(viii);

(v)    Indebtedness evidenced by the Existing Letters of Credit, as such Existing Letters of Credit may be replaced from time to time; and

(vi)    so long as no Event of Default then exists or would result therefrom, additional Indebtedness incurred by the Parent, the Borrower or any other Credit Party that does not own a Collateral Vessel at the time such Indebtedness is incurred in an aggregate principal amount not to exceed $10,000,000 (or, in the case of Indebtedness in respect of letters of credit, $5,000,000) at any one time outstanding.

9.05 Advances, Investments and Loans.    The Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any Margin Stock (or other Equity Interests), or make any capital contribution to any other Person (each of the foregoing an "Investment" and, collectively, "Investments"), except that:

-77-

(i)    the Parent and its Subsidiaries may acquire and hold accounts receivable owing to any of them and Cash Equivalents;

(ii)    so long as no Event of Default exists or would result therefrom, the Parent and its Subsidiaries may make loans and advances in the ordinary course of business to its employees, officers and directors other than officers and directors of Persons which own Equity Interests, directly or indirectly, of the Parent and constitute Affiliates of the Parent or persons employed by any such Affiliates (not including, for the avoidance of doubt, the operational managers of any Credit Party) so long as the aggregate principal amount thereof at any time outstanding which are made on or after the Original Effective Date (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $2,000,000;

(iii)    the Credit Parties may make intercompany loans and advances among one another, and Subsidiaries of the Parent (other than the Credit Parties) may make intercompany loans and advances to the Parent or any other Subsidiary of the Parent (other than any Non-Recourse Subsidiary), provided that any such loans or advances to a Credit Party pursuant to this clause shall be unsecured and subordinated to the Obligations of the respective Credit Party pursuant to written subordination provisions in the form of Exhibit N;

(iv)    the Parent and its Subsidiaries may sell or transfer assets to the extent permitted by Section 9.02;

(v)    the Parent may make Investments in GMSCII, Arlington and the Borrower, and GMSCII, Arlington and the Borrower may make equity Investments in the Subsidiary Guarantors;    .

(vi)    each of Parent, GMSCII, Arlington and the Borrower may make Investments in its respective Subsidiaries that are not Subsidiary Guarantors to the extent funded (and only to the extent funded) with the Equity Proceeds Amount; provided that for all Investments made pursuant to this clause (vi), no Event of Default has occurred and is continuing (or would arise after giving effect thereto) at the time any such Investment is made unless such Investment is funded with the Net Cash Proceeds of an Equity Investment made no earlier than six months prior to the date on which such Investment is made.

(vii)    Investments existing on the Restatement Effective Date and described on Schedule XI, without giving effect to any additions thereto or replacement thereof; and

(viii)    the Parent may make loans, advances and Investments in other Subsidiaries of the Parent (other than (i) the Credit Parties and (ii) Non-Recourse Subsidiaries);

(ix)    the Parent and its Subsidiaries may make Investments in amounts required to fund charter costs and actual expenses relating to operating Vessels leased or chartered as of the date hereof by General Maritime NSF Corporation, GMR Concord LLC, GMR Contest LLC and GMR Concept LLC; provided that such Investments may only be made

in good faith and only to the extent necessary to fund such costs and expenses after taking into account the cash and Cash Equivalents held by such Subsidiary.

9.06 Transactions with Affiliates. The Parent will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of such Person, other than on terms and conditions no less favorable to such Person as would be obtained by such Person at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that:

(i)    Dividends may be paid to the extent provided in Section 9.03;

(ii)    loans and Investments may be made and other transactions may be entered into between the Parent and its Subsidiaries to the extent permitted by Sections 9.04 and 9.05;

(iii)    as long as the Parent has an independent compensation committee, directors' fees as determined by such independent compensation committee and, at any time the Parent does not have an independent compensation committee, the Parent may pay reasonable directors' fees;

(iv)    the Parent and its Subsidiaries may enter into employment agreements or arrangements with their respective officers and employees in the ordinary course of business;

(v)    the Parent and its Subsidiaries may pay management fees to Wholly-Owned Subsidiaries of the Parent in the ordinary course of business; and

(vi)    the transactions in existence on the Restatement Effective Date which are listed on Schedule XIII shall be permitted.

9.07 Capital Expenditures. The Parent will not, and will not permit any of its Subsidiaries to, make any Capital Expenditures at any time prior to the Trigger Date and at any time that the Parent and its Subsidiaries have a Loan to Value Ratio of greater than 0.60 to 1.00, other than (i) maintenance Capital Expenditures incurred in the ordinary course of business or consistent with past practice, (ii) acquisitions of new Vessels and (iii) other Capital Expenditures not in the ordinary course of business, in the case of clauses (ii) and (iii) only to the extent funded (and only to the extent funded) with the Equity Proceeds Amount. At any time after the Trigger Date provided that the Parent and its Subsidiaries have a Loan to Value Ratio of less than or equal to 0.60 to 1.00 at such time, the Parent and its Subsidiaries may make any Capital Expenditures at such time.

9.08 Minimum Cash Balance. The Parent will not permit the Unrestricted Cash and Cash Equivalents held by the Parent and its Subsidiaries (other than amounts on deposit in the Blocked Account) to be less than (x) $10,000,000 at any time from October 1, 2012 to and including June 30, 2013, (y) $15,000,000 at any time from July 1, 2013 to and including June 30, 2014 and (z) $20,000,000 at any time thereafter.

-79-

9.09 <u>Collateral Maintenance</u>. (a) The Parent will not permit the aggregate Fair Market Value of all Primary Collateral Vessels owned by the Credit Parties which have not been sold, transferred, lost or otherwise disposed of at any time (such value, the "<u>Aggregate Primary Collateral Vessel Value</u>"), as determined by the most recent appraisal delivered by the Borrower to the Administrative Agent or obtained by the Administrative Agent in accordance with Section 8.01(d) at any time to equal less than (I) from the Restatement Effective Date to and including December 31, 2012, 110% of the aggregate principal amount of outstanding Loans at such time <u>plus</u> the Existing Letter of Credit Exposure at such time, (II) from January 1, 2013 to and including December 31, 2013, 115% of the amount equal to the aggregate principal amount of outstanding Loans at such time <u>plus</u> the Existing Letter of Credit Exposure at such time <u>minus</u> the Blocked Amount, if any, (III) from January 1, 2014 to and including September 30, 2014, 120% of the amount equal to the aggregate principal amount of outstanding Loans at such time <u>plus</u> the Existing Letter of Credit Exposure at such time <u>minus</u> the Blocked Amount, if any, and (IV) thereafter, 120% of the aggregate principal amount of outstanding Loans at such time <u>plus</u> the Existing Letter of Credit Exposure at such time; <u>provided</u> that, so long as any default in respect of this Section 9.09 is not caused by any voluntary Collateral Disposition, such default shall not constitute an Event of Default (but shall constitute a Default) so long as within 45 days of the occurrence of such default, the Borrower shall either (i) post additional collateral satisfactory to the Required Lenders, pursuant to security documentation reasonably satisfactory in form and substance to the Collateral Agent, sufficient to cure such default (and shall at all times during such period and prior to satisfactory completion thereof, be diligently carrying out such actions) or (ii) make such repayment of Loans in an amount sufficient to cure such default and/or cash collateralize the Existing Letters of Credit (it being understood that any action taken in respect of this proviso shall only be effective to cure such default pursuant to this Section 9.09 to the extent that no Default or Event of Default exists hereunder immediately after giving effect thereto).

(b)    In order to comply with clauses (II) and (III) of Section 9.09(a) above, the Parent may, at any time, deposit an amount equal to the amount of Unrestricted Cash and Cash Equivalents held by the Parent and its Subsidiaries at such time such that, after giving effect to such deposit, the Parent would be in compliance with the provisions of Section 9.08 at such time (the "<u>Blocked Amount</u>") into a non-interest bearing blocked account with Nordea, as depository bank (the "<u>Blocked Account</u>"), with respect to which the Parent shall have duly executed and delivered a control agreement granting a first priority security interest to the Collateral Agent (reasonably satisfactory in all respects to the Collateral Agent), <u>provided</u> that (I) at such time, the Parent shall have furnished to the Administrative Agent a certificate of the senior financial officer of the Parent setting forth the calculations required to establish the amount of the Unrestricted Cash and Cash Equivalents that are required by the Parent in order to establish compliance with the provisions of this Section 9.09 at the time of the deposit of the Blocked Amount into the Blocked Account and (II) notwithstanding anything set forth in Section 9.09 to the contrary, the Parent will not be permitted to deduct the Blocked Amount to establish compliance with the provisions of this Section 9.09 for more than 365 days in the aggregate during the term of this Agreement. The Blocked Amount may be released from such Blocked Account at such time as the Parent shall have furnished to the Administrative Agent a certificate of the senior financial officer of the Parent setting forth the calculations required to establish compliance with the provisions of this Section 9.09 without the deduction of any such Unrestricted Cash and Cash Equivalents so long as no Default or Event of Default exists at such time or would result under Section 9.08 or otherwise

from the withdrawal of the Blocked Amount from the Blocked Account.  The Collateral Agent may apply the Blocked Amount in accordance with the terms of the Credit Documents at any time if an Event of Default exists at such time or would result from the withdrawal of the Blocked Amount from the Blocked Account.

9.10 Interest Expense Coverage Ratio. The Parent will not permit the Interest Expense Coverage Ratio for any Test Period ending on the last day of a fiscal quarter of the Parent set forth below to be less than the ratio set forth opposite such fiscal quarter below:

| Fiscal Quarter Ending | Ratio |
| --- | --- |
| December 31, 2012 | 0.70:1.00 |
| March 31, 2013 | 0.71:1.00 |
| June 30, 2013 | 0.72:1.00 |
| September 30, 2013 | 0.69:1.00 |
| December 31, 2013 | 0.61:1.00 |
| March 31, 2014 | 0.95:1.00 |
| June 30, 2014 | 1.58:1.00 |
| September 30, 2014 | 2.20:1.00 |
| December 31, 2014 | 2.85:1.00 |
| March 31, 2015 | 3.16:1.00 |
| June 30, 2015 | 3.19:1.00 |
| September 30, 2015 | 3.19:1.00 |
| December 31, 2015 | 3.20:1.00 |

9.11 Limitation on Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.  The Parent will not, and will not permit any Subsidiary Guarantor to, amend, modify or change its Certificate of Incorporation, Certificate of Formation (including, without limitation, by the filing or modification of any certificate of designation), By-Laws, limited liability company agreement, partnership agreement (or equivalent organizational documents) or any agreement entered into by it with respect to its Equity Interests (including any Shareholders' Agreement), or enter into any new agreement with respect to its capital stock or membership interests (or equivalent interests), other than any amendments, modifications or changes or any such new agreements which are not in any way materially adverse to the interests of the Lenders. Notwithstanding the foregoing, upon not less than 30 days prior written notice to the Administrative Agent and so long as no Default or Event of Default exists and is continuing,

-81-

any Subsidiary Guarantor may change its jurisdiction of organization to another jurisdiction reasonably satisfactory to the Administrative Agent, provided that any Subsidiary Guarantor that has entered into the Security Documents or the Secondary Security Documents hereunder shall promptly take all actions reasonably deemed necessary by the Collateral Agent to preserve, protect and maintain, without interruption, the security interest and Lien of the Collateral Agent in any Collateral owned by such Subsidiary Guarantor to the satisfaction of the Collateral Agent, and such Subsidiary Guarantor shall have provided to the Administrative Agent and the Lenders such opinions of counsel as may be reasonably requested by the Administrative Agent to assure itself that the conditions of this proviso have been satisfied.

9.12 <u>Limitation on Certain Restrictions on Subsidiaries</u>. The Parent will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Parent or any Subsidiary of the Parent, or pay any Indebtedness owed to the Parent or a Subsidiary of the Parent, (b) make loans or advances to the Parent or any of the Parent's Subsidiaries or (c) transfer any of its properties or assets to the Parent or any of the Parent's Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, (iii) the Other Credit Agreement as in effect on the Restatement Effective Date, or any refinancing thereof or amendments thereto, and the other Other Credit Documents, (iv) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Parent or a Subsidiary of the Parent, (v) customary provisions restricting assignment of any agreement entered into by the Parent or a Subsidiary of the Parent in the ordinary course of business, (vi) any holder of a Permitted Lien may restrict the transfer of the asset or assets subject thereto, (vii) restrictions which are not more restrictive than those contained in this Agreement contained in any documents governing any Indebtedness incurred after the Original Effective Date in accordance with the provisions of this Agreement, and (viii) Non-Recourse Indebtedness.

9.13 <u>Limitation on Issuance of Equity Interests</u>. (a) The Parent will not issue, and will not permit any Subsidiary to issue, any preferred stock (or equivalent equity interests) other than Qualified Preferred Stock.

(b)     The Parent will not permit GMSCII, Arlington, the Borrower or any Subsidiary Guarantor described in clause (x) or (y) of the definition thereof to issue any capital stock (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, capital stock, except (i) for transfers and replacements of then outstanding shares of capital stock, (ii) for stock splits, stock dividends and additional issuances which do not decrease the percentage ownership of the Parent or any of its Subsidiaries in any class of the capital stock of such Subsidiary, (iii) to qualify directors to the extent required by applicable law and (iv) to such Person's shareholders or in connection with any Investment permitted under this Agreement. All capital stock of the Borrower, Arlington, GMSCII or any Subsidiary Guarantor described in clause (x) or (y) of the definition thereof issued in accordance with this Section 9.13(b) shall be delivered to the Collateral Agent pursuant to the Pledge Agreement or the Secondary Pledge Agreement, as applicable, subject to the Intercreditor Agreements.

9.14 <u>Business</u>.   The Parent, its Subsidiaries and its Non-Recourse Subsidiaries will not engage in any business other than the businesses in which any of them is engaged in as of the Restatement Effective Date (or, in the case of any Subsidiary or any Non-Recourse Subsidiary that is formed or incorporated after the Restatement Effective Date, any business in which the Parent, any other Subsidiary or any other Non-Recourse Subsidiary is engaged as of the Restatement Effective Date) and activities directly related thereto, and similar or related maritime businesses.   It being understood that no Subsidiary Guarantor which owns a Collateral Vessel will engage directly or indirectly in any business other than the business of owning and operating Collateral Vessels and businesses ancillary or complementary thereto, except that, to the extent that any Subsidiary that owns a Secondary Collateral Vessel is permitted under the Other Credit Agreement to engage in any business other than the business of owning and operating Collateral Vessels and businesses ancillary or complementary thereto, such change in the business of such Subsidiary Guarantor shall be permitted to do so hereunder automatically.

9.15 <u>Jurisdiction of Employment; Chartering In Contracts</u>.   (a)   The Parent will not, and will not permit the Subsidiary Guarantors or any third party charterer of a Collateral Vessel to, employ or cause to be employed any Collateral Vessel in any country or jurisdiction in which (i) the Borrower, the Subsidiary Guarantors or such third party charterer of a Collateral Vessel is prohibited by law from doing business, (ii) the Lien created by the applicable Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage, as applicable, will be rendered unenforceable or (iii) the Collateral Agent's foreclosure or enforcement rights will be materially impaired or hindered.

(b)   Prior to the Trigger Date and at any time that the Parent and its Subsidiaries have a Loan to Value Ratio of greater than 0.60 to 1.00, the Parent will not, and will not permit any Subsidiary to, enter into any contract to charter in or cause to be chartered in any Vessel for a period of 12 months or greater (including any renewal or extension option) as of the execution date of such contract unless the Administrative Agent consents in its sole discretion to such contract.

9.16 <u>Bank Accounts</u>.   The Parent will not permit the Borrower, Arlington, GMSCII or any Subsidiary Guarantor to maintain any deposit, savings, investment or other similar accounts other than (i) the Concentration Accounts, (ii) the Blocked Account (if applicable), (iii) an account maintained at Deutsche Bank as of the Restatement Effective Date in the name of General Maritime Subsidiary Corporation, (iv) an account maintained at DNB Bank ASA as of the Restatement Effective Date in the name of General Maritime Subsidiary Corporation, (v) zero balance accounts in the name of the Credit Parties, and (vi) any payroll account or accounts opened and maintained by a Credit Party at any time if the aggregate amount of cash deposited by the Credit Parties in such payroll account(s) does not exceed, together with the amount deposited in the account referenced in clauses (iii) through and including (v), $5,000,000 at such time.

9.17 <u>Indebtedness of Non-Recourse Subsidiaries</u>.   Non-Recourse Subsidiaries will not contract, create, incur, assume or suffer to exist any Indebtedness other than Indebtedness incurred to finance the acquisition of new Vessels or to finance any of the activities such Non-Recourse Subsidiaries are permitted to engage in pursuant to Section 9.14, <u>provided</u> that (I) if any such Vessel is being so acquired prior the Trigger Date, then (i) the aggregate

-83-

principal amount of such Indebtedness shall not exceed 60% of the lesser of (x) the fair market value of such Vessel on the basis of an individual charter-free arm's-length transaction between a willing and able buyer and seller not under duress as set forth in at least one appraisal and (y) the acquisition price of such Vessel, (ii) no amortization of such Indebtedness shall be permitted prior to June 30, 2014 and (iii) the Weighted Average Life to Maturity of such Indebtedness shall be at least one year longer than the Weighted Average Life to Maturity of the Loans at the time such Indebtedness is incurred, and (II) if any such Vessel is being so acquired on or after the Trigger Date, then the aggregate principal amount of such Indebtedness shall not exceed 70% of the lesser of (x) the fair market value of such Vessel on the basis of an individual charter-free arm's-length transaction between a willing and able buyer and seller not under duress as set forth in at least one appraisal and (y) the acquisition price of such Vessel.

SECTION 10. Events of Default. Upon the occurrence of any of the following specified events (each an "Event of Default"):

10.01 Payments. The Borrower shall (i) default in the payment when due of any principal of any Loan or any Note or (ii) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any Unpaid Drawings or interest on any Loan or Note or any other amounts owing hereunder or thereunder; or

10.02 Representations, etc. Any representation, warranty or statement made by any Credit Party herein or in any other Credit Document or in any certificate delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

10.03 Covenants. Any Credit Party shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 8.01(f)(i), 8.08, 8.11(a), 8.13 or Section 9 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement and, in the case of this clause (ii), such default shall continue unremedied for a period of 30 days after written notice to the Borrower by the Administrative Agent or any of the Lenders; or

10.04 Default Under Other Agreements. (i) The Parent or any of its Subsidiaries shall default in any payment of any Indebtedness (other than the Obligations) beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) the Parent or any of its Subsidiaries shall default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Indebtedness to become due prior to its stated maturity or (iii) any Indebtedness (other than the Obligations) of the Parent or any of its Subsidiaries shall be declared to be due and payable, or required to be prepaid, redeemed, defeased or repurchased other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that it shall not be a Default or Event of Default under this Section 10.04 unless the aggregate principal amount of all

-84-

Indebtedness as described in preceding clauses (i) through (iii), inclusive, exceeds $10,000,000; or

10.05 Bankruptcy, etc. The Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or an involuntary case is commenced against the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries and the petition is not controverted within 20 days after service of summons, or is not dismissed within 60 days, after commencement of the case; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries or the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries or there is commenced against the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries any such proceeding which remains undismissed for a period of 60 days, or the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries suffers any appointment of any custodian or the like for it or any substantial part of its property to continue undischarged or unstayed for a period of 60 days; or the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries makes a general assignment for the benefit of creditors; or any corporate action is taken by the Parent, any of its Subsidiaries or any of its Non-Recourse Subsidiaries for the purpose of effecting any of the foregoing, provided that, in the case of any Non-Recourse Subsidiary, it shall not be a Default or Event of Default under this Section 10.05 unless the aggregate principal amount of all Indebtedness incurred by such Non-Recourse Subsidiary pursuant to Section 9.17 exceeds $15,000,000; or

10.06 ERISA. (a) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 or 430 of the Code or Section 302 or 303 of ERISA, a Reportable Event shall have occurred, a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan subject to Title IV of ERISA shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following 30 days, any Plan which is subject to Title IV of ERISA shall have had or is reasonably likely to have a trustee appointed to administer such Plan, any Plan which is subject to Title IV of ERISA is, shall have been or is reasonably likely to be terminated or to be the subject of termination proceedings under ERISA, any Plan shall have an Unfunded Current Liability, its actuary has certified that a determination has been made that a Plan (other than a Multiemployer Plan) is an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA, a Plan which is a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA, a contribution required to be made with respect to a Plan or a Foreign Pension Plan is not timely

-85-

made, the Parent or any of its Subsidiaries or any ERISA Affiliate has incurred or events have happened, or reasonably expected to happen, that will cause it to incur any liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 436(f), 4971 or 4975 of the Code or on account of a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code) under Section 4980B of the Code, or the Parent, or any of its Subsidiaries, has incurred or is reasonably likely to incur liabilities pursuant to one or more employee welfare benefit plans (as defined in Section 3(1) of ERISA) that provide benefits to retired employees or other former employees (other than as required by Section 601 of ERISA) or Plans or Foreign Pension Plans; (b) there shall result from any such event or events the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and (c) such lien, security interest or liability, individually, and/or in the aggregate, in the reasonable opinion of the Required Lenders, has had, or could reasonably be expected to have, a Material Adverse Effect; or

10.07 Security Documents. At any time after the execution and delivery thereof, any of the Security Documents shall cease to be in full force and effect, or shall cease in any material respect to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral), in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except in connection with Permitted Liens), and subject to no other Liens (except Permitted Liens), or any Credit Party shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to any of the Security Documents and such default shall continue beyond any grace period (if any) specifically applicable thereto pursuant to the terms of such Security Document, or any "event of default" (as defined in any Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage) shall occur in respect of any Collateral Vessel Mortgage or Secondary Collateral Vessel Mortgage; or

10.08 Guaranties. After the execution and delivery thereof, any Guaranty, or any provision thereof, shall cease to be in full force or effect as to any Guarantor (unless such Guarantor is no longer a Subsidiary of the Parent by virtue of a liquidation, sale, merger or consolidation permitted by Section 9.02) or any Guarantor (or Person acting by or on behalf of such Guarantor) shall deny or disaffirm such Guarantor's obligations under the Guaranty to which it is a party or any Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Guaranty to which it is a party beyond any grace period (if any) provided therefor; or

10.09 Judgments. One or more judgments or decrees shall be entered against the Parent or any of its Subsidiaries involving in the aggregate for the Parent and its Subsidiaries a liability (not paid or fully covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 60 consecutive days, and the aggregate amount of all such judgments, to the extent not covered by insurance, exceeds $10,000,000; or

10.10 Change of Control. At any time after the Restatement Effective Date, a Change of Control shall occur; or

10.11 Default Under Non-Recourse Subsidiary Agreements. (i) Any Non-Recourse Subsidiary shall default in any payment at maturity of any Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created or (ii) any Non-Recourse Subsidiary shall default in the observance or performance of any agreement or condition relating to any Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause any such Indebtedness to become due prior to its stated maturity or (iii) any Indebtedness of any Non-Recourse Subsidiary shall be declared to be due and payable, or required to be prepaid, redeemed, defeased or repurchased other than by a regularly scheduled required prepayment, prior to the stated maturity thereof, provided that it shall not be a Default or Event of Default under this Section 10.11 unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) through (iii), inclusive, exceeds $15,000,000;

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party (provided that, if an Event of Default specified in Section 10.05 shall occur, the result which would occur upon the giving of written notice by the Administrative Agent to the Borrower as specified in clauses (i) and (ii) below shall occur automatically without the giving of any such notice): (i) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (ii) terminate any Existing Letter of Credit that may be terminated in accordance with its terms; (iii) direct the Borrower to pay (and the Borrower agrees that upon receipt of such notice, or upon the occurrence and during the continuance of an Event of Default specified in Section 10.05, it will pay) to the Collateral Agent at the Payment Office such additional amount of cash, to be held as security by the Collateral Agent, as is equal to the aggregate Stated Amount of all Existing Letters of Credit issued for the Borrower and then outstanding and (iv) enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents.

SECTION 11. Agency and Security Trustee Provisions.

11.01 Appointment. (a) The Lenders hereby designate Nordea as Administrative Agent (for purposes of this Section 11, the term "Administrative Agent" shall include Nordea (and/or any of its affiliates) in its capacity as Collateral Agent pursuant to the Security Documents and in its capacity as security trustee pursuant to the Collateral Vessel Mortgages or Secondary Collateral Vessel Mortgages) to act as specified herein and in the other Credit Documents. Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Agents to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Agents by the terms hereof and thereof and such other powers as are reasonably incidental thereto. Furthermore, each Lender hereby irrevocably authorizes the Administrative Agent and

-87-

the Collateral Agent to enter into the Intercreditor Agreements on their behalf, and agrees to be bound by the provisions set forth therein. The Agents may perform any of its duties hereunder by or through its respective officers, directors, agents, employees or affiliates and, may assign from time to time any or all of its rights, duties and obligations hereunder and under the Security Documents to any of its banking affiliates.

(b)    The Lenders hereby irrevocably appoint Nordea as security trustee solely or the purpose of holding legal title to the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages on each of the flag Vessels of an Acceptable Flag Jurisdiction on behalf of the applicable Lenders, from time to time, with regard to the (i) security, powers, rights, titles, benefits and interests (both present and future) constituted by and conferred on the Lenders or any of them or for the benefit thereof under or pursuant to the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages (including, without limitation, the benefit of all covenants, undertakings, representations, warranties and obligations given, made or undertaken by any Lender in the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages), (ii) all money, property and other assets paid or transferred to or vested in any Lender or any agent of any Lender or received or recovered by any Lender or any agent of any Lender pursuant to, or in connection with the Collateral Vessel Mortgages and the Secondary Collateral Vessel Mortgages, whether from the Borrower or any Subsidiary Guarantor or any other person and (iii) all money, investments, property and other assets at any time representing or deriving from any of the foregoing, including all interest, income and other sums at any time received or receivable by any Lender or any agent of any Lender in respect of the same (or any part thereof). Nordea hereby accepts such appointment as security trustee.

11.02 <u>Nature of Duties</u>. The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement and the Security Documents. None of the Agents nor any of their respective officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by such Person's gross negligence or willful misconduct (any such liability limited to the applicable Agent to whom such Person relates). The duties of each of the Agents shall be mechanical and administrative in nature; none of the Agents shall have by reason of this Agreement or any other Credit Document any fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon any Agents any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

11.03 <u>Lack of Reliance on the Agents</u>. Independently and without reliance upon the Agents, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Parent and its Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Parent and its Subsidiaries and, except as expressly provided in this Agreement, none of the Agents shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. None of the Agents shall be responsible to any

-88-

Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectibility, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of the Parent and its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of the Parent and its Subsidiaries or the existence or possible existence of any Default or Event of Default.

11.04 Certain Rights of the Agents.   If any of the Agents shall request instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Agents shall be entitled to refrain from such act or taking such action unless and until the Agents shall have received instructions from the Required Lenders; and the Agents shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Lender or the holder of any Note shall have any right of action whatsoever against the Agents as a result of any of the Agents acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

11.05 Reliance.   Each of the Agents shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document or telephone message signed, sent or made by any Person that the applicable Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

11.06 Indemnification.   To the extent any of the Agents is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the applicable Agents, in proportion to their respective "percentages" as used in determining the Required Lenders (without regard to the existence of any Defaulting Lenders), for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by such Agents in performing their respective duties hereunder or under any other Credit Document, in any way relating to or arising out of this Agreement or any other Credit Document; provided that no Lender shall be liable in respect to an Agent for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct.

11.07 The Administrative Agent in its Individual Capacity.   With respect to its obligation to make Loans under this Agreement, each of the Agents shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lenders," "Secured Creditors", "Required Lenders", "holders of Notes" or any similar terms shall, unless the context clearly otherwise indicates, include each of the Agents in their respective individual capacity. Each of the Agents may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Credit Party or any Affiliate of any Credit Party as if it

were not performing the duties specified herein, and may accept fees and other consideration from the Borrower or any other Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

11.08 <u>Holders</u>. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

11.09 <u>Resignation by the Administrative Agent</u>. (a) The Administrative Agent may resign from the performance of all its functions and duties hereunder and/or under the other Credit Documents at any time by giving 15 Business Days' prior written notice to the Borrower and the Lenders. Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank or trust company that is, unless an Event of Default has occurred and is continuing at such time, reasonably acceptable to the Borrower.

(c)    If a successor Administrative Agent shall not have been so appointed within such 15 Business Day period, the Administrative Agent, with the consent of the Borrower (which shall not be unreasonably withheld or delayed and shall not be required if an Event of Default has occurred and is continuing at such time), shall then appoint a commercial bank or trust company with capital and surplus of not less than $500,000,000 as successor Administrative Agent (which successor Administrative Agent shall be a Lender hereunder if any such Lender agrees to serve as Administrative Agent at such time) who shall serve as Administrative Agent hereunder until such time, if any, as the Lenders appoint a successor Administrative Agent as provided above.

(d)    If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 25th Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

11.10 <u>Collateral Matters</u>. (a) Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured Creditors. Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and

-90-

binding upon all of the Lenders. The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b)    The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Existing Letter of Credit Exposure and payment and satisfaction of all of the Obligations (other than inchoate indemnification obligations) at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than the Borrower and its Subsidiaries) upon the sale or other disposition thereof in compliance with Section 9.02, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 12.12), (iv) as otherwise may be expressly provided in the relevant Security Documents or (v) as otherwise provided in Section 12.21 hereof. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 11.10.

(c)    The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 11.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

11.11 Delivery of Information. The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

-91-

SECTION 12. <u>Miscellaneous.</u>

12.01 <u>Payment of Expenses, etc.</u> The Borrower agrees that it shall: (i) whether or not the transactions herein contemplated are consummated, pay all reasonable out-of-pocket costs and expenses of each of the Agents (including, without limitation, the reasonable fees and disbursements of White & Case LLP, Watson, Farley & Williams, other counsel to the Administrative Agent and the Joint Book Runners and local counsel) in connection with the preparation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, of the Agents in connection with their respective syndication efforts with respect to this Agreement and of the Agents and each of the Lenders in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein (including, without limitation, the reasonable fees and disbursements of counsel (including in-house counsel) for each of the Agents and for each of the Lenders); (ii) pay and hold each of the Lenders harmless from and against any and all present and future stamp, documentary, transfer, sales and use, value added, excise and other similar taxes with respect to the foregoing matters and save each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to such Lender) to pay such taxes; and (iii) indemnify the Agents, the Collateral Agent and each Lender, and each of their respective officers, directors, trustees, employees, representatives and agents from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not any of the Agents, the Collateral Agent or any Lender is a party thereto) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the consummation of any transactions contemplated herein, or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, or (b) the actual or alleged presence of Hazardous Materials on any Collateral Vessel or in the air, surface water or groundwater or on the surface or subsurface of any property at any time owned or operated by the Borrower or any of its Subsidiaries, the generation, storage, transportation, handling, disposal or Environmental Release of Hazardous Materials at any location, whether or not owned or operated by the Borrower or any of its Subsidiaries, the non-compliance of any Collateral Vessel or property with foreign, federal, state and local laws, regulations, and ordinances (including applicable permits thereunder) applicable to any Collateral Vessel or property, or any Environmental Claim asserted against the Borrower, any of its Subsidiaries or any Collateral Vessel or property at any time owned or operated by the Borrower or any of its Subsidiaries, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding (but excluding any losses, liabilities, claims, damages, penalties, actions, judgments, suits, costs, disbursements or expenses to the extent incurred by reason of the gross negligence or willful misconduct of the Person to be indemnified). To the extent that the undertaking to indemnify, pay or hold harmless each of the Agents or any Lender set forth in the preceding sentence may be unenforceable because it violates any law or public policy, the

Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

12.02 <u>Right of Setoff</u>. In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by such Lender (including, without limitation, by branches and agencies of such Lender wherever located) to or for the credit or the account of any Credit Party but in any event excluding assets held in trust for any such Person against and on account of the Obligations and liabilities of such Credit Party, to such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 12.06(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

12.03 <u>Notices</u>. Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telexed, telecopier or e-mail communication) and mailed, telexed, telecopied or delivered: if to any Credit Party, at the address specified under its signature below; if to any Lender, at its address specified opposite its name on <u>Schedule II</u>; and if to the Administrative Agent, at its Notice Office; or, as to any other Credit Party, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent. All such notices and communications shall, (i) when mailed, be effective three Business Days after being deposited in the mails, prepaid and properly addressed for delivery, (ii) when sent by overnight courier, be effective one Business Day after delivery to the overnight courier prepaid and properly addressed for delivery on such next Business Day, or (iii) when sent by telex, telecopier or e-mail, be effective when sent by telex, telecopier or e-mail except that notices and communications to the Administrative Agent shall not be effective until received by the Administrative Agent.

12.04 <u>Benefit of Agreement</u>. (a) This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; <u>provided, however</u>, that (i) no Credit Party may assign or transfer any of its rights, obligations or interest hereunder or under any other Credit Document without the prior written consent of the Lenders, (ii) although any Lender may transfer, assign or grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Loans or Individual Exposure hereunder except as provided in Section 12.04(b)) and the transferee, assignee or participant, as the case may be, shall not constitute a "Lender" hereunder and (iii) no Lender shall transfer or grant any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (x) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest thereon

-93-

(except (m) in connection with a waiver of applicability of any post-default increase in interest rates and (n) that any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (x)) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default shall not constitute a change in the terms of such participation, and that an increase in any Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (y) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement or (z) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) securing the Loans hereunder in which such participant is participating.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b)     Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Individual Exposure to its (i) (A) parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company or (B) to one or more other Lenders or any Affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company (provided that any fund that invests in bank loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an Affiliate of such other Lender for the purposes of this sub-clause (x)(i)(B)), provided that no such assignment may be made to any such Person that is, or would at such time constitute, a Defaulting Lender, or (ii) in the case of any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor of such Lender or by an Affiliate of such investment advisor or (iii) to one or more Lenders or (y) assign with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed and shall not be required if any Event of Default is then in existence, provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof) all, or if less than all, a portion equal to at least $20,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such Lender's Individual Exposure to one or more Eligible Transferees (treating any fund that invests in bank loans and any other fund that invests in bank loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, provided that (i) at such time Schedule I shall be deemed modified to reflect the outstanding Loans of such new Lender and of the existing Lenders, (ii) new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised outstanding Loans, (iii) the consent of the Administrative Agent shall be required in connection with any assignment pursuant to preceding clause (y) (which consent shall not be unreasonably withheld or delayed), and (iv) the Administrative Agent shall receive at the time of

-94-

each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500. To the extent of any assignment pursuant to this Section 12.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Loans (it being understood that the indemnification provisions under this Agreement (including, without limitation, Sections 2.09, 2.10, 3.04, 5.04, 12.01 and 12.06) shall survive as to such assigning Lender). To the extent that an assignment of all or any portion of a Lender's Loans and related outstanding Obligations pursuant to Section 2.12 or this Section 12.04(b) would, at the time of such assignment, result in increased costs under Section 2.09, 2.10, 3.04 or 5.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank or any central bank having jurisdiction over such Lender in support of borrowings made by such Lender from such Federal Reserve Bank or central bank and, with the consent of the Administrative Agent, any Lender which is a fund may pledge all or any portion of its Notes or Loans to a trustee for the benefit of investors and in support of its obligation to such investors; provided, however, no such pledge shall release a Lender from any of its obligations hereunder or substitute any such pledge for such Lender as a party hereto.

(d)     Oaktree Capital Management, L.P. and any Affiliate thereof (each an "Affiliated Lender") may purchase Loans hereunder, whether by assignment or participation, subject to the following requirements:

(i)     no Loans may be assigned, or participations sold, to an Affiliated Lender if, after giving effect to such assignment, the Affiliated Lenders in the aggregate would own (as a Lender or through a participation) in excess of 30% of all Loans then outstanding under this Agreement;

(ii)     notwithstanding anything to the contrary in the definition of "Required Lenders", or in Section 12.12, for purposes of determining whether the Required Lenders or all of the Lenders hereunder have or any affected Lender hereunder has (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Credit Document or any departure therefrom by the Credit Parties, (ii) otherwise acted on any matter related to any Credit Document or (iii) directed or required the Administrative Agent, the Collateral Agent or any Lender under the Credit Documents to undertake any action (or refrain from taking any action) with respect to or under any such Credit Document, the Loans held by any Affiliated Lender shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders, all of the Lenders have or any affected Lender has taken any action or voted on any matter (other than any vote that has a disproportionate effect on the Loans held by an Affiliated Lender relative to the Loans held by Lenders that are Affiliated Lenders);

-95-

(iii)    the Affiliated Lenders shall be prohibited from being appointed as, or succeeding to the rights and duties of, the Administrative Agent or the Collateral Agent under this Agreement and the other Credit Documents until such time (if any) as when all Obligations (other than those held by any Affiliated Lender and other than contingent obligations not then due and owing) have been paid in full in cash;

(iv)    by acquiring a Loan, each Affiliated Lender, in its capacity as a Lender, shall be deemed to have (I) waived its right to receive information prepared by the Administrative Agent or any other Lender (or any advisor, agent or counsel thereof) under or in connection with the Credit Documents (to the extent not provided to the Credit Parties), attend any meeting or conference call (or any portion thereof) with the Administrative Agent or any Lender(to the extent that the Credit Parties are excluded from attending), (II) agreed that it is prohibited from making or bringing any claim, in its capacity as a Lender hereunder against the Administrative Agent or any Lender with respect to the duties and obligations of such Persons under the Credit Documents, except any claims that the Administrative Agent or such Lender is treating such Affiliated Lender, in its capacity as a Lender, in a disproportionate manner relative to the other Lenders, and (III) agreed, without limiting its rights as a Lender described in clause (ii) above, that it will have no right whatsoever to require the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to this Agreement or any other Credit Document other than each Lender's and Administrative Agent's duties and obligations hereunder;

(v)    the applicable Affiliated Lender identifies itself as an Affiliated Lender prior to the assignment of Loans to it pursuant to the respective Assignment and Assumption Agreement; and

(vi)    in the case of this Agreement, the applicable Affiliated Lender enters into an escrow agreement or other similar arrangement reasonably satisfactory in form and substance to the Administrative Agent with respect to its obligations under this Agreement to participate in Existing Letters of Credit;

Additionally, the Credit Parties and each Affiliated Lender hereby agree that if a case under Title 11 of the United States Code is commenced against any Credit Party, such Credit Party shall seek (and each Affiliated Lender shall consent) to provide that the vote of any Affiliated Lender (in its capacity as a Lender) with respect to any plan of reorganization of such Credit Party shall not be counted except that such Affiliated Lender's vote (in its capacity as a Lender) may be counted to the extent any such plan of reorganization proposes to treat the Obligations held by such Affiliated Lender in a manner that is less favorable in any material respect to such Affiliated Lender than the proposed treatment of similar Obligations held by Lenders that are not Affiliates of the Credit Parties.

12.05   No Waiver; Remedies Cumulative.  No failure or delay on the part of the Administrative Agent or any Lender or any holder of any Note in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent or any Lender or the holder of any Note shall operate as a waiver thereof; nor shall any single or partial exercise of any right,

power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent or any Lender or the holder of any Note would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent or any Lender or the holder of any Note to any other or further action in any circumstances without notice or demand.

12.06 Payments Pro Rata. (a) Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, it shall distribute such payment to the Lenders (other than any Lender that has consented in writing to waive its pro rata share of any such payment) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)    Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)    Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 12.06(a) and (b) shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

12.07 Calculations; Computations. (a) The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with generally accepted accounting principles in the United States consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lenders). In addition, all determinations of compliance with this Agreement or any other Credit Document shall utilize accounting principles and policies in conformity with those used to prepare the historical financial statements delivered to the Lenders for the first fiscal year of the Borrower ended December 31, 2010 (with the foregoing generally accepted accounting principles, subject to the preceding proviso, herein called "GAAP"). Unless otherwise noted, all references in this Agreement to GAAP shall mean generally accepted accounting principles as in effect in the United States.

(b)     All computations of interest for Loans and fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable.

12.08 <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL</u>.  (a)  THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE COLLATERAL VESSEL MORTGAGES AND THE SECONDARY COLLATERAL VESSEL MORTGAGES, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY, IN THE CASE OF ANY SECURED CREDITOR, AND SHALL, IN THE CASE OF ANY CREDIT PARTY, BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY IN THE CITY OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARENT, THE BORROWER, GMSCII AND ARLINGTON HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH OF THE PARENT, THE BORROWER, GMSCII AND ARLINGTON FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED MAIL, POSTAGE PREPAID, TO THE PARENT, THE BORROWER, GMSCII AND/OR ARLINGTON, AS THE CASE MAY BE, AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT UNDER THIS AGREEMENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY CREDIT PARTY IN ANY OTHER JURISDICTION. IF AT ANY TIME DURING WHICH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT REMAINS IN EFFECT, THE BORROWER DOES NOT MAINTAIN A REGULARLY FUNCTIONING OFFICE IN NEW YORK CITY, IT WILL DULY APPOINT, AND AT ALL TIMES MAINTAIN, AN AGENT IN NEW YORK CITY FOR THE SERVICE OF PROCESS OR SUMMONS, AND WILL PROVIDE TO THE ADMINISTRATIVE AGENT AND THE LENDERS WRITTEN NOTICE OF THE IDENTITY AND ADDRESS OF SUCH AGENT FOR SERVICE OF PROCESS OR SUMMONS; <u>PROVIDED</u> THAT ANY FAILURE ON THE PART OF THE BORROWER TO COMPLY WITH THE FOREGOING PROVISIONS OF THIS SENTENCE SHALL NOT IN ANY WAY PREJUDICE OR LIMIT THE SERVICE OF PROCESS OR SUMMONS IN ANY OTHER MANNER DESCRIBED ABOVE IN THIS SECTION 12.08 OR OTHERWISE PERMITTED BY LAW.

(b)     THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF

VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

12.09 Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

12.10 Restatement Effective Date.  This Agreement shall become effective on the date (the "Restatement Effective Date") on which the following conditions shall have been satisfied on or prior to such date (which date shall be substantially concurrent with the "Effective Date," as defined in the Plan of Reorganization):

(i)    the Parent, GMSCII, Arlington, the Borrower, the Administrative Agent and the Lenders constituting the Required Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and the Subsidiary Guarantors described in clause (x) of the definition thereof shall have signed an acknowledgment hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or facsimile notice (actually received) at such office that the same has been signed and mailed to it;

(ii)    the Borrower shall have paid to the Administrative Agent and the Lenders all costs, fees and expenses (including, without limitation, the reasonable and documented legal fees and expenses of White & Case LLP and maritime counsel and other counsel to the Administrative Agent reasonably acceptable to the Borrower) and other compensation contemplated in connection with this Agreement and the Final DIP/Cash Collateral Order payable to the Administrative Agent and the Lenders in respect of the transactions contemplated by this Agreement to the extent then due and invoiced at least two Business Days prior to the Restatement Effective Date;

(iii)    the Borrower shall have paid to the Lenders any interest that has accrued but has not been paid on the Revolving Loans pursuant to the Final DIP/Cash Collateral Order;

(iv)    the Plan of Reorganization shall have been confirmed by the Bankruptcy Court and the conditions to effectiveness of the Plan of Reorganization shall have been satisfied or waived in accordance with the terms thereof;

(v)    the Administrative Agent shall have received a copy of the duly authorized and executed Other Credit Agreement, which Other Credit Agreement shall be in form and substance reasonably satisfactory to the Administrative Agent and shall be in full force and effect in accordance with its terms;

(vi)    (a) the Equity Investment shall have been received by the Parent and certain of its Subsidiaries, (b) the Equity Conversion shall have occurred, (c) the Tranche A Loans under this Agreement shall have been partially repaid in the amount of $35,350,780 with the proceeds of the Equity Investment and (d) all letters of credit issued under the Original Credit Agreement shall continue as Existing Letters of Credit under this Agreement pursuant to Section 3.01(a).

(vii)    all Indebtedness of the Borrower, GMSCII, the Parent and its other Subsidiaries under the DIP Credit Agreement, shall have been repaid in full with proceeds of the Equity Investment, together with all fees and other amounts owing thereon, all commitments thereunder shall have been terminated, and all security documentation relating thereto shall have been terminated and released or reassigned, and the Administrative Agent shall have received all such releases and reassignments as may have been requested by the Administrative Agent, which releases and reassignments shall be in form and substance reasonably satisfactory to the Administrative Agent;

(viii)    the Collateral and Guaranty Requirements with respect to each Collateral Vessel shall have been satisfied (including any amendments to the Security Documents set forth in the definition of Collateral and Guaranty Requirements as are necessary or desirable in the sole discretion of the Administrative Agent);

(ix)    the Administrative Agent shall have received a copy of the duly authorized and executed Primary Intercreditor Agreement, which Primary Intercreditor Agreement shall be in form and substance reasonably satisfactory to the Administrative Agent and shall be in full force and effect in accordance with its terms;

(x)    the Administrative Agent shall have received a copy of the duly authorized and executed Secondary Intercreditor Agreement, which Secondary Intercreditor Agreement shall be in form and substance reasonably satisfactory to the Administrative Agent and shall be in full force and effect in accordance with its terms;

(xi)    (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein or in any other Credit Document shall be true and correct in all material respects both before and after giving effect to the Transaction (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date);

(xii)   all Loans converted or continued pursuant to this Agreement shall be in full compliance with all applicable requirements (including without limitation the collateral valuation requirements) of law, including, without limitation, the Margin Regulations and the collateral valuation requirements thereunder, and each Lender in good faith shall be able to complete the relevant forms establishing compliance with the Margin Regulations;

(xiii)   after giving effect to the Transaction, there shall be no conflict with, or default under, any material agreement or contractual or other restrictions which is binding for the Borrower or any of its Subsidiaries;

(xiv)   the Borrower shall cause to be delivered to the Administrative Agent a solvency certificate from the senior financial officer of the Parent, in the form of Exhibit K, which shall be addressed to the Administrative Agent and each of the Lenders and dated the Restatement Effective Date, setting forth the conclusion that, after giving effect to the incurrence of all the financings contemplated hereby, the Parent and its Subsidiaries, taken as a whole, and the Borrower, Arlington and their Subsidiaries, taken as a whole, are not insolvent and will not be rendered insolvent by the incurrence of such indebtedness, and will not be left with unreasonably small capital with which to engage in their respective businesses and will not have incurred debts beyond their ability to pay such debts as they mature;

(xv)   the Administrative Agent shall have received copies of (i) the financial statements referred to in Sections 7.05(a), which financial statements shall be in form and substance reasonably satisfactory to the Administrative Agent and (ii) Cash Flow Projections for the 13-week period beginning on the Restatement Effective Date in form and substance reasonably satisfactory to the Lenders;

(xvi)   on the Restatement Effective Date, nothing shall have occurred since February 28, 2012 (and neither the Administrative Agent nor the Required Lenders shall have become aware of any facts or conditions not previously known to the Administrative Agent or the Required Lenders) which the Administrative Agent or the Required Lenders shall determine is reasonably likely to have a Material Adverse Effect (other than events publicly disclosed prior to the commencement of the Chapter 11 Proceedings, the commencement and continuation of the Chapter 11 Proceeding and the consequences that would reasonably be expected to result therefrom);

(xvi)   other than the Chapter 11 Proceedings, there shall be no actions, suits or proceedings pending or threatened (i) against the Credit Parties that challenges, enjoins or prevents this Agreement or any other Credit Document or (ii) which the Administrative Agent shall determine has had, or could reasonably be expected to have, a Material Adverse Effect (other than events publicly disclosed prior to the commencement of the Chapter 11 Proceedings, the commencement and continuation of the Chapter 11 Proceeding and the consequences that would reasonably be expected to result therefrom);

(xvii)   the Credit Parties shall have provided, or procured the supply of, the "know your customer" information required pursuant to the PATRIOT Act, in each case as reasonably requested by any Lender or the Administrative Agent at least three Business Days prior to the Restatement Effective Date in connection with its internal compliance regulations

thereunder or other information reasonably requested by the Lender or the Administrative Agent to satisfy related checks under all applicable laws and regulations pursuant to the transactions contemplated hereby;

(xviii) all necessary governmental (domestic and foreign) and third party approvals and/or consents in connection with the Loans, the other transactions contemplated hereby and the granting of Liens under the Credit Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of this Agreement or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein; and

(xix) there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon this Agreement or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein.

The Administrative Agent will give the Borrower and each Lender prompt written notice of the occurrence of the Restatement Effective Date.

12.11 Headings Descriptive.   The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

12.12 Amendment or Waiver; etc.  (a)  Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party thereto and the Required Lenders, provided that no such change, waiver, discharge or termination shall, without the consent of each Lender (other than a Defaulting Lender) (with Obligations being directly affected in the case of following clause (i)) and, in the case of the following clause (vi), to the extent that any such Lender would be required to make a Loan in excess of its pro rata portion provided for in this Agreement or would receive a payment or prepayment of Loans that (in any case) is less than its pro rata portion provided for in this Agreement, in each case, as a result of any such amendment, modification or waiver referred to in the following clause (vi)), (i) extend the final scheduled maturity of any Loan or Note, extend the timing for or reduce the principal amount of any Scheduled Repayment, or reduce the rate or extend the time of payment of fees or interest on any Loan or Note (except (x) in connection with the waiver of applicability of any post-default increase in interest rates and (y) any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (i)), or reduce the principal amount thereof (except to the extent repaid in cash), (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under the Security Documents, (iii) amend, modify or waive any provision of this Section 12.12, (iv) reduce the percentage specified in the definition of Required Lenders or otherwise amend or modify the definition of Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Loans

and the issuance or reinstatement of Existing Letters of Credit are included on the Restatement Effective Date), (v) consent to the assignment or transfer by the Borrower or any Subsidiary Guarantor of any of its respective rights and obligations under this Agreement, (vi) amend, modify or waive Section 2.06 or amend, modify or waive any other provision in this Agreement to the extent providing for payments or prepayments of Loans to be applied pro rata among the Lenders entitled to such payments or prepayments of Loans (it being understood that the provision of additional extensions of credit pursuant to this Agreement, or the waiver of any mandatory prepayment of Loans by the Required Lenders shall not constitute an amendment, modification or waiver for purposes of this clause (vi)), or (vii) release any Subsidiary Guarantor from the Subsidiaries Guaranty to the extent same owns a Collateral Vessel (other than as provided in the Subsidiaries Guaranty); provided, further, that no such change, waiver, discharge or termination shall (s) without the consent of each Issuing Lender, amend, modify or waive any provision of Section 5 or alter its rights or obligations with respect to Existing Letters of Credit, (t) without the consent of each Agent, amend, modify or waive any provision of Section 11 as same applies to such Agent or any other provision as same relates to the rights or obligations of such Agent, (u) without the consent of the Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, (v) without the consent of at least a majority of the holders of outstanding Swap Obligations at all times after the time on which all Credit Document Obligations have been paid in full, amend, modify or waive any provision set forth in Section 13, or (w) without the consent of at least a majority of the Lenders with outstanding Tranche B Loans, amend, modify or waive any provision relating to the rights or obligations of such Lenders in respect of such outstanding Tranche B Loans in a manner which adversely affects such Lenders only.

(b)    If, in connection with any proposed change, waiver, discharge or termination to any of the provisions of this Agreement as contemplated by clauses (i) through (vii), inclusive, of the first proviso to Section 12.12(a), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described in either clauses (A) or (B) below, to either (A) replace each such non-consenting Lender or Lenders (or, at the option of the Borrower if the respective Lender's consent is required with respect to less than all Loans and outstanding Existing Letters of Credit, to replace only the respective Individual Exposure of the respective non-consenting Lender which gave rise to the need to obtain such Lender's individual consent) with one or more Replacement Lenders pursuant to Section 2.12 so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination or (B) terminate such non-consenting Lender's Individual Exposure (if such Lender's consent is required as a result of its Individual Exposure), and/or repay outstanding Loans of such Lender which gave rise to the need to obtain such Lender's consent, in accordance with Sections 5.01(iv), provided that, unless the Individual Exposure being terminated and the Loans being repaid pursuant to preceding clause (B) are immediately replaced in full at such time through the addition of new Lenders or the increase of the Existing Letter of Credit Exposure and/or outstanding Loans of existing Lenders (who in each case must specifically consent thereto), then in the case of any action pursuant to preceding clause (B) the Required Lenders (determined before giving effect to the proposed action) shall specifically consent thereto, provided, further, that in any event the Borrower shall not have the right to replace a Lender, terminate its Individual Exposure or repay its Loans solely as a result of the exercise of

-103-

such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to Section 12.12(a).

(c)     In addition, notwithstanding anything set forth herein to the contrary, this Agreement may be amended or amended and restated with the written consent of the Credit Parties, the Administrative Agent and the Lenders providing the relevant Replacement Loans or to permit the refinancing of all outstanding Loans (the "Refinanced Loans"), with a replacement Loan tranche denominated in Dollars (the "Replacement Loans"), respectively, hereunder; provided that (i) the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of, plus an amount equal to accrued interest, fees and expenses with respect to, such Refinanced Loans, (ii) the Effective Yield with respect to such Replacement Loans shall not be higher than the Effective Yield with respect to such Refinanced Loans, (iii) the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Refinanced Loans, at the time of such refinancing (except to the extent of nominal amortization for periods where amortization has been eliminated as a result of prepayment of the applicable Loans), (iv) such Replacement Loans shall not receive in excess of such Replacement Loans' pro rata share of any such payment (such pro rata share to be calculated at any time on the basis of the principal amount of such Replacement Loans over the total aggregate principal amount of Loans and Replacement Loans at such time), (v) the credit parties to such Replacement Loans secured by the Collateral will become party to the Intercreditor Agreements in accordance with the terms thereof, and (vi) all other terms applicable to such Replacement Loans shall be substantially identical to, or less favorable to the Lenders providing such Replacement Loans than, those applicable to such Refinanced Loans (including, without limitation, the guarantors, obligors and security applicable thereto), except to the extent necessary to provide for covenants and other terms applicable to any period after the latest final maturity of the Loans in effect immediately prior to such refinancing.

12.13 Survival. All indemnities set forth herein including, without limitation, in Sections 2.09, 2.10, 3.04, 5.04, 12.01 and 12.06 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Loans.

12.14 Domicile of Loans. Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender. Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 12.14 would, at the time of such transfer, result in increased costs under Section 2.09, 2.10, 3.04 or 5.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective transfer).

12.15 Confidentiality. (a) Subject to the provisions of clauses (b) and (c) of this Section 12.15, each Lender agrees that it will use its best efforts not to disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel or to another Lender if the Lender or such Lender's holding or parent company or board of trustees in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 12.15 to the same extent as such Lender) any information with respect to the Borrower or any of its Subsidiaries which is now or

in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender may disclose any such information (a) as has become generally available to the public other than by virtue of a breach of this Section 12.15(a) by the respective Lender, (b) as may be required in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (c) as may be required in respect to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Lender, (e) to the Administrative Agent or the Collateral Agent, (f) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Existing Letter of Credit Exposure or any interest therein by such Lender, (g) any credit insurance provider related to the Borrower and its Obligations and (h) any direct, indirect, actual or prospective counterparty (and its advisors) to any swap, derivative or securitization transaction related to the Obligations, provided that such prospective transferee expressly agrees to be bound by the confidentiality provisions contained in this Section 12.15.

(b) The Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates any information related to the Borrower or any of its Subsidiaries (including, without limitation, any nonpublic customer information regarding the creditworthiness of the Borrower or its Subsidiaries), provided such Persons shall be subject to the provisions of this Section 12.15 to the same extent as such Lender.

12.16 Register. The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent, solely for purposes of this Section 12.16, to maintain a register (the "Register") on which it will record the Individual Exposure from time to time of each of the Lenders, the Loans made by each of the Lenders and each repayment and prepayment in respect of the principal amount (and stated interest) of the Loans of each Lender. Failure to make any such recordation, or any error in such recordation shall not affect the Borrower's obligations in respect of such Loans. With respect to any Lender, the transfer of the Individual Exposure of such Lender and the rights to reimbursement for any Unpaid Drawing under any Existing Letter of Credit shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Existing Letter of Credit Exposure and Loans and prior to such recordation all amounts owing to the transferor with respect to such Existing Letter of Credit Exposure and Loans shall remain owing to the transferor. The registration of assignment or transfer of all or part of any Existing Letter of Credit Exposure and Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 12.04(b). Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender. The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its

duties under this Section 12.16, except to the extent caused by the Administrative Agent's own gross negligence or willful misconduct.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal and interest amounts of each participant's interest in the Loans and the obligations thereunder (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

12.17 Judgment Currency. If for the purposes of obtaining judgment in any court it is necessary to convert a sum due from the Borrower hereunder or under any of the Notes in the currency expressed to be payable herein or under the Notes (the "specified currency") into another currency, the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the specified currency with such other currency at the Administrative Agent's New York office on the Business Day preceding that on which final judgment is given. The obligations of the Borrower in respect of any sum due to any Lender or the Administrative Agent hereunder or under any Note shall, notwithstanding any judgment in a currency other than the specified currency, be discharged only to the extent that on the Business Day following receipt by such Lender or the Administrative Agent (as the case may be) of any sum adjudged to be so due in such other currency such Lender or the Administrative Agent (as the case may be) may in accordance with normal banking procedures purchase the specified currency with such other currency; if the amount of the specified currency so purchased is less than the sum originally due to such Lender or the Administrative Agent, as the case may be, in the specified currency, the Borrower agrees, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any such judgment, to indemnify such Lender or the Administrative Agent, as the case may be, against such loss, and if the amount of the specified currency so purchased exceeds the sum originally due to any Lender or the Administrative Agent, as the case may be, in the specified currency, such Lender or the Administrative Agent, as the case may be, agrees to remit such excess to the Borrower.

12.18 Language. All correspondence, including, without limitation, all notices, reports and/or certificates, delivered by any Credit Party to the Administrative Agent, the Collateral Agent or any Lender shall, unless otherwise agreed by the respective recipients thereof, be submitted in the English language or, to the extent the original of such document is not in the English language, such document shall be delivered with a certified English translation thereof.

12.19 Waiver of Immunity. The Borrower, in respect of itself, each other Credit Party, its and their process agents, and its and their properties and revenues, hereby irrevocably

agrees that, to the extent that the Borrower, any other Credit Party or any of its or their properties has or may hereafter acquire any right of immunity from any legal proceedings, whether in the Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia or any other Acceptable Flag Jurisdiction or elsewhere, to enforce or collect upon the Obligations of the Borrower or any other Credit Party related to or arising from the transactions contemplated by any of the Credit Documents, including, without limitation, immunity from service of process, immunity from jurisdiction or judgment of any court or tribunal, immunity from execution of a judgment, and immunity of any of its property from attachment prior to any entry of judgment, or from attachment in aid of execution upon a judgment, the Borrower, for itself and on behalf of the other Credit Parties, hereby expressly waives, to the fullest extent permissible under applicable law, any such immunity, and agrees not to assert any such right or claim in any such proceeding, whether in the Republic of the Marshall Islands, the United Kingdom, the Bahamas, Bermuda, the Republic of Malta, the United States or the Republic of Liberia or elsewhere.

12.20 USA PATRIOT Act Notice. Each Lender hereby notifies each Credit Party that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.: 107-56 (signed into law October 26, 2001)) (the "PATRIOT Act"), it is required to obtain, verify, and record information that identifies each Credit Party, which information includes the name of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the PATRIOT Act, and each Credit Party agrees to provide such information from time to time to any Lender.

12.21 Release of Secondary Collateral and Subsidiary Guarantors. At any time that (i) the Other Agent agrees to release a Secondary Collateral Vessel (and the various guarantees and security documents related thereto) in accordance with the terms of the Other Credit Documents in accordance with the terms of the Secondary Intercreditor Agreement, other than in contemplation of the repayment of the Indebtedness thereunder in full, and (ii) no Default or Event of Default exists or would result from the release of such Secondary Collateral Vessel (including, without limitation, under Section 9.09), the Collateral Agent shall, at the request of the Borrower, (x) release and discharge the Security Documents related to such Secondary Collateral Vessel, (y) release the Credit Party which owns such Secondary Collateral Vessel from the Subsidiaries Guaranty and (z) release the Secondary Pledge Agreement Collateral of the Subsidiary Guarantor which owned such Secondary Collateral Vessel, provided that, in each case, the relevant Credit Party shall pay all documented out of pocket costs and expenses reasonably incurred by the Collateral Agent in connection with provision of such release and discharge.

SECTION 13. Holdings Guaranty.

13.01 Guaranty. In order to induce the Administrative Agent, the Collateral Agent, the Issuing Lenders and the Lenders to enter into this Agreement and to extend credit hereunder, and induce the other Guaranteed Creditors to enter into Interest Rate Protection Agreements and Other Hedging Agreements and in recognition of the direct benefits to be received by the Parent, Arlington and GMSCII from the conversion of the Loans, the deemed issuance of the Existing Letters of Credit hereunder and the entering into of such Interest Rate Protection Agreements and Other Hedging Agreements, each of the Parent, Arlington and

GMSCII hereby agrees with the Guaranteed Creditors as follows: Each of the Parent, Arlington and GMSCII hereby unconditionally and irrevocably guarantees as primary obligor and not merely as surety, the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Guaranteed Obligations of the Borrower to the Guaranteed Creditors. If any or all of the Guaranteed Obligations of the Borrower to the Guaranteed Creditors becomes due and payable hereunder, each of the Parent, Arlington and GMSCII, unconditionally and irrevocably, promises to pay such indebtedness to the Administrative Agent and/or the other Guaranteed Creditors, or order, on demand, together with any and all reasonable documented out-of-pocket expenses which may be incurred by the Administrative Agent and the other Guaranteed Creditors in collecting any of the Guaranteed Obligations. If a claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrower), then and in such event, each of the Parent, Arlington and GMSCII agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the Parent, Arlington or GMSCII, as the case may be, notwithstanding any revocation of this Holdings Guaranty or other instrument evidencing any liability of the Borrower, and the Parent, Arlington or GMSCII, as the case may be, shall both be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

13.02 <u>Bankruptcy</u>. Additionally, each of the Parent, Arlington and GMSCII unconditionally and irrevocably guarantees the payment of any and all of the Guaranteed Obligations to the Guaranteed Creditors whether or not due or payable by the Borrower upon the occurrence of any of the events specified in Section 10.05, and irrevocably, unconditionally and jointly and severally promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand, in lawful money of the United States.

13.03 <u>Nature of Liability</u>. The liability of each of the Parent, Arlington and GMSCII hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by the Parent, Arlington, GMSCII, any other guarantor or by any other party, and the liability of each of the Parent, Arlington and GMSCII hereunder shall not be affected or impaired by (a) any direction as to application of payment by the Borrower or by any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, or (e) any payment made to any Guaranteed Creditor on the Guaranteed Obligations which any such Guaranteed Creditor repays to the Borrower or any other Credit Party pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and the Borrower waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (f) any action or inaction by the Guaranteed Creditors as contemplated in Section 13.05, or (g) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor.

13.04 <u>Independent Obligation</u>.  The obligations of each of the Parent, Arlington and GMSCII hereunder are several and are independent of the obligations of any other guarantor, any other party or the Borrower, and a separate action or actions may be brought and prosecuted against the Parent, Arlington or GMSCII whether or not action is brought against any other guarantor, any other party or the Borrower and whether or not any other guarantor, any other party or the Borrower be joined in any such action or actions.  Each of the Parent, Arlington and GMSCII waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to each of the Parent, Arlington and GMSCII.

13.05 <u>Authorization</u>.  Each of the Parent, Arlington and GMSCII authorizes the Guaranteed Creditors without notice or demand (except as shall be required by applicable statute or this Agreement and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)    in accordance with the terms and provisions of this Agreement and the other Credit Documents, change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Holdings Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)    take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst;

(c)    exercise or refrain from exercising any rights against the Borrower, any other Credit Party or others or otherwise act or refrain from acting;

(d)    release or substitute any one or more endorsers, guarantors, the Borrower, other Credit Parties or other obligors;

(e)    settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to its creditors other than the Guaranteed Creditors;

(f)    apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Guaranteed Creditors regardless of what liability or liabilities of the Borrower remain unpaid;

(g)     consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document, any Interest Rate Protection Agreement or any Other Hedging Agreement or any of the instruments or agreements referred to herein or therein, or, pursuant to the terms of the Credit Documents, otherwise amend, modify or supplement this Agreement, any other Credit Document, any Interest Rate Protection Agreement or any Other Hedging Agreement or any of such other instruments or agreements; and/or

(h)     take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of the Parent, Arlington or GMSCII from its liabilities under this Holdings Guaranty.

13.06 Reliance.  It is not necessary for any Guaranteed Creditor to inquire into the capacity or powers of each of the Parent, Arlington or GMSCII or any of their respective Subsidiaries or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

13.07 Subordination.  Any indebtedness of the Borrower now or hereafter owing to each of the Parent, Arlington and GMSCII, as the case may be, is hereby subordinated to the Guaranteed Obligations of the Borrower owing to the Guaranteed Creditors; and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of the Borrower to each of the Parent, Arlington and GMSCII shall be collected, enforced and received by the Parent, Arlington or GMSCII, as the case may be, for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the Guaranteed Obligations to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of the Parent, Arlington or GMSCII under the other provisions of this Holdings Guaranty.  Prior to the transfer by the Parent, Arlington or GMSCII of any note or negotiable instrument evidencing any such indebtedness of the Borrower to the Parent, Arlington or GMSCII, as the case may be, the Parent, Arlington or GMSCII, as the case may be, shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.  Without limiting the generality of the foregoing, each of the Parent, Arlington and GMSCII hereby agrees with the Guaranteed Creditors that they will not exercise any right of subrogation which they may at any time otherwise have as a result of this Holdings Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash.  If and to the extent required in order for the Guaranteed Obligations of each of the Parent, Arlington and GMSCII to be enforceable under applicable federal, state and other laws relating to the insolvency of debtors, the maximum liability of the Parent, Arlington and GMSCII, as the case may be, hereunder shall be limited to the greatest amount which can lawfully be guaranteed by the Parent, Arlington and GMSCII, as the case may be, under such laws, after giving effect to any rights of contribution, reimbursement and subrogation arising under this Section 13.07.

13.08 Waiver.  (a) Each of the Parent, Arlington and GMSCII waives any right (except as shall be required by applicable law and cannot be waived) to require any Guaranteed Creditor to (i) proceed against the Borrower, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Borrower, any other guarantor or any other party or

(iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever. Each of the Parent, Arlington and GMSCII hereby irrevocably waives any defenses it may now or hereafter have in any way relating to any and all of the following: (a) based on or arising out of any defense of the Borrower, any other guarantor or any other party, other than payment in full in cash of the Guaranteed Obligations, based on or arising out of the disability of the Borrower, any other guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower other than payment in full in cash of the Guaranteed Obligations; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Credit Document; (c) any taking, exchange, release or nonperfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from the Holdings Guaranty or any other guaranty, for all or any of the Guaranteed Obligations; (d) any law or regulation of any foreign jurisdiction or any other event affecting any term of a Guaranteed Obligation; and (e) any other circumstance (including, without limitation, any statute of limitations or any existence of or reliance on any representation by the Administrative Agent or any other Secured Party) that might otherwise constitute a defense available to, or a discharge of, such Guarantor, any other Credit Party or any other guarantor or surety other than payment in full in cash of the Guaranteed Obligations. The Guaranteed Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Guaranteed Creditors may have against the Borrower, or any other party, or any security, without affecting or impairing in any way the liability of either the Parent, Arlington or GMSCII hereunder except to the extent the Guaranteed Obligations have been paid in cash. Each of the Parent, Arlington and GMSCII waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Parent, Arlington or GMSCII against the Borrower or any other party or any security.

(b)    Each of the Parent, Arlington and GMSCII waives all presentments, demands for performance, protests and notices, including, without limitation, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Holdings Guaranty, and notices of the existence, creation or incurring of new or additional Guaranteed Obligations. Each of the Parent, Arlington and GMSCII assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which each of the Parent, Arlington and GMSCII assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any of the other Guaranteed Creditors shall have any duty to advise either the Parent, Arlington or GMSCII of information known to them regarding such circumstances or risks.

13.09 Judgment Shortfall. (a) The obligations of the Parent, Arlington and GMSCII under the Holdings Guaranty to make payments in the respective currency or currencies in which the respective Guaranteed Obligations are required to be paid (such currency being herein called the "Obligation Currency") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the

-111-

Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by the Administrative Agent, the Collateral Agent or the respective other Secured Creditor of the full amount of the Obligation Currency expressed to be payable to the Administrative Agent, the Collateral Agent or such other Secured Creditor under this Holdings Guaranty or the other Credit Documents or any Interest Rate Protection Agreements or any Other Hedging Agreements, as applicable. If for the purpose of obtaining or enforcing judgment against the Parent, Arlington or GMSCII in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "Judgment Currency") an amount due in the Obligation Currency, the conversion shall be made, at the rate of exchange (quoted by the Administrative Agent, determined, in each case, as of the date immediately preceding the day on which the judgment is given (such Business Day being hereinafter referred to as the "Judgment Currency Conversion Date").

(b) If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due, the Parent, Arlington and GMSCII jointly and severally covenant and agree to pay, or cause to be paid, such additional amounts, if any (but in any event not a lesser amount), as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial award at the rate or exchange prevailing on the Judgment Currency Conversion Date.

\* \* \*

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

GENERAL MARITIME CORPORATION,
as Parent

By:_____

Name:
Title:  Executive Vice President & Chief Financial
      Officer
Address: 299 Park Avenue, New York, NY 10171
Telephone: (212) 763-5600
Facsimile:   (212) 763-5608

GENERAL MARITIME SUBSIDIARY CORPORATION,
as Borrower

By:_____

Name:
Title:  President
Address: 299 Park Avenue, New York, NY 10171
Telephone: (212) 763-5600
Facsimile:  (212) 763-5608

GENERAL MARITIME SUBSIDIARY II
CORPORATION,
as a Guarantor

By:_____

Name:
Title:  President
Address: 299 Park Avenue, New York, NY 10171
Telephone: (212) 763-5600
Facsimile:  (212) 763-5608

ARLINGTON TANKERS LTD.,
as a Guarantor


By:_____

  Name:
  Title:  President
  Address: 299 Park Avenue, New York, NY 10171
  Telephone:  (212) 763-5600
  Facsimile:  (212) 763-5608


With a copy to:

  Kramer Levin Naftalis & Frankel LLP
  1177 Avenue of the Americas
  New York, NY  10022
  Attention:  Kenneth Chin, Esq.
  Telephone:  (212) 715-9100
  Facsimile:  (212) 715-8000

  and

  Kirkland & Ellis LLP
  555 California Street
  San Francisco, CA 94104
  Attention: Samantha Good
  Telephone: (415) 439-1914
  Facsimile: (415) 439-1500

NORDEA BANK FINLAND PLC, NEW YORK
BRANCH, Individually, as Administrative Agent and
as Joint Book Runner


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

DNB BANK ASA, Individually and as Joint Book Runner

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

SIGNATURE PAGE TO THE THIRD AMENDED AND RESTATED CREDIT AGREEMENT, DATED AS OF THE DATE FIRST REFERENCED ABOVE, AMONG GENERAL MARITIME CORPORATION, GENERAL MARITIME SUBSIDIARY II CORPORATION, GENERAL MARITIME SUBSIDIARY CORPORATION, ARLINGTON TANKERS LTD., THE LENDERS PARTY THERETO, AND NORDEA BANK FINLAND PLC, NEW YORK BRANCH, AS ADMINISTRATIVE AGENT

NAME OF INSTITUTION:


By _____
    Name:
    Title:

By executing and delivering a copy hereof, each Subsidiary Guarantor listed below hereby acknowledges and agrees that all Guaranteed Obligations of each such Subsidiary Guarantor shall be fully guaranteed pursuant to the Subsidiaries Guaranty and shall be fully secured pursuant to the Security Documents, in each case in accordance with the respective terms and provisions thereof. Each of the undersigned, each being a Subsidiary Guarantor under, and as defined in, the Original Credit Agreement referenced in the foregoing Credit Agreement, hereby consents to the entering into of the Credit Agreement by the Borrower and agrees to the provisions thereof.

Acknowledged and Agreed by the following Subsidiary Guarantors:

GMR POSEIDON LLC,
GMR ULYSSES LLC,
GMR HERCULES LLC,
GMR ATLAS LLC,
GMR ZEUS LLC,
GMR MANIATE LLC,
GMR SPARTIATE LLC,

By: _____
   Name:
   Title: Manager

VISION LTD.
VICTORY LTD.
COMPANION LTD.
COMPATRIOT LTD.
CONSUL LTD.


By: _____

    Name:     John C. Georgiopoulos
    Title:      Director

GMR AGAMEMNON LLC
GMR AJAX LLC
GMR ALEXANDRA LLC
GMR ARGUS LLC
GMR DAPHNE LLC
GMR DEFIANCE LLC
GMR ELEKTRA LLC
GMR GEORGE T LLC
GMR HARRIET G LLC
GMR HOPE LLC
GMR HORN LLC
GMR KARA G LLC
GMR MINOTAUR LLC
GMR ORION LLC
GMR PHOENIX LLC
GMR ST. NIKOLAS LLC
GMR SPYRIDON LLC
GMR STRENGTH LLC
GMR ATLAS LLC
GMR HERCULES LLC
GMR MANIATE LLC
GMR SPARTIATE LLC
GMR POSEIDON LLC
GMR ULYSSES LLC
GMR ZEUS LLC


By: _____
    Name:    John C. Georgiopoulos
    Title:    Manager

SCHEDULE I

Redacted.

SCHEDULE I

SCHEDULE II

## LENDER ADDRESSES

| INSTITUTIONS | ADDRESSES |
|---|---|
| **NORDEA BANK FINLAND PLC, NEW YORK BRANCH** | 437 Madison Avenue, 21st Floor<br>New York, NY 10022<br>Attn: Shipping Offshore and Oil Services<br>Telephone: 212-318-9636<br>Facsimile: 212-421-4420<br>E-mail: john.boesen@nordea.com |
| **DNB BANK ASA** | 200 Park Avenue, 31st Floor<br>New York, NY 10166<br>Attn: Sanjiv Nayar/Hugues Calmet<br>Telephone: 212-681-3862/3876<br>Facsimile: 212-681-3900<br>E-mail: sanjiv.nayar@dnb.no<br>        hugues.calmet@dnb.no |
| **HSH NORDBANK AG** | Gerhart-Hauptmann-Platz 50<br>D-20095 Hamburg, Germany<br>Attn: Jörn Ohlsen<br>Telephone: +49 40 3333 13532<br>Facsimile: +49 40 3333 613532<br>E-mail: joern.ohlsen@hsh-nordbank.com |
| **SKANDINAVISKA ENSKILDA BANKEN AB (PUBL)** | Kungsträdgårdsgatan 8<br>S-106 40 Stockholm, Sweden<br>Attn: Arne Juell-Skielse<br>Telephone: (46) 87 63 8638<br>E-mail: arne.juell-skielse@seb.se |
| **CITIBANK, N.A.** | 388 Greenwich Street, 23rd Floor<br>New York, NY 10013<br>Attn: Peter Baumann<br>Telephone: 212-559-5200<br>E-mail: peter.t.baumann@citi.com |
| **CITIGROUP FINANCIAL PRODUCTS INC.** | 1615 Brett Road<br>New Castle, DE 19720<br>Attn: Ryan Gallagher / Brian Broyles<br>Telephone: 302-894-6021/6175<br>Facsimile: 212-994-1591/1592<br>E-mail: glcorporateaction@citigroup.com<br>        brian.broyles@citi.com |
| **NATIXIS, NEW YORK BRANCH** | 1251 Avenue of the Americas<br>34th Floor<br>New York, NY 10020 |

Attn: Roslyn Adams
Telephone: 212-872-5177
Facsimile:  347-710-1559
E-mail: roslyn.adams@us.natixis.com

**BANK OF SCOTLAND PLC**

c/o Lloyds Bank Corporate Markets
2nd Floor, New Uberior House
11 Earl Grey Street, Edinburgh EH3 9BN
Attn:  Douglas Newton
Telephone: (44) 131 659 1194
E-mail: douglas.newton1@lloydsbanking.com

**ROYAL BANK OF SCOTLAND**

5-10 Great Tower Street
London, England EC3P 3HX
Attn:  Colin Manchester
Telephone: (44) 20 7085 7039
E-mail: colin.manchester@rbs.co.uk

**SANTANDER UK PLC**

2 Triton Square, Regents Place,
London, England, NW1 3AN
Attn: Mark McCarthy
Telephone: (44) 207 756 4803
E-mail: mark.mccarthy@santander.co.uk

**SUMITOMO MITSUI BANKING CORP.,
NEW YORK**

277 Park Avenue
New York, NY 10172
Attn:  George Neuman
Telephone: (212) 224-4186
E-mail: gneuman@smbclf.com

**DANISH SHIP FINANCE A/S (DANMARKS
SKIBSKREDIT A/S)**

Sankt Annæ Plads 3
DK-1250 Copenhagen K Denmark
Attn:  Ole Stærgaard
Telephone: (45) 33 74 1027
E-mail: ols@shipfinance.dk

**ALLIED IRISH BANKS, P.L.C.**

St Helen's, 1 Undershaft
London, England EC3A 8AB
Attn: Matt Toolan
Telephone: (0) 20 7090 7156
E-mail: matt.p.toolan@aib.ie

**BNP PARIBAS**

520 Madison Avenue
New York NY 10022
Attn: Vikram Hiranandani
Telephone: (212) 340-5367
E-mail: vikram.hiranandani@us.bnpparibas.com

**UNICREDIT BANK AG**

Neuer Wall 64,
20354 Hamburg, Germany
Attn:  Mr. Heino Ohlen

Telephone:  (49) 40 3692-6653
E-mail: heino.ohlen@unicreditgroup.de

**CREDIT INDUSTRIEL ET COMMERCIAL,
NEW YORK BRANCH**

520 Madison Avenue
New York, NY 10022
Attn:  Andrew McKuin
Telephone:  (212) 715-4430
E-mail: amckuin@cicny.com

SCHEDULE III

**COLLATERAL VESSELS**

| # | Collateral Vessels | Type | Size (dwt) | Built | Registry | Official Number |
|---|---|---|---|---|---|---|
| | **Secondary Collateral Vessels** | | | | | |
| 1 | Genmar Poseidon | VLCC | 305,795 | 2002 | Republic of the Marshall Islands | 2187 |
| 2 | Genmar Ulysses | VLCC | 318,695 | 2003 | Republic of the Marshall Islands | 2092 |
| 3 | Genmar Hercules | VLCC | 306,543 | 2007 | Republic of the Marshall Islands | 2001 |
| 4 | Genmar Atlas | VLCC | 306,005 | 2007 | Republic of the Marshall Islands | 2004 |
| 5 | Genmar Zeus | VLCC | 318,325 | 2010 | Republic of the Marshall Islands | 2295 |
| 6 | Genmar Maniate | Suezmax | 165,000 | 2010 | Republic of the Marshall Islands | 2247 |
| 7 | Genmar Spartiate | Suezmax | 165,000 | 2011 | Republic of the Marshall Islands | 2262 |
| | **Primary Collateral Vessels** | | | | | |
| 8 | Genmar Agamemnon | Aframax | 96,214 | 1995 | Republic of Liberia | 10257 |
| 9 | Genmar Ajax | Aframax | 96,183 | 1996 | Republic of Liberia | 10259 |
| 10 | Genmar Alexandra | Aframax | 102,262 | 1992 | Republic of the Marshall Islands | 1441 |
| 11 | Genmar Daphne | Aframax | 106,560 | 2002 | Republic of the Marshall Islands | 2501 |
| 12 | Genmar Defiance | Aframax | 105,538 | 2002 | Republic of Liberia | 11678 |
| 13 | Genmar Elektra | Aframax | 106,548 | 2002 | Republic of the Marshall Islands | 2945 |
| 14 | Genmar Strength | Aframax | 105,674 | 2003 | Republic of Liberia | 11846 |
| 15 | Genmar Minotaur | Aframax | 96,226 | 1995 | Republic of Liberia | 10948 |
| 16 | Genmar Consul | Handymax | 47,400 | 2004 | Islands of Bermuda | 733745 |
| 17 | Genmar Companion | Panamax | 72,750 | 2004 | Islands of Bermuda | 733743 |

| # | Collateral Vessels | Type | Size (dwt) | Built | Registry | Official Number |
|---|---|---|---|---|---|---|
| 18 | Genmar Compatriot | Panamax | 72,750 | 2004 | Islands of Bermuda | 733750 |
| 19 | Genmar Argus | Suezmax | 164,097 | 2000 | Republic of the Marshall Islands | 1826 |
| 20 | Genmar George T | Suezmax | 149,847 | 2007 | Republic of the Marshall Islands | 2935 |
| 21 | Genmar Harriet G | Suezmax | 150,205 | 2006 | Republic of Liberia | 12884 |
| 22 | Genmar Hope | Suezmax | 153,919 | 1999 | Republic of the Marshall Islands | 1343 |
| 23 | Genmar Horn | Suezmax | 159,475 | 1999 | Republic of the Marshall Islands | 1225 |
| 24 | Genmar Kara G | Suezmax | 150,296 | 2007 | Republic of Liberia | 13098 |
| 25 | Genmar Orion | Suezmax | 159,992 | 2002 | Republic of the Marshall Islands | 1641 |
| 26 | Genmar Phoenix | Suezmax | 149,999 | 1999 | Republic of the Marshall Islands | 1882 |
| 27 | Genmar Spyridon | Suezmax | 153,972 | 2000 | Republic of the Marshall Islands | 1404 |
| 28 | Genmar St. Nikolas | Suezmax | 149,876 | 2008 | Republic of the Marshall Islands | 3046 |
| 29 | Genmar Victory | VLCC | 314,000 | 2001 | Islands of Bermuda | 733717 |
| 30 | Genmar Vision | VLCC | 314,000 | 2001 | Islands of Bermuda | 733716 |

SCHEDULE IV

## EXISTING LIENS

None.

SCHEDULE V

**EXISTING INDEBTEDNESS**

| Borrower(s) | Lender(s)/ Buyer(s) | Governing Agreement | Aggregate Principal Amount | Guarantor(s) |
|---|---|---|---|---|
| General Maritime Corporation | DNB Bank ASA (f/k/a DnB NOR Bank) | Interest Rate Swap Agreement | $75,000,000 | None |
| General Maritime Corporation | Nordea Bank Finland plc | Interest Rate Swap Agreement | $75,000,000 | None |

**SPECIFIED SWAP**

| Borrower(s) | Lender(s)/ Buyer(s) | Governing Agreement | Guarantor(s) |
|---|---|---|---|
| General Maritime Corporation | Citigroup | Interest Rate Swap Agreement | None |

SCHEDULE VI

## REQUIRED INSURANCE

Insurance to be maintained on each Collateral Vessel:

(a) The Parent shall, and shall cause its Subsidiaries to, at the Parent's expense, keep each Collateral Vessel insured with insurers and protection and indemnity clubs or associations of internationally recognized responsibility, and placed in such markets, on such terms and conditions, and through brokers, in each case reasonably acceptable to the Collateral Agent (it being understood that Leeds and Leeds, AON and Marsh are acceptable) and under forms of policies approved by the Collateral Agent against the risks indicated below and such other risks as the Collateral Agent may specify from time to time:

(i)    Marine and war risk, including terrorism, confiscation, piracy, London Blocking and Trapping Addendum and Lost Vessel Clause, hull and machinery insurance, hull interest insurance and freight interest insurance, together in an amount in U.S. dollars at all times equal to, except as otherwise approved or required in writing by the Collateral Agent, the greater of (x) the then Fair Market Value of the Collateral Vessel and (y) an amount which, when aggregated with such insured value of the other Collateral Vessels (if the other Collateral Vessels are then subject to a Collateral Vessel Mortgage or a Secondary Collateral Vessel Mortgage in favor of the Collateral Agent under the Credit Agreement, and have not suffered an Event of Loss) is equal to 120% of the sum of (A) the aggregate principal amount of outstanding Loans at such time and (B) the Existing Letter of Credit Exposure at such time. The insured values for hull and machinery required under this clause (i) for each Collateral Vessel shall at all times be in an amount equal to the greater of (x) eighty per cent (80%) of the Fair Market Value of the Collateral Vessel and (y) an amount which, when aggregated with such hull and machinery insured value of the other Collateral Vessels (if the other Collateral Vessels are then subject to a Collateral Vessel Mortgage or a Secondary Collateral Vessel Mortgage in favor of the Collateral Agent and have not suffered an Event of Loss), is equal to the sum of (A) the aggregate principal amount of outstanding Loans at such time and (B) the Existing Letter of Credit Exposure at such time, and the remaining machinery and war risk insurance required by this clause (i) may be taken out as hull and freight interest insurance.

(ii)    Marine and war risk protection and indemnity insurance or equivalent insurance (including coverage against liability for crew, fines and penalties arising out of the operation of the Collateral Vessel, insurance against liability arising out of pollution, spillage or leakage, and workmen's compensation or longshoremen's and harbor workers' insurance as shall be required by applicable law) in such amounts approved by the Collateral Agent; provided, however, that insurance against liability under law or international convention arising out of pollution, spillage or leakage shall be in an amount not less than the greater of:

(y)    the maximum amount available, as that amount may from time to time change, from the International Group of Protection and Indemnity

Associations (the "International Group") or alternatively such sources of pollution, spillage or leakage coverage as are commercially available in any absence of such coverage by the International Group as shall be carried by prudent shipowners for similar vessels engaged in similar trades plus amounts available from customary excess insurers of such risks as excess amounts shall be carried by prudent shipowners for similar vessels engaged in similar trades; and

(z)     the amounts required by the laws or regulations of the United States of America or any applicable jurisdiction in which the Collateral Vessel may be trading from time to time.

(iii)     While the Collateral Vessel is idle or laid up, at the option of the Parent and in lieu of the above-mentioned marine and war risk hull insurance, port risk insurance insuring the Collateral Vessel against the usual risks encountered by like vessels under similar circumstances.

(b)     The Collateral Agent shall, at the Parent's expense, keep each Collateral Vessel insured with mortgagee's interest insurance (including extended mortgagee's interest-additional perils-pollution) on such conditions as the Collateral Agent may reasonably require and mortgagee's interest insurance for pollution risks as from time to time agreed, in each case satisfactory to the Collateral Agent and in an amount in U.S. dollars which, when aggregated with such insured value of the other Collateral Vessels (if the other Collateral Vessels are then subject to a Collateral Vessel Mortgage or a Secondary Collateral Vessel Mortgage in favor of the Collateral Agent under the Credit Agreement, and have not suffered an Event of Loss), is not less than 120% of the sum of (A) the aggregate principal amount of outstanding Loans at such time and (B) the Existing Letter of Credit Exposure at such time; all such Collateral Agent's interest insurance cover shall in the Collateral Agent's discretion be obtained directly by the Collateral Agent and the Parent shall on demand pay all costs of such cover; premium costs shall be reimbursed by the Parent to the Collateral Agent.

(c)     The marine and commercial war-risk insurance required in this Schedule VI for each Collateral Vessel shall have deductibles no higher than the following:   (i) Hull and Machinery - U.S. $500,000 (or such other amount as may be agreed to by the Required Lenders) for all hull and machinery claims and each accident or occurrence and (ii) Protection and Indemnity – U.S. $100,000 for collision liabilities, U.S. $50,000 for cargo claims, U.S. $35,000 for crew claims, U.S. $20,000 passenger claims and U.S. $20,000 all other claims, in each case each accident or occurrence.

All insurance maintained hereunder shall be primary insurance without right of contribution against any other insurance maintained by the Collateral Agent. Each policy of marine and war risk hull and machinery insurance with respect to each Collateral Vessel shall provide that the Collateral Agent shall be a named insured in its capacity as Mortgagee and as a loss payee. Each entry in a marine and war risk protection indemnity club with respect to each Collateral Vessel shall note the interest of the Collateral Agent. The Administrative Agent, the Collateral Agent and each of their respective successors and assigns shall not be responsible for

any premiums, club calls, assessments or any other obligations or for the representations and warranties made therein by the Parent, any of the Parent's Subsidiaries or any other person.

(d)    The Collateral Agent shall from time to time, and in any event at least annually, obtain a detailed report signed by a firm of marine insurance brokers acceptable to the Collateral Agent with respect to P & I entry, the hull and machinery and war risk insurance carried and maintained on each Collateral Vessel, together with their opinion as to the adequacy thereof and its compliance with the provisions of this Schedule VI.  At the Parent's expense the Parent will cause its insurance broker (which, for the avoidance of doubt shall be a different insurance broker from the firm of marine insurance brokers referred to in the immediately preceding sentence) and the P & I club or association providing P & I insurance referred to in part (a)(ii) of this Schedule VI, to agree to advise the Collateral Agent by telecopier or electronic mail confirmed by letter of any expiration, termination, alteration or cancellation of any policy, any default in the payment of any premium and of any other act or omission on the part of the Parent or any of its Subsidiaries of which the Parent has knowledge and which might invalidate or render unenforceable, in whole or in part, any insurance on any Collateral Vessel, and to provide an opportunity of paying any such unpaid premium or call, such right being exercisable by the Collateral Agent on a Collateral Vessel on an individual basis and not on a fleet basis.  In addition, the Parent shall promptly provide the Collateral Agent with any information which the Collateral Agent reasonably requests for the purpose of obtaining or preparing any report from the Collateral Agent's independent marine insurance consultant as to the adequacy of the insurances effected or proposed to be effected in accordance with this Schedule VI as of the date hereof or in connection with any renewal thereof, and the Parent shall upon demand indemnify the Collateral Agent in respect of all reasonable fees and other expenses incurred by or for the account of the Collateral Agent in connection with any such report, provided that the Collateral Agent shall be entitled to such indemnity only for one such report during a period of twelve months.

The underwriters or brokers shall furnish the Collateral Agent with a letter or letters of undertaking to the effect that:

(i)    they will hold the instruments of insurance, and the benefit of the insurances thereunder, to the order of the Collateral Agent in accordance with the terms of the loss payable clause referred to in the relevant Assignment of Insurances or Secondary Assignment of Insurances for each Collateral Vessel, as applicable;

(ii)    they will have endorsed on each and every policy as and when the same is issued the loss payable clause and the notice of assignment referred to in the relevant Assignment of Insurances or Secondary Assignment of Insurances for each Collateral Vessel, as applicable; and

(iii)    they will not set off against any sum recoverable in respect of a claim against any Collateral Vessel under the said underwriters or brokers or any other Person in respect of any other vessel nor cancel the said insurances by reason of non-payment of such premiums or other amounts.

All policies of insurance required hereby shall provide for not less than 14 days prior written notice to be received by the Collateral Agent of the termination or cancellation of the insurance evidenced thereby. All policies of insurance maintained pursuant to this Schedule VI for risks covered by insurance other than that provided by a P & I Club shall contain provisions waiving underwriters' rights of subrogation thereunder against any assured named in such policy and any assignee of said assured. The Parent shall, and shall cause its Subsidiaries to, assign to the Collateral Agent its full rights under any policies of insurance in respect of each Collateral Vessel. The Parent agrees that it shall, and shall cause each of its Subsidiaries to, deliver, unless the insurances by their terms provide that they cannot cease (by reason of nonrenewal or otherwise) without the Collateral Agent being informed and having the right to continue the insurance by paying any premiums not paid by the Parent, receipts showing payment of premiums for Required Insurance and also of demands from the Collateral Vessel's P & I underwriters to the Collateral Agent at least two (2) days before the risk in question commences.

(e)      Unless the Collateral Agent shall otherwise agree, all amounts of whatsoever nature payable under any insurance must be payable to the Collateral Agent for distribution first to itself and thereafter to the Parent or others as their interests may appear, provided that, notwithstanding anything to the contrary herein, until otherwise required by the Collateral Agent by notice to the underwriters upon the occurrence and continuance of a Default or an Event of Default hereunder, (i) amounts payable under any insurance on each Collateral Vessel with respect to protection and indemnity risks may be paid directly to (x) the Parent to reimburse it for any loss, damage or expense incurred by it and covered by such insurance or (y) the Person to whom any liability covered by such insurance has been incurred provided that the underwriter shall have first received evidence that the liability insured against has been discharged, and (ii) amounts payable under any insurance with respect to each Collateral Vessel involving any damage to each Collateral Vessel not constituting an Event of Loss, may be paid by underwriters directly for the repair, salvage or other charges involved or, if the Parent shall have first fully repaired the damage or paid all of the salvage or other charges, may be paid to the Parent as reimbursement therefor; provided, however, that if such amounts (including any deductible) are in excess of U.S. $2,000,000, the underwriters shall not make such payment without first obtaining the written consent thereto of the Collateral Agent.

(f)      All amounts paid to the Collateral Agent in respect of any insurance on the Collateral Vessels shall be disposed of as follows (after deduction of the expenses of the Collateral Agent in collecting such amounts):

(i)      any amount which might have been paid at the time, in accordance with the provisions of paragraph (d) above, directly to the Parent or others shall be paid by the Collateral Agent to, or as directed by, the Parent;

(ii)      all amounts paid to the Collateral Agent in respect of an Event of Loss of the Collateral Vessel shall be applied by the Collateral Agent to the payment of the Indebtedness hereby secured pursuant to Section 5.02(c) of the Credit Agreement and subject to the Intercreditor Agreements;

(iii)    all other amounts paid to the Collateral Agent in respect of any insurance on the Collateral Vessel may, in the Collateral Agent's sole discretion, be held and applied to the prepayment of the Obligations or to making of needed repairs or other work on the Collateral Vessel, or to the payment of other claims incurred by the Parent or any of its Subsidiaries relating to the Collateral Vessel, or may be paid to the Parent or whosoever may be entitled thereto.

(g)    In the event that any claim or lien is asserted against any Collateral Vessel for loss, damage or expense which is covered by insurance required hereunder and it is necessary for the Parent to obtain a bond or supply other security to prevent arrest of such Collateral Vessel or to release the Collateral Vessels from arrest on account of such claim or lien, the Collateral Agent, on request of the Parent, may, in the sole discretion of the Collateral Agent, assign to any Person, firm or corporation executing a surety or guarantee bond or other agreement to save or release the Collateral Vessel from such arrest, all right, title and interest of the Collateral Agent in and to said insurance covering said loss, damage or expense, as collateral security to indemnify against liability under said bond or other agreement.

(h)    The Parent shall deliver to the Collateral Agent certified copies and, whenever so requested by the Collateral Agent, the originals of all certificates of entry, cover notes, binders, evidences of insurance and policies and all endorsements and riders amendatory thereof in respect of insurance maintained pursuant to Section 8.03 of the Credit Agreement and this Schedule VI for the purpose of inspection or safekeeping, or, alternatively, satisfactory letters of undertaking from the broker holding the same. The Collateral Agent shall be under no duty or obligation to verify the adequacy or existence of any such insurance or any such policies, endorsement or riders.

(i)    The Parent will not, and will not permit any of its Subsidiaries to, execute or permit or willingly allow to be done any act by which any insurance may be suspended, impaired or cancelled, and that it will not permit or allow the Collateral Vessels to undertake any voyage or run any risk or transport any cargo which may not be permitted by the policies in force, without having previously notified the Collateral Agent in writing and insured the Collateral Vessels by additional coverage to extend to such voyages, risks, passengers or cargoes.

(j)    In case any underwriter proposes to pay less on any claim than the amount thereof, the Parent shall forthwith inform the Collateral Agent, and if a Default, an Event of Default or an Event of Loss has occurred and is continuing, the Collateral Agent shall have the exclusive right to negotiate and agree to any compromise.

(k)    The Parent will, and will cause each of its Subsidiaries to, comply with and satisfy all of the provisions of any applicable law, convention, regulation, proclamation or order concerning financial responsibility for liabilities imposed on the Parent, its Subsidiaries or the Collateral Vessels with respect to pollution by any state or nation or political subdivision thereof and will maintain all certificates or other evidence of financial responsibility as may be required by any such law, convention, regulation, proclamation or order with respect to the trade in which the Collateral Vessels are from time to time engaged and the cargo carried by it.

<u>SCHEDULE VII</u>

<u>**ERISA**</u>

General Maritime Corporation 401(k) Profit Sharing Plan and Trust

SCHEDULE VIII

## SUBSIDIARIES

| Name of Subsidiary | Direct Owner(s) | Percent (%) Ownership | Jurisdiction of Organization |
|---|---|---|---|
| General Maritime Subsidiary Corporation | General Maritime Corporation | 100% | Republic of the Marshall Islands |
| General Maritime Management LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| General Maritime Management (UK) LLC | General Maritime Management LLC | 100% | Republic of the Marshall Islands |
| General Maritime Management (Hellas) LLC | General Maritime Management LLC | 100% | Republic of Liberia |
| General Maritime Management (Portugal) LLC | General Maritime Management LLC | 100% | Republic of the Marshall Islands |
| General Maritime Management (Portugal) LDA | General Maritime Management (Portugal) LLC | 100% | Republic of Portugal |
| General Maritime Crewing Pte. Ltd. | General Maritime Management (Portugal) LLC | 100% | Singapore |
| General Maritime Crewing Private Limited (India Division Office) | General Maritime Crewing Pte. Ltd. | 100% | India |
| General Maritime Crewing Limited | General Maritime Crewing Pte. Ltd. | 100% | Russia |
| GMR Chartering LLC | General Maritime Subsidiary Corporation | 100% | New York |
| GMR Administration Corp. | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Agamemnon LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Ajax LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Alexandra LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Argus LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Constantine LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Daphne LLC | General Maritime Subsidiary | 100% | Republic of the |

| Name of Subsidiary | Direct Owner(s) | Percent (%) Ownership | Jurisdiction of Organization |
|---|---|---|---|
| | Corporation | | Marshall Islands |
| GMR Defiance LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Elektra LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR George T LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR GP LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Gulf LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Harriet G LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Hope LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Horn LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Kara G LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Limited LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Minotaur LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Orion LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Phoenix LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Princess LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Progress LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Revenge LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |

| Name of Subsidiary | Direct Owner(s) | Percent (%) Ownership | Jurisdiction of Organization |
|---|---|---|---|
| GMR St. Nikolas LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Spyridon LLC | General Maritime Subsidiary Corporation | 100% | Republic of the Marshall Islands |
| GMR Star LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Strength LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Trader LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| GMR Trust LLC | General Maritime Subsidiary Corporation | 100% | Republic of Liberia |
| Arlington Tankers Ltd. | General Maritime Corporation | 100% | Bermuda |
| Companion Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Compatriot Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Consul Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Victory Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Vision Ltd. | Arlington Tankers Ltd. | 100% | Bermuda |
| Arlington Tankers, LLC | Arlington Tankers Ltd. | 100% | Delaware |
| General Maritime Subsidiary II Corporation | General Maritime Corporation | 100% | Republic of the Marshall Islands |
| GMR Poseidon LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Ulysses LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Hercules LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Atlas LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Zeus LLC | General Maritime Subsidiary II | 100% | Republic of the |

| Name of Subsidiary | Direct Owner(s) | Percent (%) Ownership | Jurisdiction of Organization |
|---|---|---|---|
| | Corporation | | Marshall Islands |
| GMR Maniate LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| GMR Spartiate LLC | General Maritime Subsidiary II Corporation | 100% | Republic of the Marshall Islands |
| General Maritime Investments LLC | General Maritime Corporation | 100% | Republic of the Marshall Islands |
| General Product Carriers Corporation | General Maritime Investments LLC | 100% | Republic of the Marshall Islands |
| General Maritime Subsidiary NSF Corporation | General Maritime Corporation | 100% | Republic of the Marshall Islands |
| Concept Ltd. | General Maritime Subsidiary NSF Corporation | 100% | Bermuda |
| Concord Ltd. | General Maritime Subsidiary NSF Corporation | 100% | Bermuda |
| Contest Ltd. | General Maritime Subsidiary NSF Corporation | 100% | Bermuda |
| GMR Concord LLC | General Maritime Subsidiary NSF Corporation | 100% | Republic of the Marshall Islands |
| GMR Contest LLC | General Maritime Subsidiary NSF Corporation | 100% | Republic of the Marshall Islands |
| GMR Concord LLC | General Maritime Subsidiary NSF Corporation | 100% | Republic of the Marshall Islands |

SCHEDULE IX

## CAPITALIZATION[3]

All defined terms used in this Schedule IX and not defined in the Agreement shall have the meaning assigned thereto in the Plan of Reorganization.

| | | |
|---|---|---|
| New Equity Investment Shares | Oaktree Plan Sponsors | 4,750,272 |
| Commitment Fee GMR Common Stock | Oaktree Plan Sponsors | 300,017 |
| OCM Conversion Shares | OCM | 4,750,271 |
| Unsecured Creditor Equity Distribution | Unsecured Creditor Distribution Escrow Account | 200,011 |
| New GMR Warrants | Unsecured Creditor Distribution Escrow Account | 309,296 |

10% of the shares of New GMR Common Stock, or such other amount as agreed to between the Debtors and the Oaktree Plan Sponsors, on a fully-diluted basis, will be available for award on or after the Restatement Effective Date to eligible employees, directors or officers of the Parent.

Note: Subject to True-Up for Rejection Claim Damage Claims pursuant to Article IX.D of the Plan of Reorganization.

---

[3] To be amended if the Plan of Reorganization is further amended.

SCHEDULE X

## APPROVED CLASSIFICATION SOCIETIES

American Bureau of Shipping
Nippon Kaiji Kyokai
Germanischer Lloyd
Lloyd's Register of Shipping
Bureau Veritas
Det Norske Veritas

SCHEDULE XI

## EXISTING INVESTMENTS

None.

SCHEDULE XII

**EXISTING LETTERS OF CREDIT**

| Issuing Lender | Letter of Credit Number | Account Party | Stated Amount | Beneficiary | Expiry Date |
|---|---|---|---|---|---|
| Nordea Bank Norge ASA | SBY52517 | General Maritime Corporation | $658,344.00 | Fisher Park Lane Owner LLC | 12/10/2012 |

SCHEDULE XIII

## TRANSACTIONS WITH AFFILIATES

None.

SCHEDULE XIV

## SUBSIDIARY GUARANTORS

| Name of Subsidiary | Direct Owner(s) |
|---|---|
| GMR Agamemnon LLC | General Maritime Subsidiary Corporation |
| GMR Ajax LLC | General Maritime Subsidiary Corporation |
| GMR Alexandra LLC | General Maritime Subsidiary Corporation |
| GMR Argus LLC | General Maritime Subsidiary Corporation |
| GMR Daphne LLC | General Maritime Subsidiary Corporation |
| GMR Defiance LLC | General Maritime Subsidiary Corporation |
| GMR Elektra LLC | General Maritime Subsidiary Corporation |
| GMR George T LLC | General Maritime Subsidiary Corporation |
| GMR Harriet G LLC | General Maritime Subsidiary Corporation |
| GMR Hope LLC | General Maritime Subsidiary Corporation |
| GMR Horn LLC | General Maritime Subsidiary Corporation |
| GMR Kara G LLC | General Maritime Subsidiary Corporation |
| GMR Minotaur LLC | General Maritime Subsidiary Corporation |
| GMR Orion LLC | General Maritime Subsidiary Corporation |
| GMR Phoenix LLC | General Maritime Subsidiary Corporation |
| GMR St. Nikolas LLC | General Maritime Subsidiary Corporation |
| GMR Spyridon LLC | General Maritime Subsidiary Corporation |
| GMR Strength LLC | General Maritime Subsidiary Corporation |
| Companion Ltd. | Arlington Tankers Ltd. |
| Compatriot Ltd. | Arlington Tankers Ltd. |
| Consul Ltd. | Arlington Tankers Ltd. |
| Victory Ltd. | Arlington Tankers Ltd. |
| Vision Ltd. | Arlington Tankers Ltd. |

| Name of Subsidiary | Direct Owner(s) |
|---|---|
| GMR Poseidon LLC | General Maritime Subsidiary II Corporation |
| GMR Ulysses LLC | General Maritime Subsidiary II Corporation |
| GMR Hercules LLC | General Maritime Subsidiary II Corporation |
| GMR Atlas LLC | General Maritime Subsidiary II Corporation |
| GMR Zeus LLC | General Maritime Subsidiary II Corporation |
| GMR Maniate LLC | General Maritime Subsidiary II Corporation |
| GMR Spartiate LLC | General Maritime Subsidiary II Corporation |

## LITIGATION

- On or about August 29, 2007, an oil sheen was discovered by shipboard personnel of the *Genmar Progress* in Guayanilla Bay, Puerto Rico in the vicinity of the vessel. The vessel crew took prompt action pursuant to the vessel response plan. The Parent's subsidiary which operates the vessel promptly reported this incident to the U.S. Coast Guard and subsequently accepted responsibility under the U.S. Oil Pollution Act of 1990 for any damage or loss resulting from the accidental discharge of bunker fuel determined to have been discharged from the vessel. The Parent understands the federal and Puerto Rico authorities are conducting civil investigations into an oil pollution incident which occurred during this time period on the southwest coast of Puerto Rico including Guayanilla Bay. The extent to which oil discharged from the *Genmar Progress* is responsible for this incident is currently the subject of investigation. The U.S. Coast Guard has designated the *Genmar Progress* as a potential source of discharged oil. Under the U.S. Oil Pollution Act of 1990, the source of the discharge is liable, regardless of fault, for damages and oil spill remediation as a result of the discharge. On January 13, 2009, the Parent received a demand from the U.S. National Pollution Fund for approximately $5.8 million for the U.S. Coast Guard's response costs and certain costs of the Departamento de Recursos Naturales y Ambientales of Puerto Rico in connection with the alleged damage to the environment caused by the spill. In April 2010, the U.S. National Pollution Fund made an additional natural resource damage assessment claim against the Parent of approximately $0.5 million. In October 2010, the Parent entered into a settlement agreement with the U.S. National Pollution Fund in which the Parent agreed to pay approximately $6.3 million in full satisfaction of the oil spill response costs of the U.S. Coast Guard and natural damage assessment costs of the U.S. National Pollution Fund through the date of the settlement agreement. Pursuant to the settlement agreement, the U.S. National Pollution Fund will waive its claims to any additional civil penalties under the U.S. Clean Water Act as well as for accrued interest. The settlement has been paid in full by the vessel's protection and indemnity underwriters. Notwithstanding the settlement agreement, the Parent may be subject to any further potential claims by the U.S. National Pollution Fund or the U.S. Coast Guard arising from the ongoing natural resource damage assessment.

- On November 25, 2008, a jury in the Southern District of Texas found General Maritime Management (Portugal) L.D.A., a subsidiary of GMR ("GMM Portugal"), and two vessel officers of the *Genmar Defiance* guilty of violating the Act to Prevent Pollution from Ships and 18 USC 1001. The conviction resulted from charges based on alleged incidents occurring on board the *Genmar Defiance* arising from potential failures by shipboard staff to properly record discharges of bilge waste during the period of November 24, 2007 through November 26, 2007. Pursuant to the sentence imposed by the Court on March 13, 2009, GMM Portugal paid a $1 million fine in April 2009 and is subject to a probationary period of five years. During this period, a court-appointed monitor will monitor and audit GMM Portugal's compliance with its environmental compliance plan, and GMM Portugal is required to designate a responsible corporate officer to submit monthly reports to, and respond to inquiries from, the court's probation department. The court stated that, should GMM Portugal engage in future conduct in violation of its probation, it may, under appropriate circumstances, ban certain of the Parent's vessels from calling on U.S. ports. Any violations of probation may also result in additional penalties, costs or sanctions being imposed on the Parent.

<u>SCHEDULE XVI</u>

## <u>NON-RECOURSE SUBSIDIARIES</u>

None.

## EXHIBIT 5

## New GMR Charter

**AMENDED AND RESTATED ARTICLES OF INCORPORATION**

**OF**

**GENERAL MARITIME CORPORATION**

**PURSUANT TO THE MARSHALL ISLANDS
BUSINESS CORPORATIONS ACT**

The undersigned, for the purpose of forming a corporation pursuant to the provisions of the Marshall Islands Business Corporations Act, does hereby make, subscribe, acknowledge and file with the Registrar of Corporations this instrument for that purpose, as follows:

ARTICLE ONE

The name of the Corporation shall be General Maritime Corporation.

ARTICLE TWO

The registered address of the Corporation in the Marshall Islands is Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960. The name of the Corporation's registered agent at such address is The Trust Company of the Marshall Islands, Inc.

The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the Marshall Islands Business Corporations Act.

ARTICLE THREE

The total number of shares of capital stock that the Corporation has authority to issue is (i) fifteen million (15,000,000) shares of Common Stock, par value $0.01 per share and (ii) five million (5,000,000) shares of Preferred Stock, par value $0.01 per share.

The Board of Directors of the Corporation (the "Board") is hereby authorized, by resolution or resolutions from time to time adopted, and subject to the limitations provided by law, to establish and designate one or more series of Preferred Stock, and such series of Preferred Stock shall have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions providing for the issuance of such Preferred Stock adopted by the Board.

To the extent prohibited by section 1123(a)(6) of the United States Bankruptcy Code, the Corporation shall not issue nonvoting equity securities; provided, however, the foregoing restriction shall (i) have no further force and effect beyond that required under section

1123 of the United States Bankruptcy Code and (ii) in all events may be amended or eliminated in accordance with applicable law as may be in effect.

ARTICLE FOUR

The Corporation is to have perpetual existence.

ARTICLE FIVE

Unless otherwise expressly approved by the Board, prior to the Restriction Release Date (defined below), no Equity Securities of the Corporation shall be Transferred, if such Transfer would (i) result in there being more than 200 holders of record of such class of Equity Securities as determined pursuant to Section 12(g) of the Exchange Act, with each Participant being a single holder of record for these purposes, or (ii) otherwise require the Corporation to register any class of Equity Securities under the Exchange Act or any other applicable federal or state securities laws.

No employee or agent of the Corporation, including any Transfer Agent on the books maintained by such Transfer Agent for that purpose, will record any purported Transfer in violation of this ARTICLE FIVE, and any such purported Transfer will be null and void, and will not be recognized by the Corporation, for any or all purposes.  Without limitation, the intended Transferee in any such purported Transfer of Equity Securities will not be recognized as a shareholder of the Corporation for any purpose whatsoever and will not be entitled with respect to such Equity Securities to any rights of shareholders of the Corporation, including without limitation the rights to vote such Equity Securities and to receive dividends or distributions, whether liquidating or otherwise, in respect thereof, if any.

The Board will have the sole power to make determinations regarding compliance with this ARTICLE FIVE and any matters related thereto; and the good faith determination of the Board on such matters will be conclusive and binding for all purposes of this ARTICLE FIVE; provided, however, the Board may designate a sub-committee of the Board or an officer of the Corporation to make any determination or approval required by this ARTICLE FIVE.

Each certificate representing Equity Securities issued prior to the Restriction Release Date, other than global stock certificates deposited with or for the benefit of the DTC and registered in the name of Cede & Co. or any other nominee of the DTC, will contain the legend that refers to the restrictions set forth in this ARTICLE FIVE as follows:

"THE TRANSFER OF THE SECURITIES REPRESENTED HEREBY IS SUBJECT TO RESTRICTIONS PURSUANT TO ARTICLE FIVE OF THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF GENERAL MARITIME CORPORATION.  GENERAL MARITIME CORPORATION WILL FURNISH A COPY OF ITS AMENDED AND RESTATED CERTIFICATE OF INCORPORATION TO THE HOLDER OF RECORD OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST ADDRESSED TO THE

2

CORPORATION    AT    ITS    PRINCIPAL    PLACE    OF BUSINESS."

Any Transfer or attempted Transfer of any Equity Securities in violation of any provision of these articles of incorporation shall be void, and the Corporation shall not record such Transfer on its books or treat any purported Transferee of such Equity Securities as the owner of such Equity Securities for any purpose.

No Shareholder shall avoid the provisions of these articles of incorporation by (x) making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such Shareholder's interest in any such Permitted Transferee, or (y) issuing or permitting any Transfer of any legal or beneficial interests in such Shareholder other than to the current direct and indirect holders of such interests.

ARTICLE SIX

In connection with an initial public offering or other underwritten public offering by the Corporation under the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "Securities Act"), no holder of Equity Securities shall (i) offer, sell, contract to sell, pledge or otherwise dispose of (including sales pursuant to Rule 144 promulgated under the Securities Act), directly or indirectly, any Equity Securities of the Corporation (including Equity Securities which may be deemed to be owned beneficially by such holder in accordance with the rules and regulations of the Securities and Exchange Commission), or any securities, options, or rights convertible into or exchangeable or exercisable for shares of Equity Securities ("Other Securities"), (ii) enter into a transaction which would have the same effect as described in clause (i) of this ARTICLE SIX, (iii) enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences or ownership of any equity securities or Other Securities, whether such transaction is to be settled by delivery of such equity securities, Other Securities, in cash or otherwise, or (iv) publicly disclose the intention to enter into any transaction described in (i), (ii) or (iii) above, from the date on which the Corporation gives notice to the holders of shares of Equity Securities that a preliminary prospectus has been circulated for the public offering to the date that is (x) in the case of the initial public offering, 180 days following the date of the final prospectus for such initial public offering, or (y) in the case of any other underwritten public offering, 90 days following the date of the final prospectus for such public offering (or, in the case of clause (x) or (y), such shorter period as agreed to by the underwriters designated as "book-runners" managing such public offering), unless such book-runners otherwise agree in writing (such period, the "Holdback Period"). If (1) the Corporation issues an earnings release or other material news or a material event relating to the Corporation and its subsidiaries occurs during the last 17 days of the Holdback Period or (2) prior to the expiration of the Holdback Period, the Corporation announces that it will release earnings results during the 16-day period beginning upon the expiration of the Holdback Period, then to the extent necessary for a managing or co-managing underwriter of a registered offering required hereunder to comply with Financial Industry Regulatory Authority Rule 2711(f)(4), the Holdback Period shall be extended until 18 days after the earnings release or the occurrence of the material news or event, as the case may be (such period referred to herein as the "Holdback Extension"). The Corporation may impose stop-transfer instructions with respect to its securities that are subject to the foregoing restriction until

3

the end of such period, including any period of Holdback Extension.

In connection with any such public offering, each holder of Equity Securities of the Corporation shall enter into any lockup or similar agreement with the underwriters managing the public offering as the Board may request.

ARTICLE SEVEN

If the Board or Oaktree approves a Sale of the Company (an "Approved Sale"), each shareholder shall vote for, consent to and raise no objections against such Approved Sale. If the Approved Sale is structured as a (x) merger or consolidation, each shareholder holding Equity Securities shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation, (y) sale of Equity Securities, each shareholder shall agree to sell all of his, her or its Equity Securities on the terms and conditions approved by the Board or Oaktree, as applicable, or (z) a sale of assets, each shareholder shall vote its Equity Securities to approve such sale and any subsequent liquidation of the Corporation or other distribution of the proceeds therefrom, whether by written consent or at a meeting of the shareholders (as requested by the Board or Oaktree). Each shareholder shall take all actions in connection with the consummation of the Approved Sale as reasonably requested by the Board or Oaktree, as applicable, including executing all agreements, documents and instruments in connection therewith in the form presented by the Board or Oaktree, as applicable. Notwithstanding anything to the contrary in this ARTICLE SEVEN, the provisions of this ARTICLE SEVEN shall not apply to those Shareholders who are required to hold their Common Stock through the DTC to the extent the rights and obligations provided for in this ARTICLE SEVEN are prohibited by the procedures or rules of the DTC.

The obligations of the shareholders with respect to the Approved Sale are subject to each shareholder participating in such Approved Sale being entitled to receive the consideration payable in the Approved Sale in the same portion of the aggregate consideration as such shareholder would receive if such aggregate consideration were distributed to the shareholders in a complete liquidation of the Corporation; provided that, the consideration payable to any shareholder shall be reduced by the aggregate principal amount plus all accrued and unpaid interest on any indebtedness owing from any such shareholder to the Corporation.

Notwithstanding anything herein to the contrary, in connection with an Approved Sale, (x) no shareholder shall be required to make affirmative representations or warranties with respect to the Corporation or Oaktree, except that such shareholder may be required to make representations and warranties in all cases in a manner no more onerous than as made or required to be made by Oaktree, and (y) the shareholders may be severally obligated to join on a pro rata basis (based on the amount by which each person's or entity's share of the aggregate proceeds paid with respect to its Equity Securities would have been reduced had the aggregate proceeds available for distribution to such shareholders been reduced by the amount of such indemnity) in any indemnification obligation agreed to by the Board or Oaktree in connection with such Approved Sale, except that each shareholder may be fully liable for any breach by such shareholder of such shareholder's representations and warranties as to itself; provided that, except with respect to such shareholder's representations and warranties as to itself, no shareholder shall be obligated in connection with such Approved Sale to agree to indemnify or

4

hold harmless the Transferees for any amount in excess of the aggregate proceeds to which such holder is entitled in such Approved Sale; provided further, that any escrow of proceeds of any such transaction shall be withheld on a pro rata basis among all shareholders (based on the amount by which each such shareholder's share of the aggregate proceeds otherwise payable with respect to its Equity Securities would have been reduced had the aggregate proceeds available for distribution to such shareholders been reduced by the amount placed in escrow). Each shareholder shall enter into any contribution agreement requested by the Board or Oaktree to ensure compliance with this paragraph.

If the Corporation or any of its subsidiaries or Oaktree enter into any negotiation or transaction for which Rule 506 (or any similar rule then in effect) promulgated by the United States Securities Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the other shareholders that are not "accredited investors" (as defined in Rule 501 promulgated under the Securities Act) shall, at the request of Oaktree, appoint a "purchaser representative" (as such term is defined in Rule 501 promulgated under the Securities Act) designated by the Corporation and reasonably acceptable to Oaktree. If any shareholder so appoints a purchaser representative, the Corporation (or the applicable subsidiary) shall pay the fees of such purchaser representative. However, if any shareholder declines to appoint the purchaser representative designated by the Corporation or such subsidiary, such holder shall appoint another purchaser representative (reasonably acceptable to Oaktree), and such holder shall be responsible for the fees of the purchaser representative so appointed.

Except as otherwise provided in the paragraph above, each shareholder Transferring Equity Securities pursuant to this ARTICLE SEVEN shall pay its pro rata share of the expenses incurred by the shareholders and/or the Corporation in connection with such Approved Sale (based on the amount by which each person's or entity's share of the aggregate proceeds paid with respect to its Equity Securities would have been reduced had the aggregate proceeds available for distribution to such shareholders been reduced by the amount of such expenses), including by reducing the portion of the consideration to which such shareholder would be entitled in such Approved Sale.

If any shareholder fails to deliver any certificates representing its Equity Securities as required by this ARTICLE SEVEN, or in lieu thereof, a customary affidavit (and indemnity) attesting to the loss or destruction of such certificate(s), such shareholder (v) shall not be entitled to the consideration that such shareholder would otherwise receive in the Approved Sale until such holder cures such failure (provided that, after curing such failure, such holder will be so entitled to such consideration without interest), (w) shall be deemed, for all purposes, no longer to be a shareholder and shall have no voting rights, (x) shall not be entitled to any dividends or other distributions declared after the Approved Sale with respect to the Equity Securities held by such holder, (y) shall have no other rights or privileges granted to shareholders under this Agreement or any future agreement, and (z) in the event of liquidation of the Corporation, the consideration that such holder would have received if such holder had complied with this ARTICLE SEVEN shall be paid to such holder only upon coming into compliance with this ARTICLE SEVEN, all of the foregoing provisions of this paragraph to the extent permissible under applicable law.

5

If Oaktree or the Board approves a sale, in an underwritten public offering registered under the Securities Act, of the Corporation's (or any successor's) Equity Securities, each shareholder shall, vote for, consent to (to the extent it has any voting or consenting rights) and raise no objections against any such transaction, including any reorganization, recapitalization or other similar transaction involving the Corporation in connection with such public offering, and the Corporation, the Board and each shareholder shall take all reasonable actions in connection with the consummation of any such transactions as requested by Oaktree or the Board, as applicable; provided that in any such reorganization, recapitalization or other similar transaction involving the Corporation in connection with such public offering, such shareholder shall be afforded substantially equivalent economic terms with respect to the securities held by such shareholder immediately following such transaction as such shareholder enjoyed with respect to the Equity Securities held by it immediately prior thereto.

At least 10 days prior to any Transfer of Common Stock by Oaktree or its affiliates of at least eighty-five percent (85%) all of the Equity Securities held by such holders, such holders (the "Initiating Holders") shall deliver a written notice (the "Sale Notice") to the Corporation and to each other Shareholder (the "Tag-Along Shareholders"), which such Sale Notice shall specify in reasonable detail the number of shares of Common Stock to be Transferred and the price and other terms and conditions of the Transfer; provided that this ARTICLE EIGHT shall not apply to Transfers (A) pursuant to a Public Sale, (B) pursuant to ARTICLE SEVEN or (C) to a Permitted Transferee.

Each Tag-Along Shareholder may elect to participate in the contemplated Transfer with respect to a number of shares of Common Stock not to exceed such Tag-Along Shareholder's Tag-Along Portion by delivering written notice to the Initiating Holders within 10 days after delivery of the Sale Notice, and failure to deliver such notice shall be deemed a waiver of rights by such Tag-Along Shareholder under this ARTICLE EIGHT with respect to such Transfer.  For purposes of this ARTICLE EIGHT, "Tag-Along Portion" means, with respect to any Tag-Along Shareholder, a number of shares of Common Stock equal to (x) the quotient determined by dividing the aggregate number of shares of Common Stock owned by such Tag-Along Shareholder by the number of shares of Common Stock owned by the Initiating Holders and each Tag-Along Shareholder who has elected to participate in such Transfer in accordance with this paragraph, multiplied by (y) the aggregate number of shares of Common Stock to be sold in such Transfer as set forth in the Sale Notice.  Any Tag-Along Shareholder that elects to so participate shall be obligated to participate in the contemplated Transfer, with respect to the number and class of Common Stock so elected, for so long as the Initiating Holders intend to consummate such Transfer.  Each Tag-Along Shareholder participating in such Transfer shall be entitled to receive the same amount and form of consideration per share of Common Stock as the Initiating Holder receives in such Transfer.  If no Tag-Along Shareholder has elected to participate in the contemplated Transfer (through notice to such effect or expiration of the 10-day period after delivery of the Sale Notice), then the Initiating Holders may, during the 120-day period immediately following the date of the delivery of the Sale Notice, Transfer the Common Stock specified in the Sale Notice at a price no greater and on other terms substantially the same as those specified in the Sale Notice.  Any shares of Common Stock identified in the Sale Notice but not Transferred within such 120-day period shall be subject to the provisions of this ARTICLE EIGHT upon subsequent Transfer.

6

No Initiating Holder shall Transfer any of its Common Stock to any prospective Transferee if such prospective Transferee(s) declines to allow the participation of the Tag-Along Shareholders who have elected to participate in such Transfer in accordance with the preceding paragraph, unless the Initiating Holder or its designee acquires the Common Stock that otherwise would have been sold in such Transfer for the price and on the terms that such Tag-Along Shareholder would have been entitled to receive had such Tag-Along Shareholder(s) sold the Common Stock such Shareholder was entitled to sell in such Transfer as set forth in the Sale Notice.   Each Shareholder Transferring Common Stock pursuant to this ARTICLE EIGHT (including in respect of the Transfer to the Initiating Holder or its designees referenced in the immediately foregoing sentence) shall pay its pro rata share of the expenses incurred by the Shareholders in connection with such Transfer (based on the amount by which each Shareholder's share of the aggregate proceeds paid with respect to its Common Stock would have been reduced had the aggregate proceeds available for distribution to such Shareholders been reduced by the amount of such expenses).   In connection with any such Transfer, (x) no Tag-Along Shareholder shall be required to make affirmative representations or warranties with respect to the Company or the Initiating Holders, except that such Tag-Along Shareholder may be required to make representations and warranties about itself in all cases in a manner no more onerous than as made or required to be made by the Initiating Holder about itself (the "Individual Shareholder Obligations"), and (y) the Shareholders participating in such Transfer may be severally obligated to join on a pro rata basis (based on the amount by which each Shareholder's share of the aggregate proceeds paid with respect to its Common Stock would have been reduced had the aggregate proceeds available for distribution to such Shareholders been reduced by the amount of such indemnity) in any indemnification obligation agreed to by the Initiating Holders in connection with such Transfer, except that each Shareholder may be fully liable for any breach by such Shareholder of its own Individual Shareholder Obligations; provided that, except with respect to the Individual Shareholder Obligations, no Shareholder shall be obligated in connection with such Transfer to agree to indemnify or hold harmless the Transferees for any amount in excess of the aggregate proceeds to which such holder is entitled in such Transfer; provided further, that any escrow of proceeds of any such transaction shall be withheld on a pro rata basis among all Shareholders who participate in the Transfer (based on the amount by which each such Shareholder's share of the aggregate proceeds otherwise payable with respect to its Common Stock would have been reduced had the aggregate proceeds available for distribution to such Shareholders been reduced by the amount placed in escrow).   Each Shareholder participating in such Transfer shall enter into any contribution agreement requested by the Initiating Holders to ensure compliance with this paragraph.

Each Shareholder participating in the contemplated Transfer shall take all actions in connection with the contemplated Transfer as reasonably requested by the Initiating Holders, including executing all agreements, documents and instruments in connection therewith in the form presented by the Initiating Holders (and not inconsistent with the provisions of this ARTICLE EIGHT).

ARTICLE NINE

All shares of Common Stock issued under its Second Amended Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code (other than to Oaktree) shall be issued in book-entry form, and DTC or its nominee shall be the holder of record of such

shares. Such shares may be represented by one or more global certificates registered with an agent for such shares, in the name of, and deposited with, DTC or its nominee. The ownership interest of each holder of such shares, and Transfers of ownership interests therein, will be recorded on the records of the direct and indirect participants in DTC. All recipients of such shares shall be required to designate a direct or indirect participant in DTC with whom such holder has an account into which such shares may be deposited.

## ARTICLE TEN

Prior to and as a condition to any shareholder receiving any confidential and proprietary information or trade secrets of the Corporation or any of its subsidiaries, including without limitation any information regarding identifiable, specific and discrete business opportunities being pursued by the Corporation or any of its subsidiaries, such shareholder shall, unless otherwise determined by the Board, execute and deliver to the Corporation a confidentiality agreement satisfactory to the Corporation.

## ARTICLE ELEVEN

In furtherance and not in limitation of the powers conferred by statute, the Board is expressly authorized to make, alter or repeal the by-laws of the Corporation.

## ARTICLE TWELVE

Meetings of shareholders may be held within or outside of the Republic of the Marshall Islands (the "Republic"), as the by-laws of the Corporation may provide. The books of the Corporation may be kept outside the Republic at such place or places as may be designated from time to time by the Board or in the by-laws of the Corporation. Election of directors need not be by written ballot unless the by-laws of the Corporation so provide.

## ARTICLE THIRTEEN

To the fullest extent permitted by the Marshall Islands Business Corporations Act as the same exists or may hereafter be amended, a director of this Corporation shall not be liable to the Corporation or its shareholders for monetary damages for a breach of fiduciary duty as a director. Any repeal or modification of this ARTICLE THIRTEEN shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE FOURTEEN

The Corporation reserves the right to amend, alter, change or repeal any provision contained in these articles of incorporation in the manner now or hereafter prescribed herein and by the laws of the Republic, and all rights conferred upon shareholders herein are granted subject to this reservation.

## ARTICLE FIFTEEN

To the maximum extent permitted from time to time under the law of the

8

Republic, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or shareholders, other than those officers, directors or shareholders who are employees of the Corporation.  No amendment or repeal of this ARTICLE FIFTEEN shall apply to or have any effect on the liability or alleged liability of any officer, director or shareholder of the Corporation for or with respect to any opportunities of which such officer, director, or shareholder becomes aware prior to such amendment or repeal.

## ARTICLE SIXTEEN

The Corporation shall have every power which a corporation now or hereafter organized under the Marshall Islands Business Corporations Act may have.

## ARTICLE SEVENTEEN

No Shareholder shall have any preemptive rights except as expressly set forth in a written agreement between such Shareholder and the Corporation.

## ARTICLE EIGHTEEN

For the purposes of these articles of incorporation:

1.      "Business Day" means any day other than a Saturday, Sunday or other day on which banks located in New York City and the Marshall Islands are authorized or obligated to close.

2.      "DTC" means the Depository Trust Company.

3.      "Equity Securities" means, with respect to the Corporation, (i) shares of Common Stock and any other capital stock of the Corporation from time to time outstanding, (ii) obligations, evidences of indebtedness or other securities or interests, in each case that are convertible or exchangeable into shares of Common Stock or any other capital stock of the Corporation and (iii) warrants, options or other rights to purchase or otherwise acquire shares of Common Stock or any other capital stock of the Corporation.

4.      "Exchange Act" means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

5.      "Oaktree" means OCM Marine Holdings TP, L.P., a Cayman Islands exempted limited partnership and OCM Marine Investments CTB, Ltd., a Cayman Islands exempt company.

6.      "Participant" means an institution that has an account with the depositary, with respect to a share of Common Stock or a warrant in its account.

7.      "Permitted Transferee" means (i) with respect to any Shareholder who is a natural person, such Shareholder's spouse and lineal descendants (whether natural or adopted) and any trust that is and at all times remains solely for the benefit of the Shareholder and/or the

9

Shareholder's spouse and/or lineal descendants, and (ii) with respect to any Shareholder which is an entity, any of such Shareholder's wholly owned Subsidiaries and parent companies that wholly own such Shareholder and equityholders of such Shareholder pursuant to a distribution in accordance with such Shareholder's governing documents.

8.      "Public Sale" means any sale of Equity Securities or other securities to the public pursuant to an offering registered under the Securities Act or through a broker, dealer or market maker pursuant to the provisions of Rule 144 promulgated under the Securities Act.

9.      "Restriction Release Date" means the date on which the Corporation has a class of equity securities registered under Section 12(b) or Section 12(g) of the Exchange Act or is otherwise required to file reports under Section 13 or Section 15(d) of the Exchange Act.

10.      "Sale of the Company" means a bona fide sale of the outstanding Equity Securities or assets of the Corporation on an arm's length basis to any person or entity (other than the Corporation, any subsidiary of the Corporation, Oaktree, or any affiliate of any of the foregoing) pursuant to which such person or entity, together with its affiliates, acquires (i) a majority of the voting power represented by the outstanding Equity Securities (whether by merger, consolidation, sale or Transfer of Equity Securities or otherwise) or (ii) all or substantially all of the Corporation's and its subsidiaries' assets determined on a consolidated basis.

11.      "Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.  Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

12.      "Transfer" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other direct or indirect disposition or encumbrance of an interest whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof.  The terms "Transferee," "Transferred," and other forms of the word "Transfer" shall have correlative meanings.

13.      "Transfer Agent" means a trust company, bank or other custodian assigned by the Corporation to maintain books and records with respect to the ownership of record of shares of any class of capital stock.

*    *    *    *    *

_____
Name:
Title:

**EXHIBIT 6**

**New GMR By-Laws**

**AMENDED AND RESTATED BY-LAWS**

**OF**

**GENERAL MARITIME CORPORATION**

**A Marshall Islands Corporation**

*Adopted as of [_____]*

ARTICLE I
OFFICES

The principal place of business of the corporation shall be at such place or places as the board of directors (the "Board of Directors") shall from time to time determine. The corporation may also have an office or offices at such other places within or without the Marshall Islands as the Board of Directors may from time to time appoint or the business of the corporation may require.

ARTICLE II
MEETINGS OF SHAREHOLDERS

Section 1.        Meetings Generally. At least one meeting of the shareholders shall be held each year for the purpose of electing directors and conducting any proper business as may come before the meeting. The date, time and place of such meeting shall be determined by the Board of Directors of the corporation.

Section 2.        Special Meetings. Special meetings of shareholders may be called for any purpose and may be held at such time and place, as shall be stated in a notice of meeting or in a duly executed waiver of notice thereof. Except as otherwise provided in the corporation's articles of incorporation, such meetings may be called at any time by the Board of Directors and shall be called by the highest ranking officer then in office (the "Ranking Officer") upon the written request of holders of shares entitled to cast not less than a majority of the votes at the meeting. Such written request shall state the purpose or purposes of the meeting and shall be delivered to the Ranking Officer. On such written request, the Ranking Officer shall fix a date and time for such meeting within two days of the date requested for such meeting in such written request.

Section 3.        Place of Meetings. The Board of Directors may designate any place as the place of meeting for any meeting or for any special meeting called by the Board of Directors. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the corporation.

Section 4.        Notice. Whenever shareholders are required or permitted to take action at a meeting, written or printed notice stating the place, date, time, and. in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each shareholder entitled to vote at such meeting not less than fifteen (15) nor more than sixty (60) days before the date of the meeting. All such notices shall be delivered, either personally, by mail, by facsimile or by electronic mail by or at the direction of the Board of Directors, the president or the secretary, and if mailed, such notice shall be deemed to be delivered (i) upon confirmation of receipt if sent by facsimile, electronic mail or personal delivery or (ii) when deposited in the United States mail, postage prepaid, addressed to the shareholder at his, her or its address as the same appears on the records of the corporation. Attendance of a person at a meeting

shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

Section 5.    Shareholders List.   The officer having charge of the share ledger of the corporation shall make, not more than sixty (60) nor less than fifteen (15) days before every meeting of the shareholders, a complete list of the shareholders entitled to vote at such meeting arranged in alphabetical order, showing the address of each shareholder and the number of shares registered in the name of each shareholder. Such list shall be open to the examination of any shareholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least fifteen (15) days prior to any meeting either at a place within the city where the meeting is to be held which place shall be specified in the notice of the meeting or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any shareholder who is present.

Section 6.    Quorum.   The holders of at least a majority of the outstanding shares of capital stock entitled to vote, present in person or represented by proxy, shall constitute a quorum at all meetings of the shareholders, except as otherwise provided by statute or by the articles of incorporation. If a quorum is not present, the holders of a majority of the shares present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place. When a quorum is once present to commence a meeting of shareholders, it is not broken by the subsequent withdrawal of any shareholders or their proxies.

Section 7.    Adjourned Meetings. When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each shareholder of record entitled to vote at the meeting.

Section 8.    Vote Required.   When a quorum is present, the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the shareholders, unless the question is one upon which by express provisions of an applicable law or of the corporation's articles of incorporation a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 9.    Voting Rights.   Except as otherwise provided by the Marshall Islands Business Corporations Act or by the articles of incorporation of the corporation or any amendments thereto and subject to Section 3 of Article VI hereof, every shareholder shall at every meeting of the shareholders be entitled to one (1) vote in person or by proxy for each share of common stock held (or deemed held) by such shareholder (it being understood that certain other classes or series of capital stock may, pursuant to the corporation's articles of incorporation, be entitled to vote on as as-if converted to common stock basis).

Section 10.    Proxies.   Each shareholder entitled to vote at a meeting of shareholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for him, her or it by proxy, but no such proxy shall be voted or acted upon after eleven (11) months from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation

2

generally. Any proxy is suspended when the person executing the proxy is present at a meeting of shareholders and elects to vote, except that when such proxy is coupled with an interest and the fact of the interest appears on the face of the proxy, the agent named in the proxy shall have all voting and other rights referred to in the proxy, notwithstanding the presence of the person executing the proxy. At each meeting of the shareholders, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the secretary or a person designated by the secretary and no shares may be represented or voted under a proxy that has been found to be invalid or irregular.

Section 11.     Action by Written Consent.  Unless otherwise provided in the corporation's articles of incorporation, any action required to be taken at any regular or special meeting of shareholders of the corporation, or any action which may be taken at any regular or special meeting of such shareholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken and bearing the dates of signature of the shareholders who signed the consent or consents, shall be signed by all the shareholders entitled to vote with respect to the subject matter thereof and shall be delivered to the corporation by delivery to its principal place of business, or to an officer or agent of the corporation having custody of the book or books in which proceedings of meetings of the shareholders are recorded.  All consents properly delivered in accordance with this Section shall be deemed to be recorded when so delivered.  Any action taken pursuant to such written consent or consents of the shareholders shall have the same force and effect as if taken by the shareholders at a meeting thereof.

## ARTICLE III
## DIRECTORS

Section 1.     General Powers. The business and affairs of the corporation shall be managed by or under the direction of the Board of Directors, which shall consist of at least one (1) director.

Section 2.     Number, Election and Term of Office.  The number of directors which shall constitute the first Board of Directors shall be five (5).  The number of directors shall be subject to change by the vote of holders of a majority of the shares then entitled to vote at an election of directors.  The directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote in the election of directors.  The directors shall be elected in this manner at any meeting of the shareholders, except as provided in Section 4 of this ARTICLE III.  Each director elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3.     Removal and Resignation.  The directors shall only be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.  Whenever the holders of any class or series are entitled to elect one or more directors by the provisions of the corporation's articles of incorporation, the provisions of this Section shall apply, in respect to the removal without cause of a director or directors so elected, to the vote of the holders of the outstanding shares of that class or series and not to the vote of the outstanding shares as a whole.  Any director may resign at any time upon written notice to the corporation.

Section 4.     Vacancies.  Vacancies and newly created directorships resulting from any increase in the authorized number of directors shall be filled in the same manner in which directors are elected pursuant to Section 2 of this ARTICLE III.  Notwithstanding the foregoing, any such vacancy shall automatically reduce the number of directors *pro tanto*, until such time as the shareholders elect a director to fill such vacancy in accordance with Section 2 of this ARTICLE III, whereupon the number of directors shall be automatically increased *pro tanto*.  Each director so chosen shall hold office until a

3

successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided.

Section 5.    Meetings and Notice.  Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by resolution of the Board of Directors, provided that the directors shall meet at least once per year. Special meetings of the Board of Directors may be called by or at the request of any two directors or the Ranking Officer on at least twenty-four (24) hours notice to each director, either personally, by telephone, by mail, or by facsimile or electronic mail.

Section 6.    Quorum, Required Vote and Adjournment.  Each director shall be entitled to one vote except as otherwise provided in the corporation's articles of incorporation.  Directors then in office (and specifically excluding any vacancies) and holding a majority of the votes of all directors (or such greater number required by applicable law) shall constitute a quorum for the transaction of business. The vote of directors holding a majority of votes present at a meeting at which a quorum is present shall be the act of the Board of Directors. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 7.    Committees.  The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, designate one or more committees, each committee to consist of one or more of the directors of the corporation, which to the extent provided in such resolution or these by-laws shall have and may exercise the powers of the Board of Directors in the management and affairs of the corporation except as otherwise limited by law. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Directors. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 8.    Committee Rules.  Each committee of the Board of Directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the Board of Directors designating such committee. Unless otherwise provided in such a resolution, the presence of at least a majority of the members of the committee shall be necessary to constitute a quorum. In the event that a member and that member's alternate, if alternates are designated by the Board of Directors as provided in Section 7 of this ARTICLE III, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member.

Section 9.    Communications. Equipment. Members of the Board of Directors or any committee thereof may participate in and act at any meeting of such Board of Directors or committee through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in the meeting pursuant to this Section shall constitute presence in person at the meeting.

Section 10.    Waiver of Notice and Presumption of Consent.  Any member of the Board of Directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Such member shall be conclusively presumed to have consented to any action taken unless

4

his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the secretary of the corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to any member who voted in favor of such action.

Section 11.    Action by Written Consent.    Unless otherwise restricted by the articles of incorporation, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee.

ARTICLE IV
OFFICERS

Section 1.    Number. The officers of the corporation shall be elected by the Board of Directors and shall consist of a secretary and may also consist of a chairman of the board, president, chief executive officer, chief financial officer, one or more vice-presidents, secretary, a treasurer, and such other officers and assistant officers as may be deemed necessary or desirable by the Board of Directors. Any number of offices may be held by the same person. In its discretion, the Board of Directors may choose not to fill any office, except the office of secretary, and shall fill the office of president as expeditiously as possible.

Section 2.    Election and Term of Office.    The officers of the corporation shall be elected at any meeting of the Board of Directors. Vacancies may be filled or new offices created and filled at any meeting of the Board of Directors. Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided.

Section 3.    Removal.    Any officer or agent elected by the Board of Directors may be removed by the Board of Directors whenever in its judgment the best interests of the corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

Section 4.    Vacancies.    Any vacancy occurring in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the Board of Directors for the unexpired portion of the term by the Board of Directors then in office.

Section 5.    Compensation.    Compensation of all officers shall be fixed by the Board of Directors, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the corporation.

Section 6.    Chairman of the Board.    The chairman of the board, if one is appointed, shall have the powers and perform the duties incident to that position. Subject to the powers of the Board of Directors, he shall be in the general and active charge of the entire business and affairs of the corporation. He shall preside at all meetings of the Board of Directors and shareholders and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or provided in these by-laws. Whenever the president is unable to serve, by reason of sickness, absence or otherwise, the chairman of the board shall perform all the duties and responsibilities and exercise all the powers of the president.

5

Section 7.    <u>The President</u>.   The president shall be the chief executive officer of the corporation; shall preside at all meetings of the shareholders and Board of Directors at which he is present; subject to the powers of the Board of Directors, shall have general charge of the business, affairs and property of the corporation, and control over its officers, agents and employees; and shall see that all orders and resolutions of the Board of Directors are carried into effect. The president shall execute bonds, mortgages and other contracts which the Board of Directors have authorized to be executed, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to some other officer or agent of the corporation. The president shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or as may be provided in these by-laws.  If there is no chief executive officer, the president shall also have the duties of the chief executive officer as prescribed above.

Section 8.    <u>Chief Financial Officer</u>. The chief financial officer of the corporation, if one is appointed, shall, under the direction of the chief executive officer (or, in the absence of a chief executive officer, the president), be responsible for all financial and accounting matters and for the direction of the offices of treasurer and controller. The chief financial officer shall have such other powers and perform such other duties as may be prescribed by the chairman of the board, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or the Board of Directors or as may be provided in these by-laws.

Section 9.    <u>Vice-Presidents</u>.  The vice-president, if one is appointed, or if there shall be more than one, the vice-presidents in the order determined by the Board of Directors or by the president, shall, in the absence or disability of the president, act with all of the powers and be subject to all the restrictions of the president. The vice-presidents shall also perform such other duties and have such other powers - as the Board of Directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or these by-laws may, from time to time, prescribe.

Section 10.    <u>The Secretary and Assistant Secretaries</u>. The secretary shall attend all meetings of the Board of Directors, all meetings of the committees thereof and all meetings of the shareholders and record all the proceedings of the meetings in a book or books to be kept for that purpose. Under the chief executive officer's (or, in the absence of a chief executive officer, the president's) supervision, the secretary shall give, or cause to be given, all notices required to be given by these by-laws or by law; shall have such powers and perform such duties as the Board of Directors, the chief executive officer, (or, in the absence of a chief executive officer, the president), the president or these by-laws may, from time to time, prescribe; and shall have custody of the corporate seal of the corporation. The secretary, or an assistant secretary, shall have authority to affix the corporate seal to any instrument requiring it and when so affixed, it may be attested by his or her signature or by the signature of such assistant secretary. The Board of Directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his or her signature. The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the Board of Directors, shall, in the absence or disability of the secretary, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the Board of Directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or the secretary may, from time to time, prescribe.

Section 11.    <u>The Treasurer and Assistant Treasurer</u>. The treasurer, if one if appointed, shall, subject to the authority of the chief financial officer, have the custody of the corporate funds and securities; shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation; shall deposit all monies and other valuable effects in the name and to the credit of the corporation as may be ordered by the Board of Directors; shall cause the funds of the corporation to be

6

disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements; shall render to the chief executive officer (or, in the absence of a chief executive officer, the president), the president and the Board of Directors, at its regular meeting or when the Board of Directors so requires, an account of the corporation; and shall have such powers and perform such duties as the Board of Directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or these by-laws may, from time to time, prescribe. If required by the Board of Directors, the treasurer shall give the corporation a bond (which shall be rendered every six (6) years) in such sums and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office of treasurer and for the restoration to the corporation, in case of death, resignation, retirement, or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in the possession or under the control of the treasurer belonging to the corporation. The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the Board of Directors, shall in the absence or disability of the chief financial officer, treasurer, perform the duties and exercise the powers of the treasurer. The assistant treasurers shall perform such other duties and have such other powers as the Board of Directors, the chief executive officer (or, in the absence of a chief executive officer, the president), the president or treasurer may, from time to time, prescribe.

Section 12.    Other Officers. Assistant Officers and Agents.   Officers, assistant officers and agents, if any, other than those whose duties are provided for in these by-laws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Directors.

Section 13.    Absence or Disability of Officers.   In the case of the absence or disability of any officer of the corporation and of any person hereby authorized to act in such officer's place during such officer's absence or disability, the Board of Directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

7

ARTICLE V
INDEMNIFICATION OF OFFICERS. DIRECTORS AND OTHERS

        Section 1.        Right to Indemnification.  Each person who was or is made a party or is threatened to be made a party to or is otherwise involved (including involvement as a witness) in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding"), by reason of the fact that he or she is or was a director, officer or employee of the corporation or, while a director or officer of the corporation, is or was following serving at the request of the corporation as a director, manager, officer, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (an "indemnitee", which shall in any event include only those individuals who serve as a director, officer or employee of the corporation following [_____]¹ or, while a director or officer of the corporation, is or was serving, following [_____] at the request of the corporation as a director, manager, officer, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise, including service with respect to an employee benefit plan), whether the basis of such proceeding is alleged action in an official capacity as a director, officer or other employee or in any other capacity while serving as a director, officer or employee, shall be indemnified and held harmless by the corporation to the fullest extent authorized by the Marshall Islands Business Corporations Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the corporation to provide broader indemnification rights than permitted prior thereto), against all expense, liability and loss (including attorneys' fees, judgments, fines, excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an indemnitee who has ceased to be a director, manager, officer, employee or agent and shall inure to the benefit of the indemnitee's heirs, executors and administrators; provided, however, that, except as provided in Section 2 of this ARTICLE V with respect to proceedings to enforce rights to indemnification, the corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the Board of Directors; and provided, further, that in the case of indemnification of an indemnitee in respect of services provided before the date hereof, such  indemnification shall only be against attorneys' fees and attorneys' expenses reasonably incurred or suffered by such indemnitee.  The right to indemnification conferred in this Section 1 of this ARTICLE V shall be a contract right and shall include the obligation of the corporation to pay the expenses incurred in defending any such proceeding in advance of its final disposition (an "advance of expenses"), subject, in the case of indemnitees who are current or former officers or employees of the corporation or who serve or served at the request of the corporation as an officer or employee of another corporation or of a partnership, limited liability company, joint venture, trust or other enterprise, to the prior determination by the Board of Directors in the specific case; provided, however, that in any case an advance of expenses incurred by an indemnitee shall be made only upon delivery to the corporation of an undertaking (an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 1 of this ARTICLE V or otherwise.  The corporation may, by action of its Board of Directors, provide indemnification to agents of the corporation with the same or lesser scope and effect as the foregoing indemnification of directors, officers and employees.  The corporation hereby acknowledges that certain directors and officers affiliated with institutional investors may have certain rights to indemnification, advancement of expenses and/or

---

¹ The Effective Date of the Plan.

8

insurance provided by such institutional investors or certain of their affiliates (collectively, the "Institutional Indemnitors").  The corporation hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to the indemnitee are primary and any obligation of the Institutional Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the indemnitee are secondary), (ii) that unless otherwise determined by the Board of Directors, it shall be required to advance the full amount of expenses incurred by the indemnitee in accordance with this ARTICLE V without regard to any rights the indemnitee may have against the Institutional Indemnitors and (iii)  that it irrevocably waives, relinquishes and releases the Institutional Indemnitors from any and all claims against the Institutional Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.   The corporation further agrees that no advancement or payment by the Institutional Indemnitors on behalf of the indemnitee with respect to any claim for which the indemnitee has sought indemnification from the corporation shall affect the foregoing and the Institutional Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the indemnitee against the corporation.

Section 2.        Procedure for Indemnification.   Any indemnification of a director, officer or employee of the corporation or advance of expenses pursuant to the terms of Section 1 of this ARTICLE V shall be made promptly, and in any event within forty five days (or, in the case of an advance of expenses, twenty days), upon the written request of the director, officer or employee.  If a determination by the corporation that the director, officer or employee is entitled to indemnification pursuant to this ARTICLE V is required, and the corporation fails to respond within sixty days to a written request for indemnity, the corporation shall be deemed to have approved the request.  If the corporation denies a written request for indemnification or advance of expenses that it is obligated to provide pursuant to the terms of Section 1 of this ARTICLE V , in whole or in part, or if payment in full pursuant to such request is not made within forty five days (or, in the case of an advance of expenses, twenty days), the right to indemnification or advances as granted by this ARTICLE V shall be enforceable by the director, officer or employee in any court of competent jurisdiction.   Such person's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the corporation.   It shall be a defense to any such action (other than an action brought to enforce a claim for the advance of expenses where the undertaking required pursuant to Section 1 of this ARTICLE V, if any, has been tendered to the corporation) that the claimant has not met the standards of conduct which make it permissible under the Marshall Islands Business Corporation Act for the corporation to indemnify the claimant for the amount claimed, but the burden of such defense shall be on the corporation.  Neither the failure of the corporation (including its Board of Directors, independent legal counsel or its shareholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the Marshall Islands Business Corporations Act, nor an actual determination by the corporation (including its Board of Directors, independent legal counsel or its shareholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.   The procedure for indemnification of other agents for whom indemnification is provided pursuant to Section 1 of this ARTICLE V shall be the same procedure set forth in this Section 2 of this ARTICLE V for directors, officers or employees, unless otherwise set forth in the action of the Board of Directors providing indemnification for such employee or agent.

Section 3.        Insurance.   The corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee or agent of the corporation or was serving at the request of the corporation as a director, manager, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise against any expense, liability or loss asserted against him or her and incurred by him or her in any such capacity,

9

whether or not the corporation would have the power to indemnify such person against such expenses, liability or loss under the Marshall Islands Business Corporations Act.

Section 4.        Subsidiaries.  To the extent any indemnitee under Section 1 of this ARTICLE V is also entitled to indemnification from a subsidiary of the corporation, such indemnitee shall first look to such subsidiary for indemnification, and only after seeking indemnification from such subsidiary shall such indemnitee seek indemnification from the corporation.

Section 5.        Reliance.  Persons who, after the date of the adoption of this provision, become or remain directors, officers or employees of the corporation or who, while a director, officer or employee of the corporation, become or remain a director, manager, officer, employee or agent of a subsidiary, shall be conclusively presumed to have relied on the rights to indemnity, advance of expenses and other rights contained in this ARTICLE V in entering into or continuing such service.  The rights to indemnification and to the advance of expenses conferred in this ARTICLE V shall apply to claims made against an indemnitee arising out of acts or omissions which occurred or occur both prior and subsequent to the adoption hereof.

Section 6.        Non Exclusivity of Rights.  The rights to indemnification and to the advance of expenses conferred in this ARTICLE V shall not be exclusive of any other right which any person may have or hereafter acquire under the articles of incorporation or under any statute, by law, agreement, vote of shareholders or disinterested directors or otherwise.

Section 7.        Merger or Consolidation.  For purposes of this ARTICLE V, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, manager, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, shall stand in the same position under this ARTICLE V with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

ARTICLE VI
CERTIFICATES FOR SHARES

Section 1.        Form.  Every holder of shares in the corporation shall be entitled, if such shares are not issued in book-entry form, to have a certificate, signed by, or in the name of the corporation by the chief executive officer (or, in the absence of a chief executive officer, the president), president, chief financial officer or a vice-president and the secretary or an assistant secretary of the corporation, certifying the number of shares of a specific class or series owned by such holder in the corporation. If such a certificate is countersigned (1) by a transfer agent or an assistant transfer agent other than the corporation or its employee or (2) by a registrar, other than the corporation or its employee, the signature of any such chief executive officer (or, in the absence of a chief executive officer, the president), president, chief financial officer, vice-president, secretary, or assistant secretary may be facsimiles. In case any officer or officers who have signed, or whose facsimile signature or signatures have been used on, any such certificate or certificates shall cease to be such officer or officers of the corporation whether because of death, resignation or otherwise before such certificate or certificates have been delivered by the corporation, such certificate or certificates may nevertheless be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures have been used thereon had not ceased to be such officer or officers of the corporation.  All certificates

10

for shares shall be consecutively numbered or otherwise identified. The name of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the books of the corporation. Shares of stock of the corporation shall only be transferred on the books of the corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the corporation may reasonably require, and accompanied by all necessary stock transfer stamps. In that event, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates, and record the transaction on its books. The Board of Directors may appoint a bank or trust company to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the corporation.

Section 2.     Lost Certificates.   The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates previously issued by the corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed. When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen, or destroyed certificate or certificates, or his, her or its legal representative, to give the corporation a bond sufficient to indemnify the corporation against any claim that may be made against the corporation on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate.

Section 3.     Fixing a Record Date for Shareholder Meetings.   In order that the corporation may determine the shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than fifteen (15) days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be the close of business on the next day preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of shareholders of record entitled to notice of or to vote at a meeting of shareholders shall apply to any adjournment of the meeting; provided that the Board of Directors may fix a new record date for the adjourned meeting.

Section 4.     Fixing a Record Date for Action by Written Consent.   In order that the corporation may determine the shareholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than fifteen (15) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining shareholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by statute, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its principal place of business, or an officer or agent of the corporation having custody of the book in which proceedings of meetings of shareholders are recorded. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by statute, the record date for determining shareholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

11

Section 5.    <u>Fixing a Record Date for Other Purposes</u>.  In order that the corporation may determine the shareholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the shareholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining shareholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 6.    <u>Registered Shareholders</u>.  Prior to the surrender to the corporation of the certificate or certificates for a share or shares of stock with a request to record the transfer of such share or shares, the corporation may treat the registered owner as the person entitled to receive dividends, to vote, to receive notifications, and otherwise to exercise all the rights and powers of an owner. The corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof.

Section 7.    <u>Subscriptions for Stock</u>.  Unless otherwise provided for in the applicable subscription agreement, subscriptions for shares shall be paid in full at such time, or in such installments and at such times, as shall be determined by the Board of Directors. Any call made by the Board of Directors for payment on subscriptions shall be uniform as to all shares of the same class or as to all shares of the same series. In case of default in the payment of any installment or call when such payment is due, the corporation may proceed to collect the amount due in the same manner as any debt due the corporation.

ARTICLE VII<br>GENERAL PROVISIONS

Section 1.    <u>Dividends</u>.  Dividends upon the capital stock of the corporation, subject to the provisions of the articles of incorporation, if any, may be declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the articles of incorporation. Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or any other purpose and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 2.    <u>Checks. Drafts or Orders</u>.  All checks, drafts, or other orders for the payment of money by or to the corporation and all notes and other evidences of indebtedness issued in the name of the corporation shall be signed by such officer or officers, agent or agents of the corporation, and in such manner, as shall be determined by resolution of the Board of Directors or a duly authorized committee thereof.

Section 3.    <u>Contracts</u>.  The Board of Directors may authorize any officer or officers, or any agent or agents, of the corporation to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances.

Section 4.    <u>Loans</u>.  The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the

12

directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation; provided that a loan shall not be made by the corporation to any director unless it is authorized by a vote of the shareholders. The loan, guaranty or other assistance may be with or without interest, and may be unsecured, or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the corporation. Nothing in this section contained shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

Section 5.        Fiscal Year.  The fiscal year of the corporation shall be fixed by resolution of the Board of Directors.

Section 6.        Corporate Seal.  The Board of Directors may provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the corporation and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

Section 7.        Voting Securities Owned By Corporation.  Voting securities in any other corporation held by the corporation shall be voted by the president, unless the Board of Directors specifically confers authority to vote with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer. Any person authorized to vote securities shall have the power to appoint proxies, with general power of substitution.

Section 8.        Inspection of Books and Records.  Any shareholder of record, in person or by attorney or other agent, shall, upon written demand stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the corporation's share ledger, a list of its shareholders, and its other books and records, and to make copies or extracts therefrom. A proper purpose shall mean any purpose reasonably related to such person's interest as a shareholder. In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the shareholder. The demand under oath shall be directed to the corporation at its registered office in the Republic or at its principal place of business.

Section 9.        Section Headings.  Section headings in these by-laws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 10.       Inconsistent Provisions.  In the event that any provision of these by-laws is or becomes inconsistent with any provision of the articles of incorporation, the Marshall Islands Business Corporations Act or any other applicable law, the provision of these bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

ARTICLE VIII
AMENDMENTS

Except for ARTICLE III and ARTICLE V hereof, these by-laws may be amended, altered, or repealed and new by-laws adopted at any meeting of the Board of Directors by a vote of a majority of the directors then in office. ARTICLE III and ARTICLE V hereof may be amended, altered, or repealed at any meeting of the Board of Directors only by a unanimous vote (or unanimous written consent in lieu thereof). The fact that the power to adopt, amend, alter, or repeal the by-laws has been conferred upon the Board of Directors shall not divest the shareholders of the same powers.

13

**EXHIBIT 7**

**New GMR Warrant Agreement**

**WARRANT AGREEMENT**

THIS WARRANT AGREEMENT (this "Agreement") is made as of the **[__]** day of **[_____]**, 2012 between General Maritime Corporation, a Marshall Islands corporation (the "Company"), and Computershare Shareowner Services LLC, a New Jersey limited liability company (the "Warrant Agent").

**WHEREAS,** on November 17, 2011, the Company and its debtor affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code  in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the lead case 11-15285-MG (the "Chapter 11 Cases");

**WHEREAS,** on March 26, 2012, the Debtors filed the *Second Amended Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code* (the "Plan of Reorganization");

**WHEREAS,** on May **[__]**, 2012, the Bankruptcy Court entered an order confirming the Plan of Reorganization, and the Company emerged from its chapter 11 bankruptcy proceedings on May **[__]**, 2012 (the "Plan Effective Date");

**WHEREAS**, the Company proposes to issue, at the Effective Date, warrants (the "New GMR Warrants") to purchase, in the aggregate, 309,296 shares of New GMR Common Stock, at an exercise price of $42.50, to all holders of Allowed General Unsecured Claims against the Guarantor Debtors (other than a holder of an OCM Facility Deficiency Claim), on a Pro Rata basis;

**WHEREAS**, the Company desires to provide for the form and provisions of the New GMR Warrants, the terms upon which they shall be issued and exercised, and the respective rights, limitation of rights, and immunities of the Company, the Warrant Agent, and the holders of the New GMR Warrants; and

**WHEREAS**, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, call, exercise and cancellation of the New GMR Warrants; and

**WHEREAS**, all acts and things have been done and performed which are necessary to make the New GMR Warrants, when executed on behalf of the Company and countersigned by or on behalf of the Warrant Agent, as provided herein, the valid, binding and legal obligations of the Company, and to authorize the execution and delivery of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definition of Terms.  As used in this Agreement, the following capitalized terms shall have the following respective meanings:

(a)    "Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

(b)    "Business Day" shall mean any day on which commercial banks are not authorized or permitted to close in New York, New York or in the State of New Jersey.

(c)    "Beneficial Holder" means any person or entity that holds beneficial interests in a Global Warrant Certificate.

(d)    "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(e)    "Governmental Authority" means any (i) government, (ii) governmental or quasi- governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, in each case, whether federal, state, local, municipal, foreign, supranational or of any other jurisdiction.

(f)    "Law" means all laws, statutes, rules, regulations, codes, injunctions, decrees, orders, ordinances, registration requirements, disclosure requirements and other pronouncements having the effect of law of the United States, the Republic of the Marshall Islands, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

(g)    "Market Price" means as to any security the average of the closing prices of such security's sales on all U.S. securities exchanges on which such security may at the time be listed, or, if there have been no sales on any such exchange on any day, the average of the highest bid and lowest asked prices on all such exchanges at the end of such day, or, if on any day such security is not so listed, the average of the highest bid and lowest asked prices on such day in the U.S. over-the-counter market as reported by Pink OTC Markets, Inc., or any similar successor organization, in each such case averaged over a period of twenty-one (21) days consisting of the day as of which "Market Price" is being determined and the twenty (20) consecutive Business Days prior to such day; provided that, if such security is listed on any U.S. securities exchange or quoted in a U.S. over-the-counter market (the term "Business Day" as used in this sentence means Business Days on which such exchange or market, as applicable, is open for trading).  If at any time such security is not listed on any U.S. securities exchange or quoted in the U.S. over-the-counter market, the "Market Price" shall be the fair value thereof reasonably determined in good faith by the Board of Directors of the Company.  If the Registered Holder disagrees with the determination of the market value of any securities of the Company determined by the Board of Directors of the Company in accordance with this provision, the fair market value of such securities shall be determined by an independent appraiser acceptable to the Company and the Registered Holder (or, if they cannot agree on such

2

an appraiser, by an independent appraiser selected by lot by two independent appraisers, one of which is appointed by each of them).  The cost of the appraisal shall be shared equally between the Company and the Registered Holder.

(h)    "Organic Change" means any recapitalization, reorganization, reclassification, consolidation, merger, sale of a majority of the Company's assets or other transaction, in each case which is effected in such a way that the holders of New GMR Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other assets or property with respect to or in exchange for New GMR Common Stock; provided that a Specified Sale shall not be considered an Organic Change.

(i)    "Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity (as such term is defined in the Bankruptcy Code).

(j)    "Plan of Reorganization" means the plan of reorganization of the Company as finally approved by the bankruptcy court before which the Company's case under Chapter 11 of the United States Bankruptcy Code is or was pending.

(k)    "Requisite Holders" means Registered Holders of New GMR Warrants representing a majority of the New GMR Common Stock obtainable upon exercise of all New GMR Warrants then outstanding.

(l)    "SEC" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act or the Exchange Act.

(m)    "Securities Act" means the Securities Act of 1933, as amended.

(a)    "Specified Sale" means a transfer, sale or other disposition (i) by Oaktree and its Affiliates (as such terms are defined in the Shareholders' Agreement, by and among the Company and shareholders thereof, as amended from time to time), in one or a series of related transactions, of eighty-five percent (85%) or more on a cumulative basis of the Equity Securities held by such Persons, or (ii) of eighty-five percent (85%) or more on a cumulative basis of the assets of the Company and its Subsidiaries, on a consolidated basis.

(b)    "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company or other business entity, a majority of the partnership, limited liability company or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company or other business entity gains or

3

losses or shall be or control the managing member or general partner of such partnership, limited liability company or other business entity.

        (c)    "Warrant Exercise Shares" means the shares of New GMR Common Stock issued upon the applicable exercise of a New GMR Warrant.

        (d)    "Warrant Agent" has the meaning set forth in the preamble and shall include any successor to the Warrant Agent pursuant to Section 9.1 hereof.

Each capitalized term used but not defined herein shall have the meaning ascribed to it in the Plan of Reorganization.

## ARTICLE II

## APPOINTMENT OF WARRANT AGENT

Section 2.1    Appointment.  The Company hereby appoints the Warrant Agent to act as agent for the Company for the New GMR Warrants in accordance with the express terms and subject to the conditions set forth in this Agreement (and no implied terms or conditions), and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

## ARTICLE III

## WARRANTS

Section 3.1    Issuance of New GMR Warrants.  On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan of Reorganization, on the Effective Date (such date, the "Date of Issuance"), the Company will issue and distribute the New GMR Warrants to purchase the New GMR Common Stock to the holders of Allowed General Unsecured Claims against the Guarantor Debtors (other than a holder of an OCM Facility Deficiency Claim) on a Pro Rata basis as part of the Initial Distribution, if any, and issue the balance of the New GMR Warrants following the Initial Distribution to the Unsecured Creditor Distribution Escrow Account.  The Company shall provide the Warrant Agent with a written list of all initial Registered Holders of New GMR Warrants, including the number of New GMR Warrants issued to each such initial Registered Holder, and the Warrant Agent may rely conclusively on such written list.  On or promptly after such date, the Company will deliver, or cause to be delivered to The Depository Trust Company (the "Depositary"), one or more Global Warrant Certificates (as defined below), duly executed on behalf of the Company and countersigned by the Warrant Agent, evidencing a portion of the New GMR Warrants, in the manner set forth in Section 3.2(b) below.  The remainder of the New GMR Warrants shall be issued by book-entry registration on the books of the Warrant Agent ("Book-Entry Warrants") and shall be evidenced by statements issued by the Warrant Agent from time to time to the Registered Holders (as defined below) of Book-Entry Warrants reflecting such book-entry position (the "Warrant Statements").  The maximum number of shares of New GMR Common Stock issuable pursuant to the New GMR Warrants shall be 309,296 shares, as such amount may be adjusted from time to time pursuant to this Agreement.  No warrant will be deemed issued

4

and/or outstanding until issued through the facilities of the Depositary, unless the Company otherwise consents in writing.

Section 3.2    Form of Warrant.

(a)    Subject to Section 7.1 of this Agreement, (i) the New GMR Warrants issued pursuant to the terms of the Plan of Reorganization on the Date of Issuance shall be, and other warrants to purchase capital stock of the Company that may be issued form time to time may be, issued in the form of one or more global certificates (the "Global Warrant Certificates"), with the forms of election to exercise and of assignment printed on the reverse thereof, in substantially the form set forth in Exhibit A-1 attached hereto, and/or (i) other warrants to purchase stock of the Company that may be issued from time to time may be issued via book-entry registration on the books and records of the Warrant Agent and evidenced by the Warrant Statements, in substantially the form set forth in Exhibit A-2 attached hereto.  The Warrant Statements and Global Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification or designation and such legends, summaries, or endorsements placed thereon as may be required by the Depositary or to comply with any Law or with any rules or regulations made pursuant thereto or with any rules of any securities exchange or as may, consistently herewith, or, be determined by (i) in the case of Global Warrant Certificates, the Chairman of the Board of Directors, Chief Executive Officer, President, any Senior Vice President or Treasurer of the Company (each, an "Appropriate Officer") executing such Global Warrant Certificates, as evidenced by their execution of the Global Warrant Certificates, or (ii) in the case of a Warrant Statement, any Appropriate Officer, and all of which shall be reasonably acceptable to the Warrant Agent.

(b)    The Global Warrant Certificates shall be deposited on or after Date of Issuance with the Warrant Agent and registered in the name of [_____], as the nominee of the Depositary.  Each Global Warrant Certificate shall represent such number of the outstanding New GMR Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding New GMR Warrants from time to time endorsed thereon and that the aggregate amount of outstanding New GMR Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

Section 3.3    Execution of Global Warrant Certificates.

(a)    The Global Warrant Certificates shall be signed on behalf of the Company by an Appropriate Officer.  Each such signature upon the Global Warrant Certificates may be in the form of a facsimile signature of any such Appropriate Officer and may be imprinted or otherwise reproduced on the Global Warrant Certificates and for that purpose the Company may adopt and use the facsimile signature of any Appropriate Officer.

(b)    If any Appropriate Officer who shall have signed any of the Global Warrant Certificates shall cease to be such Appropriate Officer before the Global Warrant Certificates so signed shall have been countersigned by the Warrant Agent or delivered or disposed of by or on behalf of the Company, such Global Warrant Certificates nevertheless may

5

be countersigned and delivered or disposed of with the same force and effect as though such Appropriate Officer had not ceased to be such Appropriate Officer of the Company; and any Global Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Global Warrant Certificate, shall be a proper Appropriate Officer of the Company to sign such Global Warrant Certificate, although at the date of the execution of this Agreement any such person was not such Appropriate Officer.

Section 3.4    Registration and Countersignature.

(a)    Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to do so, the Warrant Agent shall (i) register in the Warrant Register the Book-Entry Warrants in the names of the initial Registered Holders thereof, (ii) upon receipt of the Global Warrant Certificates duly executed on behalf of the Company, countersign, either by manual or facsimile signature, such Global Warrant Certificates evidencing New GMR Warrants and (iii) deliver such Global Warrant Certificates to the Depositary, or pursuant to the Depositary's instructions, hold such Global Warrant Certificates as custodian for the Depositary.  Such written order of the Company shall specifically state the number of New GMR Warrants that are to be issued as Book-Entry Warrants and the number of New GMR Warrants that are to be issued as Global Warrant Certificates.  A Global Warrant Certificate shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the New GMR Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.

(b)    No Global Warrant Certificate shall be valid for any purpose, and no New GMR Warrant evidenced thereby shall be exercisable, until such Global Warrant Certificate has been countersigned by the manual or facsimile signature of the Warrant Agent.  Such signature by the Warrant Agent upon any Global Warrant Certificate executed by the Company shall be conclusive evidence that such Global Warrant Certificate so countersigned has been duly issued hereunder.

(c)    The Warrant Agent shall keep or cause to be kept, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register the Book-Entry Warrants as well as any Global Warrant Certificates and exchanges, cancellations and transfers of outstanding New GMR Warrants in accordance with the procedures set forth in Section 7.1 of this Agreement, all in a form satisfactory to the Company and the Warrant Agent.  No service charge shall be made for any exchange or registration of transfer of the New GMR Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on any Registered Holder in connection with any such exchange or registration of transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until it is satisfied that any payments required by the immediately preceding sentence have been made.

(d)    Prior to due presentment for registration of transfer or exchange of any New GMR Warrant in accordance with the procedures set forth in this Agreement, the Company and the Warrant Agent may deem and treat the person in whose name any New GMR Warrant is registered upon the Warrant Register (the "Registered Holder" of such New GMR Warrant) as

6

the absolute owner of such New GMR Warrant (notwithstanding any notation of ownership or other writing on a Global Warrant Certificate made by anyone other than the Company or the Warrant Agent), for the purpose of any exercise thereof, any distribution to the holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary. Neither the Company nor the Warrant Agent will be liable or responsible for any registration or transfer of any New GMR Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

## ARTICLE IV

### TERMS AND EXERCISE OF NEW GMR WARRANTS

Section 4.1    Exercise Price.  On the Date of Issuance, each Warrant shall entitle (i) in the case of the Book-Entry Warrants, the Registered Holder thereof and (ii) in the case of New GMR Warrants held through the book-entry facilities of the Depositary or by or through persons that are direct participants in the Depositary, the Beneficial Holder thereof ((i) and (ii) collectively, the "Holder"), subject to the provisions of such New GMR Warrant and of this Agreement, the right to purchase from the Company the number of shares of New GMR Common Stock, at the price of $42.50 per share (as the same may be hereafter adjusted in accordance herewith, the "Exercise Price"), specified in such New GMR Warrant.

Section 4.2    Exercise Period.  New GMR Warrants may be exercised by the Holder thereof, in whole or in part (but not as to a fractional share of New GMR Common Stock), at any time and from time to time after the Date of Issuance and prior to 5:30 P.M., New York time on the fifth (5th) anniversary thereof (the "Exercise Period").  Each New GMR Warrant or portion thereof that is not exercised prior to the expiration of the Exercise Period shall be automatically cancelled with no action by any Person, and with no further rights thereunder, upon such expiration.

Section 4.3    Method of Exercise.

(a)    Subject to the provisions of the New GMR Warrants and this Agreement, the Holder of a New GMR Warrant may exercise such Holder's right to purchase shares of the New GMR Common Stock, in whole or in part, by: (x) in the case of persons who hold Book-Entry Warrants, providing an exercise form for the election to exercise such New GMR Warrant ("Exercise Form") substantially in the form of Exhibit B-1 hereto, properly completed and duly executed by the Registered Holder thereof, to the Warrant Agent, and (y) in the case of New GMR Warrants held through the book-entry facilities of the Depositary or by or through persons that are direct participants in the Depositary, providing an Exercise Form (as provided by such Holder's broker) to its broker, properly completed and executed by the Beneficial Holder thereof.

(b)    Any exercise of a New GMR Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(c)      Upon receipt of an Exercise Form pursuant to Section 4.3(a), the Warrant Agent shall:

(i)      examine all Exercise Forms and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Forms and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)      if an Exercise Form or other document appears, on its face, to have been improperly completed or executed or some other irregularity in connection with the exercise of the New GMR Warrants exists, endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)      inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the information provided on any Exercise Forms received and the information on the Warrant Register;

(iv)      advise the Company no later than three (3) Business Days after receipt of an Exercise Form, of (A) the receipt of such Exercise Form and the number of New GMR Warrants requested to be exercised in accordance with the terms and conditions of this Agreement, (B) the instructions with respect to delivery of the New GMR Common Stock deliverable upon such exercise, subject to timely receipt of the such information by the Warrant Agent, and (C) such other information as the Company shall reasonably request; and

(v)      subject to New GMR Common Stock being made available to the Warrant Agent by or on behalf of the Company for delivery to the Depositary, and written instructions from the Company, liaise with the Depositary and endeavor to effect such delivery to the relevant accounts at the Depositary in accordance with its customary requirements.

(d)      The Company reserves the right to reasonably reject any and all Exercise Forms not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful.  Such determination by the Company shall be final and binding on the Holders of the New GMR Warrants, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of New GMR Warrants or defects in Exercise Forms with regard to any particular exercise of New GMR Warrants.  The Company shall provide prompt written notice to the Warrant Agent of the exercise of any New GMR Warrant.  The Warrant Agent shall not have any obligations with respect to the exercise of any New GMR Warrant, except for canceling the Global Warrant Certificate surrendered to the Company for such exercise in accordance with written instructions received from the Company.  Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of the New GMR Warrants of any irregularities in any exercise of New GMR Warrants, nor shall it incur any liability for the failure to give such notice.

Section 4.4      Issuance of New GMR Common Stock.

8

(a)     Upon exercise of any New GMR Warrants pursuant to Section 4.3 and clearance of the funds in payment of the Exercise Price, the Company shall promptly at its expense, and in no event later than five (5) Business Days thereafter, cause to be issued to the Holder of such New GMR Warrants the total number of whole New GMR Common Stock for which such New GMR Warrants are being exercised (as the same may be hereafter adjusted pursuant to Article V) in such denominations as are requested by the Holder as set forth below:

(i)     in the case of a Beneficial Holder who holds the New GMR Warrants being exercised through the Depositary's book-entry transfer facilities, by same-day or next-day credit to the Depositary for the account of such Beneficial Holder or for the account of a participant in the Depositary the number of New GMR Common Stock to which such person is entitled, in each case registered in such name and delivered to such account as directed in the Exercise Form by such Beneficial Holder or by the direct participant in the Depositary through which such Beneficial Holder is acting, or

(ii)     in the case of a Registered Holder who holds the New GMR Warrants being exercised in the form of Book-Entry Warrants, a book-entry interest in the New GMR Common Stock registered on the books of the Company's transfer agent.

(b)     Notwithstanding the five (5) Business Day period described in Section 4.4(a), the Warrant Exercise Shares shall be deemed to have been issued to the Holder at the time at which all of the conditions to such exercise have been fulfilled, and the Holder shall be deemed for all purposes to have become the record holder of such Warrant Exercise Shares at such time.

(c)     If less than all of the New GMR Warrants evidenced by a Global Warrant Certificate surrendered upon the exercise of New GMR Warrants are exercised at any time prior to the Expiration Date, a new Global Warrant Certificate or Global Warrant Certificates shall be issued for the remaining number of New GMR Warrants evidenced by the Global Warrant Certificate so surrendered, and the Warrant Agent is hereby authorized to countersign the required new Global Warrant Certificate or Certificates pursuant to the provisions of Section 3.4 and this Section 4.4.

Section 4.5     Exercise of New GMR Warrants.  A Holder of a New GMR Warrant may exchange all or part of the purchase rights represented by the New GMR Warrant by surrendering the New GMR Warrant to the Warrant Agent, together with a written notice to the Warrant Agent that such holder is exchanging the New GMR Warrant (or a portion thereof) for an aggregate number of shares of New GMR Common Stock specified in the notice, from which the Company shall withhold and not issue to such holder a number of shares of New GMR Common Stock with an aggregate Market Price equal to the aggregate Exercise Price of the shares of New GMR Common Stock specified in such notice (and such withheld shares shall no longer be issuable under the New GMR Warrant).

Section 4.6     Reservation of Shares.  The Company shall at all times reserve and keep available out of its authorized but unissued shares of New GMR Common Stock solely for the purpose of issuance upon the exercise of the New GMR Warrants, such number of shares of New GMR Common Stock issuable upon the exercise of all outstanding New GMR Warrants.  The

9

Company shall take all such actions as may be necessary to assure that all such shares of New GMR Common Stock may be so issued without violating the Company's governing documents, any applicable Law or any requirements of any U.S. securities exchange upon which shares of New GMR Common Stock may be listed.  The Company shall not take any action which would cause the number of authorized but unissued shares of New GMR Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the New GMR Warrants.

Section 4.7   Fractional Shares.   Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of New GMR Warrants, and in any case where the Registered Holder would, except for the provisions of this Section 4.7, be entitled under the terms of New GMR Warrants to receive a fraction of a share upon the exercise of such New GMR Warrants, the Company shall, upon the exercise of such Holder's New GMR Warrants, issue or cause to be issued only the largest whole number of New GMR Common Stock issuable on such exercise (and such fraction of a share will be disregarded); provided, that if more than one New GMR Warrant is presented for exercise at the same time by the same Holder, the number of whole New GMR Common Stock which shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of New GMR Common Stock issuable upon exercise of all such New GMR Warrants.

Section 4.8   Public Offering.   Notwithstanding any other provision hereof, if an exercise of any portion of a New GMR Warrant is to be made in connection with a registered public offering or the sale of the Company, the exercise of any portion of such New GMR Warrant may, at the election of the holder thereof, be conditioned upon the consummation of such registered public offering or sale of the Company, in which case such exercise shall be deemed to be effective concurrently with the consummation of such transaction.

Section 4.9   Close of Books; Par Value.   The Company shall not close its books against the transfer of any New GMR Warrant or any Warrant Exercise Shares in any manner which interferes with the timely exercise of such New GMR Warrant.  The Company shall from time to time take all such action as may be necessary to assure that the par value per share of the unissued New GMR Common Stock acquirable upon exercise of each New GMR Warrant is at all times equal to or less than the Exercise Price then in effect.

Section 4.10   Investment Representations.   Upon any exercise of a New GMR Warrant, the Company may require customary investment representations from the Holder (other than any Holder who acquired a New GMR Warrant pursuant to the terms of the Plan of Reorganization) to the extent necessary to assure that the issuance of the New GMR Common Stock thereunder shall not require registration or qualification under the Securities Act, or the rules and regulations promulgated thereunder, or any other applicable securities Laws.

10

## ARTICLE V

## ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF
## WARRANT EXERCISE SHARES

In order to prevent dilution of the rights granted under each New GMR Warrant, the Exercise Price shall be subject to adjustment from time to time as provided in this Article V, and the number of shares of New GMR Common Stock obtainable upon exercise of each New GMR Warrant shall be subject to adjustment from time to time as provided in this Article V.

Section 5.1    Adjustments.

(a)    Subdivision or Combination of New GMR Common Stock.    If the Company at any time prior to the expiration of the Exercise Period subdivides (by any stock split, stock dividend or reclassification) one or more classes of its New GMR Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced and the number of shares of New GMR Common Stock obtainable upon exercise of each New GMR Warrant shall be proportionately increased. If the Company at any time prior to the expiration of the Exercise Period combines (by reverse stock split, or reclassification) one or more classes of its New GMR Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately increased and the number of shares of New GMR Common Stock obtainable upon exercise of each New GMR Warrant shall be proportionately decreased.

(b)    Reorganization, Reclassification, Consolidation, Merger or Sale.    In connection with any Organic Change prior to the expiration of the Exercise Period, the Company shall make appropriate provision to ensure that each holder of the New GMR Warrants shall have the right to acquire and receive in such Organic Change, in lieu of or addition to (as the case may be) the shares of New GMR Common Stock immediately theretofore acquirable and receivable upon the exercise of such holder's New GMR Warrant, such cash, stock, securities or other assets or property as would have been issued or payable in such Organic Change (if the holder had exercised such New GMR Warrant immediately prior to such Organic Change) with respect to or in exchange for the number of shares of New GMR Common Stock immediately theretofore acquirable and receivable upon exercise of such holder's New GMR Warrant, less the applicable Exercise Price.

Section 5.2    Notices .    Whenever the number and/or kind of Warrant Exercise Shares or the Exercise Price is adjusted as herein provided, the Company shall (i) prepare and deliver, or cause to be prepared and delivered, forthwith to the Warrant Agent a written statement setting forth the adjusted number and/or kind of shares purchasable upon the exercise of New GMR Warrants and the Exercise Price of such shares after such adjustment, the facts requiring such adjustment and the computation by which adjustment was made, and (ii) cause the Warrant Agent to give written notice to each Holder in the manner provided in Section 10.2 below, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event. The Warrant Agent shall be fully protected in relying upon any such written notice delivered in accordance with this Section 5.2, and on any adjustment therein contained, and shall not be deemed to have knowledge of any such

11

adjustment unless and until it shall have received such written notice.  Notwithstanding anything to the contrary contained herein, the Warrant Agent shall have no duty or obligation to investigate or confirm whether the information contained in any such written notice complies with the terms of this Agreement or any other document, including the Warrant Certificates.  The Warrant Agent shall have no duty to determine when an adjustment under this Article V should be made, how any such adjustment should be calculated, or the amount of any such adjustment. The Company shall also, at least ten (10) days prior to (x) the date on which the Company closes its books or takes a record (1) with respect to any dividend or distribution upon the New GMR Common Stock, (2) with respect to any *pro rata* subscription offer to holders of New GMR Common Stock or (3) for determining rights to vote with respect to any Organic Change, dissolution or liquidation, or (y) the date on which any Organic Change, dissolution or liquidation shall take place, issue a press release or give written notice thereof to the Warrant Agent and cause the Warrant Agent to give written notice to each Holder in the manner provided in Section 10.2 below.

Section 5.3    Form of Warrant After Adjustments.  The form of the Global Warrant Certificate need not be changed because of any adjustments in the Exercise Price or the number or kind of the New GMR Common Stock, and New GMR Warrants theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated in New GMR Warrants, as initially issued.  The Company, however, may at any time in its sole discretion make any change in the form of Global Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Global Warrant Certificate (including the rights, duties, liabilities or obligations of the Warrant Agent), and any Global Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Global Warrant Certificate, may be in the form so changed.

## ARTICLE VI

## SPECIFIED SALE

Upon the consummation of a Specified Sale during the Exercise Period at an aggregate value on a per share basis of New GMR Common Stock less than the then applicable Exercise Price (for the purposes of this Article VI, in the event the Specified Sale is a sale of assets, the aggregate value on a per share basis of New GMR Common Stock shall refer to such value that would be received if the consideration in respect of such assets of the Company would be distributed to the shareholders of the Company in a liquidating distribution, after satisfaction of all liabilities and obligations of the Company), each New GMR Warrant shall be automatically cancelled and deemed surrendered to the Company and the Company shall pay in exchange therefor consideration (at the Company's election, either (x) in cash or (y) in the same proportion of cash and non-cash consideration as is paid in respect of the shares of New GMR Common Stock in the Specified Sale) in an amount equal to the fair market value of such New GMR Warrant.  For such purpose, the fair market value of such New GMR Warrant shall be calculated by the Board of Directors of the Company in good faith using the Black-Scholes warrant valuation formula with the following assumptions: (i) New GMR Common Stock price equal to the consideration per share of New GMR Common Stock (including the fair market value of any such consideration to the extent it is not cash, as reasonably determined by the Board of Directors of the Company in good faith) paid in such transaction or series of related transactions,

12

(ii) the prevailing normalized dividend rate of the Company on the date of determination, (iii) 30% equity volatility rate, (iv) the risk free rate on the date of determination equal to the yield on an equivalent-duration U.S. Treasury bond, (v) time until expiration equal to the amount of time remaining in the Exercise Period (assuming the New GMR Warrant remained exercisable until the fifth (5th) anniversary of the Date of Issuance and was not earlier terminated) on the date of determination, and (vi) Exercise Price on the date of determination (as adjusted pursuant to Article V, if applicable).  The Company shall provide the Warrant Agent with written notice of the occurrence of a Specified Sale, and until such written notice is received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that no Specified Sale has occurred.  Notwithstanding the foregoing, the Warrant Agent shall have no duties or obligations upon the occurrence of a Specified Sale, except pursuant to any written instructions from the Company issued in accordance with the express terms of this Agreement.  If the Requisite Holders disagree with the determination of the fair market value of any non-cash consideration as determined by the Board of Directors of the Company in accordance with and for the purposes of this Article VI, the fair market value of such securities shall be determined by an independent appraiser acceptable to the Company and the Requisite Holders (or, if they cannot agree on such an appraiser, by an independent appraiser selected by lot by two independent appraisers, one of which is appointed by the Company, on the one hand,  and the Requisite Holders, on the other hand).  The cost of the appraisal shall be shared equally between the Company, on the one hand, and the Requisite Holders, on the other hand.

## ARTICLE VII

## TRANSFER AND EXCHANGE
## OF NEW GMR WARRANTS

Section 7.1    <u>Registration of Transfers and Exchanges</u>.

(a)    *Transfer and Exchange of Global Warrant Certificates or Beneficial Interests Therein*.  The transfer and exchange of Global Warrant Certificates or beneficial interests therein shall be effected through the Depositary, in accordance with this Agreement and the procedures of the Depositary therefor.

(b)    *Exchange of a Beneficial Interest in a Global Warrant Certificate for a Book-Entry Warrant*.

(i)    Any Holder of a beneficial interest in a Global Warrant Certificate may, upon request, exchange such beneficial interest for a Book-Entry Warrant.  Upon receipt by the Warrant Agent (i) from the Depositary or its nominee of written instructions or such other form of instructions as is customary for the Depositary on behalf of any person having a beneficial interest in a Global Warrant Certificate and (ii) of a written order of the Company signed by an Appropriate Officer authorizing such exchange, the Warrant Agent shall, in accordance with such instructions, cause, or direct the Depositary to cause, the number of New GMR Warrants represented by the Global Warrant Certificate to be reduced by the number of New GMR Warrants to be represented by the Book-Entry Warrants to be issued in exchange for the beneficial interest of such person in the Global Warrant Certificate and, following such

13

reduction, the Warrant Agent shall register in the name of the Holder a Book-Entry Warrant and deliver to said Holder a Warrant Statement.

(ii)    Book-Entry Warrants issued in exchange for a beneficial interest in a Global Warrant Certificate pursuant to this Section 7.1(b) shall be registered in such names as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent. The Warrant Agent shall deliver such Warrant Statements to the persons in whose names such New GMR Warrants are so registered.

(c)    *Transfer and Exchange of Book-Entry Warrants*.    When Book-Entry Warrants are presented to the Warrant Agent with a written request:

(i)    to register the transfer of the Book-Entry Warrants; or

(ii)    to exchange such Book-Entry Warrants for an equal number of Book-Entry Warrants of other authorized denominations, the Warrant Agent shall register the transfer or make the exchange as requested if its customary requirements for such transactions are met; provided, however, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing; and a written order of the Company signed by an Appropriate Officer authorizing such exchange.

(d)    *Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Global Warrant Certificate*.    A Book-Entry Warrant may not be exchanged for a beneficial interest in a Global Warrant Certificate except upon satisfaction of the requirements set forth below.    Upon receipt by the Warrant Agent of appropriate written instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of New GMR Warrants represented by the Global Warrant Certificate equal to the number of New GMR Warrants represented by such Book-Entry Warrant, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of New GMR Warrants represented by the Global Warrant Certificate to be increased accordingly.    If no Global Warrant Certificates are then outstanding, the Company shall issue and the Warrant Agent shall countersign a new Global Warrant Certificate representing the appropriate number of New GMR Warrants.    Any such transfer shall be subject to the Company's prior written approval.

(e)    *Restrictions on Transfer and Exchange of Global Warrant Certificates*.    Notwithstanding any other provisions of this Agreement (other than the provisions set forth in Section 7.1(f)), unless and until it is exchanged in whole for a Book-Entry Warrant, a Global Warrant Certificate may not be transferred as a whole except by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

14

(f)     *Book-Entry Warrants*.  If at any time:

(i)     the Depositary for the Global Warrant Certificates notifies the Company that the Depositary is unwilling or unable to continue as Depositary for the Global Warrant Certificates and a successor Depositary for the Global Warrant Certificates is not appointed by the Company within 90 days after delivery of such notice; or

(ii)     the Company, in its sole discretion, notifies the Warrant Agent in writing that it elects to exclusively cause the issuance of Book-Entry Warrants under this Agreement, then the Warrant Agent, upon written instructions signed by an Appropriate Officer of the Company, shall register Book-Entry Warrants, in an aggregate number equal to the number of New GMR Warrants represented by the Global Warrant Certificates, in exchange for such Global Warrant Certificates.

(g)     *Restrictions on Transfer*.  No New GMR Warrants or Warrant Exercise Shares shall be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities Laws.

(h)     *Cancellation of Global Warrant Certificate*.  At such time as all beneficial interests in Global Warrant Certificates have either been exchanged for Book-Entry Warrants, redeemed, repurchased or cancelled, all Global Warrant Certificates shall be returned to, or retained and cancelled pursuant to applicable Law by, the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent.

Section 7.2     Obligations with Respect to Transfers and Exchanges of New GMR Warrants.

(i)     To permit registrations of transfers and exchanges, the Company shall execute Global Warrant Certificates, if applicable, and the Warrant Agent is hereby authorized, in accordance with the provisions of Section 3.4 and this Article VII, to countersign such Global Warrant Certificates, if applicable, or register Book-Entry Warrants, if applicable, as required pursuant to the provisions of this Article VII and for the purpose of any distribution of new Global Warrant Certificates contemplated by Section 8.2 or additional Global Warrant Certificates contemplated by Article V.

(ii)     All Book-Entry Warrants and Global Warrant Certificates issued upon any registration of transfer or exchange of Book-Entry Warrants or Global Warrant Certificates shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Book-Entry Warrants or Global Warrant Certificates surrendered upon such registration of transfer or exchange.

(iii)     No service charge shall be made to a Holder for any registration, transfer or exchange but the Company or the Warrant Agent may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall forward any such sum collected by it to the Company or to such persons as the Company shall specify by written notice.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until it is satisfied that all such taxes and/or charges have been paid.

15

(iv) So long as the Depositary, or its nominee, is the registered owner of a Global Warrant Certificate, the Depositary or such nominee, as the case may be, will be considered by the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent as the sole owner or holder of the New GMR Warrants represented by such Global Warrant Certificate for all purposes under this Agreement.  Except as provided in Sections 7.1(b) and (f) upon the exchange of a beneficial interest in a Global Warrant Certificate for Book-Entry Warrants, Beneficial Holders will not be entitled to have any New GMR Warrants registered in their names, and will under no circumstances be entitled to receive physical delivery of any such New GMR Warrants and will not be considered the Registered Holder thereof under the New GMR Warrants or this Agreement.  Neither the Company nor the Warrant Agent, in its capacity as registrar for such New GMR Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent, or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy, or other authorization furnished by the Depository or impair the operation of customary practices of the Depository governing the exercise of the rights of a holder of a beneficial interest in a Global Warrant Certificate.

(v) Subject to Sections 7.1(b), (c) and (d), and this Section 7.2, the Warrant Agent shall, upon receipt of all information required to be delivered hereunder, from time to time to register the transfer of any outstanding New GMR Warrants in the Warrant Register, upon surrender of Global Warrant Certificates, if applicable, representing such New GMR Warrants at the Warrant Agent's office as set forth in Section 10.2, duly endorsed, and accompanied by a completed form of assignment substantially in the form of Exhibit C hereto (or with respect to a Book-Entry Warrant, only such completed form of assignment substantially in the form of Exhibit C hereto), properly completed and duly executed by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Warrant Agent.  Upon any such registration of transfer, a new Global Warrant Certificate or a Warrant Statement, as the case may be, shall be issued to the transferee.

(vi) Notwithstanding anything to the contrary herein, no holder may sell, exchange, assign, pledge, encumber or otherwise transfer all or any portion of any New GMR Warrant if such transfer would result in warrants to purchase common stock of the Company being held of record by more than 200 Persons as determined pursuant to Section 12(g) of the Exchange Act, unless such transfer is expressly approved by the Board of Directors of the Company or unless the Company is at the time otherwise subject, or with the passage of time will be subject, to the reporting requirements of Section 13(a) or Section 15(d) of the Exchange Act.  Any transfer of any New GMR Warrant in violation of these provisions will be void *ab initio*.

Section 7.3    Fractional Warrants.  The Warrant Agent shall not be required to effect any registration of transfer or exchange which will result in the issuance of a warrant certificate for a fraction of a New GMR Warrant.

16

# ARTICLE VIII

## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF NEW GMR WARRANTS

Section 8.1    <u>No Rights or Liability as Stockholder; Notice to Registered Holders</u>. Nothing contained in the New GMR Warrants shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company. No provision thereof and no mere enumeration therein of the rights or privileges of the Holder shall give rise to any liability of such holder for the Exercise Price hereunder or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.  To the extent not covered by any statement delivered pursuant to <u>Section 5.2</u>, the Company shall give notice to Registered Holders by regular mail or press release if at any time prior to the expiration or exercise in full of the New GMR Warrants, any of the following events shall occur:

(a)    the Company shall authorize the payment of any dividend payable in any securities upon shares of New GMR Common Stock or authorize the making of any distribution (other than a regular quarterly cash dividend) to all holders of New GMR Common Stock;

(b)    the Company shall authorize the issuance to all holders of New GMR Common Stock of any additional shares of New GMR Common Stock or New GMR Common Stock Equivalents or of rights, options or warrants to subscribe for or purchase New GMR Common Stock or New GMR Common Stock Equivalents or of any other subscription rights, options or warrants;

(c)    a dissolution, liquidation or winding up of the Company shall be proposed; or

(d)    a capital reorganization or reclassification of the New GMR Common Stock (other than a subdivision or combination of the outstanding New GMR Common Stock and other than a change in the par value of the New GMR Common Stock) or any consolidation or merger of the Company with or into another corporation (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or change of New GMR Common Stock outstanding) or in the case of any sale or conveyance to another corporation or other entity of the property of the Company as an entirety or substantially as an entirety.

Such giving of notice shall be initiated at least ten (10) days prior to the date fixed as a record date or effective date or the date of closing of the Company's stock transfer books for the determination of the stockholders entitled to such dividend, distribution or subscription rights, or for the determination of the stockholders entitled to vote on such proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  Such notice shall specify such record date or the date of closing the stock transfer books, as the case may be.  Failure to provide such notice shall not affect the validity of any action taken in connection with such

17

dividend, distribution or subscription rights, or proposed merger, consolidation, sale, conveyance, dissolution, liquidation or winding up.  For the avoidance of doubt, no such notice shall supersede or limit any adjustment called for by Section 5.1 by reason of any event as to which notice is required by this Section.

Section 8.2    Lost, Stolen, Mutilated or Destroyed Global Warrant Certificates.  If any Global Warrant Certificate is lost, stolen, mutilated or destroyed, the Company shall issue, and the Warrant Agent shall countersign and, if provided with all necessary information and documents, deliver, in exchange and substitution for and upon cancellation of the mutilated Global Warrant Certificate, or in lieu of and substitution for the Global Warrant Certificate lost, stolen or destroyed, a new Global Warrant Certificate of like tenor and representing an equivalent number of New GMR Warrants, but only upon receipt of evidence and an affidavit reasonably satisfactory to the Company and the Warrant Agent of the loss, theft or destruction of such Global Warrant Certificate, and, if requested by either the Company or the Warrant Agent, a bond sufficient to indemnify the Company and the Warrant Agent against any claim that may be made against the Company or the Warrant Agent on account of the loss, theft, mutilation or destruction of any such Global Warrant Certificate or the issuance of such new certificate. Applicants for such substitute Global Warrant Certificates shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant Agent may prescribe and as required by Section 8-405 of the Uniform Commercial Code as in effect in the State of New York.

Section 8.3    No Restrictive Legends.  No legend shall be stamped or imprinted on any stock certificate for New GMR Common Stock issued upon the exercise of any New GMR Warrant and or stock certificate issued upon the direct or indirect transfer of any such New GMR Common Stock.

Section 8.4    Cancellation of New GMR Warrants.  If the Company shall purchase or otherwise acquire New GMR Warrants, the Global Warrant Certificates and the Book-Entry Warrants representing such purchased or acquired New GMR Warrants shall thereupon be delivered to the Warrant Agent, if applicable, to be cancelled by it and retired.  The Warrant Agent shall cancel all Global Warrant Certificates surrendered, and accepted, for exchange, substitution, transfer or exercise in whole or in part.  Such cancelled Global Warrant Certificates shall thereafter be disposed of in a manner satisfactory to the Company provided in writing to the Warrant Agent.

**ARTICLE IX**

**CONCERNING THE WARRANT AGENT AND OTHER MATTERS**

Section 9.1    Resignation, Consolidation or Merger of Warrant Agent.

(a)    *Appointment of Successor Warrant Agent*.  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving sixty (60) days' notice in writing to the Company.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent.  If

18

the Company shall fail to make such appointment within a period of sixty (60) days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by the Registered Holder of a New GMR Warrant (who shall, with such notice, submit his New GMR Warrant for inspection by the Company), then the Registered Holder of any New GMR Warrant may apply to the Supreme Court of the State of New York for the County of New York for the appointment of a successor Warrant Agent at the Company's cost.  Any successor Warrant Agent, whether appointed by the Company or by such court, shall be a Person organized and existing under the Laws of the United States of America, or any state thereunder, in good standing.  After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor Warrant Agent all the authority, powers, rights, immunities, duties and obligations of such predecessor Warrant Agent hereunder; and upon request of any successor Warrant Agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Warrant Agent all such authority, powers, rights, immunities, duties and obligations.

(b)     *Notice of Successor Warrant Agent*.  In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the New GMR Common Stock not later than the effective date of any such appointment, and (ii) cause written notice thereof to be delivered to each Registered Holder at such holder's address appearing on the Warrant Register.  Failure to give any notice provided for in this Section 9.1(b) or any defect therein shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(c)     *Merger, Consolidation or Name Change of Warrant Agent*.

(i)     Any Person into which the Warrant Agent may be merged or with which it may be consolidated or any Person resulting from any merger or consolidation to which the Warrant Agent shall be a party shall be the successor Warrant Agent under this Agreement, without any further act or deed, if such person would be eligible for appointment as a successor Warrant Agent under the provisions of Section 9.1(a).  If any of the Global Warrant Certificates have been countersigned but not delivered at the time such successor to the Warrant Agent succeeds under this Agreement, any such successor to the Warrant Agent may adopt the countersignature of any previous Warrant Agent; and if at that time any of the Global Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Global Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Global Warrant Certificates shall have the full force provided in the Global Warrant Certificates and in this Agreement.

(ii)     If at any time the name of the Warrant Agent is changed and at such time any of the Global Warrant Certificates have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name;

19

and if at that time any of the Global Warrant Certificates have not been countersigned, the Warrant Agent may countersign such Global Warrant Certificates either in its prior name or in its changed name; and in all such cases such Global Warrant Certificates shall have the full force provided in the Global Warrant Certificates and in this Agreement.

Section 9.2    Fees and Expenses of Warrant Agent.

(a)    *Remuneration*.  The Company agrees to pay the Warrant Agent reasonable remuneration for its services as Warrant Agent hereunder in accordance with Schedule A and will reimburse the Warrant Agent upon demand for all reasonable and documented out-of-pocket expenses (including reasonable counsel fees and expenses), taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent in connection with the negotiation, preparation, delivery, administration, execution, modification, waiver, delivery, enforcement or amendment of this of this Agreement and the exercise and performance of its duties hereunder.

(b)    *Further Assurances*.    The Company agrees to perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments, and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

Section 9.3    Duties of Warrant Agent.

(a)    *Liability*.

(i)    References to the Warrant Agent in this Section 9.3 shall include the Warrant Agent and its affiliates, principles, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals.  The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement, the Warrant Statements or in the Global Warrant Certificates (except, in each case, its countersignature thereof) or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the Company only. The Warrant Agent shall not be under any responsibility in respect of the validity or sufficiency of this Agreement or the execution and delivery hereof or in respect of the validity or execution of any Global Warrant Certificate (except, in each case, its countersignature thereof); nor shall the Warrant Agent be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Global Warrant Certificate to be complied with by the Company; nor shall the Warrant Agent be responsible for the making of any adjustment in the Exercise Price or the number of shares issuable upon the exercise of a New GMR Warrants required under the provisions of Article V or be responsible for the manner, method or amount of any such change or the ascertaining of the existence of facts that would require any such change; nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant Exercise Shares to be issued pursuant to this Agreement or any New GMR Warrant or as to whether any Warrant Exercise Shares will, when issued, be validly issued and fully paid and non-assessable.  The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Global Warrant Certificate authenticated by the Warrant Agent and delivered by it to the Company

20

pursuant to this Agreement or for the application by the Company of the proceeds of the issue and sale, or exercise, of the New GMR Warrants.

(ii)    The Warrant Agent shall have no liability under, and no duty to inquire as to, the provisions of any agreement, instrument or document other than this Agreement, including any Global Warrant Certificate.

(iii)    The Warrant Agent may rely on and shall incur no liability or responsibility to the Company, any Holder, or any other Person for any action taken, suffered or omitted to be taken by it upon any notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument furnished to the Warrant Agent hereunder and believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Warrant Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument. The Warrant Agent shall not take any instructions or directions except those given in accordance with this Agreement.

(iv)    The Warrant Agent shall act hereunder solely as agent for the Company and in a ministerial capacity and does not assume any obligation or relationship of agency or trust with any of the owners or holders of the New GMR Warrants, and its duties shall be determined solely by the provisions hereof. The Warrant Agent shall not be liable for any action taken, suffered or omitted to be taken in connection with this Agreement except to the extent that a court of competent jurisdiction determines that its own gross negligence, willful misconduct or bad faith (as each is determined by a final, nonappealable judgment) was the primary cause of any loss.

(v)    Anything in this Agreement to the contrary notwithstanding, in no event shall the Warrant Agent be liable for any special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of such loss or damage.  Any liability of the Warrant Agent under this Agreement shall be limited to the amount of annual fees paid by the Company to the Warrant Agent hereunder.

(vi)    All rights and obligations contained in this Section 9.3 shall survive the termination of this Agreement and the resignation, replacement, incapacity or removal of the Warrant Agent. All fees and expenses incurred by the Warrant Agent prior to the resignation, replacement, incapacity or removal of the Warrant Agent shall be paid by the Company in accordance with this Section 9.3 of this Agreement notwithstanding such resignation, replacement, incapacity or removal of the Warrant Agent.

(vii)    The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to the provisions of this Agreement.

(viii)    In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without

21

limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

(ix)   In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or any Holder or other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(b)   *Reliance on Company Statement*.   Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by the Chief Executive Officer or Chairman of the Board of Directors of the Company and delivered to the Warrant Agent.   The Warrant Agent may rely upon such statement for any action taken or suffered by it pursuant to the provisions of this Agreement. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing by the Warrant Agent of the provisions of this Agreement.

(c)   *Indemnity*.   The Company agrees to indemnify, defend, protect and save the Warrant Agent and hold it harmless from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses, including without limitation reasonable fees and disbursements of counsel, that may be imposed on, incurred by, or asserted against such Person, at any time, and in any way  relating to or arising out of or in connection with, directly or indirectly, the execution, delivery or performance of this Agreement, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of such Person; provided, however, that no such Person shall be entitled to be so indemnified, defended, protected, saved and kept harmless to the extent such loss was caused by its own gross negligence, bad faith or willful misconduct, as determined by a final judgment of a court of competent jurisdiction.   Notwithstanding the foregoing, the Company shall not be responsible for any settlement made without its written consent, which written consent shall not be unreasonably conditioned, withheld or delayed.

(d)   *Exclusions*.   The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any New GMR Warrant (except, in each case, its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any New GMR Warrant; nor shall it be responsible to make any adjustments required under the provisions of Article V hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by

22

any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any New GMR Common Stock to be issued pursuant to this Agreement or any New GMR Warrant or as to whether any New GMR Common Stock will, when issued, be valid and fully paid and nonassessable. The Warrant Agent will not be under any duty or responsibility to ensure compliance with any applicable federal or state securities laws in connection with the issuance, transfer or exchange of New GMR Warrants.

(e)     The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys, agents or employees or for any loss to the Company resulting from such neglect or misconduct, provided that the Warrant Agent acts without gross negligence, willful misconduct or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in connection with the selection of such attorneys, agents or employees.

(f)     The Warrant Agent may consult at any time with legal counsel satisfactory to it (who may be legal counsel for the Company) and the advice of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by such parties in accordance with such advice.

(g)     The Warrant Agent may buy, sell, or deal in any of the New GMR Warrants or other securities of the Company freely as though it was not Warrant Agent under this Agreement. Nothing contained herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person.

(h)     The Warrant Agent shall not be required to use or risk its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in the Warrant Agent's sole and absolute judgment, could involve it in expense or liability unless furnished with security and indemnity satisfactory to it.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

Section 10.1   Binding Effects; Benefits.   This Agreement shall inure to the benefit of and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns.   Nothing in this Agreement, expressed or implied, is intended to or shall confer on any person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 10.2   Notices.   Unless a provision herein permits notice by way of a press release, Any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail, by private national courier service (return receipt requested, postage prepaid), by personal delivery or by facsimile transmission.   Such

23

notice or communication shall be deemed given (a) if mailed, two days after the date of mailing, (b) if sent by national courier service, one Business Day after being sent, (c) if delivered personally, when so delivered, or (d) if sent by facsimile transmission, on the Business Day after such facsimile is transmitted, in each case as follows:

if to the Warrant Agent, to:

Computershare Shareowner Services LLC
480 Washington Boulevard, 29th Floor
Jersey City, New Jersey 07310
Facsimile: (201) 680-4606
Attention: Eliesee Guardiola

with copies (which shall not constitute notice) to:

Computershare Shareowner Services LLC
480 Washington Boulevard, 29th Floor
Jersey City, New Jersey 07310
Facsimile: (201) 680-4610
Attention: Legal Department

if to the Company, to:

General Maritime Corporation
299 Park Avenue
New York, New York 10171
Facsimile: (212) 763-5603
Attention: Jeffrey D. Pribor

with copies (which shall not constitute notice) to:

Oaktree Capital Management, L.P.
333 South Grand Ave., 28th Floor
Los Angeles, California 90071
Facsimile:  (213) 830-6300
Attention:     B. James Ford
               Adam Pierce

and

24

Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, California 90071
Facsimile: (213) 680-8500
Attention:      Damon R. Fisher

and

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8100
Attention:      Thomas E. Molner

if to Registered Holders, at their addresses as they appear in the Warrant Register or in the records of the transfer agent or registrar for the New GMR Common Stock.

Section 10.3    Persons Having Rights under this Agreement.  Nothing in this Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the Holders, any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof.  All covenants, conditions, stipulations, promises, and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto, their successors and assigns and the Holders.

Section 10.4    Examination of this Agreement.  A copy of this Agreement shall be available at all reasonable times at an office designated for such purpose by the Warrant Agent, for examination by the Holder of any New GMR Warrant.  Prior to such examination, the Warrant Agent may require any such holder to submit his New GMR Warrant for inspection by it.

Section 10.5    Counterparts.  This Agreement may be executed in any number of original or facsimile or electronic PDF counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 10.6    Effect of Headings.  The section headings herein are for convenience only and are not part of this Agreement and shall not affect the interpretation hereof.

Section 10.7    Amendments.

(a)      Subject to Section 10.7(b) below, this agreement may not be amended except in writing signed by both parties hereto.

(b)      The Company and the Warrant Agent may from time to time supplement or amend this Agreement or the New GMR Warrants (a) without the approval of any Holders in order to cure any ambiguity, manifest error or other mistake in this Agreement or the New GMR

25

Warrants, or to correct or supplement any provision contained herein or in the New GMR Warrants that may be defective or inconsistent with any other provision herein or in the New GMR Warrants, or to make any other provisions in regard to matters or questions arising hereunder that the Company may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holders or (b) with the prior written consent of holders of the New GMR Warrants exercisable for a majority of the New GMR Common Stock then issuable upon exercise of the New GMR Warrants then outstanding. Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an Appropriate Officer which states that the proposed supplement or amendment is in compliance with the terms of this Section 10.7, the Warrant Agent shall execute such supplement or amendment; provided, that the Warrant Agent may, but shall not be obligated to, execute any amendment or supplement that affects Warrant Agent's rights, duties, immunities, liabilities or obligations hereunder. Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 10.7 will be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent. In the event of any amendment, modification or waiver, the Company will give prompt notice thereof to all Registered Holders and, if appropriate, notation thereof will be made on all Global Warrant Certificates thereafter surrendered for registration of transfer or exchange.

Section 10.8   No Inconsistent Agreements; No Impairment. The Company will not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holders in the New GMR Warrants or the provisions hereof. The Company represents and warrants to the Holders that the rights granted hereunder do not in any way conflict with the rights granted to holders of the Company's securities under any other agreements. The Company will not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of the New GMR Warrants and in the taking of all such action as may be necessary in order to preserve the exercise rights of the Holders against impairment.

Section 10.9   Integration/Entire Agreement. This Agreement (and solely with respect to the Company and the Holders, the New GMR Warrants), is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company, the Warrant Agent and the Holders in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein, with respect to the New GMR Warrants. This Agreement and the New GMR Warrants supersede all prior agreements and understandings between the parties with respect to such subject matter.

Section 10.10 Governing Law, Etc. This Agreement and each New GMR Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of such State. Each party hereto consents and submits to the jurisdiction of the courts of the State of New York and of the federal courts of the Southern District of New York in connection with any action or proceeding brought against it that arises out of or in connection with, that is based upon, or that relates to this Agreement or the transactions contemplated hereby. In connection

26

with any such action or proceeding in any such court, each party hereto hereby waives personal service of any summons, complaint or other process and hereby agrees that service thereof may be made in accordance with the procedures for giving notice set forth in Section 10.2 hereof. Each party hereto hereby waives any objection to jurisdiction or venue in any such court in any such action or proceeding and agrees not to assert any defense based on forum *non conveniens* or lack of jurisdiction or venue in any such court in any such action or proceeding.

Section 10.11  Termination.  This Agreement will terminate on the earlier of (i) such date when all New GMR Warrants have been exercised, or (ii) the expiration of the Exercise Period. The provisions of Section 9.3 and this Article X shall survive such termination and the resignation, replacement or removal of the Warrant Agent.

Section 10.12  Waiver of Trial by Jury.  Each party hereto hereby irrevocably and unconditionally waives the right to a trial by jury in any action, suit, counterclaim or other proceeding (whether based on contract, tort or otherwise) arising out of, connected with or relating to this Agreement and the transactions contemplated hereby.

Section 10.13  Remedies.  The Company hereby agrees that, in the event that the Company violates any provisions of a New GMR Warrant (including the obligation to deliver shares of New GMR Common Stock upon the exercise thereof), the remedies at law available to the holder of such Warrant may be inadequate.  In such event, the Requisite Holders and, with the prior written consent of the Requisite Holders, the holder of such New GMR Warrant, shall have the right, in addition to all other rights and remedies any of them may have, to specific performance and/or injunctive or other equitable relief to enforce or prevent any violations by the Company of such New GMR Warrant and/or any other New GMR Warrants.

Section 10.14  Severability.  In the event that any one or more of the provisions contained herein or in the New GMR Warrants, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; provided, however, that if any such excluded provision shall adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to immediately resign.

Section 10.15 <u>Customer Identification Program</u>.  The Company acknowledges that the Warrant Agent is subject to the customer identification program ("<u>Customer Identification Program</u>") requirements under the USA PATRIOT Act and its implementing regulations, and that the Warrant Agent must obtain, verify and record information that allows the Warrant Agent to identify the Company.  Accordingly, prior to accepting an appointment hereunder, the Warrant Agent may request information from the Company that will help the Warrant Agent to identify the Company, including without limitation the Company's physical address, tax identification number, organizational documents, certificate of good standing, license to do business, or any other information that the Warrant Agent deems necessary.  The Company agrees that the Warrant Agent cannot accept an appointment hereunder unless and until the Warrant Agent verifies the Company's identity in accordance with the Customer Identification Program requirements.

**[**Signature Page Follows**]**

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

GENERAL MARITIME CORPORATION

By: _____
    Name:
    Title:

COMPUTERSHARE SHAREOWNER SERVICES LLC, as Warrant Agent

By: _____
    Name:
    Title:

**EXHIBIT A-1**

FORM OF FACE OF GLOBAL WARRANT CERTIFICATE

VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON [_____], 2017

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 7.1(a) of the Warrant Agreement, (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 7.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred to a successor Depositary with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of [_____] or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to [_____] or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, [_____], has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee, and transfers of portions of this Global Warrant Certificate shall be limited to transfers made in accordance with the restrictions set forth in Section 7 of the Warrant Agreement.

No registration or transfer of the securities issuable pursuant to the Warrant will be recorded on the books of the Company until such provisions have been complied with.

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE NEW GMR WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF [_____], 2012, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "UNDERLINE WARRANT AGREEMENT").

THIS NEW GMR WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON [_____], 2017

**WARRANT TO PURCHASE**

**[_____] SHARES OF NEW GMR COMMON STOCK OF**

**GENERAL MARITIME CORPORATION.**

CUSIP # [_____]
ISSUE DATE:  [_____], 2012

No. _____

This certifies that, for value received, _____, and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from General Maritime Corporation, a Marshall Islands corporation (the "Company"), subject to the terms and conditions hereof, at any time before 5:00 p.m., New York time, on [_____], 2017, the number of fully paid and non-assessable shares of New GMR Common Stock of the Company set forth above at the Exercise Price (as defined in the Warrant Agreement).  The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Exercise Price shall be $42.50.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

IN WITNESS WHEREOF, this Warrant has been duly executed by the Company under its corporate seal as of the ___ day of [_____], 2012.

GENERAL MARITIME CORPORATION

By: _____

Print Name: _____

Title: _____

Attest: _____
Secretary

Computershare Shareowner Services LLC,
as Warrant Agent

By: _____
   Name:
   Title:

Address of Registered Holder for Notices (until changed in accordance with this New GMR Warrant):

_____
_____
_____
_____
_____

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF.  SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

FORM OF REVERSE OF WARRANT

The New GMR Warrant evidenced by this Warrant Certificate is a part of a duly authorized issue of New GMR Warrants to purchase [_____] shares of New GMR Common Stock issued pursuant to that the Warrant Agreement, a copy of which may be inspected at the office of the Warrant Agent designated for such purpose.  The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the New GMR Warrants.  All capitalized terms used on the face of this New GMR Warrant herein but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Upon due presentment for registration of transfer of the New GMR Warrant at the office of the Warrant Agent designated for such purpose, a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like number of New GMR Warrants shall be issued to the transferee in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement, without charge except for any applicable tax or other governmental charge.

The Company shall not be required to issue fractions of New GMR Common Stock or any certificates that evidence fractional New GMR Common Stock.

No New GMR Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This New GMR Warrant does not entitle the Registered Holder to any of the rights of a stockholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**EXHIBIT A-2**

FORM OF WARRANT STATEMENT

[Warrant Agent to provide form]

## EXERCISE FORM FOR REGISTERED HOLDERS
## HOLDING BOOK-ENTRY WARRANTS

(To be executed upon exercise of New GMR Warrant)

The undersigned hereby irrevocably elects to exercise the right, represented by the Book-Entry Warrants, to purchase New GMR Common Stock and (check one):

☐        herewith tenders this New GMR Warrant for _____ New GMR Common Stock pursuant to the net issuance exercise provisions of Section 4.5 of the Warrant Agreement.  This exercise and election shall ☐ be immediately effective or ☐ shall be effective as of 5:00 pm. Eastern Time, on **[insert date]**.

The undersigned requests that [a statement representing] the New GMR Common Stock be delivered as follows:

Name        _____

Address     _____

            _____

Delivery Address (if different)

            _____

            _____

If said number of shares shall not be all the shares purchasable under the within Warrant Certificate, the undersigned requests that a new Book-Entry Warrant representing the balance of such New GMR Warrants shall be registered, with the appropriate Warrant Statement delivered as follows:

Name        _____

Address     _____

            _____

Delivery Address (if different)

            _____

            _____

_____
Social Security or Other Taxpayer
Identification Number of Holder

Signature _____

Note: If the statement representing the New GMR Common Stock or any Book-Entry Warrants representing New GMR Warrants not exercised is to be registered in a name other than that in which the Book-Entry Warrants are registered, the signature of the holder hereof must be guaranteed.

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's Warrant Agent.

Countersigned:
Dated: [_____], 2012

Computershare Shareowner Services LLC,
as Warrant Agent

Signature _____
                    Authorized Signatory

**EXHIBIT B-2**

EXERCISE FORM FOR BENEFICIAL HOLDERS
HOLDING NEW GMR WARRANTS THROUGH THE DEPOSITORY TRUST COMPANY

TO BE COMPLETED BY DIRECT PARTICIPANT
IN THE DEPOSITORY TRUST COMPANY

(To be executed upon exercise of New GMR Warrant)

The undersigned hereby irrevocably elects to exercise the right, represented by _____ New GMR Warrants held for its benefit through the book-entry facilities of The Depository Trust Company (the "Depositary"), to purchase New GMR Common Stock and (check one):

☐ herewith tenders this New GMR Warrant for _____ New GMR Common Stock pursuant to the net issuance exercise provisions of Section 4.5 of the Warrant Agreement.  This exercise and election shall ☐ be immediately effective or ☐ shall be effective as of 5:00 pm., Eastern Time, on **[insert date]**.

The undersigned requests that the New GMR Common Stock issuable upon exercise of the New GMR Warrants be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below; provided, that if the New GMR Common Stock are evidenced by global securities, the New GMR Common Stock shall be registered in the name of the Depositary or its nominee.

Dated:

NOTE:  THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., EASTERN TIME, ON THE EXPIRATION DATE.  THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITARY TO WHICH YOU MUST DELIVER YOUR NEW GMR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.  NAME OF DIRECT PARTICIPANT IN THE DEPOSITARY:

(PLEASE PRINT)

ADDRESS:

CONTACT NAME:

ADDRESS:

TELEPHONE (INCLUDING INTERNATIONAL CODE):

FAX (INCLUDING INTERNATIONAL CODE):

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

ACCOUNT FROM WHICH NEW GMR WARRANTS ARE BEING DELIVERED:

DEPOSITARY ACCOUNT NO.

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE".  WARRANT HOLDER DELIVERING NEW GMR

WARRANTS, IF OTHER THAN THE DIRECT DEPOSITARY PARTICIPANT DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
         (PLEASE PRINT)

 CONTACT NAME:

TELEPHONE (INCLUDING INTERNATIONAL CODE):

FAX (INCLUDING INTERNATIONAL CODE):

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

ACCOUNT TO WHICH THE SHARES OF NEW GMR COMMON STOCK ARE TO BE CREDITED:

DEPOSITARY ACCOUNT NO.

FILL IN FOR DELIVERY OF THE NEW GMR COMMON STOCK, IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____
         (PLEASE PRINT)

ADDRESS: _____

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

FAX (INCLUDING INTERNATIONAL CODE): _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE): _____

NUMBER OF NEW GMR WARRANTS BEING EXERCISED: _____
(ONLY ONE EXERCISE PER NEW GMR WARRANT EXERCISE NOTICE)


Signature: _____

Name: _____

Capacity in which Signing: _____

SIGNATURE GUARANTEED BY: _____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's Warrant Agent.

**EXHIBIT C**

FORM OF ASSIGNMENT

(To be executed only upon assignment of New GMR Warrant)

For value received, _____ hereby sells, assigns and transfers unto the Assignee(s) named below the rights represented by such New GMR Warrant to purchase number of New GMR Common Stock listed opposite the respective name(s) of the Assignee(s) named below and all other rights of the Registered Holder under the within New GMR Warrant, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said New GMR Warrant on the books of the within-named Company with respect to the number of New GMR Common Stock set forth below, with full power of substitution in the premises:

| Name(s) of Assignee(s) | Address | No. of New GMR Common Stock |
|---|---|---|
| | | |

And if said number of New GMR Common Stock shall not be all the New GMR Common Stock represented by the New GMR Warrant, a new New GMR Warrant is to be issued in the name of said undersigned for the balance remaining of the New GMR Common Stock registered by said New GMR Warrant.

Dated:          , 20__          Signature _____

Note:   The above signature should correspond exactly with the name on the face of this New GMR Warrant

**Schedule A**

# EXHIBIT 8

**Officers and Directors of the Reorganized Debtors**

## <u>Members of the New Board</u>

Set forth below is biographical information regarding the New Board upon the Effective Date.[1]  As of the Effective Date, the Board of Directors will not receive any Cash consideration for service on the New Board.

*Jim Ford*, 43, is a Managing Director of Oaktree Capital Management, L.P. and Co-Portfolio Manager of Oaktree's Global Principal Strategy. Since joining Oaktree in 1996, Mr. Ford has been involved in sourcing and executing a number of the firm's most significant investments and led the groups' efforts in media and energy sectors.  Before being named a portfolio manager in 2006, Mr. Ford worked extensively with a variety of Oaktree portfolio companies, including serving on the Boards of Directors of Cequel Communications (the eighth largest cable operator in the U.S.); Crimson Exploration, Exco Resources and Forcenergy, Inc. (oil and gas exploration and production companies); and Regal Entertainment (the largest movie exhibitor in the U.S.); as well as numerous private companies. Before joining Oaktree, Mr. Ford worked at McKinsey & Co. and was an Analyst in the Investment Banking Division of PaineWebber Incorporated.  Mr. Ford serves as an active member of the Boards of Directors of the Children's Bureau and Dial Global, Inc.  Mr. Ford earned a B.A. in Economics from the University of California at Los Angeles and an M.B.A. from the Stanford University Graduate School of Business.

*Peter C. Georgiopoulos*, 51, is the founder and Chairman of General Maritime Corporation.  Previously, Mr. Georgiopoulos was the principal of Maritime Equity Management a ship-owning and investment company that he founded from 1991 to 1997.  From 1990 to 1991, Mr. Georgiopoulos was employed at Mallory Jones Lynch & Associates, an oil tanker brokerage firm.  Mr. Georgiopoulos was an investment banker at Drexel Burnham Lambert from 1987 to 1990.  Before entering the investment banking business, Mr. Georgiopoulos had extensive experience in the sale, purchase and chartering of vessels while working for ship-owners in New York, New York and Piraeus, Greece.  Mr. Georgiopoulos is a member of the American Bureau of Shipping.  Mr. Georgiopoulos holds an M.B.A. from Dartmouth College.

*Adam Pierce*, 33, is a Senior Vice President of Oaktree Capital Management, L.P. Before joining Oaktree in 2003, Mr. Pierce served as a Financial Analyst in the Investment Bank at JP Morgan Chase & Co., gaining experience on a range of advisory and financing assignments with a primary focus on the healthcare industry.  Prior thereto, he worked for Goldman, Sachs & Co.  Mr. Pierce received a B.A. in Economics with a focus on Business Administration from Vanderbilt University.

*Amy Rice*, 32, is a Vice President of Oaktree Capital Management, L.P.  Ms. Rice joined Oaktree in 2009 following graduation from the Wharton School of the University of Pennsylvania, where she was a Palmer Scholar.  Before receiving her M.B.A., Ms. Rice spent two years as an Associate at Lindsay Goldberg, LLC, where her responsibilities included valuation and financial modeling of LBOs, operational restructuring and divestiture transactions.

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Second Amended Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 400] (as may be amended from time to time, the "**Plan**").

Before that, she spent two years as an Analyst in the Leveraged Finance group at Deutsche Bank. Ms. Rice holds an A.B. in Biology *magna cum laude* with highest honors from Harvard College.

*John P. Tavlarios*, 50, is President and Chief Executive Officer of General Maritime Corporation and has served in that role since December 2008.  From December 2002 to December 2008 Mr. Tavlarios served as President and CEO of General Maritime Management LLC. From May 2001 to December 2002 Mr. Tavlarios served as the President and Chief Operating Officer of General Maritime Corporation. From General Maritime's inception in 1997 to January 2000, Mr. Tavlarios served as Executive Vice President. From 1995 to 1997, Mr. Tavlarios was affiliated with Maritime Equity Management, where he served as Director of Maritime Operations. From 1992 to 1995 Mr. Tavlarios was President and founder of Halcyon Trading Company, a consulting firm specializing in international business development with a particular emphasis on the international oil industry. From 1984 to 1992, Mr. Tavlarios was employed at Mobil Oil Corporation spending most of his tenure in the Marine Operations and the Marketing and Refining divisions. Before 1984, Mr. Tavlarios was involved in his family's shipping business, assisting in marine operations. Mr. Tavlarios is a member of the American Bureau of Shipping, the Det Norske Veritas North American Committee, the Aegean Marine Petroleum Network Board of Directors, the SKULD Board of Directors, Board of Trustees of the Seaman's Church Institute and the North American Panel of Intertanko. John P. Tavlarios holds an MBA from St. Johns University.

## Officers and Directors of Each of the Reorganized Debtors

| Exact Name of Debtor Entity | State or Other Jurisdiction of Incorporation or Organization | Directors/Managers | Officers |
|---|---|---|---|
| General Maritime Corporation[2] | Marshall Islands | See previous page. | John Tavlarios – President and Chief Executive Officer<br><br>Jeffrey D. Pribor – Executive Vice President and Chief Financial Officer<br><br>Leonidas J. Vrondissis – Executive Vice President, Treasurer, and Secretary |
| General Maritime Subsidiary Corporation | Marshall Islands | Directors:<br>Jeffrey D. Pribor<br><br>Leonidas J. Vrondissis | Jeffrey D. Pribor – President<br><br>Leonidas J. Vrondissis – Treasurer<br><br>Brian Kerr – Secretary |
| General Maritime Management LLC | Marshall Islands | Managers / Directors:<br>Milton H. Gonzales Jr., Manager and Technical Director<br><br>Sean Bradley | No designated officers; managers / directors only |
| GMR Administration Corp. **(Inactive)** | Marshall Islands | Directors:<br>Jeffrey D. Pribor<br><br>Leonidas J. Vrondissis<br><br>John P. Tavlarios | Jeffrey D. Pribor – Vice President and Treasurer<br><br>Leonidas J. Vrondissis – Vice President and Secretary<br><br>John P. Tavlarios – President |
| GMR Agamemnon LLC | Liberia | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Ajax LLC | Liberia | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |

---

[2] Compensation of the Officers of the Reorganized Debtors shall be set forth in a supplement to the Plan Supplement to be filed before the Confirmation Hearing.

- 3 -

| Exact Name of Debtor Entity | State or Other Jurisdiction of Incorporation or Organization | Directors/Managers | Officers |
|---|---|---|---|
| GMR Alexandra LLC | Marshall Islands | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Argus LLC | Marshall Islands | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Chartering LLC **(Inactive)** | United States (New York) | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Constantine LLC | Liberia | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Daphne LLC | Marshall Islands | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Defiance LLC | Liberia | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Elektra LLC | Marshall Islands | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR George T LLC | Marshall Islands | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR GP LLC **(Inactive)** | Marshall Islands | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |

| Exact Name of Debtor Entity | State or Other Jurisdiction of Incorporation or Organization | Directors/Managers | Officers |
|---|---|---|---|
| GMR Gulf LLC | Marshall Islands | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |
| GMR Harriet G. LLC | Liberia | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |
| GMR Hope LLC | Marshall Islands | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |
| GMR Horn LLC | Marshall Islands | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |
| GMR Kara G LLC | Liberia | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |
| GMR Limited LLC (Inactive) | Marshall Islands | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |
| GMR Minotaur LLC | Liberia | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |
| GMR Orion LLC | Marshall Islands | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |
| GMR Phoenix LLC | Marshall Islands | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |

| Exact Name of Debtor Entity | State or Other Jurisdiction of Incorporation or Organization | Directors/Managers | Officers |
|---|---|---|---|
| GMR Princess LLC | Liberia | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Progress LLC | Liberia | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Revenge LLC | Liberia | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR St. Nikolas LLC | Marshall Islands | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Spyridon LLC | Marshall Islands | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Star LLC **(Inactive)** | Liberia | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Strength LLC | Liberia | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Trader LLC **(Inactive)** | Liberia | Managers:<br>Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |

| Exact Name of Debtor Entity | State or Other Jurisdiction of Incorporation or Organization | Directors/Managers | Officers |
|---|---|---|---|
| GMR Trust LLC **(Inactive)** | Liberia | Managers: Dean Scaglione Brian Kerr | No designated officers; managers only |
| Arlington Tankers Ltd. [3] | Bermuda | Directors: Jeffrey D. Pribor Leonidas J. Vrondissis | Jeffrey D. Pribor – Chairman, President and Chief Financial Officer Leonidas J. Vrondissis – Deputy Chairman and Vice President Brian Kerr – Treasurer W. Forster Darling – Secretary and Resident Representative |
| Vision Ltd. | Bermuda | Directors: Dean Scaglione Brian D. Kerr | Dean Scaglione – President Brian Kerr – Vice President and Treasurer W. Forster Darling – Secretary and Resident Representative |
| Victory Ltd. | Bermuda | Directors: Dean Scaglione Brian D. Kerr | Dean Scaglione – President Brian Kerr – Vice President and Treasurer W. Forster Darling – Secretary and Resident Representative |
| Companion Ltd. | Bermuda | Directors: Dean Scaglione Brian D. Kerr | Dean Scaglione – President Brian Kerr – Vice President and Treasurer W. Forster Darling – Secretary and Resident Representative |

---

[3] In Bermuda, directors (as opposed to officers) sign documents.

| Exact Name of Debtor Entity | State or Other Jurisdiction of Incorporation or Organization | Directors/Managers | Officers |
|---|---|---|---|
| Compatriot Ltd. | Bermuda | Directors:<br>Dean Scaglione<br><br>Brian D. Kerr | Dean Scaglione – President<br><br>Brian Kerr – Vice President and Treasurer<br><br>W. Forster Darling – Secretary and Resident Representative |
| Concord Ltd.<br>**(Inactive)** | Bermuda | Directors:<br>Dean Scaglione<br><br>Brian D. Kerr | Dean Scaglione – President<br><br>Brian Kerr – Vice President and Treasurer<br><br>W. Forster Darling – Secretary and Resident Representative |
| Consul Ltd. | Bermuda | Directors:<br>Dean Scaglione<br><br>Brian D. Kerr | Dean Scaglione – President<br><br>Brian Kerr – Vice President and Treasurer<br><br>W. Forster Darling – Secretary and Resident Representative |
| Concept Ltd.<br>**(Inactive)** | Bermuda | Directors:<br>Dean Scaglione<br><br>Brian D. Kerr | Dean Scaglione – President<br><br>Brian Kerr – Vice President and Treasurer<br><br>W. Forster Darling – Secretary and Resident Representative |
| Contest Ltd.<br>**(Inactive)** | Bermuda | Directors:<br>Dean Scaglione<br><br>Brian D. Kerr | Dean Scaglione – President<br><br>Brian Kerr – Vice President and Treasurer<br><br>W. Forster Darling – Secretary and Resident Representative |
| Arlington Tankers, LLC<br>**(Inactive)** | Delaware | Managed by Sole Member, Arlington Tankers, Ltd. | Dean Scaglione – President and Secretary<br><br>Brian Kerr – Vice President and Treasurer<br><br>Arlington Tankers, Ltd. – Member |
| General Maritime Subsidiary II Corporation | Marshall Islands | Directors:<br>Jeffrey D. Pribor<br><br>Leonidas J. Vrondissis | Jeffrey D. Pribor – President<br><br>Leonidas J. Vrondissis – Treasurer<br><br>Brian Kerr – Secretary |

| Exact Name of Debtor Entity | State or Other Jurisdiction of Incorporation or Organization | Directors/Managers | Officers |
|---|---|---|---|
| GMR Zeus LLC | Marshall Islands | Managers: Dean Scaglione / Brian Kerr | No designated officers; managers only |
| GMR Maniate LLC | Marshall Islands | Managers: Dean Scaglione / Brian Kerr | No designated officers; managers only |
| GMR Spartiate LLC | Marshall Islands | Managers: Dean Scaglione / Brian Kerr | No designated officers; managers only |
| GMR Ulysses LLC | Marshall Islands | Managers: Dean Scaglione / Brian Kerr | No designated officers; managers only |
| GMR Atlas LLC | Marshall Islands | Managers: Dean Scaglione / Brian Kerr | No designated officers; managers only |
| GMR Hercules LLC | Marshall Islands | Managers: Dean Scaglione / Brian Kerr | No designated officers; managers only |
| GMR Poseidon LLC | Marshall Islands | Managers: Dean Scaglione / Brian Kerr | No designated officers; managers only |
| General Maritime Investments LLC **(Inactive)** | Marshall Islands | Managers: Dean Scaglione / Brian Kerr | No designated officers; managers only |
| General Product Carriers Corporation **(Inactive)** | Marshall Islands | Directors: Jeffrey D. Pribor / Leonidas J. Vrondissis | Jeffrey D. Pribor – President / Leonidas J. Vrondissis – Treasurer / Brian Kerr – Secretary |

| Exact Name of Debtor Entity | State or Other Jurisdiction of Incorporation or Organization | Directors/Managers | Officers |
|---|---|---|---|
| GMR Concord LLC | Marshall Islands | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Contest LLC | Marshall Islands | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| GMR Concept LLC | Marshall Islands | Managers: Dean Scaglione<br><br>Brian Kerr | No designated officers; managers only |
| General Maritime Subsidiary NSF Corporation | Marshall Islands | Directors: Jeffrey D. Pribor<br><br>Leonidas J. Vrondissis | Jeffrey D. Pribor – President<br><br>Leonidas J. Vrondissis – Treasurer and Secretary |

**EXHIBIT 9**

**Summary of Restructuring Transactions**

## **Summary of Restructuring Transactions**

NONE

# EXHIBIT 10

**List of Retained Causes of Action**

<u>**List of Retained Causes of Action**</u>

The following list remains subject to further revision. The Debtors expressly reserve the right to alter, modify, amend, remove, augment or supplement the following list at any time in accordance with the Plan (as defined below).

Article VI.F of the *Second Amended Joint Plan of Reorganization of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 400] (as may be amended, the "**Plan**") provides as follows:[1]

*Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, and except as expressly provided herein (including Article VI.J.1) and in paragraph G(vi) and (vii) of the DIP Financing Order, the Reorganized Debtors shall retain all Causes of Action, including those Causes of Action listed as retained Causes of Action on an exhibit to the Plan Supplement.  Nothing contained in this Plan, the Plan Supplement or the Confirmation Order shall be deemed a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense of the Debtors that is not specifically waived or relinquished by this Plan.  The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors had immediately before the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any claim that is not specifically waived or relinquished by this Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Person.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, in accordance with the Plan.  From and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Court.

Notwithstanding and without limiting the generality of Article VI.F of the Plan, the Debtors have identified below certain specific Causes of Action, including (a) claims related to contracts and leases; (b) claims related to pending and possible litigation; and (c) claims related to accounts receivable and accounts payable.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

## Claims Related to Contracts and Leases

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all contracts and leases to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or lease is specifically identified herein. The claims and Causes of Action reserved include Causes of Action against charterers, vendors, suppliers of goods and services, financial institutions or any other parties: (a) for overpayments, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment or setoff; (b) for breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors or Reorganized Debtors; (d) for payments, back charges, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, service provider, lessor or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory or statutory liens held by any one or more of the Debtors or Reorganized Debtors; (f) arising out of environmental or contaminant exposure matters against owners, landlords, lessors, lessees, environmental consultants or contractors, environmental or other governmental agencies or suppliers of environmental services or goods, including any solid or hazardous waste haulers, transporters or arrangers; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) for unfair competition, interference with contract or potential business advantage, infringement of intellectual property or any tort claims; (j) for demurrage claims due from charterers' and (k) for any claims against the Debtors' or Reorganized Debtors' insurance carriers, including for payments or other amounts owed by such insurance carrier.

**Claims, Defenses, Cross-Claims and
<u>Counter-Claims Related to Litigation and Possible Litigation</u>**

The Debtors are party to or believe they may become party to litigation, arbitration or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial. Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all entities that are party to or that may in the future become party to litigation, arbitration or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial.

### Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors regardless of whether such entity is explicitly identified in this Plan Supplement and any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all entities that assert or may assert that the Debtors or Reorganized Debtors owe money to them.

# <u>EXHIBIT 11</u>

**Material Terms of the Equity Incentive Program**

## Summary of the Material Terms of the Equity Incentive Program

As of April 16, 2012, the parties have not agreed to the material terms of the Equity Incentive Program.[1] To the extent agreed to in accordance with Article V.E of the Plan prior to the Confirmation Hearing, the material terms of the Equity Incentive Program will be filed in advance of the Confirmation Hearing.

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Second Amended Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 400] (as may be amended from time to time, the "**Plan**").

# **EXHIBIT 12**

## **New Management Agreements**

### New Management Agreements

As of April 16, 2012, there are no New Management Agreements.[1] The New Management Agreements, if any, will be filed in advance of the Confirmation Hearing.

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Second Amended Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 400] (as may be amended from time to time, the "**Plan**").

## EXHIBIT 13

**Registration Rights Agreement**

## REGISTRATION AGREEMENT

THIS REGISTRATION AGREEMENT (this "Agreement") dated as of [_____] is made by and among (i) General Maritime Corporation, a Marshall Islands corporation (the "Company"), (ii) OCM Marine Holdings TP, L.P., a Cayman Islands exempted limited partnership, and OCM Marine Investments CTB, Ltd., a Cayman Islands exempt company (together, "Oaktree"), (iii) each of the other Persons identified as an "Other Shareholder" on the signature pages hereto (the "Other Shareholder"), and (iv) each other Person who, at any time, acquires securities of the Company and, with the consent of Oaktree, executes a counterpart of this Agreement or otherwise agrees to be bound by this Agreement (collectively, with Oaktree and the Other Shareholders, the "Shareholders").

The Company and the Oaktree Funds are party to an Equity Purchase Agreement dated December 15, 2011, as amended by the First Amendment thereto dated March 26, 2012 (as so amended, the "EPA"), pursuant to which the Oaktree Funds have agreed to make an equity investment in the Company of up to $175 million (the "Equity Investment") through Oaktree.

Pursuant to the terms of the Company's Second Amended Joint Plan of Reorganization, dated [_____], 2012, (i) certain claims held by OCM Marine Investments CTB, Ltd. were converted into common equity securities of the Company (the "Conversion"), and (ii) the Oaktree Funds have made the Equity Investment, and (iii) certain claims held by certain unsecured creditors of the Company (other than Oaktree and its Affiliates) will be converted into Common Stock and Warrants to purchase Common Stock of the Company.  Those recipients described in clause (iii) of the foregoing sentence who receive at least 0.15% of the outstanding Common Stock on a fully diluted basis (i.e., assuming for the purpose of such calculation the exercise or conversion by such other Shareholder and all other Persons of all outstanding warrants, options and other Equity Securities exercisable or convertible into Common Stock of the Company) shall be deemed to join this Agreement as an Other Shareholder concurrently with the receipt of such Common Stock and Warrants.

In order to induce Oaktree, the Oaktree Funds and the Other Shareholders to consummate the transactions contemplated by the EPA and the Conversion, the Company has agreed to provide the registration rights set forth in this Agreement.

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.      Demand Registrations.

(a)      Requests for Registration.  At any time and from time to time, the holders of a majority of the Oaktree Registrable Securities may request registration under the Securities Act of all or part of their Registrable Securities on Form S-1 or any similar long-form registration ("Long-Form Registrations") or, if available, on Form S-3 (including pursuant to Rule 415 under the Securities Act) or any similar short-form registration ("Short-Form Registrations").  All registrations requested pursuant to this Section 1(a) are referred to herein as "Demand Registrations."  Each request for a Demand Registration shall specify the approximate number of Registrable Securities requested to be registered and the anticipated per share price

range for such offering.  Within five (5) days after receipt of any such request, the Company shall give written notice of such requested registration to all other holders of Registrable Securities and, subject to Section 1(d), will include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein from such Persons within ten (10) Business Days after the receipt of the Company's notice.

(b)      Long-Form Registrations.  (i) The holders of a majority of the Oaktree Registrable Securities shall be entitled to request an unlimited number of Long-Form Registrations, in which the Company shall pay all Registration Expenses (as defined below in Section 5).  All Long-Form Registrations shall be underwritten registrations, unless otherwise agreed to by the holders of a majority of the Oaktree Registrable Securities included in such registration.

(c)      Short-Form Registrations.  (i) In addition to the Long-Form Registrations provided pursuant to Section 1(b), the holders of a majority of the Oaktree Registrable Securities shall be entitled to request an unlimited number of Short-Form Registrations, in which the Company shall pay all Registration Expenses.  Demand Registrations will be Short-Form Registrations whenever the Company is permitted to use any applicable short form.  After the Company has become subject to the reporting requirements of the Securities Exchange Act, the Company shall use its best efforts to make Short-Form Registrations on Form S-3 available for the sale of Registrable Securities.  All Short-Form Registrations shall be underwritten registrations, unless otherwise agreed to by the holders of a majority of the Oaktree Registrable Securities included in such registration.  If the Company, pursuant to the request of the holder(s) of a majority of the Oaktree Registrable Securities, is qualified to and has filed with the Securities and Exchange Commission a registration statement under the Securities Act on Form S-3 pursuant to Rule 415 under the Securities Act (the "Required Registration"), then the Company shall use reasonable best efforts to cause the Required Registration to be declared effective under the Securities Act as soon as practicable after filing, and, once effective, the Company shall cause such Required Registration to remain effective until the date on which all Oaktree Registrable Securities included in such registration have been sold pursuant to the Required Registration.

(d)      Priority on Demand Registrations.  The Company shall not include in any Demand Registration any securities which are not Registrable Securities without the prior written consent of the holders of a majority of the Oaktree Registrable Securities included in such registration.  If a Demand Registration is an underwritten offering and the managing underwriters advise the Company in writing that, in their opinion, the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such offering exceeds the number of Registrable Securities and other securities, if any, which can be sold in an orderly manner in such offering within the price range acceptable to the holders of a majority of the Oaktree Registrable Securities initially requesting such registration, the Company will include in such registration, (i) first, the Registrable Securities requested to be included in such registration that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the respective holders thereof on the basis of the number of Registrable Securities owned by each such holder, and (ii) second, other securities requested (and permitted) to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the

2

holders of such securities on the basis of the number of such securities owned by each such holder.

(e)   Restrictions on Demand Registrations.   The Company shall not be obligated to effect any Long Form Registration within 90 days after the effective date of a previous Long Form Registration or a previous registration in which holders of Registrable Securities were given piggyback rights pursuant to Section 2 and in which there was no reduction in the number of Registrable Securities requested to be included.  The Company may postpone for up to six (6) months the filing or the effectiveness of a registration statement for a Demand Registration if the Company and the holders of a majority of the Oaktree Registrable Securities agree that such Demand Registration would reasonably be expected to have a material adverse effect on any proposal or plan by the Company or any of its Subsidiaries to acquire financing, engage in any acquisition of assets (other than in the ordinary course of business) or engage in any merger, consolidation, tender offer, reorganization or similar transaction; provided that, in such event, the Company shall pay all Registration Expenses in connection with such registration.  The Company may delay a Demand Registration hereunder only once in any twelve-month period.

(f)   Selection of Underwriters.   The holders of a majority of the Oaktree Registrable Securities included in any Demand Registration, shall have the right to select the investment banker(s) and managing underwriter(s) to administer the offering.

2.   Piggyback Registrations.

(a)   Right to Piggyback.  Whenever the Company proposes to register any of its equity securities (including any proposed registration of the Company's securities by any third party) under the Securities Act (other than (i) pursuant to a Demand Registration, which is governed by Section 1, (ii) pursuant to a registration on Form S-4 or S-8 or any successor or similar forms, or (iii) in connection with the Company's initial public offering of equity securities), whether or not for sale for its own account, and the registration form to be used may be used for the registration of Registrable Securities (a "Piggyback Registration"), the Company shall give prompt written notice to all holders of Registrable Securities holding at least 0.15% of the outstanding Common Stock of the Company on a fully diluted basis of its intention to effect such a registration and, subject to Section 2(c) and Section 2(d), will include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein from such Persons within ten (10) Business Days after the receipt of the Company's notice.

(b)   Piggyback Expenses.  The Registration Expenses of the holders of such Registrable Securities shall be paid by the Company in all Piggyback Registrations.

(c)   Priority on Primary Registrations.  If a Piggyback Registration is an underwritten primary registration on behalf of the Company, and the managing underwriters advise the Company in writing that in their opinion the number of securities requested to be included in such offering exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the Company, then the Company shall include in such registration (i) first, the securities the Company proposes to sell that, in the opinion of such

3

underwriters, can be sold in an orderly manner within such price range, (ii) <u>second</u>, the Registrable Securities requested to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the respective holders thereof on the basis of the number of Registrable Securities owned by each such holder, and (iii) <u>third</u>, other securities requested (and permitted) to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the holders of such securities on the basis of the number of such securities owned by each such holder.

(d)     <u>Priority on Secondary Registrations</u>.  If  a Piggyback Registration is an underwritten secondary registration on behalf of holders of the Company's securities other than holders of Registrable Securities (it being understood that secondary registrations on behalf of holders of Oaktree Registrable Securities are addressed in <u>Section</u> 1 rather than this <u>Section</u> <u>2(d))</u>, and the managing underwriters advise the Company in writing that, in their opinion, the number of securities requested to be included in such registration exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the holders of a majority of the securities initially requested to be included in such registration, then the Company shall include in such registration (i) <u>first</u>, the securities requested to be included therein by the holders requesting such registration and the Registrable Securities requested to be included in such registration pursuant to this Section 2, in each case that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the holders of such securities and the holders of such Registrable Securities on the basis of the number of securities owned by each such holder, and (ii) <u>second</u>, other securities requested (and permitted) to be included in such registration, if any, that, in the opinion of such underwriters, can be sold in an orderly manner within such price range, pro rata among the holders of such securities on the basis of the number of such securities owned by each such holder.

(e)     <u>Other Registrations</u>.  If the Company has previously filed a registration statement with respect to Registrable Securities pursuant to <u>Section</u> 1 or pursuant to this <u>Section</u> 2, and if such previous registration has not been withdrawn or abandoned, then, unless such previous registration statement is a Required Registration, the Company shall not file or cause to be effected any other registration of any of its equity securities or securities convertible or exchangeable into or exercisable for its equity securities under the Securities Act (except on Form S-4 or S-8 or any successor form), whether on its own behalf or at the request of any holder or holders of such securities, until a period of at least six (6) months has elapsed from the effective date of such previous registration.

3.     <u>Holdback Agreements.</u>

(a)     Each holder of Registrable Securities agrees that in connection with the Company's initial public offering and any Demand Registration or Piggyback Registration that is an underwritten public offering of the Company's equity securities, he, she or it shall not (i) offer, sell, contract to sell, pledge or otherwise dispose of (including sales pursuant to Rule 144), directly or indirectly, any equity securities of the Company ("<u>Securities</u>") (including Securities which may be deemed to be owned beneficially by such holder in accordance with the rules and regulations of the Securities and Exchange Commission), or any securities, options, or rights convertible into or exchangeable or exercisable for Securities ("<u>Other Securities</u>"), (ii) enter into

4

a transaction which would have the same effect as described in clause (i) of this Section 3(a), (iii) enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences or ownership of any Securities or Other Securities, whether such transaction is to be settled by delivery of such Securities, Other Securities, in cash or otherwise, or (iv) publicly disclose the intention to enter into any transaction described in (i), (ii) or (iii) above, from the date on which the Company gives notice to the holders of Registrable Securities that a preliminary prospectus has been circulated for the underwritten public offering to the date that is (x) in the case of the initial public offering, 180 days following the date of the final prospectus for such initial public offering, or (y) in the case of any other underwritten public offering, 90 days (subject to any customary extension requested by the underwriters) following the date of the final prospectus for such public offering (or, in the case of clause (x) or (y), such shorter period as the Board of Directors of the Company may determine in its sole discretion or as may be agreed to by the underwriters designated as "book-runners" managing such public offering) (such period, the "Holdback Period").  If (1) the Company issues an earnings release or other material news or a material event relating to the Company and its Subsidiaries occurs during the last 17 days of the Holdback Period or (2) prior to the expiration of the Holdback Period, the Company announces that it will release earnings results during the 16-day period beginning upon the expiration of the Holdback Period, then to the extent necessary for a managing or co-managing underwriter of a registered offering required hereunder to comply with Financial Industry Regulatory Authority Rule 2711(f)(4), the Holdback Period shall be extended until 18 days after the earnings release or the occurrence of the material news or event, as the case may be (such period referred to herein as the "Holdback Extension").  The Company may impose stop-transfer instructions with respect to its securities that are subject to the foregoing restriction until the end of such period, including any period of Holdback Extension.

(b)     In connection with any underwritten public offering of the Company's equity securities, each holder of Registrable Securities agrees to enter into any lockup or similar agreement requested by the underwriters managing the registered public offering that the holder(s) of a majority of the Oaktree Registrable Securities agree(s) to enter into, which shall provide that if the holders of Oaktree Registrable Securities shall be released from the obligations of that agreement, all other parties to similar agreements relating to the Company's equity securities shall be concurrently released.

(c)     The Company (i) agrees not to effect any Public Sale or distribution of its Securities or any Other Securities during the seven (7) days prior to and during the 180-day period (subject to any customary extension requested by the underwriters) beginning on the effective date of any Demand Registration or any underwritten Piggyback Registration (except as part of such underwritten registration or pursuant to registrations on Form S-4 or S-8 or any successor form) or, in the event of a Holdback Extension, for such longer period until the end of such period of Holdback Extension, unless the underwriters managing the registered public offering otherwise agree, and (ii) to the extent not inconsistent with applicable law, except as otherwise permitted by the holder(s) of a majority of the Oaktree Registrable Securities, shall cause each holder of its Securities or any Other Securities purchased from the Company at any time after the date of this Agreement (other than in a registered public offering) to agree not to effect any Public Sale or distribution (including sales pursuant to Rule 144) of any such securities during such period (as extended by any Holdback Extension) except as part of such

5

underwritten registration, if otherwise permitted, unless the underwriters managing the registered public offering otherwise agree.

(d)     Notwithstanding any other provision contained in this Agreement, the Company shall not include in any underwritten Demand Registration or underwritten Piggyback Registration any portion of Registrable Securities held by any officers or employees of the Company or any of its Subsidiaries the inclusion of which the underwriter of such Demand Registration or Piggyback Registration, as the case may be, determines in its sole discretion is likely to adversely affect such offering.

(e)     Notwithstanding anything to the contrary herein, except in the case of (i) a transfer to the Company, (ii) a Public Sale permitted hereunder or (iii) a transfer in connection with an Approved Sale (as defined in the Shareholders' Agreement) (clauses (i) through (iii), each, a "Permitted Transfer"), prior to transferring any Registrable Securities to any Person not already a party to this Agreement (including by operation of law), the transferring Shareholder shall cause the prospective transferee to execute and deliver to the Company a counterpart of this Agreement thereby agreeing to be bound by the terms hereof.  Any transfer or attempted transfer of any Registrable Securities in violation of any provision of this Agreement shall be void *ab initio*, and the Company shall not record such transfer on its books or treat any purported transferee of such securities as the owner of such securities for any purpose.  Other than in the case of a Permitted Transfer, whether or not any such transferee has executed a counterpart hereto, such transferee shall be subject to the obligations of the transferor hereunder.  The provisions of this Section 3(e) shall terminate upon a Sale of the Company (as defined in the Shareholders' Agreement).

(f)     Each certificate evidencing any Securities or Other Securities held by a Shareholder and each certificate issued in exchange for or upon the transfer of any such securities (unless such securities are permitted to be transferred pursuant to this Agreement and, if such securities were Registrable Securities, would no longer be Registrable Securities after such transfer) shall be stamped or otherwise imprinted with a legend in substantially the following form:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO (I) RESTRICTIONS PURSUANT TO ARTICLE FIVE OF THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF THE ISSUER (THE "COMPANY"), (II) CONDITIONS SPECIFIED IN A SHAREHOLDERS' AGREEMENT, DATED AS OF [          ], 2012, AS AMENDED OR MODIFIED FROM TIME TO TIME, GOVERNING THE COMPANY AND BY AND AMONG CERTAIN SHAREHOLDERS, AND (III)

6

(II) CONDITIONS SPECIFIED IN A REGISTRATION AGREEMENT, DATED AS OF [                    ], 2012, AS AMENDED OR MODIFIED FROM TIME TO TIME.   A COPY OF ANY OF SUCH AMENDED AND RESTATED CERTIFICATE OF INCORPORATION, SHAREHOLDERS' AGREEMENT OR REGISTRATION AGREEMENT SHALL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

The Company shall imprint such legend on certificates evidencing Securities and Other Securities outstanding prior to the date hereof.  The legend set forth above shall be removed from the certificates evidencing any securities which are transferred pursuant to a Permitted Transfer.

4.      Registration Procedures.  Whenever the holders of Registrable Securities have requested that any Registrable Securities be registered pursuant to this Agreement, the Company shall use its reasonable best efforts to effect the registration and the sale of such Registrable Securities in accordance with the intended method of disposition thereof and pursuant thereto the Company will as expeditiously as possible:

(a)      in accordance with the Securities Act and all applicable rules and regulations promulgated thereunder, prepare and (within sixty (60) days after the end of the period within which requests for registration may be given to the Company) file with the Securities and Exchange Commission a registration statement with respect to such Registrable Securities and thereafter use its reasonable best efforts to cause such registration statement to become effective as soon as practicable thereafter (provided that before filing a registration statement or prospectus or any amendments or supplements thereto, the Company shall furnish to the counsel selected by the holders of a majority of the Oaktree Registrable Securities covered by such registration statement copies of all such documents proposed to be filed, which documents shall be subject to the review and comment of such counsel);

(b)      notify in writing each holder of Registrable Securities of the effectiveness of each registration statement filed hereunder and prepare and file with the Securities and Exchange Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of either (i) not less than six (6) months (subject to extension pursuant to Section 7(b)) or, if such registration statement relates to an underwritten offering, such longer period as in the opinion of counsel for the underwriters a prospectus is required by law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer or (ii) such shorter period as will terminate when all of the securities covered by such registration statement have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof set forth in such registration statement (but in any event not before the expiration of any longer period required under the Securities Act), and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement until such time as all of such securities have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof set forth in such registration statement;

7

(c)      furnish to each seller of Registrable Securities thereunder such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), each Free Writing Prospectus and such other documents as such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(d)      use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller of Registrable Securities reasonably requests and do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller (provided that the Company shall not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 4(d), (ii) subject itself to taxation in any such jurisdiction or (iii) consent to general service of process in any such jurisdiction);

(e)      notify in writing each seller of such Registrable Securities (i) promptly after it receives notice thereof, of the date and time when such registration statement and each post-effective amendment thereto has become effective or a prospectus or supplement to any prospectus relating to a registration statement has been filed and when any registration or qualification has become effective under a state securities or blue sky law or any exemption thereunder has been obtained, (ii) promptly after receipt thereof, of any request by the Securities and Exchange Commission for the amendment or supplementing of such registration statement or prospectus or for additional information, and (iii) at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of any event as a result of which, the prospectus included in such registration statement (x) contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading in light of the circumstances under which they were made or (y) is otherwise not legally available to support sales of Registrable Securities.

(f)      prepare and file promptly with the Securities and Exchange Commission, and notify such holders of Registrable Securities prior to the filing of, such amendments or supplements to such registration statement or prospectus as may be necessary to correct any statements or omissions if, at the time when a prospectus relating to such securities is required to be delivered under the Securities Act, any event has occurred as the result of which any such prospectus or any other prospectus as then in effect would include an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and, in case any of such holders of Registrable Securities or any underwriter for any such holders is required to deliver a prospectus at a time when the prospectus then in circulation is not in compliance with the Securities Act or the rules and regulations promulgated thereunder, the Company shall use its best efforts to prepare promptly upon request of any such holder or underwriter such amendments or supplements to such registration statement and prospectus as may be necessary in order for such prospectus to comply with the requirements of the Securities Act and such rules and regulations;

(g)      cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed, or if no similar

8

securities issued by the Company are then listed, on one or more securities exchanges selected by the holders of a majority of the Oaktree Registrable Securities;

(h)      provide a transfer agent and registrar for all such Registrable Securities not later than the effective date of such registration statement;

(i)      enter into and perform such customary agreements (including underwriting agreements in customary form) and take all such other actions as the holders of a majority of the Oaktree Registrable Securities included in such registration or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including through (i) participation in "road shows", investor presentations and marketing events and effecting a share split or a combination of shares and (ii) including information in a registration statement, including by way of a prospectus supplement or otherwise, which information is reasonably requested by any underwriter or Oaktree for legal and/or marketing purposes);

(j)      make available for inspection by any underwriter participating in any disposition pursuant to such registration statement, and any attorney, accountant, or other agent retained by any such underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors, employees, and independent accountants to supply all information reasonably requested by any such underwriter, attorney, accountant, or agent in connection with such registration statement and assist and, at the request of any participating underwriter, use reasonable best efforts to cause such officers or directors to participate in presentations to prospective purchasers;

(k)      take all reasonable actions to ensure that any Free-Writing Prospectus utilized in connection with any Demand Registration or Piggyback Registration hereunder complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related prospectus, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(l)      otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the Securities and Exchange Commission, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least 12 months beginning with the first day of the Company's first full calendar quarter after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(m)      use its reasonable best efforts to prevent the issuance of any stop order suspending the effectiveness of a registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any securities included in such registration statement for sale in any jurisdiction, and in the event of the issuance of any such stop order or other such order, the Company shall advise such holders of Registrable Securities of such stop order or other such order promptly after it shall receive notice or obtain knowledge thereof and shall use its best efforts promptly to obtain the withdrawal of such order;

9

(n)  obtain one or more cold comfort letters, dated the effective date of such registration statement (and, if such registration includes an underwritten public offering, dated the date of the closing under the underwriting agreement and addressed to the underwriters), from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by cold comfort letters as the holders of a majority of the Oaktree Registrable Securities included in such registration reasonably request; and

(o)  provide a legal opinion of the Company's outside counsel, dated the effective date of such registration statement (or, if such registration includes an underwritten public offering, dated the date of the closing under the underwriting agreement), with respect to the registration statement, each amendment and supplement thereto, the prospectus included therein (including the preliminary prospectus) and such other documents (including a customary "negative assurances letter") relating thereto in customary form and covering such matters of the type customarily covered by such opinions, which opinions shall be addressed to the underwriters.  The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish the Company such information regarding such seller and the distribution of such securities as the Company may from time to time reasonably request in writing.

5.  <u>Registration Expenses</u>.

(a)  All expenses incident to the Company's performance of or compliance with this Agreement, including all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, travel expenses, filing expenses, messenger and delivery expenses, fees and disbursements of custodians, and fees and disbursements of counsel for the Company and of all independent certified public accountants, underwriters including, if necessary, a "qualified independent underwriter" within the meaning of the rules of the Financial Industry Regulatory Authority (in each case, excluding discounts and commissions), and other Persons retained by the Company or by the holders of Oaktree Registrable Securities or their Affiliates on behalf of the Company (all such expenses being herein called "<u>Registration Expenses</u>"), shall be borne as provided in this Agreement, except that the Company shall, in any event, pay its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit or quarterly review, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which similar securities issued by the Company are then listed, or if no similar securities issued by the Company are then listed, on one or more securities exchanges selected by the holders of a majority of the Oaktree Registrable Securities.  Each Person that sells securities pursuant to a Demand Registration or Piggyback Registration hereunder shall bear and pay all underwriting discounts and commissions applicable to the securities sold for such Person's account.

(b)  In connection with each Demand Registration and each Piggyback Registration, the Company shall reimburse the holders of Registrable Securities included in such registration for the reasonable fees and disbursements of one counsel chosen by the holders of a majority of the Registrable Securities included in such registration.

10

(c)     To the extent Registration Expenses are not required to be paid by the Company, each holder of securities included in any registration hereunder shall pay those Registration Expenses allocable hereunder to the registration of such holder's securities so included, and any Registration Expenses not so allocable shall be borne by all sellers of securities included in such registration in proportion to the aggregate selling price of each seller's securities to be so registered.

6.      Indemnification.

(a)     The Company agrees to indemnify and hold harmless, to the fullest extent permitted by law, each holder of Registrable Securities, its officers, directors, partners, managers, agents, and employees and each Person who controls such holder (within the meaning of the Securities Act) (each an "Indemnitee" and, collectively, the "Indemnitees") against any losses, claims, damages, liabilities, joint or several, together with reasonable costs and expenses (including reasonable attorneys' fees), to which such Indemnitee may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of, are based upon, are caused by or result from (i) any untrue or alleged untrue statement of material fact contained (A) in any registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or (B) in any application or other document or communication (in this Section 6 collectively called an "application") executed by or on behalf of the Company or based upon written information furnished by or on behalf of the Company filed in any jurisdiction in order to qualify any securities covered by such registration statement under the "blue sky" or securities laws thereof, or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, and the Company will reimburse each such Indemnitee for any legal or any other expenses incurred by him, her or it in connection with investigating or defending any such loss, claim, damage, expense, liability, action or proceeding; provided, however, that the Company shall not be liable in any such case to any such Person to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of, is based upon, is caused by or results from an untrue statement or alleged untrue statement, or omission or alleged omission, made in such registration statement, any such prospectus or preliminary prospectus or any amendment or supplement thereto, or in any application, in reliance upon, and in conformity with, written information prepared and furnished to the Company by or on behalf of such Person expressly for use therein.  In connection with an underwritten offering, the Company shall indemnify the underwriters, their officers and directors and each Person who controls such underwriters (within the meaning of the Securities Act) to the same extent as provided above with respect to the indemnification of the Indemnitees.

(b)     In connection with any registration statement in which a holder of Registrable Securities is participating, each such holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such registration statement or prospectus and, to the fullest extent permitted by law, shall indemnify and hold harmless the other holders of Registrable Securities included in such registration and the Company, and their respective directors, officers, partners, managers, agents and employees and each other Person who controls the Company or such other holders of Registrable Securities (within the meaning of the Securities Act) against any losses, claims,

11

damages, liabilities, joint or several, together with reasonable costs and expenses (including reasonable attorney's fees), to which such indemnified party may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages, costs, expenses or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of, are based upon, are caused by or result from (i) any untrue or alleged untrue statement of material fact contained in the registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or in any application or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is made in such registration statement, any such prospectus or preliminary prospectus or any amendment or supplement thereto, or in any application, in each case, in reliance upon and in conformity with written information prepared and furnished to the Company by or on behalf of such holder expressly for use therein; provided, however, that the obligation to indemnify will be several and not joint, as to each holder and will be limited to the net amount of proceeds received by such holder from the sale of Registrable Securities pursuant to such registration statement.

(c)     Any Person entitled to indemnification hereunder will (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any such Person's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party) and (ii) unless in such indemnified party's counsel's opinion a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party.  The indemnifying party will not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent will not be unreasonably withheld, conditioned or delayed).  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim will pay the fees and expenses of one (but not more than one) counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the opinion of any indemnified party's counsel a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim, in which case the indemnifying party will pay the fees and expenses of one additional counsel for such indemnified party.

(d)     The indemnifying party shall not, except with the approval of each indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to each indemnified party of a release from all liability in respect to such claim or litigation without any payment, obligation or other consideration provided by such indemnified party.

(e)     If the indemnification provided for in this <u>Section</u> 6 is unavailable to or is insufficient to hold harmless an indemnified party under the provisions above in respect to any losses, claims, damages or liabilities referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative fault of the Company on the one hand and the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect

12

not only the relative faults referred to in clause (i) above but also the relative benefit of the Company on the one hand and of the sellers of Registrable Securities and any other sellers participating in the registration statement on the other in connection with the registration statement or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative benefits received by the Company on the one hand and the sellers of Registrable Securities and any other sellers participating in the registration statement on the other shall be deemed to be in the same proportion as the total net proceeds from the offering (before deducting expenses) to the Company bear to the total net proceeds from the offering (before deducting expenses) to the sellers of Registrable Securities and any other sellers participating in the registration statement.  The relative fault of the Company on the one hand and of the sellers of Registrable Securities and any other sellers participating in the registration statement on the other shall be determined by reference to, among other things, whether the untrue statement or alleged omission to state a material fact relates to information supplied by the Company or by the sellers of Registrable Securities or other sellers participating in the registration statement and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the sellers of Registrable Securities agree that it would not be just and equitable if contribution pursuant to this Section 6 were determined by pro rata allocation (even if the sellers of Registrable Securities were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph.  The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 6, no seller of Registrable Securities shall be required to contribute any amount in excess of the net proceeds received by such seller from the sale of Registrable Securities covered by the registration statement filed pursuant hereto.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(f)    The indemnification and contribution by any such party provided for under this Agreement shall be in addition to any other rights to indemnification or contribution which any indemnified party may have pursuant to law or contract and will remain in full force and effect regardless of any investigation made or omitted by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party and will survive the transfer of securities.

7.    Participation in Underwritten Registrations.

(a)    No Person may participate in any registration hereunder which is underwritten unless such Person (i) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Person or Persons entitled hereunder to approve such arrangements (including pursuant to the terms of any over-allotment or "green shoe" option requested by the managing underwriter(s), provided that no holder of Registrable Securities will be required to sell more than the number of Registrable Securities that such holder

13

has requested the Company to include in any registration) and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; provided that no holder of Registrable Securities included in any underwritten registration shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding such holder and such holder's intended method of distribution) or to undertake any indemnification obligations to the Company or the underwriters with respect thereto, except as otherwise provided in Section 6.

(b)     Each Person that is participating in any registration hereunder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 4(e)(iii), such Person will forthwith discontinue the disposition of its Registrable Securities pursuant to the registration statement until such Person's receipt of the copies of a supplemented or amended prospectus as contemplated by Section 4(f).  In the event the Company shall give any such notice, the applicable time period mentioned in Section 4(b) during which a Registration Statement is to remain effective shall be extended by the number of days during the period from and including the date of the giving of such notice pursuant to this Section 7 to and including the date when each seller of Registrable Securities covered by such registration statement shall have received the copies of the supplemented or amended prospectus contemplated by Section 4(f).

8.     Current Public Information.   At all times after the Company has filed a registration statement with the Securities and Exchange Commission pursuant to the requirements of either the Securities Act or the Securities Exchange Act, the Company shall, except as otherwise agreed to in writing by the holders of a majority of the Oaktree Registrable Securities, file all reports required to be filed by it under the Securities Act and the Securities Exchange Act and the rules and regulations adopted by the Securities and Exchange Commission thereunder, and will take such further action as any holder or holders of Oaktree Registrable Securities may reasonably request, all to the extent required to enable such holders to sell Registrable Securities pursuant to Rule 144 or any similar rule or regulation hereafter adopted by the Securities and Exchange Commission.

9.     Definitions.

"Agreement" has the meaning set forth in the preamble.

"application" has the meaning set forth in Section 6(a).

"Business Day" means any day other than a Saturday, Sunday or other day on which banks located in New York City and the Marshall Islands are authorized or obligated to close.

"Company" has the meaning set forth in Section 1(a).

"Demand Registrations" has the meaning set forth in Section 1(a).

"EPA" has the meaning set forth in the preamble.

"Equity Investment" has the meaning set forth in the preamble.

14

"Free Writing Prospectus" means a free-writing prospectus, as defined in Rule 405 of the Securities Act.

"Holdback Extension" has the meaning set forth in Section 3(a).

"Holdback Period" has the meaning set forth in Section 3(a).

"Indemnitee" and "Indemnitees" have the meanings set forth in Section 6(a).

"Long-Form Registrations" has the meaning set forth in Section 1(a).

"Oaktree" has the meaning set forth in the preamble.

"Oaktree Fund" means each of Oaktree Principal Fund V, L.P., Oaktree Principal Fund V (Parallel), L.P., Oaktree FF Investment Fund, L.P. - Class A, and OCM Asia Principal Opportunities Fund, L.P. each, a Cayman Islands exempted limited partnership.

"Oaktree Registrable Securities" means (i) any common equity securities of the Company from time to time held by Oaktree, and (ii) common equity securities of the Company issued or issuable with respect to the securities referred to in clause (i) above by way of dividend, distribution, split or combination of securities, or any recapitalization, merger, consolidation or other reorganization.  As to any particular Oaktree Registrable Securities, such securities shall cease to be Oaktree Registrable Securities when they (a) have been distributed to the public pursuant to an offering registered under the Securities Act or sold to the public through a broker, dealer or market maker in compliance with Rule 144 (or any similar rule then in force), (b) have been purchased or otherwise acquired by any employee of the Company or its Subsidiaries, (c) have been effectively registered under a registration statement including a registration statement on Form S-8 (or any successor form), or (d) have been repurchased by the Company or any Subsidiary.  For purposes of this Agreement, a Person shall be deemed to be a holder of Oaktree Registrable Securities, and the Oaktree Registrable Securities shall be deemed to be in existence, whenever such Person has the right to acquire directly or indirectly such Oaktree Registrable Securities (upon conversion or exercise in connection with a transfer of securities or otherwise, but disregarding any restrictions or limitations upon the exercise of such right), whether or not such acquisition has actually been effected, and such Person shall be entitled to exercise the rights of a holder of Oaktree Registrable Securities hereunder.

"Other Registrable Securities" means (i) any common equity securities of the Company from time to time held by the Shareholders other than Oaktree, and (ii) common equity securities of the Company issuable with respect to the securities referred to in clause (i) above by way of dividend, distribution, split or combination of securities, or any recapitalization, merger, consolidation or other reorganization.  As to any particular Other Registrable Securities, such securities shall cease to be Other Registrable Securities when they (a) have been distributed to the public pursuant to a offering registered under the Securities Act or sold to the public through a broker, dealer or market maker in compliance with Rule 144 (or any similar rule then in force), (b) have been purchased or otherwise acquired by Oaktree, (c) have been effectively registered under a registration statement including a registration statement on Form S-8 (or any successor form), or (d) have been repurchased by the Company or any Subsidiary. Additionally, all Other Registrable Securities held by any Person shall cease to be Other Registrable Securities when all

15

such Other Registrable Securities become eligible to be sold to the public through a broker, dealer, or market maker pursuant to Rule 144 (or any similar provision then in force), during a single 90-day period.  For purposes of this Agreement, a Person shall be deemed to be a holder of Other Registrable Securities, and the Other Registrable Securities shall be deemed to be in existence, whenever such Person holds or has the right to acquire directly or indirectly such Other Registrable Securities (upon conversion or exercise in connection with a transfer of securities or otherwise, but disregarding any restrictions or limitations upon the exercise of such right), whether or not such acquisition has actually been effected, and such Person shall be entitled to exercise the rights of a holder of Other Registrable Securities hereunder.

"Other Securities" has the meaning set forth in Section 3(a).

"Other Shareholders" has the meaning set forth in the preamble.

"Permitted Transfer" has the meaning set forth in Section 3(e).

"Person" means an individual, a partnership, a joint venture, an association, a joint stock company, a corporation, a limited liability company, a trust, an unincorporated organization, an investment fund, any other business entity or a governmental entity or any department, agency or political subdivision thereof.

"Piggyback Registration" has the meaning set forth in Section 2(a).

"Public Sale" means any sale of Registrable Securities (i) to the public pursuant to an offering registered under the Securities Act or (ii) to the public through a broker, dealer or market maker after an initial public offering and sale of equity securities of the Company.

"Registrable Securities" means, collectively, the Oaktree Registrable Securities and the Other Registrable Securities.

"Registration Expenses" has the meaning set forth in Section 5(a).

"Required Registration" has the meaning set forth in Section 1(c).

"Rule 144" means Rule 144 adopted by the Securities and Exchange Commission under the Securities Act, as such rule may be amended from time to time.

"Securities" has the meaning set forth in Section 3(a).

"Securities Act" means the Securities Act of 1933, as amended, or any similar federal law then in force.

"Securities and Exchange Commission" means the United States Securities and Exchange Commission and includes any governmental body or agency succeeding to the functions thereof.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, or any similar federal law then in force.

16

"Shareholders" has the meaning set forth in the preamble.

"Shareholders' Agreement" means the Shareholders' Agreement, dated as of the date hereof, by and among Oaktree, the Company, the Other Shareholders and the other Persons party thereto from time to time, as amended from time to time in accordance with its terms.

"Short-Form Registrations" has the meaning set forth in Section 1(a).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association, or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses or shall be or control any managing director or general partner or a majority of the members of the governing body of such limited liability company, partnership, association, or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

10. Miscellaneous.

(a) Notices. Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, or received by certified mail, return receipt requested, or sent by reputable overnight courier service (charges prepaid) to the Company at the address set forth below and to any other recipient at the address indicated on the Schedule of Shareholders attached hereto or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party. Notices will be deemed to have been given hereunder (i) when delivered personally to the recipient, (ii) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) upon machine-generated acknowledgment of receipt after transmittal by facsimile if so acknowledged to have been received before 5:00 p.m. on a business day at the location of receipt and otherwise on the next following business day or (iv) five (5) days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. The Company's address is:

17

General Maritime Corporation
299 Park Avenue
New York, New York 10171
Facsimile: [_____]
Attention: [_____]

with copies (which shall not constitute notice) to:

Oaktree Capital Management, L.P.
333 South Grand Ave., 28th Floor
Los Angeles, California 90071
Facsimile:  (213) 830-6300
Attention:      B. James Ford
                       Adam Pierce

and

Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, California 90071
Facsimile: (213) 680-8500
Attention:      Damon R. Fisher

and

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8100
Attention:      Thomas E. Molner

(b)      No Inconsistent Agreements.  The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the holders of Registrable Securities in this Agreement.  Except as provided in this Agreement, the Company shall not grant to any Persons the right to request the Company to register any Securities or any Other Securities without the prior written consent of the holders of a majority of the Oaktree Registrable Securities.

(c)      Remedies.  Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

18

(d)      Amendments and Waivers.  Except as otherwise provided herein, no modification, amendment or waiver of any provision of this Agreement shall be effective against the Company or the holders of Registrable Securities unless such modification, amendment or waiver is approved in writing by the Company and holders of a majority of the Oaktree Registrable Securities; provided that no such amendment or modification that would materially and adversely affect the rights, preferences or privileges of any class or group of Other Registrable Securities in a manner disproportionate to the effect of such amendment or modification on the rights, preferences or privileges of holders of Oaktree Registrable Securities (without regard to any effect resulting from the individual circumstances of any holder of such class or group of Other Registrable Securities) shall be effective against any holder whose rights, preferences or privileges are so affected thereby without the prior written consent of the holders of a majority of each class or group of Other Registrable Securities so affected.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement, or condition. Notwithstanding the foregoing, an amendment or modification of this Agreement to add a party hereto and to grant such party registration rights will be effective against the Company and all holders of Registrable Securities if such modification, amendment or waiver is approved in writing by the Company and the holders of a majority of the Oaktree Registrable Securities.  The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter to enforce each and every provision in accordance with its terms.

(e)      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto (and the Persons specifically identified in Section 6) and their respective successors and assigns.  In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of the holders of Registrable Securities (or any portion thereof) as such shall be for the benefit of and enforceable by any subsequent holder of any Registrable Securities (or of such portion thereof); provided, that such subsequent holder of Registrable Securities shall be required to execute a joinder to this Agreement agreeing to be bound by its terms.

(f)      Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(g)      Entire Agreement.  Except as otherwise expressly set forth herein, this document embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

19

(h)     Counterparts; Facsimile Signature.  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, each of which shall be deemed an original and all of which taken together will constitute one and the same Agreement.  This Agreement may be executed by facsimile signature.

(i)     Descriptive Headings.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(j)     Governing Law.  All matters concerning the relative rights of the Company and the Shareholders and the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(k)     Mutual Waiver of Jury Trial.  BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS.  THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF, CONNECTED WITH OR RELATED OR INCIDENTAL TO, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(l)     Business Days.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the state in which the Company's chief-executive office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday or legal holiday.

\* \* \* \* \*

20

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**COMPANY:**

**GENERAL MARITIME CORPORATION**

By:_____
      Name:
      Title:

*Signature Pages - Registration Agreement*

**SHAREHOLDERS:**

**OCM MARINE INVESTMENT CTB, LTD.**

By: Oaktree Capital Management, L.P.
Its: Director


By:_____
Name:
Title:


By:_____
Name:
Title:


**OCM MARINE HOLDINGS TP, L.P.**

By: OCM Marine GP CTB, Ltd.
Its: General Partner

By: Oaktree Capital Management, L.P.
Its: Director


By:_____
Name:
Title:


By:_____
Name:
Title:


*Signature Pages - Registration Agreement*

**OTHER SHAREHOLDERS**:

*Signature Pages - Registration Agreement*

## SCHEDULE OF SHAREHOLDERS

**As of [_____]**

| Shareholder | Address |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# EXHIBIT 14

**Shareholders Agreement**

# GENERAL MARITIME CORPORATION
# SHAREHOLDERS' AGREEMENT

**Dated as of _____, 2012**

## TABLE OF CONTENTS

**Page**

1.  **COVENANTS, REPRESENTATIONS AND WARRANTIES** ....................................2

2.  **RESTRICTIONS ON TRANSFER OF COMPANY STOCK** ..............................2
    - (a)   Restrictions on Transfer ..............................................................2
    - (b)   Tag-Along Rights ..........................................................................3
    - (c)   Approved Sale; Drag Along Obligations; Public Offering .....................4
    - (d)   Termination ..................................................................................7
    - (e)   Void Transfers .............................................................................7
    - (f)   Effect of Assignment .....................................................................7
    - (g)   Additional Restrictions on Transfer ................................................7
    - (h)   Legend ........................................................................................7
    - (i)   Transfer Fees and Expenses ...........................................................8

3.  **PREEMPTIVE RIGHTS** ..................................................................................8
    - (a)   Offering .......................................................................................8
    - (b)   Exercise .......................................................................................9
    - (c)   Subsequent Sale ...........................................................................9
    - (d)   Alternative Offering ......................................................................9
    - (e)   Termination ..................................................................................9

4.  **BOARD OF DIRECTORS; VOTING** .................................................................9
    - (a)   Composition of the Board ..............................................................9
    - (b)   Subsidiary Boards .......................................................................10
    - (c)   Board Meeting Expenses ..............................................................10
    - (d)   Irrevocable Proxy .......................................................................10
    - (e)   Termination ................................................................................10

5.  **RESTRICTIONS** .........................................................................................11

6.  **CONFIDENTIALITY** ...................................................................................13

7.  **REPORTS** ...................................................................................................14
    - (a)   Reports ......................................................................................14
    - (b)   Service Provider Shareholders .....................................................14

8.  **DEFINITIONS** ............................................................................................14

9.  **MISCELLANEOUS** ......................................................................................18
    - (a)   Amendment and Waiver ...............................................................18
    - (b)   Severability ................................................................................18
    - (c)   Entire Agreement ........................................................................18
    - (d)   Successors and Assigns ................................................................18
    - (e)   Counterparts ...............................................................................18
    - (f)   Delivery by Facsimile or PDF .......................................................18

i

(g)     Remedies ...................................................................................................... 19
(h)     Notices ......................................................................................................... 19
(i)     Governing Law ............................................................................................. 20
(j)     Waiver of Jury Trial ..................................................................................... 20
(k)     Acknowledgements ....................................................................................... 21
(l)     Descriptive Headings .................................................................................... 21

ii

### SHAREHOLDERS' AGREEMENT

This Shareholders' Agreement (this "Agreement") is entered into as of _____, 2012, by and among (i) General Maritime Corporation, a Marshall Islands corporation (the "Company"), (ii) OCM Marine Holdings TP, L.P., a Cayman Islands exempted limited partnership, and OCM Marine Investments CTB, Ltd., a Cayman Islands exempt company (together, "Oaktree"), (iii) each of the Persons signatory hereto under the heading "Other Shareholders" on the signature pages hereto (the "Other Shareholders"), and (iv) each other Person listed from time to time on the Schedule of Shareholders attached hereto, who at any time acquires Equity Securities of the Company and, at the request of Oaktree or as required herein, agrees to become party to and bound by this Agreement by signing a Joinder Agreement (a "Joinder "Agreement") in the form attached hereto as Exhibit A (collectively with Oaktree and the other Shareholders, the "Shareholders").  Each capitalized term used and not otherwise defined herein shall have the meaning set forth in Section 8.

The Company and the Oaktree Funds are party to an Equity Purchase Agreement dated December 15, 2011, as amended by the First Amendment thereto dated March 26, 2012 (as so amended, the "EPA"), pursuant to which the Oaktree Funds have agreed to make an equity investment in the Company of up to $175 million (the "Equity Investment") through Oaktree.

Pursuant to the terms of the Company's Second Amended Joint Plan of Reorganization, dated [_____], 2012 (the "Plan"), (i) certain claims held by OCM Marine Investments CTB, Ltd. were converted into common equity securities of the Company, (ii) the Oaktree Funds have made the Equity Investment, and (iii) certain claims held by certain unsecured creditors of the Company (other than Oaktree and its Affiliates) were converted into Common Stock and Warrants to purchase Common Stock of the Company.  Those recipients described in clause (iii) of the foregoing sentence thereof who receive at least 0.15% of the outstanding Common Stock on a fully diluted basis (i.e., assuming for the purpose of such calculation the exercise or conversion by such other Shareholder and all other Persons of all outstanding warrants, options and other Equity Securities exercisable or convertible into Common Stock of the Company) shall be deemed to join this Agreement as an Other Shareholder concurrently with the receipt of such Common Stock and Warrants.

The Company and the Shareholders desire to enter into this Agreement for purposes, among others, of (i) establishing the composition of the Company's board of directors (the "Board"), (ii) restricting the sale, assignment, transfer, encumbrance and/or other disposition of Equity Securities, and (iii) providing for certain other rights and obligations relating to the Equity Securities.

Furthermore, the execution and delivery of this Agreement is a condition to the closing of the transactions contemplated by EPA.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1

## 1. COVENANTS, REPRESENTATIONS AND WARRANTIES

Each Shareholder (other than, with respect to the following clauses (a) through (g), those Shareholders which have acquired Equity Securities of the Company pursuant to the terms of the Plan) hereby represents and warrants to the Company and acknowledges that: (a) such Shareholder is an "accredited investor" as such term is defined in Rule 501 promulgated under the Securities Act and/or such Shareholder has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (b) such Shareholder has reviewed and evaluated all information necessary to assess the merits and risks of his, her or its investment in the Company and any and all questions regarding such information have been answered to such Shareholder's satisfaction; (c) such Shareholder is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (d) such Shareholder is acquiring interests in the Company for investment purposes only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (e) the interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be Transferred unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with; (f) the determination of such Shareholder to purchase interests in the Company has been made by such Shareholder independent of any other Shareholder and independent of any statements or opinions as to the advisability of such purchase, which may have been made or given by any other Shareholder or by any agent or employee of any other Shareholder; (g) the interests in the Company were not offered to such Shareholder by means of general solicitation or general advertising; (h) to the extent applicable, the execution, delivery and performance of this Agreement have been duly authorized by such Shareholder and do not require such Shareholder to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any law or regulation applicable to such Shareholder, any governing document of such Shareholder or any agreement or instrument to which such Shareholder is a party or by which such Shareholder is bound; and (i) this Agreement is valid, binding and enforceable against such Shareholder in accordance with its terms.

## 2. RESTRICTIONS ON TRANSFER OF COMPANY STOCK

(a)     <u>Restrictions on Transfer</u>.

(i)     Prior to consummating any Transfer of any Equity Securities (other than pursuant to a Public Sale or an Approved Sale) to any Person, and as a condition precedent to any such Transfer, the Transferring Shareholder shall cause each prospective Transferee thereof to execute and deliver to the Company a Joinder Agreement. Any Transfer or attempted Transfer of any Equity Securities in violation of the foregoing or any other provision of this Agreement shall be void, and the Company shall not record such Transfer on its books or treat any purported Transferee of such Equity Securities as the owner of such Equity Securities for any purpose.

(ii)     No Shareholder shall avoid the provisions of this Agreement by (x) making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such Person's interest in any such Permitted Transferee, or (y)

2

issuing or permitting any Transfer of any legal or beneficial interests in such Shareholder other than to the current direct and indirect holders of such interests.

(b)    Tag-Along Rights.

(i)    At least 10 days prior to any Transfer of Common Stock by Oaktree or its Affiliates, such holder shall deliver a written notice (the "Sale Notice") to the Company and to each other Shareholder holding at least 0.15% of the outstanding Common Stock of the Company on a fully diluted basis (i.e., assuming for the purpose of such calculation the exercise or conversion by such other Shareholder and all other Persons of all outstanding warrants, options and other Equity Securities exercisable or convertible into Common Stock of the Company) (the "Tag-Along Shareholders"), which such Sale Notice shall specify in reasonable detail the number of shares of Common Stock to be Transferred, such Shareholder's Tag-Along Portion (assuming the participation of each Shareholder who may exercise the rights set forth in this Section 2(b)) and the price and other terms and conditions of the Transfer; provided that the foregoing shall not apply to Transfers (A) pursuant to a Public Sale, (B) pursuant to Section 2(c) or (C) to a Permitted Transferee.

(ii)    Each Tag-Along Shareholder may elect to participate in the contemplated Transfer with respect to a number of shares of Common Stock not to exceed such Tag-Along Shareholder's Tag-Along Portion by delivering written notice to the Initiating Holder(s) within 10 days after delivery of the Sale Notice, and failure to deliver such notice shall be deemed a waiver of rights by such Tag-Along Shareholder under this Section 2(b) with respect to such Transfer.  For purposes of this Section 2(b), "Tag-Along Portion" means, with respect to any Tag-Along Shareholder, a number of shares of Common Stock equal to (x) the quotient determined by dividing the aggregate number of shares of Common Stock owned by such Tag-Along Shareholder by the number of shares of Common Stock owned by the Initiating Holder(s) and each Tag-Along Shareholder who has elected to participate in such Transfer in accordance with this Section 2(b)(i), multiplied by (y) the aggregate number of shares of Common Stock to be sold in such Transfer as set forth in the Sale Notice.  Any Tag-Along Shareholder that elects to so participate shall be obligated to participate in the contemplated Transfer, with respect to the number and class of Common Stock so elected, for so long as the Initiating Holder(s) intend to consummate such Transfer.   Each Tag-Along Shareholder participating in such Transfer shall be entitled to receive the same amount and form of consideration per share of Common Stock as the Initiating Holder receives in such Transfer.  If no Tag-Along Shareholder has elected to participate in the contemplated Transfer (through notice to such effect or expiration of the 10-day period after delivery of the Sale Notice), then the Initiating Holder(s) may, during the 120-day period immediately following the date of the delivery of the Sale Notice, Transfer the Common Stock specified in the Sale Notice at a price no greater and on other terms substantially the same as those specified in the Sale Notice.  Any shares of Common Stock identified in the Sale Notice but not Transferred within such 120-day period shall be subject to the provisions of this Section 2(b) upon subsequent Transfer.

3

(iii)    No Initiating Holder shall Transfer any of its Common Stock to any prospective Transferee if such prospective Transferee(s) declines to allow the participation of the Tag-Along Shareholders who have elected to participate in such Transfer in accordance with Section 2(b)(i), unless the Initiating Holder or its designee acquires the Common Stock that otherwise would have been sold in such Transfer for the price and on the terms that such Tag-Along Shareholder would have been entitled to receive had such Tag-Along Shareholder(s) sold the Common Stock such Shareholder was entitled to sell in such Transfer as set forth in the Sale Notice.  Each Shareholder Transferring Common Stock pursuant to this Section 2(b) (including in respect of the Transfer to the Initiating Holder or its designees referenced in the immediately foregoing sentence) shall pay its pro rata share of the expenses incurred by the Shareholders in connection with such Transfer (based on the amount by which each Person's share of the aggregate proceeds paid with respect to its Common Stock would have been reduced had the aggregate proceeds available for distribution to such Shareholders been reduced by the amount of such expenses).  In connection with any such Transfer, (x) no Tag-Along Shareholder shall be required to make affirmative representations or warranties with respect to the Company or the Initiating Holder(s), except that such Tag-Along Shareholder may be required to make representations and warranties about itself in all cases in a manner no more onerous than as made or required to be made by the Initiating Holder about itself (the "Individual Shareholder Obligations"), and (y) the Shareholders participating in such Transfer may be severally obligated to join on a pro rata basis (based on the amount by which each Person's share of the aggregate proceeds paid with respect to its Common Stock would have been reduced had the aggregate proceeds available for distribution to such Shareholders been reduced by the amount of such indemnity) in any indemnification obligation agreed to by the Initiating Holder(s) in connection with such Transfer, except that each Shareholder may be fully liable for any breach by such Shareholder of its own Individual Shareholder Obligations; provided that, except with respect to the Individual Shareholder Obligations, no Shareholder shall be obligated in connection with such Transfer to agree to indemnify or hold harmless the Transferees for any amount in excess of the aggregate proceeds to which such holder is entitled in such Transfer; provided further, that any escrow of proceeds of any such transaction shall be withheld on a pro rata basis among all Shareholders who participate in the Transfer (based on the amount by which each such Shareholder's share of the aggregate proceeds otherwise payable with respect to its Common Stock would have been reduced had the aggregate proceeds available for distribution to such Shareholders been reduced by the amount placed in escrow).  Each Shareholder participating in such Transfer shall enter into any contribution agreement requested by the Initiating Holder(s) to ensure compliance with this Section 2(b)(iii).

(iv)    Each Shareholder participating in the contemplated Transfer shall take all actions in connection with the contemplated Transfer as reasonably requested by the Initiating Holder(s), including executing all agreements, documents and instruments in connection therewith in the form presented by the Initiating Holder(s) (and not inconsistent with the provisions of this Section 2(b)).

(c)    Approved Sale; Drag Along Obligations; Public Offering

4

(i)    Approved Sale.  If the Board or Oaktree approves a Sale of the Company (an "Approved Sale"), each Shareholder shall vote for, consent to and raise no objections against such Approved Sale.  If the Approved Sale is structured as a (x) merger or consolidation, each Shareholder holding Equity Securities shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation, (y) sale of Equity Securities, each Shareholder shall agree to sell all of his, her or its Equity Securities on the terms and conditions approved by the Board or Oaktree, as applicable, or (z) a sale of assets, each Shareholder shall vote its Equity Securities to approve such sale and any subsequent liquidation of the Company or other distribution of the proceeds therefrom, whether by written consent or at a meeting of the Shareholders (as requested by the Board or Oaktree).  Each Shareholder shall take all actions in connection with the consummation of the Approved Sale as reasonably requested by the Board or Oaktree, as applicable, including executing all agreements, documents and instruments in connection therewith in the form presented by the Board or Oaktree, as applicable.  Notwithstanding anything to the contrary in this Section 2(c), the provisions of this Section 2(c) shall not apply to those Shareholders who are required to hold their Common Stock through the Depository Trust Company to the extent the rights and obligations provided for in this Section 2(c) are prohibited by the procedures or rules of the Depository Trust Company.

(ii)    Conditions.  The obligations of the Shareholders with respect to the Approved Sale are subject to each Shareholder participating in such Approved Sale being entitled to receive the consideration payable in the Approved Sale in the same portion of the aggregate consideration as such Shareholder would receive if such aggregate consideration were distributed to the Shareholders in a complete liquidation of the Company; provided that, the consideration payable to any Shareholder shall be reduced by the aggregate principal amount plus all accrued and unpaid interest on any indebtedness owing from any such Shareholder to the Company.

(iii)    Obligations.  Notwithstanding anything herein to the contrary, in connection with an Approved Sale, (x) no Shareholder shall be required to make affirmative representations or warranties with respect to the Company or Oaktree, except that such Shareholder may be required to make representations and warranties about itself in all cases in a manner no more onerous than as made or required to be made by Oaktree about itself, and (y) the Shareholders may be severally obligated to join on a pro rata basis (based on the amount by which each Person's share of the aggregate proceeds paid with respect to its Equity Securities would have been reduced had the aggregate proceeds available for distribution to such Shareholders been reduced by the amount of such indemnity) in any indemnification obligation agreed to by the Board or Oaktree in connection with such Approved Sale, except that each Shareholder may be fully liable for any breach by such Shareholder of such Shareholder's Individual Shareholder Obligations; provided that, except with respect to the Individual Shareholder Obligations, no Shareholder shall be obligated in connection with such Approved Sale to agree to indemnify or hold harmless the Transferees for any amount in excess of the aggregate proceeds to which such holder is entitled in such Approved Sale; provided further, that any escrow of proceeds of any such transaction shall be withheld on a pro rata basis among all Shareholders (based on the amount by which each such Shareholder's share of

5

the aggregate proceeds otherwise payable with respect to its Equity Securities would have been reduced had the aggregate proceeds available for distribution to such Shareholders been reduced by the amount placed in escrow).  Each Shareholder shall enter into any contribution agreement requested by the Board or Oaktree to ensure compliance with this Section 2(c)(iii).

(iv)  Rule 506 Transaction.  If the Company or any of its Subsidiaries or Oaktree enter into any negotiation or transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the other Shareholders that are not "accredited investors" (as defined in Rule 501 promulgated under the Securities Act) shall, at the request of Oaktree, appoint a "purchaser representative" (as such term is defined in Rule 501 promulgated under the Securities Act) designated by the Company and reasonably acceptable to Oaktree.  If any Shareholder so appoints a purchaser representative, the Company (or the applicable Subsidiary) shall pay the fees of such purchaser representative.  However, if any Shareholder declines to appoint the purchaser representative designated by the Company or such Subsidiary, such holder shall appoint another purchaser representative (reasonably acceptable to Oaktree), and such holder shall be responsible for the fees of the purchaser representative so appointed.

(v)  Expenses.  Except as otherwise provided in Section 2(c)(iv), each Shareholder Transferring Equity Securities pursuant to this Section 2(c) shall pay its pro rata share of the expenses incurred by the Shareholders and/or the Company in connection with such Approved Sale (based on the amount by which each Person's share of the aggregate proceeds paid with respect to its Equity Securities would have been reduced had the aggregate proceeds available for distribution to such Shareholders been reduced by the amount of such expenses), including by reducing the portion of the consideration to which such Shareholder would be entitled in such Approved Sale.

(vi)  Breach of Obligations.  If any Shareholder fails to deliver any certificates representing its Equity Securities as required by this Section 2(c), or in lieu thereof, a customary affidavit (and indemnity) attesting to the loss or destruction of such certificate(s), such Shareholder (v) shall not be entitled to the consideration that such Shareholder would otherwise receive in the Approved Sale until such holder cures such failure (provided that, after curing such failure, such holder will be so entitled to such consideration without interest), (w) shall be deemed, for all purposes, no longer to be a Shareholder and shall have no voting rights, (x) shall not be entitled to any dividends or other distributions declared after the Approved Sale with respect to the Equity Securities held by such holder, (y) shall have no other rights or privileges granted to Shareholders under this Agreement or any future agreement, and (z) in the event of liquidation of the Company, the consideration that such holder would have received if such holder had complied with this Section 2(c) shall be paid to such holder only upon coming into compliance with this Section 2(c), all of the foregoing to the extent permissible under applicable law.

(vii) <u>Public Offering</u>. If Oaktree or the Board approves a Public Offering, each Shareholder shall, vote for, consent to (to the extent it has any voting or consenting rights) and raise no objections against any such transaction, including any reorganization, recapitalization or other similar transaction involving the Company in connection with such Public Offering, and the Company, the Board and each Shareholder shall take all reasonable actions in connection with the consummation of any such transactions as requested by Oaktree or the Board, as applicable; provided that in any such reorganization, recapitalization or other similar transaction involving the Company in connection with such Public Offering, such Shareholder shall be afforded substantially equivalent economic terms with respect to the securities held by such Shareholder immediately following such transaction as such Shareholder enjoyed with respect to the Equity Securities held by it immediately prior thereto.

(d) <u>Termination</u>. The restrictions set forth in <u>Section 2(a)</u> through <u>Section 2(c)</u> shall terminate upon the earlier of the consummation of a Sale of the Company or a Public Offering.

(e) <u>Void Transfers</u>. Any Transfer by any Shareholder of any Equity Securities or other interest in the Company in contravention of this Agreement in any respect (including the failure of the Transferee to execute a Joinder Agreement in accordance with <u>Section 2(a)(i)</u>) shall be void and ineffectual and shall not bind or be recognized by the Company or any other party.

(f) <u>Effect of Assignment</u>. Any Shareholder who assigns any Equity Securities or other interest in the Company shall cease to be a Shareholder of the Company with respect to such Equity Securities or other interest and shall no longer have any rights or privileges of a Shareholder with respect to such Equity Securities or other interest.

(g) <u>Additional Restrictions on Transfer</u>. Notwithstanding any other provisions of this <u>Section 2</u>, no Transfer of Equity Securities or any other interest in the Company may be made unless in the opinion of counsel (who may be counsel for the Company), satisfactory in form and substance to Oaktree and counsel for the Company (which opinion may be waived, in whole or in part, at the discretion of the Board), such Transfer would not violate any federal securities laws or any state or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to the Company or the interest to be Transferred, or cause the Company to be required to register as an "Investment Company" under the U.S. Investment Company Act of 1940, as amended. Such opinion of counsel shall be delivered in writing to the Company prior to the date of the Transfer.

(h) <u>Legend</u>. The certificates representing the Equity Securities, other than any global certificate representing the Equity Securities deposited with a depository for transfer in book-entry form, shall include an endorsement typed conspicuously thereon of the following restrictive legends:

"THE SHARES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED

7

(THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO (I) RESTRICTIONS PURSUANT TO ARTICLE FIVE OF THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF THE ISSUER (THE "COMPANY"), (II) CONDITIONS SPECIFIED IN A SHAREHOLDERS' AGREEMENT, DATED AS OF [                    ], 2012, AS AMENDED OR MODIFIED FROM TIME TO TIME, GOVERNING THE COMPANY AND BY AND AMONG CERTAIN SHAREHOLDERS, AND (III) (II) CONDITIONS SPECIFIED IN A REGISTRATION AGREEMENT, DATED AS OF [                ], 2012, AS AMENDED OR MODIFIED FROM TIME TO TIME. A COPY OF ANY OF SUCH AMENDED AND RESTATED CERTIFICATE OF INCORPORATION, SHAREHOLDERS' AGREEMENT OR REGISTRATION AGREEMENT SHALL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

(i)    Transfer Fees and Expenses. Except as provided in Section 2(b) and Section 2(c), the Transferor and Transferee of any Equity Securities shall be jointly and severally obligated to reimburse the Company for all reasonable expenses (including attorneys' fees and expenses) of any Transfer or proposed Transfer, whether or not consummated.

## 3.    PREEMPTIVE RIGHTS

(a)    Offering. Except for issuances of Excluded Securities, if the Company authorizes the issuance or sale to Oaktree or any of its Affiliates of any Equity Securities at a price lower than $36.84 per share (as adjusted for stock splits, stock dividends, reclassifications, recapitalizations or other similar transactions), the Company shall, through the delivery of a Pre-Emptive Right Notice (as defined below), offer to sell to each Eligible Shareholder a portion of such securities equal to the quotient obtained by dividing (1) the aggregate number of shares of Common Stock held by such Eligible Shareholder, by (2) the aggregate number of outstanding shares of Common Stock (such Eligible Shareholder's "Proportional Share"). A "Pre-Emptive Right Notice" shall mean a written notice from the Company describing in reasonable detail the securities being offered, the purchase price thereof, the payment terms and such holder's Proportional Share. Each such holder shall be entitled to purchase such securities at the same price and on other economic terms no less favorable in the aggregate than the terms on which proposed to be issued or sold by the Company; provided that if the proposed purchaser(s) of any such Equity Securities is required to also purchase other securities of the Company, the holders exercising their rights pursuant to this Section 3(a) shall also be required to purchase such other securities of the same type (at the same price and on the same other economic terms and conditions and in the same relative amounts) that such other Persons are required to purchase. The purchase price for all securities offered to such holders hereunder shall be payable in cash, and in order to exercise its purchase rights hereunder, a Eligible Shareholder must purchase the securities offered to such holder no later than on the date proposed to be issued by the Company,

8

provided that the date on which the Company proposes to issue such securities is no sooner than the eleventh day after the receipt by each Eligible Shareholder of a Pre-Emptive Right Notice. An Eligible Shareholder exercising its purchase rights pursuant to this Section 3(a) shall be required to take all necessary or desirable actions in connection with the consummation of the purchase transactions contemplated by this Section 3 as requested by the Board, including the execution of all agreements, documents and instruments in connection therewith in the form presented by the Company, so long as such agreements, documents and instruments do not require such Eligible Shareholder to make more burdensome representations, warranties, covenants or indemnities than those required of Oaktree or any of its Affiliates in the agreements, documents or instruments in connection with such transaction. Any Equity Securities of any class issued to an Eligible Shareholder pursuant to this Section 3 shall have rights and obligations which are substantively equivalent to those rights and obligations granted to and imposed upon Oaktree by the Equity Securities received by Oaktree in any offering subject to this Section 3.

(b)     Exercise. In order to exercise its purchase rights hereunder, an Eligible Shareholder must within 10 days after receipt of a Pre-Emptive Right Notice , deliver a written notice to the Company describing such holder's election hereunder, which notice shall constitute such Eligible Shareholder's unconditional and irrevocable election with respect to the purchase of the securities being offered.

(c)     Subsequent Sale. The Company shall be entitled, during the 180 days following expiration of the time period set forth in Section 3(b), to sell such securities which the Eligible Shareholders have not elected to purchase, at a price not less and on other economic terms and conditions materially no more favorable to the purchasers thereof, in the aggregate, than that offered to such holders. Any securities offered or sold by the Company after such 180-day period must be reoffered to the Eligible Shareholders if required pursuant to the terms of Section 3(a).

(d)     Alternative Offering. Notwithstanding anything to the contrary herein, if the Board determines that it would be in the best interests of the Company to do so, it may issue Equity Securities which would otherwise be required to be offered to the Eligible Shareholders under this Section 3 without first complying with this Section 3; provided that within 45 days after such issuance, it offers each such Eligible Shareholder the opportunity to purchase such Equity Securities as such Eligible Shareholder would be entitled to purchase under Section 3(a).

(e)     Termination. The provisions set forth in Section 3 shall terminate upon the earlier of the consummation of a Sale of the Company or a Public Offering.

## 4.     BOARD OF DIRECTORS; VOTING

(a)     Composition of the Board. Each Shareholder shall vote all of his, her or its Common Stock and any other voting securities of the Company over which such Shareholder has voting control (whether at a shareholders' meeting which has been duly called or by written consent) and shall take all other reasonably necessary actions within his, her or its control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall take all reasonably

9

necessary or desirable actions within its control (including calling special board and shareholder meetings), so that:

(i)      the Board shall at all times be composed only of representatives designated by the holders of a majority of the Oaktree Equity Securities (the "Majority Oaktree Holders"); and

(ii)      in the event that any Person designated as a director pursuant to Section 5(a)(i) for any reason ceases to serve as a member of the Board during such Person's term of office, (a) such Person shall be automatically removed from each committee of the Board, with such removal to be concurrent with such termination of service as a member of the Board, and (b) the resulting vacancy on the Board (and any such committee to which clause (a) foregoing is applicable) shall be filled by the Majority Oaktree Holders.

(b)      Subsidiary Boards.  The Company shall at all times, unless otherwise determined by the Board in its sole discretion, cause the board of directors or board of managers, as applicable, of each of the Company's domestic Subsidiaries to be composed of the same persons who are then members of the Board pursuant to Section 4(a)(i).

(c)      Board Meeting Expenses.  The Company shall pay all reasonable reimbursable out-of-pocket costs and expenses incurred by each member of the Board incurred in the course of his or her service hereunder, including in connection with attending regular and special meetings of the Board, any board of directors or board of managers of any of the Company's Subsidiaries and/or any of their respective committees.

(d)      Irrevocable Proxy.  In order to secure the obligation of each Shareholder to vote his, her or its Common Stock and other voting securities of the Company in accordance with Section 2(c) and Section 4(a), each Shareholder appoints Oaktree as his, her or its true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of his, her or its Common Stock and other voting securities of the Company (whether now owned or hereafter acquired) for all matters in connection therewith. Oaktree may exercise the irrevocable proxy granted to it hereunder at any time that the vote, consent or approval of any Shareholder may be required pursuant Section 2(c) or Section 4(a).  The proxies and powers granted by each such Shareholder pursuant to this Section 4(d) are coupled with an interest and are given to secure the performance of each such Shareholder's obligations under this Agreement.  Such proxies and powers shall be irrevocable and shall survive the death, incompetency, disability, bankruptcy or dissolution of such Shareholder and the subsequent holders of such Shareholder's Common Stock or other voting securities.

(e)      Termination.  The provisions set forth in Section 4 shall terminate upon the earlier of the consummation of a Sale of the Company or a Public Offering.

10

### 5.      RESTRICTIONS

From and after the date hereof, the Company shall not, and shall cause each of its Subsidiaries to not, without the prior written consent of Oaktree:

(a)      directly or indirectly declare or pay any dividends or make any distributions upon any Equity Securities;

(b)      directly or indirectly redeem, purchase or otherwise acquire, or make any payment with respect to any Equity Securities;

(c)      authorize, issue or enter into any agreement providing for the issuance (contingent or otherwise) of (i) any notes or debt securities with options, warrants or other rights to acquire Equity Securities (including any notes or debt securities convertible into or exchangeable for Equity Securities or options, warrants or other rights to acquire Equity Securities issued in connection with the issuance of capital stock or options, warrants or other rights to acquire Equity Securities or containing profit participation features) of the Company or any Subsidiary, other than as expressly provided under the terms and provisions of the Credit Facilities as in effect as of the date hereof, or (ii) any Equity Securities of the Company or any Subsidiary;

(d)      make any loans or advances to, guarantees for the benefit of, or investments in, any Person (other than a wholly owned Subsidiary established under the laws of a jurisdiction of the United States), except for (i) reasonable travel advances to employees in the ordinary course of business, or (ii) investments having a stated maturity no greater than one year from the date the Company or the applicable Subsidiary makes such investment in (x) obligations of the United States government or any agency thereof or obligations guaranteed by the United States government, (y) certificates of deposit of commercial banks having combined capital and surplus of at least $100 million or (z) commercial paper with a rating of at least "Prime-1" by Moody's Investors Service, Inc;

(e)      merge or consolidate with any Person (other than the merger or consolidation of a wholly owned Subsidiary with another wholly owned Subsidiary);

(f)      sell, lease or otherwise dispose of any of its assets in any transaction or series of related transactions (other than in the ordinary course of business);

(g)      liquidate, dissolve or effect a recapitalization or reorganization in any form of transaction or series of transactions;

(h)      acquire any interest in any Person (whether by a purchase of assets, purchase of stock, merger or otherwise), or enter into any joint venture;

(i)      enter into the ownership, active management or operation of any business other than the business of providing seaborne energy transportation services, and any businesses incidental or related to the foregoing;

11

(j)       become subject to (including by way of amendment to or modification of) any agreement or instrument which by its terms would (under any circumstances) restrict (i) the right of the Company or any Subsidiary to make loans or advances or pay dividends to, transfer property to, or repay any indebtedness owed to, the Company or another Subsidiary or (ii) the Company's right to perform the provisions of this Agreement, in each case except as restricted by the terms and provisions of the Credit Facilities as in effect as of the date hereof;

(k)       make any amendment to its Governing Documents or file any resolution of the board of directors, board of managers or managing member, as applicable, with the Secretary of State (or similar governing body) of any Governmental Entity;

(l)       enter into, amend, modify or supplement any agreement, transaction, commitment or arrangement with any of its officers, directors, managers, employees or Affiliates or with any individual related by blood, marriage or adoption to any such individual or with any entity in which any such Person or individual owns a beneficial interest, except for customary employment arrangements and benefit programs in place on the date hereof and on reasonable terms consistent with past practice;

(m)       increase any compensation (including salary, bonuses and other forms of current and deferred compensation) payable to any officer, managers or director of the Company or any Subsidiary;

(n)       establish or acquire (i) any Subsidiaries other than wholly owned Subsidiaries or (ii) any Subsidiaries organized outside of the United States;

(o)       create, incur, assume or suffer to exist any indebtedness for borrowed money, guaranties or capitalized leases other than indebtedness under the terms and provisions of the Credit Facilities as in effect as of the date hereof;

(p)       approve any annual operating budget for the Company or any Subsidiary;

(q)       make capital expenditures (including payments with respect to capitalized leases, as determined in accordance with GAAP) in an aggregate amount in any fiscal year that is greater than $1,000,000 in excess of the aggregate amount included for capital expenditures in any budget approved pursuant to Section 5(p);

(r)       enter into any leases or other rental agreements (excluding capitalized leases, as determined in accordance with GAAP), except (i) to the extent included in any budget approved pursuant to Section 5(p) or (ii) for any lease identified on the Assumption Schedule (as defined in the Plan) to be assumed on the Effective Date pursuant to the Plan;

(s)       change its Fiscal Year;

(t)       amend or modify any option plan or employee equity ownership plan as in existence as of the date hereof, adopt any new equity option plan or employee equity ownership plan, or issue any equity interests of the Company or any Subsidiary to employees of the Company or any Subsidiary;

12

(u)    sell any Equity Securities or options, warrants or other rights to acquire Equity Securities of the Company or any Subsidiary to any Person other than the Company or a wholly owned Subsidiary;

(v)    borrow against, pledge, assign, modify, cancel or surrender any key-man life insurance policies, if any;

(w)    other than pursuant to the Credit Facilities, create, incur, assume or suffer to exist any security interest, pledge, bailment, mortgage, deed of trust, option, right of first refusal, grant of a power to confess judgment, conditional sales and title retention agreement, charge, security title, encumbrance or similar arrangement or interest in real or personal property other than liens for taxes not yet due and payable or minor imperfections in title that do not materially detract from the value or marketability of the underlying asset; or

(x)    commit to take any of the foregoing actions.

## 6.    CONFIDENTIALITY

Each Shareholder recognizes and acknowledges that he, she or it has and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries, including the information delivered pursuant to Section 7(a) and information regarding identifiable, specific and discrete business opportunities being pursued by the Company or its Subsidiaries (the "Confidential Information").  Except as otherwise agreed to by Oaktree, each Shareholder agrees that it will not, and shall cause each of its directors, officers, unitholders, partners, employees, agents and members not to, during or after the term of this Agreement, whether directly or indirectly through an Affiliate or otherwise, use or disclose Confidential Information for any reason or purpose whatsoever, except (a) for disclosures to authorized directors, officers, representatives, agents and employees of the Company or its Subsidiaries and as otherwise may be proper in the course of performing such Shareholder's obligations, or enforcing such Shareholder's rights, under this Agreement and the agreements expressly contemplated hereby; (b) as part of such Shareholder's normal reporting, rating or review procedure (including normal credit rating or pricing process), or in connection with such Shareholder's or such Shareholder's Affiliates' normal fund raising, marketing, informational or reporting activities, or to such Shareholder's (or any of its Affiliates') Affiliates, auditors, attorneys or other agents; (c) for disclosures to any bona fide prospective purchaser of the equity or assets of such Shareholder or its Affiliates or the Equity Securities held by such Shareholder, or prospective merger partner of such Shareholder or its Affiliates, provided that such prospective purchaser or merger partner agrees to be bound by a confidentiality agreement with the Company consistent with the provisions of this Section 6; or (d) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation, provided that in the event that a Shareholder is requested or required, pursuant to the type of process described in this clause (d), to disclose any Confidential Information (i) such Shareholder will provide the Company with prompt notice of any such request or requirement, (ii) such Shareholder may disclose only that portion of the Confidential Information which in the opinion of its legal counsel is legally required, (iii) such Shareholder will give the Company written notice of the information to be disclosed as far in advance as practicable, and (iv) such Shareholder will cooperate with the

13

Company's efforts to obtain, at the Company's sole expense, a protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information so disclosed. For purposes of this <u>Section 6</u>, "<u>Confidential Information</u>" shall not include any information which (x) a Person learns from a source other than the Company or any of its Subsidiaries who is at the time of the disclosure not bound by a confidentiality obligation with respect to such information, (y) is disclosed in a Company prospectus or other similar Company document for dissemination to the public, or (z) otherwise becomes publicly known and made generally available through no wrongful act of any Shareholder. Nothing in this <u>Section 6</u> shall in any way limit or otherwise modify the provisions of any other agreement entered into by any Shareholder with the Company or any of its Subsidiaries.

## 7. REPORTS

(a)    <u>Reports</u>.  Subject to <u>Section 7(b)</u> and for so long as the Company does not file any periodic reports with the United States Securities Exchange Commission, the Company shall provide to any Shareholder on a confidential basis through a secure online database, within a reasonable period following written request by such Shareholder, (i) from and after the date that is forty-five (45) days following the end of each fiscal quarter of the Company for the first three fiscal quarters, the unaudited consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal quarter and the related consolidated statements of income and cash flows for such fiscal quarter and for the portion of the fiscal year theretofore elapsed, together with the footnotes thereto, and (ii) from and after the date that is one hundred twenty (120) days following the end of each fiscal year of the Company (or such later time as such financial statements  are delivered to the Company by its independent auditors) the audited consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal year and the related consolidated statements of income and cash flows for such fiscal year, prepared in accordance with GAAP, except as otherwise noted therein.

(b)    <u>Service Provider Shareholders</u>.  Any Shareholder who (i) is an employee or consultant of the Company or any Subsidiary, (ii) at any time ceases to be employed or engaged by the Company or its Subsidiaries for any reason and (iii) thereafter directly or indirectly renders services to or becomes employed by or otherwise participates in the business of any competitor of the Company or any of its Subsidiaries (as determined by the Board in good faith), shall, upon so becoming employed by or otherwise participating in the business of any competitor, no longer be entitled to the rights set forth in this <u>Section 7</u>.

## 8. DEFINITIONS

"<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise.  For the avoidance of doubt, each Oaktree Fund, and any of their respective affiliated funds, shall be considered to be Affiliates of each other and Oaktree for the purposes of this Agreement.

"<u>Agreement</u>" means this Agreement, as amended, modified and waived from time to time in accordance with the terms hereof.

14

"Approved Sale" has the meaning set forth in Section 2(c)(i).

"Board" has the meaning set forth in the preface above.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks located in New York City and the Marshall Islands are authorized or obligated to close.

"Common Stock" means the shares of common stock, par value $0.01, of the Company from time to time outstanding.

"Company" has the meaning set forth in the preface above.

"Confidential Information" has the meaning set forth in Section 6.

"Credit Facilities" means (I) that Second Amended And Restated Credit Agreement, dated as of [_____], 2012, among the Company, General Maritime Subsidiary Corporation, Arlington Tankers Ltd., General Maritime Subsidiary II Corporation, the lenders party thereto from time to time, and Nordea Bank Finland PLC, New York branch, and (ii) that Third Amended and Restated Credit Agreement, dated as of [_____], 2012, by and among the same parties as those referenced in clause (i) preceding.

"Eligible Shareholder" means each Shareholder who (i) is an "accredited investor" (as defined in Rule 501 promulgated under the Securities Act) or a "qualified institutional buyer" (as defined in Rule 144A promulgated under the Securities Act), and (ii) holds at least 0.15% of the outstanding Common Stock of the Company on a fully diluted basis.

"EPA" has the meaning set forth in the preface above.

"Equity Investment" has the meaning set forth in the preface above.

"Equity Securities" means, with respect to the Company, (i) shares of Common Stock and any other capital stock of the Company from time to time outstanding, (ii) obligations, evidences of indebtedness or other securities or interests, in each case that are convertible or exchangeable into shares of Common Stock or any other capital stock of the Company and (iii) warrants, options or other rights to purchase or otherwise acquire shares of Common Stock or any other capital stock of the Company.

"Fiscal Year" means each calendar year ending December 31, or such other annual accounting period as may be established by the Board.

"GAAP" means generally accepted accounting standards in the United States, applied on a consistent basis.

"Governing Documents" with respect to the Company and any of its Subsidiaries, means, collectively, such Person's certificate of incorporation, certificate of formation, bylaws, operating agreement or similar governing documents.

15

"Governmental Entity" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Individual Shareholder Obligations" has the meaning set forth in Section 2(b)(iii).

"Initiating Holder" means the holder(s) of Oaktree Equity Securities that deliver a Sale Notice pursuant to Section 2(b)(i).

"Joinder Agreement" has the meaning set forth in the preface above.

"Majority Oaktree Holders" has the meaning set forth in Section 5(a).

"Non-Oaktree Equity Securities" means the outstanding Equity Securities held by Shareholders other than Oaktree.

"Oaktree" has the meaning set forth in the preface above.

"Oaktree Equity Securities" means (i) the Equity Securities issued to Oaktree on or prior to the date hereof and (ii) any securities issued directly or indirectly with respect to the foregoing securities by way of a share split, share dividend, or other division of securities, or in connection with a combination of securities, recapitalization, merger, consolidation, or other reorganization.  As to any particular securities constituting Oaktree Equity Securities, such securities shall cease to be Oaktree Equity Securities when they have been (a) effectively registered under the Securities Act and disposed of in accordance with the registration statement covering them, (b) distributed to the public through a broker, dealer or market maker pursuant to Rule 144 under the Securities Act (or any similar provision then in force), or (c) repurchased by the Company or any Subsidiary.

"Oaktree Fund" means each of Oaktree Principal Fund V, L.P., Oaktree Principal Fund V (Parallel), L.P., Oaktree FF Investment Fund, L.P. - Class A, and OCM Asia Principal Opportunities Fund, L.P., each a Cayman Islands exempted limited partnership.

"Other Shareholder" has the meaning set forth in the preface above.

"Permitted Transferee" means (i) with respect to any Shareholder who is a natural person, such Shareholder's spouse and lineal descendants (whether natural or adopted) and any trust that is and at all times remains solely for the benefit of the Shareholder and/or the Shareholder's spouse and/or lineal descendants, and (ii) with respect to any Shareholder which is an entity, (a) any of such Shareholder's wholly owned Subsidiaries and parent companies that wholly own such Shareholder and (b) equityholders of such Shareholder pursuant to a distribution in accordance with such Shareholder's governing documents.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Entity.

16

"Plan" has the meaning set forth in the preface above.

"Public Offering" means any sale, in an underwritten public offering registered under the Securities Act, of the Company's (or any successor's) Equity Securities.

"Public Sale" means any sale of Equity Securities or other securities to the public pursuant to an offering registered under the Securities Act or through a broker, dealer or market maker pursuant to the provisions of Rule 144 promulgated under the Securities Act.

"Sale Notice" has the meaning set forth in Section 2(b)(i).

"Sale of the Company" means a bona fide sale of the outstanding Equity Securities or assets of the Company on an arm's length basis to any Person (other than the Company, any Subsidiary of the Company, Oaktree, or any Affiliate of any of the foregoing) pursuant to which such Person, together with its Affiliates, acquires (i) a majority of the voting power represented by the outstanding Equity Securities (whether by merger, consolidation, sale or Transfer of Equity Securities or otherwise) or (ii) all or substantially all of the Company's and its Subsidiaries' assets determined on a consolidated basis.

"Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.  Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"Shareholder" has the meaning set forth in the preface above.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.  For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

"Tag-Along Portion" has the meaning set forth in Section 2(b)(i).

"Tag-Along Shareholders" has the meaning set forth in Section 2(b)(i).

17

"Transfer" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other direct or indirect disposition or encumbrance of an interest whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof.  The terms "Transferee," "Transferred," and other forms of the word "Transfer" shall have correlative meanings.

## 9.    MISCELLANEOUS

(a)    Amendment and Waiver.  This Agreement may only be amended, modified, or waived with the written consent of Oaktree; provided that if any such amendment, modification, or waiver would, individually or in the aggregate, adversely affect in any material respect the rights, preferences or privileges of any Non-Oaktree Equity Securities (without regard to any effect on the individual circumstances of the holder of such Non-Oaktree Equity Securities) as compared with the effect of such amendment, modification or waiver on the rights, preferences or privileges of the Oaktree Equity Securities, such amendment, modification, or waiver shall also require the written consent of the holders of a majority of the Non-Oaktree Equity Securities.  The Board may, without the consent of any Shareholder, amend the Schedule of Shareholders to reflect the issuance or Transfer of Equity Securities to any Shareholder consistent with this Agreement.

(b)    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(c)    Entire Agreement.  Except as otherwise expressly set forth herein, this document and the documents referenced herein embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

(d)    Successors and Assigns.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and the Shareholders from time to time party hereto and the respective successors and assigns of each of them, so long as they hold Equity Securities and have executed a Joinder Agreement with respect to such Equity Securities.

(e)    Counterparts.  This Agreement may be executed in separate counterparts (including by signature pages delivered by means of facsimile machine or electronic transmission in portable electronic format (pdf)), each of which shall be an original and all of which taken together shall constitute one and the same agreement.

(f)    Delivery by Facsimile or PDF.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or

18

thereto, to the extent signed and delivered by means of a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic transmission in portable document format (pdf) to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission in portable document format (pdf) as a defense to the formation of a contract and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

(g)     Remedies.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the Company and any Shareholder shall have the right to injunctive relief or specific performance, in addition to all of its rights and remedies at law or in equity, to enforce the provisions of this Agreement.  Nothing contained in this Agreement shall be construed to confer upon any Person who is not a signatory hereto any rights or benefits, as a third party beneficiary or otherwise.

(h)     Notices.  Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, sent by reputable overnight courier service (charges prepaid), sent by facsimile or e-mail, or (other than under Section 2(b) or Section 3(b)) sent by certified mail, return receipt requested, to the Company at the address set forth below and to any other recipient at the address indicated on the Schedule of Shareholders attached hereto or at such address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.  Notices will be deemed to have been given hereunder (i) when delivered personally to the recipient, (ii) one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) upon machine-generated acknowledgment of receipt after transmittal by facsimile or e-mail if so acknowledged to have been received before 5:00 p.m. on a business day at the location or e-mail address of receipt and otherwise on the next following business day or (iv) five (5) days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid.  The Company's address is:

> General Maritime Corporation
> 299 Park Avenue
> New York, New York 10171
> Facsimile: [_____]
> E-mail: [_____]
> Attention: [_____]

19

with copies (which shall not constitute notice) to:

Oaktree Capital Management, L.P.
333 South Grand Ave., 28th Floor
Los Angeles, California 90071
Facsimile:  (213) 830-6300
E-mail: jford@oaktreecapital.com,
apierce@oaktreecapital.com
Attention:        B. James Ford
                          Adam Pierce

and

Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, California 90071
Facsimile: (213) 680-8500
E-mail: damon.fisher@kirkland.com
Attention:        Damon R. Fisher

and

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8100
Attention:        Thomas E. Molner

(i)        <u>Governing Law</u>.    All matters concerning the relative rights of the Company and the Shareholders and the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(j)        <u>Waiver of Jury Trial</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.  EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANOTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTY THERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 9(j)</u>.

20

(k)      Acknowledgements.  Each Shareholder (i) acknowledges that Kirkland & Ellis LLP has represented Oaktree and the Company in connection with this Agreement and the transactions contemplated hereby, (ii) expects that Kirkland & Ellis LLP will be retained as legal counsel in connection with the management and operation and various other matters of Oaktree and/or the Company following the date hereof, (iii) consents to Kirkland & Ellis LLP's representation of Oaktree or the Company following the date hereof, including in connection with any disputes or litigation that may arise out of or relate to this Agreement or to any relationship between any Shareholder, on the one hand, and Oaktree or the Company, on the other hand.

(l)      Descriptive Headings.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

\* \* \* \* \*

21

IN WITNESS WHEREOF, the parties hereto have executed this Shareholders' Agreement on the day and year first above written.

**COMPANY:**

**GENERAL MARITIME CORPORATION**


By:_____
    Name:
    Title:

*[Signature Pages – Shareholders' Agreement]*

**SHAREHOLDERS:**

**OCM MARINE INVESTMENT CTB, LTD.**

By: Oaktree Capital Management, L.P.
Its: Director

By:_____
Name:
Title:

By:_____
Name:
Title:

**OCM MARINE HOLDINGS TP, L.P.**

By: OCM Marine GP CTB, Ltd.

Its: General Partner

By: Oaktree Capital Management, L.P.
Its: Director

By:_____
Name:
Title:

By:_____
Name:
Title:

*[Signature Pages – Shareholders' Agreement]*

## SCHEDULE OF SHAREHOLDERS

| Shareholder | Address |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**EXHIBIT A**

FORM OF JOINDER AGREEMENT

This Joinder Agreement is being delivered to General Maritime Corporation, a Marshall Islands corporation (the "Company"), pursuant to that certain Shareholders' Agreement, dated as of _____, 2012 (as amended from time to time in accordance with the terms thereof, the "Shareholders' Agreement"), among the Company and the Shareholders (as defined therein).  Capitalized terms used herein shall have the meanings assigned to such terms in the Shareholders' Agreement.

The undersigned hereby executes and delivers to the Company this Joinder Agreement, pursuant to which the undersigned hereby becomes a party to the Shareholders' Agreement and that certain Registration Rights Agreement dated as of _____, 2012 (as amended from time to time in accordance with the terms thereof, the "Registration Rights Agreement") among the Company and the Shareholders (as defined therein) and agrees to be bound by the provisions of the Shareholders' Agreement and the Registration Rights Agreement with respect to the Equity Securities held by the undersigned.

Any notice provided for in the Shareholders' Agreement or the Registration Rights Agreement should be delivered to the undersigned at the address set forth below:

_____
_____
_____
Telephone: _____
Facsimile:

Dated: _____

_____
[                    ]

*[Shareholders' Agreement - Joinder]*

# EXHIBIT 15

**Existing Benefits Agreements to be Assumed under the Plan**

### Existing Benefits Agreements to be Assumed Under the Plan

No Existing Benefits Agreements[1] will be assumed under the Plan.

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Second Amended Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 400] (as may be amended from time to time, the "**Plan**").

## <u>EXHIBIT 16A</u>

**New Senior 2010 Facility Intercreditor Agreement**

INTERCREDITOR AGREEMENT

among

GENERAL MARITIME CORPORATION,

as Parent,

GENERAL MARITIME SUBSIDIARY II CORPORATION,

as First Priority Borrower,

GENERAL MARITIME SUBSIDIARY CORPORATION,

as Second Priority Borrower,

EACH OF THE SUBSIDIARY GUARANTORS PARTY HERETO,

NORDEA BANK FINLAND PLC, NEW YORK BRANCH,

as First Priority Agent and Collateral Agent

and

NORDEA BANK FINLAND PLC, NEW YORK BRANCH,

as Second Priority Agent

dated as of [_____], 2012

## INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT** ("**Agreement**"), dated as of [_____], 2012, is entered into by and among GENERAL MARITIME CORPORATION (the "**Parent**"), GENERAL MARITIME SUBSIDIARY II CORPORATION, as borrower under the First Priority Credit Agreement (as defined below) (the "**First Priority Borrower**"), GENERAL MARITIME SUBSIDIARY CORPORATION, as borrower under the Second Priority Credit Agreement (as defined below) (the "**Second Priority Borrower**" and, together with the First Priority Borrower, the "**Borrowers**"), EACH OF THE UNDERSIGNED SUBSIDIARY GUARANTORS (as defined below), NORDEA BANK FINLAND PLC, NEW YORK BRANCH, in its capacity as administrative agent for the First Priority Creditors (as defined below), including its successors and assigns from time to time (the "**First Priority Agent**") and NORDEA BANK FINLAND PLC, NEW YORK BRANCH, in its capacity as administrative agent for the Second Priority Obligations (as defined below), including its successors and assigns from time to time (in such capacity, the "**Second Priority Agent**"). Capitalized terms used in this Agreement have the meanings assigned to them in Section 1 below.

## RECITALS

The First Priority Borrower, the Parent, the lenders from time to time party thereto, the First Priority Agent, the Collateral Agent and the other entities from time to time party thereto have entered into that certain $273,802,583.31 Second Amended and Restated Credit Agreement, dated as of the date hereof (the "**First Priority Credit Agreement**"), which First Priority Credit Agreement amends and restates the Amended and Restated Credit Agreement, dated as of May 6, 2011 (as amended, modified and/or supplemented from time to time to, but not including, the Restatement Effective Date (as defined in the First Priority Credit Agreement), the "**Original Credit Agreement**"), among the First Priority Borrower, the Parent, General Maritime Subsidiary Corporation, Arlington Tankers Ltd. ("**Arlington**"), the lenders party thereto and the First Priority Agent;

The Second Priority Borrower, the Parent, the lenders from time to time party thereto, the Second Priority Agent and the other entities from time to time party thereto have entered into that certain $[508,963,260.95][1] Third Amended and Restated Credit Agreement, dated as of the date hereof (the "**Second Priority Credit Agreement**"), which Second Priority Credit Agreement amends and restates the Second Amended and Restated Credit Agreement, dated as of May 6, 2011 (as amended, modified and/or supplemented from time to time to, but not including, the Restatement Effective Date), among the Second Priority Borrower, the Parent, General Maritime Subsidiary II Corporation, Arlington, the lenders party thereto and the Second Priority Agent;

Pursuant to (i) the First Priority Credit Agreement, the Parent, Arlington and the Second Priority Borrower have agreed to guaranty the First Priority Obligations and to cause certain current and future Subsidiaries listed on the signature pages hereto and to the Other

---

[1] Amount to include accrued and unpaid interest on the Specified Swap (as defined in the Second Priority Credit Agreement).

Intercreditor Agreement (as defined below) (the **"Subsidiary Guarantors"**) to agree to guaranty the First Priority Obligations (the **"First Priority Guaranty"**); and (ii) the Second Priority Credit Agreement, the Parent, Arlington and the First Priority Borrower have agreed to guaranty the Second Priority Obligations and to cause the Subsidiary Guarantors to agree to guaranty the Second Priority Obligations (the **"Second Priority Guaranty"**);

The obligations of the First Priority Borrower under the First Priority Credit Agreement and the obligations of the Parent, Arlington, the Second Priority Borrower and the Subsidiary Guarantors under the First Priority Credit Agreement and the First Priority Guaranty are secured, inter alia, on a first priority basis by Liens on the Collateral pursuant to the terms of the First Priority Collateral Documents;

The obligations of the Second Priority Borrower under the Second Priority Credit Agreement and the Existing Swap Agreements (as defined below) and the obligations of the Parent, the First Priority Borrower, Arlington and the Subsidiary Guarantors under the Second Priority Credit Agreement and the Second Priority Guaranty are secured, inter alia, on a second priority basis by Liens on the Collateral pursuant to the terms of the Second Priority Collateral Documents;

The First Priority Loan Documents and the Second Priority Loan Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

In order to induce the First Priority Agent and the First Priority Creditors to consent to the Grantors incurring the Second Priority Obligations and to induce the First Priority Creditors to convert their outstanding revolving loans under the Original Credit Agreement to Loans, continue their outstanding term loans under the Original Credit Agreement to Loans and make other financial accommodations to or for the benefit of the First Priority Borrower or any other Grantor, the Second Priority Agent on behalf of the Second Priority Creditors has agreed to the intercreditor and other provisions set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1.  Definitions.**

1.1.    Defined Terms.  As used in the Agreement, the following terms shall have the following meanings:

**"Affiliate"** means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.  For purposes of this definition, a Person shall be deemed to **"control"** or be **"controlled by"** a Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through ownership of equity interests, by contract or otherwise.

"**Agreement**" means this Intercreditor Agreement, as amended, restated, renewed, extended, supplemented, replaced or otherwise modified from time to time.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means a court having jurisdiction over an Insolvency or Liquidation Proceeding.

"**Bankruptcy Law**" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"**Borrowers**" has the meaning assigned to that term in the Preamble to this Agreement.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, Hamburg and London are authorized or required by law or executive order to close.

"**Cash Equivalents**" means (i) securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States of America is pledged in support thereof) having maturities of not more than one year from the date of acquisition, (ii) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company having capital, surplus and undivided profits aggregating in excess of $200,000,000, with maturities of not more than one year from the date of acquisition by such Person, (iii) repurchase obligations with a term of not more than 90 days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (ii) above, (iv) commercial paper issued by any Person incorporated in the United States of America rated at least A-1 or the equivalent thereof by Standard & Poor's Financial Services LLC (and its successors) or at least P 1 or the equivalent thereof by Moody's Investors Service, Inc. (and its successors) and in each case maturing not more than one year after the date of acquisition by such Person, and (v) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (iv) above.

"**Collateral**" means:

(i)      each of the Collateral Vessels;

(ii)     all the Equity Interests in (x) the First Priority Borrower, (y) each of the other Grantors that owns a Collateral Vessel and (z) each Grantor which is a Subsidiary of the First Priority Borrower and owns, directly or indirectly, any Equity Interests in any Grantor which owns a Collateral Vessel;

(iii)    all insurances on the Collateral Vessels;

(iv)    all earnings from the Collateral Vessels;

(iv)    the Earnings Accounts described in clauses (x) and (z) of the definition thereof and all property of every type and description in which any proceeds of any Disposition of Collateral are invested;

(v)    all rights under any charter contracts with respect of the Collateral Vessels;

(vi)    all tangible and intangible property which is pledged to secure the First Priority Obligations in order to cure a default or potential default under Section 9.09 of the First Priority Credit Agreement;

(vii)    any other assets and/or property of the First Priority Borrower or any other Grantor, whether real, personal or mixed, constituting "Primary Collateral" under and as defined in First Priority Credit Agreement at any time; and

(viii)    to the extent not otherwise included above, all proceeds of any of the foregoing.

It is understood and agreed that the Collateral does not include (x) the Other Collateral and that the respective rights and remedies of the First Priority Creditors and the Second Priority Creditors with respect thereto will be governed by the Other Intercreditor Agreement and (y) notwithstanding anything to the contrary contained above or in the definition of Other Collateral, the Pari Passu Collateral Accounts.

"**Collateral Agent**" means (x) prior to the Discharge of the First Priority Obligations, the First Priority Agent and (y) after the Discharge of First Priority Obligations, the Second Priority Agent.

"**Collateral Documents**" means, collectively, the First Priority Collateral Documents and the Second Priority Collateral Documents, in each case with respect to the Collateral.

"**Collateral Vessel**" means each of the vessels listed on <u>Annex I</u> hereto, together with any vessel provided as a replacement thereto in accordance with the terms of the First Priority Credit Agreement and the Second Priority Credit Agreement at any time.

"**Comparable Second Priority Collateral Document**" means, in relation to any Collateral subject to any Lien created under any First Priority Collateral Document, the Second Priority Loan Document which creates a Lien on the same Collateral, granted by the same Grantor or Grantors.

"**DIP Financing**" has the meaning assigned to that term in Section 6.1(a).

"**Discharge of First Priority Obligations**" means, except to the extent otherwise expressly provided in Section 5.6:

(a)      payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding), on all Indebtedness outstanding under the First Priority Loan Documents and constituting First Priority Obligations;

(b)      payment in full in cash of all other First Priority Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid;

(c)      termination or expiration of all commitments, if any, to extend credit that would constitute First Priority Obligations; and

(d)      termination (without any prior demand for payment thereunder having been made or, if made, with such demand having been fully reimbursed in cash) or cash collateralization (in an amount and manner, and on terms, satisfactory to the First Priority Agent) of all letters of credit issued by any First Priority Creditor.

For the avoidance of doubt, "Discharge of First Priority Obligations" shall not require the payment of First Priority Obligations consisting solely of contingent indemnification obligations for which (i) no claim has been made and (ii) notice of the event with respect to which a claim may arise has not been given to the First Priority Borrower.

"**Disposition**" means a sale, lease, exchange, transfer or other disposition.

"**Earnings Account**" means (a) each bank account required to be opened and maintained by (x) each Grantor that owns a Collateral Vessel in its name with the Collateral Agent into which bank account such Grantor shall procure that all hires, freights, pool income and other sums payable in respect of the Collateral Vessels are credited and (y) each Grantor that owns an Other Collateral Vessel in its name with the Collateral Agent into which bank account such Grantor shall procure that all hires, freights, pool income and other sums payable in respect of the Other Collateral Vessels are credited and (b) each Pari Passu Collateral Account.

"**Equity Interests**" means (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents of corporate stock and (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited).

"**Exercise Any Secured Creditor Remedies**" or "**Exercise of Secured Creditor Remedies**" means (a) the taking of any action to enforce or realize upon any Lien, including the institution of any foreclosure proceedings or the noticing of any public or private sale or other disposition pursuant to Article 9 of the UCC, applicable law or otherwise, (b) the exercise of any right or remedy provided to a secured creditor or otherwise on account of a Lien under the First Priority Loan Documents, the Second Priority Loan Documents or any Collateral Document, Article 9 of the UCC, applicable law, in an Insolvency Proceeding or otherwise, including the election to retain Collateral in satisfaction of a Lien, (c) the taking of any action or the exercise of any right or remedy in respect of the collection on, set off against, marshaling of, or foreclosure on the Collateral or the proceeds of Collateral (including, without limitation, the

notification of account debtors), (d) the sale, lease, license, or other disposition of all or any portion of the Collateral, by private or public sale, other disposition or any other means permissible under applicable law, (e) the solicitation of bids from third parties to conduct the liquidation of all or any portion of Collateral to the extent undertaken and being diligently pursued in good faith to consummate the sale of such Collateral, (f) the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers or other third parties for the purposes of valuing, marketing, promoting and selling the Collateral to the extent undertaken and being diligently pursued in good faith to consummate the sale of such Collateral, and (g) the exercise of any other enforcement right relating to the Collateral (including the exercise of any voting rights relating to any Equity Interests and including any right of recoupment or set-off) whether under the First Priority Loan Documents, the Second Priority Loan Documents or any Collateral Document, applicable law, in an Insolvency Proceeding or otherwise.

"**Exercise Any Unsecured Creditor Remedies" or "Exercise of Unsecured Creditor Remedies**" means the commencement or joinder in the commencement of an Insolvency or Liquidation Proceeding against the Parent or any of its Subsidiaries.

**"Existing Swap Agreements"** means (i) the interest rate swap agreement entered into between the Parent and DnB Bank ASA with a notional amount equal to $75,000,000 and (ii) the interest rate swap agreement entered into between the Parent and Nordea Bank Finland plc with a notional amount equal to $75,000,000.

**"First Priority Agent"** has the meaning assigned to that term in the Recitals to this Agreement.

**"First Priority Borrower"** has the meaning assigned to that term in the Preamble to this Agreement.

**"First Priority Collateral"** means all of the Collateral with respect to which a Lien is granted as security for any First Priority Obligations.

**"First Priority Collateral Documents"** means the Security Documents (as defined in the First Priority Credit Agreement) and the First Priority Guaranty and any other agreement, document or instrument pursuant to which a Lien is granted on the Collateral securing any First Priority Obligations or under which rights or remedies with respect to such Liens are governed.

**"First Priority Credit Agreement"** has the meaning assigned to that term in the Recitals to this Agreement.

**"First Priority Creditors"** means, at any relevant time, the holders of First Priority Obligations at that time, including the First Priority Lenders and the agents under the First Priority Loan Documents.

**"First Priority Debt Notice"** has the meaning assigned to that term in Section 5.6.

**"First Priority Guaranty"** has the meaning assigned to that term in the Recitals to this Agreement.

**"First Priority Lenders"** means the Lenders under and as defined in the First Priority Loan Documents.

**"First Priority Liens"** means any Liens on the Collateral securing the First Priority Obligations pursuant to the First Priority Collateral Documents, this Agreement or otherwise.

**"First Priority Loan Documents"** means the First Priority Credit Agreement and the Credit Documents (as defined in the First Priority Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other First Priority Obligation, and any other document or instrument executed or delivered at any time in connection with any First Priority Obligations, including any intercreditor or joinder agreement among holders of First Priority Obligations, to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, Refinanced or extended from time to time in accordance with the provisions of this Agreement.

**"First Priority Obligations"** means, subject to the next paragraph, all Obligations outstanding under the First Priority Credit Agreement and the other First Priority Loan Documents. "First Priority Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Priority Loan Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

Notwithstanding the foregoing, if the sum of:   (1) Indebtedness constituting principal outstanding under the First Priority Credit Agreement (including any unfunded commitments) and the other First Priority Loan Documents, plus (2) the aggregate face amount of any letters of credit issued but not reimbursed under the First Priority Credit Agreement, is in excess of the Maximum First Priority Indebtedness Amount, then only that portion of such Indebtedness and such aggregate face amount of letters of credit equal to the Maximum First Priority Indebtedness Amount shall be included in First Priority Obligations and interest, fees, premium (if any) and reimbursement obligations with respect to such Indebtedness and letters of credit shall only constitute First Priority Obligations to the extent related to Indebtedness and face amounts of letters of credit included in the First Priority Obligations.

**"First Priority Purchase Price"** has the meaning assigned to that term in Section 5.7.

**"First Priority Recovery"** has the meaning assigned to that term in Section 6.5(a).

**"First Priority Termination Fees"** has the meaning assigned to that term in Section 5.7.

"**Grantors**" means the Parent, the Borrowers, each of the Subsidiary Guarantors and each other Person that has or may from time to time hereafter execute and deliver a First Priority Collateral Document or a Second Priority Collateral Document as a "Grantor" (or the equivalent thereof).

"**Indebtedness**" means and includes all Obligations that constitute "Indebtedness" within the meaning of the First Priority Credit Agreement or the Second Priority Credit Agreement, as applicable.

"**Insolvency or Liquidation Proceeding**" means:

(a)     any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)     any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets;

(c)     any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)     any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust, UCC financing statement or other preferential arrangement having the practical effect of any of the foregoing.

"**Maximum First Priority Indebtedness Amount**" means (x) $273,802,583.31 minus (y) permanent reductions of the principal amount of the Indebtedness under the First Priority Credit Agreement; provided that no such reduction shall be deemed to occur in connection with any Refinancing of the First Priority Credit Agreement.

"**Maximum Second Priority Indebtedness Amount**" means (x) $[508,963,260.95][2] minus (y) permanent reductions of the principal amount of the Indebtedness under the Second Priority Credit Agreement; provided that no such reduction shall be deemed to occur in connection with any Refinancing of the Second Priority Credit Agreement.

"**Net Cash Proceeds**" shall mean, with respect to any Collateral Disposition, the aggregate cash payments (including any cash received by way of deferred payment pursuant to a note receivable issued in connection with such Collateral Disposition, other than the portion of such deferred payment constituting interest, but only as and when received) received by the

---

[2] Amount to include accrued and unpaid interest on the Specified Swap (as defined in the Second Priority Credit Agreement).

Parent or any Borrower or any of their respective Subsidiaries from such Collateral Disposition net of (i) reasonable transaction costs (including, without limitation, reasonable attorney's fees) and sales commissions and (ii) the estimated marginal increase in income taxes and any stamp tax payable by the Parent, any Borrower or any of its Subsidiaries as a result of such Collateral Disposition.

"**New First Priority Agent**" has the meaning assigned to that term in Section 5.6.

"**Obligations**" means all obligations of every nature of each Grantor from time to time owed to any agent or trustee, the First Priority Creditors, the Second Priority Creditors or any of them or their respective Affiliates, in each case under the First Priority Loan Documents, the Second Priority Loan Documents or Existing Swap Agreements, whether for principal, interest or payments for early termination, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing.

"**Other Collateral**" means all property (tangible and intangible) securing the Obligations other than the Collateral and shall include, without limitation:

(i)     each of the Other Collateral Vessels;

(ii)    all Equity Interests in (w) the Second Priority Borrower, (x) Arlington, (y) each of the other Grantors that owns a Other Collateral Vessel and (z) each Grantor which is a Subsidiary of the Second Priority Borrower and owns, directly or indirectly, any Equity Interests in any Grantor which owns an Other Collateral Vessel;

(ii)    all insurances on the Other Collateral Vessels;

(iv)    all earnings from the Other Collateral Vessels;

(v)     the Earnings Accounts described in clause (a) of the definition thereof and all property of every type and description in which any proceeds of any Disposition of Other Collateral are invested;

(vi)    all rights under any charter contracts with respect of the Other Collateral Vessels;

(vii)   all tangible and intangible property which is pledged to secure the Second Priority Obligations in order to cure a default or potential default under Section 9.09 of the Second Priority Credit Agreement; and

(viii)  any other assets and/or property of the First Priority Borrower or any other Grantor, whether real, personal or mixed, constituting "Secondary Collateral" under and as defined in First Priority Credit Agreement at any time; and

(ix)    to the extent not otherwise included above, all proceeds of any of the foregoing.

Notwithstanding anything to the contrary contained above or in the definition of Collateral, it is understood and agreed that the Other Collateral does not include the Pari Passu Collateral Accounts.

"**Other Collateral Vessel**" means each of the vessels listed on <u>Annex II</u> hereto, together with any vessel provided as a replacement thereto in accordance with the terms of the Second Priority Credit Agreement at any time.

"**Other Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the date hereof, entered into by and among the Parent, the Borrowers, the other Subsidiaries of the Parent from time to time party thereto, the First Priority Agent and the Second Priority Agent setting forth the respective rights and remedies of the First Priority Creditors and the Second Priority Creditors with respect to the Other Collateral.

"**Parent**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Pari Passu Collateral Accounts**" means each bank account opened and maintained by the Parent, the First Priority Borrower, the Second Priority Borrower and Arlington, which accounts (i) shall be pledged to secure the First Priority Obligations and the Second Priority Obligations on a pari passu basis and (ii) shall exclude the Earnings Accounts set forth in clause (a) of the definition thereof.

"**Pari Passu Collateral Percentage**" means (i) in the case of the First Priority Obligations, the percentage of the aggregate Obligations represented by the First Priority Obligations and (ii) in the case of the Second Priority Obligations, 100% less the Pari Passu Collateral Percentage for the First Priority Obligations.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"**Pledged Collateral**" has the meaning assigned to that term in Section 5.5(i).

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such Indebtedness in whole or in part. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Second Priority Agent**" has the meaning assigned to that term in the Preamble of this Agreement.

"**Second Priority Borrower**" has the meaning assigned to that term in the Preamble to this Agreement.

"**Second Priority Collateral Documents**" means the Security Documents (as defined in the Second Priority Credit Agreement) and the Second Priority Guaranty and any other agreement, document or instrument pursuant to which a Lien is granted securing any

Second Priority Obligations or under which rights or remedies with respect to such Liens are governed.

"**Second Priority Credit Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Second Priority Creditors**" means, at any relevant time, the holders of Second Priority Obligations at that time, including the Second Priority Lenders, the agents under the Second Priority Loan Documents and the lender counterparties to the Existing Swap Agreements.

"**Second Priority Collateral**" means all of the Collateral with respect to which a Lien is granted as security for any Second Priority Obligations.

"**Second Priority Guaranty**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Second Priority Lenders**" means the "Lenders" under and as defined in the Second Priority Loan Documents.

"**Second Priority Liens**" means any Liens on the Second Priority Collateral securing the Second Priority Obligations pursuant to the Second Priority Collateral Documents, this Agreement or otherwise.

"**Second Priority Loan Documents**" means the Second Priority Credit Agreement and the Credit Documents (as defined in the Second Priority Credit Agreement), including Existing Swap Agreements, and each of the other agreements, documents and instruments providing for or evidencing any other Second Priority Obligation, and any other document or instrument executed or delivered at any time in connection with any Second Priority Obligations, including any intercreditor or joinder agreement among holders of Second Priority Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"**Second Priority Mortgage**" means a collective reference to each mortgage, deed of trust, deed to secure debt and any other document or instrument under which any Lien on real property owned by any Grantor is granted to secure any Second Priority Obligations or under which rights or remedies with respect to any such Liens are governed.

"**Second Priority Obligations**" means, subject to the next paragraph, all Obligations outstanding under the Second Priority Credit Agreement and the other Second Priority Loan Documents, including Obligations under the Existing Swap Agreements. "Second Priority Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Second Priority Loan Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"**Second Priority Purchase Notice**" has the meaning assigned to that term in Section 5.7.

"**Second Priority Recovery**" has the meaning assigned to that term in Section 6.5(b).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"**Subsidiary Guarantors**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Triggering Event**" means (a) the tenth Business Day prior to the acceleration prior to maturity of all or any portion of the First Priority Obligations, (b) subject to Section 5.7(b), the exercise of any remedy with respect to Liens on the Collateral by the First Priority Agent, (c) a default in any payment under any of the First Priority Loan Documents, or the Second Priority Loan Documents which remains uncured or unwaived for a period of 30 days in the aggregate (after giving effect to any applicable grace period under the First Priority Loan Documents or the Second Priority Loan Documents, as the case may be) or (d) the commencement of an Insolvency or Liquidation Proceeding.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

1.2.    Terms Generally.  The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise:

(a)    any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time permitted to be amended, restated, supplemented, modified, renewed, Refinanced or extended in accordance with the terms hereof;

(b)    any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

(c)    the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d)     all references herein to Sections shall be construed to refer to Sections of this Agreement; and

(e)     the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

### SECTION 2.  Lien Priorities.

2.1.     Relative Priorities.  Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Second Priority Obligations granted on the Collateral or of any Liens securing the First Priority Obligations granted on the Collateral and notwithstanding any provision of the UCC, or any other applicable law or the Second Priority Loan Documents or any defect or deficiencies in, or failure to perfect, the Liens securing the First Priority Obligations or the Second Priority Obligations or any other circumstance whatsoever, the Second Priority Agent, on behalf of itself and the Second Priority Creditors, hereby agrees that:

(a)     so long as the Discharge of First Priority Obligations has not occurred, any Lien on the Collateral securing any First Priority Obligations now or hereafter held by or on behalf of the First Priority Agent or any First Priority Creditors or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any Second Priority Obligations; and

(b)     so long as the Discharge of First Priority Obligations has not occurred, any Lien on the Collateral securing any Second Priority Obligations now or hereafter held by or on behalf of the Second Priority Agent, any Second Priority Creditors, any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Priority Obligations.  All Liens on the Collateral securing any First Priority Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Priority Obligations for all purposes, whether or not such Liens securing any First Priority Obligations are subordinated to any Lien securing any other obligation of the Borrowers, any other Grantor or any other Person.

2.2.     Prohibition on Contesting Liens.  Each of the Second Priority Agent, for itself and on behalf of each Second Priority Creditor, and the First Priority Agent, for itself and on behalf of each First Priority Creditor, agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), (i) the validity or enforceability of any First Priority Collateral Document or Second Priority Collateral Document or any obligation thereunder, (ii) the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Priority Creditors in the First Priority Collateral or by or on behalf of any of the Second Priority Creditors in the Second Priority Collateral, as the case may be, or the provisions of this Agreement, or (iii) the relative rights and duties of the holders of First Priority Obligations or Second Priority Obligations granted and/or established pursuant to this Agreement, any First

Priority Collateral Document or any Second Priority Collateral Document that nothing in this Agreement shall be construed to prevent or impair the rights of the First Priority Agent, any First Priority Creditor, the Second Priority Agent or any Second Priority Creditor, to enforce this Agreement, including the provisions of this Agreement relating to the relative priority of the Liens securing the applicable Obligations as provided in Sections 2.1 and 3.1.

2.3.    No New Liens.  So long as the Discharge of First Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Borrowers or any other Grantor, the parties hereto agree that the Borrowers shall not, and shall not permit any other Grantor or any Subsidiary of the Parent to:

(i)    grant or permit any additional Liens on any asset or property to secure any Second Priority Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the First Priority Obligations; or

(ii)    grant or permit any additional Liens on any asset or property to secure any First Priority Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the Second Priority Obligations.

To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Agent and/or the First Priority Creditors, the Second Priority Agent, on behalf of the Second Priority Creditors, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.3.

2.4.    Similar Liens and Agreements.  The parties hereto agree that it is their intention that the First Priority Collateral and the Second Priority Collateral be identical.  In furtherance of the foregoing and of Section 9.8, the parties hereto agree, subject to the other provisions of this Agreement:

(a)    upon request by the First Priority Agent or the Second Priority Agent to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Priority Collateral and the Second Priority Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Priority Loan Documents and the Second Priority Loan Documents; and

(b)    that the documents and agreements creating or evidencing the First Priority Collateral and the Second Priority Collateral and guarantees for the First Priority Obligations and the Second Priority Obligations, subject to Section 5.3(c), shall be in all material respects the same forms of documents other than (i) with respect to the first lien and the second lien nature of the Obligations thereunder and (ii) changes with respect to the Collateral Agent as are customary where a collateral agent is acting on behalf of securityholders and is not a lender acting on its own behalf and on behalf of other lenders.

### SECTION 3.  Enforcement.

3.1.    Exercise of Remedies.

(a)      Until the Discharge of First Priority Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Borrowers or any other Grantor, the Second Priority Agent and the Second Priority Creditors:

(i)      will not Exercise Any Secured Creditor Remedies with respect to the First Priority Collateral (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Priority Agent or any Second Priority Creditor is a party);

(ii)      will not contest, protest or object to any Exercise of Secured Creditor Remedies or any Exercise of Unsecured Creditor Remedies relating to the First Priority Collateral under the First Priority Loan Documents or otherwise; and

(iii)      except as may be permitted in Section 3.1(c), will not object to the forbearance by the First Priority Agent or the First Priority Creditors from bringing or pursuing any Exercise of Secured Creditor Remedies or any Exercise of Unsecured Creditor Remedies with respect to the First Priority Collateral;

provided that, in the case of (i), (ii) and (iii) above, the Liens on the Collateral granted to secure the Second Priority Obligations of the Second Priority Creditors and the Second Priority Obligations of the Second Priority Creditors shall attach to any proceeds resulting from actions taken by the First Priority Agent or any First Priority Creditor in accordance with this Agreement after application of such proceeds to the extent necessary to meet the requirements of a Discharge of First Priority Obligations. Subject to Section 5.7(b), the First Priority Agent agrees to provide at least ten Business Days' prior written notice to the Second Priority Agent of its intention to Exercise Any Secured Creditor Remedies; provided, however, that the failure to give any such notice shall not in any way limit its ability to Exercise Any Secured Creditor Remedies to the extent that such Exercise of Secured Creditor Remedies is not otherwise prohibited by the provisions of this Agreement.

(b)      (i) Until the Discharge of First Priority Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the First Priority Borrower or any other Grantor, but subject to Section 3.1(a)(i), the First Priority Agent and the First Priority Creditors shall have the exclusive right to Exercise Any Secured Creditor Remedies with respect to the Collateral (including set off and the right to credit bid their debt) and make determinations regarding the release, Disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Second Priority Agent or any Second Priority Creditor; provided that the Lien on the Collateral securing the Second Priority Obligations shall remain on the proceeds of such Collateral released or disposed of subject to the relative priorities described in Section 2. In the Exercise of Secured Creditor Remedies, the First Priority Agent and the First Priority Creditors may enforce the provisions of the First Priority Loan Documents and Exercise Any Secured Creditor Remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion, subject to the terms of this Agreement. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in

connection with such Disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction, subject to the terms of this Agreement.

(c)     Notwithstanding the foregoing, the Second Priority Agent and any Second Priority Creditor may:

(1)     file a claim, proof of claim or statement of interest with respect to the Second Priority Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any of the Borrowers or any other Grantor;

(2)     take any action (not adverse to the priority status of the Liens on the Collateral securing the First Priority Obligations, or the rights of the First Priority Agent or the First Priority Creditors to Exercise Any Secured Creditor Remedies in respect thereof) in order to create, perfect, preserve or protect its Lien on the Collateral;

(3)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Creditors, including any claims secured by the Collateral, if any, in each case not in violation of the terms of this Agreement;

(4)     file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not in violation of the terms of this Agreement;

(5)     vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Priority Obligations and the Collateral;

(6)     join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the Collateral initiated by First Priority Agent to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay for any material period or otherwise interfere with the Exercise of Secured Creditor Remedies by First Priority Agent (it being understood that neither the Second Priority Agent nor any Second Priority Creditor shall be entitled to receive any proceeds thereof unless otherwise expressly permitted herein);

(7)     engage consultants, valuation firms, investment bankers, and perform or engage third parties to perform audits, examinations and appraisals of the Collateral for the sole purpose valuing the Collateral and not for the purpose of marketing or conducting a disposition of such Collateral; provided, however, that the Second Priority Agent shall not take any of the foregoing actions if they would materially interfere with the Exercise of Secured Creditor Remedies by the First Priority Agent;

(8)      the filing and pursuit of a lawsuit against the First Priority Agent and/or any First Priority Creditor for breach or non-performance of any payment obligations pursuant hereto;

(9)      the imposition of default interest (and interest on interest) under the Second Priority Credit Agreement; and

(10)      bidding for (including credit bidding in conjunction with a cash bid sufficient to cause a Discharge of First Priority Obligations) and, if such bidding is successful, purchasing Collateral pursuant to a disposition of Collateral that would constitute an Exercise of Secured Creditor Remedies by the First Priority Agent for a cash purchase price in an amount no less than the amount required to cause the Discharge of First Priority Obligations in full.

The Second Priority Agent, on behalf of itself and the Second Priority Creditors, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any Collateral in its capacity as a creditor in violation of this Agreement.

(d)      Subject to Section 3.1(c) and Section 6.3(b):

(1)      the Second Priority Agent, for itself and on behalf of the Second Priority Creditors, agrees that the Second Priority Agent and the Second Priority Creditors will not take any action that would hinder any Exercise of Secured Creditor Remedies under the First Priority Loan Documents or is otherwise prohibited hereunder, including any Disposition of Collateral, whether by foreclosure or otherwise;

(2)      the Second Priority Agent, for itself and on behalf of the Second Priority Creditors, hereby waives any and all rights it or the Second Priority Creditors may have as a junior lien creditor or otherwise to object to the manner in which the First Priority Agent or the First Priority Creditors seek to enforce or collect the First Priority Obligations or the Liens on the Collateral securing the First Priority Obligations granted in any of the First Priority Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the First Priority Agent or First Priority Creditors is adverse to the interest of the Second Priority Creditors, except to the extent in violation of this Agreement; and

(3)      the Second Priority Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Priority Collateral Documents or any other Second Priority Loan Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the First Priority Agent or the First Priority Creditors with respect to the Collateral as set forth in this Agreement and the First Priority Collateral Documents.

(e)      Except as otherwise specifically set forth in Section 3.1(c), the Second Priority Agent and the Second Priority Creditors may exercise rights and remedies as unsecured creditors against the Borrowers or any other Grantor that has guaranteed or granted Liens to secure the Second Priority Obligations in accordance with the terms of the Second Priority Loan

Documents and applicable law; <u>provided</u> that in the event that any Second Priority Creditor becomes a judgment lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Priority Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Obligations) as the other Liens securing the Second Priority Obligations are subject to this Agreement.

(f)     Except as otherwise set forth herein, nothing in this Agreement shall prohibit the receipt by the Second Priority Agent or any Second Priority Creditors of the required payments of interest, principal and other amounts owed in respect of the Second Priority Obligations, so long as such receipt is not the direct or indirect result of the Exercise of Secured Creditor Remedies (including set off) by the Second Priority Agent or any Second Priority Creditors or enforcement in contravention of this Agreement of any Lien held by any of them. Except as expressly provided in this Agreement, nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Priority Agent or the First Priority Creditors may have with respect to the First Priority Collateral.

### SECTION 4.  <u>Payments.</u>

4.1.     <u>Application of Proceeds of Collateral</u>.  So long as the Discharge of First Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the First Priority Borrower or any other Grantor, Collateral or proceeds thereof received in connection with the Exercise of Secured Creditor Remedies by the First Priority Agent or First Priority Creditors shall be applied by the First Priority Agent to the First Priority Obligations in such order as specified in the relevant First Priority Loan Documents.  Upon the Discharge of First Priority Obligations, the First Priority Agent shall deliver to the Second Priority Agent any Collateral and proceeds of Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Second Priority Agent to the Second Priority Obligations in such order as specified in the Second Priority Collateral Documents.

4.2.     <u>Application of Proceeds of Pari Passu Collateral Accounts</u>.  So long as the Discharge of First Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the First Priority Borrower or any other Grantor, proceeds of the Pari Passu Collateral Accounts received in connection with the Exercise of Secured Creditor Remedies by the First Priority Agent or First Priority Creditors shall be applied by the First Priority Agent to the Obligations in the following order of application:

(i)     *First*, to the payment of all amounts payable under the First Priority Loan Documents and the Second Priority Loan Documents on account of the Collateral Agent's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Agent or any co-trustee or agent of the Collateral Agent in connection with any of the First Priority Loan Documents or the Second Priority Loan Documents;

(ii)    *Second*, to the First Priority Agent and the Second Priority Agent, <u>pro</u> <u>rata</u>, based upon their respective Pari Passu Collateral Percentages, for application to the payment of the First Priority Obligations and the Second Priority Obligations, as the case may be, which are secured by such Pari Passu Collateral Accounts that are then due and payable in such order as may be provided in the First Priority Loan Documents or the Second Priority Loan Documents, as the case may be, in an amount sufficient to pay in full in cash all outstanding First Priority Obligations and Second Priority Obligations, as the case may be, that are then due and payable (including (x) the cash collateralization of outstanding letters of credit as provided in the First Priority Documents and (y) all interest accrued on the First Priority Obligations and the Second Priority Obligations, as the case may be, after the commencement of any Insolvency or Liquidation Proceeding at the rate, and including any applicable post-default rate, specified in the First Priority Documents or Second Priority Documents, as the case may be), <u>provided</u> that if the Discharge of First Priority Obligations has occurred or occurs or if the Second Priority Obligations have been paid in full, in each case by reason of the application pursuant to this clause, then any excess shall be applied to the then outstanding First Priority Obligations or Second Priority Obligations, as the case may be; and

(iii)    *Third*, any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses will be paid to the Parent, the First Priority Borrower, the Second Priority Borrower and Arlington, as the case may be, their respective successors or assigns, or as a court of competent jurisdiction may direct.

4.3.    <u>Payments Over in Violation of Agreement</u>.  So long as the Discharge of First Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the First Priority Borrower or any other Grantor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second Priority Agent or any Second Priority Creditors in connection with the exercise of any right or remedy (including set off) relating to the Collateral (including, without limitation, as a result of any cash distribution in respect of the Collateral in any such Insolvency or Liquidation Proceeding) shall be segregated and held in trust and forthwith paid over to the First Priority Agent for the benefit of the First Priority Creditors in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The Collateral Agent is hereby authorized to make any such endorsements in the name of Nordea Bank Finland plc, New York Branch, as agent for the Second Priority Agent or any such Second Priority Creditors.  This authorization is coupled with an interest and is irrevocable until the Discharge of First Priority Obligations.

**SECTION 5.  <u>Other Agreements.</u>**

5.1.    <u>Releases</u>.  (a) Subject to Section 5.7, if in connection with the Exercise of Secured Creditor Remedies by the First Priority Agent in respect of the Collateral provided for in Section 3.1, the First Priority Agent, for itself or on behalf of any of the First Priority Creditors, releases any of its Liens on any part of the Collateral (other than to the extent constituting Pari Passu Collateral Accounts) or releases any Grantor from its obligations under its guaranty of the First Priority Obligations in connection with the sale of the stock, or substantially all the assets, of such Grantor (in each case other than in the case of a release granted in connection with the

Discharge of First Priority Obligations), then the Liens, if any, of the Second Priority Agent, for itself or for the benefit of the Second Priority Creditors, on such Collateral, and the obligations of such Grantor under its guaranty of the Second Priority Obligations, shall be automatically, unconditionally and simultaneously released. The Second Priority Agent, for itself or on behalf of any such Second Priority Creditors, promptly shall execute and deliver to the First Priority Agent or such Grantor such termination statements, releases and other documents as the First Priority Agent or such Grantor may reasonably request to effectively confirm such release. Notwithstanding anything herein to the contrary, no release shall occur without the consent of the Second Priority Agent for an Exercise of Secured Creditor Remedies as to any Collateral the Net Cash Proceeds of the disposition of which will not be applied to repay and to permanently reduce commitments with respect to the First Priority Obligations and/or the Second Priority Obligations as applicable.

(b)     If in connection with a Disposition of Collateral permitted under the terms of the First Priority Loan Documents (including following any waiver granted to permit such Disposition) (other than in connection with the exercise of the First Priority Agent's remedies in respect of the Collateral provided for in Section 3.1), the First Priority Agent, for itself or on behalf of any of the First Priority Creditors, releases any of its Liens on any part of the Collateral (other than to the extent constituting Pari Passu Collateral Accounts) or releases any Grantor from its obligations under its guaranty of the First Priority Obligations in connection with the sale of the stock, or substantially all the assets, of such Grantor, in each case other than in connection with the Discharge of First Priority Obligations, then the Liens, if any, of the Second Priority Agent, for itself or for the benefit of the Second Priority Creditors, on such Collateral, and the obligations of such Grantor under its guaranty of the Second Priority Obligations shall be automatically, unconditionally and simultaneously released, as long as the Net Cash Proceeds of such Disposition of such Collateral shall be applied to the permanent repayment of First Priority Obligations and/or Second Priority Obligations, as applicable, in accordance with the terms of the First Priority Credit Agreement and/or the Second Priority Credit Agreement, as applicable. The Second Priority Agent, for itself or on behalf of any such Second Priority Creditors, promptly shall execute and deliver to the Collateral Agent or such Grantor such termination statements, releases and other documents as the First Priority Agent or such Grantor may reasonably request to effectively confirm such release.

(c)     Until the Discharge of First Priority Obligations occurs, the Second Priority Agent, for itself and on behalf of the Second Priority Creditors, hereby irrevocably constitutes and appoints the First Priority Agent and any officer or agent of the First Priority Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the Second Priority Agent or any such officer or agent in the First Priority Agent's own name, from time to time in the First Priority Agent's discretion, for the purpose of carrying out the terms of this Section 5.1 with respect to the Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1 with respect to the Collateral, including any endorsements or other instruments of transfer or release.

(d)     Until the Discharge of First Priority Obligations occurs, to the extent that the First Priority Agent or the First Priority Creditors (i) have released any Lien on Collateral or any Grantor from its obligation under its guaranty and any such Liens or guaranty are later

reinstated or (ii) obtain any new liens or additional guarantees from any Grantor, then the Second Priority Agent, for itself and for the Second Priority Creditors, shall be granted a Lien on any such Collateral, subject to the lien subordination provisions of this Agreement, and an additional guaranty, as the case may be.

5.2.    Insurance.  Unless and until the Discharge of First Priority Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the First Priority Loan Documents, the First Priority Agent and the First Priority Creditors shall have the sole and exclusive right to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral.  Unless and until the Discharge of First Priority Obligations has occurred, and subject to the rights of the Grantors under the First Priority Loan Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) shall be paid to the First Priority Agent for the benefit of the First Priority Creditors pursuant to the terms of the First Priority Loan Documents (including, without limitation, for purposes of cash collateralization of letters of credit) and thereafter, to the extent no First Priority Obligations are outstanding, and subject to the rights of the Grantors under the Second Priority Loan Documents, to the Second Priority Agent for the benefit of the Second Priority Creditors to the extent required under the Second Priority Collateral Documents and then, to the extent no Second Priority Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.  Until the Discharge of First Priority Obligations has occurred, if the Second Priority Agent or any Second Priority Creditors shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such proceeds over to the First Priority Agent in accordance with the terms of Section 4.3.

5.3.    Amendments to First Priority Loan Documents and Second Priority Loan Documents.  (a)    The First Priority Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms and the First Priority Credit Agreement may be Refinanced, in each case, without notice to, or the consent of the Second Priority Agent or the Second Priority Creditors, all without affecting the lien subordination or other provisions of this Agreement; provided, however, that:

(i)    in the case of a Refinancing, the holders of such Refinancing debt (or an agent for such holders) bind themselves in a writing addressed to the Second Priority Agent and the Second Priority Creditors to the terms of this Agreement, and

(ii)    no amendment, supplement or other modification or Refinancing of the First Priority Loan Documents shall be permitted without the consent of the parties hereto if such amendment, supplement or other modification would increase the aggregate principal amount of Indebtedness or lending commitments under the First Priority Credit Agreement above the Maximum First Priority Indebtedness Amount.

(b)    The Second Priority Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms and the Second Priority Credit Agreement may be Refinanced, in each case, without notice to, or the consent of the First Priority Agent or

the First Priority Creditors all without affecting the lien subordination or other provisions of this Agreement; provided, however, that:

>     (i)     in the case of a Refinancing, the holders of such Refinancing debt (or an agent for such holders) bind themselves in a writing addressed to the First Priority Agent and the First Priority Creditors to the terms of this Agreement, and

>     (ii)     no amendment, supplement or other modification or Refinancing of the Second Priority Loan Documents shall be permitted without the consent of the parties hereto if such amendment, supplement or other modification would increase the aggregate principal amount of Indebtedness or lending commitments under the Second Priority Credit Agreement above the Maximum Second Priority Indebtedness Amount.

>     (c)     In the event any First Priority Agent or the First Priority Creditors and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the First Priority Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Collateral Document or changing in any manner the rights of the First Priority Agent, such First Priority Creditors, the First Priority Borrower or any other Grantor thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Priority Collateral Document without the consent of the Second Priority Agent or the Second Priority Creditors, as applicable, and without any action by the Second Priority Agent, the Borrowers or any other Grantor (and shall, at the request of the First Priority Agent, be documented in writing by the Second Priority Agent and the Second Priority Lenders, as applicable), provided that:

>>     (1)     no such amendment, waiver or consent shall have the effect of:

>>>     (A)     removing or releasing assets subject to the Lien of the Second Priority Collateral Documents, except to the extent that a release of such Lien is permitted or required by Section 5.1 of this Agreement and provided that there is a corresponding release of the Liens securing the First Priority Obligations;

>>>     (B)     imposing duties on the Second Priority Agent without its consent;

>>>     (C)     permitting other Liens on the Collateral not permitted under the terms of the Second Priority Loan Documents or Section 6; or

>>>     (D)     being prejudicial to the interests of the Second Priority Creditors to a greater extent than the First Priority Creditors; and

>>     (2)     notice of such amendment, waiver or consent shall have been given to the Second Priority Agent at least ten (10) Business Days prior to the effective date of such amendment, waiver or consent.

>     5.4.     Legends.

(a)     The Parent and the Grantors agree that each Second Priority Collateral Document shall include the following language (or language to similar effect approved by the First Priority Agent):

> "Notwithstanding anything herein to the contrary, the lien and security interest granted to the Second Priority Agent pursuant to this Agreement and the exercise of any right or remedy by the Second Priority Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of [_____], 2012 (as amended, restated, supplemented or otherwise modified from time to time, the **"Intercreditor Agreement"**), among General Maritime Corporation, General Maritime Subsidiary II Corporation, as first priority borrower, General Maritime Subsidiary Corporation, Nordea Bank Finland plc, New York Branch, as First Priority Agent, Nordea Bank Finland plc, New York Branch, as Second Priority Agent and certain other persons party or that may become party thereto from time to time. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(b)     In addition, the Parent and the Borrowers agree that each Second Priority Mortgage covering any Collateral shall contain such other language as the First Priority Agent may reasonably request to reflect the subordination of such Second Priority Mortgage to the First Priority Collateral Document covering such Collateral.

5.5.    <u>Bailee for Perfection</u>.  Until the Discharge of First Priority Obligations has occurred:

(i)     The First Priority Agent as Collateral Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC, including, but not limited to, the Earnings Accounts (such Collateral being the **"Pledged Collateral"**) as agent for the First Priority Creditors and as bailee for the Second Priority Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-106(a) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting the security interest granted under the First Priority Loan Documents and the Second Priority Loan Documents, respectively, subject to the terms and conditions of this Section 5.5.

(ii)    The First Priority Agent as Collateral Agent shall have no obligation whatsoever to the First Priority Creditors, the Second Priority Agent, or any Second Priority Creditor, to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.5. The duties or responsibilities of the First Priority Agent under this Section 5.5 shall be limited solely to holding the Pledged Collateral as bailee in accordance with this Section 5.5 and delivering the Pledged Collateral upon a Discharge

of First Priority Obligations as provided in paragraph (iv) below.

(iii)    The First Priority Agent acting pursuant to this Section 5.5 shall not have by reason of any Collateral Document, this Agreement or any other document a fiduciary relationship in respect of the First Priority Creditors, the Second Priority Agent or any Second Priority Creditor.

(iv)    Upon the Discharge of First Priority Obligations, the First Priority Agent shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, first, to the Second Priority Agent to the extent Second Priority Obligations remain outstanding, and second, to the Borrowers to the extent no First Priority Obligations or Second Priority Obligations remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral); provided that, in each case, the First Priority Agent shall be entitled to rely on certifications from the Second Priority Agent or the Borrowers, as the case may be, as to whether any Second Priority Obligations remain outstanding.  The First Priority Agent further agrees to take all other action reasonably requested by the Second Priority Agent in connection with the Second Priority Agent obtaining a first priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

(v)    Subject to the terms of this Agreement, so long as the Discharge of First Priority Obligations has not occurred, the First Priority Agent shall be entitled to deal with the Pledged Collateral or Collateral within its "control" in accordance with the terms of this Agreement and other First Priority Collateral Documents as if the Liens of the Second Priority Agent or Second Priority Creditors did not exist.

5.6.    When Discharge of First Priority Obligations Deemed to Not Have Occurred.  If concurrently with the Discharge of First Priority Obligations, the Parent, the First Priority Borrower or any other Grantor thereafter enters into any Refinancing of any First Priority Loan Document evidencing a First Priority Obligation which Refinancing is permitted hereby, then such Discharge of First Priority Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken as a result of the occurrence of such first Discharge of First Priority Obligations), and, from and after the date on which the First Priority Debt Notice (as defined below) is delivered to the Second Priority Agent in accordance with the next sentence, the obligations under such Refinancing of the First Priority Loan Document shall automatically be treated as First Priority Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the First Priority Agent under such First Priority Loan Documents shall be the First Priority Agent for all purposes of this Agreement. Upon receipt of a notice from the First Priority Borrower or any other Grantor and the First Priority Agent (the **"First Priority Debt Notice"**) stating that the Parent, the First Priority Borrower or such other Grantor has entered into a new First Priority Loan Document (which notice shall include the identity of the new First Priority Agent, such agent, the **"New First Priority Agent"**), the Second Priority Agent shall promptly (a) enter into such documents and agreements (including amendments or supplements to this Agreement) as the Parent, the First Priority Borrower, such other Grantor or such New First Priority Agent shall reasonably request in order to provide to the New First Priority Agent the rights contemplated hereby, in each case

consistent in all material respects with the terms of this Agreement and (b) deliver to the New First Priority Agent any Pledged Collateral held by it together with any necessary endorsements (or otherwise allow the New First Priority Agent to obtain control of such Pledged Collateral). The New First Priority Agent shall agree in a writing addressed to the Second Priority Agent and the Second Priority Creditors to be bound by the terms of this Agreement.  If the new First Priority Obligations under the new First Priority Loan Documents are secured by assets of the Grantors constituting Collateral that do not also secure the Second Priority Obligations, then the Second Priority Obligations shall be secured at such time by a Second Priority Lien on such assets to the same extent provided in the Second Priority Collateral Documents and this Agreement.

5.7.    Purchase Right.  Without prejudice to the enforcement of any remedy of the First Priority Creditors, so long as a Triggering Event has occurred and is continuing, any of the Second Priority Creditors may, at its sole expense and effort, upon written notice (which notice, subject to the last sentence of this Section 5.7 and with the understanding that such notice will be revocable upon the failure by any First Priority Lender to comply with the provisions contained in this Section 5.7, shall be irrevocable and may only be given by the Second Priority Creditors on one occasion, the "**Second Priority Purchase Notice**") to the Borrowers, the Collateral Agent, the First Priority Agent and the Second Priority Agent, require the First Priority Creditors to transfer and assign to such Second Priority Creditors, without warranty or representation or recourse, all (but not less than all) of the First Priority Obligations; provided that (x) the Second Priority Purchase Notice, if any, will be given no more than 10 Business Days after the occurrence of the related Triggering Event and, if the right to purchase the First Priority Obligations is in fact exercised by the Second Priority Creditors, the obligations related to such purchase of First Priority Obligations shall be fulfilled by such Second Priority Creditors within 10 Business Days thereafter, (y) such assignment shall not conflict with any law, rule or regulation or order of any court or other governmental authority having jurisdiction, and (z) such Second Priority Creditors shall have paid to the First Priority Agent, for the account of the First Priority Creditors, in immediately available funds, an amount equal to 100% of such First Priority Obligations then outstanding (which shall include, with respect to the aggregate face amount of the letters of credit outstanding under the First Priority Credit Agreement, an amount in cash equal to the amount of outstanding letters of credit required to be cash collateralized pursuant to the First Priority Documents *plus* all accrued and unpaid interest thereon *plus* all accrued and unpaid fees (other than any prepayment penalties or premiums other than customary Eurodollar breakage costs (the **"First Priority Termination Fees"**)) (such amount, the **"First Priority Purchase Price"**).  If the right set forth in this Section 5.7 is exercised, (1) the parties shall endeavor to close promptly thereafter but in any event within 10 Business Days of the notice (or the First Priority Creditors shall no longer be required to transfer any such First Priority Obligations), (2) such purchase of the First Priority Obligations shall be exercised pursuant to documentation mutually acceptable to each of the First Priority Agent and such Second Priority Creditors, and (3) such First Priority Obligations shall be purchased pro rata among the Second Priority Creditors giving notice to the Second Priority Agent of their intent to exercise the purchase option hereunder according to such Second Priority Creditors' portion of the Second Priority Obligations outstanding on the date of purchase.  In order to effectuate the foregoing, the First Priority Agent shall calculate, upon the written request of the Second Priority Agent (acting at the direction of one or more Second Priority Creditors) from time to time, the amount in cash that would be necessary so to purchase the First Priority Obligations.  If, for any

reason other than a default by the First Priority Creditors, the Second Priority Creditors fail to purchase and pay for the First Priority Obligations after the delivery of the Second Priority Purchase Notice, the Second Priority Creditors shall be liable to the First Priority Creditors for any losses or damages, including fees and disbursements to counsel, incurred by them by reason of such failure to purchase and pay.  It is understood that the obligations of each First Priority Lender and each Second Priority Lender are several and not joint, and no First Priority Lender or Second Priority Lender shall be responsible for any default by any other First Priority Lender and/or any Second Priority Lender, as the case may be, of its obligations under the First Priority Credit Agreement and/or the Second Priority Credit Agreement.

### SECTION 6.  Insolvency or Liquidation Proceedings.

6.1.    Finance and Sale Issues.    (a)    Until the Discharge of First Priority Obligations has occurred, if any of the First Priority Borrower or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First Priority Agent shall consent in writing to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) which constitute Collateral and on which the First Priority Agent or any other creditor has a Lien or to permit the First Priority Borrower or any other Grantor to obtain financing, whether from the First Priority Creditors or any other Person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law (**"DIP Financing"**) then the Second Priority Agent, on behalf of itself and the Second Priority Creditors, agrees that if the conditions set forth in the immediately succeeding sentence are satisfied (x) it will raise no objection to such Cash Collateral use or DIP Financing and (y) it will not request adequate protection or any other relief in connection therewith (except as expressly agreed by the First Priority Agent or to the extent permitted by Section 6.3).  The conditions applicable to the agreement in the preceding sentence are as follows: (a) the sum of the aggregate principal amount and the total commitments of the DIP Financing does not exceed $100,000,000, (b) the interest rate, fees, advance rates, lending limits and sublimits are on market terms that are commercially reasonable under the circumstances, and (c) the Liens securing such DIP Financing are pari passu with or superior in priority to the Liens on the Collateral securing the then outstanding First Priority Obligations and are pari passu to the Liens of the Collateral Agent, the First Priority Creditors and the Second Priority Creditors on the Pari Passu Collateral Accounts.  To the extent the Liens securing the First Priority Obligations are subordinated to or pari passu with such DIP Financing, the Second Priority Agent shall be deemed to have subordinated its Liens in the Collateral to the Liens securing such DIP Financing (and all Obligations relating thereto), and the Liens securing the Second Priority Obligations shall have the same priority with respect to the Collateral relative to the Liens securing the First Priority Obligations as if such DIP Financing had not occurred.

(b)    Nothing in this Section 6.1 limits or impairs the right of Second Priority Agent to object to any motion regarding DIP Financing (including a DIP Financing proposed by one or more First Priority Creditors) or cash collateral to the extent that (i) the DIP Financing does not meet the requirements in Section 6.1(a), or (ii) the objection could be asserted in an Insolvency Proceeding by unsecured creditors generally and is not inconsistent with this Agreement.

6.2.    Relief from the Automatic Stay.    Until the Discharge of First Priority Obligations has occurred, the Second Priority Agent, on behalf of itself and the Second Priority

Creditors, agrees that it shall not seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First Priority Agent.

6.3.   Adequate Protection.   (a)   The Second Priority Agent, on behalf of itself and the Second Priority Creditors, agrees that it shall not contest (or support any other Person contesting):

(i)   any request by the First Priority Agent or the First Priority Creditors for adequate protection with respect to the Collateral; or

(ii)   any objection by the First Priority Agent or the First Priority Creditors to any motion, relief, action or proceeding based on the First Priority Agent or the First Priority Creditors claiming a lack of adequate protection with respect to the Collateral.

(b)   Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency or Liquidation Proceeding:

(i)   if the First Priority Creditors (or any subset thereof) are granted adequate protection in the form of additional or replacement collateral with respect to the Collateral in connection with any Cash Collateral use or DIP Financing, then the Second Priority Agent, on behalf of itself or any of the Second Priority Creditors, may seek or request adequate protection in the form of a Lien on such additional or replacement collateral, which Lien will be subordinated to the First Priority Liens on the same basis as the other Liens securing the Second Priority Obligations are so subordinated to the First Priority Obligations under this Agreement; and

(ii)   in the event the Second Priority Agent, on behalf of itself or any of the Second Priority Creditors, seeks or requests adequate protection in respect of Second Priority Obligations and such adequate protection is granted in the form of additional or replacement collateral with respect to the Collateral, then the Second Priority Agent, on behalf of itself or any of the Second Priority Creditors, agrees that until the Discharge of First Priority Obligations, the First Priority Agent shall also be granted a senior Lien on such additional or replacement collateral as security for the First Priority Obligations and for any Cash Collateral use or DIP Financing provided by the First Priority Creditors and that any Lien on such additional or replacement collateral securing the Second Priority Obligations shall be subordinated to the First Priority Liens on the same basis as the other Liens securing the Second Priority Obligations are so subordinated to such First Priority Obligations under this Agreement.  Except as otherwise expressly set forth in Section 6.1 or in connection with the exercise of remedies with respect to the Collateral, nothing herein shall limit the rights of the Second Priority Agent or the Second Priority Creditors from seeking adequate protection with respect to their rights in the Collateral in any Insolvency or Liquidation Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise).

6.4.   No Waiver.  Nothing contained herein shall prohibit or in any way limit the First Priority Agent or any First Priority Creditor from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Second Priority Agent or any of the Second Priority Creditors including the seeking by the Second Priority Agent or any Second Priority Creditors of adequate protection (except as provided in Section 6.3) or the asserting by the Second Priority Agent or any Second Priority Creditors of any of its rights and remedies under the Second Priority Loan Documents or otherwise.

6.5.   Avoidance Issues. (a) If any First Priority Creditor is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the First Priority Borrower or any other Grantor any amount paid in respect of First Priority Obligations (a **"First Priority Recovery"***)*, then such First Priority Creditors shall be entitled to a reinstatement of First Priority Obligations with respect to all such recovered amounts.

(b)   If any Second Priority Creditor is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Borrowers or any other Grantor any amount paid in respect of Second Priority Obligations (a **"Second Priority Recovery"***)*, then such Second Priority Creditors shall be entitled to a reinstatement of Second Priority Obligations with respect to all such recovered amounts.

(c)   If this Agreement shall have been terminated prior to a First Priority Recovery or an Second Priority Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

6.6.   Reorganization Securities.   If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, all on account of First Priority Obligations and on account of Second Priority Obligations then, to the extent the debt obligations distributed on account of the First Priority Obligations and on account of the Second Priority Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

6.7.   Post-Petition Interest. (a)  None of the Second Priority Agent or any Second Priority Creditor shall oppose or seek to challenge any claim by the First Priority Agent or any First Priority Creditor for allowance in any Insolvency or Liquidation Proceeding of First Priority Obligations consisting of post-petition interest, fees or expenses.

(b)   None of the First Priority Agent or any First Priority Creditor shall oppose or seek to challenge any claim by the Second Priority Agent or any Second Priority Creditor for allowance in any Insolvency or Liquidation Proceeding of Second Priority Obligations consisting of post-petition interest, fees or expenses.

6.8.   Waiver.  The Second Priority Agent, for itself and on behalf of the Second Priority Creditors, waives any claim it may hereafter have against any First Priority Creditor

arising out of the election of any First Priority Creditor of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding.

        6.9.    Separate Grants of Security and Separate Classification.  The Second Priority Agent, for itself and on behalf of the Second Priority Creditors, and the First Priority Agent, for itself and on behalf of the First Priority Creditors, acknowledge and agree that: (a) the grants of Liens pursuant to the First Priority Collateral Documents and the Second Priority Collateral Documents constitute two separate and distinct grants of Liens; and (b) because of, among other things, their differing rights in the Collateral, the Second Priority Obligations and the First Priority Obligations are fundamentally different from each other and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.

To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the class of First Priority Creditors and the class of Second Priority Creditors in respect of the Collateral constitute only one secured claim (rather than separate classes of senior, junior and subordinated secured claims), then each of the parties hereto hereby acknowledges and agrees that, subject to Sections 2.1, 4.1 and 4.2, all distributions shall be made as if there were separate classes of senior, junior and subordinated secured claims against the Grantors in respect of the Collateral, with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Creditors, with respect to payment to the First Priority Creditors, (A) subject to the Maximum First Priority Indebtedness Amount, the First Priority Creditors shall be entitled to receive, in addition to amounts otherwise distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, including any additional interest payable pursuant to the First Priority Credit Agreement, arising from or related to a default, which is disallowed as a claim in any Insolvency or Liquidation Proceeding, before any distribution is made in respect of the claims held by the Second Priority Creditors with respect to the Collateral, and (B) after such payments to the First Priority Creditors, subject to the Maximum Second Priority Indebtedness Amount, the Second Priority Creditors shall be entitled to receive, in addition to amounts otherwise distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, including any additional interest payable pursuant to the Second Priority Credit Agreement, arising from or related to a default, which is disallowed as a claim in any Insolvency or Liquidation Proceeding, with the Second Priority Agent, for itself and on behalf of the Second Priority Creditors, hereby acknowledging and agreeing to turn over to the First Priority Agent, for itself and on behalf of the First Priority Creditors, amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence (with respect to the payment of post-petition interest), even if such turnover has the effect of reducing the claim or recovery of the Second Priority Creditors.

        **SECTION 7.  Reliance; Waivers; Etc.**

        7.1.    Reliance.  Other than any reliance on the terms of this Agreement, the First Priority Agent, on behalf of itself and the First Priority Creditors under its First Priority

Loan Documents, acknowledges that it and such First Priority Creditors have, independently and without reliance on the Second Priority Agent or any Second Priority Creditor, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such First Priority Loan Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the First Priority Credit Agreement or this Agreement.  The Second Priority Agent, on behalf of itself and the Second Priority Creditors, acknowledges that it and the Second Priority Creditors have, independently and without reliance on the First Priority Agent or any First Priority Creditor, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Second Priority Loan Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Second Priority Loan Documents or this Agreement.

7.2.    No Warranties or Liability.  (a)        The First Priority Agent, on behalf of itself and the First Priority Creditors under the First Priority Loan Documents, acknowledges and agrees that each of the Second Priority Agent, the Second Priority Creditors, have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Priority Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the Second Priority Creditors will be entitled to manage and supervise their respective loans and extensions of credit under the Second Priority Loan Documents, respectively, in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(b)    Except as otherwise provided herein, the Second Priority Agent, on behalf of itself and the Second Priority Creditors, acknowledges and agrees that the First Priority Agent and the First Priority Creditors have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Priority Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  Except as otherwise provided herein, the First Priority Creditors will be entitled to manage and supervise their respective loans and extensions of credit under the First Priority Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(c)    (A) The First Priority Agent and the First Priority Creditors shall have no duty to the Second Priority Agent, or any of the Second Priority Creditors, and (B) the Second Priority Agent and the Second Priority Creditors shall have no duty to the First Priority Agent or any of the First Priority Creditors, in each case to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Borrowers or any other Grantor (including the First Priority Loan Documents and the Second Priority Loan Documents), regardless of any knowledge thereof which they may have or be charged with.

7.3.    No Waiver of Lien Priorities.  (a)    No right of the First Priority Creditors, the First Priority Agent or any of them to enforce any provision of this Agreement or any First Priority Loan Document shall at any time in any way be prejudiced or impaired by any

act or failure to act on the part of the First Priority Borrower or any other Grantor or by any act or failure to act by any First Priority Creditor or the First Priority Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Priority Loan Documents or any of the Second Priority Loan Documents, regardless of any knowledge thereof which the First Priority Agent or the First Priority Creditors, or any of them, may have or be otherwise charged with.

(b)      No right of the Second Priority Creditors, the Second Priority Agent or any of them to enforce any provision of this Agreement or any Second Priority Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Borrowers or any other Grantor or by any act or failure to act by any Second Priority Creditor or the Second Priority Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the Second Priority Loan Documents, regardless of any knowledge thereof which the Second Priority Agent or the Second Priority Creditors, or any of them, may have or be otherwise charged with.

7.4.    Obligations Unconditional.    All rights, interests, agreements and obligations of the First Priority Agent and the First Priority Creditors and the Second Priority Agent and the Second Priority Creditors, respectively, hereunder shall remain in full force and effect irrespective of:

(a)      any lack of validity or enforceability of any First Priority Loan Documents or any Second Priority Loan Documents;

(b)      except as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Priority Obligations or Second Priority Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Priority Loan Document or any Second Priority Loan Document;

(c)      except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Priority Obligations or Second Priority Obligations or any guaranty thereof;

(d)      the commencement of any Insolvency or Liquidation Proceeding in respect of the Borrowers or any other Grantor; or

(e)      any other circumstances which otherwise might constitute a defense available to, or a discharge of, the Borrowers or any other Grantor in respect of the First Priority Agent, the First Priority Obligations, any First Priority Creditor, the Second Priority Agent, the Second Priority Obligations, or any Second Priority Creditor, in respect of this Agreement.

**SECTION 8.  Pari Passu Priority Collateral**.

8.1.    Lien Priorities.

(a)     <u>Relative Priorities</u>.  Notwithstanding (i) the time, manner, order or method of grant, creation, attachment or perfection of any Liens securing the First Priority Obligations or Second Priority Obligations granted on the Pari Passu Collateral Accounts, (ii) the validity or enforceability of the security interests and Liens granted in favor of the Collateral Agent, any First Priority Creditor or any Second Priority Creditor on the Pari Passu Collateral Accounts, (iii) the date on which any First Priority Obligations or Second Priority Obligations are extended, (iv) any provision of the UCC or any other applicable law, including any rule for determining priority thereunder or under any other law or rule governing the relative priorities of secured creditors, including with respect to real property or fixtures, (v) any provision set forth in any First Priority Loan Document or any Second Priority Loan Document (other than this Agreement), (vi) the possession or control by the Collateral Agent, any First Priority Creditor or any Second Priority Creditor or any bailee of all or any part of any Pari Passu Collateral Accounts as of the date hereof or otherwise, or (vii) any other circumstance whatsoever, the First Priority Agent, on behalf of itself and the First Priority Creditors, and the Second Priority Agent, on behalf of itself and the Second Priority Creditors, hereby agree that any Lien on the Pari Passu Collateral Accounts securing any First Priority Obligations or Second Priority Obligations now or hereafter held by or on behalf of the Collateral Agent, any First Priority Creditor or any Second Priority Creditor or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be equal and ratable in all respects.

(b)     <u>Prohibition on Contesting Liens</u>.  Each of the Second Priority Agent, for itself and on behalf of each Second Priority Creditor, and the First Priority Agent, for itself and on behalf of each First Priority Creditor, agree that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the priority, validity or enforceability of a Lien held by or on behalf of any of the First Priority Creditors and the Second Priority Creditors in the Pari Passu Collateral Accounts; <u>provided</u> that nothing in this Agreement shall be construed to prevent or impair the rights of the Collateral Agent, any First Priority Creditor or any Second Priority Creditor to enforce this Agreement.

(c)     <u>Effectiveness of Lien Priorities</u>.  Each of the parties hereto acknowledges that the Lien priorities in respect of the Pari Passu Collateral Accounts provided for in this Agreement shall not be affected or impaired in any manner whatsoever, including, without limitation, on account of:  (i) the invalidity, irregularity or unenforceability of all or any part of the First Priority Loan Documents or the Second Priority Loan Documents; (ii) any amendment, change or modification of any First Priority Loan Documents or Second Priority Loan Documents; or (iii) any impairment, modification, change, exchange, release or subordination of or limitation on, any liability of, or stay of actions or lien enforcement proceedings against, the Parent or any of its Subsidiaries party to any of the First Priority Loan Documents or Second Priority Loan Documents, its property, or its estate in bankruptcy resulting from any bankruptcy, arrangement, readjustment, composition, liquidation, rehabilitation, similar proceeding or otherwise involving or affecting any First Priority Creditor or any Second Priority Creditor.

8.2.    <u>Exercise of Remedies</u>.

(a)      So long as neither the Discharge of First Priority Obligations nor the payment in full of the Second Priority Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrowers or any other Grantor, neither the Collateral Agent nor any of the First Priority Creditors or the Second Priority Creditors will, without the consent of the First Priority Agent, the Second Priority Agent and Collateral Agent, as the case may be, (who shall be entitled but not required, to seek such consents of the First Priority Creditors or the Second Priority Creditors, as the case may be, as they may be deem necessary or desirable), exercise or seek to exercise any rights or remedies (including, without limitation, set-off) with respect to any Pari Passu Collateral Accounts or institute or commence or join with any Person in commencing any action or proceeding with respect to such rights or remedies; provided that:

(I)      the Collateral Agent may take any action (not adverse to the Liens on the Pari Passu Collateral Accounts securing the Obligations, or the rights of the First Priority Creditors or the Second Priority Creditors, as the case may be, to exercise remedies in respect thereof) in order to preserve or protect its Lien on the Pari Passu Collateral Accounts;

(II)     the First Priority Creditors and the Second Priority Creditors shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the First Priority Creditors and the Second Priority Creditors, including without limitation any claims secured by the Pari Passu Collateral Accounts, if any, in each case in accordance with the terms of this Agreement;

(III)    the First Priority Creditors and the Second Priority Creditors shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either the Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement; and

(IV)     the First Priority Creditors and the Second Priority Creditors shall be entitled to vote on any plan of reorganization and file any proof of claim in an Insolvency or Liquidation Proceeding or otherwise and other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Pari Passu Collateral Accounts.

(b)      Each of the First Priority Agent and the Second Priority Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in any First Priority Loan Document or Second Priority Loan Document, respectively, (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the First Priority Creditors or the Second Priority Creditors, respectively, with respect to the Pari Passu Collateral

Accounts as set forth in this Agreement and the First Priority Loan Documents or Second Priority Loan Documents, respectively.

8.3. Applications of Proceeds. Any Pari Passu Collateral Accounts or proceeds received by the Collateral Agent, the First Priority Creditors or the Second Priority Creditors in connection with the exercise of any right or remedy (including set off) relating to the Pari Passu Collateral Accounts in contravention of this Agreement shall be segregated and held in trust and forthwith paid over and applied as set forth in Section 4.2.

8.4. Perfection. Until the Discharge of First Priority Obligations or the payment in full of the Second Priority Obligations has occurred, the First Priority Agent and the Second Priority Agent agree to hold the Pari Passu Collateral Accounts jointly as collateral agent for the First Priority Creditors and the Second Priority Creditors and any assignee thereof solely for the purpose of perfecting the security interest granted under the First Priority Loan Documents and the Second Priority Loan Documents subject to the terms and conditions of this Section 8.4.

### SECTION 9. Miscellaneous.

9.1. Conflicts. In the event of any conflict between the provisions of this Agreement and the provisions of the First Priority Loan Documents or the Second Priority Loan Documents, the provisions of this Agreement shall govern and control.

9.2. Effectiveness; Continuing Nature of this Agreement; Severability. (a) This Agreement shall become effective when executed and delivered by the parties hereto.

(b) This is a continuing agreement of lien subordination and the First Priority Creditors may continue, at any time and without notice to the Second Priority Agent or any Second Priority Creditor subject to the Second Priority Loan Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrowers or any Grantor constituting First Priority Obligations in reliance hereof. The Second Priority Agent, on behalf of itself and the Second Priority Creditors, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.

(c) The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to the Borrowers or any other Grantor shall include the Borrowers or such Grantor as debtor and debtor in possession and any receiver or trustee for the Borrowers or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding. This Agreement shall terminate and be of no further force and effect on the date of Discharge of First Priority Obligations, subject to the rights of the First Priority Creditors and the Second Priority Creditors under Section 6.5.

9.3. Amendments; Waivers. No amendment, modification or waiver of any of the provisions of this Agreement by the Second Priority Agent or the First Priority Agent shall be

deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent; provided that (x) the First Priority Agent (at the direction of the Required Lenders (as defined in the First Priority Credit Agreement)) may, without the written consent of any other holder of Second Priority Obligations, agree to modifications of this Agreement for the purpose of securing additional extensions of credit (including pursuant to the First Priority Credit Agreement or Second Priority Credit Agreement or any Refinancing or extension thereof) and adding new creditors as "First Priority Creditors" and "Second Priority Creditors" hereunder, so long as such extensions (and resulting additions) do not otherwise give rise to a violation of the express terms of the First Priority Credit Agreement or the Second Priority Credit Agreement and (y) additional Grantors may be added as parties hereto in accordance with the provisions of Section 9.16 of this Agreement.  Each waiver of the terms of this Agreement, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, the Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent (x) their rights are directly affected (which includes, but is not limited to, any amendment to the Grantors' ability to cause additional obligations to constitute First Priority Obligations or Second Priority Obligations as the Grantors may designate or any amendment in respect of Section 5.1 that imposes additional conditions or requirements to effect a release of Collateral or any amendment in respect of Section 5.3 that imposes additional conditions or requirements to adopt modifications of the First Priority Loan Documents or Second Priority Loan Documents, as the case may be) or (y) such amendment, modification, or waiver in any way amends, modifies or waives the definition of "Maximum First Priority Indebtedness Amount" or "Maximum Second Priority Indebtedness Amount" or, to the extent the rights of the Grantors are directly affected thereby, Section 9.2.

9.4.    Information Concerning Financial Condition of the Borrowers and their Subsidiaries.  The First Priority Agent and the First Priority Creditors, in the first instance, and the Second Priority Agent and the Second Priority Creditors, in the second instance, shall each be responsible for keeping themselves informed of (a) the financial condition of the Borrowers and their Subsidiaries and all endorsers and/or guarantors of the First Priority Obligations or the Second Priority Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations.  None of the First Priority Agent or any First Priority Creditors or the Second Priority Agent or any Second Priority Creditor shall have a duty to advise of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the First Priority Agent or any of the First Priority Creditors or the Second Priority Agent or any of the Second Priority Creditors in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the First Priority Agent or any First Priority Creditor or the Second Priority Agent or any Second Priority Creditor, it or they shall be under no obligation:

(a)    to make, and it or they shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)    to provide any additional information or to provide any such information on any subsequent occasion;

(c)    to undertake any investigation; or

(d)    to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

9.5.    Subrogation. With respect to the value of any payments or distributions in cash, property or other assets that any of the Second Priority Creditors or the Second Priority Agent pays over to the First Priority Agent or the First Priority Creditors under the terms of this Agreement, the Second Priority Creditors and the Second Priority Agent, as applicable, shall be subrogated to the rights of the First Priority Agent and the First Priority Creditors; provided that the Second Priority Agent, on behalf of itself and the Second Priority Creditors hereby agrees not to assert or enforce any such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Priority Obligations has occurred.  The Borrowers acknowledge and agree that the value of any payments or distributions in cash, property or other assets received by the Second Priority Agent or the Second Priority Creditors that are paid over to the First Priority Agent or the First Priority Creditors pursuant to this Agreement shall not reduce any of the Second Priority Obligations.

9.6.    SUBMISSION TO JURISDICTION; WAIVERS. (a)    ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY:

(1)    **ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS;**

(2)    **WAIVES ANY DEFENSE OF FORUM NON CONVENIENS;**

(3)    **AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 9.7; AND**

(4)    **AGREES THAT SERVICE AS PROVIDED IN CLAUSE (3) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.**

(b)    **EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT**

**MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.   EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE; MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 9.6(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**(c)   EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER FIRST PRIORITY LOAN DOCUMENT OR SECOND PRIORITY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.**

9.7.   Notices.  All notices to the Second Priority Creditors and the First Priority Creditors permitted or required under this Agreement shall also be sent to the Second Priority Agent and the First Priority Agent, respectively.  Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, telexed, electronically mailed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of electronic mail, telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set forth on Annex III hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.8.   Further Assurances.  The First Priority Agent, on behalf of itself and the First Priority Creditors under the First Priority Loan Documents, and the Second Priority Agent, on behalf of itself and the Second Priority Creditors under the Second Priority Loan Documents, and the Borrowers, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Priority Agent or the Second Priority Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

9.9.   **APPLICABLE LAW**.  THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9.10.   Binding on Successors and Assigns.   This Agreement shall be binding upon, and inure to the benefit of, the First Priority Agent, the First Priority Creditors, the Second Priority Agent, the Second Priority Creditor, and their respective successors and assigns.

9.11.   Specific Performance. Each of the First Priority Agent and the Second Priority Agent may demand specific performance of this Agreement.  The First Priority Agent, on behalf of itself and the First Priority Creditors and the Second Priority Agent, on behalf of itself and the Second Priority Creditors, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the First Priority Agent or the First Priority Creditors or the Second Priority Agent or the Second Priority Creditors, as the case may be.

9.12.   Headings.   Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

9.13.   Counterparts.   This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

9.14.   Authorization. (a)   By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

(b)   The First Priority Agent represents and warrants that it has full power and authority to execute and deliver this Agreement and to bind each First Priority Lender to the agreements, obligations and representations of the First Priority Lenders contained in this agreement or which are stated herein to be binding upon the First Priority Lenders.

(c)   The Second Priority Agent represents and warrants that it has full power and authority to execute and deliver this Agreement and to bind each Second Priority Lender to the agreements, obligations and representations of the Second Priority Lenders contained in this agreement or which are stated herein to be binding upon the Second Priority Lenders.

9.15.   Provisions Solely to Define Relative Rights.   The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Priority Agent and the First Priority Creditors in the first instance and the Second Priority Agent and the Second Priority Creditors in the second instance.  Except as provided in Section 9.3, none of the Borrowers, any other Grantor or any other creditor thereof shall have any rights hereunder and neither the Borrowers nor any Grantor may rely on the terms hereof.  Nothing in

this Agreement is intended to or shall impair the obligations of the Borrowers or any other Grantor, which are absolute and unconditional, to pay the First Priority Obligations and the Second Priority Obligations as and when the same shall become due and payable in accordance with their terms.

9.16.    <u>Grantors; Additional Grantors</u>.  It is understood and agreed that the Parent, the Borrowers and each other Grantor on the date of this Agreement shall constitute the original Grantors party hereto.   The original Grantors hereby covenant and agree to cause each Subsidiary of the Parent which becomes a Subsidiary Guarantor after the date hereof to contemporaneously become a party hereto (as a Grantor) by executing delivering a counterpart hereof to the First Priority Agent or by executing and delivering an assumption agreement in form and substance reasonably satisfactory to the First Priority Agent.  The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Subsidiary Guarantor at any time (and any security granted by any such Person) shall be subject to the provisions hereof as fully as if same constituted a Grantor party hereto and had complied with the requirements of the immediately preceding sentence.

*    *    *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**First Priority Agent**

**NORDEA BANK FINLAND PLC, NEW YORK BRANCH,**
   as First Priority Agent


By:_____
   Name:
   Title:


By:_____
   Name:
   Title:

*Signature Page to General Maritime $273M Intercreditor Agreement*

**Second Priority Agent**

**NORDEA BANK FINLAND PLC, NEW YORK BRANCH,**
as Second Priority Agent


By:_____
   Name:
   Title:


By:_____
   Name:
   Title:


*Signature Page to General Maritime $273M Intercreditor Agreement*

**Acknowledged and Agreed to by:**

**The Parent**

**GENERAL MARITIME CORPORATION**


By:_____
       Name:  Jeffrey D. Pribor
       Title:  Executive Vice President & Chief Financial Officer



**The First Priority Borrower**

**GENERAL MARITIME SUBSIDIARY II CORPORATION**


By:_____
       Name:  Jeffrey D. Pribor
       Title:  President



**The Second Priority Borrower**

**GENERAL MARITIME SUBSIDIARY CORPORATION**


By:_____
       Name:  Jeffrey D. Pribor
       Title:  President

*Signature Page to General Maritime $273M Intercreditor Agreement*

**The Subsidiary Guarantors**

ARLINGTON TANKERS LTD.
VISION LTD.
VICTORY LTD.
COMPATRIOT LTD.
COMPANION LTD.
CONSUL LTD.


By: _____
    Name:  John C. Georgiopoulos
    Title:  Director

GMR ALEXANDRA LLC
GMR ARGUS LLC
GMR DAPHNE LLC
GMR ELEKTRA LLC
GMR GEORGE T LLC
GMR HOPE LLC
GMR HORN LLC
GMR ORION LLC
GMR PHOENIX LLC
GMR ST. NIKOLAS LLC
GMR SPYRIDON LLC
GMR ATLAS LLC
GMR HERCULES LLC
GMR MANIATE LLC
GMR POSEIDON LLC
GMR SPARTIATE LLC
GMR ULYSSES LLC
GMR ZEUS LLC
GMR AGAMEMNON LLC
GMR AJAX LLC
GMR DEFIANCE LLC
GMR HARRIET G LLC
GMR KARA G LLC
GMR MINOTAUR LLC
GMR STRENGTH LLC


By: _____
    Name:  John C. Georgiopoulos
    Title:  Manager

*Signature Page to General Maritime $273M Intercreditor Agreement*

GMR POSEIDON LLC,
GMR ULYSSES LLC,
GMR HERCULES LLC,
GMR ATLAS LLC,
GMR ZEUS LLC,
GMR MANIATE LLC,
GMR SPARTIATE LLC,

By: _____
   Name:
   Title: Manager

*Signature Page to General Maritime $273M Intercreditor Agreement*

**ANNEX I**

## Collateral Vessels

| | Vessel | Type | DWT | Year Built |
|---|---|---|---|---|
| 1 | Genmar Atlas | VLCC | 306,005 | 2007 |
| 2 | Genmar Hercules | VLCC | 306,543 | 2007 |
| 3 | Genmar Maniate | Suezmax | 164,925 | 2010 |
| 4 | Genmar Poseidon | VLCC | 305,795 | 2002 |
| 5 | Genmar Ulysses | VLCC | 318,695 | 2003 |
| 6 | Genmar Zeus | VLCC | 318,325 | 2010 |
| 7 | Genmar Spartiate | Suezmax | 164,925 | 2011 |

**ANNEX II**

**Other Collateral Vessels**

| | Vessel | Type | DWT | Year Built |
|---|---|---|---|---|
| 1 | Genmar Agamemnon | Aframax | 96,000 | 1995 |
| 2 | Genmar Ajax | Aframax | 96,000 | 1996 |
| 3 | Genmar Alexandra | Aframax | 102,000 | 1992 |
| 4 | Genmar Daphne | Aframax | 106,500 | 2002 |
| 5 | Genmar Defiance | Aframax | 105,000 | 2002 |
| 6 | Genmar Elektra | Aframax | 105,000 | 2002 |
| 7 | Genmar Strength | Aframax | 105,000 | 2003 |
| 8 | Genmar Minotaur | Aframax | 96,500 | 1995 |
| 9 | Genmar Consul | Handymax | 47,400 | 2004 |
| 10 | Genmar Companion | Panamax | 72,000 | 2004 |
| 11 | Genmar Compatriot | Panamax | 72,000 | 2004 |
| 12 | Genmar Argus | Suezmax | 153,000 | 2000 |
| 13 | Genmar George T | Suezmax | 155,000 | 2007 |
| 14 | Genmar Harriet G | Suezmax | 155,000 | 2006 |
| 15 | Genmar Hope | Suezmax | 159,000 | 1999 |
| 16 | Genmar Horn | Suezmax | 159,000 | 1999 |
| 17 | Genmar Kara G | Suezmax | 155,000 | 2007 |
| 18 | Genmar Orion | Suezmax | 153,000 | 2002 |
| 19 | Genmar Phoenix | Suezmax | 153,000 | 1999 |
| 20 | Genmar Spyridon | Suezmax | 153,000 | 2000 |
| 21 | Genmar St. Nikolas | Suezmax | 155,000 | 2008 |
| 22 | Genmar Victory | VLCC | 314,000 | 2001 |
| 23 | Genmar Vision | VLCC | 314,000 | 2001 |

**ANNEX III**

**Notices**

**First Priority Agent**

Nordea Bank Finland plc, New York Branch
Attention:  Martin Lunder
Telecopier:  (212) 421-4420
Email:  martin.lunder@nordea.com

**with a copy to:**

White & Case LLP
Attention:  David E. Joyce
Telecopier:  (212) 354-8113
Email:  djoyce@whitecase.com

**Second Priority Agent**

Nordea Bank Finland plc, New York Branch
Attention:  Martin Lunder
Telecopier:  (212) 421-4420
Email:  martin.lunder@nordea.com

**with a copy to:**

White & Case LLP
Attention:  David E. Joyce
Telecopier:  (212) 354-8113
Email:  djoyce@whitecase.com

**The First Priority Borrower**

General Maritime Subsidiary II Corporation
299 Park Avenue
New York, New York 10171
Attention:  John C. Georgiopoulos
Telecopy:  (212) 763-5608

**with a copy to:**

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention:  Kenneth Chin
Telecopy:  (212) 715-8000

and

Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Attention: Samantha Good
Telephone: (415) 439-1914
Facsimile: (415) 439-1500

**The Second Priority Borrower**

General Maritime Subsidiary Corporation
299 Park Avenue
New York, New York 10171
Attention:  John C. Georgiopoulos
Telecopy:  (212) 763-5608

**with a copy to:**

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention:  Kenneth Chin
Telecopy:  (212) 715-8000

and

Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Attention: Samantha Good
Telephone: (415) 439-1914
Facsimile: (415) 439-1500

**ANNEX III**

Table of Contents

Page

SECTION 1.  Definitions ...................................................................................................2
   1.1.  Defined Terms .............................................................................................2
   1.2.  Terms Generally ........................................................................................12

SECTION 2.  Lien Priorities ............................................................................................13
   2.1.  Relative Priorities .....................................................................................13
   2.2.  Prohibition on Contesting Liens ...............................................................13
   2.3.  No New Liens ............................................................................................14
   2.4.  Similar Liens and Agreements ..................................................................14

SECTION 3.  Enforcement. .............................................................................................14
   3.1.  Exercise of Remedies ................................................................................14

SECTION 4.  Payments. ...................................................................................................18
   4.1.  Application of Proceeds of Collateral .......................................................18
   4.2.  Application of Proceeds of Pari Passu Collateral Accounts .....................18
   4.3.  Payments Over in Violation of Agreement ...............................................19

SECTION 5.  Other Agreements. .....................................................................................19
   5.1.  Releases .....................................................................................................19
   5.2.  Insurance ...................................................................................................21
   5.3.  Amendments to First Priority Loan Documents and Second Priority Loan
        Documents ..................................................................................................21
   5.4.  Legends .....................................................................................................22
   5.5.  Bailee for Perfection .................................................................................23
   5.6.  When Discharge of First Priority Obligations Deemed to Not Have Occurred ....24
   5.7.  Purchase Right ..........................................................................................25

SECTION 6.  Insolvency or Liquidation Proceedings. ....................................................26
   6.1.  Finance and Sale Issues ............................................................................26
   6.2.  Relief from the Automatic Stay ................................................................26
   6.3.  Adequate Protection ..................................................................................27
   6.4.  No Waiver ..................................................................................................28
   6.5.  Avoidance Issues ......................................................................................28
   6.6.  Reorganization Securities .........................................................................28
   6.7.  Post-Petition Interest .................................................................................28
   6.8.  Waiver .......................................................................................................28
   6.9.  Separate Grants of Security and Separate Classification ..........................29

SECTION 7.  Reliance; Waivers; Etc ..............................................................................29
   7.1.  Reliance .....................................................................................................29
   7.2.  No Warranties or Liability .........................................................................30
   7.3.  No Waiver of Lien Priorities .....................................................................30
   7.4.  Obligations Unconditional .........................................................................31

i

SECTION 8.    Pari Passu Priority Collateral ...................................................................31
    8.1.    Lien Priorities.........................................................................................31
    8.2.    Exercise of Remedies.............................................................................32
    8.3.    Applications of Proceeds .......................................................................34
    8.4.    Perfection ...............................................................................................34

SECTION 9.    Miscellaneous. ......................................................................................34
    9.1.    Conflicts.................................................................................................34
    9.2.    Effectiveness; Continuing Nature of this Agreement; Severability.......34
    9.3.    Amendments; Waivers............................................................................34
    9.4.    Information Concerning Financial Condition of the Borrowers and their
          Subsidiaries ...........................................................................................35
    9.5.    Subrogation ............................................................................................36
    9.6.    SUBMISSION TO JURISDICTION; WAIVERS .................................36
    9.7.    Notices ...................................................................................................37
    9.8.    Further Assurances.................................................................................37
    9.9.    **APPLICABLE LAW** ........................................................................38
    9.10.   Binding on Successors and Assigns........................................................38
    9.11.   Specific Performance .............................................................................38
    9.12.   Headings ................................................................................................38
    9.13.   Counterparts...........................................................................................38
    9.14.   Authorization .........................................................................................38
    9.15.   Provisions Solely to Define Relative Rights...........................................38
    9.16.   Grantors; Additional Grantors ...............................................................39

## EXHIBIT 16B

**New Senior 2011 Facility Intercreditor Agreement**

INTERCREDITOR AGREEMENT

among

GENERAL MARITIME CORPORATION,

as Parent,

GENERAL MARITIME SUBSIDIARY CORPORATION,

as First Priority Borrower,

GENERAL MARITIME SUBSIDIARY II CORPORATION,

as Second Priority Borrower,

EACH OF THE SUBSIDIARY GUARANTORS PARTY HERETO,

NORDEA BANK FINLAND PLC, NEW YORK BRANCH,

as First Priority Agent and Collateral Agent

and

NORDEA BANK FINLAND PLC, NEW YORK BRANCH,

as Second Priority Agent

dated as of [_____], 2012

## INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT** ("**Agreement**"), dated as of [_____], 2012, is entered into by and among GENERAL MARITIME CORPORATION (the **"Parent"**), GENERAL MARITIME SUBSIDIARY CORPORATION, as borrower under the First Priority Credit Agreement (as defined below) (the "**First Priority Borrower**"), GENERAL MARITIME SUBSIDIARY II CORPORATION, as borrower under the Second Priority Credit Agreement (as defined below) (the "**Second Priority Borrower**" and, together with the First Priority Borrower, the "**Borrowers**"), EACH OF THE UNDERSIGNED SUBSIDIARY GUARANTORS (as defined below), NORDEA BANK FINLAND PLC, NEW YORK BRANCH, in its capacity as administrative agent for the First Priority Creditors (as defined below), including its successors and assigns from time to time (the **"First Priority Agent"**) and NORDEA BANK FINLAND PLC, NEW YORK BRANCH, in its capacity as administrative agent for the Second Priority Obligations (as defined below), including its successors and assigns from time to time (in such capacity, the **"Second Priority Agent"**). Capitalized terms used in this Agreement have the meanings assigned to them in Section 1 below.

## RECITALS

The First Priority Borrower, the Parent, the lenders from time to time party thereto, the First Priority Agent, the Collateral Agent and the other entities from time to time party thereto have entered into that certain $[508,963,260.95][1] Third Amended and Restated Credit Agreement, dated as of the date hereof (the "**First Priority Credit Agreement**"), which First Priority Credit Agreement amends and restates the Second Amended and Restated Credit Agreement, dated as of May 6, 2011 (as amended, modified and/or supplemented from time to time to, but not including, the Restatement Effective Date (as defined in the First Priority Credit Agreement), the "**Original Credit Agreement**"), among the First Priority Borrower, the Parent, General Maritime Subsidiary II Corporation, Arlington Tankers Ltd. ("**Arlington**"), the lenders party thereto and the First Priority Agent;

The Second Priority Borrower, the Parent, the lenders from time to time party thereto, the Second Priority Agent and the other entities from time to time party thereto have entered into that certain $273,802,583.31 Second Amended and Restated Credit Agreement, dated as of the date hereof (the "**Second Priority Credit Agreement**"), which Second Priority Credit Agreement amends and restates the Amended and Restated Credit Agreement, dated as of May 6, 2011 (as amended, modified and/or supplemented from time to time to, but not including, the Restatement Effective Date), among the Second Priority Borrower, the Parent, General Maritime Subsidiary Corporation, Arlington, the lenders party thereto and the Second Priority Agent;

Pursuant to (i) the First Priority Credit Agreement, the Parent, Arlington and the Second Priority Borrower have agreed to guaranty the First Priority Obligations and to cause certain current and future Subsidiaries listed on the signature pages hereto and to the Other

---

[1] Amount to include accrued and unpaid interest on the Specified Swap (as defined in the First Priority Credit Agreement).

Intercreditor Agreement (as defined below) (the **"Subsidiary Guarantors"**) to agree to guaranty the First Priority Obligations (the **"First Priority Guaranty"**); and (ii) the Second Priority Credit Agreement, the Parent, Arlington and the First Priority Borrower have agreed to guaranty the Second Priority Obligations and to cause the Subsidiary Guarantors to agree to guaranty the Second Priority Obligations (the **"Second Priority Guaranty"**);

The obligations of the First Priority Borrower under the First Priority Credit Agreement and the Existing Swap Agreements (as defined below) and the obligations of the Parent, Arlington, the Second Priority Borrower and the Subsidiary Guarantors under the First Priority Credit Agreement and the First Priority Guaranty are secured, inter alia, on a first priority basis by Liens on the Collateral pursuant to the terms of the First Priority Collateral Documents;

The obligations of the Second Priority Borrower under the Second Priority Credit Agreement and the obligations of the Parent, the First Priority Borrower, Arlington and the Subsidiary Guarantors under the Second Priority Credit Agreement and the Second Priority Guaranty are secured, inter alia, on a second priority basis by Liens on the Collateral pursuant to the terms of the Second Priority Collateral Documents;

The First Priority Loan Documents and the Second Priority Loan Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

In order to induce the First Priority Agent and the First Priority Creditors to consent to the Grantors incurring the Second Priority Obligations and to induce the First Priority Creditors to convert their outstanding revolving loans under the Original Credit Agreement to Tranche A Loans, convert the Specified Swap (as defined in the First Priority Credit Agreement) to Tranche B Loans and make other financial accommodations to or for the benefit of the First Priority Borrower or any other Grantor, the Second Priority Agent on behalf of the Second Priority Creditors has agreed to the intercreditor and other provisions set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1.  Definitions.**

1.1.    Defined Terms.  As used in the Agreement, the following terms shall have the following meanings:

**"Affiliate"** means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.  For purposes of this definition, a Person shall be deemed to **"control"** or be **"controlled by"** a Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through ownership of equity interests, by contract or otherwise.

**"Agreement"** means this Intercreditor Agreement, as amended, restated, renewed, extended, supplemented, replaced or otherwise modified from time to time.

**"Bankruptcy Code"** means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

**"Bankruptcy Court"** means a court having jurisdiction over an Insolvency or Liquidation Proceeding.

**"Bankruptcy Law"** means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

**"Borrowers"** has the meaning assigned to that term in the Preamble to this Agreement.

**"Business Day"** means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, Hamburg and London are authorized or required by law or executive order to close.

**"Cash Equivalents"** means (i) securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States of America is pledged in support thereof) having maturities of not more than one year from the date of acquisition, (ii) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company having capital, surplus and undivided profits aggregating in excess of $200,000,000, with maturities of not more than one year from the date of acquisition by such Person, (iii) repurchase obligations with a term of not more than 90 days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (ii) above, (iv) commercial paper issued by any Person incorporated in the United States of America rated at least A-1 or the equivalent thereof by Standard & Poor's Financial Services LLC (and its successors) or at least P 1 or the equivalent thereof by Moody's Investors Service, Inc. (and its successors) and in each case maturing not more than one year after the date of acquisition by such Person, and (v) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (iv) above.

**"Collateral"** means:

(i)     each of the Collateral Vessels;

(ii)    all the Equity Interests in (w) the First Priority Borrower, (x) Arlington, (y) each of the other Grantors that owns a Collateral Vessel and (z) each Grantor which is a Subsidiary of the First Priority Borrower and owns, directly or indirectly, any Equity Interests in any Grantor which owns a Collateral Vessel;

(iii)   all insurances on the Collateral Vessels;

(iv)    all earnings from the Collateral Vessels;

(iv)    the Earnings Accounts described in clause (a) of the definition thereof and all property of every type and description in which any proceeds of any Disposition of Collateral are invested;

(v)    all rights under any charter contracts with respect of the Collateral Vessels;

(vi)    all tangible and intangible property which is pledged to secure the First Priority Obligations in order to cure a default or potential default under Section 9.09 of the First Priority Credit Agreement;

(vii)    any other assets and/or property of the First Priority Borrower or any other Grantor, whether real, personal or mixed, constituting "Primary Collateral" under and as defined in First Priority Credit Agreement at any time; and

(viii)    to the extent not otherwise included above, all proceeds of any of the foregoing.

It is understood and agreed that the Collateral does not include (x) the Other Collateral and that the respective rights and remedies of the First Priority Creditors and the Second Priority Creditors with respect thereto will be governed by the Other Intercreditor Agreement and (y) notwithstanding anything to the contrary contained above or in the definition of Other Collateral, the Pari Passu Collateral Accounts.

"**Collateral Agent**" means (x) prior to the Discharge of the First Priority Obligations, the First Priority Agent and (y) after the Discharge of First Priority Obligations, the Second Priority Agent.

"**Collateral Documents**" means, collectively, the First Priority Collateral Documents and the Second Priority Collateral Documents, in each case with respect to the Collateral.

"**Collateral Vessel**" means each of the vessels listed on Annex I hereto, together with any vessel provided as a replacement thereto in accordance with the terms of the First Priority Credit Agreement and the Second Priority Credit Agreement at any time.

"**Comparable Second Priority Collateral Document**" means, in relation to any Collateral subject to any Lien created under any First Priority Collateral Document, the Second Priority Loan Document which creates a Lien on the same Collateral, granted by the same Grantor or Grantors.

"**DIP Financing**" has the meaning assigned to that term in Section 6.1(a).

"**Discharge of First Priority Obligations**" means, except to the extent otherwise expressly provided in Section 5.6:

(a)      payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding), on all Indebtedness outstanding under the First Priority Loan Documents and constituting First Priority Obligations;

(b)      payment in full in cash of all other First Priority Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid;

(c)      termination or expiration of all commitments, if any, to extend credit that would constitute First Priority Obligations;

(d)      termination (without any prior demand for payment thereunder having been made or, if made, with such demand having been fully reimbursed in cash) or cash collateralization (in an amount and manner, and on terms, satisfactory to the First Priority Agent) of all letters of credit issued by any First Priority Creditor; and

(e)      termination and payment of all Existing Swap Agreements issued or entered into under the First Priority Loan Documents and constituting First Priority Obligations.

For the avoidance of doubt, "Discharge of First Priority Obligations" shall not require the payment of First Priority Obligations consisting solely of contingent indemnification obligations for which (i) no claim has been made and (ii) notice of the event with respect to which a claim may arise has not been given to the First Priority Borrower.

"Disposition" means a sale, lease, exchange, transfer or other disposition.

"Earnings Account" means (a) each bank account required to be opened and maintained by (x) each Grantor that owns a Collateral Vessel in its name with the Collateral Agent into which bank account such Grantor shall procure that all hires, freights, pool income and other sums payable in respect of the Collateral Vessels are credited and (y) each Grantor that owns an Other Collateral Vessel in its name with the Collateral Agent into which bank account such Grantor shall procure that all hires, freights, pool income and other sums payable in respect of the Other Collateral Vessels are credited and (b) each Pari Passu Collateral Account.

"Equity Interests" means (i) in the case of a corporation, corporate stock, (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents of corporate stock and (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited).

"Exercise Any Secured Creditor Remedies" or "Exercise of Secured Creditor Remedies" means (a) the taking of any action to enforce or realize upon any Lien, including the institution of any foreclosure proceedings or the noticing of any public or private sale or other disposition pursuant to Article 9 of the UCC, applicable law or otherwise, (b) the exercise of any right or remedy provided to a secured creditor or otherwise on account of a Lien under the First Priority Loan Documents, the Second Priority Loan Documents or any Collateral Document, Article 9 of the UCC, applicable law, in an Insolvency Proceeding or otherwise, including the

election to retain Collateral in satisfaction of a Lien, (c) the taking of any action or the exercise of any right or remedy in respect of the collection on, set off against, marshaling of, or foreclosure on the Collateral or the proceeds of Collateral (including, without limitation, the notification of account debtors), (d) the sale, lease, license, or other disposition of all or any portion of the Collateral, by private or public sale, other disposition or any other means permissible under applicable law, (e) the solicitation of bids from third parties to conduct the liquidation of all or any portion of Collateral to the extent undertaken and being diligently pursued in good faith to consummate the sale of such Collateral, (f) the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers or other third parties for the purposes of valuing, marketing, promoting and selling the Collateral to the extent undertaken and being diligently pursued in good faith to consummate the sale of such Collateral, and (g) the exercise of any other enforcement right relating to the Collateral (including the exercise of any voting rights relating to any Equity Interests and including any right of recoupment or set-off) whether under the First Priority Loan Documents, the Second Priority Loan Documents or any Collateral Document, applicable law, in an Insolvency Proceeding or otherwise.

"**Exercise Any Unsecured Creditor Remedies" or "Exercise of Unsecured Creditor Remedies**" means the commencement or joinder in the commencement of an Insolvency or Liquidation Proceeding against the Parent or any of its Subsidiaries.

"**Existing Swap Agreements**" means (i) the interest rate swap agreement entered into between the Parent and DnB Bank ASA with a notional amount equal to $75,000,000 and (ii) the interest rate swap agreement entered into between the Parent and Nordea Bank Finland plc with a notional amount equal to $75,000,000.

"**First Priority Agent**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First Priority Borrower**" has the meaning assigned to that term in the Preamble to this Agreement.

"**First Priority Collateral**" means all of the Collateral with respect to which a Lien is granted as security for any First Priority Obligations.

"**First Priority Collateral Documents**" means the Security Documents (as defined in the First Priority Credit Agreement) and the First Priority Guaranty and any other agreement, document or instrument pursuant to which a Lien is granted on the Collateral securing any First Priority Obligations or under which rights or remedies with respect to such Liens are governed.

"**First Priority Credit Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First Priority Creditors**" means, at any relevant time, the holders of First Priority Obligations at that time, including the First Priority Lenders, the agents under the First Priority Loan Documents and the lender counterparties to the Existing Swap Agreements.

**"First Priority Debt Notice"** has the meaning assigned to that term in Section 5.6.

**"First Priority Guaranty"** has the meaning assigned to that term in the Recitals to this Agreement.

**"First Priority Lenders"** means the Lenders under and as defined in the First Priority Loan Documents.

**"First Priority Liens"** means any Liens on the Collateral securing the First Priority Obligations pursuant to the First Priority Collateral Documents, this Agreement or otherwise.

**"First Priority Loan Documents"** means the First Priority Credit Agreement and the Credit Documents (as defined in the First Priority Credit Agreement), including Existing Swap Agreements, and each of the other agreements, documents and instruments providing for or evidencing any other First Priority Obligation, and any other document or instrument executed or delivered at any time in connection with any First Priority Obligations, including any intercreditor or joinder agreement among holders of First Priority Obligations, to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, Refinanced or extended from time to time in accordance with the provisions of this Agreement.

**"First Priority Obligations"** means, subject to the next paragraph, all Obligations outstanding under the First Priority Credit Agreement and the other First Priority Loan Documents, including Obligations under the Existing Swap Agreements. "First Priority Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Priority Loan Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

Notwithstanding the foregoing, if the sum of: (1) Indebtedness constituting principal outstanding under the First Priority Credit Agreement (including any unfunded commitments) and the other First Priority Loan Documents (but excluding, for the avoidance of doubt, indebtedness under any Existing Swap Agreement), plus (2) the aggregate face amount of any letters of credit issued but not reimbursed under the First Priority Credit Agreement, is in excess of the Maximum First Priority Indebtedness Amount, then only that portion of such Indebtedness and such aggregate face amount of letters of credit equal to the Maximum First Priority Indebtedness Amount shall be included in First Priority Obligations and interest, fees, premium (if any) and reimbursement obligations with respect to such Indebtedness and letters of credit shall only constitute First Priority Obligations to the extent related to Indebtedness and face amounts of letters of credit included in the First Priority Obligations. For the avoidance of doubt, indebtedness under any Existing Swap Agreements shall not be included in calculating the Maximum First Priority Indebtedness Amount.

**"First Priority Purchase Price"** has the meaning assigned to that term in Section 5.7.

**"First Priority Recovery"** has the meaning assigned to that term in Section 6.5(a).

**"First Priority Termination Fees"** has the meaning assigned to that term in Section 5.7.

**"Grantors"** means the Parent, the Borrowers, each of the Subsidiary Guarantors and each other Person that has or may from time to time hereafter execute and deliver a First Priority Collateral Document or a Second Priority Collateral Document as a "Grantor" (or the equivalent thereof).

**"Indebtedness"** means and includes all Obligations that constitute "Indebtedness" within the meaning of the First Priority Credit Agreement or the Second Priority Credit Agreement, as applicable.

**"Insolvency or Liquidation Proceeding"** means:

(a)     any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)     any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets;

(c)     any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)     any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

**"Lien"** means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust, UCC financing statement or other preferential arrangement having the practical effect of any of the foregoing.

**"Maximum First Priority Indebtedness Amount"** means (x) $[508,963,260.95][2] minus (y) permanent reductions of the principal amount of the Indebtedness under the First Priority Credit Agreement; provided that no such reduction shall be deemed to occur in connection with any Refinancing of the First Priority Credit Agreement.

---

[2] Amount to include accrued and unpaid interest on the Specified Swap (as defined in the First Priority Credit Agreement).

**"Maximum Second Priority Indebtedness Amount"** means (x) $273,802,583.31 <u>minus</u> (y) permanent reductions of the principal amount of the Indebtedness under the Second Priority Credit Agreement; <u>provided</u> that no such reduction shall be deemed to occur in connection with any Refinancing of the Second Priority Credit Agreement.

"**Net Cash Proceeds**" shall mean, with respect to any Collateral Disposition, the aggregate cash payments (including any cash received by way of deferred payment pursuant to a note receivable issued in connection with such Collateral Disposition, other than the portion of such deferred payment constituting interest, but only as and when received) received by the Parent or any Borrower or any of their respective Subsidiaries from such Collateral Disposition net of (i) reasonable transaction costs (including, without limitation, reasonable attorney's fees) and sales commissions and (ii) the estimated marginal increase in income taxes and any stamp tax payable by the Parent, any Borrower or any of its Subsidiaries as a result of such Collateral Disposition.

**"New First Priority Agent"** has the meaning assigned to that term in Section 5.6.

**"Obligations"** means all obligations of every nature of each Grantor from time to time owed to any agent or trustee, the First Priority Creditors, the Second Priority Creditors or any of them or their respective Affiliates, in each case under the First Priority Loan Documents, the Second Priority Loan Documents or Existing Swap Agreements, whether for principal, interest or payments for early termination, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing.

**"Other Collateral"** means all property (tangible and intangible) securing the Obligations other than the Collateral and shall include, without limitation:

(i)    each of the Other Collateral Vessels;

(ii)   all Equity Interests in (x) the Second Priority Borrower, (y) each of the other Grantors that owns a Other Collateral Vessel and (z) each Grantor which is a Subsidiary of the Second Priority Borrower and owns, directly or indirectly, any Equity Interests in any Grantor which owns an Other Collateral Vessel;

(ii)   all insurances on the Other Collateral Vessels;

(iv)   all earnings from the Other Collateral Vessels;

(v)    the Earnings Accounts described in clauses (y) and (z) of the definition thereof and all property of every type and description in which any proceeds of any Disposition of Other Collateral are invested;

(vi)   all rights under any charter contracts with respect of the Other Collateral Vessels;

(vii)   all tangible and intangible property which is pledged to secure the Second Priority Obligations in order to cure a default or potential default under Section 9.09 of the Second Priority Credit Agreement; and

(viii)  any other assets and/or property of the First Priority Borrower or any other Grantor, whether real, personal or mixed, constituting "Secondary Collateral" under and as defined in First Priority Credit Agreement at any time; and

(ix)    to the extent not otherwise included above, all proceeds of any of the foregoing.

Notwithstanding anything to the contrary contained above or in the definition of Collateral, it is understood and agreed that the Other Collateral does not include the Pari Passu Collateral Accounts.

"**Other Collateral Vessel**" means each of the vessels listed on <u>Annex II</u> hereto, together with any vessel provided as a replacement thereto in accordance with the terms of the Second Priority Credit Agreement at any time.

"**Other Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the date hereof, entered into by and among the Parent, the Borrowers, the other Subsidiaries of the Parent from time to time party thereto, the First Priority Agent and the Second Priority Agent setting forth the respective rights and remedies of the First Priority Creditors and the Second Priority Creditors with respect to the Other Collateral.

"**Parent**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Pari Passu Collateral Accounts**" means each bank account opened and maintained by the Parent, the First Priority Borrower, the Second Priority Borrower and Arlington, which accounts (i) shall be pledged to secure the First Priority Obligations and the Second Priority Obligations on a pari passu basis and (ii) shall exclude the Earnings Accounts set forth in clause (a) of the definition thereof.

"**Pari Passu Collateral Percentage**" means (i) in the case of the First Priority Obligations, the percentage of the aggregate Obligations represented by the First Priority Obligations and (ii) in the case of the Second Priority Obligations, 100% less the Pari Passu Collateral Percentage for the First Priority Obligations.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"**Pledged Collateral**" has the meaning assigned to that term in Section 5.5(i).

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other

indebtedness, in exchange or replacement for, such Indebtedness in whole or in part. **"Refinanced"** and **"Refinancing"** shall have correlative meanings.

"**Second Priority Agent**" has the meaning assigned to that term in the Preamble of this Agreement.

"**Second Priority Borrower**" has the meaning assigned to that term in the Preamble to this Agreement.

"**Second Priority Collateral Documents**" means the Security Documents (as defined in the Second Priority Credit Agreement) and the Second Priority Guaranty and any other agreement, document or instrument pursuant to which a Lien is granted securing any Second Priority Obligations or under which rights or remedies with respect to such Liens are governed.

"**Second Priority Credit Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Second Priority Creditors**" means, at any relevant time, the holders of Second Priority Obligations at that time, including the Second Priority Lenders and the agents under the Second Priority Loan Documents.

"**Second Priority Collateral**" means all of the Collateral with respect to which a Lien is granted as security for any Second Priority Obligations.

"**Second Priority Guaranty**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Second Priority Lenders**" means the "Lenders" under and as defined in the Second Priority Loan Documents.

"**Second Priority Liens**" means any Liens on the Second Priority Collateral securing the Second Priority Obligations pursuant to the Second Priority Collateral Documents, this Agreement or otherwise.

"**Second Priority Loan Documents**" means the Second Priority Credit Agreement and the Credit Documents (as defined in the Second Priority Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Second Priority Obligation, and any other document or instrument executed or delivered at any time in connection with any Second Priority Obligations, including any intercreditor or joinder agreement among holders of Second Priority Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"**Second Priority Mortgage**" means a collective reference to each mortgage, deed of trust, deed to secure debt and any other document or instrument under which any Lien on real property owned by any Grantor is granted to secure any Second Priority Obligations or under which rights or remedies with respect to any such Liens are governed.

"**Second Priority Obligations**" means, subject to the next paragraph, all Obligations outstanding under the Second Priority Credit Agreement and the other Second Priority Loan Documents.  "Second Priority Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Second Priority Loan Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"**Second Priority Purchase Notice**" has the meaning assigned to that term in Section 5.7.

"**Second Priority Recovery**" has the meaning assigned to that term in Section 6.5(b).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"**Subsidiary Guarantors**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Triggering Event**" means (a) the tenth Business Day prior to the acceleration prior to maturity of all or any portion of the First Priority Obligations, (b) subject to Section 5.7(b), the exercise of any remedy with respect to Liens on the Collateral by the First Priority Agent, (c) a default in any payment under any of the First Priority Loan Documents, or the Second Priority Loan Documents which remains uncured or unwaived for a period of 30 days in the aggregate (after giving effect to any applicable grace period under the First Priority Loan Documents or the Second Priority Loan Documents, as the case may be) or (d) the commencement of an Insolvency or Liquidation Proceeding.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

1.2.   Terms Generally.  The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise:

(a)   any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document

as from time to time permitted to be amended, restated, supplemented, modified, renewed, Refinanced or extended in accordance with the terms hereof;

(b)     any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

(c)     the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d)     all references herein to Sections shall be construed to refer to Sections of this Agreement; and

(e)     the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## SECTION 2.  Lien Priorities.

2.1.     Relative Priorities.  Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Second Priority Obligations granted on the Collateral or of any Liens securing the First Priority Obligations granted on the Collateral and notwithstanding any provision of the UCC, or any other applicable law or the Second Priority Loan Documents or any defect or deficiencies in, or failure to perfect, the Liens securing the First Priority Obligations or the Second Priority Obligations or any other circumstance whatsoever, the Second Priority Agent, on behalf of itself and the Second Priority Creditors, hereby agrees that:

(a)     so long as the Discharge of First Priority Obligations has not occurred, any Lien on the Collateral securing any First Priority Obligations now or hereafter held by or on behalf of the First Priority Agent or any First Priority Creditors or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any Second Priority Obligations; and

(b)     so long as the Discharge of First Priority Obligations has not occurred, any Lien on the Collateral securing any Second Priority Obligations now or hereafter held by or on behalf of the Second Priority Agent, any Second Priority Creditors, any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Priority Obligations.  All Liens on the Collateral securing any First Priority Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Priority Obligations for all purposes, whether or not such Liens securing any First Priority Obligations are subordinated to any Lien securing any other obligation of the Borrowers, any other Grantor or any other Person.

2.2.     Prohibition on Contesting Liens.  Each of the Second Priority Agent, for itself and on behalf of each Second Priority Creditor, and the First Priority Agent, for itself and

on behalf of each First Priority Creditor, agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), (i) the validity or enforceability of any First Priority Collateral Document or Second Priority Collateral Document or any obligation thereunder, (ii) the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Priority Creditors in the First Priority Collateral or by or on behalf of any of the Second Priority Creditors in the Second Priority Collateral, as the case may be, or the provisions of this Agreement, or (iii) the relative rights and duties of the holders of First Priority Obligations or Second Priority Obligations granted and/or established pursuant to this Agreement, any First Priority Collateral Document or any Second Priority Collateral Document that nothing in this Agreement shall be construed to prevent or impair the rights of the First Priority Agent, any First Priority Creditor, the Second Priority Agent or any Second Priority Creditor, to enforce this Agreement, including the provisions of this Agreement relating to the relative priority of the Liens securing the applicable Obligations as provided in Sections 2.1 and 3.1.

2.3.    No New Liens.  So long as the Discharge of First Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Borrowers or any other Grantor, the parties hereto agree that the Borrowers shall not, and shall not permit any other Grantor or any Subsidiary of the Parent to:

(i)    grant or permit any additional Liens on any asset or property to secure any Second Priority Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the First Priority Obligations; or

(ii)    grant or permit any additional Liens on any asset or property to secure any First Priority Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the Second Priority Obligations.

To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Agent and/or the First Priority Creditors, the Second Priority Agent, on behalf of the Second Priority Creditors, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.3.

2.4.    Similar Liens and Agreements.  The parties hereto agree that it is their intention that the First Priority Collateral and the Second Priority Collateral be identical.  In furtherance of the foregoing and of Section 9.8, the parties hereto agree, subject to the other provisions of this Agreement:

(a)    upon request by the First Priority Agent or the Second Priority Agent to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Priority Collateral and the Second Priority Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Priority Loan Documents and the Second Priority Loan Documents; and

(b)      that the documents and agreements creating or evidencing the First Priority Collateral and the Second Priority Collateral and guarantees for the First Priority Obligations and the Second Priority Obligations, subject to Section 5.3(c), shall be in all material respects the same forms of documents other than (i) with respect to the first lien and the second lien nature of the Obligations thereunder and (ii) changes with respect to the Collateral Agent as are customary where a collateral agent is acting on behalf of securityholders and is not a lender acting on its own behalf and on behalf of other lenders.

### SECTION 3.  Enforcement.

3.1.    Exercise of Remedies.

(a)      Until the Discharge of First Priority Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Borrowers or any other Grantor, the Second Priority Agent and the Second Priority Creditors:

(i)      will not Exercise Any Secured Creditor Remedies with respect to the First Priority Collateral (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Priority Agent or any Second Priority Creditor is a party);

(ii)      will not contest, protest or object to any Exercise of Secured Creditor Remedies or any Exercise of Unsecured Creditor Remedies relating to the First Priority Collateral under the First Priority Loan Documents or otherwise; and

(iii)      except as may be permitted in Section 3.1(c), will not object to the forbearance by the First Priority Agent or the First Priority Creditors from bringing or pursuing any Exercise of Secured Creditor Remedies or any Exercise of Unsecured Creditor Remedies with respect to the First Priority Collateral;

provided that, in the case of (i), (ii) and (iii) above, the Liens on the Collateral granted to secure the Second Priority Obligations of the Second Priority Creditors and the Second Priority Obligations of the Second Priority Creditors shall attach to any proceeds resulting from actions taken by the First Priority Agent or any First Priority Creditor in accordance with this Agreement after application of such proceeds to the extent necessary to meet the requirements of a Discharge of First Priority Obligations.  Subject to Section 5.7(b), the First Priority Agent agrees to provide at least ten Business Days' prior written notice to the Second Priority Agent of its intention to Exercise Any Secured Creditor Remedies; provided, however, that the failure to give any such notice shall not in any way limit its ability to Exercise Any Secured Creditor Remedies to the extent that such Exercise of Secured Creditor Remedies is not otherwise prohibited by the provisions of this Agreement.

(b)      (i) Until the Discharge of First Priority Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the First Priority Borrower or any other Grantor, but subject to Section 3.1(a)(i), the First Priority Agent and the First Priority Creditors shall have the exclusive right to Exercise Any Secured

Creditor Remedies with respect to the Collateral (including set off and the right to credit bid their debt) and make determinations regarding the release, Disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Second Priority Agent or any Second Priority Creditor; provided that the Lien on the Collateral securing the Second Priority Obligations shall remain on the proceeds of such Collateral released or disposed of subject to the relative priorities described in Section 2.  In the Exercise of Secured Creditor Remedies, the First Priority Agent and the First Priority Creditors may enforce the provisions of the First Priority Loan Documents and Exercise Any Secured Creditor Remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion, subject to the terms of this Agreement.  Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such Disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction, subject to the terms of this Agreement.

(c)     Notwithstanding the foregoing, the Second Priority Agent and any Second Priority Creditor may:

(1)     file a claim, proof of claim or statement of interest with respect to the Second Priority Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any of the Borrowers or any other Grantor;

(2)     take any action (not adverse to the priority status of the Liens on the Collateral securing the First Priority Obligations, or the rights of the First Priority Agent or the First Priority Creditors to Exercise Any Secured Creditor Remedies in respect thereof) in order to create, perfect, preserve or protect its Lien on the Collateral;

(3)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Creditors, including any claims secured by the Collateral, if any, in each case not in violation of the terms of this Agreement;

(4)     file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not in violation of the terms of this Agreement;

(5)     vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Priority Obligations and the Collateral;

(6)     join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding with respect to the Collateral initiated by First Priority Agent to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay for any

material period or otherwise interfere with the Exercise of Secured Creditor Remedies by First Priority Agent (it being understood that neither the Second Priority Agent nor any Second Priority Creditor shall be entitled to receive any proceeds thereof unless otherwise expressly permitted herein);

(7)     engage consultants, valuation firms, investment bankers, and perform or engage third parties to perform audits, examinations and appraisals of the Collateral for the sole purpose valuing the Collateral and not for the purpose of marketing or conducting a disposition of such Collateral; provided, however, that the Second Priority Agent shall not take any of the foregoing actions if they would materially interfere with the Exercise of Secured Creditor Remedies by the First Priority Agent;

(8)     the filing and pursuit of a lawsuit against the First Priority Agent and/or any First Priority Creditor for breach or non-performance of any payment obligations pursuant hereto;

(9)     the imposition of default interest (and interest on interest) under the Second Priority Credit Agreement; and

(10)     bidding for (including credit bidding in conjunction with a cash bid sufficient to cause a Discharge of First Priority Obligations) and, if such bidding is successful, purchasing Collateral pursuant to a disposition of Collateral that would constitute an Exercise of Secured Creditor Remedies by the First Priority Agent for a cash purchase price in an amount no less than the amount required to cause the Discharge of First Priority Obligations in full.

The Second Priority Agent, on behalf of itself and the Second Priority Creditors, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any Collateral in its capacity as a creditor in violation of this Agreement.

(d)     Subject to Section 3.1(c) and Section 6.3(b):

(1)     the Second Priority Agent, for itself and on behalf of the Second Priority Creditors, agrees that the Second Priority Agent and the Second Priority Creditors will not take any action that would hinder any Exercise of Secured Creditor Remedies under the First Priority Loan Documents or is otherwise prohibited hereunder, including any Disposition of Collateral, whether by foreclosure or otherwise;

(2)     the Second Priority Agent, for itself and on behalf of the Second Priority Creditors, hereby waives any and all rights it or the Second Priority Creditors may have as a junior lien creditor or otherwise to object to the manner in which the First Priority Agent or the First Priority Creditors seek to enforce or collect the First Priority Obligations or the Liens on the Collateral securing the First Priority Obligations granted in any of the First Priority Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the First Priority Agent or First Priority Creditors is adverse to the interest of the Second Priority Creditors, except to the extent in violation of this Agreement; and

(3)    the Second Priority Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Priority Collateral Documents or any other Second Priority Loan Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the First Priority Agent or the First Priority Creditors with respect to the Collateral as set forth in this Agreement and the First Priority Collateral Documents.

(e)    Except as otherwise specifically set forth in Section 3.1(c), the Second Priority Agent and the Second Priority Creditors may exercise rights and remedies as unsecured creditors against the Borrowers or any other Grantor that has guaranteed or granted Liens to secure the Second Priority Obligations in accordance with the terms of the Second Priority Loan Documents and applicable law; provided that in the event that any Second Priority Creditor becomes a judgment lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Priority Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Priority Obligations) as the other Liens securing the Second Priority Obligations are subject to this Agreement.

(f)    Except as otherwise set forth herein, nothing in this Agreement shall prohibit the receipt by the Second Priority Agent or any Second Priority Creditors of the required payments of interest, principal and other amounts owed in respect of the Second Priority Obligations, so long as such receipt is not the direct or indirect result of the Exercise of Secured Creditor Remedies (including set off) by the Second Priority Agent or any Second Priority Creditors or enforcement in contravention of this Agreement of any Lien held by any of them. Except as expressly provided in this Agreement, nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Priority Agent or the First Priority Creditors may have with respect to the First Priority Collateral.

## SECTION 4.  Payments.

4.1.    Application of Proceeds of Collateral.  So long as the Discharge of First Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the First Priority Borrower or any other Grantor, Collateral or proceeds thereof received in connection with the Exercise of Secured Creditor Remedies by the First Priority Agent or First Priority Creditors shall be applied by the First Priority Agent to the First Priority Obligations in such order as specified in the relevant First Priority Loan Documents, provided that it is understood and agreed that Section 9 of the Pledge Agreement and the Parent Pledge Agreement (each as defined in the First Priority Credit Agreement) provides that any such amounts received shall be applied first to the payment of the First Priority Obligations other than Obligations under the Existing Swap Agreements, and second to the payment of First Priority Obligations under the Existing Swap Agreements.  Upon the Discharge of First Priority Obligations, the First Priority Agent shall deliver to the Second Priority Agent any Collateral and proceeds of Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Second Priority Agent to the Second Priority Obligations in such order as specified in the Second Priority Collateral Documents.

4.2.     Application of Proceeds of Pari Passu Collateral Accounts.  So long as the Discharge of First Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the First Priority Borrower or any other Grantor, proceeds of the Pari Passu Collateral Accounts received in connection with the Exercise of Secured Creditor Remedies by the First Priority Agent or First Priority Creditors shall be applied by the First Priority Agent to the Obligations in the following order of application:

(i)     *First*, to the payment of all amounts payable under the First Priority Loan Documents and the Second Priority Loan Documents on account of the Collateral Agent's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Collateral Agent or any co-trustee or agent of the Collateral Agent in connection with any of the First Priority Loan Documents or the Second Priority Loan Documents;

(ii)     *Second*, to the First Priority Agent and the Second Priority Agent, pro rata, based upon their respective Pari Passu Collateral Percentages, for application to the payment of the First Priority Obligations and the Second Priority Obligations, as the case may be, which are secured by such Pari Passu Collateral Accounts that are then due and payable in such order as may be provided in the First Priority Loan Documents or the Second Priority Loan Documents, as the case may be, in an amount sufficient to pay in full in cash all outstanding First Priority Obligations and Second Priority Obligations, as the case may be, that are then due and payable (including (x) the cash collateralization of outstanding letters of credit as provided in the First Priority Documents and (y) all interest accrued on the First Priority Obligations and the Second Priority Obligations, as the case may be, after the commencement of any Insolvency or Liquidation Proceeding at the rate, and including any applicable post-default rate, specified in the First Priority Documents or Second Priority Documents, as the case may be), provided that if the Discharge of First Priority Obligations has occurred or occurs or if the Second Priority Obligations have been paid in full, in each case by reason of the application pursuant to this clause, then any excess shall be applied to the then outstanding First Priority Obligations or Second Priority Obligations, as the case may be; and

(iii)     *Third*, any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses will be paid to the Parent, the First Priority Borrower, the Second Priority Borrower and Arlington, as the case may be, their respective successors or assigns, or as a court of competent jurisdiction may direct.

4.3.     Payments Over in Violation of Agreement.  So long as the Discharge of First Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the First Priority Borrower or any other Grantor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second Priority Agent or any Second Priority Creditors in connection with the exercise of any right or remedy (including set off) relating to the Collateral (including, without limitation, as a result of any cash distribution in respect of the Collateral in any such Insolvency or Liquidation Proceeding) shall be segregated and held in trust and forthwith paid over to the First Priority Agent for the benefit of the First

Priority Creditors in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  The Collateral Agent is hereby authorized to make any such endorsements in the name of Nordea Bank Finland plc, New York Branch, as agent for the Second Priority Agent or any such Second Priority Creditors.  This authorization is coupled with an interest and is irrevocable until the Discharge of First Priority Obligations.

### SECTION 5.  Other Agreements.

5.1.    Releases.  (a)  Subject to Section 5.7, if in connection with the Exercise of Secured Creditor Remedies by the First Priority Agent in respect of the Collateral provided for in Section 3.1, the First Priority Agent, for itself or on behalf of any of the First Priority Creditors, releases any of its Liens on any part of the Collateral (other than to the extent constituting Pari Passu Collateral Accounts) or releases any Grantor from its obligations under its guaranty of the First Priority Obligations in connection with the sale of the stock, or substantially all the assets, of such Grantor (in each case other than in the case of a release granted in connection with the Discharge of First Priority Obligations), then the Liens, if any, of the Second Priority Agent, for itself or for the benefit of the Second Priority Creditors, on such Collateral, and the obligations of such Grantor under its guaranty of the Second Priority Obligations, shall be automatically, unconditionally and simultaneously released.  The Second Priority Agent, for itself or on behalf of any such Second Priority Creditors, promptly shall execute and deliver to the First Priority Agent or such Grantor such termination statements, releases and other documents as the First Priority Agent or such Grantor may reasonably request to effectively confirm such release. Notwithstanding anything herein to the contrary, no release shall occur without the consent of the Second Priority Agent for an Exercise of Secured Creditor Remedies as to any Collateral the Net Cash Proceeds of the disposition of which will not be applied to repay and to permanently reduce commitments with respect to the First Priority Obligations and/or the Second Priority Obligations as applicable.

(b)     If in connection with a Disposition of Collateral permitted under the terms of the First Priority Loan Documents (including following any waiver granted to permit such Disposition) (other than in connection with the exercise of the First Priority Agent's remedies in respect of the Collateral provided for in Section 3.1), the First Priority Agent, for itself or on behalf of any of the First Priority Creditors, releases any of its Liens on any part of the Collateral (other than to the extent constituting Pari Passu Collateral Accounts) or releases any Grantor from its obligations under its guaranty of the First Priority Obligations in connection with the sale of the stock, or substantially all the assets, of such Grantor, in each case other than in connection with the Discharge of First Priority Obligations, then the Liens, if any, of the Second Priority Agent, for itself or for the benefit of the Second Priority Creditors, on such Collateral, and the obligations of such Grantor under its guaranty of the Second Priority Obligations shall be automatically, unconditionally and simultaneously released, as long as the Net Cash Proceeds of such Disposition of such Collateral shall be applied to the permanent repayment of First Priority Obligations and/or Second Priority Obligations, as applicable, in accordance with the terms of the First Priority Credit Agreement and/or the Second Priority Credit Agreement, as applicable. The Second Priority Agent, for itself or on behalf of any such Second Priority Creditors, promptly shall execute and deliver to the Collateral Agent or such Grantor such termination statements, releases and other documents as the First Priority Agent or such Grantor may reasonably request to effectively confirm such release.

(c)     Until the Discharge of First Priority Obligations occurs, the Second Priority Agent, for itself and on behalf of the Second Priority Creditors, hereby irrevocably constitutes and appoints the First Priority Agent and any officer or agent of the First Priority Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the Second Priority Agent or any such officer or agent in the First Priority Agent's own name, from time to time in the First Priority Agent's discretion, for the purpose of carrying out the terms of this Section 5.1 with respect to the Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1 with respect to the Collateral, including any endorsements or other instruments of transfer or release.

(d)     Until the Discharge of First Priority Obligations occurs, to the extent that the First Priority Agent or the First Priority Creditors (i) have released any Lien on Collateral or any Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtain any new liens or additional guarantees from any Grantor, then the Second Priority Agent, for itself and for the Second Priority Creditors, shall be granted a Lien on any such Collateral, subject to the lien subordination provisions of this Agreement, and an additional guaranty, as the case may be.

5.2.    Insurance.  Unless and until the Discharge of First Priority Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the First Priority Loan Documents, the First Priority Agent and the First Priority Creditors shall have the sole and exclusive right to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral.  Unless and until the Discharge of First Priority Obligations has occurred, and subject to the rights of the Grantors under the First Priority Loan Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) shall be paid to the First Priority Agent for the benefit of the First Priority Creditors pursuant to the terms of the First Priority Loan Documents (including, without limitation, for purposes of cash collateralization of letters of credit) and thereafter, to the extent no First Priority Obligations are outstanding, and subject to the rights of the Grantors under the Second Priority Loan Documents, to the Second Priority Agent for the benefit of the Second Priority Creditors to the extent required under the Second Priority Collateral Documents and then, to the extent no Second Priority Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.  Until the Discharge of First Priority Obligations has occurred, if the Second Priority Agent or any Second Priority Creditors shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such proceeds over to the First Priority Agent in accordance with the terms of Section 4.3.

5.3.    Amendments to First Priority Loan Documents and Second Priority Loan Documents.  (a)  The First Priority Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms and the First Priority Credit Agreement may be Refinanced, in each case, without notice to, or the consent of the Second Priority Agent or the Second Priority Creditors, all without affecting the lien subordination or other provisions of this Agreement; provided, however, that:

(i)    in the case of a Refinancing, the holders of such Refinancing debt (or an agent for such holders) bind themselves in a writing addressed to the Second Priority Agent and the Second Priority Creditors to the terms of this Agreement, and

(ii)    no amendment, supplement or other modification or Refinancing of the First Priority Loan Documents shall be permitted without the consent of the parties hereto if such amendment, supplement or other modification would increase the aggregate principal amount of Indebtedness or lending commitments under the First Priority Credit Agreement above the Maximum First Priority Indebtedness Amount.

(b)    The Second Priority Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms and the Second Priority Credit Agreement may be Refinanced, in each case, without notice to, or the consent of the First Priority Agent or the First Priority Creditors all without affecting the lien subordination or other provisions of this Agreement; provided, however, that:

(i)    in the case of a Refinancing, the holders of such Refinancing debt (or an agent for such holders) bind themselves in a writing addressed to the First Priority Agent and the First Priority Creditors to the terms of this Agreement, and

(ii)    no amendment, supplement or other modification or Refinancing of the Second Priority Loan Documents shall be permitted without the consent of the parties hereto if such amendment, supplement or other modification would increase the aggregate principal amount of Indebtedness or lending commitments under the Second Priority Credit Agreement above the Maximum Second Priority Indebtedness Amount.

(c)    In the event any First Priority Agent or the First Priority Creditors and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the First Priority Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Collateral Document or changing in any manner the rights of the First Priority Agent, such First Priority Creditors, the First Priority Borrower or any other Grantor thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Priority Collateral Document without the consent of the Second Priority Agent or the Second Priority Creditors, as applicable, and without any action by the Second Priority Agent, the Borrowers or any other Grantor (and shall, at the request of the First Priority Agent, be documented in writing by the Second Priority Agent and the Second Priority Lenders, as applicable), provided that:

(1)    no such amendment, waiver or consent shall have the effect of:

(A)    removing or releasing assets subject to the Lien of the Second Priority Collateral Documents, except to the extent that a release of such Lien is permitted or required by Section 5.1 of this Agreement and provided that there is a corresponding release of the Liens securing the First Priority Obligations;

(B)     imposing duties on the Second Priority Agent without its consent;

(C)     permitting other Liens on the Collateral not permitted under the terms of the Second Priority Loan Documents or Section 6; or

(D)     being prejudicial to the interests of the Second Priority Creditors to a greater extent than the First Priority Creditors; and

(2)     notice of such amendment, waiver or consent shall have been given to the Second Priority Agent at least ten (10) Business Days prior to the effective date of such amendment, waiver or consent.

5.4.     Legends.

(a)     The Parent and the Grantors agree that each Second Priority Collateral Document shall include the following language (or language to similar effect approved by the First Priority Agent):

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Second Priority Agent pursuant to this Agreement and the exercise of any right or remedy by the Second Priority Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of [_____], 2012 (as amended, restated, supplemented or otherwise modified from time to time, the **"Intercreditor Agreement"**), among General Maritime Corporation, General Maritime Subsidiary Corporation, as first priority borrower, General Maritime Subsidiary II Corporation, Nordea Bank Finland plc, New York Branch, as First Priority Agent, Nordea Bank Finland plc, New York Branch, as Second Priority Agent and certain other persons party or that may become party thereto from time to time.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(b)     In addition, the Parent and the Borrowers agree that each Second Priority Mortgage covering any Collateral shall contain such other language as the First Priority Agent may reasonably request to reflect the subordination of such Second Priority Mortgage to the First Priority Collateral Document covering such Collateral.

5.5.     Bailee for Perfection.  Until the Discharge of First Priority Obligations has occurred:

(i)     The First Priority Agent as Collateral Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC, including, but not limited to, the Earnings Accounts (such

Collateral being the **"Pledged Collateral"**) as agent for the First Priority Creditors and as bailee for the Second Priority Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-106(a) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting the security interest granted under the First Priority Loan Documents and the Second Priority Loan Documents, respectively, subject to the terms and conditions of this Section 5.5.

(ii)     The First Priority Agent as Collateral Agent shall have no obligation whatsoever to the First Priority Creditors, the Second Priority Agent, or any Second Priority Creditor, to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.5.  The duties or responsibilities of the First Priority Agent under this Section 5.5 shall be limited solely to holding the Pledged Collateral as bailee in accordance with this Section 5.5 and delivering the Pledged Collateral upon a Discharge of First Priority Obligations as provided in paragraph (iv) below.

(iii)     The First Priority Agent acting pursuant to this Section 5.5 shall not have by reason of any Collateral Document, this Agreement or any other document a fiduciary relationship in respect of the First Priority Creditors, the Second Priority Agent or any Second Priority Creditor.

(iv)     Upon the Discharge of First Priority Obligations, the First Priority Agent shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, first, to the Second Priority Agent to the extent Second Priority Obligations remain outstanding, and second, to the Borrowers to the extent no First Priority Obligations or Second Priority Obligations remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral); provided that, in each case, the First Priority Agent shall be entitled to rely on certifications from the Second Priority Agent or the Borrowers, as the case may be, as to whether any Second Priority Obligations remain outstanding.  The First Priority Agent further agrees to take all other action reasonably requested by the Second Priority Agent in connection with the Second Priority Agent obtaining a first priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

(v)     Subject to the terms of this Agreement, so long as the Discharge of First Priority Obligations has not occurred, the First Priority Agent shall be entitled to deal with the Pledged Collateral or Collateral within its "control" in accordance with the terms of this Agreement and other First Priority Collateral Documents as if the Liens of the Second Priority Agent or Second Priority Creditors did not exist.

5.6.     When Discharge of First Priority Obligations Deemed to Not Have Occurred. If concurrently with the Discharge of First Priority Obligations, the Parent, the First Priority Borrower or any other Grantor thereafter enters into any Refinancing of any First Priority Loan Document evidencing a First Priority Obligation which Refinancing is permitted hereby, then such Discharge of First Priority Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken as a result of the occurrence of such first Discharge of First Priority Obligations), and, from and

after the date on which the First Priority Debt Notice (as defined below) is delivered to the Second Priority Agent in accordance with the next sentence, the obligations under such Refinancing of the First Priority Loan Document shall automatically be treated as First Priority Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the First Priority Agent under such First Priority Loan Documents shall be the First Priority Agent for all purposes of this Agreement. Upon receipt of a notice from the First Priority Borrower or any other Grantor and the First Priority Agent (the **"First Priority Debt Notice"**) stating that the Parent, the First Priority Borrower or such other Grantor has entered into a new First Priority Loan Document (which notice shall include the identity of the new First Priority Agent, such agent, the **"New First Priority Agent"**), the Second Priority Agent shall promptly (a) enter into such documents and agreements (including amendments or supplements to this Agreement) as the Parent, the First Priority Borrower, such other Grantor or such New First Priority Agent shall reasonably request in order to provide to the New First Priority Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement and (b) deliver to the New First Priority Agent any Pledged Collateral held by it together with any necessary endorsements (or otherwise allow the New First Priority Agent to obtain control of such Pledged Collateral). The New First Priority Agent shall agree in a writing addressed to the Second Priority Agent and the Second Priority Creditors to be bound by the terms of this Agreement. If the new First Priority Obligations under the new First Priority Loan Documents are secured by assets of the Grantors constituting Collateral that do not also secure the Second Priority Obligations, then the Second Priority Obligations shall be secured at such time by a Second Priority Lien on such assets to the same extent provided in the Second Priority Collateral Documents and this Agreement.

5.7. <u>Purchase Right</u>. Without prejudice to the enforcement of any remedy of the First Priority Creditors, so long as a Triggering Event has occurred and is continuing, any of the Second Priority Creditors may, at its sole expense and effort, upon written notice (which notice, subject to the last sentence of this Section 5.7 and with the understanding that such notice will be revocable upon the failure by any First Priority Lender to comply with the provisions contained in this Section 5.7, shall be irrevocable and may only be given by the Second Priority Creditors on one occasion, the "**Second Priority Purchase Notice**") to the Borrowers, the Collateral Agent, the First Priority Agent and the Second Priority Agent, require the First Priority Creditors to transfer and assign to such Second Priority Creditors, without warranty or representation or recourse, all (but not less than all) of the First Priority Obligations; <u>provided</u> that (x) the Second Priority Purchase Notice, if any, will be given no more than 10 Business Days after the occurrence of the related Triggering Event and, if the right to purchase the First Priority Obligations is in fact exercised by the Second Priority Creditors, the obligations related to such purchase of First Priority Obligations shall be fulfilled by such Second Priority Creditors within 10 Business Days thereafter, (y) such assignment shall not conflict with any law, rule or regulation or order of any court or other governmental authority having jurisdiction, and (z) such Second Priority Creditors shall have paid to the First Priority Agent, for the account of the First Priority Creditors, in immediately available funds, an amount equal to 100% of such First Priority Obligations then outstanding (which shall include, with respect to (i) the aggregate face amount of the letters of credit outstanding under the First Priority Credit Agreement, an amount in cash equal to the amount of outstanding letters of credit required to be cash collateralized pursuant to the First Priority Documents and (ii) each Existing Swap Agreement, 100% of the

aggregate amount (but not less than zero) that the applicable Borrower or Grantor would be required to pay if such Existing Swap Agreements were terminated at such time after netting all settlement amounts and unpaid amounts under such Existing Swap Agreements with the applicable Borrower or Grantor, but without reduction for any other amounts owing by the relevant lender counterparty to the applicable Borrower or Grantor) *plus* all accrued and unpaid interest thereon *plus* all accrued and unpaid fees (other than any prepayment penalties or premiums other than customary Eurodollar breakage costs (the **"First Priority Termination Fees"**)) (such amount, the **"First Priority Purchase Price"**).   In connection with any such assignment or transfer of the First Priority Obligations, all Existing Swap Agreements shall be terminated unless all parties thereto shall have consented to the assignment thereof to the Second Priority Creditors and to the release of the lender counterparties thereto from all liability thereunder.  If the right set forth in this Section 5.7 is exercised, (1) the parties shall endeavor to close promptly thereafter but in any event within 10 Business Days of the notice (or the First Priority Creditors shall no longer be required to transfer any such First Priority Obligations), (2) such purchase of the First Priority Obligations shall be exercised pursuant to documentation mutually acceptable to each of the First Priority Agent and such Second Priority Creditors, and (3) such First Priority Obligations shall be purchased pro rata among the Second Priority Creditors giving notice to the Second Priority Agent of their intent to exercise the purchase option hereunder according to such Second Priority Creditors' portion of the Second Priority Obligations outstanding on the date of purchase.  In order to effectuate the foregoing, the First Priority Agent shall calculate, upon the written request of the Second Priority Agent (acting at the direction of one or more Second Priority Creditors) from time to time, the amount in cash that would be necessary so to purchase the First Priority Obligations.  If, for any reason other than a default by the First Priority Creditors, the Second Priority Creditors fail to purchase and pay for the First Priority Obligations after the delivery of the Second Priority Purchase Notice, the Second Priority Creditors shall be liable to the First Priority Creditors for any losses or damages, including fees and disbursements to counsel, incurred by them by reason of such failure to purchase and pay.  It is understood that the obligations of each First Priority Lender and each Second Priority Lender are several and not joint, and no First Priority Lender or Second Priority Lender shall be responsible for any default by any other First Priority Lender and/or any Second Priority Lender, as the case may be, of its obligations under the First Priority Credit Agreement and/or the Second Priority Credit Agreement.

## SECTION 6.  <u>Insolvency or Liquidation Proceedings.</u>

6.1.    <u>Finance and Sale Issues</u>.    (a)    Until the Discharge of First Priority Obligations has occurred, if any of the First Priority Borrower or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First Priority Agent shall consent in writing to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) which constitute Collateral and on which the First Priority Agent or any other creditor has a Lien or to permit the First Priority Borrower or any other Grantor to obtain financing, whether from the First Priority Creditors or any other Person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law (**"DIP Financing"**) then the Second Priority Agent, on behalf of itself and the Second Priority Creditors, agrees that if the conditions set forth in the immediately succeeding sentence are satisfied (x) it will raise no objection to such Cash Collateral use or DIP Financing and (y) it will not request adequate protection or any other relief in connection therewith (except as expressly agreed by the First Priority Agent or to the extent

permitted by Section 6.3).  The conditions applicable to the agreement in the preceding sentence are as follows: (a) the sum of the aggregate principal amount and the total commitments of the DIP Financing does not exceed $100,000,000, (b) the interest rate, fees, advance rates, lending limits and sublimits are on market terms that are commercially reasonable under the circumstances, and (c) the Liens securing such DIP Financing are pari passu with or superior in priority to the Liens on the Collateral securing the then outstanding First Priority Obligations and are pari passu to the Liens of the Collateral Agent, the First Priority Creditors and the Second Priority Creditors on the Pari Passu Collateral Accounts.  To the extent the Liens securing the First Priority Obligations are subordinated to or pari passu with such DIP Financing, the Second Priority Agent shall be deemed to have subordinated its Liens in the Collateral to the Liens securing such DIP Financing (and all Obligations relating thereto), and the Liens securing the Second Priority Obligations shall have the same priority with respect to the Collateral relative to the Liens securing the First Priority Obligations as if such DIP Financing had not occurred.

(b)    Nothing in this Section 6.1 limits or impairs the right of Second Priority Agent to object to any motion regarding DIP Financing (including a DIP Financing proposed by one or more First Priority Creditors) or cash collateral to the extent that (i) the DIP Financing does not meet the requirements in Section 6.1(a), or (ii) the objection could be asserted in an Insolvency Proceeding by unsecured creditors generally and is not inconsistent with this Agreement.

6.2.    <u>Relief from the Automatic Stay</u>.  Until the Discharge of First Priority Obligations has occurred, the Second Priority Agent, on behalf of itself and the Second Priority Creditors, agrees that it shall not seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First Priority Agent.

6.3.    <u>Adequate Protection</u>.  (a)  The Second Priority Agent, on behalf of itself and the Second Priority Creditors, agrees that it shall not contest (or support any other Person contesting):

(i)    any request by the First Priority Agent or the First Priority Creditors for adequate protection with respect to the Collateral; or

(ii)    any objection by the First Priority Agent or the First Priority Creditors to any motion, relief, action or proceeding based on the First Priority Agent or the First Priority Creditors claiming a lack of adequate protection with respect to the Collateral.

(b)    Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency or Liquidation Proceeding:

(i)    if the First Priority Creditors (or any subset thereof) are granted adequate protection in the form of additional or replacement collateral  with respect to the Collateral in connection with any Cash Collateral use or DIP Financing, then the Second Priority Agent, on behalf of itself or any of the Second Priority Creditors, may seek or request adequate protection in the form of a Lien on such additional or replacement

collateral, which Lien will be subordinated to the First Priority Liens on the same basis as the other Liens securing the Second Priority Obligations are so subordinated to the First Priority Obligations under this Agreement; and

(ii)      in the event the Second Priority Agent, on behalf of itself or any of the Second Priority Creditors, seeks or requests adequate protection in respect of Second Priority Obligations and such adequate protection is granted in the form of additional or replacement collateral with respect to the Collateral, then the Second Priority Agent, on behalf of itself or any of the Second Priority Creditors, agrees that until the Discharge of First Priority Obligations, the First Priority Agent shall also be granted a senior Lien on such additional or replacement collateral as security for the First Priority Obligations and for any Cash Collateral use or DIP Financing provided by the First Priority Creditors and that any Lien on such additional or replacement collateral securing the Second Priority Obligations shall be subordinated to the First Priority Liens on the same basis as the other Liens securing the Second Priority Obligations are so subordinated to such First Priority Obligations under this Agreement.  Except as otherwise expressly set forth in Section 6.1 or in connection with the exercise of remedies with respect to the Collateral, nothing herein shall limit the rights of the Second Priority Agent or the Second Priority Creditors from seeking adequate protection with respect to their rights in the Collateral in any Insolvency or Liquidation Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise).

6.4.    No Waiver.  Nothing contained herein shall prohibit or in any way limit the First Priority Agent or any First Priority Creditor from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Second Priority Agent or any of the Second Priority Creditors including the seeking by the Second Priority Agent or any Second Priority Creditors of adequate protection (except as provided in Section 6.3) or the asserting by the Second Priority Agent or any Second Priority Creditors of any of its rights and remedies under the Second Priority Loan Documents or otherwise.

6.5.    Avoidance Issues. (a)If any First Priority Creditor is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the First Priority Borrower or any other Grantor any amount paid in respect of First Priority Obligations (a **"First Priority Recovery"***)*, then such First Priority Creditors shall be entitled to a reinstatement of First Priority Obligations with respect to all such recovered amounts.

(b)      If any Second Priority Creditor is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Borrowers or any other Grantor any amount paid in respect of Second Priority Obligations (a **"Second Priority Recovery"***)*, then such Second Priority Creditors shall be entitled to a reinstatement of Second Priority Obligations with respect to all such recovered amounts.

(c)      If this Agreement shall have been terminated prior to a First Priority Recovery or an Second Priority Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

6.6.   <u>Reorganization Securities</u>.   If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, all on account of First Priority Obligations and on account of Second Priority Obligations then, to the extent the debt obligations distributed on account of the First Priority Obligations and on account of the Second Priority Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

6.7.   <u>Post-Petition Interest</u>.   (a)   None of the Second Priority Agent or any Second Priority Creditor shall oppose or seek to challenge any claim by the First Priority Agent or any First Priority Creditor for allowance in any Insolvency or Liquidation Proceeding of First Priority Obligations consisting of post-petition interest, fees or expenses.

(b)   None of the First Priority Agent or any First Priority Creditor shall oppose or seek to challenge any claim by the Second Priority Agent or any Second Priority Creditor for allowance in any Insolvency or Liquidation Proceeding of Second Priority Obligations consisting of post-petition interest, fees or expenses.

6.8.   <u>Waiver</u>.   The Second Priority Agent, for itself and on behalf of the Second Priority Creditors, waives any claim it may hereafter have against any First Priority Creditor arising out of the election of any First Priority Creditor of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding.

6.9.   <u>Separate Grants of Security and Separate Classification</u>.   The Second Priority Agent, for itself and on behalf of the Second Priority Creditors, and the First Priority Agent, for itself and on behalf of the First Priority Creditors, acknowledge and agree that:  (a) the grants of Liens pursuant to the First Priority Collateral Documents and the Second Priority Collateral Documents constitute two separate and distinct grants of Liens; and (b) because of, among other things, their differing rights in the Collateral, the Second Priority Obligations and the First Priority Obligations are fundamentally different from each other and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.

To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the class of First Priority Creditors and the class of Second Priority Creditors in respect of the Collateral constitute only one secured claim (rather than separate classes of senior, junior and subordinated secured claims), then each of the parties hereto hereby acknowledges and agrees that, subject to Sections 2.1, 4.1 and 4.2, all distributions shall be made as if there were separate classes of senior, junior and subordinated secured claims against the Grantors in respect of the Collateral, with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Creditors, with respect to payment to the First Priority Creditors, (A) subject to the Maximum First Priority Indebtedness Amount, the First Priority Creditors shall be entitled to

receive, in addition to amounts otherwise distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, including any additional interest payable pursuant to the First Priority Credit Agreement, arising from or related to a default, which is disallowed as a claim in any Insolvency or Liquidation Proceeding, before any distribution is made in respect of the claims held by the Second Priority Creditors with respect to the Collateral, and (B) after such payments to the First Priority Creditors, subject to the Maximum Second Priority Indebtedness Amount, the Second Priority Creditors shall be entitled to receive, in addition to amounts otherwise distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, including any additional interest payable pursuant to the Second Priority Credit Agreement, arising from or related to a default, which is disallowed as a claim in any Insolvency or Liquidation Proceeding, with the Second Priority Agent, for itself and on behalf of the Second Priority Creditors, hereby acknowledging and agreeing to turn over to the First Priority Agent, for itself and on behalf of the First Priority Creditors, amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence (with respect to the payment of post-petition interest), even if such turnover has the effect of reducing the claim or recovery of the Second Priority Creditors.

### SECTION 7.  Reliance; Waivers; Etc.

7.1.    Reliance.  Other than any reliance on the terms of this Agreement, the First Priority Agent, on behalf of itself and the First Priority Creditors under its First Priority Loan Documents, acknowledges that it and such First Priority Creditors have, independently and without reliance on the Second Priority Agent or any Second Priority Creditor, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such First Priority Loan Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the First Priority Credit Agreement or this Agreement.  The Second Priority Agent, on behalf of itself and the Second Priority Creditors, acknowledges that it and the Second Priority Creditors have, independently and without reliance on the First Priority Agent or any First Priority Creditor, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Second Priority Loan Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Second Priority Loan Documents or this Agreement.

7.2.    No Warranties or Liability.  (a)    The First Priority Agent, on behalf of itself and the First Priority Creditors under the First Priority Loan Documents, acknowledges and agrees that each of the Second Priority Agent, the Second Priority Creditors, have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Priority Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the Second Priority Creditors will be entitled to manage and supervise their respective loans and extensions of credit under the Second Priority Loan Documents, respectively, in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(b)    Except as otherwise provided herein, the Second Priority Agent, on behalf of itself and the Second Priority Creditors, acknowledges and agrees that the First Priority Agent and the First Priority Creditors have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Priority Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  Except as otherwise provided herein, the First Priority Creditors will be entitled to manage and supervise their respective loans and extensions of credit under the First Priority Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(c)    (A) The First Priority Agent and the First Priority Creditors shall have no duty to the Second Priority Agent, or any of the Second Priority Creditors, and (B) the Second Priority Agent and the Second Priority Creditors shall have no duty to the First Priority Agent or any of the First Priority Creditors, in each case to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Borrowers or any other Grantor (including the First Priority Loan Documents and the Second Priority Loan Documents), regardless of any knowledge thereof which they may have or be charged with.

7.3.    <u>No Waiver of Lien Priorities</u>. (a)    No right of the First Priority Creditors, the First Priority Agent or any of them to enforce any provision of this Agreement or any First Priority Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the First Priority Borrower or any other Grantor or by any act or failure to act by any First Priority Creditor or the First Priority Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Priority Loan Documents or any of the Second Priority Loan Documents, regardless of any knowledge thereof which the First Priority Agent or the First Priority Creditors, or any of them, may have or be otherwise charged with.

(b)    No right of the Second Priority Creditors, the Second Priority Agent or any of them to enforce any provision of this Agreement or any Second Priority Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Borrowers or any other Grantor or by any act or failure to act by any Second Priority Creditor or the Second Priority Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the Second Priority Loan Documents, regardless of any knowledge thereof which the Second Priority Agent or the Second Priority Creditors, or any of them, may have or be otherwise charged with.

7.4.    <u>Obligations Unconditional</u>.    All rights, interests, agreements and obligations of the First Priority Agent and the First Priority Creditors and the Second Priority Agent and the Second Priority Creditors, respectively, hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any First Priority Loan Documents or any Second Priority Loan Documents;

(b)      except as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Priority Obligations or Second Priority Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Priority Loan Document or any Second Priority Loan Document;

(c)      except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Priority Obligations or Second Priority Obligations or any guaranty thereof;

(d)      the commencement of any Insolvency or Liquidation Proceeding in respect of the Borrowers or any other Grantor; or

(e)      any other circumstances which otherwise might constitute a defense available to, or a discharge of, the Borrowers or any other Grantor in respect of the First Priority Agent, the First Priority Obligations, any First Priority Creditor, the Second Priority Agent, the Second Priority Obligations, or any Second Priority Creditor, in respect of this Agreement.

## SECTION 8.  Pari Passu Priority Collateral.

8.1.    Lien Priorities.

(a)      Relative Priorities.  Notwithstanding (i) the time, manner, order or method of grant, creation, attachment or perfection of any Liens securing the First Priority Obligations or Second Priority Obligations granted on the Pari Passu Collateral Accounts, (ii) the validity or enforceability of the security interests and Liens granted in favor of the Collateral Agent, any First Priority Creditor or any Second Priority Creditor on the Pari Passu Collateral Accounts, (iii) the date on which any First Priority Obligations or Second Priority Obligations are extended, (iv) any provision of the UCC or any other applicable law, including any rule for determining priority thereunder or under any other law or rule governing the relative priorities of secured creditors, including with respect to real property or fixtures, (v) any provision set forth in any First Priority Loan Document or any Second Priority Loan Document (other than this Agreement), (vi) the possession or control by the Collateral Agent, any First Priority Creditor or any Second Priority Creditor or any bailee of all or any part of any Pari Passu Collateral Accounts as of the date hereof or otherwise, or (vii) any other circumstance whatsoever, the First Priority Agent, on behalf of itself and the First Priority Creditors, and the Second Priority Agent, on behalf of itself and the Second Priority Creditors, hereby agree that any Lien on the Pari Passu Collateral Accounts securing any First Priority Obligations or Second Priority Obligations now or hereafter held by or on behalf of the Collateral Agent, any First Priority Creditor or any Second Priority Creditor or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be equal and ratable in all respects.

(b)      Prohibition on Contesting Liens.  Each of the Second Priority Agent, for itself and on behalf of each Second Priority Creditor, and the First Priority Agent, for itself and on behalf of each First Priority Creditor, agree that it shall not (and hereby waives any right to)

contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the priority, validity or enforceability of a Lien held by or on behalf of any of the First Priority Creditors and the Second Priority Creditors in the Pari Passu Collateral Accounts; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the Collateral Agent, any First Priority Creditor or any Second Priority Creditor to enforce this Agreement.

(c)     Effectiveness of Lien Priorities.  Each of the parties hereto acknowledges that the Lien priorities in respect of the Pari Passu Collateral Accounts provided for in this Agreement shall not be affected or impaired in any manner whatsoever, including, without limitation, on account of:  (i) the invalidity, irregularity or unenforceability of all or any part of the First Priority Loan Documents or the Second Priority Loan Documents; (ii) any amendment, change or modification of any First Priority Loan Documents or Second Priority Loan Documents; or (iii) any impairment, modification, change, exchange, release or subordination of or limitation on, any liability of, or stay of actions or lien enforcement proceedings against, the Parent or any of its Subsidiaries party to any of the First Priority Loan Documents or Second Priority Loan Documents, its property, or its estate in bankruptcy resulting from any bankruptcy, arrangement, readjustment, composition, liquidation, rehabilitation, similar proceeding or otherwise involving or affecting any First Priority Creditor or any Second Priority Creditor.

8.2.     Exercise of Remedies.

(a)     So long as neither the Discharge of First Priority Obligations nor the payment in full of the Second Priority Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrowers or any other Grantor, neither the Collateral Agent nor any of the First Priority Creditors or the Second Priority Creditors will, without the consent of the First Priority Agent, the Second Priority Agent and Collateral Agent, as the case may be, (who shall be entitled but not required, to seek such consents of the First Priority Creditors or the Second Priority Creditors, as the case may be, as they may be deem necessary or desirable), exercise or seek to exercise any rights or remedies (including, without limitation, set-off) with respect to any Pari Passu Collateral Accounts or institute or commence or join with any Person in commencing any action or proceeding with respect to such rights or remedies; provided that:

(I)     the Collateral Agent may take any action (not adverse to the Liens on the Pari Passu Collateral Accounts securing the Obligations, or the rights of the First Priority Creditors or the Second Priority Creditors, as the case may be, to exercise remedies in respect thereof) in order to preserve or protect its Lien on the Pari Passu Collateral Accounts;

(II)     the First Priority Creditors and the Second Priority Creditors shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the First Priority Creditors and the Second Priority Creditors, including without limitation any claims

secured by the Pari Passu Collateral Accounts, if any, in each case in accordance with the terms of this Agreement;

(III)   the First Priority Creditors and the Second Priority Creditors shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either the Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement; and

(IV)   the First Priority Creditors and the Second Priority Creditors shall be entitled to vote on any plan of reorganization and file any proof of claim in an Insolvency or Liquidation Proceeding or otherwise and other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Pari Passu Collateral Accounts.

(b)   Each of the First Priority Agent and the Second Priority Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in any First Priority Loan Document or Second Priority Loan Document, respectively, (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the First Priority Creditors or the Second Priority Creditors, respectively, with respect to the Pari Passu Collateral Accounts as set forth in this Agreement and the First Priority Loan Documents or Second Priority Loan Documents, respectively.

8.3.   Applications of Proceeds.   Any Pari Passu Collateral Accounts or proceeds received by the Collateral Agent, the First Priority Creditors or the Second Priority Creditors in connection with the exercise of any right or remedy (including set off) relating to the Pari Passu Collateral Accounts in contravention of this Agreement shall be segregated and held in trust and forthwith paid over and applied as set forth in Section 4.2.

8.4.   Perfection.   Until the Discharge of First Priority Obligations or the payment in full of the Second Priority Obligations has occurred, the First Priority Agent and the Second Priority Agent agree to hold the Pari Passu Collateral Accounts jointly as collateral agent for the First Priority Creditors and the Second Priority Creditors and any assignee thereof solely for the purpose of perfecting the security interest granted under the First Priority Loan Documents and the Second Priority Loan Documents subject to the terms and conditions of this Section 8.4.

### SECTION 9.  Miscellaneous.

9.1.   Conflicts.   In the event of any conflict between the provisions of this Agreement and the provisions of the First Priority Loan Documents or the Second Priority Loan Documents, the provisions of this Agreement shall govern and control.

9.2.   Effectiveness; Continuing Nature of this Agreement; Severability.   (a) This Agreement shall become effective when executed and delivered by the parties hereto.

(b)      This is a continuing agreement of lien subordination and the First Priority Creditors may continue, at any time and without notice to the Second Priority Agent or any Second Priority Creditor subject to the Second Priority Loan Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrowers or any Grantor constituting First Priority Obligations in reliance hereof.  The Second Priority Agent, on behalf of itself and the Second Priority Creditors, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.

(c)      The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to the Borrowers or any other Grantor shall include the Borrowers or such Grantor as debtor and debtor in possession and any receiver or trustee for the Borrowers or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect on the date of Discharge of First Priority Obligations, subject to the rights of the First Priority Creditors and the Second Priority Creditors under Section 6.5.

9.3.      Amendments; Waivers.  No amendment, modification or waiver of any of the provisions of this Agreement by the Second Priority Agent or the First Priority Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent; provided that (x) the First Priority Agent (at the direction of the Required Lenders (as defined in the First Priority Credit Agreement)) may, without the written consent of any other holder of Second Priority Obligations, agree to modifications of this Agreement for the purpose of securing additional extensions of credit (including pursuant to the First Priority Credit Agreement or Second Priority Credit Agreement or any Refinancing or extension thereof) and adding new creditors as "First Priority Creditors" and "Second Priority Creditors" hereunder, so long as such extensions (and resulting additions) do not otherwise give rise to a violation of the express terms of the First Priority Credit Agreement or the Second Priority Credit Agreement and (y) additional Grantors may be added as parties hereto in accordance with the provisions of Section 9.16 of this Agreement.  Each waiver of the terms of this Agreement, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, the Grantors shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent (x) their rights are directly affected (which includes, but is not limited to, any amendment to the Grantors' ability to cause additional obligations to constitute First Priority Obligations or Second Priority Obligations as the Grantors may designate or any amendment in respect of Section 5.1 that imposes additional conditions or requirements to effect a release of Collateral or any amendment in respect of Section 5.3 that imposes additional conditions or requirements to adopt modifications of the First Priority Loan Documents or Second Priority Loan Documents, as the case may be) or (y) such amendment, modification, or waiver in any way amends, modifies or waives the definition of "Maximum First Priority Indebtedness Amount" or "Maximum Second Priority Indebtedness Amount" or, to the extent the rights of the Grantors are directly affected thereby, Section 9.2.

9.4.    Information Concerning Financial Condition of the Borrowers and their Subsidiaries.  The First Priority Agent and the First Priority Creditors, in the first instance, and the Second Priority Agent and the Second Priority Creditors, in the second instance, shall each be responsible for keeping themselves informed of (a) the financial condition of the Borrowers and their Subsidiaries and all endorsers and/or guarantors of the First Priority Obligations or the Second Priority Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations.  None of the First Priority Agent or any First Priority Creditors or the Second Priority Agent or any Second Priority Creditor shall have a duty to advise of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the First Priority Agent or any of the First Priority Creditors or the Second Priority Agent or any of the Second Priority Creditors in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the First Priority Agent or any First Priority Creditor or the Second Priority Agent or any Second Priority Creditor, it or they shall be under no obligation:

(a)    to make, and it or they shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)    to provide any additional information or to provide any such information on any subsequent occasion;

(c)    to undertake any investigation; or

(d)    to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

9.5.    Subrogation.  With respect to the value of any payments or distributions in cash, property or other assets that any of the Second Priority Creditors or the Second Priority Agent pays over to the First Priority Agent or the First Priority Creditors under the terms of this Agreement, the Second Priority Creditors and the Second Priority Agent, as applicable, shall be subrogated to the rights of the First Priority Agent and the First Priority Creditors; provided that the Second Priority Agent, on behalf of itself and the Second Priority Creditors hereby agrees not to assert or enforce any such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Priority Obligations has occurred.  The Borrowers acknowledge and agree that the value of any payments or distributions in cash, property or other assets received by the Second Priority Agent or the Second Priority Creditors that are paid over to the First Priority Agent or the First Priority Creditors pursuant to this Agreement shall not reduce any of the Second Priority Obligations.

9.6.    SUBMISSION TO JURISDICTION; WAIVERS. (a)    ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY:

(1)      **ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS;**

(2)      **WAIVES ANY DEFENSE OF FORUM NON CONVENIENS;**

(3)      **AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 9.7; AND**

(4)      **AGREES THAT SERVICE AS PROVIDED IN CLAUSE (3) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.**

(b)      **EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE; MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 9.6(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

(c)      **EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER FIRST PRIORITY LOAN DOCUMENT OR SECOND PRIORITY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.**

9.7.    Notices.  All notices to the Second Priority Creditors and the First Priority Creditors permitted or required under this Agreement shall also be sent to the Second Priority Agent and the First Priority Agent, respectively.  Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, telexed, electronically mailed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of electronic mail, telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set forth on Annex III hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

9.8.    Further Assurances.  The First Priority Agent, on behalf of itself and the First Priority Creditors under the First Priority Loan Documents, and the Second Priority Agent, on behalf of itself and the Second Priority Creditors under the Second Priority Loan Documents, and the Borrowers, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Priority Agent or the Second Priority Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

9.9.    **APPLICABLE LAW**.  THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9.10.    Binding on Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the First Priority Agent, the First Priority Creditors, the Second Priority Agent, the Second Priority Creditor, and their respective successors and assigns.

9.11.    Specific Performance. Each of the First Priority Agent and the Second Priority Agent may demand specific performance of this Agreement.  The First Priority Agent, on behalf of itself and the First Priority Creditors and the Second Priority Agent, on behalf of itself and the Second Priority Creditors, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the First Priority Agent or the First Priority Creditors or the Second Priority Agent or the Second Priority Creditors, as the case may be.

9.12.    Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

9.13.    Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

9.14.   <u>Authorization</u>. (a)   By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

(b)   The First Priority Agent represents and warrants that it has full power and authority to execute and deliver this Agreement and to bind each First Priority Lender to the agreements, obligations and representations of the First Priority Lenders contained in this agreement or which are stated herein to be binding upon the First Priority Lenders.

(c)   The Second Priority Agent represents and warrants that it has full power and authority to execute and deliver this Agreement and to bind each Second Priority Lender to the agreements, obligations and representations of the Second Priority Lenders contained in this agreement or which are stated herein to be binding upon the Second Priority Lenders.

9.15.   <u>Provisions Solely to Define Relative Rights</u>.   The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Priority Agent and the First Priority Creditors in the first instance and the Second Priority Agent and the Second Priority Creditors in the second instance.  Except as provided in Section 9.3, none of the Borrowers, any other Grantor or any other creditor thereof shall have any rights hereunder and neither the Borrowers nor any Grantor may rely on the terms hereof.  Nothing in this Agreement is intended to or shall impair the obligations of the Borrowers or any other Grantor, which are absolute and unconditional, to pay the First Priority Obligations and the Second Priority Obligations as and when the same shall become due and payable in accordance with their terms.

9.16.   <u>Grantors; Additional Grantors</u>.  It is understood and agreed that the Parent, the Borrowers and each other Grantor on the date of this Agreement shall constitute the original Grantors party hereto.  The original Grantors hereby covenant and agree to cause each Subsidiary of the Parent which becomes a Subsidiary Guarantor after the date hereof to contemporaneously become a party hereto (as a Grantor) by executing delivering a counterpart hereof to the First Priority Agent or by executing and delivering an assumption agreement in form and substance reasonably satisfactory to the First Priority Agent.  The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Subsidiary Guarantor at any time (and any security granted by any such Person) shall be subject to the provisions hereof as fully as if same constituted a Grantor party hereto and had complied with the requirements of the immediately preceding sentence.

*        *        *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**First Priority Agent**

**NORDEA BANK FINLAND PLC, NEW YORK BRANCH,**
as First Priority Agent

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

*Signature Page to General Maritime $508M Intercreditor Agreement*

**Second Priority Agent**

**NORDEA BANK FINLAND PLC, NEW YORK BRANCH,**
  as Second Priority Agent


By:_____
   Name:
   Title:


By:_____
   Name:
   Title:

**Acknowledged and Agreed to by:**

**The Parent**

**GENERAL MARITIME CORPORATION**


By:_____
    Name:  Jeffrey D. Pribor
    Title:  Executive Vice President & Chief Financial Officer



**The First Priority Borrower**

**GENERAL MARITIME SUBSIDIARY CORPORATION**


By:_____
    Name:  Jeffrey D. Pribor
    Title:  President



**The Second Priority Borrower**

**GENERAL MARITIME SUBSIDIARY II CORPORATION**


By:_____
    Name:  Jeffrey D. Pribor
    Title:  President

**The Subsidiary Guarantors**

ARLINGTON TANKERS LTD.
VISION LTD.
VICTORY LTD.
COMPATRIOT LTD.
COMPANION LTD.
CONSUL LTD.


By: _____
    Name:  John C. Georgiopoulos
    Title:  Director

GMR ALEXANDRA LLC
GMR ARGUS LLC
GMR DAPHNE LLC
GMR ELEKTRA LLC
GMR GEORGE T LLC
GMR HOPE LLC
GMR HORN LLC
GMR ORION LLC
GMR PHOENIX LLC
GMR ST. NIKOLAS LLC
GMR SPYRIDON LLC
GMR ATLAS LLC
GMR HERCULES LLC
GMR MANIATE LLC
GMR POSEIDON LLC
GMR SPARTIATE LLC
GMR ULYSSES LLC
GMR ZEUS LLC
GMR AGAMEMNON LLC
GMR AJAX LLC
GMR DEFIANCE LLC
GMR HARRIET G LLC
GMR KARA G LLC
GMR MINOTAUR LLC
GMR STRENGTH LLC


By: _____
    Name:  John C. Georgiopoulos
    Title:  Manager

*Signature Page to General Maritime $508M Intercreditor Agreement*

GMR POSEIDON LLC,
GMR ULYSSES LLC,
GMR HERCULES LLC,
GMR ATLAS LLC,
GMR ZEUS LLC,
GMR MANIATE LLC,
GMR SPARTIATE LLC,


By: _____
    Name:
    Title: Manager

**ANNEX I**

## Collateral Vessels

|  | Vessel | Type | DWT | Year Built |
|---|---|---|---|---|
| 1 | Genmar Agamemnon | Aframax | 96,000 | 1995 |
| 2 | Genmar Ajax | Aframax | 96,000 | 1996 |
| 3 | Genmar Alexandra | Aframax | 102,000 | 1992 |
| 4 | Genmar Daphne | Aframax | 106,500 | 2002 |
| 5 | Genmar Defiance | Aframax | 105,000 | 2002 |
| 6 | Genmar Elektra | Aframax | 105,000 | 2002 |
| 7 | Genmar Strength | Aframax | 105,000 | 2003 |
| 8 | Genmar Minotaur | Aframax | 96,500 | 1995 |
| 9 | Genmar Consul | Handymax | 47,400 | 2004 |
| 10 | Genmar Companion | Panamax | 72,000 | 2004 |
| 11 | Genmar Compatriot | Panamax | 72,000 | 2004 |
| 12 | Genmar Argus | Suezmax | 153,000 | 2000 |
| 13 | Genmar George T | Suezmax | 155,000 | 2007 |
| 14 | Genmar Harriet G | Suezmax | 155,000 | 2006 |
| 15 | Genmar Hope | Suezmax | 159,000 | 1999 |
| 16 | Genmar Horn | Suezmax | 159,000 | 1999 |
| 17 | Genmar Kara G | Suezmax | 155,000 | 2007 |
| 18 | Genmar Orion | Suezmax | 153,000 | 2002 |
| 19 | Genmar Phoenix | Suezmax | 153,000 | 1999 |
| 20 | Genmar Spyridon | Suezmax | 153,000 | 2000 |
| 21 | Genmar St. Nikolas | Suezmax | 155,000 | 2008 |
| 22 | Genmar Victory | VLCC | 314,000 | 2001 |
| 23 | Genmar Vision | VLCC | 314,000 | 2001 |

**ANNEX II**

### Other Collateral Vessels

|   | Vessel | Type | DWT | Year Built |
|---|--------|------|-----|-----------|
| 1 | Genmar Atlas | VLCC | 306,005 | 2007 |
| 2 | Genmar Hercules | VLCC | 306,543 | 2007 |
| 3 | Genmar Maniate | Suezmax | 164,925 | 2010 |
| 4 | Genmar Poseidon | VLCC | 305,795 | 2002 |
| 5 | Genmar Ulysses | VLCC | 318,695 | 2003 |
| 6 | Genmar Zeus | VLCC | 318,325 | 2010 |
| 7 | Genmar Spartiate | Suezmax | 164,925 | 2011 |

**ANNEX III**

**Notices**

**First Priority Agent**

Nordea Bank Finland plc, New York Branch
Attention:  Martin Lunder
Telecopier:  (212) 421-4420
Email:  martin.lunder@nordea.com

**with a copy to:**

White & Case LLP
Attention:  David E. Joyce
Telecopier:  (212) 354-8113
Email:  djoyce@whitecase.com

**Second Priority Agent**

Nordea Bank Finland plc, New York Branch
Attention:  Martin Lunder
Telecopier:  (212) 421-4420
Email:  martin.lunder@nordea.com

**with a copy to:**

White & Case LLP
Attention:  David E. Joyce
Telecopier:  (212) 354-8113
Email:  djoyce@whitecase.com

**The First Priority Borrower**

General Maritime Subsidiary Corporation
299 Park Avenue
New York, New York 10171
Attention:  John C. Georgiopoulos
Telecopy:  (212) 763-5608

**with a copy to:**

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention:  Kenneth Chin
Telecopy:  (212) 715-8000

and

Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Attention: Samantha Good
Telephone: (415) 439-1914
Facsimile: (415) 439-1500

**The Second Priority Borrower**

General Maritime Subsidiary II Corporation
299 Park Avenue
New York, New York 10171
Attention:  John C. Georgiopoulos
Telecopy:  (212) 763-5608

**with a copy to:**

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention:  Kenneth Chin
Telecopy:  (212) 715-8000

and

Kirkland & Ellis LLP
555 California Street
San Francisco, CA 94104
Attention: Samantha Good
Telephone: (415) 439-1914
Facsimile: (415) 439-1500

**ANNEX III**


Table of Contents

Page

SECTION 1.   Definitions.................................................................................................................2
    1.1.   Defined Terms ...................................................................................................2
    1.2.   Terms Generally................................................................................................12

SECTION 2.   Lien Priorities...........................................................................................................13
    2.1.   Relative Priorities..............................................................................................13
    2.2.   Prohibition on Contesting Liens ........................................................................13
    2.3.   No New Liens ....................................................................................................14
    2.4.   Similar Liens and Agreements...........................................................................14

SECTION 3.   Enforcement.............................................................................................................15
    3.1.   Exercise of Remedies........................................................................................15

SECTION 4.   Payments..................................................................................................................18
    4.1.   Application of Proceeds of Collateral.................................................................18
    4.2.   Application of Proceeds of Pari Passu Collateral Accounts ................................19
    4.3.   Payments Over in Violation of Agreement.........................................................19

SECTION 5.   Other Agreements. ...................................................................................................20
    5.1.   Releases.............................................................................................................20
    5.2.   Insurance ..........................................................................................................21
    5.3.   Amendments to First Priority Loan Documents and Second Priority Loan
            Documents ........................................................................................................21
    5.4.   Legends .............................................................................................................23
    5.5.   Bailee for Perfection .........................................................................................23
    5.6.   When Discharge of First Priority Obligations Deemed to Not Have Occurred ....24
    5.7.   Purchase Right ..................................................................................................25

SECTION 6.   Insolvency or Liquidation Proceedings. ...................................................................26
    6.1.   Finance and Sale Issues ....................................................................................26
    6.2.   Relief from the Automatic Stay ........................................................................27
    6.3.   Adequate Protection..........................................................................................27
    6.4.   No Waiver.........................................................................................................28
    6.5.   Avoidance Issues ..............................................................................................28
    6.6.   Reorganization Securities ..................................................................................29
    6.7.   Post-Petition Interest.........................................................................................29
    6.8.   Waiver...............................................................................................................29
    6.9.   Separate Grants of Security and Separate Classification....................................29

SECTION 7.   Reliance; Waivers; Etc.............................................................................................30
    7.1.   Reliance............................................................................................................30
    7.2.   No Warranties or Liability .................................................................................30
    7.3.   No Waiver of Lien Priorities..............................................................................31
    7.4.   Obligations Unconditional .................................................................................31

i

SECTION 8.    Pari Passu Priority Collateral .................................................................32
    8.1.    Lien Priorities.........................................................................................32
    8.2.    Exercise of Remedies.............................................................................33
    8.3.    Applications of Proceeds .......................................................................34
    8.4.    Perfection ...............................................................................................34

SECTION 9.    Miscellaneous. ......................................................................................34
    9.1.    Conflicts.................................................................................................34
    9.2.    Effectiveness; Continuing Nature of this Agreement; Severability........34
    9.3.    Amendments; Waivers............................................................................35
    9.4.    Information Concerning Financial Condition of the Borrowers and their
           Subsidiaries ............................................................................................36
    9.5.    Subrogation ............................................................................................36
    9.6.    SUBMISSION TO JURISDICTION; WAIVERS ................................36
    9.7.    Notices ...................................................................................................38
    9.8.    Further Assurances.................................................................................38
    9.9.    **APPLICABLE LAW** ..........................................................................38
    9.10.    Binding on Successors and Assigns.......................................................38
    9.11.    Specific Performance .............................................................................38
    9.12.    Headings .................................................................................................38
    9.13.    Counterparts...........................................................................................38
    9.14.    Authorization .........................................................................................39
    9.15.    Provisions Solely to Define Relative Rights..........................................39
    9.16.    Grantors; Additional Grantors ..............................................................39

**EXHIBIT 17**

**Elected Treatment of Intercompany Claims and Subsidiary Equity Interests**

## Elected Treatment of Intercompany Claims and Subsidiary Equity Interests

On the Effective Date,[1] Intercompany Claims and Subsidiary Equity Interests will be reinstated.  Accordingly, Classes 8 and 9 are Unimpaired by the Plan and holders of Class 8 Intercompany Claims and Class 9 Subsidiary Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

---

[1] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the *Second Amended Joint Plan of Reorganization of the Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 400] (as may be amended from time to time, the "**Plan**").